IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

---

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
vs.                                  )    CRIM. NO. 2013-22
                                     )
RAYMOND BROWN, WALTER HILL,          )
                                     )
                    Defendants.      )
_____)


REPORTER'S TRANSCRIPT

<u>MOTIONS HEARING</u>
(Omnibus/Suppression)

February 28, 2014

---

BEFORE:      THE HONORABLE CURTIS V. GOMEZ
             Chief Judge

APPEARANCES: OFFICE OF THE UNITED STATES ATTORNEY
             BY:  KELLY LAKE, AUSA
                  KIM LINDQUIST, AUSA

                  For the Government

             ARTURO WATLINGTON, ESQ.

                  For Defendant Brown

             JOSEPH MINGOLLA, ESQ.

                  For Defendant Hill

             ---

COURT REPORTER:   CHANDRA R. KEAN, RMR
                  Official Court Reporter
                  Virgin Islands District Court
                  St. Thomas, Virgin Islands

1                                INDEX

2


3     COURT QUESTIONS OF DEFENDANT                        5

4     WITNESS (Government)     DIRECT  CROSS  REDIRECT  RECROSS

5     Shawn Querrard           9, 36  21, 42   ---       ---

6     Rafael A. Fernandez       54     57      ---       ---

7     ARGUMENT BY THE GOVERNMENT                          62

8     ARGUMENT BY THE DEFENDANT                           65

9     RULING BY THE COURT                                 69

10
           (Court recessed)
11

12                         ---

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

(Court called to order at 10:00 a.m.)

THE CLERK:  United States of America versus Raymond Brown.  United States of America versus Walter Hill.

MS. LAKE:  Good morning, Your Honor.  Kelly Lake and Kim Lindquist for the government.

THE COURT:  Okay.  Good morning again.

MR. WATLINGTON:  Good morning, Your Honor. Arturo Watlington for Raymond Brown.

THE COURT:  Okay.  Good morning, Attorney Watlington.

MR. MINGOLLA:  Good morning, Judge.  Joe Mingolla here on behalf of Mr. Walter Hill, who is present in court and to my right.

THE COURT:  Good morning, Attorney Mingolla.

We're here for a suppression hearing.

Attorney Watlington, I saw a filing, I think yesterday, that you were withdrawing your petition for suppression.  Is that correct?

MR. WATLINGTON:  Yes, Your Honor.  We did file it after the close of business.

We had informed the U.S. attorney that we were satisfied with the information that was shared with us

10:01:20   1    during the conference that we had last week.  I

10:01:24   2    discussed this matter with my client on yesterday and

10:01:26   3    on -- I'm sorry, on Tuesday and Wednesday -- yesterday,

10:01:34   4    and he has no objection thereto.  All of that is

10:01:39   5    encompassed -- embodied in my motion and, thus, I

10:01:43   6    believe we don't have an issue before this Court to

10:01:45   7    participate in the suppression hearing today.

10:01:47   8            THE COURT:  And you want to be excused from

10:01:49   9    this hearing?

10:01:50  10            MR. WATLINGTON:  Yes, Your Honor.  That's what

10:01:52  11    we requested in our motion.

10:01:54  12        We know that was late, so we did come this morning

10:01:57  13    to make sure that, in fact, the Court does not feel that

10:01:59  14    we were in any way being disrespectful in terms of not

10:02:02  15    being here.  I, in fact, had talked to my client, and

10:02:05  16    that's why he's not here, and explained to him that

10:02:07  17    after we discussed the motion, and I would have filed

10:02:09  18    it.  And he called me this morning and asked me, should

10:02:12  19    he come.

10:02:13  20        I told him, well, I don't believe that the Court

10:02:15  21    will compel us to be -- to partake in the hearing once,

10:02:19  22    in fact, the Court is aware of our motion, and that it

10:02:22  23    was not necessary for him to leave his house.

10:02:24  24            THE COURT:  All right.  Good.  The motion is

10:02:26  25    granted.  So thank you for your consideration, and

| | | |
|---|---|---|
| 10:02:29 | 1 | you're excused. |
| 10:02:30 | 2 | MR. WATLINGTON:  Thank you, Your Honor. |
| 10:02:31 | 3 | THE COURT:  Thank you. |
| 10:02:31 | 4 | COURT QUESTIONS OF THE DEFENDANT |
| 10:02:35 | 5 | THE COURT:  All right.  Mr. Mingolla, that |
| 10:02:37 | 6 | leaves one issue with you, is that correct? |
| 10:02:41 | 7 | Why don't you tell us, what is the thing that you |
| 10:02:45 | 8 | seek to suppress? |
| 10:02:47 | 9 | MR. MINGOLLA:  May I take the -- |
| 10:02:49 | 10 | THE COURT:  Yes. |
| 10:02:59 | 11 | MR. MINGOLLA:  Your Honor, what I wish to |
| 10:03:02 | 12 | suppress is the conversation, the bugging, if you will, |
| 10:03:12 | 13 | as opposed to a phone tap of a conversation which took |
| 10:03:16 | 14 | place between Mr. Angelo Hill and my client, Mr. Walter |
| 10:03:19 | 15 | Hill, in the private parking lot of an automobile rental |
| 10:03:28 | 16 | agency, in an area where customers and private |
| 10:03:34 | 17 | individuals generally aren't allowed; hence it's private |
| 10:03:44 | 18 | property. |
| 10:03:44 | 19 | Your Honor -- |
| 10:03:46 | 20 | THE COURT:  All right.  So it's a conversation |
| 10:03:47 | 21 | that took place in a parking lot between your client |
| 10:03:50 | 22 | and, who is the other person? |
| 10:03:54 | 23 | MR. MINGOLLA:  A chap by the name of Angelo |
| 10:03:56 | 24 | Hill, his cousin. |
| 10:03:57 | 25 | THE COURT:  All right.  Angelo Hill and |

| | | |
|---|---|---|
| 10:03:58 | 1 | Mr. Walter Hill. |
| 10:03:59 | 2 | And the date? |
| 10:04:01 | 3 | MR. MINGOLLA:  October 20th, sir. |
| 10:04:02 | 4 | THE COURT:  October 20th of what year? |
| 10:04:06 | 5 | MR. MINGOLLA:  '13, 2013. |
| 10:04:09 | 6 | THE COURT:  So a conversation that took place |
| 10:04:10 | 7 | on October 20th, 2013? |
| 10:04:16 | 8 | MR. MINGOLLA:  Yes, sir. |
| 10:04:17 | 9 | THE COURT:  All right. |
| 10:04:18 | 10 | MR. MINGOLLA:  May I continue? |
| 10:04:19 | 11 | THE COURT:  Is there -- yes.  Tell me what |
| 10:04:22 | 12 | else -- what other things you wish to suppress.  Is that |
| 10:04:26 | 13 | it? |
| 10:04:27 | 14 | MR. MINGOLLA:  That's, that's it.  I mean, I'm |
| 10:04:29 | 15 | not done.  I mean, I am done -- I haven't even commenced |
| 10:04:33 | 16 | my argument, but that is what I wish to suppress. |
| 10:04:38 | 17 | THE COURT:  I don't want argument now, just a |
| 10:04:41 | 18 | list of the things.  That's it? |
| 10:04:43 | 19 | MR. MINGOLLA:  And I also have, like a broken |
| 10:04:46 | 20 | record, we have been having tremendous difficulties with |
| 10:04:50 | 21 | ECF, so I assume and hope that Your Honor received a |
| 10:04:53 | 22 | motion in limine that we filed on the same day with this |
| 10:04:57 | 23 | chap who's been doing our ECF work, because Meyers, |
| 10:05:03 | 24 | Ms. Meyers quit, and she was the only one that had a |
| 10:05:06 | 25 | clue as to how to use it. |

10:05:07  1          In any event, we filed a motion in limine regarding

10:05:10  2     a previous, a previous conviction --

10:05:14  3          THE COURT:  All right.  We'll deal with that

10:05:17  4     later.

10:05:19  5          MR. MINGOLLA:  -- that was 20-some-odd years

10:05:22  6     ago.

10:05:22  7          THE COURT:  And tell me, the October 20th,

10:05:25  8     2013, conversation.  Tell me what the constitutional

10:05:28  9     infirmity is.

10:05:30  10         MR. MINGOLLA:  I'm pretty -- I find rather

10:05:32  11    egregious violations of both the 4th, 6th and 14th

10:05:35  12    Amendments.

10:05:35  13         I find a blatant disregard in point of fact.

10:05:41  14         I unfortunately for me, excuse me, was handed the

10:05:54  15    case approximately four and a half months after everyone

10:06:00  16    else did, so if I'm repetitious or if I mentioned

10:06:03  17    arguments which others have argued, which there are so

10:06:06  18    many other issues which might be a trifle repetitive,

10:06:13  19    but I think they are variations on a theme that

10:06:16  20    certainly differentiate my client's --

10:06:18  21         THE COURT:  Well, I'm not -- right now I just

10:06:20  22    wanted to know if you were going -- I know you're

10:06:24  23    arguing -- your petition is that there is some 4th

10:06:27  24    Amendment violation.

10:06:27  25         I didn't know if there was any more flesh you want

| 10:06:31 | 1 | to put on it, if not right now, then I'll listen to you |
| 10:06:35 | 2 | later with your argument. |
| 10:06:37 | 3 | MR. MINGOLLA:  I'm as fleshy as a wooly |
| 10:06:42 | 4 | mammoth, sir.  I don't have any more flesh to proceed. |
| 10:06:47 | 5 | We're looking at a minimum of 15, 20 minutes maybe. |
| 10:06:50 | 6 | THE COURT:  All right. |
| 10:06:51 | 7 | Attorney Lake, are you ready to proceed? |
| 10:06:52 | 8 | MS. LAKE:  Yes, Your Honor. |
| 10:06:53 | 9 | THE COURT:  All right.  Go right ahead. |
| 10:06:56 | 10 | MS. LAKE:  We're going to proceed by way of |
| 10:06:58 | 11 | argument, Your Honor.  We have no witnesses to present |
| 10:07:00 | 12 | at this time. |
| 10:07:07 | 13 | MR. MINGOLLA:  I'm sorry, I didn't hear the |
| 10:07:08 | 14 | question. |
| 10:07:09 | 15 | THE COURT:  Do you have any witnesses? |
| 10:07:10 | 16 | MS. LAKE:  The government has no witnesses, |
| 10:07:11 | 17 | Your Honor.  We're prepared to argue the defendant's |
| 10:07:13 | 18 | motion. |
| 10:07:16 | 19 | THE COURT:  All right.  Well, there's no |
| 10:07:20 | 20 | evidence before me now on the manner in which the |
| 10:07:22 | 21 | conversation was received. |
| 10:07:32 | 22 | MS. LAKE:  Your Honor, the government filed a |
| 10:07:34 | 23 | motion in opposition, and in that motion in opposition |
| 10:07:37 | 24 | represented that the conversations between Angelo Hill |
| 10:07:39 | 25 | and Walter Hill was a consensually recorded |

| 10:07:46 | 1 | conversation. |
| 10:07:46 | 2 | THE COURT:  That's a motion.  That's not |
| 10:07:50 | 3 | evidence. |
| 10:07:50 | 4 | Do you have any evidence to put before the Court? |
| 10:07:53 | 5 | MS. LAKE:  If I can have a moment, Your Honor? |
| 10:07:54 | 6 | THE COURT:  Yes. |
| 10:08:05 | 7 | MS. LAKE:  We call Shawn Querrard, Your Honor. |
| 10:08:08 | 8 | THE COURT:  All right. |
| 10:08:32 | 9 | (Witness sworn) |
| 10:08:36 | 10 | THE WITNESS:  I do. |
| 10:08:36 | 11 | THEREUPON, SHAWN QUERRARD, having been duly |
| 10:08:40 | 12 | sworn, was examined and testified as follows: |
| 10:08:40 | 13 | DIRECT EXAMINATION |
| 10:08:40 | 14 | BY MS. LAKE: |
| 10:08:40 | 15 | Q.   Good morning. |
| 10:08:41 | 16 | A.   Good morning. |
| 10:08:41 | 17 | Q.   Please state your name for the record. |
| 10:08:43 | 18 | A.   Shawn Querrard. |
| 10:08:44 | 19 | Q.   And could you please spell your last name? |
| 10:08:47 | 20 | A.   Querrard, Q-u-e-r-r-a-r-d. |
| 10:08:50 | 21 | Q.   Agent Querrard, who do you work for? |
| 10:08:54 | 22 | A.   I'm a deputized federal task force agent assigned |
| 10:08:56 | 23 | to the Drug Enforcement Administration, High Intensity |
| 10:09:01 | 24 | Drug Trafficking Task Force. |
| 10:09:01 | 25 | Q.   And how long have you worked in that capacity? |

| 10:09:03 | 1 | A.   I've worked in that capacity for nine years.  I've |
|---|---|---|

10:09:03   1   A.   I've worked in that capacity for nine years.  I've

10:09:07   2   been a police officer for 17 years.

10:09:09   3   Q.   And are you familiar with the investigation as it

10:09:12   4   relates to the Tapia investigation?

10:09:14   5   A.   Yes, I am.

10:09:15   6   Q.   And are you specifically familiar with the

10:09:18   7   investigation as it relates to Walter Hill?

10:09:21   8   A.   Yes, I am.

10:09:22   9   Q.   Are you familiar with the investigation as it

10:09:24   10   relates to Angelo Hill?

10:09:25   11   A.   Yes, I am.

10:09:27   12   Q.   And are you aware whether or not at some point in

10:09:30   13   time Angelo Hill made contact with the U.S. Attorney's

10:09:34   14   Office?

10:09:34   15   A.   Yes.

10:09:35   16   Q.   And during that contact with the U.S. Attorney's

10:09:38   17   Office, are you aware whether or not Angelo Hill

10:09:41   18   consented to recorded conversations with codefendants?

10:09:45   19   A.   Yes, he did.

10:09:46   20   Q.   And was that approximately --

10:09:53   21        THE COURT:  You're asking an awful lot of

10:09:55   22   leading questions.

10:09:56   23        All the witness is saying is yes, yes, yes.

10:09:58   24        I think the witness needs to testify.

10:10:02   25        MS. LAKE:  I will, Your Honor.  I would just

10:10:04   1   ask the Court for some leeway to lay the foundation.

10:10:07   2              THE COURT:  That's why I've given you some.

10:10:09   3   But I think it's time to have the witness testify.

10:10:12   4              MS. LAKE:  Just one last foundational question.

10:10:15   5   BY MS. LAKE:

10:10:15   6   Q.   Was that approximately September 2013 that Angelo

10:10:20   7   Hill gave consent to record conversations with Angelo

10:10:23   8   Hill [sic]?

10:10:23   9   A.   Yes, I believe so.

10:10:24   10  Q.   Please describe the circumstances that occurred

10:10:26   11  when Angelo Hill had contact with Walter Hill.

10:10:30   12  A.    On that time frame, after agreeing with the Drug

10:10:35   13  Enforcement Administration to assist us in this

10:10:37   14  investigation, an audio/video recording device was

10:10:43   15  placed on Mr. Angelo Hill.  And he proceeded to set up

10:10:47   16  to meet with Mr. Walter Hill on the Island of St. John

10:10:52   17  in the area of a rental, vehicle rental company that was

10:10:57   18  owned by Angelo Hill's family.

10:11:00   19  Q.   And directing your attention specifically to the

10:11:02   20  date of October 20, 2013, was a conversation made -- had

10:11:08   21  between Angelo Hill and Walter Hill?

10:11:10   22  A.   Yes, there was a consensual recorded conversation

10:11:15   23  that was conducted.

10:11:15   24  Q.   And during the course of the conversation, briefly

10:11:18   25  and in general, what, if anything, was said by the

10:11:22  1   defendant Walter Hill?

10:11:23  2   A.   Basically, the conversation between the two

10:11:29  3   individuals was regarding the May 17th seizure and

10:11:35  4   arrest of -- a seizure of seven kilograms of cocaine and

10:11:39  5   the arrest of Roberto Tapia.

10:11:42  6         MR. MINGOLLA:   I would object to this, Your

10:11:43  7   Honor, as speculative.

10:11:44  8         THE COURT:   Okay.  Overruled.

10:11:47  9   BY MS. LAKE:

10:11:47  10  Q.   And what else was the content of the conversation?

10:11:50  11  A.   Basically, the conversation, Mr. Walter Hill

10:11:55  12  explained his involvement in that particular transaction

10:11:57  13  that occurred before the arrest of Mr. Roberto Tapia.

10:12:01  14  Q.   And if you can provide, in general, just a bit more

10:12:05  15  detail.  Specifically, what did Walter Hill say

10:12:08  16  regarding his involvement in that narcotics transaction?

10:12:11  17  A.   Roberto -- Mr. Walter Hill and Angelo Hill

10:12:15  18  basically discussed Mr. Roberto Tapia's arrival to St.

10:12:20  19  John, how he was picked up by Angelo Hill, and basically

10:12:26  20  dropped off to meet with Mr. Walter Hill.  During that

10:12:29  21  meet, Mr. Walter Hill provided him seven kilograms of

10:12:33  22  cocaine.

10:12:33  23      He discussed that, persons who were in the area,

10:12:39  24  where that they met.  And other discussions were where

10:12:41  25  Mr. Walter Hill was concerned about him handling of the

10:12:46  1    seven kilograms of cocaine.

10:12:48  2    Q.   And at the conclusion of the conversation between

10:12:51  3    Angelo Hill and Walter Hill, what did Angelo Hill do in

10:12:55  4    terms of his contact with law enforcement?

10:12:58  5    A.   Basically -- could you repeat question, please?

10:13:02  6    Q.   Did Angelo Hill report his conversation that --

10:13:06  7    with Walter Hill to law enforcement?

10:13:08  8    A.   Yes.   Immediately after the conversation he

10:13:11  9    returned to meet with myself and another agent, where

10:13:15  10   the audio/video device was removed and taken from Angelo

10:13:20  11   Hill.   And then basically we did debriefing on him as to

10:13:24  12   the conversations that he had with Mr. Angelo Hill --

10:13:26  13   Mr. Walter Hill.

10:13:28  14   Q.   And then did Angelo Hill consent to record a second

10:13:32  15   conversation with Walter Hill?

10:13:33  16   A.   Yes, he did.

10:13:34  17   Q.   And that conversation did not occur, was not

10:13:37  18   recorded, correct?

10:13:38  19   A.   Correct.   There were some technical issues that had

10:13:41  20   occurred within the time frame between him actually

10:13:46  21   receiving the recording device and when Mr. Angelo --

10:13:49  22   Mr. Walter Hill was able to arrive.   It was too long a

10:13:53  23   period, and the battery basically had went dead.

10:13:55  24   Q.   And before that, obviously, you testified that

10:13:57  25   Angelo Hill gave consent for that recording; is that

10:14:01   1   correct?

10:14:01   2   A.   That is correct.

10:14:03   3        MS. LAKE:  I have no further questions, Your

10:14:05   4   Honor.

10:14:05   5        THE COURT:  All right.

10:14:06   6   Agent Querrard, did you observe or surveil any of

10:14:12   7   the individuals who took part in the conversation?

10:14:18   8        THE WITNESS:  I, myself, was not part of the

10:14:20   9   surveillance team, but we did have a surveillance team.

10:14:24  10   We did have other agents who observed Mr. Walter Hill

10:14:27  11   arrive at the location and meet with Angelo Hill that

10:14:29  12   day.

10:14:30  13        THE COURT:  Is there anyone who observed

10:14:31  14   whether Mr. Walter Hill was, and Mr. Angelo Hill were

10:14:35  15   alone, or whether there were others present?

10:14:37  16        THE WITNESS:  They were alone.

10:14:39  17        THE COURT:  My question is, were there any

10:14:41  18   people who observed, so that they could testify based on

10:14:44  19   firsthand knowledge, based on their observation, that

10:14:48  20   it -- whether Mr. Walter Hill and Angelo Hill were alone

10:14:52  21   in their conversation?

10:14:53  22        THE WITNESS:  He --

10:14:55  23        THE COURT:  My question is a yes or no

10:14:57  24   question.

10:15:00  25        THE WITNESS:  Yes.

10:15:02  1          THE COURT:  Okay.  Who would that be?

10:15:04  2          THE WITNESS:  The agents who were there.  I

10:15:07  3   believe Mr. Mike Grossman, possibly.  There were several

10:15:09  4   agents who were there.  I can't say specifically who all

10:15:12  5   were present.

10:15:13  6          THE COURT:  I don't need to know who all.  It's

10:15:18  7   just, was anyone there to observe to express any --

10:15:22  8   their observations as to the demeanor and the

10:15:25  9   circumstances of the conversation?

10:15:27  10         THE WITNESS:  I personally reviewed audio and

10:15:32  11  video recordings, so I can testify to what I observed.

10:15:36  12         THE COURT:  All right.  So there was a video

10:15:38  13  recording?

10:15:38  14         THE WITNESS:  Correct.

10:15:39  15         THE COURT:  All right.

10:15:40  16         MS. LAKE:  If I can clarify, Your Honor.

10:15:43  17  BY MS. LAKE:

10:15:44  18  Q.   Agent Querrard, what type of recording device was

10:15:46  19  placed on Angelo Hill?  Was it simply audio?  Was it

10:15:50  20  audio and video?

10:15:51  21  A.   It was an audio and video recording device.

10:15:54  22  Q.   And --

10:15:56  23         THE COURT:  Let me remind the parties.  The

10:15:58  24  question here would -- seems whether this is a

10:16:01  25  consensual recording or not, and that seems to implicate

10:16:05  1    several things:  Is it consensual?  What's the demeanor?

10:16:08  2    Who was there?  Was there a gun to someone's head?

10:16:11  3         I haven't heard anything like that.

10:16:12  4         I don't know if this witness is going to do it or

10:16:14  5    some other witness is going to talk about the

10:16:16  6    circumstances.

10:16:17  7         But it seems to me if we want to zero in on the

10:16:19  8    circumstances, whether the Court can assess indeed

10:16:21  9    whether things were consensual, that's where we need to

10:16:24  10   go.

10:16:25  11        So if this witness has the information, fine.  If

10:16:27  12   someone else does, then we'll get to that in due course,

10:16:31  13   I suspect.

10:16:32  14   BY MS. LAKE:

10:16:33  15   Q.   Based on your review of -- strike that.

10:16:35  16        Were you present for the -- were you able to

10:16:38  17   observe the conversation between Walter Hill and Angelo

10:16:41  18   Hill?

10:16:41  19   A.   Yes.

10:16:42  20   Q.   And based on your observation of the conversation

10:16:44  21   between them, did -- was there anything that would lead

10:16:48  22   you to believe that --

10:16:49  23        THE COURT:  No, ask him what he saw.  Don't --

10:16:53  24   stop leading the witness.

10:16:53  25        MS. LAKE:  I will, Your Honor.

10:16:54  1    BY MS. LAKE:

10:16:54  2    Q.   What did you see?

10:16:56  3    A.   It was a clearly consensual meeting, in speaking

10:17:00  4    with Angelo Hill --

10:17:02  5              THE COURT:  Mr. Querrard --

10:17:04  6              MR. MINGOLLA:  Objection, Your Honor.  I would,

10:17:06  7    again, calls for speculative.

10:17:08  8              THE COURT:  All right.

10:17:08  9              THE WITNESS:  And what I observed --

10:17:09  10             THE COURT:  Just tell us what you observed.

10:17:11  11   Don't use any conclusory terms.  I'll decide if it's

10:17:16  12   consensual.  Just tell me what you saw.

10:17:18  13             THE WITNESS:  Angelo Hill proceeded to the

10:17:21  14   vehicle rental business on St. John.

10:17:22  15       Mr. Walter Hill arrived there on his own accord.

10:17:26  16   They -- Mr. Walter Hill met with Angelo Hill at the

10:17:30  17   rental business.  Mr. Walter -- Angelo Hill exited the

10:17:35  18   rental business.  Walked over to a vehicle, where Walter

10:17:38  19   Hill also walked over to a vehicle.

10:17:41  20       They greeted.  They began conversation about their

10:17:44  21   family and then the conversation continued.

10:17:47  22       It was clearly consensual.

10:17:48  23       It was in an open parking area.  It was over the

10:17:52  24   hood of a vehicle, and they basically sat and spoke

10:17:55  25   with -- there was no one around, no additional persons

10:17:59  1    around.

10:17:59  2         Mr. Angelo Hill and Walter Hill, at the time, there

10:18:03  3    was no, it was consensual from all that I observed.

10:18:06  4    BY MS. LAKE:

10:18:06  5    Q.   And at the conclusion of the conversation, did

10:18:09  6    Walter Hill leave?

10:18:11  7    A.   Yes.  Walter left on his own accord, also.

10:18:15  8    Q.   And Walter -- did Angelo Hill leave?

10:18:17  9    A.   Yes.  Angelo Hill also had left shortly afterwards.

10:18:21  10   Q.   So at no point in time was anyone not free to

10:18:25  11   leave; is that correct?

10:18:25  12   A.   That's correct.

10:18:26  13   Q.   And during -- based on your observation, did you

10:18:28  14   see anything that would lead you to believe that there

10:18:33  15   was tension between the two, based on your observation?

10:18:35  16             MR. MINGOLLA:  Objection.

10:18:35  17             THE WITNESS:  Absolutely not.

10:18:36  18             THE COURT:  Sustained.

10:18:37  19             MR. MINGOLLA:  Leading.

10:18:38  20             THE COURT:  Again, let the witness testify.

10:18:39  21        You're just having him say yes, and I would like to

10:18:42  22   hear what the witness has to say as opposed to just

10:18:45  23   affirming what you're saying.

10:18:48  24   BY MS. LAKE:

10:18:48  25   Q.   Based on your observations, did you notice anything

10:18:51  1   else?

10:18:52  2   A.   Like I said, Walter Hill arrived at the location

10:19:00  3   and met with Angelo Hill by himself, free.  He arrived

10:19:05  4   on his own.  They met, they walked outside.  They spoke

10:19:09  5   freely.  They laughed.  They spoke about family

10:19:11  6   conversations, and to include what occurred on May 17th.

10:19:15  7        There was at no time any sign of any confrontation

10:19:23  8   or anything of that nature.  They spoke about meeting

10:19:28  9   again.  Walter Hill stated that he would do certain

10:19:31  10  things and then get back to Angelo.  There were no signs

10:19:35  11  of confrontation.  Everything appeared to be just normal

10:19:38  12  friends talking.

10:19:39  13  Q.   And the entire conversation was audio and video

10:19:43  14  recordings; is that correct?

10:19:45  15  A.   That is correct.

10:19:46  16  Q.   So everything you're testifying to is documented,

10:19:49  17  correct?

10:19:50  18  A.   That is correct.

10:19:52  19  Q.   Thank you.

10:19:52  20       MS. LAKE:  I have nothing further.

10:19:54  21       THE COURT:  Attorney Mingolla?

10:19:55  22       MR. MINGOLLA:  Yes, sir.

10:20:03  23       THE COURT:  Was the government going to

10:20:05  24  introduce this video?

10:20:08  25       MS. LAKE:  If I may have a moment, Your Honor.

10:20:13  1          THE COURT:  If you would yield the lectern for

10:20:15  2     a moment, Attorney Mingolla.

10:20:17  3          Go ahead.

10:20:18  4          MS. LAKE:  Based on the government's -- the

10:20:20  5     issue of consent is a Starks foundational issue, and

10:20:23  6     based on an earlier hearing the Court said the Court

10:20:26  7     would rather deal with Starks during the course of the

10:20:29  8     jury trial.

10:20:30  9          So based on that investigation, we don't have the

10:20:33  10    video because it's a Starks foundational element.

10:20:36  11         We can easily get that video and present it and

10:20:39  12    play it for the Court.  But consent in terms of

10:20:42  13    admissibility of the videotape is a Starks foundational

10:20:44  14    element.

10:20:44  15         We're more than prepared to proceed in that regard,

10:20:46  16    if I can just have five minutes to get the videotape.

10:20:50  17    But it is a Starks foundational issue.

10:20:51  18         THE COURT:  All right.  Well, arguably it goes

10:20:54  19    beyond that if it's a consent issue.  But we'll cover

10:20:57  20    that later.

10:20:57  21         If you have that, I think that would be useful.

10:20:59  22         Attorney Mingolla, go ahead.

10:21:03  23         MR. MINGOLLA:  Thank you, Judge.

10:21:03  24

10:21:09  25

|          |    |                                                    |
|----------|----|----------------------------------------------------|
| 10:21:09 | 1  | CROSS-EXAMINATION                                  |
| 10:21:10 | 2  | BY MR. MINGOLLA:                                   |
| 10:21:10 | 3  | Q.   Good morning, Agent Querrard.                 |
| 10:21:12 | 4  | A.   Good morning.                                 |
| 10:21:12 | 5  | Q.   Agent Querrard, you've left me a little perplexed |
| 10:21:18 | 6  | about a few things that I would get some clarification |
| 10:21:21 | 7  | on.  Given that you are under oath and telling the truth |
| 10:21:29 | 8  | and that you were present that day, approximately how |
| 10:21:34 | 9  | far away were you from this alleged conversation?  I |
| 10:21:37 | 10 | mean the two Misters Hill -- Messrs. Hill?         |
| 10:21:42 | 11 | A.   I met with Angelo Hill before --              |
| 10:21:43 | 12 | Q.   I didn't ask that question.  I asked how far away |
| 10:21:47 | 13 | were you during the course of this alleged conversation? |
| 10:21:49 | 14 | A.   I did not physically observe it as it occurred. |
| 10:21:52 | 15 | Q.   Thank you.                                    |
| 10:21:52 | 16 | A.   I reviewed the video.                         |
| 10:21:53 | 17 | Q.   Very well.                                    |
| 10:21:54 | 18 | You also mentioned something to the effect -- not  |
| 10:21:57 | 19 | something, that's colloquial.                      |
| 10:21:59 | 20 | You also mentioned definitely twice, and Attorney  |
| 10:22:04 | 21 | Lake further mentioned that this recorder, is the word |
| 10:22:09 | 22 | that was used, was put on Angelo's body.  Do you recall |
| 10:22:14 | 23 | testifying to that a few minutes ago?              |
| 10:22:18 | 24 | A.   There was --                                  |
| 10:22:20 | 25 | Q.   You said it twice?                            |

10:22:21   1    A.   Yeah.

10:22:21   2    Q.   You said it twice.

10:22:23   3         Do you recall Attorney Lake saying it?

10:22:27   4    A.   That it was placed on his body?  I don't know if

10:22:29   5    that was specifically said.

10:22:31   6    Q.   All right.  Now, why don't you be specific and tell

10:22:35   7    me precisely where on Mr. Hill, that's Angelo Hill,

10:22:40   8    where on Mr. Hill's body was the recorder?

10:22:45   9         Was it not placed in a cup or a can or some kind --

10:22:51   10   a soda can or cup?

10:22:53   11        I've just never been clarified by the government.

10:22:57   12        MS. LAKE:  Objection.  Relevance.  It exceeds

10:22:59   13   the issue of consent.

10:23:01   14        MR. MINGOLLA:  It goes to the issue --

10:23:02   15        THE COURT:  Stop, stop.  I'm going to allow you

10:23:04   16   a little leeway, but let's try to keep this focused.

10:23:06   17        Go ahead.  Overruled.

10:23:08   18        THE WITNESS:  I don't believe I recall

10:23:09   19   specifically that it was placed on Angelo Hill's body.

10:23:12   20   BY MR. MINGOLLA:

10:23:12   21   Q.   No, it wasn't.  Okay.  So it was placed where?

10:23:20   22        Where was the audio/video device placed?

10:23:24   23   A.   It was given -- it was given to Angelo Hill to be

10:23:29   24   utilized.  I'm not sure if I need to be specific as to

10:23:32   25   the tools and the manners in which we do investigation.

10:23:34   1    Q.   I think you do.  I think you do.  Where was it

10:23:37   2    placed?

10:23:44   3         It shouldn't be that hard for you to remember.  You

10:23:47   4    said you're an agent for --

10:23:49   5              THE COURT:  All right.  Stop.

10:23:50   6              MS. LAKE:  Objection, Your Honor.

10:23:51   7              THE COURT:  Sustained.  Let the witness answer

10:23:53   8    the question.

10:23:54   9              THE WITNESS:  There were two items that was

10:23:57  10    used.  One was placed in, on his arm and the other one

10:24:01  11    was placed in a cup.

10:24:04  12    BY MR. MINGOLLA:

10:24:04  13    Q.   I see.  And now you earlier, you stated that there

10:24:08  14    were two recordings made.  Because if I understand --

10:24:14  15    strike that.  If I heard you correctly, one of them ran

10:24:17  16    out of batteries or something, so you had to use another

10:24:24  17    one; is that correct?

10:24:24  18    A.   That's two different dates.

10:24:28  19    Q.   Is what?

10:24:29  20    A.   Two different dates.

10:24:30  21    Q.   So on the date they were discussing at the Hill

10:24:33  22    parking lot, it's a -- it's the second recording, I

10:24:38  23    would suppose, correct?  Since the first one ran out of

10:24:45  24    batteries?

10:24:45  25    A.   I'm confused with your question.

10:24:47  1          MS. LAKE:  Objection.  Misstates the evidence,

10:24:49  2     Your Honor.

10:24:49  3          THE COURT:  All right.  Let the witness -- I

10:24:50  4     mean, if he's able to answer it or if he needs

10:24:53  5     clarification, the witness can say that.

10:24:55  6          THE WITNESS:  Please, could you repeat the

10:24:56  7     question, please?

10:24:59  8     BY MR. MINGOLLA:

10:24:59  9     Q.   On the day that -- you say this took place on two

10:25:02  10    different days, which I'm unaware.  But be that as it

10:25:07  11    may, I assume, correct me if I'm wrong, that the

10:25:12  12    conversation that was recorded was recorded in a second,

10:25:19  13    in the second conversation, because the first time the

10:25:22  14    batteries ran out?

10:25:25  15    A.   No.  To clarify, on the date in which you're

10:25:27  16    speaking of and the particular piece of evidence that

10:25:30  17    you're speaking of, it was recorded in its entirety.

10:25:33  18         There was a second meeting between Mr. Walter Hill

10:25:35  19    and Angelo Hill that was not recorded because of the

10:25:39  20    fact that the recording equipment, the battery had died

10:25:43  21    before they had an opportunity to meet.

10:25:53  22    Q.   And how would you know that?

10:25:54  23    A.   I -- because I'm part of the investigation, and I'm

10:25:58  24    aware of that.

10:25:59  25    Q.   To be more specific, how was anyone aware of that,

10:26:05  1   government agent aware of that?

10:26:06  2   A.   Task Force Officer Mark Joseph was the one handling

10:26:10  3   the equipment, and he advised me --

10:26:11  4           THE COURT:  Are you asking the witness how are

10:26:13  5   they aware if the battery is dead?

10:26:16  6           MR. MINGOLLA:  No, most certainly not.

10:26:19  7           THE COURT:  What's the "that"?

10:26:20  8           MR. MINGOLLA:  I -- Agent Querrard is saying

10:26:22  9   there were two conversations.  That one conversation --

10:26:26  10  if I understand --

10:26:26  11          THE COURT:  I just want to know what the "that"

10:26:28  12  is that you're referring to.

10:26:29  13          MR. MINGOLLA:  The "that" is, there's a second

10:26:31  14  conversation that was not recorded, that he alleges.

10:26:36  15  And I'm wanting to know who saw that conversation and

10:26:41  16  or, well, apparently it was -- he pointed out -- I keep

10:26:45  17  saying "he."  Forgive me.

10:26:47  18     Agent Querrard pointed out there was no recording

10:26:50  19  or no recording of that conversation.  So I'm curious as

10:26:55  20  to how they were aware -- the government is aware there

10:26:59  21  was even a conversation in the first place.  Who was

10:27:01  22  present at this conversation, if they can say a

10:27:05  23  conversation took place.

10:27:06  24          THE COURT:  All right.  Go ahead.  Answer the

10:27:08  25  question.

10:27:09   1              THE WITNESS:  The second conversation was,

10:27:12   2    again, under the direction of DEA with Mr. Angelo Hill

10:27:16   3    to meet with Walter Hill.  This is a separate date.

10:27:19   4    This is after the date that we're discussing.

10:27:22   5              MR. MINGOLLA:  This is nonresponsive.

10:27:22   6    BY MR. MINGOLLA:

10:27:25   7    Q.   I asked you who can vouch for that meeting taking

10:27:28   8    place?  Who saw it or heard it?

10:27:31   9    A.   Task Force Officer Mark Joseph.

10:27:36  10    Q.   I see.  And is -- I won't ask that.

10:27:39  11         Now, did you go to either --

10:27:57  12              MR. MINGOLLA:  Forgive me if I don't know your

10:27:59  13    official function.  Is it acting --

10:28:06  14              MS. LAKE:  Just ask the question.

10:28:08  15              THE COURT:  Attorney Mingolla, you're

10:28:10  16    addressing the witness.  Please.

10:28:11  17              MR. MINGOLLA:  I want to know the direct title

10:28:14  18    for Mr. Lindquist.

10:28:16  19              THE COURT:  All right.

10:28:16  20    BY MR. MINGOLLA:

10:28:16  21    Q.   Did you go to Mr. Lindquist or did you go to Judge

10:28:19  22    Gomez to seek permission to put a tap, a bug on, a

10:28:31  23    bugging device on a cup or any kind of a can or

10:28:34  24    something?

10:28:34  25    A.   Yes.  This Court was made aware of that

10:28:37   1   Mr. Angelo Hill would be working with the DEA.

10:28:41   2   Q.   I didn't ask that question.

10:28:42   3      I asked the question:  Did you apprise the judge,

10:28:46   4   or did you apprise your boss -- I say your boss, I

10:28:50   5   assume he's your boss, Mr. Lindquist or Ms. Lake,

10:28:55   6   anyone, but probably one of those two, did you ask for a

10:29:00   7   warrant or permission of any kind to conduct that

10:29:04   8   bugging?

10:29:05   9   A.   Yes.

10:29:06   10   Q.   I see.  And can you provide the affidavit that's

10:29:11   11   required by law to accompany said request?

10:29:15   12      THE COURT:  All right.  Let's make sure that

10:29:16   13   we're clear.

10:29:17   14      Are you talking about -- are you inquiring about a

10:29:23   15   conversation that was recorded using a device placed on

10:29:30   16   Mr. Angelo Hill?

10:29:33   17      MR. MINGOLLA:  I'm talking about a bug --

10:29:34   18      THE COURT:  My question is a yes or no.

10:29:35   19      Are you talking about that?

10:29:37   20      MR. MINGOLLA:  It wasn't on him.  It was -- it

10:29:39   21   may have been one on him.  It was a bug.  We were only

10:29:43   22   made aware there was a bug in the cup.

10:29:44   23      THE COURT:  My question is a yes or no one.

10:29:47   24      Are you talking about a recording made from a

10:29:49   25   device that was placed on Angelo Hill while in

10:29:51  1    conversation with Walter Hill?

10:29:53  2         Yes or no.

10:29:57  3         MR. MINGOLLA:  Sir, I cannot answer that.  It

10:29:59  4    was not placed upon Mr. Hill.  It was placed on an

10:30:02  5    object which was not on Mr. Hill.  It was in a cup.  And

10:30:05  6    the cup was not always in his possession.

10:30:08  7         THE COURT:  Right.  So are you talking about a

10:30:10  8    recording that was not made using the phone lines?

10:30:18  9         MR. MINGOLLA:  Yes, I am.

10:30:21  10        THE COURT:  Let's move along, then.  Next

10:30:23  11   question.

10:30:25  12        MR. MINGOLLA:  Very well.

10:30:25  13   BY MR. MINGOLLA:

10:30:29  14   Q.   Now let me ask this again.  And I'm trying -- I'm

10:30:31  15   sorry I'm having -- I'm redundant.  I don't recall if I

10:30:35  16   got an answer.

10:30:36  17        Did you supply an affidavit to an authority figure,

10:30:42  18   i.e., a judge or your bosses, to get authorization to

10:30:47  19   plant a bug?

10:30:48  20        MS. LAKE:  Objection.  Relevance.  Asked and

10:30:51  21   answered.

10:30:51  22        THE COURT:  All right.  Sustained.

10:30:56  23   BY MR. MINGOLLA:

10:30:57  24   Q.   Did you provide an affidavit on anything?

10:30:59  25        MS. LAKE:  Objection.  Relevance, Your Honor.

10:31:01   1           THE COURT:  You need to narrow your question.

10:31:04   2   Affidavit for what?

10:31:09   3           MR. MINGOLLA:  I thought I had.

10:31:09   4   BY MR. MINGOLLA:

10:31:09   5   Q.   Did you provide an affidavit that's required by law

10:31:15   6   to support any request for a recording device?

10:31:19   7           MS. LAKE:  Objection.  Misstates the law and

10:31:21   8   relevance.  Beyond --

10:31:22   9           THE COURT:  All right.  Rephrase your question.

10:31:24   10       Are you talking about wire, that is something like

10:31:28   11   phone line intercepts?

10:31:29   12           MR. MINGOLLA:  No, sir.

10:31:30   13           THE COURT:  Or are you -- all right.  Then move

10:31:34   14   on.  Next question.

10:31:36   15           MR. MINGOLLA:  I use the word, definition, I

10:31:37   16   use the old-fashioned term "bug," which doesn't involve,

10:31:41   17   usually, telecommunication.  It is a recording device

10:31:43   18   placed upon a button or a wall hanging or anything else

10:31:47   19   you can hide a place -- hide a thing, and it the records

10:31:50   20   a conversation allegedly.  However, in this case, it was

10:31:56   21   placed in a -- we believe, and I've been told -- it was

10:32:00   22   placed in a cup.

10:32:01   23           THE COURT:  All right.  Agent Querrard, whose

10:32:04   24   cup was it?

10:32:06   25           THE WITNESS:  This cup was property of the FBI.

| | | |
|---|---|---|
| 10:32:09 | 1 | THE COURT:  All right.  Next question. |
| 10:32:18 | 2 | BY MR. MINGOLLA: |
| 10:32:18 | 3 | Q.  Were you involved -- simple question.  Were you |
| 10:32:23 | 4 | involved in any way in the minimization -- alleged |
| 10:32:26 | 5 | minimization of the over, astonishingly, 18,000 |
| 10:32:33 | 6 | telephone calls? |
| 10:32:36 | 7 | MS. LAKE:  Objection, Your Honor.  Relevance. |
| 10:32:38 | 8 | THE COURT:  Attorney Mingolla, I tried to get a |
| 10:32:42 | 9 | sense of the subject of your suppression, and I thought |
| 10:32:51 | 10 | it was an October 2013 conversation.  Is that what it is |
| 10:32:57 | 11 | you seek to suppress? |
| 10:32:59 | 12 | MR. MINGOLLA:  Yes, sir. |
| 10:33:00 | 13 | THE COURT:  All right.  And the conversation |
| 10:33:03 | 14 | that you're talking about is not one that involves the |
| 10:33:05 | 15 | phone lines, correct? |
| 10:33:08 | 16 | MR. MINGOLLA:  Yes.  Correct. |
| 10:33:09 | 17 | THE COURT:  Okay.  All right.  So you were just |
| 10:33:15 | 18 | posing a question about minimization, which would be for |
| 10:33:20 | 19 | phone line, wire intercepts. |
| 10:33:22 | 20 | MR. MINGOLLA:  Let me refine.  You're -- you're |
| 10:33:25 | 21 | absolutely correct, Your Honor, obviously. |
| 10:33:27 | 22 | Let me, let me refine the question. |
| 10:33:29 | 23 | BY MR. MINGOLLA: |
| 10:33:30 | 24 | Q.  Were you involved with the minimization of said -- |
| 10:33:33 | 25 | alleged conversation between Messrs. Hill at the car |

10:33:38  1    lot?

10:33:38  2            MS. LAKE:  Objection, Your Honor.  Relevance.

10:33:41  3            THE COURT:  All right.  Sustained.

10:33:48  4            MR. MINGOLLA:  I would object to that.  I think

10:33:50  5    minimization is a very important element of this.  But

10:33:52  6    obviously I defer to your judgment.

10:34:02  7    BY MR. MINGOLLA:

10:34:02  8    Q.   Do you know -- and if you don't, that's fine.  Do

10:34:06  9    you know how the copies were made of these, of the

10:34:16  10   disks, specifically?  I'm not discussing all the disks.

10:34:21  11   I'm discussing the last three disks, which are the only

10:34:29  12   disks of more or less 50 that involve my client.

10:34:31  13        Were you involved at all in the reproduction, shall

10:34:34  14   we say, of those?

10:34:37  15   A.   No, I was not.

10:34:38  16   Q.   Who was?

10:34:42  17   A.   I believe that would have been --

10:34:48  18            MS. LAKE:  Objection, Your Honor.  Relevance.

10:34:49  19            THE COURT:  Sustained.

10:34:50  20            MR. MINGOLLA:  Your Honor, the copies that we

10:34:53  21   received, with all due respect, were incoherent.  They--

10:34:57  22            THE COURT:  Attorney Mingolla, I can appreciate

10:35:00  23   your position.  This is a suppression hearing.

10:35:06  24        If there are other matters you need to raise with

10:35:08  25   the Court, we'll deal with that at the appropriate time.

| | | |
|---|---|---|
| 10:35:11 | 1 | MR. MINGOLLA:  Just a -- |
| 10:35:12 | 2 | THE COURT:  Your position is noted.  I know you |
| 10:35:14 | 3 | want to ask the question.  I sustained the objection. |
| 10:35:16 | 4 | So let's move on. |
| 10:35:17 | 5 | MR. MINGOLLA:  Very well. |
| 10:35:26 | 6 | BY MR. MINGOLLA: |
| 10:35:26 | 7 | Q.   I asked, I asked you, Agent Querrard, about an |
| 10:35:33 | 8 | alleged -- do you know whether Agent Joseph requested -- |
| 10:35:39 | 9 | strike that -- drafted an affidavit -- provided an |
| 10:35:43 | 10 | affidavit requesting permission? |
| 10:35:44 | 11 | MS. LAKE:  Objection.  Relevance, Your Honor. |
| 10:35:46 | 12 | THE COURT:  All right.  Sustained. |
| 10:35:56 | 13 | BY MR. MINGOLLA: |
| 10:35:57 | 14 | Q.   Now, you were -- no, let me rephrase. |
| 10:36:07 | 15 | How long on that given day that this recording in |
| 10:36:15 | 16 | Delbert's parking lot, how long have you been involved, |
| 10:36:19 | 17 | time frame, how many hours had you been involved that |
| 10:36:23 | 18 | day in that scenario, shall we call it? |
| 10:36:25 | 19 | MS. LAKE:  Objection.  Relevance. |
| 10:36:27 | 20 | THE COURT:  I'm going to give you a little |
| 10:36:29 | 21 | leeway.  Overruled. |
| 10:36:32 | 22 | THE WITNESS:  We traveled from St. Thomas to |
| 10:36:36 | 23 | St. John, 45 minutes.  And then meeting with Angelo Hill |
| 10:36:41 | 24 | prior to, in 15 minutes the entire conversation, and |
| 10:36:50 | 25 | then meeting with him afterwards.  I would probably say |

10:36:53   1    approximately four hours.

10:37:01   2    BY MR. MINGOLLA:

10:37:01   3    Q.   And was this recording device, this bug, was it

10:37:07   4    within your purview, if you will, was it within your

10:37:15   5    view throughout the time it was being utilized?

10:37:20   6    A.   It was in my view prior to Angelo Hill leaving our

10:37:26   7    presence to actually go meet with Walter.  And then upon

10:37:29   8    him meeting with Walter, he again met with us.

10:37:33   9         But during the period of -- him leaving us and

10:37:36   10   getting back to us, no, it was not in my view.  But

10:37:40   11   during that period it was recorded.

10:37:43   12              MR. MINGOLLA:  Judge, I would appreciate your

10:37:45   13   asking this witness to refer to my client as Mr. Hill,

10:37:49   14   not Walter.  He's not on a first name basis with my

10:37:52   15   client.

10:37:52   16              THE COURT:  All right.

10:37:53   17              MR. MINGOLLA:  My client deserves respect.

10:37:56   18              THE WITNESS:  Your Honor, may I comment?

10:37:57   19              THE COURT:  No.  Wait for the next question.

10:38:06   20   BY MR. MINGOLLA:

10:38:07   21   Q.   You're aware that both of those men are related and

10:38:10   22   they have been extremely close friends all their lives

10:38:12   23   since childhood, are you not?

10:38:14   24   A.   This is what I was advised.

10:38:17   25   Q.   By whom?

10:38:19  1    A.    Mr. Angelo Hill.

10:38:31  2    Q.    And you're going back to your involvement -- my

10:38:34  3    question previous, you say that you were involved for, I

10:38:36  4    believe, approximately four hours.  Are you aware during

10:38:47  5    the course of one hour, Mr. Angelo Hill called my client

10:38:52  6    12 times in one hour, to ascertain that he was going to

10:38:58  7    come to Delbert Hill's parking lot that morning?

10:39:03  8    A.    I can't say specifically he was called, but I was

10:39:05  9    aware that he had contacted him, yes, or attempted to

10:39:09  10   contact him, yes.

10:39:10  11   Q.    Twelve times --

10:39:11  12   A.    I can't --

10:39:13  13   Q.    -- in an hour?

10:39:14  14   A.    -- say specifically the amount.

10:39:25  15         MR. MINGOLLA:  Bear with me just a moment, Your

10:39:28  16   Honor, if you would, please?

10:39:29  17         THE COURT:  Yes.

10:39:31  18   BY MR. MINGOLLA:

10:39:31  19   Q.    Now --

10:39:32  20         THE COURT:  Attorney Mingolla let's try this.

10:39:38  21   It might expedite things.  I don't know if the

10:39:41  22   government is prepared now to cover the videotape of

10:39:44  23   that conversation, and then I'll give you a chance to

10:39:47  24   examine on that, so we won't have to go up and down and

10:39:50  25   up and down.

10:39:51  1          If you could yield the lectern for the moment to

10:39:55  2     Attorney Lake, so she can probably put that in so we can

10:39:58  3     go from there, it might expedite and focus the inquiry.

10:40:02  4          MR. MINGOLLA:  Obviously I will acquiesce to

10:40:05  5     your wishes.

10:40:05  6          I would only ask one thing.  Because again, forgive

10:40:09  7     me, but I'm a late starter in all of this.

10:40:09  8     BY MR. MINGOLLA:

10:40:14  9     Q.   Was authentication heard on this matter?

10:40:19  10          THE COURT:  You're asking the witness?

10:40:22  11          MR. MINGOLLA:  Yes.

10:40:23  12          MS. LAKE:  Objection.  Relevance, Your Honor.

10:40:25  13          THE COURT:  Okay.  Sustained.

10:40:27  14          Attorney Mingolla, you're going to have another

10:40:29  15     chance to ask questions.

10:40:31  16          If we can get to the subject video.  Attorney --

10:40:41  17          MR. MINGOLLA:  Thank you, Judge.

10:40:42  18          THE COURT:  Yes.

10:40:53  19          MS. LAKE:  If I can just have a moment, Your

10:40:56  20     Honor?

10:40:57  21          THE COURT:  Yes.

10:40:57  22          MS. LAKE:  And while we're setting this up, if

10:41:00  23     I can ask one clarifying question of the witness.

10:41:04  24          THE COURT:  Go right ahead.

10:41:05  25

```
10:41:05   1              FURTHER DIRECT EXAMINATION

10:41:05   2    BY MS. LAKE:

10:41:06   3    Q.   Agent Querrard, were there multiple recording

10:41:09   4    devices that were given to Angelo Hill?

10:41:11   5    A.   There were two, correct.

10:41:13   6    Q.   And what were those two?

10:41:17   7    A.   One was on --

10:41:21   8              THE COURT:  Haven't we been over this?  He said

10:41:23   9    one was on his person and one was in a cup.

10:41:27  10              MS. LAKE:  I wanted to make sure that was clear

10:41:32  11    to Your Honor.  Because defense counsel --

10:41:50  12              THE COURT:  You made the inquiry of the

10:42:00  13    witness, so...

10:42:03  14              MS. LAKE:  Thank you.

10:42:11  15              MR. MINGOLLA:  Your Honor, my eyes being what

10:42:12  16    they are, do you mind if I sat up here?

10:42:16  17              THE COURT:  You can sit there.  Your screen can

10:42:18  18    be on, though.  If it isn't, we'll make sure it is put

10:42:22  19    on.

10:42:22  20              MR. MINGOLLA:  I beg your pardon?

10:42:24  21              THE COURT:  Your screen should be on.  If it

10:42:27  22    isn't, we'll put it on.

10:42:29  23              MR. MINGOLLA:  Oh, I'm sorry.

10:43:10  24    BY MS. LAKE:

10:43:10  25    Q.   Agent Querrard, showing you what's been marked as
```

10:43:12  1    Government's Exhibit Number 1 for purposes of this

10:43:15  2    suppression hearing.

10:43:17  3        Do you see this in front of you?

10:43:19  4    A.   Yes.

10:43:23  5    Q.   And can you please explain to me what you're

10:43:26  6    looking at right now?

10:43:27  7             THE COURT:  First tell us what it is.  What is

10:43:27  8    Exhibit Number 1?

10:43:30  9             THE WITNESS:  This is the audio/video recording

10:43:37  10   that was utilized to record the meeting between Angelo

10:43:41  11   Hill and Walter Hill.

10:43:46  12       This is on the Island of St. John.  It was being

10:43:49  13   activated by Task Force Officer Mark Joseph, and given

10:44:01  14   to Mr. Hill, Mr. Angelo Hill.

10:44:03  15   BY MS. LAKE:

10:44:03  16   Q.   In the very beginning of the videotape there was a

10:44:06  17   man's face in view.  Did you see that?

10:44:10  18   A.   Yes.  That is Task Force Officer Mark Joseph.

10:44:31  19       I believe this is after Mr. Angelo Hill met with

10:44:33  20   us, and I believe he is now entering the vehicle that he

10:44:36  21   was operating to proceed to the car rental company in

10:44:42  22   Cruz Bay area, St. John.

10:44:43  23   Q.   And when you say "he," you're referring to Angelo

10:44:46  24   Hill, correct?

10:44:46  25   A.   Correct.

| | | |
|---|---|---|
| 10:44:57 | 1 | Q.   At this point in time, Angelo Hill is meeting with |
| 10:45:02 | 2 | Task Force Officer Mark Joseph, correct? |
| 10:45:02 | 3 | A.   And myself, correct. |
| 10:45:04 | 4 | Q.   And Shawn -- you, okay. |
| 10:45:40 | 5 | MR. MINGOLLA:  Your Honor, may I ask a |
| 10:45:42 | 6 | question? |
| 10:45:42 | 7 | There's a device that you can't see right now, but |
| 10:45:44 | 8 | it's down there.  Is that -- what is that?  A mike? |
| 10:45:49 | 9 | What is that? |
| 10:45:50 | 10 | THE COURT:  Attorney Mingolla, why don't you |
| 10:45:52 | 11 | wait for your opportunity to ask questions.  Let the |
| 10:45:55 | 12 | government complete its exam. |
| 10:56:36 | 13 | (Pause) |
| 10:56:37 | 14 | THE COURT:  Is there a time marked to get to |
| 10:56:39 | 15 | the point where there's the parking lot discussion? |
| 10:56:42 | 16 | Can we get to that? |
| 10:56:43 | 17 | MS. LAKE:  Sure.  I wasn't sure if the Court |
| 10:56:45 | 18 | wanted to see the full video, to make sure there is no |
| 10:56:48 | 19 | undue -- |
| 10:56:48 | 20 | THE COURT:  It is the conversation that's being |
| 10:56:50 | 21 | sought to be suppressed, not all of this stuff.  So |
| 10:56:52 | 22 | let's get to the conversation. |
| 10:58:48 | 23 | MS. LAKE:  Could you pause it for a second? |
| 10:58:49 | 24 | BY MS. LAKE: |
| 10:58:50 | 25 | Q.   Agent Querrard, who is speaking right now? |

10:58:53   1    A.   This is a conversation between Mr. Angelo Hill and

10:58:56   2    Mr. Walter Hill.

11:01:27   3              MS. LAKE:  Can you stop it there?

11:01:29   4    BY MS. LAKE:

11:01:29   5    Q.   The person who is talking at this point the most in

11:01:35   6    the video, who is that person talking?

11:01:37   7    A.   Mr. Walter Hill.

11:01:39   8              MS. LAKE:  Can you keep playing it?

11:01:39   9         (Recording played)

11:02:50   10             MS. LAKE:  Can you stop it here?

11:02:51   11   BY MS. LAKE:

11:02:53   12   Q.   Who is saying, "No, let me tell you how it went"?

11:02:57   13   A.   Mr. Walter Hill.

11:02:59   14             MR. MINGOLLA:  Leading question.

11:03:00   15             THE COURT:  Overruled.

11:03:01   16   BY MS. LAKE:

11:03:01   17   Q.   I didn't hear your answer.  I'm sorry?

11:03:03   18   A.   Mr. Walter Hill.

11:03:04   19             MS. LAKE:  Can you keep playing it?

11:03:04   20        (Recording played)

11:08:22   21             MS. LAKE:  Can you stop it there?

11:08:23   22   BY MS. LAKE:

11:08:23   23   Q.   Who are we seeing in the video right now?

11:08:25   24   A.   Mr. Walter Hill.

11:08:27   25   Q.   And do you see him in the courtroom today?

11:08:29  1    A.   Yes, I do.

11:08:30  2    Q.   Could you please point to where he's located and

11:08:33  3    describe something he's wearing?

11:08:34  4    A.   He is sitting over to defense counsel by Attorney

11:08:39  5    Mingolla.  He is wearing a white long-sleeve shirt and

11:08:42  6    glasses.  Bald head.

11:08:44  7         MS. LAKE:  Thank you.

11:08:45  8    Your Honor, I ask that the record reflect the

11:08:47  9    witness has identified the defendant Walter Hill.

11:08:49  10         THE COURT:  Yes, the record will reflect the

11:08:52  11   witness has identified the defendant Walter Hill.

11:08:55  12         MS. LAKE:  Thank you.

11:08:56  13   Can you keep playing?

11:08:56  14   (Recording played)

11:14:49  15         MS. LAKE:  Your Honor, there's -- if we have a

11:14:50  16   moment -- could have a moment.  There's a second CD for

11:14:53  17   this video.

11:14:54  18         THE COURT:  Yes.

11:15:06  19         MS. LAKE:  Could you stop it?

11:15:07  20   BY MS. LAKE:

11:15:07  21   Q.   What are you watching now, Agent Querrard?

11:15:10  22   A.   This is the continuation.

11:15:12  23         MS. LAKE:  And I ask to mark this as

11:15:15  24   Exhibit 1a, Your Honor.  It's a separate CD with the

11:15:19  25   same video.

| | | |
|---|---|---|
| 11:15:20 | 1 | THE COURT:  Yes. |
| 11:15:22 | 2 | MS. LAKE:  Can you keep playing it? |
| 11:15:22 | 3 | (Recording played) |
| 11:15:38 | 4 | MS. LAKE:  Could you stop it? |
| 11:15:38 | 5 | BY MS. LAKE: |
| 11:15:39 | 6 | Q.   Again, who are you looking at now on the video? |
| 11:15:41 | 7 | A.   This is Mr. Walter Hill. |
| 11:15:43 | 8 | Q.   Thank you. |
| 11:15:44 | 9 | MS. LAKE:  Can you keep playing it? |
| 11:33:30 | 10 | (Recording played) |
| 11:33:32 | 11 | MS. LAKE:  If we can have a moment, Your Honor. |
| 11:33:34 | 12 | THE COURT:  How much longer is this? |
| 11:33:36 | 13 | MS. LAKE:  If I can inquire? |
| 11:33:43 | 14 | THE COURT:  Yes. |
| 11:33:44 | 15 | MS. LAKE:  Six and a half minutes, Your Honor. |
| 11:33:46 | 16 | THE COURT:  All right. |
| 11:33:49 | 17 | BY MS. LAKE: |
| 11:33:49 | 18 | Q.   And right before we took a break in the video, who |
| 11:33:52 | 19 | was the last person that was speaking? |
| 11:33:54 | 20 | A.   Mr. Walter Hill. |
| 11:33:55 | 21 | Q.   And who was the person speaking about the Leayle |
| 11:34:00 | 22 | Benjamin case? |
| 11:34:00 | 23 | A.   Mr. Walter Hill. |
| 11:36:01 | 24 | (Recording played) |
| 11:36:01 | 25 | MS. LAKE:  Can you stop right here? |

BY MS. LAKE:

Q.   And at this point, what are we seeing in the view?

A.   That is Mr. Angelo Hill getting back into the vehicle that he came down in, and traveling to meet with myself and Task Force Agent Mark Joseph.

Q.   And he's traveling alone?

A.   Yes.

        MS. LAKE:  If you just play the rest of it.

        (Recording played)

BY MS. LAKE:

Q.   Is Walter Hill any more in the video?

A.   No.

        MS. LAKE:  I have nothing further, Your Honor.

        THE COURT:  All right.  Thank you.

        Attorney Mingolla?

        MR. MINGOLLA:  Yes, Your Honor.

        May I approach?

        THE COURT:  Yes.

                    FURTHER CROSS-EXAMINATION

BY MR. MINGOLLA:

Q.   Agent Querrard, you -- we've discussed that we're not going to discuss authentication, so I shan't get into that.  But I think I'm obliged to ask you a question, and that is as follows.

        There are two copies of transcripts, do you agree,

11:37:56  1    of the --

11:37:56  2              MS. LAKE:  Objection.  Relevance, exceeds the

11:37:59  3    scope of the issue of consent, Your Honor.

11:38:01  4              THE COURT:  I haven't heard the whole question.

11:38:03  5              MR. MINGOLLA:  I beg your pardon, sir?

11:38:05  6              THE COURT:  No, ask your question.

11:38:06  7              MR. MINGOLLA:  Thank you.

11:38:06  8    BY MR. MINGOLLA:

11:38:07  9    Q.   There are two copies of this transcript, are there

11:38:09  10   not?

11:38:11  11             MS. LAKE:  Objection.  Relevance, Your Honor.

11:38:13  12             MR. MINGOLLA:  The relevance is the fact --

11:38:15  13             THE COURT:  Sustained.

11:38:19  14   BY MR. MINGOLLA:

11:38:19  15   Q.   Who did the translation -- well, let me -- I'm

11:38:24  16   getting ahead of myself.  You'll have noted -- it's not

11:38:29  17   up there now, but you will have noted that the date on

11:38:31  18   the bottom of those videotapes was October 22nd, and yet

11:38:36  19   they were recorded on October 20th.

11:38:42  20        Why would it be recorded on a machine, that is to

11:38:45  21   say, on a device, the recording device, why would it be

11:38:49  22   recorded as the 22nd when it took place on the 20th?

11:38:52  23             MS. LAKE:  Objection.  Relevance.  Exceeds the

11:38:55  24   issue of the scope of consent, Your Honor.

11:38:57  25             THE COURT:  All right.  Sustained.

```
11:39:03   1   BY MR. MINGOLLA:

11:39:05   2   Q.   Who translated -- then let me get to, who

11:39:09   3   translated these -- the audio portions?

11:39:12   4            MS. LAKE:  Objection, Your Honor.  Relevance.

11:39:15   5   Exceeds the scope of consent.

11:39:16   6            THE COURT:  All right.  Sustained.

11:39:30   7            MR. MINGOLLA:  Your Honor, there are two

11:39:32   8   transcripts.  They are both different from one another.

11:39:37   9       My query --

11:39:40  10            THE COURT:  Let's see if we can move on.  I

11:39:42  11   have sustained the objection.

11:39:43  12       This is a suppression hearing.  We're focused on

11:39:45  13   what, if anything, is constitutionally infirm with what

11:39:51  14   the government did in obtaining the utterances of your

11:39:54  15   client.

11:39:54  16       So as I understand, there is a conversation at

11:39:58  17   issue and we're trying to assess whether there is

11:40:01  18   something constitutionally infirm.  So I understand your

11:40:04  19   position.  I've sustained the objection.

11:40:05  20       Ask your next question.

11:40:21  21   BY MR. MINGOLLA:

11:40:21  22   Q.   The translators, whomever they might be, are they

11:40:25  23   familiar with the fact that here in the Virgin Islands

11:40:29  24   and throughout the Caribbean, there's a certain patois,

11:40:36  25   if you will, or an argot?
```

```
11:40:41   1          Are they familiar with West Indian phrases that are
11:40:47   2   distinctly different than conventional, let's say,
11:40:51   3   American English?
11:40:53   4          MS. LAKE:  Objection.  Relevance.
11:40:55   5          THE COURT:  Sustained.
11:40:58   6   BY MR. MINGOLLA:
11:40:58   7   Q.   And I'll ask you again, because again, I'm sorry, I
11:41:01   8   must have -- did you obtain, under Title III, any
11:41:18   9   permission to make this bug, this recording?
11:41:25  10          MS. LAKE:  Objection, Your Honor.  Relevance.
11:41:28  11          MR. MINGOLLA:  It's not, it's not --
11:41:29  12          THE COURT:  Hold on.  Stop.
11:41:31  13      If you can answer.  Go ahead.
11:41:33  14          THE WITNESS:  I do.
11:41:33  15   BY MR. MINGOLLA:
11:41:33  16   Q.   From whom?
11:41:37  17   A.   From this Court, from the AUSA's office, and it's a
11:41:41  18   consensual from Mr. Angelo Hill.
11:41:46  19   Q.   And --
11:41:47  20          THE COURT:  Let's make sure the record is
11:41:48  21   clear.  Let's move on.  This is just confusing the
11:41:51  22   record.  It's not aiding in getting to the end here.
11:41:55  23          MR. MINGOLLA:  All right, Judge.  Very well.
11:41:56  24          THE COURT:  If it's an interception of a wire,
11:41:58  25   that is like a phone line, then Title III is implicated.
```

```
11:42:04   1    If it is not, then Title III is not necessarily
11:42:06   2    implicated.
11:42:06   3        So what the witness said is really a matter for the
11:42:12   4    Court to say what's essential under the law, and
11:42:16   5    factually, it's not what occurred precisely in this
11:42:20   6    case.
11:42:20   7        Go ahead.  Next question.
11:42:27   8            MR. MINGOLLA:  My reading of Title III says it
11:42:29   9    requires an affidavit --
11:42:30   10           THE COURT:  This is not the time to argue.
11:42:31   11       Just ask the question.  Let's get the evidence on
11:42:34   12   the record and then we can go on to other matters.
11:42:37   13           MR. MINGOLLA:  Very well, sir.
11:42:47   14   BY MR. MINGOLLA:
11:42:47   15   Q.  Now --
11:42:51   16           MR. MINGOLLA:  I heard Your Honor, that Your
11:42:53   17   Honor, I don't know if reproach is the right word
11:42:56   18   mentioned, that they, mentioned that you were not going
11:42:58   19   to -- Your Honor was not going to get into Stark, as I
11:43:02   20   recall.  So, if I recall correctly, so I won't get into
11:43:09   21   Stark or 901 at this time, although I dearly want to.
11:43:25   22       For the record, the copies that were made for the
11:43:36   23   defendants that I heard, including my own, were
11:43:43   24   distinctly less clear than this tape -- this video we
11:43:47   25   just saw.
```

11:43:50  1    BY MR. MINGOLLA:

11:43:50  2    Q.   Agent Querrard, the question is this:  Do you know

11:43:53  3    whether this, the original audio/visual tape was

11:44:00  4    enhanced in any way subsequent to its being made?

11:44:05  5            MS. LAKE:  Objection.  Relevance.

11:44:07  6            THE COURT:  Sustained.

11:44:23  7            MR. MINGOLLA:  Now, I'll wrap this up, Judge.

11:44:36  8    BY MR. MINGOLLA:

11:44:36  9    Q.   In AUSA -- in the government's objection to my

11:44:42  10   predecessor's motion to suppress, the issue came up that

11:44:48  11   my client was, had no standing because he was not an

11:44:53  12   aggrieved party.

11:44:59  13       Would you agree, Agent Querrard, that my client,

11:45:03  14   Mr. Walter Hill, was implicated in, I believe, paragraph

11:45:12  15   37 of the superseding indictment?

11:45:15  16           MS. LAKE:  Objection.  Relevance.

11:45:17  17           THE COURT:  Sustained.

11:45:31  18   BY MR. MINGOLLA:

11:45:32  19   Q.   And this device that was placed on his arm

11:45:46  20   allegedly, was that there -- strike that.

11:45:54  21       You mentioned that there was a device placed on his

11:45:58  22   arm, and then you seem to have acceded to the fact that

11:46:03  23   there was another device above, in another, in a

11:46:07  24   container, or in something, not on his body.

11:46:14  25       Were both of these devices in use simultaneously,

| | | |
|---|---|---|
| 11:46:24 | 1 | or was one used, and then for whatever reason that |
| 11:46:30 | 2 | device ceased being used and another device was used? |
| 11:46:36 | 3 | By "device" I'm talking about the two items, either |
| 11:46:38 | 4 | this alleged bug on his, on his naked arm, if he's |
| 11:46:44 | 5 | wearing a short-sleeve shirt, or the cup.  Was there two |
| 11:46:52 | 6 | separate, was there one used and then that was stopped |
| 11:46:57 | 7 | and then another one used?  Or were they used |
| 11:47:00 | 8 | simultaneously? |
| 11:47:01 | 9 | MS. LAKE:  Objection.  Relevance. |
| 11:47:02 | 10 | THE COURT:  Overruled.  If you can answer it. |
| 11:47:05 | 11 | Go ahead. |
| 11:47:06 | 12 | THE WITNESS:  Yes, they were both used |
| 11:47:07 | 13 | simultaneously, at the same time. |
| 11:47:17 | 14 | BY MR. MINGOLLA: |
| 11:47:17 | 15 | Q.   Whereabouts on his arm was it? |
| 11:47:19 | 16 | MS. LAKE:  Objection.  Relevance. |
| 11:47:20 | 17 | THE COURT:  Sustained. |
| 11:47:28 | 18 | MR. MINGOLLA:  You surely can't answer this. |
| 11:47:29 | 19 | BY MR. MINGOLLA: |
| 11:47:29 | 20 | Q.   What was the other device placed in, a coffee cup, |
| 11:47:33 | 21 | tin can, Coca Cola can, what? |
| 11:47:36 | 22 | MS. LAKE:  Objection.  Relevance. |
| 11:47:37 | 23 | THE COURT:  I think it's been asked and |
| 11:47:39 | 24 | answered.  I think he said it was a cup. |
| 11:47:39 | 25 | |

11:47:39   1    BY MR. MINGOLLA:

11:47:45   2    Q.   What kind of cup?  Styrofoam cup, plastic cup,

11:47:49   3    metal cup?

11:47:51   4         MS. LAKE:  Objection.  Relevance.

11:47:52   5         THE COURT:  Sustained.

11:47:53   6         MR. MINGOLLA:  I think it's -- I'll object to

11:47:57   7    that, Your Honor.  I think it's relevant.  But again,

11:48:01   8    I'll defer.

11:48:10   9         Just a couple more questions for you, Agent.  I

11:48:13  10    appreciate your patience.

11:48:20  11    BY MR. MINGOLLA:

11:48:21  12    Q.   Did you have -- you had a conversation with

11:48:31  13    Mr. Angelo Hill prior to this alleged recording between

11:48:39  14    he and my client at the Hill parking lot.  Did you brief

11:48:43  15    him as to what you wished him to ask?

11:48:50  16    A.   Basically he was instructed to provide any

11:48:53  17    information regarding the investigation.

11:48:56  18    Q.   By whom?

11:49:01  19    A.   Excuse me?

11:49:02  20    Q.   Who instructed him, if you recall?

11:49:04  21    A.   Myself and Task Force Officer Mark Joseph.

11:49:07  22    Q.   How long did that take, approximately?  Just

11:49:11  23    ball-park figure.  Hour, two, three?

11:49:13  24    A.   Just a few minutes.  We prior -- we had interviews

11:49:16  25    with Mr. Angelo Hill prior to this date.

11:49:18  1    Q.   And about how long were those interviews with

11:49:21  2    Mr. Hill, in the aggregate, if you will?

11:49:24  3         MS. LAKE:  Objection.  Relevance.  Exceeds the

11:49:27  4    scope of --

11:49:27  5         THE COURT:  Sustained.

11:49:28  6    BY MR. MINGOLLA:

11:49:29  7    Q.   But it can be said that you did indeed brief him,

11:49:32  8    however long it took, you briefed him prior to his

11:49:36  9    meeting with my client, Mr. Walter Hill, correct?

11:49:42  10   A.   Generally, yes.

11:49:47  11   Q.   All right.  And was his attorney -- Mr. King, was

11:50:03  12   he present at that time?

11:50:04  13        MS. LAKE:  Objection.  Relevance.

11:50:06  14        THE COURT:  Sustained.

11:50:17  15        MR. MINGOLLA:  Before I forget, Judge, I want

11:50:19  16   to place on the record that, an objection, that I'm

11:50:21  17   going to file an appeal, with no authentication was done

11:50:25  18   on this matter.  It was not done, anything other than

11:50:34  19   mere procedural.  It was nothing personal.  I need it on

11:50:38  20   the record because -- it doesn't matter why.

11:50:53  21   BY MR. MINGOLLA:

11:50:53  22   Q.   Did anyone --

11:50:56  23        MR. MINGOLLA:  I have maybe two more questions.

11:50:58  24   BY MR. MINGOLLA:

11:50:58  25   Q.   Did any other defense attorney -- because again,

11:51:01  1   I'm a Johnny-come-lately here, so forgive me if I'm

11:51:05  2   asking something that's been answered already, but I

11:51:08  3   wasn't here.

11:51:09  4       Did any other defendants -- or strike that -- their

11:51:15  5   counsel, indicate -- how should we put it -- the

11:51:25  6   incomprehensibility of the tapes we just saw, these

11:51:27  7   audio/video tapes?

11:51:29  8       By "incomprehensibility, I mean the difficulty in

11:51:33  9   understanding what was being said and the lack of

11:51:35  10  clarity.  Did anyone besides myself complain about this?

11:51:39  11          MS. LAKE:  Objection.  Relevance.

11:51:40  12          THE COURT:  Sustained.

11:51:43  13          MR. MINGOLLA:  I think it's important, Your

11:51:45  14  Honor, that --

11:51:46  15          THE COURT:  I know you -- I understand what

11:51:48  16  your question is, but I've ruled.  So ask your next

11:51:51  17  question.

11:51:51  18      The record is clear.  Our court reporter is getting

11:51:54  19  everything.

11:51:55  20          MR. MINGOLLA:  Very well, sir.

11:52:23  21      I shall also, for the record, perhaps file a motion

11:52:31  22  for ineffective counsel on my own behalf, regarding the

11:52:35  23  suppression hearing --

11:52:36  24          THE COURT:  Let's do this, Attorney Mingolla:

11:52:38  25  If you have questions for the evidence, that the

| | | |
|---|---|---|
| 11:52:40 | 1 | evidence can be put on the record, go and ask.  If not, |
| 11:52:46 | 2 | you can yield the witness. |
| 11:52:52 | 3 | MR. MINGOLLA:  I'm pretty much done with him -- |
| 11:52:55 | 4 | excuse me, Agent Querrard.  I say him. |
| 11:53:19 | 5 | BY MR. MINGOLLA: |
| 11:53:19 | 6 | Q.   Last question. |
| 11:53:20 | 7 | Was there any, was there any contraband of any kind |
| 11:53:25 | 8 | found on my client, Mr. Hill -- Mr. Walter Hill, at any |
| 11:53:34 | 9 | time? |
| 11:53:35 | 10 | MS. LAKE:  Objection.  Relevance. |
| 11:53:37 | 11 | THE COURT:  Overruled. |
| 11:53:39 | 12 | THE WITNESS:  Not that I'm aware of. |
| 11:53:42 | 13 | BY MR. MINGOLLA: |
| 11:53:42 | 14 | Q.   And since you and Agent Joseph were, I believe, |
| 11:53:47 | 15 | correct me if I'm wrong, were, so to speak, the lead |
| 11:53:51 | 16 | agents on this matter, you would be in a position to |
| 11:53:53 | 17 | know, correct? |
| 11:53:59 | 18 | A.   I'm confused by the question that you're asking. |
| 11:54:02 | 19 | Q.   The question I'm asking simply -- |
| 11:54:06 | 20 | MR. MINGOLLA:  He's answered.  He didn't find |
| 11:54:09 | 21 | anything.  I don't need to repeat it.  That's okay. |
| 11:54:12 | 22 | Thank you. |
| 11:54:12 | 23 | No further questions of this client -- for this -- |
| 11:54:18 | 24 | for Agent Querrard. |
| 11:54:20 | 25 | THE COURT:  All right.  Attorney Lake, are you |

11:54:22  1    done with this witness?

11:54:23  2              MS. LAKE:  Yes, Your Honor.  We ask --

11:54:24  3              THE COURT:  Agent Querrard, thank you for your

11:54:27  4    testimony.  You may step down.

11:54:28  5              THE WITNESS:  Thank you, Your Honor.

11:54:29  6         (Witness withdrew from stand)

11:54:29  7              THE COURT:  Any other testimony?

11:54:30  8              MS. LAKE:  Yes, Your Honor.  We ask that

11:54:32  9    Exhibit 1a be received into evidence for purposes of the

11:54:34 10    suppression hearing?

11:54:35 11              THE COURT:  Any objection, Attorney Mingolla?

11:54:37 12              MR. MINGOLLA:  I'm sorry, I didn't hear the

11:54:39 13    question.

11:54:39 14              THE COURT:  You have any objection to the

11:54:42 15    recording being admitted?

11:54:43 16              MR. MINGOLLA:  Yes, I do.

11:54:46 17              THE COURT:  All right.  1 and 1a are admitted.

11:54:48 18              MR. MINGOLLA:  I'm sorry, I didn't hear what

11:54:50 19    you said, Your Honor.  I'm sorry.

11:54:52 20              THE COURT:  All right.  They're admitted.

11:54:53 21              MR. MINGOLLA:  They are admitted.

11:54:55 22              THE COURT:  Yes.

11:54:56 23              MR. MINGOLLA:  Over my objection.  Thank you.

11:54:59 24              MS. LAKE:  We would ask to call Rafael

11:55:10 25    Fernandez.

| | | |
|---|---|---|
| 11:55:10 | 1 | THE COURT:  All right. |
| 11:55:11 | 2 | (Witness sworn) |
| 11:55:14 | 3 | THE WITNESS:  I do. |
| 11:55:16 | 4 | THEREUPON, RAFAEL FERNANDEZ, having been duly |
| 11:55:18 | 5 | sworn, was examined and testified as follows: |
| 11:55:18 | 6 | DIRECT EXAMINATION |
| 11:55:20 | 7 | BY MS. LAKE: |
| 11:55:28 | 8 | Q.   Good morning, Agent.  Please state your name for |
| 11:55:32 | 9 | the record? |
| 11:55:32 | 10 | A.   My name is Rafael A. Fernandez; R-a-f-a-e-l, |
| 11:55:34 | 11 | F-e-r-n-a-n-d-e-z. |
| 11:55:39 | 12 | Q.   And who do you work for? |
| 11:55:40 | 13 | A.   I work for the Federal Bureau of Investigation. |
| 11:55:42 | 14 | Q.   And how long have you been so employed? |
| 11:55:45 | 15 | A.   I've been employed for approximately three years. |
| 11:55:47 | 16 | Q.   And are you familiar with the Tapia investigation? |
| 11:55:51 | 17 | A.   Yes, I am. |
| 11:55:53 | 18 | Q.   Are you familiar with the Angelo Hill |
| 11:55:56 | 19 | investigation? |
| 11:55:56 | 20 | A.   Yes, I am. |
| 11:55:57 | 21 | Q.   And are you familiar with the Walter Hill |
| 11:55:59 | 22 | investigation? |
| 11:55:59 | 23 | A.   Yes, I am. |
| 11:56:00 | 24 | Q.   Were you involved in the surveillance, if there |
| 11:56:05 | 25 | were -- was any, during the time that Angelo Hill and |

11:56:08  1   Walter Hill had a conversation on St. John?

11:56:10  2   A.   Yes, I was part of the surveillance team during the

11:56:13  3   recording.

11:56:14  4   Q.   And what was -- what were the circumstances --

11:56:18  5   strike that.

11:56:19  6        What did you observe between Angelo Hill and Walter

11:56:23  7   Hill while you were conducting surveillance?

11:56:26  8   A.   Well, I was in a position to actually oversee the

11:56:30  9   conversation.  After we were alerted by Agent Querrard

11:56:33  10  that the device was on Angelo Hill's person, we actually

11:56:36  11  observed Angelo Hill show up to the place of business.

11:56:40  12       We waited and waited for some time until Walter

11:56:44  13  Hill also showed up to the place of business.

11:56:45  14       We observed them step outside the place of business

11:56:49  15  and have a conversation.

11:56:51  16  Q.   And what did you observe in terms of their

11:56:53  17  mannerisms between Walter Hill and Angelo Hill during

11:56:58  18  the course of this conversation?

11:56:59  19  A.   We conducted, you know, essentially the

11:57:02  20  surveillance.  We want to make sure they were meeting.

11:57:04  21  We took some photographs.  And we also just noticed that

11:57:07  22  they were just having a conversation.  We also noticed

11:57:14  23  that Mr. -- well, Angelo Hill had the recording device

11:57:16  24  and the conversation was being recorded.

11:57:18  25            THE COURT:  Who was there?  Who did you

| | | |
|---|---|---|
| 11:57:20 | 1 | observe. |
| 11:57:20 | 2 | THE WITNESS:  Angelo Hill and Walter Hill. |
| 11:57:23 | 3 | THE COURT:  Did you observe anyone else? |
| 11:57:25 | 4 | THE WITNESS:  No, I did not. |
| 11:57:27 | 5 | THE COURT:  All right.  And explain what, in |
| 11:57:30 | 6 | terms of mannerism, you observed on the part of Walter |
| 11:57:36 | 7 | Hill and Angelo Hill. |
| 11:57:38 | 8 | THE WITNESS:  We observed, just me in |
| 11:57:40 | 9 | particular, just a casual conversation.  When Walter |
| 11:57:43 | 10 | Hill showed up they both said -- they walked outside, |
| 11:57:48 | 11 | they leaned over a jeep and had a conversation, pretty |
| 11:57:50 | 12 | relaxed, it seems like to me.  It was just a normal |
| 11:57:55 | 13 | conversation that I would have with a friend. |
| 11:57:59 | 14 | BY MS. LAKE: |
| 11:57:59 | 15 | Q.   And at the conclusion of the conversation, what did |
| 11:58:02 | 16 | you see Walter Hill do? |
| 11:58:04 | 17 | A.   We saw that he left out the vicinity.  At that |
| 11:58:09 | 18 | point we noticed, we -- you know, I guess Angelo Hill |
| 11:58:14 | 19 | had communicated to the case agent, Shawn Querrard, the |
| 11:58:17 | 20 | conversation was over, and we just saw that Walter Hill |
| 11:58:19 | 21 | got in his vehicle and left. |
| 11:58:21 | 22 | Q.   And then what did you observe Angelo Hill do? |
| 11:58:23 | 23 | A.   Similar thing.  He got into his vehicle and I guess |
| 11:58:27 | 24 | met with Shawn Querrard and Task Force Agent Mark |
| 11:58:31 | 25 | Joseph. |

11:58:31    1    Q.   So Walter Hill and Angelo Hill left separately?

11:58:34    2    A.   Yes.

11:58:36    3    Q.   And did you have an opportunity to observe the

11:58:39    4    audio and video recording of that conversation?

11:58:42    5    A.   I did.

11:58:43    6           THE COURT:  All right.  Let's move on.  I've

11:58:44    7    observed it.

11:58:45    8        Any other questions for this witness?

11:58:47    9           MS. LAKE:  No further questions, Your Honor.

11:58:48   10           THE COURT:  Attorney Mingolla?

11:58:49   11           MR. MINGOLLA:  Just one or two.

11:58:51   12                      CROSS-EXAMINATION

11:58:51   13    BY MR. MINGOLLA:

11:58:53   14    Q.   Was there a time when --

11:58:59   15           MR. MINGOLLA:  You know, I'm terribly sorry.

11:59:01   16    My hearing stinks.

11:59:03   17    BY MR. MINGOLLA:

11:59:03   18    Q.   What is your name agent again?

11:59:04   19    A.   My name is Rafael Fernandez.

11:59:08   20    Q.   Thank you.

11:59:10   21        Agent Fernandez -- by the way, where are you based?

11:59:18   22    A.   I'm based here in St. Thomas.

11:59:19   23    Q.   Okay.  How long have you been here?

11:59:22   24    A.   I've been here for approximately, going on three

11:59:27   25    years.  Two and a half years.

| | | |
|---|---|---|
| 11:59:28 | 1 | Q.   Okey-doke. |
| 11:59:31 | 2 | And you indicated to the U.S. attorney's -- the |
| 11:59:43 | 3 | government, that you had observed Mr. Walter and, |
| 11:59:49 | 4 | Mr. Walter Hill and Mr. Angelo Hill for a period of |
| 11:59:56 | 5 | time, but you didn't hear what they were saying.  Is |
| 11:59:59 | 6 | that correct? |
| 12:00:00 | 7 | A.   That is correct. |
| 12:00:01 | 8 | Q.   Okay.  But you assume that it was going to be |
| 12:00:04 | 9 | recorded on some recording device, correct? |
| 12:00:07 | 10 | A.   That's correct. |
| 12:00:07 | 11 | Q.   Okay.  And did you install the recording device? |
| 12:00:17 | 12 | MS. LAKE:  Objection.  Relevance. |
| 12:00:18 | 13 | THE COURT:  Overruled. |
| 12:00:18 | 14 | THE WITNESS:  I did not personally install a |
| 12:00:21 | 15 | recording device for Mr. Angelo Hill. |
| 12:00:21 | 16 | BY MR. MINGOLLA: |
| 12:00:23 | 17 | Q.   Who did? |
| 12:00:24 | 18 | A.   Agent Shawn Querrard. |
| 12:00:28 | 19 | Q.   And you say -- you indicated that -- |
| 12:00:45 | 20 | MR. MINGOLLA:  This is about my last question, |
| 12:00:47 | 21 | Judge. |
| 12:00:48 | 22 | BY MR. MINGOLLA: |
| 12:00:48 | 23 | Q.   You indicated, you indicated that, if I understood |
| 12:00:54 | 24 | you properly -- and please correct me, obviously, if I'm |
| 12:00:58 | 25 | wrong -- but didn't you indicate that you saw |

12:01:02  1    Mr. Walter Hill after meeting -- after this alleged

12:01:09  2    meeting was over?

12:01:10  3    A.   Mr. Walter Hill drove away.  What I recall, and I

12:01:17  4    would probably have to refresh my memory, he left the

12:01:21  5    vicinity.

12:01:21  6    Q.   How?

12:01:22  7    A.   Angelo Hill got in his vehicle and also left, and

12:01:24  8    we were alerted that the conversation was over.  And at

12:01:26  9    the scene we actually terminated surveillance.

12:01:29  10   Q.   Well, you had seen the conversation was over, but

12:01:33  11   the fact they were separated?

12:01:35  12   A.   That's correct.

12:01:36  13   Q.   And you were watching it all, correct?

12:01:40  14   A.   That's correct.

12:01:40  15   Q.   And Mr. Angelo [sic] Hill, how did he depart?

12:01:45  16   A.   Again, I have to review some of the reports.  I

12:01:47  17   just remember him departing.  I don't recall

12:01:51  18   specifically if he was picked up or he walked.

12:01:53  19        But I knew that Angelo Hill got in a vehicle and

12:01:56  20   left.

12:01:57  21   Q.   Well, you just contradicted yourself.  You said he

12:02:00  22   got in the vehicle and left, but you don't know whether

12:02:03  23   he -- earlier you said you don't know whether he walked

12:02:05  24   or how he left.  So can you be a little more specific?

12:02:10  25        Isn't it true you don't know how -- whether he

12:02:13  1   walked, took a car or what?

12:02:14  2   A.   He came in a walk.  And again, when the

12:02:17  3   conversation was over, we saw him -- and again I have to

12:02:21  4   confirm with my other surveillance partners at the time.

12:02:24  5   I was literally over a building watching the

12:02:29  6   conversation.  He left in the vehicle.  I just have to

12:02:32  7   confirm specifically what vehicle he got into, if

12:02:35  8   someone picked him up or not.

12:02:37  9   Q.   And lastly, you -- isn't it true that there were

12:02:50  10  periods of time where you lost contact, let's phrase it

12:02:55  11  like that, with your informant, Mr. Angelo Hill?

12:03:02  12      By "lost contact," I mean lost contact, couldn't

12:03:05  13  find him, lost him in St. John, correct?

12:03:09  14  A.   I wasn't in contact with him personally.

12:03:14  15  Q.   Right.  But are you aware there was a period of

12:03:17  16  time -- into whose custody was this recording, these two

12:03:23  17  recordings, into whose custody?  What was the chain of

12:03:27  18  custody for those recordings?

12:03:30  19      Who removed this alleged device on the arm and who

12:03:37  20  took them, whatever it was --

12:03:40  21          MS. LAKE:  Objection.  Relevance.

12:03:42  22          THE COURT:  Sustained.

12:03:42  23  BY MR. MINGOLLA:

12:03:50  24  Q.   I guess I never really did get an answer to those

12:03:55  25  questions.  Did you respond to my question?  I'm sorry

12:03:58   1    if you did and I don't remember.

12:03:59   2         Was there a time when you lost contact, you,

12:04:03   3    personally, lost contact with Angelo Hill and/or Mr. --

12:04:12   4    moreover, Mr. Walter Hill in St. John that day on the

12:04:15   5    22nd -- on the 20th?

12:04:17   6              MS. LAKE:  Objection.  Asked and answered.

12:04:19   7              THE COURT:  Overruled.

12:04:23   8              THE WITNESS:  When you say "lost contact," I

12:04:25   9    never had contact with either.  We conducted

12:04:29  10    surveillance of the conversation.

12:04:31  11    BY MR. MINGOLLA:

12:04:31  12    Q.   So you were pre-positioned in a --

12:04:34  13    A.   We were pre-positioned in a position where we knew

12:04:37  14    the conversation would take place, and we were there to

12:04:39  15    make sure that the conversation took place based on our

12:04:43  16    operational guidelines.

12:04:45  17         We observed the two parties meet, have a

12:04:47  18    conversation, and we observed the two parties depart

12:04:50  19    each other's presence.

12:04:51  20         So as far as contact, I'm a little confused about

12:04:54  21    the question.

12:04:55  22    Q.   Very well.  And again, lastly, just for clarity's

12:05:16  23    sake, the chain of custody for that videotape went, to

12:05:25  24    the best of your knowledge, went from whom to whom?

12:05:28  25              MS. LAKE:  Objection.  Relevance.

| | | |
|---|---|---|
| 12:05:30 | 1 | THE COURT:  Sustained. |
| 12:05:35 | 2 | BY MR. MINGOLLA: |
| 12:05:36 | 3 | Q.   Does anyone know there was a chain of custody? |
| 12:05:39 | 4 | MS. LAKE:  Objection.  Exceeds the scope of |
| 12:05:41 | 5 | suppression hearing -- |
| 12:05:42 | 6 | THE COURT:  All right.  Sustained. |
| 12:05:45 | 7 | MS. LAKE:  -- relevance. |
| 12:05:49 | 8 | MR. MINGOLLA:  Okay.  No further questions. |
| 12:05:51 | 9 | Thank you, Agent Fernandez. |
| 12:05:54 | 10 | THE COURT:  Thank you, Attorney Mingolla. |
| 12:05:57 | 11 | No further questions for Agent Fernandez, correct? |
| 12:06:00 | 12 | MS. LAKE:  No further questions. |
| 12:06:02 | 13 | THE COURT:  Thank you, Agent Fernandez.  You |
| 12:06:05 | 14 | may step down. |
| 12:06:05 | 15 | (Witness withdrew from stand) |
| 12:06:05 | 16 | MS. LAKE:  No, your Honor. |
| 12:06:06 | 17 | THE COURT:  Attorney Mingolla, any testimony? |
| 12:06:08 | 18 | MR. MINGOLLA:  No, sir. |
| 12:06:09 | 19 | THE COURT:  All right.  Let's see.  The |
| 12:06:10 | 20 | government has the burden.  You want to be heard |
| 12:06:14 | 21 | briefly? |
| 12:06:14 | 22 | MS. LAKE:  Yes, Your Honor. |
| 12:06:14 | 23 | ARGUMENT BY THE GOVERNMENT |
| 12:06:19 | 24 | MS. LAKE:  As to the issue of suppression of |
| 12:06:20 | 25 | the conversation between Walter Hill and Angelo Hill, |

12:06:26   1    the conversation was -- Angelo Hill gave consent to the

12:06:32   2    government to record the conversation and to engage in a

12:06:35   3    conversation with Walter Hill.

12:06:37   4         Based on the consent given by Angelo Hill, there is

12:06:42   5    no expectation of privacy on the part of Walter Hill,

12:06:45   6    because Walter Hill has no expectation of privacy.

12:06:51   7              MR. MINGOLLA:  Your Honor, is there a question

12:06:53   8    here?

12:06:53   9              THE COURT:  I'm sorry.  Attorney Mingolla,

12:06:55   10   we're having argument now.

12:06:57   11        You'll get a chance to argue your position as well.

12:07:00   12        Go ahead, Attorney.

12:07:02   13             MS. LAKE:  There is -- Walter Hill has no

12:07:05   14   expectation of privacy because the conversation -- one

12:07:08   15   party consented to the conversation.  Based on case law,

12:07:12   16   Walter Hill has no expectation of privacy.

12:07:16   17        Because there's no expectation of privacy, the

12:07:22   18   defendant is not entitled to any 4th Amendment

12:07:24   19   protection in a conversation with Angelo Hill.  So based

12:07:28   20   on that --

12:07:28   21             THE COURT:  You would agree if the conversation

12:07:30   22   wasn't voluntary, then there might be a constitutional

12:07:32   23   issue, correct?

12:07:33   24        That is, forgetting Angelo Hill for the moment and

12:07:36   25   him giving consent to record this, if there was a gun to

| | | |
|---|---|---|
| 12:07:40 | 1 | Mr. Walter Hill's head, for instance, then the |
| 12:07:45 | 2 | Constitution might be implicated, correct? |
| 12:07:47 | 3 | MS. LAKE:  If there's a gun to his head -- |
| 12:07:49 | 4 | THE COURT:  Correct?  Yes or no. |
| 12:07:52 | 5 | MS. LAKE:  If the Court finds there's no |
| 12:07:54 | 6 | consent, then yes, there would be, then the defendant |
| 12:07:57 | 7 | would have an expectation of privacy.  But only if the |
| 12:08:00 | 8 | Court found there was no consent. |
| 12:08:02 | 9 | To answer your question, that specific |
| 12:08:04 | 10 | hypothetical, the gun to Angelo Hill's head, admitted |
| 12:08:13 | 11 | give consent, then yes, Walter Hill would have privacy |
| 12:08:18 | 12 | in that conversation. |
| 12:08:19 | 13 | THE COURT:  My question was if Walter Hill was |
| 12:08:22 | 14 | being forced or coerced or anything.  Not Angelo Hill, |
| 12:08:27 | 15 | Walter Hill.  Your position is the Constitution would |
| 12:08:30 | 16 | not be implicated. |
| 12:08:31 | 17 | MS. LAKE:  If Walter Hill was coerced in this |
| 12:08:33 | 18 | conversation, he had no Fourth Amendment expectation of |
| 12:08:36 | 19 | privacy. |
| 12:08:36 | 20 | If he was coerced in that conversation, that's |
| 12:08:39 | 21 | another analysis whether or not there's a Fifth |
| 12:08:42 | 22 | Amendment violation or whether or not, based on the |
| 12:08:44 | 23 | Starks foundational elements, there's a lack of |
| 12:08:46 | 24 | foundation in the conversation.  But there's no |
| 12:08:49 | 25 | expectation of privacy when one party gives consent. |

12:08:52  1      What the Court is mentioning is maybe some sort of

12:08:56  2  entrapment or coercion of the conversation.  That does

12:08:59  3  not negate the defendant's expectation of privacy in the

12:09:03  4  conversation.

12:09:03  5      THE COURT:  All right.  Thank you, Attorney

12:09:05  6  Lake.

12:09:05  7      Attorney Mingolla, briefly.

12:09:25  8                  ARGUMENT BY THE DEFENDANT

12:09:25  9      MR. MINGOLLA:  For once I don't have much to

12:09:26 10  say.  I think that the testimony has spoken for itself.

12:09:43 11      I believe Mr. Hill was coerced -- Walter Hill was

12:09:46 12  coerced into a conversation.

12:09:49 13      I believe that his rights to the Fourth, Sixth and

12:09:57 14  Fourth amendments were violated by said conversation.  I

12:10:03 15  believe that the incoherence of the disks provided is

12:10:12 16  objectionable, provided to the defendants.

12:10:19 17      I believe that under Title III, my belief of the --

12:10:32 18  and it's of the justice department manual, also that not

12:10:37 19  only was a warrant required to do this tap, which is

12:10:42 20  not, distinctly not, which they had asked and received

12:10:48 21  very cogent and very explicit instructions from you as

12:10:53 22  to wiretapping, and boy did they take advantage of that.

12:10:59 23      But I maintain under Title III that they had to

12:11:03 24  come to you with a proposed warrant, Agent Querrard

12:11:10 25  presumably, or Joseph, I don't know, one of them had to

12:11:13  1     come to you and get a warrant to do this tap, which did

12:11:16  2     not involve telephones.

12:11:19  3         And furthermore, to the best of my knowledge, I

12:11:22  4     don't believe that any requisite affidavit was filed by

12:11:29  5     either Mr. -- Agent Querrard nor Mr. -- nor Agent

12:11:33  6     Joseph, which is a prerequisite to getting said

12:11:39  7     permission from Your Honor do this tap -- strike that --

12:11:44  8     not tap, let me be precise, as precise as I can, bug.

12:11:50  9     Because there's a difference.

12:11:51  10        So therefore, I feel that this entire conversation

12:11:58  11    was taken under coercion, that there are other issues,

12:12:04  12    Stark issues, which can be discussed later, that it

12:12:08  13    violated Title III, by virtue of the failure to provide

12:12:16  14    the government -- Your Honor with the requisite

12:12:18  15    documents required, i.e., specifically the affidavit.

12:12:23  16        And the affidavit has to be very specific.  And it

12:12:26  17    has to say precisely what it is that they expect, that

12:12:32  18    the government expects to ascertain from said

12:12:36  19    information that they obtained.

12:12:39  20        I feel that furthermore, and lastly, I think

12:12:50  21    lastly, that my client was coerced by dint of getting 12

12:12:59  22    phone calls in one hour to meet -- which phone records

12:13:02  23    will substantiate -- he gets 12 phone calls in an hour

12:13:07  24    from Angelo Hill to meet Angelo Hill directly.

12:13:11  25        And I find that a little bit untoward.  I think it

12:13:17   1    smacks of coercion.

12:13:18   2         Furthermore, I believe that Agent Querrard fully

12:13:26   3    briefed Mr. Angelo Hill as to what questions to try and

12:13:33   4    use to entrap my client, which again I realize

12:13:36   5    entrapment isn't really what we're on point here, so I'm

12:13:38   6    not going to dwell on it.  But he admits he briefed him,

12:13:44   7    and they clearly briefed him for more than 15 minutes.

12:13:51   8         And furthermore, last -- this is last -- Agent

12:13:55   9    Fernandez apprised the Court, testified, that whilst he

12:14:02   10   may have seen them together, he didn't hear anything.

12:14:07   11   And I believe his actual words were, it looks like they

12:14:11   12   were -- I mean, I'm paraphrasing, but it's pretty close,

12:14:14   13   it looks like they were simply having a casual

12:14:17   14   conversation.

12:14:18   15        So -- and lastly -- this is the last thing, I

12:14:29   16   swear.  The clarity of the videotape -- the

12:14:32   17   audio/videotapes that I received, maybe everybody else

12:14:36   18   got ones that were crystal clear like that.  I didn't.

12:14:39   19   Mine are incoherent.  You can't make out what anyone is

12:14:43   20   saying.

12:14:43   21        And that's why I wanted to find out, you know, a

12:14:51   22   little about the translation work, because there are two

12:14:55   23   transcripts.  Both of them are different.  They are

12:14:57   24   significantly different.  They are the same

12:14:59   25   conversation, but they don't contain the same

12:15:01  1    information.

12:15:01  2         There's significant differences between the

12:15:04  3    documents, which was my reason for asking how they

12:15:09  4    obtained these two different transcripts and who did the

12:15:12  5    translating.  Because they're distinctly different.

12:15:17  6         They -- well, I won't go into the details now.

12:15:22  7    They are very different.

12:15:24  8         So I would put forth to this Court that this

12:15:29  9    case -- strike that -- that this, that my motion to

12:15:36  10   suppress should be sustained on those grounds, and

12:15:42  11   others that have come up in testimony; and that

12:15:47  12   furthermore, I have to put it on the record, although I

12:15:50  13   don't want to, that I will be, I will be filing, if this

12:15:57  14   is denied, I will be filing -- I have to do this Judge;

12:16:01  15   I'm not doing it to be vindictive -- will be denied, if

12:16:06  16   it's denied, I have to file a motion for appeal, and I

12:16:10  17   also will probably file a motion for ineffective

12:16:13  18   counsel.

12:16:13  19        So that's it.  Thank you, sir, for listening to me.

12:16:17  20         THE COURT:  All right.  Thank you, Attorney

12:16:19  21   Mingolla.  And of course, if there's anything you need

12:16:22  22   to file, file it.  You don't need to explain or

12:16:27  23   apologize or be reserved.  You have to file whatever is

12:16:31  24   needed to preserve the record and the rights of your

12:16:33  25   client.

RULING BY THE COURT

THE COURT:  All right.  Before the Court is a motion to suppress.  Specifically, the defense seeks to suppress a conversation that was recorded between Walter Hill and Angelo Hill in October of 2013.

Of course, when the Court is assessing whether suppression is appropriate, the Court is primarily focused on what, if any, constitutional infirmity occurred that would cause the Court to suppress the evidence at the center of the motion.

And here, the Court heard the testimony of two witnesses, Agent Querrard and Agent Fernandez.  Agent Querrard did not witness the conversation personally, was not in a position to surveil the conversation as it occurred.

He did view a recording.  And I believe in his testimony he indicated that Walter Hill arrived on his own and left on his own.

The Court's view of the tape doesn't indicate that, certainly not in a way that's clear.

There was more footage of Mr. Angelo Hill getting to his destination in a covered environment than in an environment where you saw a lot of blue sky, blue clouds, if I'm not mistaken, and electrical utility wires.  And occasionally, Mr. Walter Hill, it isn't

12:18:16  1    evident on the recording that Mr. Hill, Walter Hill,

12:18:19  2    that is, left without company or arrived without

12:18:25  3    company.

12:18:29  4         What is evident, though, at least what the Court

12:18:32  5    heard, is there was some conversation.  The conversation

12:18:35  6    was free and loose and was primarily dominated by Walter

12:18:41  7    Hill.

12:18:41  8         The Court also heard the testimony of Agent

12:18:45  9    Fernandez, who was in a position to observe, and he

12:18:47  10   observed the arrival and departure of Walter Hill.

12:18:50  11        And that was done in a manner that indicated that

12:18:55  12   Walter Hill was, arrived on his own, left on his own and

12:19:00  13   was free to leave.

12:19:02  14        There's nothing that the Court heard or saw that

12:19:04  15   would indicate that he was not free to leave at any

12:19:07  16   time.

12:19:08  17        So, with respect to the applicable law that the

12:19:13  18   Court has to apply to those circumstances, the Court is

12:19:16  19   not convinced that suppression is appropriate.

12:19:18  20        I'll deal with the inquiry that the defense counsel

12:19:27  21   made about whether there was an affidavit or permission

12:19:31  22   required from this Court to do anything that was done

12:19:34  23   here.

12:19:34  24        First of all, the evidence is clear that there was

12:19:39  25   consent from Angelo Hill to engage in this recorded

12:19:47  1    conversation.

12:19:48  2         There is no requirement under Title III or other

12:19:53  3    section of the law or Constitution for an affidavit from

12:19:55  4    this Court or Title III authorization in order to record

12:20:01  5    a consensual conversation.

12:20:05  6         So there is no wiretap authorization on this record

12:20:14  7    for the devices that were used and the conversation that

12:20:17  8    was recorded with those devices in October 2013 between

12:20:21  9    Angelo Hill and Walter Hill.

12:20:23 10         So the record is clear, to the extent there was any

12:20:27 11    testimony, I believe from Agent Querrard, that there was

12:20:30 12    authorization from this Court for that, the Court

12:20:33 13    doesn't see anything in the record that indicates as

12:20:35 14    such.  And indeed, none was required for that consensual

12:20:42 15    recording.

12:20:42 16         So the record is clear, let me make sure, from the

12:20:45 17    government, there is no such authorization from this

12:20:47 18    Court for an October 2013 recorded conversation between

12:20:52 19    Angelo Hill and Walter Hill; is that correct?

12:20:54 20         MS. LAKE:  That's correct.

12:20:55 21         THE COURT:  All right.  Thank you.  So the

12:20:56 22    record is clear.

12:20:56 23         All right.  With respect to the conversation

12:21:01 24    itself, the Court wants to make clear that once consent

12:21:06 25    is given, that certainly goes a long way.  The Court's

12:21:09   1    concern would be whether there's some level of coercion.

12:21:12   2         No different than if a defendant were in a

12:21:19   3    jailhouse or the police station, and the Court would

12:21:22   4    evaluate the circumstances and determine whether there

12:21:27   5    was some level of coercion to elicit some utterances.

12:21:34   6    And the Court would be concerned with some Fifth

12:21:38   7    Amendment or due process violation.

12:21:39   8         And here the Court finds nothing whatsoever that

12:21:43   9    suggests even the slightest bit of coercion that would

12:21:47  10    make this constitutionally infirm.

12:21:48  11         Mr. Walter Hill, from everything the Court has seen

12:21:52  12    and heard, was free to leave at every time.  That is, he

12:21:56  13    was never in custody.

12:21:57  14         The only two people who were there were Angelo Hill

12:22:00  15    and Walter Hill, engaged in what Agent Fernandez

12:22:05  16    testified was a loose -- I don't know if he used that

12:22:09  17    word -- but looks like a free conversation between two

12:22:12  18    individuals.

12:22:13  19         What the Court heard, again, was something that was

12:22:16  20    just a loose conversation between two people who knew

12:22:19  21    each other and felt comfortable with each other.

12:22:21  22         So the question would be:  Was there something else

12:22:25  23    attendant that would make this akin to where you have

12:22:29  24    some coercive sort of circumstance?

12:22:32  25         And there's none.  No one else was there, no gun,

12:22:35  1   no agents, no nothing, just two familiar people engaged

12:22:40  2   in a conversation.

12:22:42  3       So the Court finds there's nothing that implicates

12:22:46  4   the Constitution in this case.

12:22:47  5       So the record is also very clear, I've heard some

12:22:53  6   discussion about the chain of custody and also about

12:22:59  7   entrapment.

12:23:01  8       Those are things that would be properly raised at

12:23:04  9   trial.  They certainly don't have any bearing here, or

12:23:10  10  much, if any, bearing in the Court's assessment of

12:23:13  11  whether there's something constitutionally infirm.

12:23:15  12      The Court was more concerned with coercion of the

12:23:18  13  kind that you would have if someone was in, again, the

12:23:22  14  police station and there were ten agents in the room and

12:23:24  15  they had their guns visible, and there was a level of

12:23:29  16  questioning.  That didn't happen here.

12:23:33  17      So the petition for suppression is denied.

12:23:38  18      And I believe we have a trial date.  To the extent

12:23:43  19  you want to file for any relief, of course, you don't

12:23:46  20  need to apologize or even ask for permission to do that,

12:23:49  21  Attorney Mingolla.  That's your prerogative.  But we do

12:23:53  22  have a trial date.

12:23:54  23      So unless there's anything else that needs to be

12:23:56  24  brought up, and then -- let me ask the government first,

12:23:59  25  is there anything we need to attend to?

12:24:02  1          MS. LAKE:  There is one outstanding motion,

12:24:04  2     Your Honor, a motion to consolidate the sentencings in

12:24:07  3     this matter in the related case.

12:24:10  4          THE COURT:  Oh, the sentencings.  All right.

12:24:12  5     We'll deal with that at some other time.

12:24:15  6          MS. LAKE:  Aside from that, there are no

12:24:16  7     additional motions, Your Honor.

12:24:18  8          THE COURT:  Very good.

12:24:19  9        Attorney Mingolla?

12:24:20  10         MR. MINGOLLA:  There's one thing, I don't know

12:24:23  11    if now is the appropriate time.  You tell me.  I want to

12:24:26  12    make abundantly certain that the motion in limine that I

12:24:30  13    filed vis-a-vis the previous conviction of my client

12:24:35  14    some 22 years ago or something --

12:24:38  15         THE COURT:  This is your 404(b) motion?

12:24:40  16         MR. MINGOLLA:  Precisely.

12:24:41  17         THE COURT:  Does the government even intend to

12:24:44  18    even bring that up in this case?

12:24:46  19         MR. LINDQUIST:  No.

12:24:46  20         THE COURT:  So the motion is denied as moot --

12:24:49  21    or you can withdraw the motion.  The government says

12:24:52  22    they're not going bring that up.

12:24:54  23         MR. MINGOLLA:  No, that's fine.  That's great.

12:24:57  24         THE COURT:  Anything else, Attorney Mingolla,

12:24:59  25    then?

| | | |
|---|---|---|
| 12:24:59 | 1 | MR. MINGOLLA:  No, sir. |
| 12:25:00 | 2 | THE COURT:  All right.  Then we have a trial |
| 12:25:01 | 3 | date. |
| 12:25:02 | 4 | Let me thank counsel for a well-argued motion. |
| 12:25:05 | 5 | Thank you. |
| | 6 | (Court in recess, 12:25 p.m.) |
| | 7 | |
| | 8 | --- |
| | 9 | |
| | 10 | CERTIFICATE |
| | 11 | |
| | 12 | This document is hereby certified |
| | 13 | to be a true and accurate transcript |
| | 14 | of the foregoing proceedings. |
| | 15 | |
| | 16 | |
| | 17 | /s_____   March 16, 2014 |
| | 18 | Chandra Kean, RMR               DATE |
| | | Official Court Reporter |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |