```
            IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                 DIVISION OF ST. THOMAS AND ST. JOHN

                              ---

   UNITED STATES OF AMERICA,          )
                                      )
                       Plaintiff,     )
                                      )
   vs.                                )   CRIM. NO. 2013-22
                                      )
                                      )
   RAYMOND BROWN, WALTER HILL,        )
                                      )
                       Defendants.    )
   _____)
```

10:48:15
10:48:19

REPORTER'S TRANSCRIPT

<u>JURY TRIAL</u>

10:48:03
10:48:09

Monday, March 24, 2014

---

```
   BEFORE:      THE HONORABLE CURTIS V. GOMEZ
                District Judge

   APPEARANCES: OFFICE OF THE UNITED STATES ATTORNEY
                BY:  KELLY LAKE, AUSA
                     NELSON JONES, AUSA

                For the Government

                ARTURO WATLINGTON, ESQ.

                For Defendant Brown

                JOSEPH MINGOLLA, ESQ.
                LAW OFFICES OF JOSEPH MINGOLLA

                For Defendant Hill

                         ---

   COURT REPORTER:   CHANDRA R. KEAN, RMR
                     Official Court Reporter
                     Virgin Islands District Court
                     St. Thomas, Virgin Islands
```

INDEX


JURY VOIR DIRE / JURY SELECTION                    11

PRELIMINARY JURY INSTRUCTIONS                      45

OPENING STATEMENT BY THE GOVERNMENT (Re Brown)     50

OPENING STATEMENT BY DEFENDANT BROWN               52

OPENING STATEMENT BY THE GOVERNMENT (Re Hill)      55

OPENING STATEMENT BY DEFENDANT HILL                57

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Rafael Fernandez | 72 | 90 | 98 | --- |
| Henry Enright | 99 | --- | --- | --- |
| Eduardo Colon Mas | 116 | 125 | --- | --- |
| Creighton Skeen | 128 | 138 | --- | --- |
| Roberto Tapia | 146 (Not completed) | | | |

        (Court recessed)


                      ---

1                          <u>EXHIBITS</u>

2            GOVERNMENT'S

3            <u>EXHIBIT NO.</u>        <u>MARKED</u>        <u>ADMITTED</u>

| # | Exhibit No. | Marked | Admitted |
|---|---|---|---|
| 4 | 1a-1 | 74 | |
| 5 | 1a-2 | 78 | |
| 6 | 1a-3 | 79 | |
| 7 | 1b-1 | 80 | |
| 8 | 1b-2 | 81 | |
| 9 | 1b-3 | 82 | |
| 10 | 1c-1 | 83 | |
| 11 | 1c-2 | 84 | |
| 12 | 1c-3 | 85 | |
| 13 | 2a-1, 2a-2 | 101 | |
| 14 | 2a-3, 2a-4 | 102 | |
| 15 | 2b-1, 2b-2 | 102 | |
| 16 | 2c-1 | 102 | |
| 17 | 2c-2, 2c-3, 2c-4 | 103 | |
| 18 | 85a | 110 | |
| 19 | 3b through 78b | 122 | |
| 20 | 79a | 134 | |
| 21 | 79b | 135 | |
| 22 | 87a | 151 | |
| 23 | 87b | 152 | |
| 24 | 7a | --- | 190 |
| 25 | 9a | --- | 192 |

<pre>
 1                        EXHIBITS (Continued)

 2
        GOVERNMENT'S
 3      EXHIBIT NO.          MARKED          ADMITTED

 4      12a                   ---              192

 5      14a                   ---              193

 6      16a                   ---              193

 7      25a through 53a       ---              208

 8      25b through 53b       ---              208
        (Spanish translations only)
 9

10
        DEFENDANT'S
11       EXHIBIT          MARKED          ADMITTED

12       (None)

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

PROCEEDINGS

1

2

3        (In chambers conference; jury not present)

4            THE COURT:  This is United States versus Hill

5    and Brown.

6        The Court has met with counsel in chambers to

7    discuss procedures for selecting two juries to try this

8    matter, one for each defendant.

9        The Court's concern was that there were two

10   separate conspiracies, no overlap.  There are multiple

11   substantive counts, no overlap between the two

12   defendants.

13       While initially there was an overarching

14   conspiracy, there is none now.  And nothing that ties

15   the two defendants together.

16       Out of an abundance of caution, the Court is

17   inclined to select two juries to hear this matter, and

18   they will be segregated for opening, closing.

19       And if there is any evidence that clearly only

20   related to one and there is a practicable way to

21   segregate the jury to listen to that testimony, the

22   Court will do so.

23       Alternatively, the Court may give a curative

24   instruction, as it would in any case where there is

25   joinder and there are counts that only relate to one

 1    defendant, and indicate that the testimony with respect

 2    to certain exhibits only relate to that one witness --

 3    I'm sorry, that one defendant.

 4        The Court has explained this process to counsel and

 5    taken the input of counsel and answered counsel's

 6    questions, and doesn't believe it has any objection from

 7    counsel with the procedure as it just outlined.

 8        Is that the case, Attorney Watlington?

 9            MR. WATLINGTON:  Yes.  Arturo Watlington.  Yes,

10    Your Honor.

11            THE COURT:  Attorney Mingolla, is that the

12    case?

13            MR. MINGOLLA:  Yes, Your Honor.  Joe Mingolla

14    on behalf of ter hill, and I have no objection to that,

15    Judge.

16            THE COURT:  Attorney Lake, is that the case?

17            MS. LAKE:  Yes, Your Honor.  We suggested an

18    alternative, that we have one jury and curative

19    instructions, but we do understand the Court's

20    instruction.

21            THE COURT:  Very good.  All right, Counsel.

22        (End of in-chambers conference.)

23

24                         ---

25

| | | |
|---|---|---|
| | 1 | <u>PROCEEDINGS</u> |
| | 2 | |
| 10:49:46 | 3 | (Court called to order at 10:49 a.m.) |
| 10:49:46 | 4 | (Sidebar discussion held as follows:) |
| 10:49:48 | 5 | THE COURT:  All right.  The juror who is listed |
| 10:49:51 | 6 | in seat 25 is not in seat 25.  All right.  That juror. |
| 10:49:58 | 7 | MR. JONES:  Is 48? |
| 10:50:00 | 8 | THE COURT:  Juror Number 48 is in seat 49. |
| 10:50:12 | 9 | Let's just stick with this to make sure we're |
| 10:50:15 | 10 | talking about the same seat. |
| 10:50:18 | 11 | MR. JONES:  We haven't got that. |
| 10:50:20 | 12 | MS. LAKE:  We don't have that. |
| 10:50:22 | 13 | THE COURT:  What do you have?  It's the same |
| 10:50:27 | 14 | one. |
| 10:50:28 | 15 | MR. JONES:  It's the same one? |
| 10:50:30 | 16 | THE COURT:  The very same one. |
| 10:50:31 | 17 | MS. LAKE:  We don't have that.  We gave it to |
| 10:50:33 | 18 | you. |
| 10:51:38 | 19 | Juror 48, who is listed in seat 25, is not in seat |
| 10:51:44 | 20 | 25. |
| 10:51:46 | 21 | So the information that you have with respect to |
| 10:51:49 | 22 | juror 20 -- I'm sorry, juror 48 in seat 25 -- Attorney |
| 10:51:57 | 23 | Mingolla -- if you guys can help each other out it would |
| 10:52:01 | 24 | certainly help me.  He is looking at the wrong thing. |
| 10:52:04 | 25 | Seat 25. |

| | | |
|---|---|---|
| 10:52:06 | 1 | MR. MINGOLLA:  Got you. |
| 10:52:08 | 2 | THE COURT:  The juror who is seated there.  The |
| 10:52:10 | 3 | juror information in that seat, that juror is not |
| 10:52:13 | 4 | sitting in seat 25.  That juror is juror 48. |
| 10:52:18 | 5 | MR. MINGOLLA:  48, right. |
| 10:52:25 | 6 | THE COURT:  The Juror Number is there.  Juror |
| 10:52:28 | 7 | 48. |
| 10:52:29 | 8 | MR. MINGOLLA:  Okay. |
| 10:52:30 | 9 | THE COURT:  Juror 48 is in seat 49.  So the |
| 10:52:34 | 10 | information you have about juror 48, whatever |
| 10:52:39 | 11 | information you have about that juror on the bio sheet, |
| 10:52:48 | 12 | apply it to juror -- |
| 10:52:50 | 13 | MR. MINGOLLA:  Juror 49. |
| 10:52:51 | 14 | THE COURT:  Juror 49 is not in seat 49.  So you |
| 10:52:53 | 15 | can scratch out -- not the seat number, just the |
| 10:52:57 | 16 | information.  ████████ is not in seat 49. |
| 10:53:01 | 17 | MR. MINGOLLA:  Okay. |
| 10:53:01 | 18 | THE COURT:  Juror 48 is in seat 49. |
| 10:53:04 | 19 | Do you understand, government? |
| 10:53:08 | 20 | MS. LAKE:  Yes, Your Honor. |
| 10:53:08 | 21 | THE COURT:  You understand, Attorney Mingolla? |
| 10:53:12 | 22 | MR. MINGOLLA:  No, 49 is -- |
| 10:53:13 | 23 | THE COURT:  Juror 48 is in seat 49. |
| 10:53:16 | 24 | Do you understand that? |
| 10:53:17 | 25 | MR. MINGOLLA:  Okay. |

| | | |
|---|---|---|
| 10:53:17 | 1 | THE COURT:  Do you understand that? |
| 10:53:20 | 2 | MR. MINGOLLA:  Yes, I do. |
| 10:53:22 | 3 | THE COURT:  Juror 48 is in seat 49. |
| 10:53:34 | 4 | The first row is the back row.  The back row, seat |
| 10:53:42 | 5 | 31, you can do the back row. |
| 10:53:45 | 6 | Juror 52 is the first seat in the back row. |
| 10:53:48 | 7 | Juror 52 in seat 31.  And that ends with juror 44 |
| 10:53:56 | 8 | who is in seat number 10 in the back row. |
| 10:54:01 | 9 | MR. MINGOLLA:  I'm sorry.  31 is, is the first |
| 10:54:08 | 10 | one in the back row. |
| 10:54:13 | 11 | MS. LAKE:  Yes.  I understand seat number 10 is |
| 10:54:17 | 12 | juror 44; is that correct? |
| 10:54:18 | 13 | THE COURT:  We're just going to use seat |
| 10:54:20 | 14 | numbers.  Seat 31 is the first seat.  That's juror 52. |
| 10:54:27 | 15 | Seat number 40 is juror 44, which is right here. |
| 10:54:31 | 16 | Seat number 41 is Juror Number 20, the gentleman at the |
| 10:54:38 | 17 | very left.  Okay?  Juror Number 20. |
| 10:54:40 | 18 | Juror Number 20, raise your card. |
| 10:54:43 | 19 | Thank you, sir. |
| 10:54:45 | 20 | And Juror Number 65 is the end of the second row. |
| 10:54:51 | 21 | Juror 65, raise your card. |
| 10:54:55 | 22 | And then juror 75 is in seat 51. |
| 10:55:01 | 23 | Juror 75, raise your card.  Okay.  And. |
| 10:55:08 | 24 | MR. MINGOLLA:  Where was 75? |
| 10:55:09 | 25 | THE COURT:  Attorney Mingolla, we can't keep |

10:55:11  1    repeating.

10:55:13  2        MR. MINGOLLA:  Okay.

10:55:13  3        THE COURT:  If you need to look at the jury,

10:55:15  4    look at the jury.  Otherwise, we will have to say this

10:55:18  5    thing twice.

10:55:20  6        MR. MINGOLLA:  I got you.

10:55:21  7        THE COURT:  Juror 65, raise your card again.

10:55:23  8    Thank you.

10:55:24  9        Juror 75, raise your card.  Thank you.

10:55:47  10       Juror 42, raise your card.  Thank you.

10:55:50  11       That's the end of that row.

10:55:52  12       Juror 62, raise your card.

10:55:58  13       And juror 24, raise your card.

10:56:00  14       Those are our rows.

10:56:01  15       All right.  We're going to start the jury selection

10:56:04  16   and start our case.

10:56:06  17       (End of sidebar, open court as follows:)

10:56:22  18       THE CLERK:  Everyone please stand.

10:56:25  19       Jurors, please raise your right hand to take the

10:56:28  20   oath.

10:56:29  21       (Jury sworn).

10:57:07  22       THE CLERK:  United States of America versus

10:57:08  23   Walter Hill.

10:57:12  24       MS. LAKE:  Good morning, Your Honor.  Good

10:57:14  25   morning, ladies and gentlemen.  Kelly Lake for the

10:57:16   1    government.

10:57:19   2            THE COURT:  Good morning, Attorney Lake.

10:57:21   3            MR. MINGOLLA:  Good morning, everyone.  I'm Joe

10:57:24   4    Mingolla.  I'm here on behalf of Mr. Walter Hill, who is

10:57:27   5    sitting to my right.  And to his right is Mr. Gaston

10:57:32   6    Tuckett.

10:57:33   7            THE COURT:  All right.  Thank you.

10:57:34   8        Good morning.

10:57:34   9        Good morning, ladies and gentlemen.

10:57:36   10       I apologize for the late start.  There were some

10:57:39   11   logistical issues that proved a little more challenging

10:57:42   12   than we had anticipated, but we'll move as quickly as we

10:57:45   13   can.

10:57:46   14       You're here for jury selection.

10:57:46   15               JURY VOIR DIRE / JURY SELECTION

10:57:48   16           THE COURT:  This portion of jury selection is

10:57:50   17   what we refer to as voir dire.

10:57:51   18       There are a series of questions I need to ask you.

10:57:54   19   If you have an affirmative answer, a yes answer, raise

10:57:56   20   your card, stand up and give your answer.

10:57:58   21       The attorney who is prosecuting this case is

10:58:00   22   Attorney Kelly Lake.  Does anyone have a relationship by

10:58:05   23   blood, business or marriage with Attorney Lake?

10:58:11   24       (No response).

10:58:12   25           THE COURT:  The -- thank you, Attorney Lake.

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:58:13 | 1  | The attorney who is defending this case is Attorney |
| 10:58:16 | 2  | Joe Mingolla.  Does anyone have a relationship by blood, |
| 10:58:20 | 3  | marriage or business with Attorney Mingolla? |
| 10:58:20 | 4  | (No response.) |
| 10:58:25 | 5  | THE COURT:  The defendant in this case -- |
| 10:58:28 | 6  | Attorney Mingolla, can you just introduce us to your |
| 10:58:31 | 7  | client, please? |
| 10:58:32 | 8  | MR. MINGOLLA:  Walter Hill. |
| 10:58:33 | 9  | THE COURT:  Does anyone have a relationship by |
| 10:58:35 | 10 | blood, marriage or business with Mr. Walter Hill? |
| 10:58:38 | 11 | Juror 89.  Stand up and tell us your relation. |
| 10:58:41 | 12 | JURY MEMBER:  Good morning.  His son is my |
| 10:58:45 | 13 | stepson. |
| 10:58:45 | 14 | THE COURT:  I'm sorry.  His son -- |
| 10:58:47 | 15 | JURY MEMBER:  Is my stepson. |
| 10:58:50 | 16 | THE COURT:  All right. |
| 10:58:55 | 17 | Is there anything in that relationship that would |
| 10:58:58 | 18 | prevent you from following my instructions on the law? |
| 10:59:04 | 19 | JURY MEMBER:  I know him before that.  I mean, |
| 10:59:06 | 20 | we have a relationship from in St. John, so I know him |
| 10:59:10 | 21 | from in St. John. |
| 10:59:13 | 22 | THE COURT:  All right.  Well, my question isn't |
| 10:59:15 | 23 | whether it's going to be difficult, because all the |
| 10:59:17 | 24 | questions and everything that a jury does, we understand |
| 10:59:20 | 25 | is going to be difficult. |

| | | |
|---|---|---|
| 10:59:23 | 1 | Is there anything that would prevent you from |
| 10:59:24 | 2 | following my instructions on the law? |
| 10:59:26 | 3 | JURY MEMBER:  No, no. |
| 10:59:27 | 4 | THE COURT:  Is there anything that would |
| 10:59:28 | 5 | prevent you from listening to the evidence in this case |
| 10:59:30 | 6 | fairly and impartially? |
| 10:59:31 | 7 | JURY MEMBER:  No. |
| 10:59:32 | 8 | THE COURT:  All right.  Thank you.  You can |
| 10:59:36 | 9 | have a seat. |
| 10:59:37 | 10 | Juror 62.  Yes, tell us your relation. |
| 10:59:42 | 11 | JURY MEMBER:  My relation is friend from which, |
| 10:59:45 | 12 | back from in St. John. |
| 10:59:47 | 13 | THE COURT:  You are friends with Mr. Walter |
| 10:59:48 | 14 | Hill? |
| 10:59:49 | 15 | JURY MEMBER:  Yes, sir. |
| 10:59:50 | 16 | THE COURT:  All right.  And what's the nature |
| 10:59:51 | 17 | of that friendship? |
| 10:59:52 | 18 | JURY MEMBER:  Just a regular friend:  Hi, how |
| 10:59:55 | 19 | you doing?  Stop, hold a little conversation sometimes, |
| 10:59:59 | 20 | and that's it.  How we're doing and stuff like that. |
| 11:00:03 | 21 | THE COURT:  Do you dine together regularly? |
| 11:00:06 | 22 | JURY MEMBER:  No, no. |
| 11:00:08 | 23 | THE COURT:  Do you socialize together |
| 11:00:11 | 24 | regularly? |
| 11:00:11 | 25 | JURY MEMBER:  No, it's not relate. |

| | | |
|---|---|---|
| 11:00:16 | 1 | THE COURT:  Is there anything in that |
| 11:00:17 | 2 | relationship that would prevent you from following my |
| 11:00:19 | 3 | instructions on the law? |
| 11:00:20 | 4 | JURY MEMBER:  No. |
| 11:00:20 | 5 | THE COURT:  Is there anything in that |
| 11:00:21 | 6 | relationship that would prevent you from listening to |
| 11:00:23 | 7 | the evidence in this case fairly and impartially? |
| 11:00:25 | 8 | JURY MEMBER:  No. |
| 11:00:25 | 9 | THE COURT:  All right.  Thank you. |
| 11:00:30 | 10 | The defendant can have a seat. |
| 11:00:32 | 11 | This trial will likely last today, tomorrow and |
| 11:00:37 | 12 | Wednesday, perhaps a part of Thursday. |
| 11:00:39 | 13 | Does anyone have any prepaid travel arrangements |
| 11:00:45 | 14 | for those days? |
| 11:00:45 | 15 | (No response.) |
| 11:00:49 | 16 | THE COURT:  Let me ask the government to get |
| 11:00:51 | 17 | its witnesses. |
| 11:01:00 | 18 | Are there any students in the panel? |
| 11:01:06 | 19 | Juror 11, tell us where you're attending and when |
| 11:01:10 | 20 | your classes are. |
| 11:01:11 | 21 | JURY MEMBER:  Good morning.  I go to UVI at |
| 11:01:15 | 22 | 5:30, Monday, Tuesday and Thursday. |
| 11:01:19 | 23 | THE COURT:  You have a class at 5:30? |
| 11:01:22 | 24 | JURY MEMBER:  Correct.  Monday, Tuesdays and |
| 11:01:26 | 25 | Thursdays. |

11:01:26  1            THE COURT:  All right.  Thank you.

11:01:38  2        All right.  The government has charged Mr. Hill

11:01:49  3    with violating the narcotics laws of the United States

11:01:55  4    and has charged him with violations from on or about

11:01:59  5    April 5th, 2013, to on or about May 18, 2013.

11:02:08  6        Has anyone read or heard anything about this case

11:02:13  7    involving Mr. Walter Hill?

11:02:19  8        Juror 42, 89, 24, 9 and 18, 20.

11:02:41  9        For the next question I'll take your answers at

11:02:43  10   sidebar.  You just need to raise your card now.

11:02:46  11       Have you, a relative or very close friend been

11:02:52  12   involved in the criminal justice system, either as a

11:02:56  13   victim, a witness or a defendant?

11:03:06  14       76, 90, 30, 65, 66, 42, 89, 24.

11:03:29  15       All right.  Let me repeat the question.  The

11:03:31  16   question is whether you, a relative or very close friend

11:03:35  17   have been involved in the criminal justice system.

11:03:38  18   Either as a victim, a witness or a defendant.

11:03:43  19       If you've already raised your card and I've called

11:03:45  20   your number, you don't need to raise it again.

11:03:47  21       If you haven't raised your card, then...

11:03:51  22       63 -- 30, I already had your number.  47, 62.  All

11:04:05  23   right.  18.

11:04:09  24       Let me ask the government's witnesses to introduce

11:04:12  25   themselves, starting with the witness who is closest to

| | | |
|---|---|---|
| 11:04:15 | 1 | the bench going out to the gallery.  Raise your hand, |
| 11:04:18 | 2 | say your name and where you work. |
| 11:04:19 | 3 | THE WITNESS:  Mark Joseph, task force agent |
| 11:04:21 | 4 | with the Drug Enforcement Administration and VIPD |
| 11:04:24 | 5 | detective. |
| 11:04:25 | 6 | THE WITNESS:  Fred Ott, agent with the Drug |
| 11:04:29 | 7 | Enforcement Administration. |
| 11:04:29 | 8 | THE WITNESS:  Eric Barnard, agent with the Drug |
| 11:04:32 | 9 | Enforcement Agency. |
| 11:04:32 | 10 | THE WITNESS:  Eduardo Colon, DEA contractor. |
| 11:04:35 | 11 | THE WITNESS:  Agent Creighton Skeen, Office of |
| 11:04:37 | 12 | Air and Marine. |
| 11:04:38 | 13 | THE WITNESS:  Rafael Fernandez, special agent, |
| 11:04:41 | 14 | FBI. |
| 11:04:41 | 15 | THE WITNESS:  Anthony Sorenson, special agent, |
| 11:04:46 | 16 | FBI. |
| 11:04:47 | 17 | THE WITNESS:  Rick Dominguez, DEA task force. |
| 11:04:52 | 18 | THE WITNESS:  Andrew Niermeier, DEA. |
| 11:04:59 | 19 | THE WITNESS:  Henry Enright, AT&T custodian of |
| 11:05:05 | 20 | records. |
| 11:05:05 | 21 | THE WITNESS:  William Rivera, Claro custodian |
| 11:05:05 | 22 | of records. |
| 11:05:05 | 23 | THE COURT:  Are there any witnesses who are not |
| 11:05:06 | 24 | here, Attorney Lake? |
| 11:05:08 | 25 | MS. Lake:  Yes, Your Honor, there is.  Roberto |

| | | |
|---|---|---|
| 11:05:09 | 1 | Tapia, Angel Negron-Beltran, Angelo Hill, and Shawn |
| 11:05:17 | 2 | Querrard, who is the case agent who is seated at counsel |
| 11:05:21 | 3 | table; Ricardo Leal, Sprint custodian of records; |
| 11:05:26 | 4 | Michael Grossman, DEA; and Carolyn Hudson, DEA chemist. |
| 11:05:30 | 5 | THE COURT:  All right.  Are there -- do you -- |
| 11:05:34 | 6 | let me repeat that.  Do you have a relationship by |
| 11:05:38 | 7 | blood, marriage or business with any witnesses to whom |
| 11:05:42 | 8 | you've just been introduced? |
| 11:05:47 | 9 | Juror 11. |
| 11:05:53 | 10 | THE COURT:  Stand up and tell us your relation. |
| 11:05:55 | 11 | JURY MEMBER:  Good morning once again.  Agent |
| 11:05:58 | 12 | Barnard and Agent Niermeier, they are both customers of |
| 11:06:03 | 13 | my business where I work. |
| 11:06:05 | 14 | THE COURT:  Where is that? |
| 11:06:07 | 15 | JURY MEMBER:  Mail stop in Crown Bay Marina. |
| 11:06:09 | 16 | THE COURT:  Is there anything in that |
| 11:06:10 | 17 | relationship that would prevent you from following my |
| 11:06:13 | 18 | instructions on the law? |
| 11:06:14 | 19 | JURY MEMBER:  No, sir. |
| 11:06:14 | 20 | THE COURT:  Is there anything in that |
| 11:06:16 | 21 | relationship that would prevent you from listening to |
| 11:06:18 | 22 | the evidence in this case fairly and impartially? |
| 11:06:20 | 23 | JURY MEMBER:  No, sir. |
| 11:06:20 | 24 | THE COURT:  All right.  Thank you. |
| 11:06:21 | 25 | The witnesses can leave the courtroom.  Thank you. |

| | | |
|---|---|---|
| 11:06:23 | 1 | Sidebar, Counsel. |
| 11:06:40 | 2 | (Sidebar discussion held as follows:) |
| 11:06:41 | 3 | THE COURT:  Juror 76. |
| 11:06:53 | 4 | JURY MEMBER:  Good morning. |
| 11:06:54 | 5 | THE COURT:  Good morning. |
| 11:06:55 | 6 | JURY MEMBER:  How you doing? |
| 11:06:56 | 7 | THE COURT:  Tell us your Juror Number, please. |
| 11:06:58 | 8 | JURY MEMBER:  76. |
| 11:06:59 | 9 | THE COURT:  Okay.  You raised your card in |
| 11:07:00 | 10 | response to the question about the criminal justice |
| 11:07:02 | 11 | system?  Tell us why. |
| 11:07:06 | 12 | JURY MEMBER:  You said relatives, defendants or |
| 11:07:07 | 13 | witnesses, right? |
| 11:07:08 | 14 | THE COURT:  Right.  Victim, witness or |
| 11:07:15 | 15 | defendant. |
| 11:07:16 | 16 | JURY MEMBER:  Dorian Swan, first cousin; Lori |
| 11:07:19 | 17 | Swan, first cousin, Shanille Harrigan, third cousin. |
| 11:07:23 | 18 | Those are just the last two years. |
| 11:07:25 | 19 | THE COURT:  Okay.  Those are cousins who were |
| 11:07:27 | 20 | involved as defendants? |
| 11:07:29 | 21 | JURY MEMBER:  Defendants, yeah. |
| 11:07:30 | 22 | THE COURT:  And the result of those? |
| 11:07:32 | 23 | JURY MEMBER:  Two convictions, one acquittal. |
| 11:07:35 | 24 | THE COURT:  Okay.  Is there anything in those |
| 11:07:38 | 25 | experiences that would prevent you from following my |

| | | |
|---|---|---|
| 11:07:41 | 1 | instructions on the law? |
| 11:07:42 | 2 | JURY MEMBER:  No. |
| 11:07:43 | 3 | THE COURT:  Okay.  Is there anything in those |
| 11:07:45 | 4 | experiences that would prevent you from listening to the |
| 11:07:47 | 5 | evidence in this case fairly and impartially? |
| 11:07:48 | 6 | JURY MEMBER:  No. |
| 11:07:49 | 7 | THE COURT:  Thank you, sir. |
| 11:07:55 | 8 | Juror 90. |
| 11:08:15 | 9 | Good morning.  Tell us your Juror Number, please. |
| 11:08:17 | 10 | JURY MEMBER:  90. |
| 11:08:17 | 11 | THE COURT:  Okay.  You raised your card in |
| 11:08:19 | 12 | response to the question about the criminal justice |
| 11:08:21 | 13 | system.  Tell us why. |
| 11:08:22 | 14 | JURY MEMBER:  My mother was involved in a |
| 11:08:25 | 15 | situation back in '73 for murder. |
| 11:08:29 | 16 | THE COURT:  For what?  Murder? |
| 11:08:30 | 17 | JURY MEMBER:  Uhm-hmm. |
| 11:08:31 | 18 | THE COURT:  You said your mother? |
| 11:08:32 | 19 | JURY MEMBER:  Yes. |
| 11:08:32 | 20 | THE COURT:  What was the result of that? |
| 11:08:34 | 21 | JURY MEMBER:  Guilty.  She was found guilty. |
| 11:08:38 | 22 | MR. MINGOLLA:  What was the result? |
| 11:08:39 | 23 | JURY MEMBER:  Guilty. |
| 11:08:40 | 24 | THE COURT:  Is there anything in that |
| 11:08:41 | 25 | experience that would prevent you from following my |

11:08:43  1    instructions on the law?

11:08:44  2              JURY MEMBER:  No.

11:08:44  3              THE COURT:  Is there anything in that

11:08:45  4    experience that would prevent you from listening to the

11:08:47  5    evidence in this case fairly and impartially?

11:08:48  6              JURY MEMBER:  No.

11:08:49  7              THE COURT:  Okay.  Thank you.

11:08:54  8         Juror 30.

11:09:17  9         Good morning.  Come a little closer.

11:09:20  10        Tell us your Juror Number, please.

11:09:21  11             JURY MEMBER:  30.

11:09:22  12             THE COURT:  Okay.  You raised your card in

11:09:23  13   response to the question about the criminal justice

11:09:25  14   system.  Tell us why.

11:09:27  15             JURY MEMBER:  One of my sons had been convicted

11:09:31  16   and incarcerated about 25 years ago.

11:09:36  17             THE COURT:  Okay.  For what?

11:09:37  18             JURY MEMBER:  Murder one.

11:09:38  19             THE COURT:  Okay.  And that was a conviction,

11:09:41  20   you said?

11:09:41  21             JURY MEMBER:  Yes, sir.

11:09:42  22             THE COURT:  All right.  Is there anything in

11:09:43  23   that experience that would prevent you from following my

11:09:45  24   instructions on the law?

11:09:46  25             JURY MEMBER:  No sir.

11:09:49  1           THE COURT:  Is there anything in that

11:09:50  2  experience that would prevent you from listening to the

11:09:51  3  evidence in this case fairly and impartially?

11:09:53  4           JURY MEMBER:  No, sir.

11:09:54  5           THE COURT:  Thank you.

11:09:56  6           MR. JONES:  Your Honor, can I ask her son's

11:10:01  7  name?

11:10:02  8           JURY MEMBER:  Keith Benjamin.

11:10:04  9           THE COURT:  Thank you, ma'am.

11:10:08  10     Juror 65.

11:10:24  11     Good morning.  Tell us your Juror Number, please.

11:10:26  12           JURY MEMBER:  65.

11:10:27  13           THE COURT:  Okay.  You raised your card in

11:10:28  14  response to the question about the criminal justice

11:10:31  15  system.  Tell us why.

11:10:32  16           JURY MEMBER:  My sister.

11:10:35  17           THE COURT:  Okay, what was your sister's

11:10:37  18  involvement?

11:10:37  19           JURY MEMBER:  She was convicted for drugs.

11:10:40  20           THE COURT:  Okay, which Court?

11:10:41  21           JURY MEMBER:  District Court.

11:10:42  22           THE COURT:  Okay.  And what's your sister's

11:10:45  23  name?

11:10:45  24           JURY MEMBER:  Annie Joseph.

11:10:47  25           THE COURT:  How long ago was that?

| | | |
|---|---|---|
| 11:10:48 | 1 | JURY MEMBER:  That was like 1980. |
| 11:10:51 | 2 | THE COURT:  Okay.  Is there anything in that |
| 11:10:52 | 3 | experience that would prevent you from following my |
| 11:10:54 | 4 | instructions on the law? |
| 11:10:55 | 5 | JURY MEMBER:  No. |
| 11:10:55 | 6 | THE COURT:  Is there anything in that |
| 11:10:57 | 7 | experience that would prevent you from listening to the |
| 11:10:59 | 8 | evidence in this case fairly and impartially? |
| 11:11:00 | 9 | JURY MEMBER:  No. |
| 11:11:01 | 10 | THE COURT:  Thank you. |
| 11:11:05 | 11 | 66. |
| 11:11:21 | 12 | Good morning. |
| 11:11:22 | 13 | JURY MEMBER:  Good morning. |
| 11:11:22 | 14 | THE COURT:  Tell us your Juror Number, please. |
| 11:11:24 | 15 | JURY MEMBER:  66. |
| 11:11:25 | 16 | THE COURT:  You raised your card in response to |
| 11:11:26 | 17 | the question about the criminal justice system.  Tell us |
| 11:11:29 | 18 | why. |
| 11:11:30 | 19 | JURY MEMBER:  Yes.  One time I was charged, tax |
| 11:11:32 | 20 | fraud and tax evasion, tried in District Court, win the |
| 11:11:35 | 21 | case.  I was innocent. |
| 11:11:37 | 22 | Number two -- |
| 11:11:38 | 23 | THE COURT:  Who was what?  Who was tried here? |
| 11:11:40 | 24 | JURY MEMBER:  In this Court, District Court. |
| 11:11:42 | 25 | THE COURT:  Who was? |

11:11:43    1                    JURY MEMBER:  I was.

11:11:43    2                    THE COURT:  Oh, you were.  Okay.

11:11:45    3                    JURY MEMBER:  Uh-huh.

11:11:46    4            Number two, the case involving is the case with

11:11:50    5    Tapia and so on, and my boss down to work, brother was

11:11:54    6    in the same case.  I think he pled guilty.  I would

11:11:57    7    rather back away from this case.

11:11:59    8                    THE COURT:  You said -- where do you work?

11:12:01    9                    JURY MEMBER:  My boss, down to work.

11:12:03   10                    THE COURT:  Where do you work.

11:12:05   11                    JURY MEMBER:  VITRAN.  One of the same people

11:12:07   12    that was involved in this case, what Tapia and this guy

11:12:09   13    here is my boss brother, which was Monsanto.

11:12:12   14                    THE COURT:  Okay.  Well, the question that we

11:12:15   15    ask isn't whether it would be difficult, because we

11:12:17   16    expect that being a juror, being part of a jury is

11:12:20   17    always going to be a difficult thing.  The question that

11:12:22   18    we're always concerned with is will you follow the

11:12:25   19    Court's instructions on the law?

11:12:28   20                    JURY MEMBER:  I will, but --

11:12:30   21                    THE COURT:  All right.

11:12:30   22                    JURY MEMBER:  -- it's tough, because like I

11:12:32   23    say, my boss is one of the people that was involved in

11:12:34   24    this case, brother.

11:12:35   25                    THE COURT:  Right.  Well, your boss isn't in

11:12:38  1     this case, right?

11:12:40  2          JURY MEMBER:  No.

11:12:40  3          THE COURT:  And his brother is involved in this

11:12:43  4     case?

11:12:43  5          JURY MEMBER:  He pled guilty.

11:12:44  6          THE COURT:  So the question is, jurors are

11:12:46  7     required to follow the Court's instructions on the law.

11:12:48  8     Will you do that?

11:12:49  9          JURY MEMBER:  Yes.

11:12:50  10         THE COURT:  All right.  Will you listen to the

11:12:51  11    evidence in this case fairly and impartially?

11:12:53  12         JURY MEMBER:  Yeah.

11:12:53  13         THE COURT:  All right.  Thank you, sir.

11:12:59  14       42.

11:13:09  15         JURY MEMBER:  Good morning.

11:13:09  16         THE COURT:  Good morning.  Tell us your Juror

11:13:11  17    Number, please.

11:13:12  18         JURY MEMBER:  42.

11:13:15  19         THE COURT:  I need you to speak right into

11:13:16  20    this.  You raised your card about the criminal justice

11:13:19  21    system.  Tell us why.

11:13:20  22         JURY MEMBER:  My brother-in-law was just

11:13:21  23    convicted in January.

11:13:24  24         THE COURT:  Okay.  And in which court?  This

11:13:28  25    court?

| | | |
|---|---|---|
| 11:13:28 | 1 | JURY MEMBER:  Right here.  Uhm-hmm. |
| 11:13:30 | 2 | THE COURT:  And that involved what? |
| 11:13:32 | 3 | JURY MEMBER:  Drugs. |
| 11:13:33 | 4 | THE COURT:  Okay.  Is there anything in that |
| 11:13:35 | 5 | experience that would prevent you from following my |
| 11:13:37 | 6 | instructions on the law? |
| 11:13:38 | 7 | JURY MEMBER:  I don't care to. |
| 11:13:42 | 8 | THE COURT:  I'm sorry? |
| 11:13:43 | 9 | JURY MEMBER:  I don't care to.  I watch my |
| 11:13:49 | 10 | nieces home without a father.  I don't like the |
| 11:13:54 | 11 | experience. |
| 11:13:54 | 12 | THE COURT:  Okay.  The question isn't one that |
| 11:13:57 | 13 | asks -- we all know it's going to be difficult to serve |
| 11:13:59 | 14 | as a juror, but the question is, given that the juror's |
| 11:14:04 | 15 | duty is to listen to the instructions on the law and |
| 11:14:07 | 16 | listen to the evidence fairly and impartially, the |
| 11:14:11 | 17 | question is, will you listen -- will you follow the |
| 11:14:14 | 18 | Court's instructions on the law? |
| 11:14:17 | 19 | JURY MEMBER:  I think so. |
| 11:14:20 | 20 | THE COURT:  All right.  Okay.  Thank you. |
| 11:14:22 | 21 | MS. LAKE:  What was her name?  The person's |
| 11:14:25 | 22 | name who was convicted? |
| 11:14:27 | 23 | THE COURT:  Thank you. |
| 11:14:30 | 24 | Let me remind counsel that you ask questions |
| 11:14:32 | 25 | through the Court, or you ask permission. |

| 11:14:34 | 1 | MS. LAKE:  Okay. |
| 11:14:35 | 2 | THE COURT:  The Court conducts the voir dire. |
| 11:14:37 | 3 | Juror 89. |
| 11:14:49 | 4 | Good morning.  Tell us your Juror Number, please? |
| 11:14:52 | 5 | JURY MEMBER:  89. |
| 11:14:53 | 6 | THE COURT:  Okay.  You raised your card in |
| 11:14:54 | 7 | response to the question about the criminal justice |
| 11:14:56 | 8 | system. |
| 11:14:57 | 9 | JURY MEMBER:  Yes. |
| 11:14:58 | 10 | THE COURT:  Tell us about that. |
| 11:14:59 | 11 | JURY MEMBER:  My son is signing in at Superior |
| 11:15:06 | 12 | Court right now on probation.  And my stepson, which is |
| 11:15:09 | 13 | Mr. Hill's son, is right now incarcerated and awaiting |
| 11:15:14 | 14 | trial in October. |
| 11:15:15 | 15 | THE COURT:  Okay.  All right.  Thank you, |
| 11:15:17 | 16 | ma'am. |
| 11:15:19 | 17 | The Court is going to strike juror -- Attorney |
| 11:15:22 | 18 | Mingolla, you've got to pay attention.  The Court is |
| 11:15:25 | 19 | going to strike juror 89 for cause.  Any objection to |
| 11:15:27 | 20 | that? |
| 11:15:29 | 21 | MS. LAKE:  No. |
| 11:15:29 | 22 | MR. MINGOLLA:  No. |
| 11:15:30 | 23 | THE COURT:  All right. |
| 11:15:32 | 24 | Juror 24.  Is it 24? |
| 11:15:44 | 25 | Good morning.  Tell us your Juror Number, please. |

| | | |
|---|---|---|
| 11:15:46 | 1 | JURY MEMBER:  Juror 24. |
| 11:15:47 | 2 | THE COURT:  Okay.  You raised your card about |
| 11:15:49 | 3 | the criminal justice system.  Tell us why. |
| 11:15:52 | 4 | JURY MEMBER:  Only because I heard a bit about |
| 11:15:55 | 5 | it on the news, just a little bit, just brief. |
| 11:15:57 | 6 | THE COURT:  Okay.  Is there anything that you |
| 11:15:59 | 7 | read or heard that would prevent you from following my |
| 11:16:01 | 8 | instructions on the law? |
| 11:16:02 | 9 | JURY MEMBER:  No. |
| 11:16:03 | 10 | THE COURT:  Is there anything national you read |
| 11:16:04 | 11 | or heard that would prevent you from listening to the |
| 11:16:07 | 12 | evidence in this case fairly and impartially? |
| 11:16:08 | 13 | JURY MEMBER:  No. |
| 11:16:10 | 14 | THE COURT:  Okay.  Did you raise your card in |
| 11:16:13 | 15 | response to the criminal justice system. |
| 11:16:15 | 16 | JURY MEMBER:  Yes.  My father was killed |
| 11:16:17 | 17 | 21 years ago and the criminals are still roaming the |
| 11:16:24 | 18 | street. |
| 11:16:24 | 19 | THE COURT:  Is there anything in that |
| 11:16:25 | 20 | experience that would prevent you from following my |
| 11:16:27 | 21 | instructions on the law? |
| 11:16:28 | 22 | JURY MEMBER:  No; only that I'm the sole |
| 11:16:31 | 23 | proprietor of my business and I work Monday, Tuesday, |
| 11:16:34 | 24 | Wednesday, mostly. |
| 11:16:34 | 25 | THE COURT:  Is there anything that would |

| | | |
|---|---|---|
| 11:16:35 | 1 | prevent you from listening to the evidence in this case |
| 11:16:38 | 2 | fairly and impartially? |
| 11:16:39 | 3 | JURY MEMBER:  No. |
| 11:16:40 | 4 | THE COURT:  All right.  Thank you, ma'am. |
| 11:16:43 | 5 | JURY MEMBER:  Okay. |
| 11:16:46 | 6 | THE COURT:  Juror 63.  Tell us your Juror |
| 11:17:08 | 7 | Number, please. |
| 11:17:08 | 8 | JURY MEMBER:  63. |
| 11:17:09 | 9 | THE COURT:  You raised your card in response to |
| 11:17:10 | 10 | the criminal justice system.  Tell us why. |
| 11:17:14 | 11 | JURY MEMBER:  I recently was a witness in a |
| 11:17:16 | 12 | criminal case, and I also know some defendants and -- |
| 11:17:26 | 13 | defendants and plaintiffs in other trials. |
| 11:17:29 | 14 | THE COURT:  Okay.  You said you -- |
| 11:17:32 | 15 | JURY MEMBER:  Victims.  I'm sorry, victims. |
| 11:17:35 | 16 | THE COURT:  You said you were a witness in a |
| 11:17:37 | 17 | case, was that in the Superior Court? |
| 11:17:40 | 18 | JURY MEMBER:  Alexander Farrelly justice. |
| 11:17:42 | 19 | THE COURT:  What was the result of that case? |
| 11:17:44 | 20 | JURY MEMBER:  The one defendant was found |
| 11:17:46 | 21 | guilty. |
| 11:17:47 | 22 | THE COURT:  Were you a government witness or a |
| 11:17:49 | 23 | prosecution witness? |
| 11:17:50 | 24 | JURY MEMBER:  Prosecution. |
| 11:17:52 | 25 | THE COURT:  Okay.  Is there anything in that |

11:17:53  1    experience that would prevent you from following my

11:17:56  2    instructions on the law?

11:17:57  3         JURY MEMBER:  No.

11:17:57  4         THE COURT:  Is there anything in that

11:17:59  5    experience that would prevent you from listening to the

11:18:00  6    evidence in this case fairly and impartially?

11:18:02  7         JURY MEMBER:  No.

11:18:03  8         THE COURT:  Thank you, sir.

11:18:06  9       Juror 47.

11:18:23  10      Good morning.  Come forward.  Tell us your Juror

11:18:26  11   Number, please.

11:18:27  12      Say your number, please.

11:18:29  13        JURY MEMBER:  47.

11:18:30  14        THE COURT:  Okay.  You raised your card in

11:18:32  15   response to the question about the criminal justice

11:18:34  16   system.  Tell us why.

11:18:37  17        JURY MEMBER:  I have a brother in St. Croix

11:18:38  18   prison.

11:18:39  19        THE COURT:  Okay.  And what is that for?

11:18:41  20        JURY MEMBER:  Sexual assault.

11:18:42  21        THE COURT:  Okay.  Is there -- was he convicted

11:18:47  22   or is he awaiting trial?

11:18:49  23        JURY MEMBER:  Convicted.

11:18:49  24        THE COURT:  Okay.  Is there anything in that

11:18:51  25   experience that would prevent you from following my

| | | |
|---|---|---|
| 11:18:53 | 1 | instructions on the law? |
| 11:18:54 | 2 | JURY MEMBER:  No. |
| 11:18:54 | 3 | THE COURT:  Is there anything in that |
| 11:18:55 | 4 | experience that would prevent you from listening to the |
| 11:18:57 | 5 | evidence in this case fairly and impartially? |
| 11:18:59 | 6 | JURY MEMBER:  No. |
| 11:19:00 | 7 | THE COURT:  Thank you, ma'am. |
| 11:19:02 | 8 | Juror 62. |
| 11:19:06 | 9 | MR. MINGOLLA:  Was it a daughter or brother? |
| 11:19:09 | 10 | Who was in prison? |
| 11:19:10 | 11 | MS. LAKE:  Brother. |
| 11:19:12 | 12 | MR. MINGOLLA:  Brother. |
| 11:19:15 | 13 | THE COURT:  Good morning.  Come closer. |
| 11:19:17 | 14 | Tell us your Juror Number, please. |
| 11:19:19 | 15 | JURY MEMBER:  62. |
| 11:19:19 | 16 | THE COURT:  Okay.  You raised your card in |
| 11:19:22 | 17 | response to the question about the criminal justice |
| 11:19:25 | 18 | system.  Tell us why. |
| 11:19:26 | 19 | JURY MEMBER:  That was for my son. |
| 11:19:28 | 20 | THE COURT:  He's involved?  Tell us how. |
| 11:19:32 | 21 | JURY MEMBER:  No, not as of right now.  It was |
| 11:19:35 | 22 | for an assault with his girlfriend, his girlfriend. |
| 11:19:39 | 23 | THE COURT:  Okay.  Is that matter still pending |
| 11:19:41 | 24 | or is it concluded? |
| 11:19:42 | 25 | JURY MEMBER:  No, it's concluded. |

| | | |
|---|---|---|
| 11:19:44 | 1 | THE COURT:  Okay.  Is there anything in that |
| 11:19:45 | 2 | experience that would prevent you from following my |
| 11:19:47 | 3 | instructions on the law? |
| 11:19:48 | 4 | JURY MEMBER:  No. |
| 11:19:49 | 5 | THE COURT:  Is there anything in that |
| 11:19:50 | 6 | experience that would prevent you from listening to the |
| 11:19:52 | 7 | evidence in this case fairly and impartially? |
| 11:19:53 | 8 | JURY MEMBER:  No.  No, sir. |
| 11:19:54 | 9 | THE COURT:  Thank you. |
| 11:19:55 | 10 | JURY MEMBER:  You're welcome. |
| 11:19:56 | 11 | THE COURT:  Juror Number 18. |
| 11:20:19 | 12 | Good morning.  Tell us your Juror Number, please. |
| 11:20:21 | 13 | JURY MEMBER:  18. |
| 11:20:23 | 14 | THE COURT:  Okay.  You raised your card in |
| 11:20:25 | 15 | response to the question about the criminal justice |
| 11:20:27 | 16 | system and reading something about the case.  Is that |
| 11:20:30 | 17 | right? |
| 11:20:30 | 18 | JURY MEMBER:  Well, I read about it; but the |
| 11:20:34 | 19 | name, I'm not too familiar with. |
| 11:20:35 | 20 | THE COURT:  Okay.  Tell us about the criminal |
| 11:20:38 | 21 | justice system.  Who was involved in that? |
| 11:20:40 | 22 | JURY MEMBER:  I have an adopted son that was |
| 11:20:42 | 23 | recently sentenced to life imprisonment. |
| 11:20:45 | 24 | THE COURT:  Okay.  And where did that happen? |
| 11:20:47 | 25 | JURY MEMBER:  Huh? |

| | | |
|---|---|---|
| 11:20:48 | 1 | THE COURT:  Where did that happen? |
| 11:20:50 | 2 | JURY MEMBER:  Here in St. Thomas. |
| 11:20:51 | 3 | THE COURT:  In the Superior Court? |
| 11:20:53 | 4 | JURY MEMBER:  No, local. |
| 11:20:55 | 5 | THE COURT:  Local Court?  All right. |
| 11:20:57 | 6 | Is there, is there anything in that experience or |
| 11:21:01 | 7 | anything that you've read or heard that would prevent |
| 11:21:03 | 8 | you from following my instructions on the law? |
| 11:21:06 | 9 | JURY MEMBER:  No. |
| 11:21:06 | 10 | THE COURT:  Is there anything that you have |
| 11:21:08 | 11 | read or heard or anything in that experience that would |
| 11:21:11 | 12 | prevent you from listening to the evidence in this case |
| 11:21:14 | 13 | fairly and impartially? |
| 11:21:18 | 14 | JURY MEMBER:  No. |
| 11:21:19 | 15 | THE COURT:  Okay.  Thank you, ma'am. |
| 11:21:21 | 16 | Juror Number 9. |
| 11:21:32 | 17 | Good morning.  Tell us your Juror Number, please. |
| 11:21:36 | 18 | Say your Juror Number, please. |
| 11:21:37 | 19 | JURY MEMBER:  Nine. |
| 11:21:38 | 20 | THE COURT:  Okay.  You indicated that you had |
| 11:21:41 | 21 | read or heard something about this case. |
| 11:21:43 | 22 | JURY MEMBER:  I have been following it in the |
| 11:21:53 | 23 | newspaper since the story broke. |
| 11:21:55 | 24 | THE COURT:  Okay.  Is there anything that you |
| 11:21:57 | 25 | read or heard that would prevent you from following my |

11:21:59  1  instructions on the law?

11:22:01  2          JURY MEMBER:  No.

11:22:02  3          THE COURT:  Is there anything that you read or

11:22:03  4  heard that would prevent you from listening to the

11:22:04  5  evidence in this case fairly and impartially?

11:22:07  6          JURY MEMBER:  No.

11:22:08  7          THE COURT:  Okay.  Thank you, ma'am.

11:22:13  8      Juror Number 20.

11:22:32  9          JURY MEMBER:  Good morning.

11:22:32  10          THE COURT:  Good morning, sir.

11:22:39  11      Hold on one second.

11:22:43  12      Okay.  Tell us your Juror Number, sir.

11:22:46  13          JURY MEMBER:  Number 20.

11:22:47  14          THE COURT:  Okay.  You raised your card in

11:22:49  15  response to having read something about this case or

11:22:51  16  heard something.

11:22:52  17          JURY MEMBER:  Well, I have, yes, very much so,

11:22:54  18  because I work for the V.I. Port Authority Marine

11:22:58  19  Division.  And from time to time I used to have dealing

11:22:59  20  with Tapia and the DPNR group.  So really I prefer not

11:23:09  21  to have to sit on --

11:23:10  22          THE COURT:  Well, Mr. Tapia is not on trial.

11:23:12  23  You understand that?

11:23:13  24          JURY MEMBER:  I understand.

11:23:13  25          THE COURT:  Okay.  And the question isn't

11:23:15  1    whether it would be difficult, because we anticipate

11:23:17  2    being a juror is always difficult, and sometimes even

11:23:21  3    uncomfortable.  The question is, notwithstanding what

11:23:23  4    you may have read or heard, whether you will follow the

11:23:27  5    Court's instructions on the law.

11:23:31  6            JURY MEMBER:  Your Honor, I would rather not

11:23:32  7    have to deal with it, honestly, because the relationship

11:23:37  8    is too close to me.

11:23:38  9            THE COURT:  You have a relationship with

11:23:40  10   Mr. Walter Hill?

11:23:42  11           JURY MEMBER:  Not him personally.

11:23:43  12           THE COURT:  Right.

11:23:45  13           JURY MEMBER:  A friend of mine have already

11:23:46  14   told me so much about the case with him, that I don't

11:23:49  15   want to have to reflect any of my influence of what sort

11:23:54  16   of judgment will have to come out.

11:23:57  17           THE COURT:  Well, as I said, the task is really

11:24:00  18   one of following the Court's instructions and listening

11:24:03  19   to the evidence fairly and impartially.  Because we

11:24:05  20   understand for every juror, especially in our small

11:24:10  21   community, it's difficult to -- and uncomfortable -- to

11:24:14  22   serve on a jury.

11:24:17  23       So I want to make sure --

11:24:19  24           JURY MEMBER:  I've had experience on juries, on

11:24:22  25   cases, quite a few, not in this court, but, you know.

| | | |
|---|---|---|
| 11:24:25 | 1 | THE COURT:  All right. |
| 11:24:26 | 2 | JURY MEMBER:  I just would rather not -- |
| 11:24:28 | 3 | THE COURT:  Right.  Okay. |
| 11:24:30 | 4 | JURY MEMBER:  I have no problem with doing my |
| 11:24:32 | 5 | civic duty at all.  But this one is kind of -- the |
| 11:24:39 | 6 | relationship, the activity between DPNR and the Port |
| 11:24:44 | 7 | Authority, I would rather not. |
| 11:24:45 | 8 | THE COURT:  Your relationship is with |
| 11:24:47 | 9 | Mr. Tapia, you say? |
| 11:24:48 | 10 | JURY MEMBER:  Yeah.  And I know about the Hill |
| 11:24:50 | 11 | situation as well through a close friend of his. |
| 11:24:56 | 12 | THE COURT:  Well, your duty as a juror would be |
| 11:24:58 | 13 | to follow the Court's instructions on the law.  Could |
| 11:25:00 | 14 | you do that? |
| 11:25:01 | 15 | JURY MEMBER:  I can do it. |
| 11:25:02 | 16 | THE COURT:  All right.  And your duty would be |
| 11:25:03 | 17 | to listen to the evidence fairly and impartially.  Will |
| 11:25:06 | 18 | you do that? |
| 11:25:06 | 19 | JURY MEMBER:  I can do that. |
| 11:25:07 | 20 | THE COURT:  Okay.  Thank you, sir. |
| 11:25:10 | 21 | JURY MEMBER:  All right. |
| 11:25:28 | 22 | THE COURT:  Juror 53. |
| 11:25:41 | 23 | Good morning.  Tell us your Juror Number, please. |
| 11:25:43 | 24 | JURY MEMBER:  53. |
| 11:25:44 | 25 | THE COURT:  You raised your card in response to |

11:25:47  1    the question about the criminal justice system.  Tell us

11:25:49  2    why.

11:25:51  3              JURY MEMBER:  Yes.  Because my current

11:25:54  4    spouse --

11:25:57  5              THE COURT:  Come a little closer and speak into

11:25:59  6    the microphone.

11:26:00  7              JURY MEMBER:  -- my spouse has been a defendant

11:26:06  8    in a case before.

11:26:06  9              THE COURT:  Your spouse is a defendant

11:26:08  10   currently?

11:26:09  11             JURY MEMBER:  Has been a defendant.

11:26:10  12             THE COURT:  Has been.  Okay.

11:26:12  13        And what was the cause of action or what was the

11:26:14  14   crime?

11:26:15  15             JURY MEMBER:  I don't know the details, the

11:26:16  16   full details, but I know that the charges were attempted

11:26:21  17   robbery and I'm thinking murder.  But I don't know the

11:26:25  18   full details of it.

11:26:26  19             THE COURT:  Okay.  And what was the result of

11:26:28  20   that?

11:26:28  21             JURY MEMBER:  She did time in jail.

11:26:30  22             THE COURT:  And where did that happen?

11:26:31  23             JURY MEMBER:  Where?

11:26:32  24             THE COURT:  Yes.  Was it in --

11:26:34  25             JURY MEMBER:  Here in St. Thomas.

| | | |
|---|---|---|
| 11:26:35 | 1 | THE COURT:  In Superior Court? |
| 11:26:36 | 2 | JURY MEMBER:  I'm not sure. |
| 11:26:37 | 3 | THE COURT:  Federal Court or Local Court?  Do |
| 11:26:39 | 4 | you know? |
| 11:26:39 | 5 | JURY MEMBER:  I don't know. |
| 11:26:41 | 6 | THE COURT:  And what's the name of the, of your |
| 11:26:44 | 7 | spouse? |
| 11:26:44 | 8 | JURY MEMBER:  Kirsten Greenaway. |
| 11:26:46 | 9 | THE COURT:  Is there anything in that |
| 11:26:48 | 10 | experience that would prevent you from following my |
| 11:26:49 | 11 | instructions on the law? |
| 11:26:50 | 12 | JURY MEMBER:  No. |
| 11:26:51 | 13 | THE COURT:  Is there anything in that |
| 11:26:52 | 14 | experience that would prevent you from listening to the |
| 11:26:54 | 15 | evidence in this case fairly and impartially? |
| 11:26:56 | 16 | JURY MEMBER:  No. |
| 11:26:56 | 17 | THE COURT:  Thank you, ma'am. |
| 11:27:31 | 18 | For cause, I'm going to excuse juror 42.  She |
| 11:27:34 | 19 | couldn't answer the questions about being fair and |
| 11:27:35 | 20 | impartial and following the Court's instructions.  So |
| 11:27:37 | 21 | that will be 89 and 42. |
| 11:27:42 | 22 | All right, Counsel.  Seven minutes. |
| 11:27:47 | 23 | (End of sidebar, open court as follows:) |
| 11:34:46 | 24 | (Sidebar discussion held as follows:) |
| 11:34:47 | 25 | THE COURT:  Okay.  For cause. |

| | | |
|---|---|---|
| 11:35:30 | 1 | Counsel, why don't we do this:  Why don't we deal |
| 11:35:39 | 2 | with cause first. |
| 11:35:40 | 3 | Does the government have any strikes for cause? |
| 11:35:42 | 4 | MS. LAKE:  Yes, Your Honor.  Juror Number 20. |
| 11:35:46 | 5 | THE COURT:  In what seat? |
| 11:35:52 | 6 | MS. LAKE:  He's in seat, seat 11, seat 11. |
| 11:35:59 | 7 | THE COURT:  We don't have a seat 11 anymore. |
| 11:36:02 | 8 | MR. JONES:  Seat 12. |
| 11:36:04 | 9 | MS. LAKE:  I'm sorry. |
| 11:36:05 | 10 | THE COURT:  Starting from 31. |
| 11:36:07 | 11 | MS. LAKE:  Oh, seat 41. |
| 11:36:10 | 12 | THE COURT:  What's the basis? |
| 11:36:13 | 13 | MS. LAKE:  The Court was questioning him on |
| 11:36:15 | 14 | voir dire and he indicated that he is friends with -- |
| 11:36:23 | 15 | THE COURT:  I don't think he said he was |
| 11:36:24 | 16 | friends with any -- I thought he said that his boss was, |
| 11:36:27 | 17 | had a relationship with Mr. Tapia -- |
| 11:36:30 | 18 | MS. LAKE:  He works at V.I. Port Authority and |
| 11:36:33 | 19 | the relationship with V.I. -- with DPNR would make it |
| 11:36:38 | 20 | difficult for him to listen to the evidence. |
| 11:36:40 | 21 | THE COURT:  He said it would be difficult, and |
| 11:36:42 | 22 | I gathered there might be some discomfort. |
| 11:36:46 | 23 | Notwithstanding that, he said he could be fair and |
| 11:36:50 | 24 | impartial.  That's denied. |
| 11:36:51 | 25 | MR. JONES:  May I be heard on that, Your Honor? |

| | | |
|---|---|---|
| 11:36:52 | 1 | THE COURT:  I usually only have one person, |
| 11:36:58 | 2 | but... |
| 11:36:58 | 3 | MS. LAKE:  May I have a moment, Your Honor? |
| 11:36:58 | 4 | (Pause.) |
| 11:37:05 | 5 | MS. LAKE:  I believe -- Your Honor, I believe |
| 11:37:06 | 6 | Juror Number 20 indicated he had gotten information from |
| 11:37:10 | 7 | a friend of Walter Hill. |
| 11:37:11 | 8 | THE COURT:  He said that he had heard this. |
| 11:37:13 | 9 | And the question was, notwithstanding what you have |
| 11:37:16 | 10 | heard or your relationship, can you be fair and |
| 11:37:19 | 11 | impartial and would you listen to the Court's |
| 11:37:21 | 12 | instructions? |
| 11:37:21 | 13 | And he said yes. |
| 11:37:22 | 14 | And the same thing with respect to him being fair |
| 11:37:26 | 15 | and impartial. |
| 11:37:26 | 16 | I understand your position.  It's denied. |
| 11:37:28 | 17 | Okay.  Anything else for cause? |
| 11:37:31 | 18 | MS. LAKE:  No. |
| 11:37:31 | 19 | THE COURT:  Attorney Mingolla, for cause? |
| 11:37:33 | 20 | MR. MINGOLLA:  No. |
| 11:37:34 | 21 | THE COURT:  Okay.  The government, hand up your |
| 11:37:36 | 22 | peremptories. |
| 11:39:01 | 23 | Attorney Jones, would you help your brother for me, |
| 11:39:04 | 24 | please? |
| 11:39:46 | 25 | (Pause.) |

| | | |
|---|---|---|
| 11:39:49 | 1 | THE COURT:  Attorney Lake, can you ask your |
| 11:39:51 | 2 | agent to ask Attorney Watlington to come in? |
| 11:41:04 | 3 | (Pause) |
| 11:41:10 | 4 | THE COURT:  I'm thinking about doing |
| 11:41:12 | 5 | preliminary instructions right after we select this |
| 11:41:15 | 6 | jury.  We're almost there.  So we're going to have |
| 11:41:18 | 7 | preliminary instructions.  Then we'll have panel B, |
| 11:41:22 | 8 | which is the panel people who just got selected, leave, |
| 11:41:25 | 9 | and then you can do your opening, opening, opening.  And |
| 11:41:29 | 10 | then we'll excuse them, bring in panel B, and then give |
| 11:41:32 | 11 | the opening, and then Attorney Mingolla's opening. |
| 11:41:35 | 12 | By that time, lunch should be here.  So they'll |
| 11:41:39 | 13 | have lunch and then we'll start with the presentation of |
| 11:41:42 | 14 | the testimony. |
| 11:41:43 | 15 | MR. WATLINGTON:  I'm panel A. |
| 11:41:45 | 16 | THE COURT:  We'll do the testimony for |
| 11:41:47 | 17 | everyone. |
| 11:41:47 | 18 | MR. WATLINGTON:  I'm sorry.  Yeah, I forget. |
| 11:41:51 | 19 | THE COURT:  We'll separate them for opening and |
| 11:41:57 | 20 | closing at this point. |
| 11:41:59 | 21 | MS. LAKE:  Can the government have five |
| 11:42:02 | 22 | minutes? |
| 11:42:02 | 23 | THE COURT:  I just wanted Attorney Watlington |
| 11:42:05 | 24 | for that, to be aware. |
| 11:42:07 | 25 | MR. WATLINGTON:  I'll be right outside. |

11:42:10  1          THE COURT:  Attorney Watlington, I asked

11:42:11  2   Attorney Jones to help your brother.  If you might help

11:42:13  3   him, since you're defense and he's defense.

11:42:20  4          MR. JONES:  His problem was he was looking at

11:42:22  5   this number here, looking for the Juror Number.  I told

11:42:27  6   him he has to look for the Juror Number here.  That's

11:42:30  7   the confusion.

11:47:35  8      (Pause.)

11:47:37  9          MR. MINGOLLA:  I'm a little rusty, Judge.  I'm

11:47:41 10   sorry, it's a mess.  It's messy.

11:47:45 11          THE COURT:  That's okay.

11:49:00 12      All right.  For its peremptories the government

11:49:02 13   strikes the following:  Juror 76 in seat 35, 123 in seat

11:49:07 14   36, 66 in seat 38, 20 in seat 41, 75 in seat 51, and 62

11:49:21 15   in seat 57.

11:49:24 16          MR. MINGOLLA:  75 is in seat 40-what, sir?

11:49:28 17          THE COURT:  The defense for its peremptories

11:49:29 18   strikes juror 37 in seat 32, 18 in seat 33, 87 in seat

11:49:37 19   34, 123 in seat 36, struck by the government, juror 66

11:49:45 20   in seat 38, also struck by the government, juror 47 in

11:49:50 21   seat 39, juror 44 in seat 40, juror 20 in seat 41, juror

11:49:57 22   5 in seat 44, juror 63 in seat 45.

11:50:29 23      I note that juror 11 in seat 54 had indicated that

11:50:35 24   she is a student and has class at 5:30.  I'm inclined to

11:50:39 25   strike her for cause.  Is there any objection from the

| 11:50:41 | 1 | government? |
|---|---|---|

11:50:41  1  government?

11:50:43  2          MS. LAKE:  No objection.

11:50:43  3          THE COURT:  Any objection from the defense?

11:50:45  4          MR. MINGOLLA:  No objection, sir.

11:50:46  5          THE COURT:  Juror 11 in seat 54 will be struck

11:50:49  6  by the Court for cause.

11:51:02  7      So our 12th juror would be 54 in seat 55.  Is there

11:51:08  8  any objection to juror 79 in seat 58 being the, being

11:51:12  9  the first alternate?  From the government?

11:51:14  10          MS. LAKE:  No objection.

11:51:15  11          THE COURT:  Attorney Mingolla, any objection to

11:51:17  12  juror 79 in seat 58 being the first alternate?

11:51:21  13          MR. MINGOLLA:  No, sir.

11:51:23  14          THE COURT:  That's our first alternate.

11:51:28  15      Any objection to Juror Number 9 in seat 59 being

11:51:31  16  our second alternate?  From the government?

11:51:35  17          MS. LAKE:  No objection.

11:51:36  18          MR. MINGOLLA:  No, sir.

11:51:36  19          THE COURT:  That's our second alternate, then.

11:51:39  20      Thank you, Counsel, that's our jury.

11:51:48  21      (End of sidebar, open court as follows:)

11:51:48  22          THE COURT:  If you hear your number, have a

11:51:50  23  seat in the gallery, please.

11:51:56  24      Juror 37, 18 -- you can have a seat in the

11:52:01  25  gallery -- 18, 87, 76, 123, 66, 47, 44, 20, 5, 63, 75,

| | | |
|---|---|---|
| 11:52:32 | 1 | 11, 42, 62, 89, 24. |
| 11:52:54 | 2 | Ladies and gentleman, you will be the jury that |
| 11:52:58 | 3 | will be hearing this case. |
| 11:52:59 | 4 | For those of you in the gallery, let me thank you |
| 11:53:02 | 5 | for your patience and your cooperation. |
| 11:53:03 | 6 | I know it is never easy serving as a juror.  We |
| 11:53:07 | 7 | impose on your time, we ask a lot of you, and you give |
| 11:53:12 | 8 | that and so much more.  And for that, we're grateful.  I |
| 11:53:15 | 9 | know your country is grateful.  Your community is |
| 11:53:18 | 10 | grateful.  I know counsel is grateful.  The Court is |
| 11:53:21 | 11 | grateful. |
| 11:53:22 | 12 | When you serve as a juror, even though when you |
| 11:53:25 | 13 | stand and serve -- stand and wait you still serve, and |
| 11:53:29 | 14 | you join a distinguished group of people.  Vice |
| 11:53:31 | 15 | President Joe Biden went to Delaware as a sitting Vice |
| 11:53:35 | 16 | President to attend to jury service.  Marco Rubio, the |
| 11:53:40 | 17 | Senator from Florida, returned to his home state I think |
| 11:53:43 | 18 | about ten days ago to show up for jury service.  Elena |
| 11:53:51 | 19 | Kagan, a Supreme Court justice, showed up for jury |
| 11:53:53 | 20 | service.  Oprah Winfrey showed up for jury service. |
| 11:53:56 | 21 | So when you serve as a juror you join an elite |
| 11:54:00 | 22 | group of people who recognize it's one of your important |
| 11:54:03 | 23 | duties and privileges, really, as a citizen. |
| 11:54:05 | 24 | So for those of you in the gallery, let me thank |
| 11:54:10 | 25 | you and urge you to call the code-a-phone. |

| | | |
|---|---|---|
| 11:54:12 | 1 | For the rest of the jury, you will be the jury that |
| 11:54:15 | 2 | will be hearing this case.  So we need to have you sworn |
| 11:54:18 | 3 | and there are some preliminary instruction. |
| 11:54:20 | 4 | There's one other note I need make. |
| 11:54:22 | 5 | As you know, you will be hearing the case of United |
| 11:54:25 | 6 | States versus Walter Hill. |
| 11:54:26 | 7 | You will not be the only jury that will be hearing |
| 11:54:29 | 8 | the evidence in this case, however.  There will be |
| 11:54:32 | 9 | another jury that -- that has already been impaneled and |
| 11:54:35 | 10 | will be sitting with you to hear testimony with respect |
| 11:54:38 | 11 | to another defendant.  I'm going to refer to that first |
| 11:54:42 | 12 | selected panel as panel A, and you are panel B. |
| 11:54:45 | 13 | So there are certain times where we might need to |
| 11:54:49 | 14 | have panel A alone and certain times where we only need |
| 11:54:53 | 15 | to have panel B.  You'll be instructed and directed |
| 11:54:56 | 16 | where to sit and where to come in at those times where |
| 11:54:58 | 17 | we need to separate you. |
| 11:55:00 | 18 | What we need to do now is we're going to bring in |
| 11:55:03 | 19 | the members of panel A.  They will fill in any seats in |
| 11:55:09 | 20 | order -- we'll have you lined up in a better order when |
| 11:55:11 | 21 | we come back.  And here's what we're going to do.  We're |
| 11:55:14 | 22 | going to give you preliminary instructions.  And then we |
| 11:55:18 | 23 | will excuse panel B, that's you, and panel A will hear |
| 11:55:24 | 24 | opening statements. |
| 11:55:25 | 25 | Then we'll bring you back in here for your opening |

```
11:55:28   1    statements.
11:55:28   2          After that, we will break for lunch, and then we'll
11:55:32   3    begin taking the testimony after lunch.
11:55:33   4          So for right now all we're going to do is bring in
11:55:36   5    panel A, you will be sworn, then you'll have your
11:55:39   6    preliminary instructions.
11:55:42   7          So we can bring in panel A.
11:55:45   8          For those of you who are in the gallery, thank you
11:55:48   9    for your attendance and your patience.
11:55:49  10          Please leave your cards in the seat, and you may
11:55:52  11    leave.
11:57:00  12          (Panel A and B present, sworn.)
11:57:29  13                    PRELIMINARY JURY INSTRUCTIONS
11:57:29  14          THE COURT:  Members of the Jury, now that
11:57:31  15    you've been sworn, let me give you some preliminary
11:57:33  16    instructions that should guide you as you serve as
11:57:36  17    jurors here.
11:57:37  18          It will be your duty to find from the evidence what
11:57:39  19    the facts are.  You and you alone will be the judges of
11:57:42  20    the facts.
11:57:42  21          You will then have to apply to those facts the law
11:57:45  22    as the Court will give it to you.  You must follow that
11:57:47  23    law whether you agree with it or not.
11:57:50  24          Nothing the Court may say or do during the course
11:57:52  25    of the trial is intended to indicate, or should be taken
```

11:57:54  1    by you as indicating, what your verdict should be.

11:57:58  2         The evidence from which you will find the facts

11:58:00  3    will consist of the testimony of witnesses, documents

11:58:02  4    and other things received into the record as exhibits,

11:58:05  5    and any facts that the lawyers agree to or stipulate to

11:58:09  6    or that the Court may instruct you to find.

11:58:12  7         Certain things are not evidence and must not be

11:58:14  8    considered by you.  I'll list some of those things for

11:58:17  9    you.

11:58:17  10        Statements, arguments and questions by lawyers are

11:58:20  11   not evidence.  Objections to questions are not evidence.

11:58:24  12   Lawyers have an obligation to their clients to make

11:58:28  13   objections when they believe evidence being offered is

11:58:30  14   improper under the Rules of Evidence.

11:58:31  15        You should not be influenced by the objection or by

11:58:34  16   the Court's ruling on it.  If the objection is

11:58:38  17   sustained, ignore the question.  If it is overruled,

11:58:41  18   treat the answer like any other.

11:58:42  19        If you're instructed that some item of evidence is

11:58:45  20   received for a limited purpose only, you must follow

11:58:48  21   that instruction.

11:58:49  22        Testimony that the Court has excluded or told you

11:58:51  23   to disregard is not evidence and must not be considered.

11:58:54  24        Anything you may have seen or heard outside the

11:58:58  25   courtroom is not evidence and must be disregarded.  You

11:59:02  1    are to decide the case solely on the evidence presented

11:59:04  2    here in the courtroom.

11:59:06  3        There are two kinds of evidence, direct and

11:59:08  4    circumstantial.  Direct evidence is direct proof of a

11:59:12  5    fact, such as testimony of an eyewitness.

11:59:14  6    Circumstantial evidence is proof of facts from which you

11:59:17  7    may infer or conclude that other facts exist.

11:59:21  8        I'll give you further instructions on these as well

11:59:23  9    as other matters at the end of the case, but keep in

11:59:26  10   mind that you may consider both kinds of evidence.

11:59:29  11       It will be up to you to decide which witnesses to

11:59:32  12   believe, which witnesses not to believe, and how much of

11:59:35  13   any witness' testimony to accept or reject.

11:59:38  14       I'll give you some guidelines for determining the

11:59:40  15   credibility of witnesses at the end of the case.

11:59:42  16       As you know, this is a criminal case.  There are

11:59:45  17   three basic rules about a criminal case that you must

11:59:48  18   keep in mind.

11:59:49  19       First, the defendant is presumed innocent until

11:59:52  20   proven guilty.

11:59:53  21       The indictment brought by the government is

11:59:56  22   against -- brought by the government against the

11:59:59  23   defendant is only an accusation, nothing more.  It is

12:00:02  24   not proof of guilt or anything else.  The defendant

12:00:04  25   therefore starts out with a clean slate.

12:00:07  1          Second, the burden of proof is on the government

12:00:10  2    until the very end of the case.  The defendant has no

12:00:13  3    burden to prove his innocence or to present any evidence

12:00:15  4    or to testify.

12:00:17  5          Since the defendant has the right to remain silent,

12:00:20  6    the law prohibits you from arriving at your verdict by

12:00:23  7    considering that the defendant may not have testified.

12:00:26  8          Third, the government must prove the defendant's

12:00:28  9    guilt beyond a reasonable doubt.  And I'll give you

12:00:30  10   further instructions on this point later, but bear in

12:00:32  11   mind that in this respect a criminal case is different

12:00:37  12   from a civil case.

12:00:37  13         Now a few words about your conduct as jurors.

12:00:39  14         First, I instruct you that during the trial you are

12:00:42  15   not to discuss the case with anyone or permit anyone to

12:00:45  16   discuss it with you.  Until you retire to the jury room

12:00:49  17   at the end of the case to deliberate on your verdict,

12:00:52  18   you simply are not to talk about this case.

12:00:54  19         Second, do not read or listen to anything touching

12:00:57  20   on this case in any way.

12:00:59  21         If anyone tries to talk to you about it, bring it

12:01:02  22   to the Court's attention promptly.

12:01:05  23         Third, do not try to do any research or make any

12:01:08  24   investigation about the case on your own.

12:01:09  25         Finally, do not form any opinion until all the

12:01:13  1    evidence is in.  Keep an open mind until you start your

12:01:15  2    deliberations at the end of the case.

12:01:16  3        If you want to, you may take notes.  You will be

12:01:20  4    provided with notes for use during the course of the

12:01:24  5    trial.

12:01:24  6        You should keep in mind that sometimes when you're

12:01:26  7    taking notes it distracts from the evidence and the

12:01:31  8    testimony as they're coming in.  But I'm sure you can

12:01:36  9    strike the proper balance.  Just bear that in mind.

12:01:39  10       Also remember that the notes are for your own

12:01:42  11   personal use.  You cannot take them home at night.

12:01:44  12       We will begin with the trial.  We'll start with the

12:01:46  13   opening statements, and we'll start with the opening

12:01:48  14   statement for the panel A jury.

12:01:51  15       So those of you who were just -- just returned to

12:01:54  16   the courtroom and are part of panel A, remain here.

12:01:57  17       For those of you who are panel B, that is, you were

12:02:00  18   just selected, you can proceed to the jury room.  And

12:02:02  19   there you can -- we'll ask you to return here probably

12:02:06  20   in about 15 minutes, after the opening statements.

12:02:08  21       So panel B jurors, please follow the instructions

12:02:12  22   from the marshal.

12:02:14  23       All rise.

12:02:14  24       (Jury from panel B not present.)

12:02:50  25            THE COURT:  Let me ask those who are in

| | | |
|---|---|---|
| 12:02:52 | 1 | panel A, you can sit in the jury box for now, so you |
| 12:02:57 | 2 | won't be so disjointed. |
| 12:02:58 | 3 | Let me ask the two gentlemen up in the front to |
| 12:03:02 | 4 | join the other two gentlemen in the front row. |
| 12:03:11 | 5 | Okay.  This is in United States versus Raymond |
| 12:03:13 | 6 | Brown. |
| 12:03:13 | 7 | Is the government ready to make its opening |
| 12:03:15 | 8 | statement? |
| 12:03:16 | 9 | MS. LAKE:  Yes, Your Honor. |
| 12:03:16 | 10 | THE COURT:  Okay, government, right ahead. |
| 12:03:19 | 11 | OPENING STATEMENT BY THE GOVERNMENT (Re Def't Brown) |
| 12:03:19 | 12 | MS. LAKE:  Good morning, ladies and gentlemen. |
| 12:03:21 | 13 | Again, my name is Kelly Lake and I represent the |
| 12:03:25 | 14 | government. |
| 12:03:25 | 15 | As you're aware, the defendant Raymond Brown has |
| 12:03:28 | 16 | been charged in a number of counts, including conspiracy |
| 12:03:33 | 17 | to distribute cocaine, possession with intent to |
| 12:03:37 | 18 | distribute cocaine, and using the telephone to commit |
| 12:03:40 | 19 | those crimes. |
| 12:03:42 | 20 | You will hear from a number of witnesses.  You will |
| 12:03:46 | 21 | hear from Roberto Tapia.  You will hear from Angel |
| 12:03:54 | 22 | Negron.  You will hear from members of the conspiracy. |
| 12:03:57 | 23 | Roberto Tapia will tell you that he was a |
| 12:03:59 | 24 | negotiator, broker, in between the buyers in Puerto Rico |
| 12:04:04 | 25 | and sellers here. |

12:04:05  1            THE COURT:  Attorney Lake, let me ask you to

12:04:08  2  either use the wireless mike or pull the microphone

12:04:12  3  toward you so we can hear you clearly.

12:04:14  4            MS. LAKE:  You will hear testimony from Roberto

12:04:16  5  Tapia.  He is the negotiator and the broker between the

12:04:20  6  buyers in Puerto Rico and the sellers here.

12:04:22  7       You will hear testimony that Raymond Brown

12:04:25  8  completed two drug deals with Roberto Tapia.  You will

12:04:30  9  hear testimony that Raymond Brown provided 24 kilograms

12:04:35  10  of cocaine to Roberto Tapia.  Roberto Tapia then

12:04:41  11  transported those drugs to a buyer in Puerto Rico.

12:04:44  12       You will also hear evidence that on a separate

12:04:47  13  occasion, Raymond Brown supplied two kilograms of

12:04:52  14  cocaine to Roberto Tapia.  Roberto Tapia then

12:04:56  15  transported those drugs to another buyer in Puerto Rico.

12:05:01  16  And you will hear from that buyer, Angel Negron.

12:05:06  17       You will hear from a number of witnesses.  You will

12:05:08  18  hear a number of phone calls.  And at the conclusion of

12:05:11  19  the government's case, we are confident you will find

12:05:13  20  Raymond Brown guilty of a conspiracy to distribute

12:05:18  21  cocaine, possession with intent to distribute cocaine,

12:05:21  22  and using a telephone to complete those crimes.

12:05:23  23       Thank you.

12:05:26  24            THE COURT:  Thank you, Attorney Lake.

12:05:28  25       Attorney Watlington.

12:05:30  1          You can use the wireless mike or the lectern mike.

12:05:37  2              OPENING STATEMENT BY DEFENDANT BROWN

12:05:37  3          MR. WATLINGTON:  Good afternoon, ladies and

12:05:39  4    gentlemen of the jury.  My name is Arturo Watlington, as

12:05:42  5    I said earlier, and I represent Mr. Raymond Brown.

12:05:46  6          As the judge has said, and we agree, Mr. Brown sits

12:05:52  7    there and is cloaked, is cloaked in a coat of innocence.

12:05:58  8    It is our belief, it's our position that once you hear

12:06:04  9    what the government says they would put forward as

12:06:13  10   evidence, you will continue to believe and you will

12:06:15  11   continue to find that Mr. Brown is still innocent.

12:06:21  12         Oddly enough, you have not heard the government say

12:06:24  13   or you have not heard them promise you that you're going

12:06:26  14   to see some cocaine.  You're not -- you haven't been

12:06:30  15   promised you're going to see any money.  And more than

12:06:34  16   likely, you will not hear about any money or any

12:06:42  17   specific transaction that you can say beyond a

12:06:51  18   reasonable doubt that Mr. Brown did something that will

12:06:56  19   make him culpable and guilty of the charges as filed by

12:07:00  20   the government, the U.S. Government.

12:07:06  21         It's usually very interesting when I have to get up

12:07:09  22   after the government's case -- government's opening

12:07:12  23   argument, and say what they said is completely different

12:07:19  24   from what the evidence would prove.  As the Court has

12:07:23  25   indicated, we don't have to put on any evidence, and we

12:07:26  1    may not, because we believe once you hear the

12:07:29  2    government's case you will not be able to find beyond a

12:07:34  3    reasonable doubt that Mr. Brown is guilty of conspiracy,

12:07:38  4    using a telephone to facilitate a drug transaction, or

12:07:44  5    specific possession of cocaine.

12:07:47  6         You will never hear an agent say that they seized

12:07:51  7    from Raymond Brown this amount of money, this amount of

12:07:56  8    cocaine, or in fact they personally witnessed him with

12:07:59  9    any cocaine.

12:08:01  10        Yes, you will hear from some criminals, Roberto

12:08:05  11   Tapia, who we entrusted with being the chief law

12:08:13  12   enforcement of DPNR.  Yes, we believe he used the

12:08:18  13   government boat to transport drugs and to sell drugs.

12:08:24  14        Mr. Tapia has pled guilty and is now saving

12:08:33  15   himself, saving himself to the point that he will do

12:08:36  16   anything to reduce the time that he must serve in jail

12:08:43  17   for betraying the confidence and the trust of the

12:08:46  18   Government of the Virgin Islands and the people of the

12:08:53  19   Virgin Islands.

12:08:53  20        You'll hear from, yes, this guy by the name Negron,

12:08:57  21   another drug dealer, drug purchaser, who too has pleaded

12:09:03  22   guilty, and who for the sake of getting a reduced

12:09:10  23   sentence in jail will do the same.

12:09:17  24        It is not someone who we entrusted with the

12:09:20  25   operations of our government like Roberto Tapia.  But

12:09:23  1    similarly, that's the government's testimony.  They are

12:09:28  2    laying their heads on the block for these two convicted

12:09:34  3    drug dealers.

12:09:36  4        We will ask you, ladies and gentlemen, to use your

12:09:39  5    common sense, use your ability to think, and that's why

12:09:45  6    we selected you because we know, we believe you have the

12:09:47  7    ability to think and use your common sense.  Would you,

12:09:53  8    in the most important decisions that you make in your

12:09:57  9    life, in your life, rely upon the testimony of convicted

12:10:04  10   drug dealers to try to convict someone else?

12:10:10  11       Would you rely on those people when in fact you

12:10:13  12   have to make an important decision in your own

12:10:15  13   individual lives?  I think not.

12:10:19  14       And we ask you to keep an open mind and keep that

12:10:24  15   in your head and forefront on your mind as we go through

12:10:29  16   this trial.

12:10:29  17       I ask you not to blame Mr. Brown if you see me

12:10:35  18   scratch my head, my nose, my ear.  I'm a little nervous

12:10:39  19   because someone's life is on the line here.

12:10:41  20       I ask you only to listen carefully, evaluate the

12:10:46  21   evidence as it comes to you.  And we are hopeful, and

12:10:51  22   ever confident that you can in fact render a fair and

12:10:56  23   impartial verdict that will continue to support my

12:11:02  24   client's position of innocence.

12:11:04  25       Thank you.

12:11:05  1          THE COURT:  Thank you, Attorney Watlington.

12:11:07  2          All right.  Ladies and gentlemen, I'm going to

12:11:12  3   excuse you.  What we're going to do is have you go to

12:11:15  4   the deliberation room.  We're going take a one hour and

12:11:18  5   15 minute break.

12:11:20  6          When we resume we will have the testimony -- you'll

12:11:24  7   be assigned your seat, and that's the seating that you

12:11:27  8   will keep for the duration of the trial.  It will

12:11:30  9   include you and panel B as well.  But for now, it is

12:11:35  10  time for your lunch, and I'll see you in an hour and

12:11:38  11  15 minutes -- actually an hour and 20 minutes.  Enjoy

12:11:41  12  your lunch.

12:14:43  13         (Jury panel A out.)

12:14:45  14         (Jury panel B in.)

12:14:52  15         THE COURT:  Good afternoon, ladies and

12:14:54  16  gentlemen.  As I indicated, we will now have the opening

12:14:56  17  statement in United States versus Walter Hill.

12:14:59  18         Attorney Lake?

12:14:59  19         MS. LAKE:  Thank you, Your Honor.

12:14:59  20    OPENING STATEMENT BY THE GOVERNMENT (Re Def't Hill)

12:15:01  21         MS. LAKE:  Good afternoon, ladies and

12:15:03  22  gentlemen.  My name is Kelly Lake and I represent the

12:15:05  23  government.

12:15:05  24         Now as you're aware, the defendant Walter Hill has

12:15:08  25  been charged in a number of counts.  He's been charged

12:15:10   1   with conspiracy to possess with intent to distribute

12:15:14   2   cocaine.  He's also been charged with possession with

12:15:19   3   intent to distribute cocaine, and using a telephone to

12:15:22   4   commit those things.

12:15:25   5       You'll hear from a number of witnesses.  You will

12:15:27   6   hear from Roberto Tapia.  You will hear from Angel

12:15:33   7   Negron Beltran, and you will hear from Walter Hill.

12:15:35   8       The evidence will show that in May of 2013, Roberto

12:15:40   9   Tapia negotiated and brokered a seven-kilogram deal for

12:15:44   10   cocaine.  He negotiated for the buyers in Puerto Rico

12:15:52   11   and for the sellers here in the Virgin Islands.

12:15:54   12       You'll hear testimony that Roberto Tapia took a

12:15:57   13   government boat, met couriers in, near the area of

12:16:01   14   Puerto Rico, picked up money, came back to the Virgin

12:16:06   15   Islands, met with Angelo Hill, met with Walter Hill, and

12:16:10   16   that Walter Hill supplied Roberto Tapia with seven

12:16:14   17   kilograms of cocaine.

12:16:16   18       You will hear testimony that Walter Hill was paid

12:16:19   19   for that, was paid to supply seven kilograms of cocaine.

12:16:29   20   You'll hear from a number of witnesses regarding a

12:16:32   21   seven-kilogram cocaine deal that Walter Hill tried to do

12:16:37   22   with Roberto Tapia and Angel Negron, the buyer in Puerto

12:16:41   23   Rico.

12:16:41   24       Again you will hear from Angel Negron and you will

12:16:45   25   hear from Roberto Tapia.  And at the conclusion of the

| | | |
|---|---|---|
| 12:16:49 | 1 | case we are confident that you will find Walter Hill |
| 12:16:52 | 2 | guilty of conspiracy to supply seven -- to distribute |
| 12:16:56 | 3 | seven kilograms of cocaine, possession with intent to |
| 12:16:59 | 4 | distribute seven kilograms of cocaine, and using a |
| 12:17:02 | 5 | telephone to commit those crimes. |
| 12:17:05 | 6 | THE COURT:  Thank you, Attorney Lake. |
| 12:17:06 | 7 | Attorney Mingolla. |
| 12:17:32 | 8 | (Counsel conferring.) |
| 12:17:39 | 9 | OPENING STATEMENT BY DEFENDANT HILL |
| 12:17:39 | 10 | MR. MINGOLLA:  Good afternoon, ladies and |
| 12:17:40 | 11 | gentlemen.  I'm Joe Mingolla and I represent Captain |
| 12:17:44 | 12 | Walter Hill. |
| 12:17:45 | 13 | This case can be summed up as a case of both |
| 12:18:04 | 14 | overkill by the government and the prosecution.  And |
| 12:18:12 | 15 | it's also a case of what I would -- can you all hear me |
| 12:18:37 | 16 | okay? |
| 12:18:38 | 17 | Okay.  This is also a case of what I'm going to |
| 12:18:44 | 18 | call agents gone rogue.  Now, if you're not familiar |
| 12:18:52 | 19 | with the term "rogue" -- I'm sure you are -- but a rogue |
| 12:18:59 | 20 | can be an animal, usually an elephant, that deviates |
| 12:19:05 | 21 | from the herding patterns and the conventions of the |
| 12:19:14 | 22 | herd of elephants. |
| 12:19:15 | 23 | And by "deviate," I mean acts abnormally and does |
| 12:19:21 | 24 | not follow the lead, if you will, of the chief elephant. |
| 12:19:30 | 25 | There's always a head elephant in a pack. |

12:19:33  1        If one of the elephants in that pack breaks away

12:19:40  2   from the pack and does, and does things and behaves

12:19:47  3   abnormally, then they're called a rogue elephant.

12:19:55  4        Furthermore, the Oxford dictionary describes a

12:20:05  5   rogue as a naive or a miscreant or a wrongdoer acting on

12:20:17  6   their own.

12:20:22  7        Now, you're going to hear from witnesses,

12:20:29  8   government witnesses, that have all -- strike that.

12:20:38  9        You're going to hear from several witnesses of the

12:20:40  10  government who were involved in a conspiracy that were

12:20:47  11  law enforcement officers, which my client is not.  My

12:20:53  12  client works at Caneel Bay, and has done so for many

12:21:05  13  years.

12:21:06  14       You're going to hear that there were over 19,000

12:21:22  15  phone taps, that is to say, the government listened to

12:21:29  16  over 19,000 phone calls.  And of the 19,000 phone calls,

12:21:39  17  only approximately 1,200 had any relevancy to the case.

12:21:46  18  And my clients -- my client is only in one phone call.

12:21:52  19  19,000 phone calls is a lot of phone calls.

12:22:01  20       It's my position that the government -- my client

12:22:08  21  was the last arrested in this case.  He was arrested

12:22:17  22  five months after the other defendants in this case, all

12:22:25  23  of whom, with the exception of Attorney Watlington's

12:22:28  24  client --

12:22:28  25            THE COURT:  All right.  Let's stick to the --

12:22:34   1          MR. MINGOLLA:  -- are guilty.

12:22:40   2          THE COURT:  Go ahead.

12:22:41   3          MR. MINGOLLA:  It's my position that the

12:22:44   4   government -- and government means -- let me be

12:22:49   5   specific, literally ran amok and they went rogue and

12:23:01   6   they committed acts that were inappropriate for them to

12:23:05   7   commit.

12:23:06   8          You're going to hear testimony from some of these,

12:23:13   9   our men who have been convicted.  And you need to bear

12:23:17  10   in mind this, you need to bear in mind this fact, that

12:23:27  11   these men who have been convicted, they would, to use

12:23:34  12   the colloquialism, they would literally, to reduce their

12:23:39  13   sentences, sell their mothers for live bait if they

12:23:45  14   thought that they could get a reduced sentence.

12:23:49  15          They would sell anybody down the river that they

12:23:53  16   could to get a reduced sentence at their sentencing

12:23:59  17   hearing.  They would implicate anybody that they thought

12:24:05  18   that they could implicate in order to get a reduced

12:24:10  19   sentence.

12:24:11  20          So there's a great deal of incentive for them to

12:24:16  21   lie, and that's what you're going to be hearing, are

12:24:23  22   flat-out lies.

12:24:28  23          I want you to keep an open mind.  I want you to

12:24:36  24   keep an open mind, and to bear in mind that my client

12:24:54  25   had, my client had nothing to do with the other

12:25:02   1   individuals in this conspiracy who have been found

12:25:08   2   guilty.

12:25:12   3       He was belatedly arrested.  He -- the evidence

12:25:18   4   against my client, as you will see, is extremely thin.

12:25:22   5   "Thin" means it's not very substantial.

12:25:30   6       When I say "gone rogue," and then I'll wrap this

12:25:34   7   up.  When I say "gone rogue," these agents involved in

12:25:38   8   this case, they were so ambitious, they were so

12:25:48   9   ambitious to try and -- they felt like they were on a

12:25:59   10   roll, and so they went to extreme lengths to try and

12:26:05   11   implicate my client.

12:26:10   12       And my client is a family man with a very good job

12:26:17   13   at Caneel Bay, which he's had for eight years.  And just

12:26:25   14   for your edification, I'm not some fellow from the

12:26:32   15   States that came down here to represent him.  I have

12:26:35   16   lived here for 50 years --

12:26:37   17           MS. LAKE:  Objection, Your Honor.

12:26:38   18           THE COURT:  Sustained.  Let's stick to the

12:26:40   19   facts.  You have 30 seconds more, so wrap up.

12:26:43   20           MR. MINGOLLA:  So I trust, in essence, I trust

12:26:45   21   that you will keep an open mind and that you will see

12:26:51   22   that the government clearly went far and beyond what

12:26:59   23   they should have been allowed to do in order to

12:27:08   24   implicate and to charge my client.  In point of fact, my

12:27:17   25   client is an innocent man and he's being falsely accused

12:27:22   1    by crooked cops.

12:27:25   2              THE COURT:  All right.  It's time to wrap up.

12:27:28   3              MR. MINGOLLA:  That's all I have.  Thank you

12:27:29   4    very much for your time.

12:27:30   5              THE COURT:  All right.  Thank you, Attorney

12:27:32   6    Mingolla.

12:27:32   7         All right.  Ladies and gentlemen, it is time for

12:27:35   8    lunch.  We're going to break for one hour and five

12:27:42   9    minutes.  So let me tell you a few things before you go

12:27:45  10    to lunch.

12:27:45  11         First, enjoy your lunch.  When you come back you

12:27:49  12    will be seated with panel A, and those will be the

12:27:52  13    seats, whatever you're assigned, those will be the seats

12:27:54  14    that you will use for the duration of the trial.

12:27:59  15         And I believe for the rest of the trial you will be

12:28:01  16    seated together, and there will be no more separation of

12:28:04  17    the two panels except when you take your breaks you go

12:28:08  18    to your respective rooms or your respective deliberation

12:28:11  19    rooms.

12:28:12  20         All right?  So with that, enjoy your lunch, and

12:28:15  21    I'll see you in an hour and five minutes.

12:28:17  22         (Jury panel B out)

12:28:55  23              THE COURT:  All right.  Counsel, we'll resume

12:28:57  24    in one hour and five minutes.

12:29:00  25         Let me remind counsel to be careful when you are

12:29:06  1    examining witnesses, particularly if it's a cooperating

12:29:15  2    witness and the issue is whether they are testifying in

12:29:23  3    a way that will benefit them at sentencing.  Remember

12:29:26  4    that the Court does not allow jurors to hear specific

12:29:33  5    sentencing information.

12:29:34  6         So specific sentencing information is never to be a

12:29:39  7    part of the examination.  It is perfectly appropriate to

12:29:43  8    inquire and examine that someone's testimony might be

12:29:47  9    colored because they're interested in what is typically

12:29:51  10   referred to as they're singing for their supper.  That's

12:29:55  11   fine.

12:29:55  12        And there are certain lines the courts permit, but

12:30:01  13   specifically those who are presently on trial are not to

12:30:03  14   be put before the jury, since as the Court always

12:30:06  15   instructs the jury, punishment is never to be a part of

12:30:10  16   their deliberation.  So I just urge counsel to be

12:30:12  17   cautious with that.

12:30:14  18        All right.  Is there anything we need to cover

12:30:16  19   before we break for lunch?  Attorney Lake?

12:30:20  20             MS. LAKE:  No, Your Honor.

12:30:20  21             THE COURT:  Attorney Mingolla?

12:30:23  22             MR. MINGOLLA:  Well, I'm a little confused --

12:30:25  23   may I approach the bench?

12:30:27  24             THE COURT:  Yes.

12:30:30  25             MR. MINGOLLA:  The podium.

| | | |
|---|---|---|
| 12:30:35 | 1 | I must confess that I'm a little perplexed, because |
| 12:30:40 | 2 | it was my impression at the suppression, at the |
| 12:30:46 | 3 | suppression hearing on March the 3rd, that Attorney |
| 12:30:48 | 4 | Lindquist had indicated at that time that they, the |
| 12:31:02 | 5 | government, were not going to introduce evidence of |
| 12:31:06 | 6 | prior bad acts.  Because I had made a comment to the |
| 12:31:12 | 7 | effect that I would be filing a motion in limine |
| 12:31:16 | 8 | concerning prior bad acts, and Attorney Lindquist |
| 12:31:20 | 9 | responded:  That's not a problem.  We're not going to be |
| 12:31:25 | 10 | mentioning prior bad acts. |
| 12:31:26 | 11 | Fine. |
| 12:31:27 | 12 | It is further -- so that's not a problem per se. |
| 12:31:32 | 13 | But it is further my contention and my recollection that |
| 12:31:38 | 14 | Attorney Lindquist also indicated that he was not -- or |
| 12:31:46 | 15 | strike that -- that the government was not going to be |
| 12:31:52 | 16 | introducing evidence regarding my client and his one |
| 12:31:57 | 17 | phone call. |
| 12:32:01 | 18 | Now -- |
| 12:32:01 | 19 | THE COURT:  When you say "bad acts," just so |
| 12:32:03 | 20 | we're clear, are you talking about the prior conviction? |
| 12:32:05 | 21 | MR. MINGOLLA:  Yes. |
| 12:32:06 | 22 | THE COURT:  All right.  The government said |
| 12:32:07 | 23 | they wouldn't be bringing that in in their |
| 12:32:09 | 24 | case-in-chief, so we'll see how the evidence progresses. |
| 12:32:13 | 25 | But I wouldn't anticipate it.  So that resolves one |

12:32:16  1      issue.

12:32:17  2          Now there's a second issue you're pointing the

12:32:19  3      Court to, and that is what, a discovery issue?  Yes or

12:32:22  4      no.

12:32:22  5          MR. MINGOLLA:  Well, yes.

12:32:23  6          THE COURT:  All right.  Tell me what it is that

12:32:25  7      the government failed to provide that the government was

12:32:27  8      obligated to provide.

12:32:32  9          MR. MINGOLLA:  I don't know what

12:32:33  10     conversation -- I don't know the contents of the

12:32:35  11     conversation that my client allegedly had on the

12:32:40  12     telephone, for starters.

12:32:42  13         Secondly, my contention is that Attorney Lindquist

12:32:46  14     sat there and said we are not going to use that

12:32:51  15     telephone call.

12:32:53  16         THE COURT:  Okay.  Is it a telephone call that

12:32:56  17     you do not have?  Or are you saying you have it, but now

12:33:00  18     the government intends to use something --

12:33:02  19         MR. MINGOLLA:  I haven't heard it.  And I was

12:33:05  20     under the distinct belief it wasn't going to be used,

12:33:08  21     based on Attorney Lindquist's --

12:33:10  22         THE COURT:  All right.  Just so we're very

12:33:12  23     clear, I'm trying to get a sense of what it is to which

12:33:15  24     you refer.  You're saying they're not going to use it.

12:33:18  25     What is "it"?

12:33:19  1          MR. MINGOLLA:  Now suddenly I'm finding out

12:33:21  2    this morning that the government is going to be using

12:33:23  3    some sort of telephone conversation or conversations --

12:33:30  4    I don't know if it's plural or singular -- involving my

12:33:35  5    client, when Attorney Lindquist had indicated at our

12:33:38  6    suppression hearing that they were not going to.

12:33:41  7          THE COURT:  All right.  Well, here's what I'm

12:33:43  8    going to do.  I'm not sure what the telephone call is to

12:33:46  9    which you refer.

12:33:48  10          MR. MINGOLLA:  There's only one phone call.

12:33:50  11          THE COURT:  All right.  I'll review the -- you

12:33:51  12    said at the suppression hearing.  I'll search the

12:33:54  13    transcript and see if there's any reference to that

12:33:57  14    phone call.

12:33:57  15      This is something that Attorney Lindquist referred

12:34:00  16    to on the record that you're talking about?

12:34:02  17          MR. MINGOLLA:  Yes, sir.

12:34:02  18          THE COURT:  All right.  And your view is that

12:34:07  19    there will be no phone call evidence as against your

12:34:11  20    client, correct?

12:34:14  21          MR. MINGOLLA:  Yes, sir.

12:34:15  22          THE COURT:  All right.  Attorney Lake, do you

12:34:17  23    have a different view on the matter?  Yes or no?

12:34:24  24          MS. LAKE:  Yes, I have a different view on the

12:34:26  25    matter, Your Honor.

| | | |
|---|---|---|
| 12:34:27 | 1 | THE COURT:  All right.  Well, then I'll look at |
| 12:34:29 | 2 | the record and see what it is. |
| 12:34:30 | 3 | MS. LAKE:  Can I also ask the Court -- |
| 12:34:31 | 4 | THE COURT:  It seems to me -- hold on one |
| 12:34:33 | 5 | second.  This is a case that I believe is a wiretap |
| 12:34:38 | 6 | case, I suspect, and there are some other recordings as |
| 12:34:41 | 7 | well.  So my sense is that there would be a general |
| 12:34:45 | 8 | expectation that some of that evidence would come in. |
| 12:34:47 | 9 | But if you say the government has represented on |
| 12:34:49 | 10 | the record that they would not use any phone calls, I'll |
| 12:34:52 | 11 | look at that and see where we go from there.  But I will |
| 12:34:57 | 12 | look at the suppression transcript.  All right? |
| 12:35:04 | 13 | MR. MINGOLLA:  Very well. |
| 12:35:04 | 14 | THE COURT:  That's your position, that the |
| 12:35:06 | 15 | government would introduce no phone calls against your |
| 12:35:08 | 16 | client.  Is that?  -- |
| 12:35:12 | 17 | MR. MINGOLLA:  My impression, Your Honor, that |
| 12:35:14 | 18 | there was only one phone call involving my client, and |
| 12:35:16 | 19 | they were not going to use it.  One phone call out of |
| 12:35:20 | 20 | approximately 1,200, I believe. |
| 12:35:24 | 21 | THE COURT:  All right. |
| 12:35:26 | 22 | MR. MINGOLLA:  And I think 28 seconds long. |
| 12:35:38 | 23 | Now may I ask one other question?  I also have a |
| 12:35:41 | 24 | problem with what I ascertained this morning from the |
| 12:35:46 | 25 | government concerning this transcript.  Now do you want |

12:35:52   1    me to bring, to raise that issue now, or do you want me

12:35:55   2    to --

12:35:56   3            THE COURT:  Tell me, when you say "this

12:35:59   4    transcript," which transcript?

12:36:01   5            MR. MINGOLLA:  Good question.  There's -- there

12:36:04   6    was no stipulation on a transcript.  I attempted to

12:36:13   7    discuss that with Attorney Lindquist and got nowhere

12:36:17   8    fast in terms of this transcription, because basically,

12:36:27   9    Your Honor, I have three completely different

12:36:33   10   transcripts of --

12:36:34   11           THE COURT:  When you say a transcript, you mean

12:36:36   12   a transcript of a phone call or --

12:36:38   13           MR. MINGOLLA:  No.  Forgive me, sir.  I was

12:36:40   14   unclear.  No, transcripts of the conversation between

12:36:43   15   the two Hills.

12:36:51   16           THE COURT:  So tell me what is the issue?

12:36:53   17           MR. MINGOLLA:  The issue is there are about 50

12:36:55   18   differences in -- I have four transcripts.

12:37:05   19           THE COURT:  All right.  This is an English

12:37:07   20   conversation, correct?

12:37:07   21           MR. MINGOLLA:  Yes, but that's the point.  Some

12:37:10   22   is West Indian English and some is in the King's

12:37:12   23   English.

12:37:13   24           THE COURT:  Well, let's just focus on answers

12:37:16   25   to my questions.  It's an English conversation, correct?

12:37:19  1    They're not speaking Spanish or --

12:37:22  2              MR. MINGOLLA:  No, no sir.

12:37:23  3              THE COURT:  All right.  And it is a recording

12:37:28  4    that I suspect the government will seek to introduce

12:37:30  5    during its case-in-chief, correct?

12:37:34  6              MR. MINGOLLA:  Yes.  I believe so.

12:37:35  7              THE COURT:  And you disagree with the words

12:37:36  8    that the government gleans from the oral utterances,

12:37:40  9    correct?

12:37:40  10             MR. MINGOLLA:  Yes, sir.

12:37:41  11             THE COURT:  All right.  We'll deal with that

12:37:43  12   when it comes up, then.  If the transcript has been

12:37:45  13   provided to you and you have some disagreement with

12:37:50  14   that, I'll take a look at it.  I believe I have

12:37:54  15   something in my policies and procedures about

12:37:57  16   discrepancies if the parties intend to use any

12:38:01  17   transcripts.

12:38:02  18        Since it's in English, I really wonder if there's a

12:38:05  19   need for any transcript for English speakers.  So I

12:38:09  20   don't know if it will come in, number one.

12:38:11  21        Number two, to the extent there's any desire to use

12:38:13  22   a transcript, I think I have something in my policies

12:38:17  23   and procedures that suggests that it should be shared.

12:38:20  24   If there are discrepancies, you should bring it to the

12:38:23  25   Court's attention.

12:38:23   1            So I'll look at all of that.

12:38:25   2            But if there is a version of the transcript that

12:38:29   3      the government seeks to use -- does the government want

12:38:32   4      to use the transcript when it's presenting the

12:38:34   5      testimony?

12:38:34   6            MS. LAKE:  Yes, Your Honor.  We filed a notice

12:38:35   7      of the transcript with the Court, and counsel received

12:38:40   8      that.

12:38:40   9            THE COURT:  All right.  Well, we'll deal with

12:38:41  10      it when it comes up.

12:38:44  11            MR. MINGOLLA:  Well, I received it very

12:38:45  12      belatedly, Your Honor.  I only picked it up -- got it on

12:38:49  13      Friday.

12:38:50  14            MS. LAKE:  That's incorrect, Your Honor.

12:38:51  15            THE COURT:  I don't want any back and forth,

12:38:54  16      please.  I said I'll look at the submissions, make a

12:38:56  17      decision.  It will not take me long at all.

12:38:58  18          All right.  Are those all the issues we have?

12:39:01  19      Attorney --

12:39:02  20            MR. MINGOLLA:  For me, Your Honor.

12:39:04  21            THE COURT:  All right.  Enjoy your lunch.

12:39:07  22            MS. LAKE:  If I may, on the earlier issue that

12:39:08  23      was addressed regarding the one phone call, I direct the

12:39:11  24      Court's attention to Count 42, where the defendant is

12:39:15  25      charged with a telephone count.

| | | |
|---|---|---|
| 12:39:18 | 1 | THE COURT: Use of a telephone to facilitate. |
| 12:39:21 | 2 | MS. LAKE: And that phone call is listed. |
| 12:39:23 | 3 | THE COURT: All right. As I said, I'll deal |
| 12:39:28 | 4 | with it as it comes up. I suspect Attorney Mingolla is |
| 12:39:30 | 5 | talking about a recording. Is that what your issue is? |
| 12:39:32 | 6 | You're not suggesting that for using a facility, |
| 12:39:34 | 7 | some sort of communication to facilitate some drug |
| 12:39:37 | 8 | transaction, you're not saying the government can't |
| 12:39:39 | 9 | prove up its case, are you? |
| 12:39:41 | 10 | Your concern was with a recorded conversation, |
| 12:39:44 | 11 | utterances on a wiretap. Is that what your concern -- |
| 12:39:51 | 12 | MR. MINGOLLA: That stems from the transcript |
| 12:39:53 | 13 | of that -- yes, yes. |
| 12:39:55 | 14 | THE COURT: Your issue about a telephone call, |
| 12:40:00 | 15 | your issue is with the recording or the use of the |
| 12:40:04 | 16 | phone. |
| 12:40:04 | 17 | MR. MINGOLLA: I'm concerned with the fact that |
| 12:40:06 | 18 | it's my understanding, and it was my, it's my reading of |
| 12:40:10 | 19 | the evidence there's only one phone call, and that -- |
| 12:40:12 | 20 | THE COURT: Let me see if I can be more |
| 12:40:14 | 21 | precise. Are there words on a phone call that you |
| 12:40:17 | 22 | believe the government may use against your client? Yes |
| 12:40:20 | 23 | or no. |
| 12:40:20 | 24 | MR. MINGOLLA: I can only assume yes. |
| 12:40:22 | 25 | THE COURT: All right. Is that your primary |

12:40:24   1      concern?

12:40:25   2                MR. MINGOLLA:  Yes, it is, sir.

12:40:26   3                THE COURT:  That there may be words.  All

12:40:28   4      right.

12:40:28   5         I suspect that the government is going to present,

12:40:30   6      I don't know -- is probably going to present some

12:40:32   7      evidence that your client used a phone as opposed to the

12:40:35   8      specific utterances.

12:40:36   9         Is that the government's intention?

12:40:40   10               MS. LAKE:  Both, Your Honor, used the phone and

12:40:43   11     the utterances, Your Honor.

12:40:43   12               THE COURT:  All right.  So with respect to

12:40:45   13     Mr. Hill, you're going to have some words that he

12:40:47   14     uttered or someone uttered that implicate him.  All

12:40:50   15     right?

12:40:51   16               MS. LAKE:  Yes, sir.

12:40:51   17               THE COURT:  I'll deal with it when it comes up.

12:40:53   18     Thank you, Counsel.  Fifty minutes for lunch.  We're

12:40:57   19     back at 1:30.  It's 12:40 now.  Thank you, Counsel.

13:51:24   20        Court in recess 12:41 p.m.)

13:51:25   21        (After recess, juries present, 1:51 p.m.)

13:51:28   22               THE COURT:  Good afternoon, ladies and

13:51:30   23     gentlemen.

13:51:30   24        Okay.  We will now begin the testimony.

13:51:32   25        Attorney Lake, you're ready to proceed?

| | | |
|---|---|---|
| 13:51:36 | 1 | MS. LAKE:  Yes, Your Honor. |
| 13:51:37 | 2 | THE COURT:  All right.  Let's go. |
| 13:51:39 | 3 | MS. LAKE:  The government calls Rafael |
| 13:51:41 | 4 | Fernandez. |
| 13:52:25 | 5 | (Witness sworn.) |
| 13:52:27 | 6 | THE WITNESS:  I do. |
| 13:52:28 | 7 | THEREUPON, RAFAEL FERNANDEZ, having been duly |
| 13:52:34 | 8 | sworn, was examined and testified as follows: |
| 13:52:34 | 9 | DIRECT EXAMINATION |
| 13:52:34 | 10 | BY MS. LAKE: |
| 13:52:35 | 11 | Q.   Good afternoon, Rafael. |
| 13:52:36 | 12 | A.   Good afternoon. |
| 13:52:36 | 13 | Q.   Agent, please state and spell your first and last |
| 13:52:39 | 14 | name for the record. |
| 13:52:40 | 15 | A.   My name is Rafael A. Fernandez; R-a-f-a-e-l, |
| 13:52:47 | 16 | F-e-r-n-a-n-d-e-z. |
| 13:52:47 | 17 | Q.   Agent Fernandez, who do you work for? |
| 13:52:49 | 18 | A.   I work for the Federal Bureau of Investigation, the |
| 13:52:51 | 19 | FBI. |
| 13:52:52 | 20 | Q.   And where are you assigned? |
| 13:52:54 | 21 | A.   I'm assigned to the office here in St. Thomas, U.S. |
| 13:52:58 | 22 | Virgin Islands. |
| 13:52:58 | 23 | Q.   How long have you worked for the FBI? |
| 13:53:00 | 24 | A.   I've worked for the FBI a little over three years. |
| 13:53:02 | 25 | Q.   Where did you work before that? |

13:53:03  1    A.    I worked, spent time in the military as a combat

13:53:07  2    arms infantry officer, and had a short-time work

13:53:10  3    managing the oil and gas business work for Exxon.

13:53:13  4    Q.    Briefly describe your educational background?

13:53:15  5    A.    I have a bachelor's degree and also have a master's

13:53:18  6    degree in business.

13:53:18  7    Q.    And what are some of your duties currently as an

13:53:21  8    FBI --

13:53:22  9    A.    What I do for the FBI is I'm responsible to

13:53:25  10   investigate Title 18 and Title 21 investigations, public

13:53:28  11   corruption and the drug trafficking here in St. Thomas.

13:53:31  12   Q.    And are you familiar with the Roberto Tapia

13:53:35  13   investigation?

13:53:35  14   A.    Yes.

13:53:36  15   Q.    And what was your role in the Roberto Tapia

13:53:38  16   investigation?

13:53:38  17   A.    My role in the Roberto Tapia investigation was I

13:53:42  18   was one of the investigators in the FBI that was

13:53:44  19   assigned to this particular matter.  In addition to

13:53:47  20   that, I was one of the wire room supervisors that

13:53:51  21   oversaw the actual wiretapping of the telephone.

13:53:57  22   Q.    What are some general duties as a wire room

13:54:00  23   supervisor?

13:54:00  24   A.    As wire room supervisor, one of the things we did

13:54:04  25   is essentially ensure that we had court authorization to

13:54:06   1    conduct the wiretap, make sure that the court orders

13:54:09   2    were served to the telephone companies, and to make sure

13:54:13   3    that the people monitoring were authenticated, they were

13:54:16   4    able to access the system and actually conduct

13:54:20   5    monitoring of phone calls.

13:54:22   6            MR. LAKE:   Showing you what's marked as

13:54:23   7    exhibit, Government's Exhibit 1a-1.

13:54:23   8        (Government's Exhibit 1a-1 marked for

13:54:23   9    identification.)

13:54:23   10   BY MS. LAKE:

13:54:26   11   Q.   Do you see that on the screen in front of you?

13:54:32   12   A.   I do.

13:54:33   13   Q.   Show you page one and page two, three, and the last

13:54:36   14   page.

13:54:39   15       What is that?

13:54:40   16   A.   That is one of the Court orders for initial wiretap

13:54:44   17   in Mr. Tapia's telephone, that was issued on

13:54:47   18   November 13, 2012.

13:54:49   19   Q.   And can you describe what a wiretap is?

13:54:55   20   A.   A wiretap is when we execute the technique of

13:54:58   21   listening to phone calls.   In this particular scenario,

13:55:01   22   we did have a mobile telephone that the Court authorized

13:55:06   23   us to listen to, and the wiretap meant really that we

13:55:10   24   had court authorization to intercept and listen to and

13:55:13   25   record telephone conversations.

13:55:15  1    Q.   And can you just briefly describe the activation

13:55:19  2    procedure of a Title III intercept or a court-ordered

13:55:23  3    phone intercept?

13:55:24  4    A.   Sure.  The procedure is once a court has determined

13:55:29  5    that this particular -- basically orders us to conduct

13:55:34  6    the telephone intercept.  We have a system that we use

13:55:37  7    in the FBI that links to AT&T to record these phone

13:55:43  8    calls.

13:55:43  9         So basically, it's not like we install any

13:55:47  10   listening device on a phone.  We actually operate a

13:55:49  11   system here in St. Thomas that allows us to listen to

13:55:53  12   phone calls and record them.  That system is called the

13:55:56  13   voice box system.

13:55:57  14        That voice box system, we, in this particular

13:55:59  15   investigation we had monitors that monitored those

13:56:02  16   particular phone calls and were able to activate the

13:56:05  17   recording here in St. Thomas, and actually recorded the

13:56:07  18   phone calls as we listened to the phone calls live.

13:56:11  19   Q.   And so now when you received the court order that's

13:56:14  20   reflected in Government's Exhibit 1a-1, what did you do

13:56:18  21   next?

13:56:19  22   A.   What I did, I was the agent here in St. Thomas that

13:56:21  23   received the Court order, and it was my responsibility

13:56:22  24   to make sure that court order got to AT&T, which is the

13:56:27  25   phone company for this particular phone call.

13:56:29  1    Q.   So what happened next?

13:56:30  2    A.   Once the court order was received by AT&T, we

13:56:33  3    received confirmation.  Here in St. Thomas, I was able

13:56:35  4    to see the system that this particular phone number was

13:56:38  5    programmed.  I saw the phone number again in my voice

13:56:41  6    box system, and we were able to begin listening to phone

13:56:45  7    calls once AT&T provided us with the content.

13:56:48  8    Q.   So what happened next?

13:56:49  9    A.   What happened next is we continued to listen -- we

13:56:53  10   tested the equipment before, you know, the intercepts

13:56:56  11   occurred.  And then once we heard the first, what we

13:57:00  12   call the first call, we knew that the system was working

13:57:03  13   because we heard our, you know, subjects talking on the

13:57:07  14   phone.

13:57:07  15   Q.   So the voice box system was recording the

13:57:11  16   conversation?

13:57:11  17   A.   That's correct.

13:57:12  18   Q.   And again, how do you know that?

13:57:13  19   A.   Again, I've been trained in that system, you know,

13:57:19  20   throughout the law enforcement training or FBI Academy,

13:57:23  21   we spend at least a week understanding how to use this

13:57:26  22   system, understanding the technique.  And so I've been

13:57:28  23   trained, I've used the system, we've used it before here

13:57:31  24   in St. Thomas, and that's how I knew exactly the system

13:57:34  25   was working as it was supposed to.

13:57:36   1    Q.   And what happened after the 30-day period of this

13:57:40   2    Title III intercept ended?

13:57:42   3    A.   Because, because the way our system is set up here,

13:57:45   4    we, the call is actually, we operate the recorder here,

13:57:49   5    so, if you will, we have an on-and-off switch here in

13:57:53   6    St. Thomas.

13:57:53   7         The actual recording is recorded in San Juan,

13:57:56   8    Puerto Rico, which is our headquarters office out of the

13:57:59   9    St. Thomas office.  So what I did is when the 30-day

13:58:03   10   period is over, I physically travel to Puerto Rico to

13:58:05   11   retrieve the disk, the actual disk where these calls

13:58:09   12   were recorded.

13:58:10   13   Q.   And what did you do next?

13:58:12   14   A.   I brought the disks back to St. Thomas with me and

13:58:15   15   I met with the judge and we had the disks sealed.

13:58:18   16   Q.   And what does "sealed" mean?

13:58:20   17   A.   That means we do not alter, make changes or do

13:58:23   18   anything with the disk.  We bring it back, we sit down

13:58:26   19   with the judge and an order is issued to seal this

13:58:30   20   particular disk with these phone calls.  And the judge

13:58:32   21   and I, we initial the actual sealing.  We enclose it in

13:58:37   22   an envelope, we tape it.  Our initials actually go on

13:58:41   23   the seal and package.

13:58:44   24        MS. LAKE:  May I approach, Your Honor?

13:58:45   25        THE COURT:  Can you show whatever it is on the

13:58:47  1    Elmo?

13:58:50  2            MS. LAKE:  No, no, Your Honor.

13:58:51  3            THE COURT:  You can use the Elmo.

13:59:17  4    BY MS. LAKE:

13:59:17  5    Q.   Can you see this in front of you, agent?

13:59:19  6    A.   I can.

13:59:20  7            MS. LAKE:  And showing you Exhibit, what's been

13:59:23  8    marked as Government's Exhibit 1a-2.

13:59:23  9         (Government's Exhibit 1a-2 marked for

13:59:23  10   identification.)

13:59:23  11   BY MS. LAKE:

13:59:29  12   Q.   Do you see that envelope?

13:59:29  13   A.   Yes, I do.

13:59:30  14   Q.   And what is that?

13:59:31  15   A.   That is our chain of custody document, and also

13:59:35  16   it's an envelope in which the disk is contained.  Those

13:59:38  17   are my signature and initials, date and times of -- and

13:59:44  18   reasons, you know, why I had the disk.  And that's what,

13:59:47  19   that's the envelope presented to the judge for sealing.

13:59:53  20   Q.   And showing you the back side of Government's

13:59:55  21   Exhibit 1a-2, what is that?

13:59:56  22   A.   The same thing.  That's the back side of our ELSUR

14:00:03  23   documentation with my initials, as well as the judge's.

14:00:05  24   Q.   What's contained inside of Government's Exhibit

14:00:05  25   1a-2?

14:00:09    1    A.    Inside of this particular envelope is contained the

14:00:12    2    30-day period of monitoring that was initiated

14:00:16    3    November 19th, 2012, and ceased December 18th, 2012.

14:00:23    4    And it's for phone number 390-690-1220, which is Roberto

14:00:29    5    Tapia's phone line.

14:00:30    6    Q.    And is this the same disk that's associated with

14:00:33    7    the order that you previously testified to in

14:00:35    8    Government's Exhibit 1a-1?

14:00:36    9    A.    Yes, it's that, that particular disk for that

14:00:40   10    order.

14:00:40   11        MS. LAKE:   And now showing you Government's

14:00:49   12    Exhibit 1a-3.

14:00:49   13        (Government's Exhibit 1a-3 marked for

14:00:49   14    identification.)

14:00:49   15    BY MS. LAKE:

14:00:51   16    Q.    Can you see that in front of you?

14:00:53   17    A.    Yes, I do.

14:00:53   18    Q.    And what is Government's Exhibit 1a-3?

14:00:58   19    A.    That is essentially a duplicate copy of the MO disk

14:01:02   20    that I downloaded from our servers in Puerto Rico, that

14:01:07   21    we used to record this particular disk.

14:01:10   22    Q.    So what is the relationship between 1a-2 and 1a-3?

14:01:15   23    A.    Those are exactly identical copies.   One -- that

14:01:20   24    particular exhibit is an MO disk.   It's actually a

14:01:24   25    larger disk that's not playable in a CD player.   It

14:01:28  1    doesn't even take Windows Media.

14:01:30  2        And the disk that you hold in your left hand there,

14:01:32  3    that is an exact copy of the content and phone calls

14:01:35  4    that are contained within the MO disk.  And it was used,

14:01:40  5    as far to develop working copies exactly identical to

14:01:43  6    the MO disk.

14:01:43  7        (Government's Exhibit 1b-1 marked for

14:01:43  8    identification.)

14:01:44  9    BY MS. LAKE:

14:01:44  10   Q.   Now, showing you what's been marked as government

14:01:47  11   Exhibit 1 b-one.  Do you see that in front of you?

14:01:52  12   A.   I do not see 1b-1.

14:02:01  13        Okay.  I have 1b-1, and that's an additional court

14:02:05  14   order for 340-690-1220, which was Roberto Tapia's phone

14:02:10  15   number, which was issued in April of 2013.

14:02:21  16   Q.   What did you do after you received Exhibit 1b-2 --

14:02:24  17   I'm sorry -- 1b-1?

14:02:25  18   A.   When I received the Court order, again, we initiate

14:02:28  19   our, you know, processes that I have, which is again to

14:02:32  20   get this court order authorizing us to execute a wire

14:02:36  21   communication intercept to the phone company.

14:02:38  22        Again, this particular phone company is AT&T.

14:02:42  23   They, again, we test the equipment, make sure it's

14:02:45  24   working, all users and monitors that were in the wire

14:02:48  25   room to be authenticated, logging onto the system and

14:02:53   1    make sure that this particular intercept occurs based on

14:02:56   2    the Court order.

14:02:57   3    Q.   And was the voice box system working?

14:02:59   4    A.   Yes, it was.

14:03:00   5    Q.   And how did you know that?

14:03:01   6    A.   Again, anytime we conduct a wiretap, in this

14:03:05   7    particular case, again, we conducted a test.  We made

14:03:08   8    sure it was working.  I saw the phone number, again,

14:03:11   9    programmed it into the system, the phone number we had

14:03:14   10   the court order for.

14:03:15   11       And after serving the court order to the phone

14:03:18   12   company, we began to listen to calls.  And again, we

14:03:21   13   knew that this was, this system was in fact working.

14:03:24   14   Q.   And what happened after the 30-day period ended?

14:03:28   15   What did you do?

14:03:29   16   A.   Again, the 30-day period for this particular wire

14:03:32   17   ended May 3rd, 2013.  I went to, traveled again to

14:03:41   18   Puerto Rico myself, recovered the original disk as I had

14:03:45   19   done previously for the wiretaps, brought the disk back

14:03:49   20   to St. Thomas, and had an appointment to sit with the

14:03:51   21   judge and had the disk sealed.

14:03:51   22       (Government's Exhibit 1b-2 marked for

14:03:51   23   identification.)

14:03:52   24   BY MS. LAKE:

14:03:52   25   Q.   Showing you what's been marked as Government's

14:03:55  1    Exhibit 1b-2.  Do you have this in front of you?

14:03:58  2    A.   I do.

14:03:58  3    Q.   And what is this?

14:04:00  4    A.   That is -- actually, this is -- I think you meant

14:04:08  5    maybe the other envelope.

14:04:16  6              MS. LAKE:  If I have a moment, Your Honor?

14:04:17  7              THE COURT:  Yes.

14:04:27  8    BY MS. LAKE:

14:04:28  9    Q.   Do you see what's been marked -- do you see what's

14:04:30  10   in front of you?

14:04:30  11   A.   Yes, I do.

14:04:31  12   Q.   And showing you what's been marked Government's

14:04:33  13   Exhibit 1b-2.  Do you recognize that?

14:04:35  14   A.   I do.

14:04:35  15   Q.   What is that?

14:04:36  16   A.   Again, that's our internal envelope, a chain of

14:04:39  17   custody to monitor and track this particular MO disk.

14:04:43  18   Again, those are my -- that's my signature.  Those are

14:04:46  19   dates and times of when I recovered it.

14:04:49  20       And on the back of that you will see the sealing

14:04:52  21   when I met with the judge and had the envelope sealed

14:04:58  22   that contained the original.

14:04:58  23       (Government's Exhibit 1b-3 marked for

14:04:58  24   identification.)

14:04:59  25   BY MS. LAKE:

14:04:59  1    Q.   Showing you what's been marked as Government's

14:05:02  2    Exhibit 1b-3.  Do you have that in front of you?

14:05:04  3    A.   That's correct.

14:05:05  4    Q.   And what is that?

14:05:06  5    A.   Again, that's a direct, exact copy of that original

14:05:09  6    disk, playable in Windows Media, so you can put it into

14:05:13  7    a computer and actually listen to it.  It's exactly

14:05:17  8    identical.  I downloaded that particular copy myself

14:05:20  9    from our servers in which that particular MO disk was

14:05:24  10   recorded on.

14:05:25  11   Q.   What is the relationship between Exhibit 1b-2 and

14:05:28  12   1b-3?

14:05:29  13   A.   Identical.

14:05:29  14   Q.   Are there any additions, deletions, changes --

14:05:32  15   A.   No.

14:05:32  16   Q.   -- made to either of these two?

14:05:33  17   A.   No.

14:05:33  18        (Government's Exhibit 1c-1 marked for

14:05:33  19   identification.)

14:05:37  20   BY MS. LAKE:

14:05:37  21   Q.   And now showing you what's been marked as

14:05:39  22   Government's Exhibit 1c-1.  Do you see that in front of

14:05:43  23   you?

14:05:43  24   A.   I do.

14:05:44  25   Q.   And what is that?

14:05:45 1    A.   That's an additional court order authorizing us to

14:05:48 2    conduct another interception of wire communications, one

14:05:52 3    of the phone numbers here -- this is an order for

14:05:54 4    several phone numbers.  One of the phone numbers here is

14:05:56 5    for 340-690-1220, and again, that's Roberto Tapia's

14:06:02 6    cellular telephone with AT&T.

14:06:05 7    Q.   And what did you do after you received that Court

14:06:07 8    order?

14:06:07 9    A.   We received the court order on May 1st.  We, the

14:06:11 10   judge authorized us to do this.  We, again, it was my

14:06:15 11   responsibility to make sure this court order got to

14:06:20 12   AT&T.  It was my responsibility to make sure the

14:06:22 13   equipment here in St. Thomas was working properly.  We

14:06:24 14   conducted tests on the equipment.

14:06:26 15       I confirmed again that the phone number in our

14:06:28 16   system here in St. Thomas is exactly the same number

14:06:30 17   listed on this order.  AT&T began to send us data, or

14:06:36 18   content, and we recorded the data and content and we

14:06:40 19   operated the machinery here in St. Thomas.

14:06:42 20   Q.   And was the voice box system working?

14:06:44 21   A.   Yes.

14:06:47 22   Q.   How did you know that?

14:06:48 23   A.   We tested the system to make sure it was working.

14:06:48 24       (Government's Exhibit 1c-2 marked for

14:06:48 25   identification.)

14:06:48 1    BY MS. LAKE:

14:06:51 2    Q.   Showing you what has been marked as Government's

14:06:53 3    Exhibit 1c-2.  Do you see that in front of you?

14:06:58 4    A.   I do.

14:06:58 5    Q.   What is that?

14:06:59 6    A.   That's the envelope that contains the original MO

14:07:02 7    disk for this original 30-day period, because each one

14:07:05 8    of these wires is just for 30 days.  Again, you see my

14:07:07 9    name there, my initials, signature and so on of the

14:07:10 10   dates of the particular wiretap.

14:07:13 11        And in the back of it, again, you see the judge's

14:07:16 12   initials and signature on the day we sealed it, which

14:07:19 13   was June 3rd, 2013.

14:07:19 14        (Government's Exhibit 1c-3 marked for

14:07:19 15   identification.)

14:07:21 16   BY MS. LAKE:

14:07:21 17   Q.   And now showing you Government's Exhibit 1c-3.  Do

14:07:24 18   you have that in front of you?

14:07:28 19   A.   I do.

14:07:28 20   Q.   What is that?

14:07:28 21   A.   That is again from the time period here from

14:07:32 22   May 1st to May 20th.  There's a slight variation because

14:07:35 23   Mr. Tapia was arrested May 17th, so we did not receive

14:07:39 24   any additional content after the 20th.  But this is an

14:07:41 25   exact duplicate copy of that original MO disk that I

14:07:45   1    downloaded personally.

14:07:46   2    Q.   And what is the relationship between 1c-2, the

14:07:50   3    original MO disk, and 1c-3?

14:07:53   4    A.   The audio calls contained in the original is

14:07:55   5    exactly the same as the audio calls contained in the

14:07:58   6    duplicate.

14:07:58   7    Q.   So there are no changes, additions or deletions in

14:08:01   8    either one of these?

14:08:02   9    A.   There are no changes, additions or deletions.

14:08:02   10       (Government's Exhibits 3a through 78a marked for

14:08:02   11   identification.)

14:08:13   12   BY MS. LAKE:

14:08:13   13   Q.   Now showing you Government's Exhibits 3a through

14:08:18   14   78a?

14:08:19   15   A.   Okay.

14:08:19   16   Q.   Exhibits 3 through 78, have you seen what I'm

14:08:22   17   holding up, Exhibits 3 through 78?

14:08:25   18   A.   I have.

14:08:26   19   Q.   And what am I holding up?

14:08:27   20   A.   Those are what I call trial disks.  And those are

14:08:32   21   individual calls contained in the, essentially the

14:08:37   22   30-day period calls.

14:08:38   23       Those are individual calls that we extrapolated for

14:08:42   24   trial purposes.  And those are exactly the same --

14:08:46   25   they're basically just copied over into those disks from

14:08:50  1    those, from those duplicates.

14:08:53  2    Q.    So, again, the relationship between Exhibits 3a

14:08:56  3    through 78a, what is the relationship between these

14:09:00  4    disks and the working disks that you just testified to,

14:09:04  5    1a-3, 1b-3 and 1c-3?

14:09:07  6    A.    The calls contained in those trial disks are

14:09:10  7    exactly the same as the calls contained in the original

14:09:16  8    duplicate working copy.

14:09:17  9    Q.    And are there any changes, additions or deletions

14:09:20  10   to any of the calls reflected in Exhibits 3a through

14:09:25  11   78a?

14:09:25  12   A.    No changes, additions or deletions were done to any

14:09:28  13   of those trial disks.

14:09:32  14   Q.    Thank you.

14:09:41  15       Now during the course of the investigation, did you

14:09:43  16   become familiar with Roberto Tapia?

14:09:45  17   A.    I did.

14:09:45  18   Q.    And how?

14:09:47  19   A.    Of course, you know, we had an ongoing

14:09:50  20   investigation before we had initiated the Title III

14:09:52  21   intercepts.  So there was reasonable suspicion and

14:09:56  22   probable cause to establish that.

14:09:58  23       And I knew that there were, there were suspicions

14:10:02  24   to believe that he had been involved in drug

14:10:04  25   trafficking.  I heard him on the phone.  We, of course,

14:10:06  1    intercepted his line, and we were able to conduct that

14:10:09  2    investigation.

14:10:10  3        In addition, there were other allegations that he

14:10:13  4    had been involved in, you know, other aspects of

14:10:16  5    corruption, potentially extorted folks and selling

14:10:21  6    government property.

14:10:22  7        So I knew the allegations, we had specific

14:10:24  8    instructions to listen to just those particular

14:10:26  9    violations.  So, of course, that's what we listened to.

14:10:28  10   Q.   And did you, during the course of the

14:10:30  11   investigation, did you become familiar with Angel Negron

14:10:36  12   Beltran?

14:10:36  13   A.   I did become familiar with Angel Negron Beltran.

14:10:41  14   Q.   How?

14:10:41  15   A.   In the course of the beginning, it was very

14:10:45  16   difficult to confirm the relationship between Tapia and

14:10:48  17   Beltran.  They talked as friends.  We didn't know if

14:10:50  18   they were relatives.  In the phone call he didn't really

14:10:53  19   identify himself.

14:10:53  20       So, but over the course of the investigation we

14:10:56  21   determined that Angel Negron Beltran was one of Roberto

14:11:01  22   Tapia's buyers of cocaine, living in Puerto Rico.

14:11:04  23   Q.   During the course of the investigation, did you

14:11:06  24   determine Mr. Negron Beltran's nickname?

14:11:09  25   A.   Yes.

14:11:09  1    Q.    And what is that?

14:11:09  2    A.    On several calls Roberto Tapia refers to

14:11:15  3    Negron Beltran on the phone as Pee Wee.

14:11:17  4    Q.    During the course of the investigation, did you

14:11:19  5    determine Mr. Negron Beltran's phone number?

14:11:22  6    A.    Yes, we did.

14:11:23  7    Q.    Did he have several phone numbers?

14:11:25  8    A.    Negron Beltran, as I said, at the onset it was

14:11:28  9    difficult for us to determine who he was, locate and

14:11:31  10   find him.  He, you know, would rotate phones, he would

14:11:34  11   use one phone and then he would change over to another

14:11:37  12   phone.

14:11:37  13        We would listen to the voice and when Mr. Tapia

14:11:39  14   would refer to him as Pee Wee, we knew that it was the

14:11:42  15   same person.  But he had, he had several phones that he

14:11:44  16   used to communicate with Roberto Tapia.

14:11:47  17   Q.    And what was the last phone number that Negron

14:11:50  18   Beltran used that you determined during the course of

14:11:52  19   your investigation?

14:11:52  20   A.    The last number that we have here would have been

14:11:56  21   939-268-5737.

14:11:59  22   Q.    Is it -2857?

14:12:01  23   A.    2857, correct, yes, correct.

14:12:10  24        MS. LAKE:   Thank you.

14:12:11  25        I have nothing further, Your Honor.

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 14:12:23 | 1  | THE COURT:  Attorney Mingolla?                           |
| 14:12:31 | 2  |                                                          |
| 14:12:31 | 3  | CROSS-EXAMINATION                                        |
| 14:12:31 | 4  | BY MR. MINGOLLA:                                         |
| 14:12:32 | 5  | Q.   Was there --                                        |
| 14:12:33 | 6  | THE COURT:  Come to the lectern, please.                |
| 14:12:37 | 7  | BY MR. MINGOLLA:                                         |
| 14:12:37 | 8  | Q.   Agent Fernandez, was there any minimization?       |
| 14:12:42 | 9  | MS. LAKE:  Objection.  Relevance.                       |
| 14:12:43 | 10 | THE COURT:  Sustained.                                  |
| 14:12:50 | 11 | BY MR. MINGOLLA:                                         |
| 14:12:50 | 12 | Q.   Agent Fernandez --                                 |
| 14:12:51 | 13 | A.   Yes.                                               |
| 14:12:51 | 14 | Q.   -- did you listen to all of these conversations in |
| 14:12:53 | 15 | their entirety that you recorded?                       |
| 14:12:56 | 16 | A.   No.  Not me, myself.  We had several monitors that  |
| 14:13:00 | 17 | listened to phone calls.                                |
| 14:13:02 | 18 | Q.   Were these conversations listened to in their      |
| 14:13:11 | 19 | entirety?                                               |
| 14:13:13 | 20 | A.   If the call was not pertinent, we minimized the    |
| 14:13:16 | 21 | phone calls.  So if it was a pertinent phone call that  |
| 14:13:20 | 22 | we identified as pertinent, yes, we did listen to it in |
| 14:13:23 | 23 | its entirety.                                           |
| 14:13:24 | 24 | Q.   Is there any evidence that you did that            |
| 14:13:25 | 25 | minimization?                                           |

| | | |
|---|---|---|
| 14:13:27 | 1 | MS. LAKE:  Objection, Your Honor.  Relevance. |
| 14:13:29 | 2 | THE COURT:  Overruled. |
| 14:13:31 | 3 | THE WITNESS:  Yes, there is evidence we |
| 14:13:33 | 4 | conducted minimization. |
| 14:13:34 | 5 | BY MR. MINGOLLA: |
| 14:13:34 | 6 | Q.   Let me ask you, what might that be? |
| 14:13:36 | 7 | MS. LAKE:  Objection.  Relevance. |
| 14:13:38 | 8 | THE COURT:  Okay.  Overruled. |
| 14:13:39 | 9 | THE WITNESS:  We had approximately, off the top |
| 14:13:41 | 10 | of my head, if I'm recalling, we did a full analysis of |
| 14:13:45 | 11 | the number of phone calls we intercepted versus the |
| 14:13:47 | 12 | pertinent and minimized.  And we had minimized somewhere |
| 14:13:52 | 13 | in the ball park, both by an operator and the system, |
| 14:13:56 | 14 | somewhere in the ball park of about 12 to 13 thousand |
| 14:14:00 | 15 | phone calls.  I don't remember the exact number, but we |
| 14:14:02 | 16 | had minimized quite a bit. |
| 14:14:02 | 17 | BY MR. MINGOLLA: |
| 14:14:04 | 18 | Q.   But you recorded about 19,000 --  over 19,000 |
| 14:14:07 | 19 | conversations, did you not? |
| 14:14:10 | 20 | A.   Again, off the top of my head, the figures that I |
| 14:14:13 | 21 | had working were 17,000-and-so, actual phone calls that |
| 14:14:20 | 22 | had, that had actual audio that were recorded.  And |
| 14:14:27 | 23 | again, this is throughout the investigation, so there |
| 14:14:31 | 24 | were several wiretaps.  These were just three.  We have |
| 14:14:35 | 25 | other -- |

14:14:37    1    BY MR. MINGOLLA:

14:14:37    2    Q.   So it wouldn't surprise you if I told you there

14:14:39    3    were about 19,200 wiretaps?

14:14:44    4    A.   It would, because again, when I did my calculation

14:14:46    5    I ended up with north of 17,000, not 19,000, when we

14:14:51    6    looked at all the calls that we had that actually had

14:14:54    7    audio content.

14:14:57    8    Q.   And out of those, you say 17,000 -- we'll take your

14:15:02    9    figure, even though evidence is indicated that --

14:15:07   10         MS. LAKE:   Objection.   Argumentative.

14:15:08   11         THE COURT:   Sustained.

14:15:10   12    BY MR. MINGOLLA:

14:15:10   13    Q.   Taking your figures, 17,000, isn't it true that

14:15:15   14    only approximately 1,800, 1,900 were relevant?

14:15:21   15    A.   That sounds about right.  We, pertinent, pertinent

14:15:24   16    phone calls are somewhere in the ball park of about

14:15:29   17    2,000.   That's correct.

14:15:31   18    Q.   And on those, how many people were involved --

14:15:45   19    these conversations that were recorded, who transcribed

14:15:54   20    them?

14:15:54   21    A.   We had both DEA --

14:15:56   22    Q.   Well, let -- strike that.

14:15:59   23    A.   Sure.

14:15:59   24    Q.   Let me be more specific and use a different word,

14:16:04   25    because some are in Spanish, are they not?

14:16:08   1      A.    That's correct.

14:16:09   2      Q.    And in fact, most of them are in Spanish, correct,

14:16:11   3      of the 1,900, more or less?

14:16:13   4      A.    The pertinent -- right.  The majority of them were

14:16:16   5      in Spanish with individuals in Puerto Rico, yes.

14:16:23   6      Q.    And who did the translation work on those?

14:16:26   7      A.    We had, I think that was assigned to the lead

14:16:32   8      linguist.  We had one lead.  And we had several in which

14:16:34   9      we had -- essentially rigorous process to make sure the

14:16:40   10     transcriptions and the translations were accurate and

14:16:42   11     conducted to the best of their ability.

14:16:45   12     Q.    Who are these several individuals' names?

14:16:49   13     A.    They are, lead linguist is Eduardo Colon.  And for,

14:16:54   14     we had several that worked.  Off the top of my head, I

14:16:57   15     don't remember those names.

14:16:58   16     Q.    Are they certified?

14:16:59   17     A.    Eduardo Colon is certified.

14:17:01   18     Q.    Is the other gentlemen certified?

14:17:04   19     A.    These are individuals that the Drug Enforcement

14:17:07   20     Administration hires to conduct this particular

14:17:09   21     function.

14:17:10   22     Q.    That's not my question.

14:17:12   23           MS. LAKE:  Objection.  Relevance, Your Honor.

14:17:13   24     BY MR. MINGOLLA:

14:17:13   25     Q.    Are they certified?

14:17:14   1                    THE COURT:  Overruled.

14:17:15   2                    THE WITNESS:  I wouldn't know as to their

14:17:16   3    certification directly.

14:17:18   4    BY MR. MINGOLLA:

14:17:19   5    Q.    So it's a distinct possibility that they're not

14:17:23   6    really certified translators?

14:17:25   7    A.    Again, I wouldn't know directly what the

14:17:27   8    certification process is.  But they're hired as

14:17:30   9    translators, and I would imagine that the certification

14:17:33   10   process --

14:17:34   11   Q.    It's your speculation that you think that what they

14:17:37   12   translated might be correct?

14:17:39   13   A.    That's correct.

14:17:40   14   Q.    But you're not sure?

14:17:41   15   A.    No.  I mean, I'm almost a Spanish speaker, so if

14:17:44   16   there was any question that I had, I mean I personally

14:17:47   17   listened to all the pertinent calls, and if there was

14:17:50   18   any question that I had, I would talk it over with --

14:17:53   19   and I am certified to also speak Spanish.  So if there

14:17:57   20   were key calls, which in this particular case the key

14:18:00   21   calls that we listened to, the pertinent calls were drug

14:18:03   22   activity, I listened to the calls myself and made sure

14:18:05   23   that the transcripts were done correctly.

14:18:09   24   Q.    And on these transcripts, did you find any

14:18:23   25   discrepancies?

14:18:27  1                    MS. LAKE:  Objection.  Relevance.

14:18:29  2                    THE WITNESS:  I mean, when you --

14:18:30  3                    THE COURT:  Overruled.

14:18:32  4                    THE WITNESS:  When -- anytime you translate a

14:18:35  5       language you're going to, you know, find a word that

14:18:38  6       doesn't fit.  I mean, I wouldn't necessary call that a

14:18:42  7       discrepancy.  The gist of the conversations were what

14:18:44  8       they were.  I mean, we understood the context and the

14:18:48  9       coding used.  So, I mean --

14:18:50  10      BY MR. MINGOLLA:

14:18:50  11      Q.   And how did you understand the codes that they

14:18:52  12      used?

14:18:53  13      A.   Because we had been conducting an investigation for

14:18:55  14      over a year before we got to the point that we conducted

14:18:58  15      a wiretap.  We knew that the drug traffickers would use

14:19:02  16      code to talk about drugs.

14:19:04  17      Q.   Well, that's not exactly what I asked.  How did you

14:19:08  18      determine what these code words meant?

14:19:10  19      A.   Again --

14:19:11  20      Q.   Specifically?

14:19:11  21      A.   Specifically, we would ask, you know, individuals

14:19:15  22      that we work with, whether it be, you know, folks that

14:19:18  23      have been in the drug trafficking organization, if they

14:19:25  24      ever used the code word like "bricks," for example, to

14:19:29  25      signify that meant cocaine.  And we would make logical

| | | |
|---|---|---|
| 14:19:34 | 1 | deductions that when they used this particular word, |
| 14:19:36 | 2 | they meant something else. |
| 14:19:39 | 3 | Q.    About how many particular code words did they use? |
| 14:19:42 | 4 | MS. LAKE:  Objection.  Exceeds the scope of |
| 14:19:46 | 5 | direct examination, Your Honor. |
| 14:19:47 | 6 | THE COURT:  Sustained. |
| 14:19:47 | 7 | Come to sidebar, Counsel. |
| 14:19:56 | 8 | (Sidebar discussion held as follows:) |
| 14:20:00 | 9 | THE COURT:  Attorney Mingolla, I'm not quite |
| 14:20:02 | 10 | sure where you're going with this, but this witness only |
| 14:20:05 | 11 | talked about the machines -- well, first, the |
| 14:20:07 | 12 | authorization from the Court to conduct the wiretap, the |
| 14:20:10 | 13 | machines to record it, copies made of the calls, and he |
| 14:20:14 | 14 | hasn't testified about code words or transcripts or how |
| 14:20:19 | 15 | he determined it. |
| 14:20:21 | 16 | But it seems to me he's headed off to the races. |
| 14:20:26 | 17 | It doesn't seem -- I don't know if you wanted to have |
| 14:20:28 | 18 | this witness go into this level of detail.  I'm giving |
| 14:20:32 | 19 | you leeway because it's cross-examination.  But there's |
| 14:20:38 | 20 | been no prior testimony about there even being any code |
| 14:20:43 | 21 | words or how you figure out code words, or whether this |
| 14:20:47 | 22 | person is even qualified to know the code words.  It |
| 14:20:51 | 23 | sounds like he might be heading into hearsay, what he |
| 14:20:54 | 24 | heard others say that certain words meant, as opposed to |
| 14:21:00 | 25 | having firsthand knowledge of any code words. |

14:21:03  1        So I don't know where you wanted to head with it

14:21:07  2    but, you know, it seems if you invite this witness, he

14:21:11  3    will head off to the races in telling you where code

14:21:16  4    words are coming from and telling what you they are.

14:21:19  5    And I don't think he testified he had any expertise or

14:21:22  6    did anything out of personal knowledge with these code

14:21:26  7    words.

14:21:27  8        MR. MINGOLLA:  He said he speaks Spanish and

14:21:31  9    did a lot of his own translation.

14:21:32  10        THE COURT:  Yes, I heard that testimony.  But

14:21:33  11    again, there was no testimony that he did any

14:21:35  12    transcription here or translation --

14:21:37  13        MR. MINGOLLA:  That's true.

14:21:38  14        THE COURT:  -- until you brought it up.  So I

14:21:39  15    don't know if you wanted to expand like that.  You know,

14:21:42  16    I'm giving you plenty of leeway because it's your cross,

14:21:45  17    but so -- I think that's why the government was

14:21:47  18    objecting, beyond the scope.

14:21:49  19      I'm giving you some leeway, and wasn't sure if you

14:21:51  20    were headed in the direction of opening the gateway for

14:21:56  21    this witness to run off to the races.

14:21:59  22        MR. MINGOLLA:  Yeah, I understand, Judge.

14:22:00  23        THE COURT:  All right.  Okay.

14:22:02  24      (End of sidebar, open court as follows:)

14:22:20  25        MR. MINGOLLA:  I have no further questions for

14:22:21  1        this witness, Judge.  I pass the witness.

14:22:23  2                  THE COURT:  Okay.  Attorney Watlington.

14:22:25  3                  MR. WATLINGTON:  No questions, Your Honor.

14:22:26  4                  THE COURT:  Redirect?

14:22:27  5                  MS. LAKE:  Just briefly.

14:22:29  6                          REDIRECT EXAMINATION

14:22:29  7        BY MS. LAKE:

14:22:30  8        Q.   Agent Fernandez, you testified you're familiar with

14:22:32  9        Exhibits 3a through 75a; is that correct?

14:22:34  10       A.   That's correct.

14:22:34  11       Q.   Did you review all of those calls?

14:22:36  12       A.   I did.

14:22:37  13       Q.   And after you reviewed all of those calls, what did

14:22:40  14       you do with the disks that you reviewed?

14:22:42  15       A.   I initialed each individual disk.

14:22:44  16       Q.   You initialed them in their entirety?

14:22:47  17       A.   In their entirety?

14:22:48  18       Q.   There are no additions, deletions or corrections or

14:22:52  19       additions from the MO disk or the working copy?

14:22:56  20       A.   No, there are no additions to those disks.

14:22:58  21                  MS. LAKE:  Thank you.

14:22:59  22            Nothing further.

14:22:59  23                  THE COURT:  Agent Fernandez, thank you for your

14:23:01  24       testimony.

14:23:01  25            You may step down and leave through the side door.

14:23:01  1          (Witness withdrew from stand.)

14:23:03  2               THE COURT:  Your next witness.

14:23:04  3               MS. LAKE:  The government calls Henry Enright.

14:24:38  4               THE CLERK:  Please stand and raise your right

14:24:40  5      hand to take the oath.

14:24:44  6          (Witness sworn.)

14:24:44  7               THE WITNESS:  I do.

14:24:45  8               THEREUPON, HENRY ENRIGHT, having been duly

14:24:48  9      sworn, was examined and testified as follows:

14:24:48  10                      DIRECT EXAMINATION

14:24:48  11     BY MS. LAKE:

14:24:54  12     Q.   Good afternoon.

14:24:54  13     A.   Good afternoon.

14:24:55  14     Q.   Please state your full name for the record.

14:24:58  15     A.   Henry Enright.

14:25:00  16     Q.   Could you please spell your first and last name?

14:25:03  17     A.   Henry, H-e-n-r-y; Enright is E-n-r-i-g-h-t.

14:25:10  18     Q.   Thank you, Mr. Enright.

14:25:11  19          Who do you work for?

14:25:13  20     A.   AT&T Mobility.

14:25:14  21     Q.   What is your job title?

14:25:16  22     A.   Custodian of records.

14:25:17  23     Q.   And how long have you been with the company?

14:25:19  24     A.   Twenty years as an employee, three and a half years

14:25:22  25     as contractor.

14:25:23  1    Q.    And what are some of your duties and

14:25:25  2    responsibilities as a custodian of records?

14:25:28  3    A.    To verify and authenticate the legitimacy of call

14:25:32  4    detail records and AT&T wireless communications.

14:25:35  5    Q.    Does that include processing court orders that AT&T

14:25:39  6    receives from law enforcement?

14:25:40  7    A.    Correct, it does.

14:25:41  8    Q.    And are you familiar with the types of records that

14:25:43  9    are received and generated and maintained by AT&T in the

14:25:47  10   course of such work?

14:25:48  11   A.    I am.

14:25:49  12   Q.    And give us the kind of, an idea of the kind of

14:25:54  13   documents that you maintain as a custodian of records.

14:25:58  14   A.    There are call detail records, subscriber

14:26:03  15   information, and they also receive court orders.

14:26:08  16   Q.    And generally how are these records generated,

14:26:13  17   received or maintained?

14:26:15  18   A.    They are received by the AT&T's national subpoena

14:26:20  19   compliance center and then processed.

14:26:22  20   Q.    And in general, how are they maintained?

14:26:26  21   A.    They are maintained in AT&T's -- the records are

14:26:29  22   kept in AT&T's billing systems.

14:26:31  23   Q.    Now, specifically relating to court orders you

14:26:37  24   receive from law enforcement, are those documents made

14:26:40  25   at or near the time from people -- from information with

14:26:46  1    people of knowledge?

14:26:47  2    A.    Yes.

14:26:48  3    Q.    Are these documents, records, received, generated

14:26:50  4    and kept by the company -- by AT&T in the regular course

14:26:53  5    of company or business activity?

14:26:54  6    A.    They are.

14:26:55  7    Q.    Is it your regular practice of the company to

14:26:58  8    receive, generate and keep these types of documents?

14:27:00  9    A.    It is.

14:27:00  10   Q.    And are you here pursuant to a subpoena?

14:27:02  11   A.    I am.

14:27:02  12   Q.    And were you previously asked to submit documents

14:27:05  13   or records in conjunction with that subpoena?

14:27:07  14   A.    Yes.

14:27:07  15        (Government's Exhibit 2a-1 marked for

14:27:07  16   identification.)

14:27:08  17   BY MS. LAKE:

14:27:08  18   Q.    Now, showing you what's been marked as government's

14:27:23  19   Exhibit 2a-1.  Do you see that in front of you?

14:27:31  20   A.    Yes.

14:27:31  21        (Government's Exhibit 2a-2 marked for

14:27:31  22   identification.)

14:27:31  23   BY MS. LAKE:

14:27:31  24   Q.    And showing you Government's Exhibit 2a-2.  Do you

14:27:35  25   see that in front of you?

14:27:40    1    A.   Yes.

14:27:40    2

14:27:40    3         (Government's Exhibit 2a-3 marked for

14:27:40    4    identification.)

14:27:40    5    BY MS. LAKE:

14:27:40    6    Q.   And showing you 2a-3.  Do you see that in front of

14:27:44    7    you?

14:27:44    8    A.   Yes.

14:27:44    9         (Government's Exhibit 2a-4 marked for

14:27:44   10    identification.)

14:27:47   11    BY MS. LAKE:

14:27:47   12    Q.   And now 2a-4.  Do you see that in front of you?

14:27:49   13    A.   Yes.

14:27:49   14         (Government's Exhibit 2b-1 marked for

14:27:49   15    identification.)

14:27:54   16    BY MS. LAKE:

14:27:54   17    Q.   Now showing you Government's Exhibit 2b-1.  Do you

14:27:57   18    see that in front you?

14:27:58   19    A.   Yes.

14:27:58   20         (Government's Exhibit 2b-2 marked for

14:27:58   21    identification.)

14:27:58   22    BY MS. LAKE:

14:27:58   23    Q.   And showing you 2b-2.  Do you see that in front of

14:28:02   24    you?

14:28:02   25    A.   Yes.

14:28:02   1          (Government's Exhibit 2c-1 marked for

14:28:02   2     identification.)

14:28:03   3     BY MS. LAKE:

14:28:03   4     Q.   And now showing you 2c-1.  Do you see that in front

14:28:06   5     of you?

14:28:06   6     A.   Yes.

14:28:06   7          (Government's Exhibit 2c-2 marked for

14:28:06   8     identification.)

14:28:06   9     BY MS. LAKE:

14:28:07  10     Q.   Do you see 2c-2 in front of you?

14:28:09  11     A.   Yes.

14:28:09  12          (Government's Exhibit 2c-3 marked for

14:28:09  13     identification.)

14:28:09  14     BY MS. LAKE:

14:28:09  15     Q.   Now 2c-3.  Do you see that?

14:28:14  16     A.   Yes.

14:28:14  17          (Government's Exhibit 2c-4 marked for

14:28:14  18     identification.)

14:28:14  19     BY MS. LAKE:

14:28:15  20     Q.   2c-4?

14:28:17  21     A.   Yes.

14:28:18  22     Q.   Describe these documents collectively.  In general,

14:28:24  23     what are these documents?

14:28:24  24     A.   Okay.  So -- I would actually like to split them up

14:28:33  25     in two different parts.  You have a Title III intercept

14:28:36  1    order -- court order --

14:28:37  2              THE COURT:  Mr. Enright, can you put the

14:28:39  3    microphone right in front of your mouth?  When you're

14:28:42  4    speaking, speak right into it, please.

14:28:43  5              THE WITNESS:  Yes, Your Honor.  Thank you.

14:28:44  6         You have a Title III intercept order, and some of

14:28:50  7    the other attachments were screen shots of the Title III

14:28:55  8    system provisioning the court order from what's being

14:28:58  9    asked of us.

14:29:01  10   BY MS. LAKE:

14:29:01  11   Q.    And were these documents provided in conjunction

14:29:03  12   with the subpoena?

14:29:07  13   A.    A Court order.

14:29:08  14   Q.    A Court order?

14:29:08  15   A.    Yes.

14:29:09  16   Q.    And the documents that you just reviewed that were

14:29:12  17   in front of you, were these documents or records

14:29:15  18   maintained, received and generated by AT&T in the

14:29:19  19   regular course of AT&T business activity?

14:29:22  20   A.    Yes.

14:29:23  21   Q.    Were these same documents made at or near the time

14:29:26  22   by information with people with knowledge [sic]?

14:29:27  23   A.    Yes.

14:29:28  24   Q.    Was it the regular practice of AT&T to receive,

14:29:32  25   generate and keep these types of documents or data

14:29:35  1    compilations?

14:29:35  2    A.   It is.

14:29:35  3    Q.   Now, specifically now showing you Exhibit 2a-1, do

14:29:42  4    you have that in front of you?

14:29:42  5    A.   I do.

14:29:43  6    Q.   Specifically what is Exhibit 2a-1?  What is that

14:29:46  7    document?

14:29:47  8    A.   That is a Title III intercept order and -- in the

14:29:57  9    USA.

14:29:58  10   Q.   And now showing you Exhibits 2a-2, 2a-3 and 2a-4.

14:30:10  11   What is the relationship between that court order that

14:30:12  12   you just testified to in 2a-1?

14:30:15  13   A.   Those are the screen shots that the AT&T reps are

14:30:20  14   required to make whenever they execute a Title III

14:30:28  15   intercept order.  So that's the actual screen shots of

14:30:33  16   the system when they're provisioning the order.

14:30:35  17   Q.   And was that intercept order executed by AT&T?

14:30:39  18   A.   It was, yes.

14:30:40  19   Q.   And how do you know that?

14:30:45  20   A.   Because I can see the install dates that's related

14:30:52  21   to the actual order.  And that there are very strict

14:30:56  22   guidelines that they have, is they have to follow the

14:30:58  23   order specific to the time period that the order

14:31:02  24   requests.

14:31:07  25   Q.   And what else can you tell me, based on, based on

14:31:11  1    those screen shots, based on the documents you provided
14:31:14  2    pursuant to a court order or a subpoena?
14:31:16  3    A.   Sure.  Can you make the screen a little bit larger?
14:31:19  4    I can expound on that.
14:31:21  5         Okay.  So a screen shot would contain the
14:31:25  6    information that's in front of me, which would include
14:31:27  7    the target number, the time frame for the intercept to
14:31:34  8    be installed, the collection function identifier, the
14:31:46  9    telephone number to transmit the audio.  The AT&T
14:31:50  10   wireless target phone is there, and the information
14:31:58  11   that's supposed to be there is there.
14:31:59  12   Q.   And was the order executed?
14:32:00  13   A.   It was.
14:32:01  14   Q.   And were the phone calls transmitted?
14:32:04  15   A.   They were.
14:32:04  16   Q.   And was the machinery working properly?
14:32:08  17   A.   It was.
14:32:08  18   Q.   Was the machinery capable of recording the
14:32:11  19   conversations?
14:32:11  20   A.   It was.
14:32:12  21   Q.   And how do you know that?
14:32:16  22   A.   The rep that did this confirmed that with me.  And
14:32:19  23   that screen shot wouldn't be in front of me if it didn't
14:32:22  24   happen.
14:32:24  25   Q.   Now showing you Government's Exhibit 2b-1.

14:32:27   1   Specifically, do you see that in front of you?

14:32:29   2   A.   I do.

14:32:29   3   Q.   And what is that?

14:32:30   4   A.   That is the similar order.  It's a Title III

14:32:33   5   intercept order.  It's a Court order.

14:32:35   6   Q.   Now showing you Government's Exhibit 2b-2, what is

14:32:38   7   that?

14:32:38   8   A.   Similarly, it's a screen shot of that order being

14:32:41   9   provisioned in our system to execute the Title III

14:32:47   10   intercept order.

14:32:48   11   Q.   And was the Title III intercept order executed?

14:32:50   12   A.   It was.

14:32:51   13   Q.   And was the recording device capable of recording

14:32:53   14   the conversation?

14:32:54   15   A.   It was.

14:32:54   16   Q.   And was that conversation sent to the FBI?

14:32:59   17   A.   It was.

14:33:02   18   Q.   And how do you know that?

14:33:07   19   A.   Well, I see their identifier on the collection

14:33:10   20   point and part of the Court order.

14:33:13   21   Q.   Showing you Government's Exhibit 2c-1.  Do you see

14:33:16   22   that in front of you?

14:33:18   23   A.   I do.

14:33:20   24   Q.   And what specifically is that?

14:33:21   25   A.   That is yet another Title III intercept order.

14:33:23  1    Q.   And now showing you 2c-2?

14:33:28  2    A.   That's the related screen shots.

14:33:30  3    Q.   2c-3, and 2c-4?

14:33:35  4    A.   It's the related screen shots for the intercept

14:33:37  5    order.

14:33:37  6    Q.   And was that intercept order executed and

14:33:40  7    processed?

14:33:40  8    A.   It was.

14:33:41  9    Q.   And was the machinery working properly and capable

14:33:44  10   of recording the conversation?

14:33:48  11   A.   It was.

14:33:48  12   Q.   And was the conversations sent to the FBI?

14:33:50  13   A.   They were.

14:33:57  14   Q.   How do you know that?

14:33:59  15   A.   The screen shots tells me the order was processed

14:34:01  16   and the person that processed the order confirmed it

14:34:03  17   with me.

14:34:05  18           MS. LAKE:  Your Honor, I would ask that

14:34:06  19   Government's Exhibits 2a-1, 2a-2, 2a-3, 2a-4,

14:34:11  20   Government's Exhibits 2b-1, 2b-2, and 2c-1, 2c-2, 2c-3

14:34:21  21   and 2c-4 be received in evidence.

14:34:25  22           THE COURT:  Attorney Mingolla?

14:34:26  23           MR. MINGOLLA:  No objection.

14:34:27  24           THE COURT:  Attorney Watlington?

14:34:29  25           MR. WATLINGTON:  None from Defendant Brown,

14:34:30   1    Your Honor.

14:34:31   2          THE COURT:  All right.  It's under advisement.

14:34:32   3

14:34:32   4    BY MS. LAKE:

14:34:33   5    Q.   And now you're also the custodian of records for

14:34:36   6    toll records; is that correct?

14:34:40   7    A.   Correct.

14:34:40   8    Q.   And showing you -- well, give us the kind of --

14:34:48   9    give us an indication what kind of information are

14:34:50  10    contained in toll records, phone records?

14:34:52  11    A.   Certainly.  That will contain --

14:34:55  12          MR. MINGOLLA:  Objection.  Calls for

14:34:56  13    speculation.

14:34:57  14          THE COURT:  Overruled.

14:35:01  15    BY MS. LAKE:

14:35:01  16    Q.   You may answer.

14:35:02  17    A.   Toll records will encompass what are called whole

14:35:06  18    title records or CDR, will encompass voice

14:35:09  19    communications, data sessions as well as text messages.

14:35:13  20    And usually within those records subscriber information

14:35:15  21    will also be obtained.

14:35:18  22    Q.   And now, in general, are toll records and

14:35:21  23    subscriber records, are they records or documents that

14:35:25  24    are regularly maintained by AT&T in the regular course

14:35:28  25    of AT&T business?

14:35:30  1    A.    They are.

14:35:31  2    Q.    And generally, how are these documents received and

14:35:33  3    maintained by AT&T?

14:35:35  4    A.    At the time or near the event they are recorded

14:35:41  5    into our billing systems.

14:35:43  6    Q.    And now toll records and subscriber information,

14:35:45  7    are they made at or near the time by or from people with

14:35:48  8    information, from knowledge of the information?

14:35:51  9    A.    Yes.

14:35:51  10   Q.    And are these documents or records maintained and

14:35:55  11   received and kept in the regular course of AT&T

14:35:58  12   business?

14:35:58  13   A.    They are.

14:35:59  14   Q.    And is it the regular practice of AT&T to receive

14:36:01  15   and maintain these documents?

14:36:02  16   A.    It is.

14:36:02  17        (Government's Exhibit 85a marked for

14:36:02  18   identification.)

14:36:03  19   BY MS. LAKE:

14:36:03  20   Q.    And now, did you -- showing you Government's

14:36:05  21   Exhibit 85a.

14:36:19  22        Showing you Government's Exhibit 85a.  Do you see

14:36:21  23   that in front of you?

14:36:22  24   A.    I do.

14:36:22  25   Q.    And again, an extension of 85a, do you see that in

14:36:25   1    front of you?

14:36:26   2    A.   I do.

14:36:27   3    Q.   Are you familiar with these documents?

14:36:28   4    A.   I am.

14:36:29   5    Q.   And did you provide these documents pursuant to a

14:36:33   6    subpoena or Court order?

14:36:34   7    A.   Yes.

14:36:38   8    Q.   And describe them generally.  What are they?

14:36:41   9    A.   Well, I have 85a in front of me.  Do you want me to

14:36:45  10    talk about that one?

14:36:46  11    Q.   Yes, please.

14:36:47  12    A.   Okay.  This is a subscriber information page, which

14:36:50  13    shows the financially responsible person, the name and

14:36:55  14    address given at the time they provisioned service, and

14:37:02  15    the type of account, its current status, as well as the

14:37:08  16    MISM.  That's the wireless number the subscriber was

14:37:14  17    given.

14:37:14  18    Q.   Who was the subscriber number this was given for?

14:37:16  19    A.   Walter Hill.

14:37:19  20         MR. MINGOLLA:  Objection, Your Honor.

14:37:19  21         THE COURT:  Overruled.

14:37:20  22    BY MS. LAKE:

14:37:20  23    Q.   Does this Exhibit 85a provide -- include toll

14:37:25  24    records?

14:37:25  25    A.   Yes.

14:37:25  1    Q.    Toll records related to Walter Hill?

14:37:27  2    A.    Yes.

14:37:28  3    Q.    And now again, Government's Exhibit 85a, do you see

14:37:34  4    this in front of you?

14:37:41  5    A.    Yes.  Those are quality toll records.

14:37:46  6    Q.    Are you familiar with these records?

14:37:48  7    A.    Yes, I am.

14:37:48  8    Q.    What are they?

14:37:49  9    A.    These are actual voice calls that were made to the

14:37:53  10   mobile.

14:37:53  11   Q.    And what mobile number?

14:37:57  12   A.    If you could scroll down a little.  It says voice

14:38:00  13   usage for 340-690-1220.

14:38:06  14   Q.    And -- I apologize?

14:38:07  15   A.    This number says 340-690-1220.

14:38:11  16   Q.    Thank you.

14:38:12  17         And these documents were submitted in conjunction

14:38:15  18   with the subpoena?

14:38:15  19   A.    Yes.

14:38:16  20   Q.    And these documents, records, have been kept in the

14:38:18  21   regular course of AT&T business or activity?

14:38:21  22   A.    They.

14:38:22  23   Q.    And these documents are made at or near the time,

14:38:24  24   with people with knowledge?

14:38:25  25   A.    Yes.

14:38:26  1    Q.   And it was the regular practice of AT&T to maintain

14:38:29  2    these records?

14:38:30  3    A.   It is.

14:38:38  4    Q.   Now, referencing you back to documents in the 2

14:38:41  5    series, Exhibit 2a-1.

14:38:44  6          MS. LAKE:  Can you pull that up?

14:38:44  7    BY MS. LAKE:

14:38:45  8    Q.   You testified this was a Court order?

14:38:46  9    A.   I don't have it in front of me.

14:38:48  10   Q.   Do you see 2a-1 in front of you?

14:38:50  11   A.   No.  There's nothing on the --

14:38:52  12   Q.   Give it one second.

14:38:54  13   A.   Okay.  There's a little bit of a delay.

14:38:56  14        Yes, that's a Title III intercept order.

14:38:58  15   Q.   And what phone number is that for?

14:39:00  16   A.   I think you need to go to the next page.

14:39:10  17   Q.   Do you see the next page?

14:39:11  18   A.   I have it now.  Do you want me to tell it?

14:39:11  19   Q.   Yes.  What's the phone number for that?

14:39:13  20   A.   340-690-1220.

14:39:19  21   Q.   And is it the court order for -- I'm showing,

14:39:23  22   showing you Government Exhibit 2b-1.  Do you see that in

14:39:26  23   front of you?

14:39:27  24   A.   Now I see it.

14:39:28  25   Q.   And what Court order, is that for a specific phone

14:39:33   1   number?

14:39:33   2   A.   I'm sure it is.  If you go to the next page.  Now

14:39:37   3   I'm there.  Do you want me to tell you the number?

14:39:40   4   Q.   Yes.  What is that phone number?

14:39:41   5   A.   340-690-1220.

14:39:48   6   Q.   Now showing you Government's Exhibit 1c-1.  Do you

14:39:51   7   have that in front of you?

14:39:52   8   A.   I do.

14:39:52   9   Q.   Is it a court order for multiple phone numbers?

14:39:56  10   A.   Yes.  Going back.  You might need one more page.

14:40:07  11   Okay.  Right there.  Yes.

14:40:08  12   Q.   And showing you the top of page three, do you see

14:40:11  13   the phone number that this is the court order for?

14:40:14  14   A.   There's three numbers.

14:40:15  15   Q.   Can you tell us the first number?

14:40:16  16   A.   340-690-1220.

14:40:21  17   Q.   And what's the person's name?

14:40:24  18   A.   Roberto Tapia.

14:40:29  19   Q.   Thank you.

14:40:30  20        MS. LAKE:  Again, Your Honor, we ask that the 2

14:40:32  21   series be received in evidence.

14:40:34  22        THE COURT:  Okay.  It's under advisement.

14:40:35  23        MS. LAKE:  And Your Honor, we ask that --

14:40:50  24   BY MS. LAKE:

14:40:50  25   Q.   Just one more question.  Showing you Government's

14:40:52  1    Exhibit Number 85a.

14:41:07  2          You previously testified to this, correct?

14:41:09  3    A.   Yeah.  Could you just go down a little bit, because

14:41:11  4    I need to see -- yes.

14:41:14  5    Q.   Do you see that?

14:41:14  6    A.   Yes, I see it now, yes.

14:41:16  7    Q.   What are the phone numbers that these toll records

14:41:18  8    are related to?

14:41:19  9    A.   340-690-7076.

14:41:30  10   Q.   What are the toll records that this phone number is

14:41:33  11   related to, the phone number that these toll records are

14:41:37  12   related to?

14:41:37  13         THE COURT:  When you say "these toll records,"

14:41:41  14   refer to the exhibit number so everyone can follow the

14:41:44  15   record and it's clear.

14:41:46  16         THE WITNESS:  340-690-1220.

14:41:51  17         MS. LAKE:  I'm sorry, Exhibit 85a.

14:41:55  18     Thank you.

14:41:55  19     I have nothing further, Your Honor.

14:41:58  20         THE COURT:  Attorney Mingolla?

14:42:00  21         MR. MINGOLLA:  I have no questions for this

14:42:01  22   witness, Judge.

14:42:02  23         THE COURT:  Okay.  Attorney Watlington?

14:42:04  24         MR. WATLINGTON:  No questions, Your Honor.

14:42:05  25         THE COURT:  Mr. Enright, thank you for your

14:42:07  1    testimony.

14:42:07  2        You may step down.

14:42:08  3        Next witness.

14:42:08  4            THE WITNESS:  Thank you, Your Honor.

14:42:10  5        (Witness withdrew from stand.)

14:42:10  6            MS. LAKE:  The government calls Eduardo Colon.

14:43:45  7            THE CLERK:  Please stand and raise your right

14:43:47  8    hand to take the oath.

14:43:50  9        (Witness sworn.)

14:43:51  10           THE WITNESS:  I do.

14:43:53  11           THEREUPON, EDUARDO COLON MAS, having been duly

14:43:54  12   sworn, was examined and testified as follows:

14:43:54  13                   DIRECT EXAMINATION

14:43:55  14   BY MS. LAKE:

14:44:03  15   Q.   Good afternoon.

14:44:04  16        Please state your full name for the record.

14:44:05  17   A.   Eduardo Colon Mas.

14:44:07  18   Q.   Could you please spell your full name for the

14:44:09  19   record?

14:44:09  20   A.   E-d-u-a-r-d-o, C-o-l-o-n, M-a-s.

14:44:21  21   Q.   Thank you.

14:44:22  22        Mr. Colon, who do you work for?

14:44:23  23   A.   I work for a DEA contractor named SOS

14:44:28  24   International.

14:44:28  25   Q.   And what did you call it, a FEA contractor?

14:44:32   1    A.    DEA.

14:44:33   2    Q.    DEA contractor.

14:44:35   3          And do you also work for another company also?

14:44:37   4    A.    Yes.  There's another company that's called All

14:44:44   5    Language Consultants.

14:44:44   6    Q.    First starting with SOS International, what type of

14:44:46   7    company is that?

14:44:47   8    A.    We provide monitoring services for DEA and other

14:44:52   9    local, federal law enforcement contracts.  And we do

14:44:56   10   monitoring translation and transcripts for federal law

14:45:01   11   enforcement.

14:45:01   12   Q.    And how long have you worked for that company?

14:45:03   13   A.    For that company, a year and a half.

14:45:08   14   Q.    And now you indicated you work for ALC, is that

14:45:11   15   correct?

14:45:11   16   A.    Yes.

14:45:11   17   Q.    What type of work do you do for ALC?

14:45:14   18   A.    Basically the same work.  It's translating,

14:45:17   19   monitoring and, you know, processing information for

14:45:22   20   DEA, local law enforcement.

14:45:25   21   Q.    And how long you have worked for that company?

14:45:26   22   A.    For about three years.

14:45:30   23   Q.    Now tell us about your educational background.  Can

14:45:34   24   you please describe that briefly for us?

14:45:35   25   A.    I went to bilingual schools, and in college I took

14:45:40  1    classes for advanced English and Spanish, as well as my

14:45:46  2    job always surrounding by bilingual environment.

14:45:52  3    Q.   When you say "bilingual," what two languages are

14:45:55  4    you referring to?

14:45:56  5    A.   English and Spanish.

14:45:58  6    Q.   And please tell us -- you're familiar with the

14:46:00  7    Spanish language.  Where do you live?

14:46:02  8    A.   Puerto Rico.

14:46:03  9    Q.   And where were you born?

14:46:04  10   A.   Puerto Rico.

14:46:04  11   Q.   And what is your first language?

14:46:06  12   A.   Spanish.

14:46:07  13   Q.   And are you a certified Spanish language speaker?

14:46:12  14   A.   Yes.

14:46:12  15   Q.   And how are you -- who are you certified with?

14:46:15  16   A.   It's a private company that certifies linguists.

14:46:19  17   It's called ALTA.  And what they do is they're a

14:46:25  18   third-party company that certifies members.

14:46:28  19   Q.   What does that certification involve?  What is the

14:46:31  20   process of becoming certified?

14:46:33  21   A.   Well, I have to answer questions in the native

14:46:36  22   tongue, in this case Spanish, and English, and they'll

14:46:40  23   rate me accordingly to, you know, the standards.

14:46:45  24   Q.   And have you received any sort of training or

14:46:48  25   education when it comes to being a bilingual speaker?

14:46:53   1    A.   Yes.

14:46:53   2    Q.   What training is that, or education is that?

14:46:55   3    A.   Well, in college and in school.  Like I said, I

14:46:58   4    went to both bilingual schools and Spanish.  I took

14:47:02   5    advanced courses in Spanish and in English, as well as

14:47:05   6    in high school and, you know, middle school, all my

14:47:10   7    life.

14:47:11   8    Q.   And do you receive periodic training to maintain

14:47:15   9    your bilingual certification?

14:47:19   10   A.   Yes, I do.  I do self-educate.  Most of the courses

14:47:22   11   I take as part of my certifications and other

14:47:26   12   certifications are in English, so basically I'm -- all

14:47:29   13   my studies are in the English language.

14:47:31   14   Q.   And what qualifies you to work for SOS

14:47:34   15   International and ALC?

14:47:36   16   A.   Well, previous experience, job experiences and

14:47:39   17   basically certifications and --

14:47:42   18            THE COURT:  Hold on one second.

14:47:52   19            THE WITNESS:  Yes.

14:47:52   20   BY MS. LAKE:

14:47:53   21   Q.   How many years have you engaged in professional

14:47:54   22   interpretation or translation?

14:47:56   23   A.   Professional interpretation and translation with

14:47:59   24   SOS and ALC, the last three years.  The previous

14:48:05   25   companies, I would say the last ten years.

14:48:07  1    Q.    And how many Spanish to English transcriptions have

14:48:11  2    you done, professional?

14:48:13  3    A.    About 6,000.

14:48:20  4    Q.    Approximately how many hours of Spanish to English

14:48:22  5    translation do you engage in during the course of your

14:48:26  6    professional work?

14:48:30  7    A.    Tens of thousands.

14:48:34  8    Q.    And how many hours of experience do you have?

14:48:41  9    A.    Basically -- this job, for the past three years

14:48:44  10   probably, I would say every day for the last three

14:48:49  11   years, you know.  If you would say that in hours, in the

14:48:54  12   thousands of them.

14:48:56  13   Q.    Are you familiar with the Roberto Tapia

14:48:57  14   investigation?

14:48:58  15   A.    Yes.

14:49:01  16   Q.    And how are you familiar with it?

14:49:01  17   A.    I was the monitor for the Title III investigation.

14:49:04  18   Q.    What were some of your duties as being a monitor

14:49:07  19   for the Title III investigation?

14:49:10  20   A.    Monitor and translate the conversations from

14:49:13  21   Spanish to English, as well as summarize conversations

14:49:16  22   between targets and associates.

14:49:20  23   Q.    Briefly describe the process of translating and

14:49:24  24   transcribing calls that you intercepted and listened to

14:49:27  25   while you were a monitor.

14:49:30  1    A.    When we intercept the call we identify the call and

14:49:34  2    it goes through the process where we would listen to the

14:49:37  3    call and verbatim write, word for word, what was said in

14:49:41  4    that conversation.

14:49:45  5    Q.    And briefly describe the process of actually

14:49:46  6    monitoring the call.

14:49:47  7    A.    Well, when the call, the session comes in, we would

14:49:56  8    listen to the -- the call would come in.  We would

14:49:58  9    listen to the conversation and write the date and time

14:50:02  10   it came in, if it's incoming or outgoing, the time and

14:50:08  11   phone number to identify the caller.  And we would

14:50:10  12   proceed to summarize the conversation, in this case in

14:50:12  13   English.

14:50:13  14        After that call has been completed and summarized,

14:50:16  15   it's selected for transcript, so we work on the

14:50:19  16   transcript, writing word for word the content of the

14:50:22  17   conversation.

14:50:22  18   Q.    Would you do that for Spanish calls?

14:50:24  19   A.    Yes.

14:50:24  20   Q.    And would you do that for English calls?

14:50:26  21   A.    Yes.

14:50:32  22   Q.    And now showing you what's been marked as Exhibits

14:50:34  23   3 through 78, the "a" series; so 3a through 78a.  Do you

14:50:39  24   see these disks in front of me?

14:50:41  25   A.    Yes.

14:50:41  1    Q.   Have you seen them before?

14:50:43  2    A.   Yes.

14:50:44  3    Q.   Where have you seen them before?

14:50:45  4    A.   In my office.

14:50:49  5    Q.   And are you familiar with these?

14:50:50  6    A.   Yes.

14:50:51  7    Q.   How are you familiar with these?

14:50:52  8    A.   Because I listened to each and every one of them.

14:50:55  9    Q.   And what did you do after you listened to each and

14:50:57  10   every one of them?

14:50:58  11   A.   I signed the CD's with my initials and the date.

14:51:05  12   Q.   Is that reflected on each and every one of these

14:51:08  13   CD's?

14:51:08  14   A.   Yes.

14:51:08  15        (Government's Exhibit 3b through 78b marked for

14:51:08  16   identification.)

14:51:17  17   BY MS. LAKE:

14:51:17  18   Q.   And showing you what's been marked as Exhibit 3

14:51:21  19   through 78, the "b" series, 3b through 78b, are you

14:51:25  20   familiar with these?

14:51:26  21   A.   Yes.

14:51:26  22   Q.   What are these documents?

14:51:27  23   A.   Those are the transcripts for the calls in the

14:51:31  24   CD's.

14:51:31  25   Q.   So what's the relationship between the 3a through

14:51:34  1    78a series?

14:51:36  2    A.   Each transcript pertains to each CD.

14:51:41  3    Q.   So what did you do when you -- did you prepare

14:51:46  4    these transcripts?

14:51:46  5    A.   Yes.

14:51:47  6    Q.   What did you do when you, after you prepared these

14:51:50  7    transcripts?

14:51:50  8    A.   I would sign them and date them, just as I did with

14:51:53  9    the CD's.

14:51:54  10   Q.   So each and every one of these exhibits, Exhibit 3b

14:51:57  11   through 78b contains your signature?

14:52:00  12   A.   Yes.

14:52:00  13   Q.   And they contain your date?

14:52:02  14   A.   Yes.

14:52:03  15   Q.   The date?

14:52:03  16   A.   Yes.

14:52:04  17   Q.   And briefly describe the process of transcribing

14:52:07  18   Exhibits 3a through 78a.

14:52:11  19   A.   Basically I would take each CD, open up the CD,

14:52:14  20   listen to the conversation and transcribe word by word

14:52:17  21   what was said on that conversation.

14:52:23  22   Q.   Are these transcripts, Exhibit 3b through 78b, are

14:52:28  23   they a fair and accurate paper trail of the call --

14:52:31  24   conversation of each individual call that's reflected in

14:52:35  25   Exhibit 3a through 78a?

14:52:36    1    A.    Yes.

14:52:36    2    Q.    How do you know that?

14:52:37    3    A.    Because I listened to each and every one of them.

14:52:39    4    Q.    And you confirmed their accuracy?

14:52:40    5    A.    Yes.

14:52:43    6    Q.    And now the Spanish to English calls, are the

14:52:45    7    Spanish to English transcripts, are they a fair and

14:52:49    8    accurate representation of the Spanish to English calls

14:52:53    9    that's reflective on Exhibit 3a through 78a?

14:52:57   10    A.    Yes.

14:52:57   11    Q.    How do you know that it's an accurate translation

14:53:01   12    of the Spanish to English calls?

14:53:03   13    A.    Because I listened as I was reading the

14:53:06   14    conversations translated on paper.

14:53:07   15    Q.    And did you confirm their accuracy?

14:53:09   16    A.    Yes.

14:53:23   17    Q.    And do these transcripts accurately reflect the

14:53:25   18    conversation that's being had, being engaged in in

14:53:28   19    Exhibits 3a through 78a?

14:53:29   20    A.    Yes.

14:53:32   21    Q.    Do they accurately reflect the -- identify the

14:53:34   22    speakers on each of those calls?

14:53:36   23    A.    Yes.

14:53:36   24    Q.    And do the transcripts in Exhibit 3b through 78b

14:53:41   25    accurately reflect the dates the conversations were had?

14:53:43  1    A.    Yes.

14:53:47  2    Q.    And how do you know that?

14:53:48  3    A.    Well, whenever a call comes in, it comes in with a

14:53:51  4    time stamp.  The system will record that.  So basically

14:53:54  5    every call that comes in, it's given a session number, a

14:53:58  6    time and date --

14:53:59  7            THE COURT:  Mr. Colon, can you have the

14:54:00  8    microphone right in front of your mouth, so you speak

14:54:03  9    right into it.

14:54:04  10           THE WITNESS:  Yeah, sure.

14:54:04  11           THE COURT:  Go right ahead.

14:54:05  12           THE WITNESS:  Every call gets time stamped with

14:54:07  13   the date and the hour it came in.  And basically what we

14:54:12  14   write on that document is the same information that's

14:54:14  15   recorded in the system when the session was created.

14:54:16  16           MS. LAKE:  Thank you.  Nothing further.

14:54:22  17           THE COURT:  Attorney Mingolla.

14:54:23  18           MR. MINGOLLA:  I have no questions for this

14:54:24  19   witness, Your Honor.

14:54:26  20           THE COURT:  Attorney Watlington?

14:54:30  21           MR. WATLINGTON:  Yes, I have one question.  Can

14:54:31  22   I ask it from here, Your Honor?

14:54:33  23           THE COURT:  Yes, go right ahead.

14:54:34  24                    CROSS-EXAMINATION

14:54:36  25   BY MR. WATLINGTON:

14:54:36  1    Q.   Mr. Colon, good afternoon.

14:54:37  2    A.   Good afternoon.

14:54:37  3    Q.   Mr. Colon, who reviews and certifies the

14:54:41  4    information that you have transcribed?

14:54:44  5    A.   Who reviews and certifies?

14:54:55  6    Q.   Yes.

14:54:56  7    A.   Well, it goes back to the agents.

14:54:57  8    Q.   So nobody in your company goes --

14:54:59  9    A.   We do have a QC process.  It is not just me

14:55:04  10   listening to the conversation, but the supervisors

14:55:07  11   actually listen.

14:55:08  12   Q.   Well, let's put it that way.  Isn't it true that

14:55:12  13   their names are not on the documents, on those

14:55:14  14   documents?

14:55:14  15   A.   Just my signature.

14:55:16  16   Q.   Just your signature.

14:55:16  17        So there's no written signature certification of a

14:55:19  18   reviewer or certification from someone who you say

14:55:22  19   certified the documents?

14:55:24  20   A.   Till when we review the transcripts.

14:55:25  21   Q.   Mr. Colon --

14:55:26  22   A.   Yes.

14:55:27  23   Q.   -- my question is very straight.  There is no

14:55:30  24   written certification of a reviewer or other

14:55:34  25   certification of your transcripts or the CD's, written

14:55:39  1    on there.  No one has certified that they reviewed and

14:55:44  2    certified what you've said, correct?

14:55:49  3    A.   Well, yes.  There are other signatures on this CD

14:55:52  4    is from people that have reviewed the conversation and

14:55:53  5    can confirm that it's true.

14:55:55  6    Q.   You can't confirm it's true?

14:55:57  7    A.   There's other signatures on the CD's that --

14:56:00  8             MR. WATLINGTON:  All right.  Thank you.

14:56:02  9             THE WITNESS:  -- in addition to mine.

14:56:03  10             THE COURT:  Okay.  Redirect?

14:56:04  11             MS. LAKE:  Nothing further, Your Honor.

14:56:05  12             THE COURT:  Mr. Colon, thank you for your

14:56:06  13    testimony.

14:56:07  14        Next witness.

14:56:08  15             THE WITNESS:  Thank you.

14:56:09  16             THE COURT:  You can step down and leave through

14:56:11  17    the side door, Mr. Colon.

14:56:11  18        (Witness withdrew from stand.)

14:56:13  19             THE COURT:  Next witness.

14:56:14  20             MS. LAKE:  The government calls Creighton

14:56:17  21    Skeen.

14:56:52  22             THE CLERK:  Please stand and raise your right

14:56:54  23    hand to take the oath.

14:56:55  24        (Witness sworn.)

14:56:56  25             THE WITNESS:  I do.

14:56:56   1

14:56:56   2

14:56:57   3

14:56:57   4          THEREUPON, CREIGHTON SKEEN, having been duly

14:56:58   5     sworn, was examined and testified as follows:

14:56:58   6                    DIRECT EXAMINATION

14:56:59   7     BY MS. LAKE:

14:57:07   8     Q.    Good afternoon.

14:57:08   9     A.    Good afternoon.

14:57:08  10     Q.    Could you please state your full name for the

14:57:10  11     record?

14:57:10  12     A.    Creighton Alexander Skeen.

14:57:13  13     Q.    Can you pull the microphone really close to you, or

14:57:16  14     pull your chair up if possible?

14:57:17  15     A.    How is that?

14:57:18  16     Q.    Thank you.

14:57:19  17          Can you again state your full name for the record?

14:57:21  18     A.    Yes.   Creighton Alexander Skeen.

14:57:24  19     Q.    Can you please spell your full name for the record?

14:57:26  20     A.    Yes.   C-r-e-i-g-h-t-o-n, A-l-e-x-a-n-d-e-r,

14:57:37  21     S-k-e-e-n.

14:57:40  22     Q.    Thank you.

14:57:40  23          Mr. Skeen, who do you work for?

14:57:42  24     A.    I work for the Office of Air and Marine.

14:57:43  25     Q.    What agency is that with?

14:57:45  1    A.    That's under Customs and Border Protection.

14:57:48  2    Q.    And how long you have worked for that agency?

14:57:50  3    A.    I've worked for Customs and Border Protection since

14:57:55  4    January of 2006, and specifically with the Office of Air

14:57:58  5    and Marine since 2010.

14:58:04  6    Q.    Can you briefly describe your educational

14:58:06  7    background for us?

14:58:07  8    A.    Yes.  I attended the University of Florida, studied

14:58:10  9    finance.  Also Savannah State University.  I attended

14:58:14  10   the Federal Law Enforcement Training Center in Artesia,

14:58:19  11   New Mexico, for border patrol training academy.  I also

14:58:22  12   attended the Federal Law Enforcement Training Center in

14:58:26  13   Brunswick, Georgia, for the Office of Air and Marine.

14:58:29  14       I've received training at Elizabeth City for

14:58:33  15   avionics technician and radar repair.

14:58:37  16   Q.    What is your job title?

14:58:38  17   A.    Aviation enforcement agent.

14:58:40  18   Q.    What do you do as an aviation enforcement agent?

14:58:46  19   A.    My primary job is as a mission sensor operator on a

14:58:50  20   maritime surveillance aircraft.  I operate radar system

14:58:54  21   and a flare system to forward-looking infrared camera.

14:58:58  22   And we patrol the area around Puerto Rico and the U.S.

14:59:01  23   Virgin Islands.  I detect various vessels that contain

14:59:13  24   contraband or migrants coming to the mainland or U.S.

14:59:13  25   Virgin Islands.

14:59:17  1    Q.   In laymen's terms, what are you doing?  You're in

14:59:20  2    an airplane?

14:59:20  3    A.   I'm in an airplane, flying around looking for

14:59:24  4    boats.

14:59:24  5    Q.   And are you capable -- is that airplane capable of

14:59:27  6    recording what you're seeing --

14:59:30  7             THE COURT:  Stop asking leading questions of

14:59:31  8    your witnesses.

14:59:33  9             MS. LAKE:  Yes.

14:59:34  10            THE WITNESS:  Okay.  On the aircraft I have

14:59:36  11   various equipment that I operate.  I operate a radar

14:59:39  12   system.  I operate a cam- -- we have two daylight

14:59:42  13   cameras and a nighttime camera.

14:59:45  14       I also have --

14:59:45  15            THE COURT:  Mr. Skeen, can you put the mike so

14:59:48  16   it's, you're speaking right into it.

14:59:56  17       Go ahead.

14:59:57  18            THE WITNESS:  Radar camera, various

14:59:58  19   communication equipment.  I pick up radar tracks, and I

15:00:01  20   take the camera and I look at the boats.  I determine if

15:00:04  21   I see anything illegal or not illegal.

15:00:04  22   BY MS. LAKE:

15:00:06  23   Q.   And what's a sensor?

15:00:10  24   A.   The sensor is the entire package.  So the radar is

15:00:13  25   going to pick up boats and objects in the water.  It's

15:00:16   1   just going to tell me there's something in the water.

15:00:18   2        I have to individually look at each object and see

15:00:22   3   what it is.  It could be a coconut floating in the

15:00:25   4   water.  It could be a boat.  It could be a whale.

15:00:29   5   Q.   What kind of training, if any, do you have as it

15:00:31   6   relates to being a mission sensor operator?

15:00:33   7   A.   I received on-the-job training at the Office of Air

15:00:39   8   and Marine at Aguadilla.  I was essentially trained as

15:00:43   9   second class on just the radar, and backup to the first

15:00:46   10  class sensor radar operator.

15:00:48   11       I was moved up to radar sensor operator first

15:00:51   12  class, and that was December 2010.  And in October 2012

15:00:57   13  I became an instructor on the system.

15:01:00   14       I currently have -- well, at the time of this

15:01:03   15  incident I had 500 -- approximately 550 hours' flight

15:01:11   16  time operating the radar systems.

15:01:14   17  Q.   Directing your attention to May 17th, 2013, what,

15:01:18   18  if anything, were you doing on that date?

15:01:24   19  A.   When I showed up to work that morning, I was told

15:01:27   20  we had -- our aircraft was instructed to detect a sea

15:01:32   21  surface transfer occurring at --

15:01:35   22       MR. WATLINGTON:  Objection, Your Honor, at this

15:01:36   23  point --

15:01:36   24       THE COURT:  Sustained.

15:01:37   25  BY MS. LAKE:

15:01:37  1    Q.   What, if anything -- just tell us what you did or

15:01:39  2    what you observed.

15:01:40  3         Do you understand?

15:01:41  4    A.   Yes.

15:01:42  5              THE COURT:   All right.   Ask your next question.

15:01:45  6    BY MS. LAKE:

15:01:45  7    Q.   What, if anything, did you do?

15:01:46  8    A.   I conducted a border security patrol in our

15:01:49  9    maritime aircraft.   We went -- I departed from

15:01:53  10   Aguadilla, Puerto Rico, en route to the east side of

15:01:57  11   Puerto Rico and the U.S. Virgin Islands, looking for

15:02:00  12   targets of interest.

15:02:01  13   Q.   And what, if anything, did you observe?

15:02:04  14   A.   I observed a vessel coming from Puerto Rico towards

15:02:15  15   Sail Rock.   It's a red-foot vessel, twin engines, two

15:02:18  16   subjects on board.   I saw it go to Sail Rock, wait at

15:02:23  17   Sail Rock.   And I observed another vessel coming from

15:02:25  18   the direction of St. Thomas, meet with this vessel.   The

15:02:27  19   vessels met for approximately one minute.   And I

15:02:31  20   observed a package from the smaller vessel, the red

15:02:34  21   vessel, being thrown to the larger vessel.

15:02:37  22   Q.   Now let me stop you here.   Where is Sail Rock?

15:02:41  23   A.   Sail Rock is just west of St. Thomas, south, in

15:02:49  24   south and west.

15:02:49  25   Q.   You indicated there were two vessels; is that

15:02:51  1    correct?

15:02:51  2    A.    That's correct.

15:02:52  3    Q.    What did the larger vessel look like?

15:02:54  4    A.    The larger vessel was a marked law enforcement

15:02:54  5    vessel.

15:02:58  6    Q.    What, if anything, did you observe next?

15:03:01  7    A.    Once the bag was thrown from the red small vessel

15:03:06  8    to the police vessel, both vessels departed.  The law

15:03:11  9    enforcement vessel departed toward St. Thomas.  The

15:03:15  10   second vessel, the smaller one, remained on scene for a

15:03:18  11   few minutes.  They changed their clothes, and then they

15:03:21  12   started heading back towards Puerto Rico.

15:03:23  13   Q.    And at the conclusion of your observations, what,

15:03:28  14   if anything, did you do next?

15:03:35  15   A.    I maintained surveillance on the red vessel only.

15:03:38  16   I maintained -- we maintained surveillance in the

15:03:42  17   aircraft for a couple hours.

15:03:44  18        After that event, I relayed the last-known position

15:03:47  19   of that vessel and asked what I was supposed to do with

15:03:49  20   it.  And they said -- we left and departed back to

15:03:54  21   Aguadilla.

15:03:56  22   Q.    Now your observations, were they recorded using the

15:03:58  23   sensor machine on the aircraft?

15:04:00  24   A.    Yes.

15:04:01  25              MR. MINGOLLA:  Objection.  Leading.

15:04:02  1          THE COURT:  Sustained.

15:04:03  2    BY MS. LAKE:

15:04:03  3    Q.   What, if anything, happened with the recording?

15:04:08  4    A.   I recorded the exchange of vessels.  I also

15:04:13  5    recorded the last-known position of the vessels as well.

15:04:16  6    Q.   What, if anything, did you do next as it relates to

15:04:19  7    that recording?

15:04:21  8    A.   I took that recording and I burned a copy to a

15:04:24  9    disk, a DCD, and I provided it to the case agent.

15:04:24  10         (Government's Exhibit 79a marked for

15:04:24  11    identification.)

15:04:27  12    BY MS. LAKE:

15:04:27  13    Q.   And showing you what's been marked as Government's

15:04:30  14    Exhibit 79a.  Do you see that in front of you?

15:04:37  15    A.   Yes.

15:04:40  16    Q.   Do you see this?

15:04:41  17         THE COURT:  Use the Elmo.  That's what the Elmo

15:04:43  18    is for.

15:04:51  19    BY MS. LAKE:

15:04:51  20    Q.   Do you see Exhibit 79a?

15:04:53  21    A.   Yes.

15:04:53  22    Q.   And again, Exhibit 79a?

15:04:56  23    A.   Yes.

15:04:56  24    Q.   What, if anything, is contained inside of

15:04:59  25    Exhibit 79a?

15:05:01  1    A.    The original copy of the DCD that I provided.

15:05:05  2    Q.    Now showing you Government's Exhibit -- when you

15:05:12  3    say "copy," copy of what?

15:05:13  4    A.    The way our recording system works on the aircraft,

15:05:19  5    everything, there is no specific original.  It is on the

15:05:24  6    aircraft, which gets deleted.  You have to take a copy

15:05:27  7    of that video.

15:05:28  8          The video goes to a thumb drive.  I bring the thumb

15:05:34  9    drive to my office and I burn a DVD for evidentiary

15:05:38  10   purposes, and provide that to the case agent.

15:05:40  11   Q.    So Government's Exhibit 79a, does it contain a

15:05:43  12   recording of what you observed on May 17th, 2013?

15:05:46  13   A.    Yes, it does.

15:05:46  14         (Government's Exhibit 79b marked for

15:05:46  15   identification.)

15:05:58  16   BY MS. LAKE:

15:05:58  17   Q.    Showing you Government's Exhibit 79b, do you see

15:06:03  18   that in front of you?

15:06:04  19   A.    Barely.  I see it.

15:06:11  20   Q.    So you can see Exhibit 79b?

15:06:14  21   A.    Yes.

15:06:14  22   Q.    What is Government's Exhibit 79b?

15:06:16  23   A.    That is a working copy of the original that I

15:06:18  24   provided to the case agent.

15:06:19  25   Q.    So what is the relationship between 79a and 79b?

15:06:27  1   A.   That's the same thing.

15:06:28  2   Q.   And now are there any additions, deletions,

15:06:31  3   corrections to the recording that's reflected on

15:06:36  4   Exhibit 79a?

15:06:36  5   A.   No.

15:06:37  6   Q.   And are there any additions, deletions to the

15:06:39  7   original recording of anything that's exhibited or

15:06:42  8   recorded on Exhibit 79b?

15:06:44  9   A.   No.

15:06:44  10       (Government's Exhibit 79c marked for

15:06:44  11   identification.)

15:06:51  12  BY MS. LAKE:

15:06:51  13  Q.   And now finally showing you Government's

15:06:54  14  Exhibit 79c.

15:06:59  15  A.   Yes, I do.

15:07:00  16  Q.   What is Government's Exhibit 79c?

15:07:02  17  A.   That is a shortened version of the original -- it's

15:07:07  18  a shortened version of the original.

15:07:09  19  Q.   Approximately how long is the original?

15:07:14  20  A.   I do not know exact.

15:07:15  21  Q.   Is it -- can you estimate?

15:07:20  22       MR. MINGOLLA:  Objection, Your Honor.

15:07:21  23  Speculation.

15:07:22  24       THE COURT:  Hold on.  Sustained.

15:07:23  25       THE WITNESS:  Half hour.  I'm not sure.

15:07:25   1   BY MS. LAKE:

15:07:25   2   Q.   So Exhibit 79c, what is the relationship between

15:07:29   3   Exhibit 79b and 79c?

15:07:30   4   A.   That's a shortened version.  And I've watched both

15:07:35   5   personally.  It has the same content.  Nothing has been

15:07:42   6   changed.  It's just a shorter version.

15:07:44   7   Q.   And after you reviewed 79b, what, if anything, did

15:07:50   8   you do with it?

15:07:50   9   A.   I initialed and dated it.  I reviewed both of them

15:07:54   10   yesterday.

15:07:54   11   Q.   After reviewing Exhibit 79c, what, if anything, did

15:07:57   12   you do with it?

15:07:58   13   A.   I initialed it and dated it.

15:07:59   14   Q.   And Exhibit 79c, are there any additions,

15:08:06   15   corrections?

15:08:13   16   A.   No.

15:08:14   17        MR. MINGOLLA:  Objection, Your Honor.

15:08:14   18        THE COURT:  Overruled.

15:08:14   19   BY MS. LAKE:

15:08:15   20   Q.   Does Exhibit 79c accurately reflect what you saw

15:08:19   21   from your plane on May 17, 2013?

15:08:21   22   A.   Yes.

15:08:22   23   Q.   And it's an accurate excerpt of the original

15:08:25   24   recording?

15:08:25   25   A.   Yes.

15:08:26   1          MS. LAKE:  Thank you.

15:08:26   2        I have nothing further.

15:08:27   3          THE COURT:  Attorney Mingolla.

15:08:38   4                 CROSS-EXAMINATION

15:08:40   5   BY MR. MINGOLLA:

15:08:41   6   Q.   Mr. Skeen, what sort of aircraft were you flying?

15:08:44   7   A.   It's a Dehavilland dash 8.

15:08:50   8   Q.   It's a twin engine?

15:08:52   9   A.   Yes, sir.

15:08:53   10  Q.   And how many -- I'm a little confused here.  You

15:08:56   11  say you're a radar operator, correct?

15:08:58   12  A.   Yes, sir.

15:08:59   13  Q.   You're certified -- not certified, but a radar

15:09:02   14  operator?

15:09:02   15  A.   I'm trained and certified by our training

15:09:05   16  personnel.

15:09:05   17  Q.   Okay.  About how often do you go out in your

15:09:13   18  Dehavilland?

15:09:13   19  A.   Three to four times a week.

15:09:16   20  Q.   What sort of cameras do you use -- this is the

15:09:23   21  confusing bit --

15:09:24   22          MS. LAKE:  Objection.  Argumentative.

15:09:26   23          THE COURT:  Overruled.

15:09:29   24  BY MR. MINGOLLA:

15:09:29   25  Q.   You say you saw something on radar?

15:09:31    1    A.   Yes, sir.

15:09:32    2    Q.   Now, if I'm not mistaken, radar only shows, has a

15:09:40    3    screen that only shows dots that are objects, correct?

15:09:43    4    A.   Yes.

15:09:43    5    Q.   Doesn't show colors?

15:09:44    6    A.   No.

15:09:45    7    Q.   Doesn't show sizes -- strike that.  Doesn't show

15:09:49    8    shapes?

15:09:58    9    A.   No.

15:09:58   10    Q.   Basically you see dots?

15:10:00   11    A.   That's correct.

15:10:11   12    Q.   So you see these dots.  You've indicated you took

15:10:18   13    photographs?

15:10:18   14    A.   Photographs, video.

15:10:20   15    Q.   What sort of cameras did you use?

15:10:21   16    A.   It's an MX15 camera.

15:10:24   17    Q.   Who makes it?

15:10:26   18         MS. LAKE:  Objection.  Relevance.

15:10:27   19         THE COURT:  Sustained.

15:10:32   20    BY MR. MINGOLLA:

15:10:32   21    Q.   How often have you used an MX15 camera?

15:10:35   22    A.   I've used it frequently since October 2010.

15:10:39   23    Q.   And how high is the resolution of the MX15 camera?

15:10:50   24    A.   I do not know the resolution.

15:10:52   25    Q.   Wouldn't it be significantly high resolution for

15:10:59  1    you to determine what's a coconut -- what did you say, a

15:11:02  2    coconut floating in the water?

15:11:04  3    A.    Yes.  It's very clear.

15:11:16  4    Q.    And that photograph -- those photographs taken by

15:11:18  5    your MX15 -- are you saying you can't remove the MX15

15:11:29  6    from the aircraft?

15:11:30  7    A.    It can be done by a mechanic, yes.

15:11:32  8    Q.    All right.

15:11:33  9    A.    All the software, all the components of the

15:11:36  10   aircraft can be removed.

15:11:37  11   Q.    And it's -- isn't it approximately, maybe, I'm

15:11:41  12   using my hands, maybe this big by this big, the camera?

15:11:46  13   A.    It's a little larger than that, yes.

15:11:51  14   Q.    So why would there be any necessity, and not

15:11:54  15   particularly -- I mean, you've indicated that you didn't

15:11:56  16   want to take it out of the airplane, so you used a, what

15:12:01  17   do you call it, not a chip?

15:12:04  18   A.    Thumb drive.

15:12:05  19   Q.    Yeah.  Why didn't you just take the camera?

15:12:09  20   A.    We don't ground our aircraft to, we don't ground

15:12:13  21   our aircraft.  It's not policy to disassemble the

15:12:17  22   aircraft to show the recording.

15:12:19  23   Q.    You're not disassembling the aircraft.  You're

15:12:23  24   removing a camera?

15:12:24  25   A.    You're making the camera not patrol worthy, and

15:12:28   1    it's CBP policy not to remove components of the

15:12:33   2    aircraft.  It's an airworthiness issue.

15:12:36   3    Q.   How long does it take to remove a --

15:12:39   4         MS. LAKE:  Objection.  Relevance.

15:12:41   5         THE WITNESS:  I'm not a mechanic.  I can't tell

15:12:43   6    you.

15:12:43   7    BY MR. MINGOLLA:

15:12:43   8    Q.   You said you're an expert on this.  You don't know

15:12:45   9    how long it would take to remove a camera from a

15:12:49  10    Dehavilland?

15:12:49  11    A.   I'm an operator.  I've never removed a camera.

15:12:53  12    Q.   Have you ever seen one removed?

15:12:55  13    A.   No, I haven't.

15:12:56  14         MS. LAKE:  Objection.  Irrelevance and

15:13:00  15    argumentative.

15:13:01  16         THE COURT:  Sustained.  Let's move on.

15:13:09  17    BY MR. MINGOLLA:

15:13:09  18    Q.   Now, you mentioned something about -- you talked

15:13:11  19    about there was a version that you removed using a thumb

15:13:14  20    drive or whatever it's called, from your MX.  And then

15:13:23  21    you took that to whom?

15:13:24  22    A.   To my work station.

15:13:35  23    Q.   And then you discussed the fact that you made a

15:13:37  24    shortened version?

15:13:38  25    A.   No, that's not correct.  I burned the original copy

15:13:42  1    of what is exactly on the thumb drive, and I provided

15:13:45  2    that to the case agent.  Nothing more.

15:13:46  3    Q.   What did you reference -- what were you referencing

15:13:48  4    when you say it was shortened?

15:13:51  5    A.   There's a version I looked at yesterday that the

15:13:53  6    AUSA provided, that was a shortened version.  I did not

15:13:58  7    make that video.

15:13:59  8    Q.   Who made that shortened version?

15:14:01  9    A.   The AUSA's office.

15:14:04  10   Q.   Who?

15:14:04  11   A.   The AUSA's office.

15:14:06  12   Q.   Did they discuss with you, the AUSA's office, the

15:14:13  13   aspect of shortening this tape, this video?

15:14:15  14   A.   They asked me to review it and see if any content

15:14:19  15   had been changed in that shortened version.

15:14:29  16   Q.   And approximately how much had been shortened?  To

15:14:31  17   what degree had it been shortened?

15:14:33  18   A.   It showed the event which occurred --

15:14:35  19   Q.   I didn't ask you that question.

15:14:36  20   A.   I don't know the time period, sir.

15:14:44  21   Q.   Would you say that more or less than half of it had

15:14:46  22   been shortened?

15:14:51  23   A.   I'm thinking, possibly.

15:14:56  24   Q.   And do you know who in the AUSA's office did the

15:15:04  25   shortening?

15:15:05  1          MS. LAKE:  Objection.  Relevance, Your Honor.

15:15:07  2          THE COURT:  Okay.  Overruled.

15:15:07  3          THE WITNESS:  No.

15:15:08  4   BY MR. MINGOLLA:

15:15:08  5   Q.   Do you know whether the person in the AUSA's office

15:15:12  6   who shortened it has any experience in shortening

15:15:17  7   videos?

15:15:18  8   A.   I have no idea.

15:15:19  9          MS. LAKE:  Objection.  Relevance, Your Honor.

15:15:20  10          THE COURT:  Okay.  Overruled.

15:15:23  11   BY MR. MINGOLLA:

15:15:34  12   Q.   And how many -- you indicated -- you indicated, you

15:15:56  13   testified that you saw two boats converge, you saw two

15:16:10  14   boats converge?

15:16:13  15   A.   Correct.

15:16:13  16   Q.   And in your experience and in your 550 hours of

15:16:17  17   flight time, have you, have you ever seen boats converge

15:16:22  18   before?

15:16:23  19   A.   Yes.

15:16:23  20   Q.   And on more or less how many occasions have you

15:16:33  21   seen boats converge?

15:16:34  22   A.   I couldn't tell you.  Numerous.

15:16:36  23   Q.   Numerous?

15:16:37  24   A.   Yes.

15:16:38  25   Q.   And on those numerous occasions that you've seen

```
15:16:41   1    boats converge, more or less on many occasions when
15:16:52   2    those boats converge were there drugs involved, or on
15:16:58   3    those occasions they were friends and, like
15:17:01   4    Puerto Ricans, they gather their boats together?
15:17:03   5    A.   Yes, people gather boats together all the time and
15:17:06   6    they're not conducting anything illegal.  However, they
15:17:08   7    are normally longer there than a minute.
15:17:12   8    Q.   But that in and of itself, the duration of time, is
15:17:18   9    indicative of really nothing, right?
15:17:19  10    A.   No.
15:17:20  11    Q.   Right?
15:17:21  12    A.   No.  Could have been innocent.
15:17:29  13    Q.   And what was being -- when the boats converged, and
15:17:34  14    I'm trying to recall what word that you used.
15:17:39  15    A.   I used "object."
15:17:39  16    Q.   "Object."  You don't know what this object was?
15:17:41  17    A.   No, sir.
15:17:47  18    Q.   This object could have been scuba diving equipment,
15:17:51  19    could it not?
15:17:51  20         MS. LAKE:  Objection.  Calls for speculation.
15:17:53  21         THE COURT:  Sustained.  He said he doesn't
15:17:57  22    know.
15:17:57  23    BY MR. MINGOLLA:
15:17:57  24    Q.   This object could have been anything, could it not?
15:18:00  25         MS. LAKE:  Objection.  Asked and answered.
```

15:18:03  1          MR. MINGOLLA:  No.

15:18:04  2          THE COURT:  It's the same point.  Let's move

15:18:06  3   on.  He doesn't know what it is.

15:18:40  4   BY MR. MINGOLLA:

15:18:41  5   Q.   So this could, this convergence of boats, it could

15:18:45  6   have been a perfectly innocent convergence of boats,

15:18:50  7   correct?

15:18:50  8          MS. LAKE:  Objection.  Asked and answered and

15:18:51  9   calls for speculation.

15:18:53  10         MR. MINGOLLA:  No.

15:18:53  11         THE COURT:  Hold on.  We've covered this

15:18:55  12   ground.  Move on.

15:18:56  13  BY MR. MINGOLLA:

15:18:56  14  Q.   It could have been perfectly innocent, right?

15:18:58  15         MS. LAKE:  Objection.  Asked and answered.

15:19:01  16  Calls for speculation.

15:19:01  17         THE COURT:  I think the witness already covered

15:19:03  18  that ground.  Move on.

15:19:04  19         MR. MINGOLLA:  Okay.  I don't have any further

15:19:07  20  questions.  Thank you, Mr. Skeen.

15:19:08  21         THE COURT:  Attorney Watlington.

15:19:10  22         MR. WATLINGTON:  No questions, Your Honor.

15:19:11  23         THE COURT:  Officer Skeen, thank you for your

15:19:13  24  testimony.

15:19:13  25      You may step down.

15:19:13   1            (Witness withdrew from stand.)

15:19:17   2                 THE COURT:  Your next witness.

15:19:19   3                 MS. LAKE:  The government calls Roberto Tapia.

15:22:13   4                 THE CLERK:  Please stand and raise your right

15:22:15   5      hand to take the oath.

15:22:21   6            (Witness sworn.)

15:22:23   7                 THE WITNESS:  I do.

15:22:24   8                 THEREUPON, ROBERTO TAPIA, having been duly

15:22:37   9      sworn, was examined and testified as follows:

15:22:37  10                         DIRECT EXAMINATION

15:22:39  11      BY MS. LAKE:

15:22:44  12      Q.    Please state your name for the record.

15:22:46  13      A.    Roberto Tapia.

15:22:48  14      Q.    Please spell your first and your last name.

15:22:51  15      A.    Roberto, R-o-b-e-r-t-o; Tapia, T-a-p-i-a.

15:22:56  16      Q.    Mr. Tapia, how old are you?

15:22:58  17      A.    I'm 55 years old.

15:23:00  18      Q.    And where are you from?

15:23:02  19      A.    I was born in St. Thomas.

15:23:04  20      Q.    And were you raised also in St. Thomas?

15:23:06  21      A.    I was raised in St. Thomas.

15:23:07  22      Q.    Can you briefly describe your educational

15:23:10  23      background?

15:23:14  24      A.    I attended Ulla Muller -- at the time it was Nisky

15:23:21  25      Elementary, Wayne Aspinall Junior High School, and

15:23:25  1   graduated from Charlotte Amalie High School.

15:23:27  2   Q.   Can you briefly describe your work background for

15:23:30  3   us?

15:23:31  4   A.   I was in Germany for a spell.  I worked for the

15:23:40  5   military.  I came back home.  I joined the Department of

15:23:50  6   Planning and Natural Resources enforcement in '89.  I

15:23:52  7   went over -- transferred to the Police Department in

15:23:54  8   '96, and I went back to DPNR in 2006, I think.

15:24:03  9   Q.   Now, let's start with 1989.  Your said you worked

15:24:06  10  for DPNR, is that correct?

15:24:08  11  A.   That's correct.

15:24:09  12  Q.   What does DPNR stand for?

15:24:12  13  A.   It stands for the Department of Planning and

15:24:15  14  Natural Resources.

15:24:15  15  Q.   And what was your job title?

15:24:19  16  A.   I started as the assistant director and I ended up

15:24:24  17  as the director.

15:24:26  18  Q.   And are you a -- were you a law enforcement agent?

15:24:31  19  A.   Yes, I was.

15:24:32  20  Q.   And you indicated that you left DPNR and joined

15:24:36  21  VIPD in 1996; is that correct?

15:24:38  22  A.   That's correct.

15:24:39  23  Q.   What did you do when you worked for VIPD?

15:24:41  24  A.   I was assigned to the Marine Unit.  And then when

15:24:47  25  the Marine Unit was disbanded I went to special

15:24:53  1    operations, and from there I went back to DPNR.

15:24:56  2    Q.    While you were employed with VIPD, were you a law

15:24:59  3    enforcement officer?

15:24:59  4    A.    That is correct.

15:25:00  5    Q.    And what specifically were your responsibilities

15:25:03  6    with the Marine Unit?

15:25:04  7    A.    The Marine Unit, we patrolled the shorelines.  We

15:25:10  8    did search and rescue.  And we did a lot of alien

15:25:17  9    interdiction, drug interdiction.

15:25:19  10   Q.    Did you carry a firearm when you were with the

15:25:22  11   Marine Unit?

15:25:23  12   A.    Yes, I did.

15:25:23  13   Q.    And now when you were with special operations, what

15:25:27  14   were your responsibilities?

15:25:28  15   A.    Special operations, I was with the entry team.  I

15:25:35  16   was, I was the outer perimeter guard for any special

15:25:43  17   operations that we had.

15:25:45  18   Q.    And again, were you law enforcement?

15:25:46  19   A.    Yes, ma'am.  All of it was law enforcement.

15:25:49  20   Q.    And all of your career you carried a firearm in

15:25:52  21   conjunction with being law enforcement?

15:25:53  22   A.    Yes, ma'am.

15:25:54  23   Q.    And now when you left VIPD, you went back to DPNR;

15:25:59  24   is that correct?

15:26:00  25   A.    Yes, ma'am.

15:26:00  1    Q.    What was your job title when you went back to DPNR?

15:26:03  2    A.    When I went back to DPNR, my job title was

15:26:08  3    assistant director.

15:26:09  4    Q.    And what were your duties?

15:26:10  5    A.    My duties was to -- I supervised the St. Thomas,

15:26:15  6    St. John District.  We had eight officers, four vessels,

15:26:20  7    four vehicles.

15:26:21  8    Q.    And what does DPNR do?  What are their activities?

15:26:26  9    A.    DPNR has 13 divisions, to which would include

15:26:34  10    enforcement, which is the division that I was in.  And

15:26:38  11    we enforce the rules and regulations of the Department

15:26:44  12    of Planning and Natural Resources, and also the

15:26:47  13    environment, marine environment law enforcement.  We did

15:26:52  14    all the marine enforcement on the water, meaning the

15:26:57  15    registrations, the moorings, the anchoring, and

15:27:04  16    inspections --

15:27:06  17    Q.    And --

15:27:07  18    A.    -- of the vessels.

15:27:08  19    Q.    And during the course of that enforcement, did you

15:27:10  20    have access to DPNR vessels?

15:27:15  21    A.    Yes, I did.

15:27:16  22    Q.    How many vessels did you have access to?

15:27:18  23    A.    I had access to all of them.  Three of them.

15:27:22  24    Q.    And were they prominently displayed as being law

15:27:27  25    enforcement vessels?

15:27:27  1    A.   Yes.  They had all blue lights, sirens, "DPNR" on

15:27:34  2    it.

15:27:34  3    Q.   Did you have any other job title after -- you said

15:27:38  4    you were deputy chief, I believe?

15:27:39  5    A.   Yes, deputy director.  And I became the director

15:27:52  6    in, maybe '10 or '12.  I don't remember.

15:27:58  7    Q.   And now, while you were with DPNR, you also engaged

15:28:02  8    in drug trafficking; is that correct?

15:28:04  9    A.   That is correct.

15:28:05  10   Q.   And when did you start drug trafficking?

15:28:10  11   A.   I would say someplace between 2001, off and on,

15:28:21  12   until 2014 -- '13.

15:28:28  13   Q.   So it started while you were employed as a VIPD

15:28:31  14   officer?

15:28:37  15   A.   No -- yes.  It started when I was employed with

15:28:41  16   DPN-- with VIPD.

15:28:42  17   Q.   And it continued while you were employed with DPNR?

15:28:46  18   A.   Yes, it did.  It was not a -- yes, it did.

15:28:50  19   Q.   And you were charged in this case, correct?

15:28:53  20   A.   Yes, I was.

15:28:55  21   Q.   And you pled guilty, didn't you?

15:28:56  22   A.   Yes, I did.

15:28:57  23   Q.   And what did you plead guilty to?

15:28:59  24   A.   I pled guilty to racketeering.

15:29:06  25   Q.   And racketeering, what does that -- what do you

15:29:08    1    mean by "racketeering"?

15:29:10    2              THE COURT:  Let's move on.

15:29:11    3

15:29:11    4    BY MS. LAKE:

15:29:11    5    Q.   Did you also -- did that include pleading guilty to

15:29:15    6    drug trafficking?

15:29:19    7              MR. MINGOLLA:  Objection.  Leading.

15:29:20    8              THE COURT:  Overruled.

15:29:20    9              THE WITNESS:  The racketeering, the --

15:29:22   10              MR. MINGOLLA:  Objection.

15:29:23   11              THE COURT:  Overruled.

15:29:23   12         What's the question?

15:29:25   13    BY MS. LAKE:

15:29:25   14    Q.   Does the plea involve pleading to drug trafficking?

15:29:31   15              THE COURT:  Answer the question.

15:29:32   16              THE WITNESS:  I'm not too sure -- I know it

15:29:35   17    includes me facilitating drugs.  I don't know if it's

15:29:40   18    for drug trafficking, but it does have drug in there,

15:29:44   19    several counts of drugs in there, charges in there.

15:29:47   20    BY MS. LAKE:

15:29:47   21    Q.   And why did you plead guilty?

15:29:49   22    A.   Why did I plead guilty?

15:29:58   23         I pled guilty because I did something wrong and I

15:30:02   24    needed to get this straight, correct it, and try to get

15:30:06   25    my life back on an even keel.

15:30:06  1        (Government's Exhibit 87a marked for

15:30:06  2   identification.)

15:30:06  3

15:30:09  4   BY MS. LAKE:

15:30:09  5   Q.   Now, showing you what's been marked as Government's

15:30:15  6   Exhibit 87a.  Do you see this in front of you?

15:30:19  7   A.   Not yet.

15:30:30  8        Yes, I do.

15:30:30  9   Q.   And what is that?

15:30:33  10   A.   That is a plea agreement.

15:30:48  11        MS. LAKE:  We can show maybe the last page of

15:30:50  12   that.

15:30:54  13        Could I have a moment, Your Honor?

15:31:06  14        (Pause.)

15:31:06  15   BY MS. LAKE:

15:31:06  16   Q.   Can you see that exhibit clearly in front of you,

15:31:08  17   Mr. Tapia?

15:31:09  18   A.   I can see it clearly, but there is some lines

15:31:12  19   jumping up and down.

15:31:13  20   Q.   Do you recognize what Government's Exhibit 87a is?

15:31:26  21   A.   That is the plea agreement I signed with the

15:31:27  22   government.

15:31:27  23        (Government's Exhibit 87b marked for

15:31:27  24   identification.)

15:31:28  25   BY MS. LAKE:

15:31:28  1    Q.    And now showing you Exhibit 87b, as in "boy."  Do

15:31:31  2    you see this in front of you?

15:31:32  3    A.    Yes, I do.

15:31:33  4    Q.    And what is that?

15:31:34  5    A.    This is a supplement agreement.

15:31:35  6    Q.    Is that essentially a cooperation agreement?

15:31:37  7    A.    Yes, it is.

15:31:38  8    Q.    And you agreed to cooperate with the government; is

15:31:41  9    that correct?

15:31:41  10   A.    That's correct.

15:31:42  11   Q.    And why did you do that?

15:31:44  12   A.    I did that to, so that I can have better

15:31:56  13   understanding with my sentencing.

15:31:59  14   Q.    And were you promised anything by the government?

15:32:03  15   A.    No, I was not promised anything.

15:32:06  16   Q.    And what's your understanding of what your

15:32:09  17   cooperation agreement is?  What's your understanding of

15:32:11  18   what you must do?

15:32:14  19   A.    I must testify to the facts of the case as it has

15:32:22  20   presented to me, be truthful.  And there's no

15:32:26  21   recommendation or there was no promise of anything,

15:32:29  22   other than we do have an agreement.

15:32:33  23   Q.    And is it accurate that the government promises to

15:32:36  24   recommend --

15:32:38  25            MR. WATLINGTON:  Objection, Your Honor.  She's

15:32:40   1    leading the witness.

15:32:41   2                MR. MINGOLLA:  Objection.

15:32:42   3                THE COURT:  Sustained.

15:32:42   4    BY MS. LAKE:

15:32:43   5    Q.   What is your obligation pursuant to that

15:32:45   6    cooperation agreement?

15:32:47   7    A.   To speak truthfully.

15:32:51   8    Q.   And what is the -- well, strike that.

15:32:54   9         And so now you indicated that you were involved in,

15:32:59   10   in dealing in selling and transporting cocaine; is that

15:33:03   11   correct?

15:33:03   12   A.   That is correct, ma'am.

15:33:04   13   Q.   And what was your role --

15:33:06   14               THE COURT:  Let me see counsel at sidebar.

15:33:28   15        (Sidebar discussion held as follows:)

15:33:42   16               THE COURT:  All right.  This has happened on

15:33:43   17   more than one occasion.  You're assuming facts not in

15:33:46   18   evidence.  He didn't mention the word "cocaine."  At

15:33:49   19   least not in my notes, you've mentioned it.

15:33:53   20        You said you've been dealing and selling.  And he

15:33:55   21   didn't say any of that.

15:33:57   22               MR. WATLINGTON:  Yes.

15:33:58   23               MS. LAKE:  I'll ask the question.

15:34:04   24               THE COURT:  It's more than that.  Attorney

15:34:06   25   Watlington, be quiet, please.

15:34:08    1          MR. WATLINGTON:  Sorry.

15:34:08    2          THE COURT:  You can't assume facts not in

15:34:10    3   evidence.  And your restatement of what the facts are is

15:34:13    4   not accurate.  So I want you to be careful with that.  I

15:34:15    5   didn't hear an objection, but it's happened more than

15:34:17    6   once.  That's why we're here.  We shouldn't have it

15:34:23    7   happen again.  All right.  Okay.

15:34:26    8      I'm sorry, Attorney Watlington, did you have

15:34:29    9   something to add?

15:34:30   10          MR. WATLINGTON:  Well, no -- and also you said

15:34:32   11   it once, but what was also being said was that he was

15:34:37   12   drug trafficking.  And that is not something that's also

15:34:42   13   in there -- he pled guilty to racketeering, and the

15:34:45   14   prosecution brought in the drug trafficking issue.

15:34:48   15      And that's basically the charge, and my charge that

15:34:52   16   I have to defend against, and that's not on the record.

15:34:55   17   That was again brought up without any, any proper

15:34:59   18   foundation.

15:35:00   19          THE COURT:  Well, he can talk about what he

15:35:02   20   did, it's just that -- he needs to talk about what he

15:35:05   21   did, and then you can certainly --

15:35:07   22          MR. WATLINGTON:  Yeah.

15:35:08   23          THE COURT:  -- summarize what he did, or ask

15:35:09   24   him about what he did.

15:35:10   25          MS. LAKE:  And in that instance I simply asked

15:35:14  1    that question.

15:35:15  2              THE COURT:  Let's proceed.

15:35:16  3         (End of sidebar, open court as follows:)

15:35:27  4              THE COURT:  All right.  Go ahead, Counsel.

15:35:32  5              Ms. Lake, it's time for our afternoon break.

15:35:34  6         So remember your respective A and B rooms, and

15:35:38  7    we'll resume in a few minutes.

15:35:42  8              (Juries out.)

15:36:31  9              THE COURT:  Mr. Tapia, we're going to take a

15:36:33 10    ten-minute break.  Do not discuss your testimony during

15:36:36 11    the break.  Do you understand?

15:36:37 12              THE WITNESS:  Yes.  Yes, sir.

15:36:39 13              THE COURT:  All right.  You need to be back on

15:36:41 14    the witness stand in ten minutes.  All right.

15:36:41 15         (Witness stood aside.)

15:36:52 16              THE COURT:  Is there anything we need to cover

15:36:54 17    before we go on the break, Attorney Lake?

15:36:56 18              MS. LAKE:  No.

15:36:57 19              THE COURT:  Attorney Mingolla.

15:36:58 20              MR. MINGOLLA:  I'm sorry, sir.  I didn't hear

15:36:59 21    the question.

15:37:01 22              THE COURT:  Is there anything we need to cover

15:37:02 23    before we go on our break?

15:37:08 24              MR. MINGOLLA:  No, not --

15:37:10 25              THE COURT:  Attorney Watlington?

15:37:12   1           MR. WATLINGTON:  Nothing for Defendant Brown,

15:37:14   2   Your Honor.

15:37:15   3         THE COURT:  All right.  Ten minutes.

15:59:04   4      (Court in recess, 3:37 p.m.)

15:59:04   5      (After recess, jury present, 3:59 p.m.)

15:59:11   6      (Witness resumed stand.)

15:59:11   7         THE COURT:  All right.  The government ready to

15:59:13   8   resume?

15:59:14   9          MS. LAKE:  Yes, Your Honor.

15:59:28  10         THE COURT:  All right.  Go ahead.

15:59:30  11          DIRECT EXAMINATION (Continued)

15:59:30  12   BY MS. LAKE:

15:59:30  13   Q.   Mr. Tapia?

15:59:31  14   A.   Yes, ma'am.

15:59:31  15   Q.   What, if anything, was your involvement with drugs?

15:59:34  16   A.   My involvement was I acted as a broker, trying to

15:59:40  17   negotiate to get the best price I could get for the

15:59:45  18   buyer.

15:59:49  19   Q.   And what else did you do?

15:59:51  20   A.   I would in some occasions, depending, I will pick

15:59:57  21   up the money and drop it off at a certain point, or pick

16:00:02  22   up the drugs and drop that off at a certain point.

16:00:06  23   Q.   And how -- what kind of transportation would you

16:00:08  24   use to pick up money?

16:00:12  25   A.   If I had to go off of St. Thomas, off the west end

16:00:18  1    of St. Thomas, I would use the DPNR vessel and go down

16:00:23  2    and pick up the money and bring it back up.

16:00:25  3        And I would drop that off and pick up the drugs and

16:00:29  4    drop it back at the same point.

16:00:34  5    Q.   And what type of drugs were you dealing with?

16:00:40  6    A.   Mainly cocaine.

16:00:43  7    Q.   And what, if any, other role did you play in the

16:00:50  8    dealing of drugs?

16:00:52  9    A.   That was my only role.  I would make sure that it

16:00:57  10   was -- if they would come on their own vessel.  I would

16:01:01  11   sit and make sure that no one would tamper with the

16:01:04  12   vessels, or I would just make sure that, you know, there

16:01:09  13   was no mishaps in between point A and point B.

16:01:17  14   Q.   Did you only have contact with buyers?

16:01:19  15   A.   I had contact with buyers and sellers.

16:01:23  16   Q.   Who were some of your buyers?

16:01:35  17   A.   I had a couple -- I had a couple from St. John, a

16:01:38  18   couple from Tortola, a couple from here.  I had -- two

16:01:43  19   of my codefendants were point of contacts.  One,

16:01:51  20   Mr. Brown, that is sitting there at the table with

16:01:54  21   counsel.

16:01:54  22            MR. WATLINGTON:  Objection, Your Honor.

16:01:55  23            THE COURT:  Overruled.

16:01:56  24            MR. WATLINGTON:  Nonresponsive to the question

16:01:59  25   that was asked.

16:02:02  1          THE COURT:  All right.  Overruled.

16:02:02  2   BY MS. LAKE:

16:02:03  3   Q.   And you indicated Mr. Brown?

16:02:05  4   A.   Yes.

16:02:05  5   Q.   Can you please identify where Mr. Brown is located

16:02:09  6   right now in the courtroom?

16:02:10  7   A.   Mr. Brown is sitting at the left with his attorney,

16:02:13  8   Attorney Watlington.

16:02:14  9   Q.   Could you please point to where he's located?

16:02:18  10  A.   Over there (indicating).

16:02:19  11  Q.   Can you please describe something that he's

16:02:22  12  wearing?

16:02:22  13  A.   He has on a gray jacket.  I don't know what color

16:02:28  14  shirt he has underneath; a gray jacket.

16:02:30  15  Q.   And where is he seated?

16:02:32  16  A.   He is seated next to his attorney, Attorney

16:02:34  17  Watlington.

16:02:35  18          MS. LAKE:  And for the record, Your Honor, I

16:02:38  19  would ask that the defendant -- I'm sorry -- that the

16:02:42  20  witness has identified the defendant, Raymond Brown.

16:02:44  21          THE COURT:  Yes.  The record will reflect the

16:02:46  22  witness has identified the defendant, Raymond Brown.

16:02:48  23  BY MS. LAKE:

16:02:48  24  Q.   And what role did Raymond Brown have in your drug

16:02:52  25  deals?

16:02:56  1   A.   He was a point of contact.  I would call and find

16:02:59  2   out if he knew of anything, what was available.  If it

16:03:06  3   was, you know, I would know.  And that would be about

16:03:10  4   it.

16:03:13  5   Q.   When you say if anything was available, what are

16:03:15  6   you talking about exactly?

16:03:16  7   A.   Talking about if there was any drugs available,

16:03:19  8   mainly cocaine, if he knew of anybody who may have, who

16:03:24  9   may not have.

16:03:28  10          MR. MINGOLLA:  Your Honor, excuse me.  I cannot

16:03:30  11  see the face.  All I can see is a computer screen.  I

16:03:34  12  would like to be able to see the face of the witness.

16:03:37  13          THE COURT:  All right.  Hold on, Attorney

16:03:39  14  Mingolla.

16:03:40  15          MR. MINGOLLA:  I can't see.

16:03:41  16          THE COURT:  All right.  Attorney Mingolla, I

16:03:44  17  heard you.  Have a seat.

16:03:55  18          MR. MINGOLLA:  That's more like it.  Thank you,

16:03:57  19  Judge.

16:03:57  20          THE COURT:  Go ahead with your question.

16:03:58  21  BY MS. LAKE:

16:03:58  22  Q.   What else, if anything, was Raymond Brown, what was

16:04:00  23  his role?

16:04:03  24          MR. WATLINGTON:  Objection, Your Honor.  She

16:04:04  25  just said -- she just asked that question.  He just

16:04:07  1    answered that question.  He said that was about it.

16:04:09  2            THE COURT:  All right.  Overruled.

16:04:11  3            THE WITNESS:  Can you repeat the question,

16:04:12  4    please?

16:04:12  5    BY MS. LAKE:

16:04:12  6    Q.    What else, if anything, was Raymond Brown's role in

16:04:18  7    the drug deals?

16:04:19  8    A.    He would just let me know if there is anything

16:04:23  9    available.  I don't know if he had -- what contacts he

16:04:26  10   had or where he made his contacts.  But I would contact

16:04:29  11   him and he would let me know if there was -- he would

16:04:35  12   check on it and he would let me know if it was available

16:04:38  13   or not.

16:04:38  14   Q.    And why would you ask Raymond Brown if he had

16:04:41  15   anything available?

16:04:42  16   A.    Because we, we talked about things before and we

16:04:46  17   just asked -- I just asked if he had anything available,

16:04:49  18   and he just let me know.

16:04:51  19   Q.    When you say "things," you talked about things,

16:04:53  20   what things?

16:04:54  21   A.    Drugs, cocaine.

16:04:55  22   Q.    And when you say he had anything available, what

16:04:58  23   are you talking about?

16:04:59  24   A.    I'm talking about cocaine.

16:05:02  25   Q.    And what, who were your other, if any, points of

16:05:05   1   contacts?

16:05:10   2   A.   My codefendant, which was Mr. Monsanto, Alsenio,

16:05:17   3   and this guy I only know as G.   I don't know his full

16:05:22   4   name.

16:05:22   5   Q.   Did you have any other points of contact?

16:05:25   6   A.   No, I did not.

16:05:28   7   Q.   And did you have any points of contact on Puerto

16:05:31   8   Rico?

16:05:31   9   A.   I had one point of contact in Puerto Rico.

16:05:38   10   Q.   And who, if anybody, were your buyers?

16:05:41   11   A.   My main buyer was Pee Wee, which is, his name is

16:05:50   12   Angel Negron-Beltran, if I'm not mistaken.

16:05:53   13   Q.   And did you have any other buyers in Puerto Rico?

16:05:58   14   A.   There were, but I never met him or I don't know who

16:06:01   15   they were.

16:06:02   16   Q.   And did you have any points of contacts on St.

16:06:08   17   John?

16:06:08   18   A.   I had a point of contact in St. John.

16:06:10   19   Q.   And who was that?

16:06:11   20   A.   The Angelo Hill.

16:06:17   21   Q.   And what was the role Angelo Hill played in the

16:06:20   22   drug deals?

16:06:22   23   A.   I would ask Angelo if he knew of any things that

16:06:27   24   were available, meaning cocaine.   And he would let me

16:06:30   25   know and we will get it and make the transaction.

16:06:39  1    Q.    And who or what, if anything, would Angelo Hill do

16:06:41  2    in terms of the point of contact?

16:06:43  3    A.    He would --

16:06:48  4            MR. MINGOLLA:  Objection.  Calls for

16:06:50  5    speculation.

16:06:51  6            THE COURT:  All right.  Overruled.

16:06:56  7            THE WITNESS:  Angelo would make -- I don't know

16:06:58  8    who Angelo would make contact with most of the -- I only

16:07:02  9    did three or four -- two or three transactions with him.

16:07:05  10   And --

16:07:06  11           THE COURT:  Just testify based on what you know

16:07:08  12   and what you observed.

16:07:10  13           THE WITNESS:  Okay.  In -- particularly this

16:07:15  14   last time I got seven kilos that he facilitated for me.

16:07:20  15   BY MS. LAKE:

16:07:21  16   Q.    And who did you get those from?

16:07:22  17   A.    I got them from Mr. Hill.

16:07:30  18   Q.    And do you know Mr. Hill by any other name?

16:07:35  19   A.    I think they call him Biggs.

16:07:42  20   Q.    And do you see Mr. Hill in the courtroom today?

16:07:44  21   A.    Yes.  He is sitting at the table with his attorney.

16:07:48  22   Q.    And can you please point to where he's located?

16:07:51  23   A.    He's located next to Attorney Bengoa [sic] in a

16:07:58  24   brown suit, wearing glasses.

16:08:00  25   Q.    And --

16:08:02  1          MS. LAKE:  For the record, Your Honor, I would

16:08:03  2    ask that the record reflect that the witness has

16:08:05  3    identified Walter Hill.

16:08:07  4          THE COURT:  Yes.  The record will reflect that

16:08:09  5    the witness has identified Walter Hill.

16:08:13  6    BY MS. LAKE:

16:08:13  7    Q.   And what else was your role as a broker in these

16:08:20  8    drug deals?

16:08:21  9    A.   I would negotiate the prices, see if we could get a

16:08:27  10   better price.  Sometimes I would test the merchandise

16:08:34  11   items to make sure it was good.  Then I would make sure

16:08:37  12   it got to its destination.  If there were -- the courier

16:08:42  13   was here at the dock, or I had to meet him outside the

16:08:46  14   dock.

16:08:46  15   Q.   When you say "merchandise," what are you referring

16:08:48  16   to.

16:08:51  17   A.   The cocaine.

16:08:51  18   Q.   And would you be paid for your activities?

16:08:54  19   A.   Yes, I was.

16:08:55  20   Q.   How were you paid?

16:08:58  21   A.   Depending on the quantity and where it was going,

16:09:01  22   it was $500 per kilo.

16:09:08  23   Q.   And in what manner, what was the situation of you

16:09:10  24   being paid?

16:09:12  25   A.   The situation would be -- normally the kilos would

16:09:18   1   go down, and once it was, if it was 10, I would make

16:09:26   2   $5,000, $5,000 off of that.  And it would come back up

16:09:29   3   the next week or the week after.

16:09:30   4   Q.   When you say come down, go back up, what are you

16:09:33   5   referring to?

16:09:34   6   A.   Okay.  When -- if the vessel was here on -- at the

16:09:39   7   dock I would see to it that the bag was put in the

16:09:44   8   vessel.  And then the vessel would leave.  Or I would

16:09:47   9   take it off the tip of St. Thomas and give it to the

16:09:51   10  carrier.

16:09:52   11      He, in return, will come back, three, four days, a

16:09:57   12  week, and bring me my payment.

16:10:00   13  Q.   And when you say it would be in the vessel, what

16:10:03   14  are you referring to when you say "it"?

16:10:06   15  A.   The drugs.

16:10:08   16  Q.   And how would you be in contact with Defendant

16:10:11   17  Raymond Brown?

16:10:12   18  A.   We talk by phone, cell phone.

16:10:15   19  Q.   And what was your cell phone number?

16:10:21   20  A.   I had two numbers.  One was -- my personal number

16:10:26   21  was 690-1220, and my work number was 643-5604.

16:10:35   22  Q.   What were the Area Codes for each of those phone

16:10:37   23  numbers?

16:10:38   24  A.   340.

16:10:39   25  Q.   And how would you -- how would you call or contact

16:10:44  1    Raymond Brown?

16:10:48  2    A.   We would, I would call him on his cell or -- that's

16:10:53  3    about all the communications.  We get on the cell and

16:10:56  4    then we'll meet someplace.

16:10:58  5    Q.   And how would you be in contact with Angelo Hill?

16:11:01  6    A.   By cell phone.

16:11:04  7    Q.   And how would you be in contact with Pee Wee or

16:11:10  8    Angel Negron?

16:11:11  9    A.   By cell phone.

16:11:13  10   Q.   How would you be in contact with the defendant,

16:11:16  11   Mr. Hill, that you identified in court?

16:11:19  12   A.   I spoke to him very briefly once or twice.

16:11:22  13   Q.   And what, if any, vessel would you use to

16:11:29  14   accomplish these deals?

16:11:30  15   A.   I would use DPNR vessel.

16:11:34  16        MR. WATLINGTON:  Objection, Your Honor.

16:11:35  17        THE COURT:  Overruled.

16:11:42  18   BY MS. LAKE:

16:11:42  19   Q.   And when you would do these things, how would you

16:11:44  20   be clothed or dressed?

16:11:47  21   A.   I would be in my DPNR uniform.

16:11:51  22   Q.   Would you be carrying anything as part of your

16:11:53  23   uniform?

16:11:53  24   A.   As part of my uniform I wear a gun belt.  I would

16:11:57  25   have my handcuffs, my extra magazines, my weapon, a

16:12:01   1    baton, radio, flashlight.

16:12:04   2    Q.   And how did you exactly get started in doing these

16:12:15   3    deals?

16:12:15   4    A.   Actually, a vessel -- a friend of mine called me

16:12:18   5    one evening and told me there was a vessel stranded

16:12:22   6    outside of Sail Rock, that they broke down --

16:12:27   7            THE COURT:   All right.   Stop.   Move on.   How is

16:12:31   8    this not hearsay?

16:12:33   9            MS. LAKE:   I'll move on, Your Honor.

16:12:38  10    BY MS. LAKE:

16:12:39  11    Q.   Approximately what year was the first time that you

16:12:42  12    engaged in a deal?

16:12:46  13    A.   About 2001, 2002.

16:12:52  14    Q.   What type of drugs were they?

16:12:54  15    A.   Cocaine.

16:12:55  16    Q.   And how did you get started in that?

16:13:04  17    A.   I met a friend through a boat race, and we just

16:13:11  18    begin to talk and we -- it just took off from there.

16:13:17  19    Q.   Now how many, if any, deals did you do with Raymond

16:13:23  20    Brown?

16:13:23  21            MR. WATLINGTON:   Objection, Your Honor.

16:13:24  22            THE COURT:   Sustained.   Rephrase.

16:13:26  23    BY MS. LAKE:

16:13:26  24    Q.   What was your relationship with Raymond Brown as it

16:13:30  25    relates to cocaine?

16:13:31  1            MR. WATLINGTON:  Objection, Your Honor.  It's

16:13:33  2    been asked and answered twice.

16:13:35  3            THE COURT:  Okay.  Overruled.

16:13:39  4            THE WITNESS:  Can you repeat the question,

16:13:40  5    please.

16:13:43  6            MS. LAKE:  Actually, Your Honor, if I can.

16:13:43  7    BY MS. LAKE:

16:13:46  8    Q.   Showing you exhibits, showing you Exhibit 3 through

16:14:05  9    78, do you see these in front of you?

16:14:13  10   A.   Yes, I do.

16:14:16  11   Q.   And as I hold them up, do you see Exhibits 3

16:14:19  12   through 78 in my hands?

16:14:20  13   A.   Yes, I do.

16:14:22  14   Q.   And is the "a" series, 3a through 78a, have you

16:14:25  15   seen these before?

16:14:25  16   A.   Yes, I have.

16:14:26  17   Q.   Where have you seen these?

16:14:29  18   A.   At the office of the district attorney.

16:14:33  19   Q.   And have you listened to all the calls reflected on

16:14:38  20   Exhibits 3a through 78a?

16:14:39  21   A.   I have.

16:14:40  22   Q.   And after you listened to the calls what, if

16:14:43  23   anything, did you do with the CD's that they were played

16:14:46  24   on?

16:14:47  25   A.   Each CD that I listened to, I initialed and dated.

16:14:51  1    Q.   And whose voice is on these, on these calls?

16:14:59  2    A.   We have my voice.  We have Pee Wee voice.  We have

16:15:03  3    Raymond Brown voice.  We have Angelo Hill voice.

16:15:11  4    Q.   And showing you what's been marked as Exhibits 3b

16:15:18  5    through 78b.

16:15:23  6         Do you see these in front of you?

16:15:24  7    A.   Yes, I do.

16:15:25  8    Q.   As I'm holding them up in front of you, do you see

16:15:28  9    these?

16:15:29  10   A.   Yes, I do.

16:15:29  11   Q.   Have you reviewed these transcripts, Exhibits 3b

16:15:32  12   through 78b?

16:15:33  13   A.   Yes, I have.

16:15:34  14   Q.   And have you reviewed them while listening to the

16:15:37  15   calls in 3a through 78a?

16:15:39  16   A.   Yes, I did.

16:15:40  17   Q.   And are these transcripts an accurate reflection of

16:15:44  18   the calls that you listened to on Exhibits 3a through

16:15:47  19   78a?

16:15:48  20   A.   They are.

16:15:49  21   Q.   And are some calls in English?

16:15:50  22   A.   Some calls are in English and some calls are in

16:15:50  23   Spanish.

16:15:53  24   Q.   And are you a Spanish speaker?

16:15:54  25   A.   I speak Spanish fluently.

16:15:56  1    Q.    And the Spanish calls that you listened to, was it

16:15:59  2    your voice on those calls?

16:16:00  3    A.    Yes, it was.

16:16:01  4    Q.    And the transcripts of those calls, are they an

16:16:04  5    accurate reflection of the calls that you listened to?

16:16:06  6    A.    Yes, they were.

16:16:13  7    Q.    And the recordings are a true and accurate

16:16:15  8    reflection of the conversations that you had in Exhibits

16:16:17  9    3a through 78a?

16:16:18  10   A.    That is correct.

16:16:21  11         MS. LAKE:  Your Honor, I would ask to play

16:16:23  12   Exhibit 3a -- or 3.

16:16:27  13       I would ask that it be published to the courtroom.

16:16:31  14         THE COURT:  It's not evidence.

16:16:33  15         MR. WATLINGTON:  Your Honor, I would object.

16:16:34  16         MS. LAKE:  I would ask that Exhibits 3a --

16:16:37  17   well, 3a through 78a be received into evidence.  And we

16:16:41  18   would ask that 3b through 78b be received into evidence.

16:16:47  19         THE COURT:  Did you want to inquire about

16:16:48  20   relevance?

16:16:51  21         MR. WATLINGTON:  Your Honor, I'm objecting --

16:16:52  22         THE COURT:  It's under advisement.  Nothing is

16:16:55  23   in.

16:16:55  24   BY MS. LAKE:

16:16:56  25   Q.    Showing you exhibit -- well, first, Exhibit 3,

16:16:59  1    Exhibits 3a through 24a.  Are you familiar with those

16:17:06  2    calls?

16:17:07  3    A.    Yes, I am.

16:17:07  4    Q.    And in those calls, what are they referring to?

16:17:16  5    A.    They're referring to getting some, getting some

16:17:24  6    cocaine from Mr. Brown.

16:17:26  7          I contact Mr. Brown and we talked about getting --

16:17:32  8    if he had anyone or knew of anyone that could provide me

16:17:39  9    with the amount of cocaine that I needed.

16:17:42  10          MS. LAKE:  Your Honor, I would ask to play

16:17:45  11    Exhibit 3 for the witness.

16:17:50  12          THE COURT:  Come to sidebar.

16:18:05  13          (Sidebar discussion held as follows:)

16:18:06  14          THE COURT:  Attorney Lake, you keep saying

16:18:09  15    "play," you haven't -- it's not in evidence.  Now, what

16:18:13  16    was this witness testifying about?  Was he testifying

16:18:17  17    strictly about 3?  Is that what he was testifying about

16:18:21  18    just now?

16:18:22  19          MS. LAKE:  I was laying the foundation for

16:18:24  20    Exhibits 3 through --

16:18:25  21          THE COURT:  Answer my question first.  Was he

16:18:28  22    testifying about 3a just now?  Yes or no.

16:18:33  23          MS. LAKE:  I can't say yes or no.  It included

16:18:36  24    Exhibit 3.

16:18:36  25          THE COURT:  So he was not talking about 3.

16:18:38  1          MS. LAKE:  He was talking about Exhibit 3 --

16:18:40  2          THE COURT:  All right.

16:18:41  3          MS. LAKE:  -- and other exhibits, but included

16:18:44  4   Exhibit 3.

16:18:44  5          THE COURT:  Okay.  So you said -- you were

16:18:46  6   asking him a question and he mentioned Brown, correct?

16:18:48  7          MS. LAKE:  The collective calls, yes, including

16:18:52  8   3, referring to a deal with Brown, and he's trying to

16:18:56  9   get drugs from Raymond Brown.

16:18:58  10         THE COURT:  Okay.  So all of these calls have

16:19:00  11  to do with a drug deal involving Mr. Brown?

16:19:04  12         MS. LAKE:  That is correct.

16:19:04  13         THE COURT:  3a through 78a.

16:19:07  14         MS. LAKE:  No, not 3a through -- I stated it

16:19:10  15  for the record.  I believe it's 20 --

16:20:10  16      (Pause.)

16:20:10  17         THE COURT:  All right.  So you're seeking --

16:20:12  18  you're asking to play 3.  So what is it you want to move

16:20:14  19  in at this point?

16:20:18  20         MS. LAKE:  Exhibits 3 through -- I believe it

16:20:20  21  was 20 -- well, 3 through 78, I ask be moved into

16:20:24  22  evidence.

16:20:24  23         THE COURT:  All right.  That's under

16:20:26  24  advisement.  What did the witness just speak of, a drug

16:20:30  25  deal with Mr. Brown, correct?

16:20:32  1          MS. LAKE:  Yes.

16:20:32  2          THE COURT:  And is that 3 through 24?

16:20:37  3          MS. LAKE:  Yes.  I would ask that 3 through 24

16:20:40  4    be received into evidence.

16:20:41  5          THE COURT:  What?

16:20:42  6          MS. LAKE:  I would ask that Exhibits 3 through

16:20:44  7    24 be received into evidence.

16:20:46  8          THE COURT:  All right.  Now, the, with 3

16:20:50  9    through 24, did the witness testify about the voices on

16:20:57  10   3 through 24?

16:20:59  11         MS. LAKE:  He said -- I need to play the call

16:21:01  12   so he can identify the voices on Exhibits 3 through 24.

16:21:04  13   I ask that they be played subject to foundation of who

16:21:07  14   is on the call.  He indicated he was on every single

16:21:10  15   call.

16:21:10  16         THE COURT:  Hold on.  3 through 78 he

16:21:16  17   identified a number of voices.  I believe he had said

16:21:20  18   Pee Wee, Hill and Beltran.

16:21:24  19         MS. LAKE:  And Raymond Brown.

16:21:25  20         THE COURT:  And Brown.

16:21:27  21         MS. LAKE:  And Walter Hill.

16:21:32  22         THE COURT:  I don't recall he said that.

16:21:35  23      (Simultaneous discussion).

16:21:36  24         THE COURT:  Attorney.

16:21:37  25         MR. MINGOLLA:  Sorry.

16:21:37    1          THE COURT:  I heard the names, and Walter Hill

16:21:39    2    wasn't one of them.

16:21:40    3       Let's just focus on 3 through 24.  Does he know the

16:21:44    4    voices on those calls?

16:21:45    5          MS. LAKE:  Yes, Your Honor.

16:21:46    6          THE COURT:  All right.  Whose voices are on

16:21:48    7    those calls?

16:21:49    8          MS. LAKE:  3 through 24 -- he is on every

16:21:52    9    single call.

16:21:52   10          THE COURT:  So the record is clear, who are you

16:21:54   11    referring to?

16:21:55   12          MS. LAKE:  Roberto Tapia has identified his

16:21:57   13    voice on every single call on Exhibits 3 through 78.  So

16:22:01   14    we'll focus on Exhibits 3 through 24 right now.  Roberto

16:22:05   15    Tapia has indicated his voice is on every call on

16:22:08   16    Exhibit 3 through 24.

16:22:09   17          THE COURT:  Okay.  That's only one.  Who is the

16:22:11   18    other person?

16:22:12   19          MS. LAKE:  Yes.  The other person would be a

16:22:14   20    buyer in Puerto Rico and it would be Raymond Brown.

16:22:17   21          THE COURT:  I don't recall hearing any of that

16:22:19   22    testimony.

16:22:20   23          MR. WATLINGTON:  He didn't --

16:22:21   24          MS. LAKE:  In order for me to identify the

16:22:23   25    speaker on each call, I need to play the call and ask

16:22:26  1   him who is the speaker on that call.  As an offer of

16:22:28  2   proof I can represent that he can identify himself and

16:22:31  3   the other speaker.

16:22:32  4        But by memory, to ask him to testify to each and

16:22:39  5   every call Exhibit 3 through 78, I would ask to lay

16:22:43  6   the --

16:22:43  7        THE COURT:  Is the witness capable of

16:22:44  8   identifying whose voices are on each -- on the

16:22:47  9   collective group of calls?

16:22:49  10       MS. LAKE:  Yes.

16:22:50  11       THE COURT:  All right.  He did that.  Walter

16:22:52  12  Hill wasn't one of those, as I recall the testimony.  I

16:22:56  13  think I asked a question, were you going to inquire

16:22:58  14  about relevance.  Because other than voices, he hadn't

16:23:01  15  said what, if anything, was on those calls, until he did

16:23:04  16  with respect to 3 through 24 and Raymond Brown.  So I

16:23:08  17  have no idea what is on 25 through 78 in terms of

16:23:13  18  relevance.

16:23:13  19       Having the name of someone only tells me the name

16:23:16  20  of someone.  It doesn't say why it's relevant to this

16:23:19  21  case.

16:23:21  22       But now I have some more information about 3

16:23:23  23  through 24 and why it's relevant, because it deals with

16:23:28  24  drug dealing.  At least that's what the testimony is --

16:23:34  25  I just looked into it -- dealing with some sort of

16:23:37  1    cocaine trafficking.

16:23:37  2         Was there going to be any inquiry to develop the

16:23:42  3    relevance as to 25 through 78?

16:23:47  4         MS. LAKE:  Yes.  I broke it into three separate

16:23:50  5    drug deals.  Two is for defendant -- one is for

16:23:52  6    Defendant Walter Hill.

16:23:53  7         I was doing it that way so that both juries

16:23:56  8    wouldn't hear evidence for both defendants, as we

16:23:59  9    discussed earlier.

16:24:01  10        Two-thirds of the calls relate to Raymond Brown and

16:24:04  11   one-third of the calls relate to Walter Hill.  I was

16:24:06  12   trying to establish the foundation one-third at a time,

16:24:09  13   so that I can establish for the Court which jury needs

16:24:13  14   to listen to what evidence.

16:24:14  15        But I established the relevance and the

16:24:16  16   foundational elements for 3 through 24.  I can establish

16:24:21  17   the foundational relevance for all of the calls, but

16:24:24  18   they are based on three and -- thirds.

16:24:26  19        3 through 24 relate to Raymond Brown and Roberto

16:24:29  20   Tapia.  25 through -- I forgot the next number -- will

16:24:33  21   relate to Raymond Brown and Roberto Tapia.  After that,

16:24:38  22   the next number through 78 will deal with the seven-kilo

16:24:42  23   deal involving Walter Hill.

16:24:43  24        THE COURT:  Okay.

16:24:46  25        MS. LAKE:  And to answer your question, yes, he

16:24:48  1    can identify each and every voice on the calls, his

16:24:50  2    voice on each and every call.

16:24:52  3            THE COURT:  Well, that's -- my question, I

16:24:54  4    think we're running afield of what I initially asked,

16:24:57  5    which was were you going to inquire about relevance.  I

16:25:00  6    thought you said yes.  But you limited your inquiry on

16:25:02  7    relevance to just 3 through 24.

16:25:04  8        So my follow-up question was:  Were you planning to

16:25:06  9    do any relevance inquiry for any of the other things?

16:25:10  10           MS. LAKE:  Yes, Your Honor.

16:25:10  11           THE COURT:  Because other than saying there are

16:25:12  12   these voices, Pee Wee, Angelo Hill, Beltran and Raymond

16:25:19  13   Brown, that's all I have about the tapes, with the

16:25:21  14   exception of 3 through 24, which I now have, that

16:25:24  15   Raymond Brown is involved in that.

16:25:26  16       And it has to deal with cocaine.  That makes it

16:25:28  17   relevant to this case, since this is a drug trafficking

16:25:30  18   case.  I don't know about relevance to the other.  So if

16:25:33  19   you plan to, then fine, you can get to that.

16:25:36  20           MS. LAKE:  If possible, Your Honor, I would

16:25:37  21   like to admit -- I ask the Court to admit 3 through 24.

16:25:42  22   I will play and establish relevance to --

16:25:44  23           THE COURT:  Any objection to 3 through 24?

16:25:47  24           MR. WATLINGTON:  Yes, Your Honor.  Your Honor,

16:25:48  25   if in fact you're going to -- first of all, he has not

16:25:52  1    testified as to what is on those tapes.

16:25:55  2              THE COURT:  Don't pound that --

16:25:57  3              MR. WATLINGTON:  I'm sorry.  He has not

16:26:00  4    testified as to what is the content.

16:26:02  5              THE COURT:  I just saw it.  He said he is

16:26:04  6    talking about cocaine.

16:26:05  7              MR. WATLINGTON:  What -- he is talking about

16:26:07  8    cocaine, but that doesn't mean that they in fact, that

16:26:09  9    in fact they're talking about cocaine and a sale of

16:26:12  10   cocaine or buying of a cocaine.  Yeah, counsel is

16:26:14  11   talking about cocaine, but how is it made, how is it

16:26:18  12   used, and so on --

16:26:20  13             THE COURT:  That will probably be a weight

16:26:21  14   issue.  I don't know if it goes to admissibility.

16:26:25  15             MR. WATLINGTON:  Yes, Your Honor.  But what I'm

16:26:26  16   saying he has not said, well, he has not identified an

16:26:30  17   exhibit, so that exhibit can be properly introduced as

16:26:35  18   evidence.

16:26:36  19        What the government is attempting to do is to

16:26:39  20   publish, then he would verify and then it be admitted.

16:26:43  21   That is tantamount to reading a statement that is not in

16:26:48  22   evidence into the record, and then after you read it you

16:26:52  23   move it into evidence.

16:26:54  24        I think he has to in fact say, well, 3, 3a is a

16:27:00  25   conversation on such and such a time about such and such

16:27:04  1   an event.  Number 5 is a conversation about such and

16:27:07  2   such a thing and such an event that took place.

16:27:09  3       Not that you just throw all of them in and then he

16:27:13  4   just says, okay, they're in evidence, without the

16:27:16  5   foundation.  And then once it's published, once it's

16:27:22  6   published, he identifies it, which he's supposed to do

16:27:25  7   beforehand.

16:27:27  8       THE COURT:  It's not going to be published

16:27:29  9   until it's admitted.  But I think there's enough there.

16:27:32 10   I note your objection.  I'm not persuaded by it.

16:27:34 11       I think the witness testified that 3 through 24

16:27:37 12   were phone calls.  He identified the phone calls

16:27:39 13   collectively from 3 through 78, and he indicated that 3

16:27:44 14   through 24 were about drug trafficking, cocaine

16:27:47 15   specifically is what he mentioned.  And he said it

16:27:49 16   involved Raymond Brown, who is a defendant, which makes

16:27:51 17   it relevant.  And it's been authenticated so I'm going

16:27:54 18   to allow it in.

16:27:55 19       All right.  Thank you, Counsel.

16:27:57 20       (End of sidebar, open court as follows:)

16:28:09 21       THE COURT:  All right.  Exhibits 3 through 24

16:28:10 22   are admitted.

16:28:10 23       (Government's Exhibits 3 through 24 admitted into

16:28:11 24   evidence.)

16:28:11 25       MS. LAKE:  I ask to publish 3 through 24 for

16:28:15  1      the jurors.

16:28:16  2              THE COURT:  Yes, they're admitted.  Yes.

16:28:18  3          Before we do that...

16:28:19  4          Attorney Mingolla, you had an objection to 3

16:28:22  5      through 24?

16:28:22  6              MR. MINGOLLA:  Yeah -- yes, I do, Your Honor.

16:28:24  7              THE COURT:  Attorney Watlington, you had an

16:28:26  8      objection to 3 through 24.

16:28:30  9              MR. WATLINGTON:  Yes, I do, Your Honor.

16:28:31 10              THE COURT:  All right.  Very good.  It's

16:28:32 11      admitted.

16:28:38 12      BY MS. LAKE:

16:28:38 13      Q.   Mr. Tapia, showing you Exhibit Number 3 --

16:28:53 14              THE COURT:  Without the text.

16:28:58 15              MS. LAKE:  Can we stop it for a second, Your

16:29:00 16      Honor?

16:29:00 17              THE COURT:  It's not published yet.  Make sure

16:29:02 18      there's no text.

16:29:03 19          All right.  You can go ahead and play it.

16:29:06 20      BY MS. LAKE:

16:29:07 21      Q.   Playing Exhibit Number 3 for you, Mr. Tapia.

16:29:49 22          (Exhibit published.)

16:29:51 23      Q.   Mr. Tapia, did you hear Exhibit Number 3?

16:29:53 24      A.   Yes, I did.

16:29:54 25      Q.   Who is speaking?

16:29:55  1    A.    That's me and one of the couriers.

16:29:57  2    Q.    And did you review Exhibit Number 3 previously?

16:30:03  3    A.    Yes, I did.

16:30:04  4    Q.    And did you review the transcript that's associated

16:30:06  5    with Exhibit Number 3, specifically Exhibit 3b?

16:30:09  6    A.    Yes, I did.

16:30:10  7    Q.    And you verified the accuracy of the translation in

16:30:13  8    Exhibit 3b?

16:30:14  9    A.    Yes, I did.

16:30:15  10          MS. LAKE:  Your Honor, I would ask that

16:30:17  11   Exhibit 3b be received into evidence.

16:30:22  12          MR. WATLINGTON:  Your Honor, the same objection

16:30:23  13   as to relevance to Defendant Brown.

16:30:27  14          MR. MINGOLLA:  I second that objection, Judge.

16:30:28  15          THE COURT:  All right.  3b is admitted.

16:30:35  16   BY MS. LAKE:

16:30:36  17   Q.    And Mr. Tapia, Exhibits 3 through 24, which have

16:30:38  18   been received into evidence, of those Spanish language

16:30:42  19   calls, who is speaking on those Spanish language calls?

16:30:45  20          THE COURT:  You can't tell the witness that

16:30:49  21   they're Spanish language.  It hasn't been said that

16:30:53  22   they're all Spanish.

16:30:54  23   BY MS. LAKE:

16:30:54  24   Q.    Mr. Tapia, Exhibits 3 through 24, have you reviewed

16:30:57  25   the transcripts 3b through 24b?

16:31:00  1    A.    I have.

16:31:01  2    Q.    And have you verified the accuracy of the content

16:31:05  3    of those transcripts?

16:31:05  4    A.    I have.

16:31:06  5    Q.    And are they a true and accurate reflection and

16:31:10  6    representation of the recordings associated with that

16:31:12  7    transcript?

16:31:12  8    A.    They are.

16:31:13  9             MR. WATLINGTON:  Objection, Your Honor.

16:31:15  10            THE COURT:  Overruled.

16:31:18  11            MS. LAKE:  Your Honor I would ask that exhibits

16:31:20  12   3b through 24b be received into evidence.

16:31:26  13            THE COURT:  All right.  Come to sidebar.

16:31:35  14         (Sidebar discussion held as follows:)

16:31:36  15            THE COURT:  Has there been any testimony that

16:31:49  16   all of these are Spanish language?

16:31:51  17            MS. LAKE:  As I --

16:31:55  18            THE COURT:  Yes or no.  So why is it we're

16:31:57  19   getting to this then in this manner?

16:32:00  20            MS. LAKE:  I'm sorry?

16:32:01  21            THE COURT:  Why are we getting to it in this

16:32:02  22   manner, then?  You're speaking as though it's a known

16:32:05  23   thing that they're Spanish.

16:32:06  24        I was under the impression I thought that they were

16:32:09  25   conversations involving Mr. Brown.

16:32:11   1              MS. LAKE:  They are.

16:32:12   2              THE COURT:  All right.  They involve, but they

16:32:13   3     do not include Mr. Brown.

16:32:16   4              MS. LAKE:  They are --

16:32:17   5              THE COURT:  Do they include Mr. Brown?  Yes or

16:32:20   6     no.

16:32:20   7              MS. LAKE:  These conversations, some of the

16:32:21   8     calls include Mr. Brown, yes.

16:32:22   9              THE COURT:  All right.

16:32:23   10             MS. LAKE:  If I make it clear to the Court,

16:32:24   11    Your Honor, Exhibits 3 through 24 involve a 24-kilo drug

16:32:29   12    deal in which Mr. --

16:32:31   13             THE COURT:  Involve a what?

16:32:33   14             MS. LAKE:  A 24-kilo drug deal in which

16:32:37   15    Mr. Brown supplied 24 kilos to Mr. Tapia.  Mr. Tapia

16:32:40   16    then provided those same 24 kilos to a buyer in Puerto

16:32:44   17    Rico.

16:32:44   18        Exhibits 3 through 24 involve calls with the buyer

16:32:52   19    and calls with Mr. Brown.

16:32:53   20        In these calls they establish that Mr. Tapia was in

16:32:56   21    contact with a Puerto Rican buyer in Puerto Rico.  Those

16:33:02   22    calls are in Spanish.

16:33:03   23             Is the person in Puerto Rico?

16:33:05   24             MS. LAKE:  He is not a charged defendant.  He

16:33:07   25    is an unindicted coconspirator with a nickname Nene.

16:33:11   1          THE COURT:  I haven't heard -- no, this is not

16:33:14   2   proceeding in a way that's logical or in a way that

16:33:17   3   makes good legal --

16:33:18   4          MS. LAKE:  If I may, Your Honor --

16:33:19   5          THE COURT:  No, let me finish.

16:33:20   6     -- doesn't lay a good legal foundation.  If you

16:33:22   7   want to have the voices of other people -- I was

16:33:25   8   prepared to say that perhaps there's enough, but a

16:33:27   9   preponderance to make a Bourjaily finding.

16:33:31   10     I have not heard the word Nene until you just said

16:33:34   11   it.  This witness, who is the only person that can give

16:33:37   12   evidence, hasn't said anything about Nene, has he?

16:33:42   13          MS. LAKE:  He called it a courier.

16:33:43   14          THE COURT:  My point is you're telling me Nene

16:33:45   15   now.

16:33:46   16          MS. LAKE:  I withdraw that.  I apologize for

16:33:48   17   using the nickname.

16:33:49   18          THE COURT:  Whatever the witness is.

16:33:50   19          MS. LAKE:  The witness has testified to --

16:33:51   20          THE COURT:  Hold on a second.  Whatever it is.

16:33:53   21   If you want utterances of people in and they are coming

16:33:56   22   in under some exception or they are nonhearsay, then you

16:34:00   23   have to lay the foundation.

16:34:01   24     There is no foundation laid here.  I thought that

16:34:03   25   it was going to be admissions of a party opponent.  I

16:34:06   1    thought we were talking about Mr. Brown.  It's not

16:34:08   2    Mr. Brown.  It's Spanish.

16:34:10   3        So the only way that that Spanish speaker can come

16:34:13   4    in is if that Spanish speaker's utterances fall in as

16:34:18   5    nonhearsay.  In order to do that you have to lay your

16:34:20   6    foundation.  You haven't.

16:34:23   7            MS. LAKE:  We have.  And I can do that again,

16:34:26   8    Your Honor.  I've established that there --

16:34:27   9            THE COURT:  Tell me -- you say "again" --

16:34:27  10        (Simultaneous discussion.)

16:34:29  11            THE COURT:  Please don't talk over me.

16:34:30  12    You say "again."  Just tell me what is it the

16:34:32  13    witness has uttered that would lay the foundation.  That

16:34:35  14    would help me.

16:34:37  15            MS. LAKE:  The witness has identified an

16:34:39  16    agreement between himself and Mr. Brown to provide

16:34:47  17    cocaine.  The witness testified that the defendant

16:34:50  18    Mr. Brown was providing cocaine to a Puerto Rican buyer.

16:34:59  19            MR. WATLINGTON:  Your Honor, may I?

16:35:01  20            THE COURT:  Who is -- no, I'll give you a

16:35:02  21    chance.

16:35:03  22            MS. LAKE:  Mr. Tapia has not identified a

16:35:05  23    specific name of a person.  Mr. Tapia testified that his

16:35:09  24    dealings were with Mr. Brown.  Mr. Brown is a point of

16:35:11  25    contact.  He was supplied drugs from Mr. Brown, and

16:35:15  1    those drugs were then transported to a buyer in Puerto

16:35:18  2    Rico.

16:35:18  3            THE COURT:  Has this witness identified the

16:35:20  4    voices on the calls?

16:35:21  5            MS. LAKE:  Not yet.  I was trying to --

16:35:23  6            THE COURT:  I thought he did, because I seem to

16:35:25  7    recall some names, Pee Wee, Angelo Hill, Mr. Brown, and

16:35:31  8    Beltran.

16:35:33  9            MR. MINGOLLA:  Beltran.

16:35:33  10           THE COURT:  I haven't heard -- you say that any

16:35:35  11   of those voices were the ones we just heard.  I haven't

16:35:38  12   heard him say that.

16:35:39  13           MS. LAKE:  He testified that there's another

16:35:40  14   person that he was in contact with in Puerto Rico.  He

16:35:43  15   knew him by voice.  He did not --

16:35:44  16           THE COURT:  Let me back up.

16:35:46  17           MS. LAKE:  He identified another person.

16:35:47  18           THE COURT:  Voices on the tape.  Did he not,

16:35:50  19   did you not ask him who was on the tapes?

16:35:52  20           MS. LAKE:  Yes.

16:35:53  21           THE COURT:  Did he mention anyone other than

16:35:55  22   those four people that I mentioned?

16:35:57  23           MS. LAKE:  Yes.

16:35:58  24           MR. WATLINGTON:  No.

16:35:59  25           MR. MINGOLLA:  No.

16:35:59  1              THE COURT:  Brown --

16:38:22  2         (Pause.)

16:38:23  3              THE COURT:  When I just looked through the

16:38:24  4    transcript it doesn't say Beltran.  It says Pee Wee,

16:38:28  5    Angelo Hill, Tapia and Raymond Brown.  Those are the

16:38:31  6    voices.  Those are the only ones.

16:38:33  7         You asked him specifically whose voices, and he

16:38:35  8    said his voice, Tapia -- his voice, Angelo Hill, Raymond

16:38:41  9    Brown and Pee Wee.  Those were the four.

16:38:46 10         So those were the four people who are on the tape.

16:38:49 11    That's all we had at that point on the tape.  I asked a

16:38:53 12    question about relevance.

16:38:53 13         The relevance that you mentioned was that Raymond

16:38:56 14    Brown was in a discussion with, about cocaine.

16:39:00 15         What I've heard is not Raymond Brown.  I've heard

16:39:03 16    some name who you've referred to as Nene, who no one has

16:39:07 17    mentioned, at least in any of the testimony that I

16:39:10 18    recall.  So your foundation is not there.

16:39:14 19         So with respect to Exhibits 3 through 24, they are

16:39:18 20    not in.  Let's see if we can get this done in a way that

16:39:21 21    makes it legally sound, because it's not legally sound

16:39:24 22    now.  You haven't laid a foundation.

16:39:26 23         Did you have anything to add, Attorney Watlington?

16:39:28 24              MR. WATLINGTON:  Well, I -- that's why I'm

16:39:31 25    saying -- that's my --

16:39:32  1          THE COURT:  Well, it's not in.  The only thing

16:39:34  2    that's been played in open court is Spanish, and there's

16:39:37  3    no transcripts.

16:39:38  4          MR. WATLINGTON:  Well, Your Honor, we have what

16:39:40  5    the government have provided as exhibits, and all of

16:39:44  6    them are Spanish.  Most of them are true -- are Spanish

16:39:48  7    translations.

16:39:48  8          THE COURT:  There's nothing wrong with having

16:39:52  9    Spanish.  You can have translations.  The government

16:39:54  10   hasn't laid any foundation for it at this point.

16:39:59  11         MR. WATLINGTON:  I agree, Judge.

16:40:01  12         THE COURT:  The trial isn't over yet.  I don't

16:40:03  13   know what the government would or will not do at this

16:40:06  14   point.  What I'm saying is nothing is in.

16:40:08  15         MR. WATLINGTON:  I agree, Judge.  But what I'm

16:40:09  16   saying, the government cannot throw something, throw a

16:40:12  17   line out and say we're going to hook one, one someplace,

16:40:16  18   a fish someplace.  They have to be specific that this

16:40:23  19   Exhibit Number 15, this Exhibit Number 20 is a

16:40:27  20   conversation with Raymond Brown and Tapia, with

16:40:29  21   something that is relevant.

16:40:31  22         THE COURT:  Let's see where we go from there.

16:40:34  23         MS. LAKE:  Your Honor, I would ask to have

16:40:36  24   Exhibits 7, 8, 9, 12, 14, 16 --

16:40:42  25         MR. MINGOLLA:  I'm sorry --

16:40:43   1          MS. LAKE:  -- received into evidence.

16:40:44   2          THE COURT:  I'm not really sure what goes on.

16:40:48   3   I'll check my notes and we'll go from there.

16:40:51   4          MS. LAKE:  I'm asking at sidebar.  I've laid

16:40:54   5   the foundation for cause between Mr. Tapia and Raymond

16:40:57   6   Brown.  I've established relevance between calls between

16:40:59   7   Tapia and Raymond Brown.

16:41:00   8          THE COURT:  These are calls in English between

16:41:03   9   Brown and Tapia?

16:41:03   10          MS. LAKE:  Yes.

16:41:04   11          THE COURT:  All right.  What's your objection?

16:41:08   12          MR. WATLINGTON:  Well, if in fact they are,

16:41:10   13   because we just heard that 3 through 24 was in fact the

16:41:13   14   ones that were relative to Raymond Brown.  Now we're

16:41:17   15   here specific, so I don't know if they are.  So I would

16:41:20   16   object.

16:41:21   17          THE COURT:  All right.

16:41:21   18          MR. WATLINGTON:  But I'm saying, if they are

16:41:23   19   published before they are in evidence --

16:41:25   20          THE COURT:  I'll see them before.  Put them up

16:41:27   21   with the transcript and I'll take a look at them.

16:41:29   22          MS. LAKE:  Okay.

16:41:29   23          THE COURT:  You have an English transcript?

16:41:31   24          MS. LAKE:  Yes.

16:41:31   25          THE COURT:  If it's published and it's

16:41:33 admitted, I'm not going to allow the English transcript.
16:41:36 If it's English, they don't need a transcript. They can
16:41:39 listen. So whatever it is you want, you can move it and
16:41:41 just put them on the screen now.
16:41:43 MS. LAKE: Okay.
16:41:44 (End of sidebar, open court as follows:)
16:41:57 MS. LAKE: Can you pull up Exhibit 7 for me?
16:42:00 THE COURT: The Court is vacating its prior
16:42:03 ruling on Exhibits 3 through 24. Those are not in.
16:42:10 None of the 3a or 3b through 78b are in evidence.
16:42:10 (Government's Exhibits 3 through 78, 3b, withdrawn
16:42:10 from evidence by the Court.)
16:42:17 THE COURT: All right. Go ahead.
16:42:18 MS. LAKE: Your Honor, I would ask to move
16:42:20 Exhibit 7a into evidence. If I can pull that up,
16:42:23 please.
16:42:37 THE COURT: Let me see it.
16:42:44 No, not with the volume.
16:43:04 All right. 7a, any objection?
16:43:05 MR. WATLINGTON: Your Honor, we don't have a
16:43:07 hard copy of 7a.
16:43:09 THE COURT: It was just on the screen. Any
16:43:12 objection?
16:43:13 MR. WATLINGTON: Yes, as to relevance.
16:43:14 THE COURT: 7a is admitted.

16:43:14   1          (Government's Exhibit 7a admitted into evidence.)

16:43:15   2                THE COURT:  What's the next one?

16:43:19   3                MS. LAKE:  Exhibit 8, Your Honor.

16:43:21   4                THE COURT:  8a?

16:43:22   5                MS. LAKE:  Yes, Your Honor.

16:43:28   6                MR. MINGOLLA:  Your Honor --

16:43:29   7                MR. WATLINGTON:  Your Honor, I'm not hearing

16:43:31   8    Attorney Lake, what she said.

16:43:34   9                MS. LAKE:  I asked --

16:43:34   10               THE COURT:  Hold on.  Hold on.  Only one person

16:43:37   11   can speak at a time so we can have a clear record.

16:43:39   12        Now, she's asking for 8a.  8a will be put on the

16:43:45   13   screen.

16:43:45   14               MR. WATLINGTON:  8a.

16:43:52   15               MS. LAKE:  If I have a moment, Your Honor?

16:43:57   16               THE COURT:  Yes.

16:44:35   17        All right.  Any objection to 8a?

16:44:37   18               MR. MINGOLLA:  Yes, Your Honor.

16:44:38   19               MR. WATLINGTON:  Yes.  Yes, Your Honor.

16:44:40   20   Because it's not identified properly in the exhibits

16:44:43   21   that we have, we have it as 7b -- 8b.  The same

16:44:52   22   recording that the government is offering as 7a, we're

16:44:59   23   offering as 8b.

16:45:01   24               THE COURT:  8b is the transcript of 8a, is that

16:45:04   25   right, Attorney Lake?

16:45:05    1            MS. LAKE:  Yes, Your Honor.

16:45:05    2            THE COURT:  8b is just a transcription of 8a,

16:45:08    3    any objection to 8a?

16:45:10    4        No transcript will be played --

16:45:13    5            MR. WATLINGTON:  No, Your Honor.

16:45:13    6            THE COURT:  8a is admitted.

16:45:17    7        (Government's Exhibit 8a admitted into evidence.)

16:45:17    8            MS. LAKE:  Exhibit 9, will you play that,

16:45:20    9    please.

16:45:21   10            THE COURT:  9a.

16:45:22   11            MS. LAKE:  I would ask that 9a be received.

16:45:24   12            THE COURT:  And 9b is going to be scrolled.

16:45:35   13        Any objection?

16:45:36   14            MR. WATLINGTON:  No.

16:45:37   15            MR. MINGOLLA:  No, Your Honor.

16:45:38   16            THE COURT:  9a is admitted.

16:45:45   17            MS. LAKE:  I ask that 12a be received in

16:45:49   18    evidence.  If we could play 12a.

16:46:07   19            THE COURT:  All right.  Any objection to 12a?

16:46:15   20            MR. WATLINGTON:  Yes, Your Honor.

16:46:17   21            THE COURT:  All right.  12a is admitted.

16:46:21   22        (Government's Exhibit 12a admitted into evidence.)

16:46:21   23            MS. LAKE:  I would ask that Exhibit 14 be

16:46:24   24    received into evidence, Your Honor.

16:46:37   25            THE COURT:  Okay.  Any objection to 14a,

16:46:39   1    Attorney Mingolla?

16:46:42   2         Attorney Watlington?

16:46:45   3             MR. WATLINGTON:  Yes, Your Honor.  I would

16:46:45   4    object to all of them.

16:46:47   5             MR. MINGOLLA:  Yes.  Yes.

16:46:48   6             THE COURT:  All right.  14a is admitted.

16:46:51   7         (Government's Exhibit 14a admitted into evidence.)

16:46:51   8             MS. LAKE:  I would ask that Exhibit 16 be

16:46:53   9    received into evidence.

16:47:07  10             THE COURT:  Attorney Watlington.

16:47:09  11             MR. WATLINGTON:  Same objection, Your Honor.

16:47:10  12             MR. MINGOLLA:  Seconded, Your Honor.

16:47:12  13             THE COURT:  All right.  16a is admitted.

16:47:15  14         (Government's Exhibit 16a admitted into evidence.)

16:47:15  15             MS. LAKE:  Now I ask that Exhibit 25 be

16:47:20  16    received into evidence.

16:47:51  17             THE COURT:  Any objection to 25?

16:47:54  18             MR. WATLINGTON:  Yes, Your Honor.

16:47:55  19         And to add to what I've been saying before, Your

16:47:58  20    Honor, 24 is even outside the scope of what was

16:48:00  21    discussed at sidebar.

16:48:03  22             THE COURT:  All right.  Okay.

16:48:20  23         Attorney Mingolla?

16:48:21  24             MR. MINGOLLA:  Yes, I would object as well,

16:48:23  25    Judge.

16:48:23   1                    THE COURT:   25 is admitted.

16:48:25   2                    MS. LAKE:   I would ask that Exhibit 29 be

16:48:27   3      admitted.

16:48:33   4                    THE COURT:   Actually, I'll take 25 under

16:48:35   5      advisement.   All right.   25 is under advisement, not

16:48:40   6      admitted.

16:48:42   7                    MS. LAKE:   I would ask that Exhibit 29 be

16:48:44   8      received into evidence.

16:48:45   9                    THE COURT:   All right.   After 24, the same

16:48:47   10     issue that the Court had at sidebar.

16:48:51   11                   MS. LAKE:   Okay.

16:48:51   12                   THE COURT:   You can proceed.

16:48:53   13                   MS. LAKE:   I would ask to play and publish

16:48:55   14     Exhibits -- Exhibit 7 for the jury.

16:48:57   15                   THE COURT:   7a only.

16:49:00   16                   MS. LAKE:   7a.

16:49:01   17                   THE COURT:   Yes.

16:49:02   18                   MS. LAKE:   May I have a moment, Your Honor?

16:50:48   19          (Exhibit published.)

16:50:49   20     BY MS. LAKE:

16:50:50   21     Q.   Who is speaking?

16:50:50   22     A.   That's me and Raymond Brown.

16:50:52   23     Q.   And what are you two talking about?

16:50:53   24     A.   We were talking about meeting at --

16:50:56   25                    MR. MINGOLLA:   Objection.

16:50:57  1         MR. WATLINGTON:  Objection, Your Honor.  Your

16:51:00  2    Honor?  Objection.

16:51:01  3         THE COURT:  Overruled.

16:51:01  4    BY MS. LAKE:

16:51:01  5    Q.   What are you two talking about?

16:51:02  6    A.   We were talking about meeting at Fort Christian

16:51:05  7    parking lot.

16:51:06  8    Q.   Why?

16:51:07  9    A.   We were discussing some purchase of some drugs.

16:51:13  10   Q.   What drugs?  What kind of drugs?

16:51:16  11   A.   Cocaine.

16:51:16  12   Q.   What -- did you discuss -- did you in fact meet

16:51:19  13   with Defendant Raymond Brown?

16:51:20  14        MR. WATLINGTON:  Objection, Your Honor.

16:51:22  15   Objection.  Leading the witness.

16:51:23  16        THE COURT:  Rephrase.  Sustained.

16:51:24  17   BY MS. LAKE:

16:51:24  18   Q.   What, if anything, did you do after this phone

16:51:28  19   call?

16:51:28  20   A.   I met Raymond Brown at the parking lot.

16:51:33  21   Q.   And what, if anything, did you and Raymond Brown

16:51:35  22   discuss?

16:51:36  23   A.   We discussed price and where we would meet again.

16:51:45  24   Q.   And how much, how, what quantity of drugs?

16:51:51  25        MR. WATLINGTON:  Objection, Your Honor.

16:51:52  1                    THE COURT:  Rephrase.

16:51:52  2      BY MS. LAKE:

16:51:53  3      Q.   Did you and Raymond Brown discuss anything else?

16:51:57  4      A.   There was two -- there was two, two transactions.

16:52:02  5      I just -- I don't remember -- because we are not

16:52:05  6      listening to all of it, we were discussing.

16:52:08  7                    MR. WATLINGTON:  Your Honor, at this time I

16:52:10  8      would object to the response is not responsive to the

16:52:14  9      question as being asked.

16:52:15  10                   THE COURT:  All right.  Overruled.

16:52:21  11                   THE WITNESS:  The -- we were discussing either

16:52:22  12     the purchase of either 20 kilos, or I was going to

16:52:27  13     receive two kilos from him; one of those -- one of those

16:52:30  14     two we was going to -- we discussed.

16:52:34  15     BY MS. LAKE:

16:52:34  16     Q.   And now can I play for you Exhibit Number 8?

16:52:48  17          (Exhibit published.)

16:53:03  18     Q.   Who is speaking?

16:53:05  19     A.   Raymond Brown and I.

16:53:07  20     Q.   And what are you two talking about?

16:53:08  21     A.   We were talking about we were supposed to meet

16:53:11  22     earlier and we were having a long -- I was having a long

16:53:14  23     time at Innovative.  I was still out there.

16:53:17  24     Q.   What, if anything, were you two supposed to meet

16:53:19  25     about?

16:53:19  1    A.   We were supposed to meet about --

16:53:22  2              MR. WATLINGTON:   Objection, Your Honor.   Same

16:53:24  3    objection as before, Your Honor.

16:53:25  4              THE COURT:   Okay.   Overruled.

16:53:28  5              THE WITNESS:   -- him giving me two kilos of

16:53:32  6    cocaine.

16:53:32  7    BY MS. LAKE:

16:53:32  8    Q.   And now can you play Exhibit 9, please.

16:53:47  9         (Exhibit published.)

16:54:01 10    Q.   Who is speaking?

16:54:02 11    A.   Raymond Brown and myself.

16:54:03 12    Q.   And what are you talking about?

16:54:04 13    A.   I was still at Innovative and we were, I would call

16:54:08 14    him when I get out.

16:54:10 15    Q.   Playing Exhibit Number 12, please.

16:54:22 16         (Exhibit published.)

16:54:55 17    Q.   Who is speaking?

16:54:56 18    A.   Raymond Brown and I.

16:54:58 19    Q.   And what are you two talking about?

16:54:59 20    A.   The price of the cocaine that was in Puerto Rico.

16:55:04 21    The price had dropped.

16:55:05 22    Q.   And why were you discussing that?

16:55:07 23    A.   Because the price up here, the price was exceeding

16:55:12 24    what was negotiable.

16:55:16 25    Q.   And what else, if anything, did you and Raymond

16:55:20  1    Brown talk about?

16:55:20  2    A.   We talked about meeting again --

16:55:24  3         MR. WATLINGTON:  Objection, Your Honor.

16:55:27  4    There's been no testimony that they talked about

16:55:29  5    anything other than what was heard on the --

16:55:33  6         THE COURT:  All right.  Sustained.

16:55:35  7    BY MS. LAKE:

16:55:36  8    Q.   Did you and Raymond Brown talk again?

16:55:38  9    A.   Yes, we did.

16:55:40  10   Q.   And what, if anything, did you and Raymond Brown

16:55:42  11   talk about?

16:55:46  12   A.   We talked about the price of the cocaine and where

16:55:51  13   the price was too high that was quoted to me.

16:55:58  14   Q.   And what price was quoted to you?

16:56:00  15   A.   A price was quoted to me at 15 --

16:56:03  16        MR. WATLINGTON:  Objection, Your Honor.

16:56:05  17   Hearsay.

16:56:07  18        THE COURT:  All right.  Overruled.

16:56:09  19        THE WITNESS:  A price was quoted to me, 15 and

16:56:12  20   a half --

16:56:13  21        THE COURT:  Stop.  Stop.  Quoted by whom?

16:56:15  22        THE WITNESS:  It was relayed to me by

16:56:18  23   Raymond --

16:56:19  24        MR. WATLINGTON:  Objection, Your Honor.

16:56:20  25        THE COURT:  Okay.  Overruled.

16:56:22  1              THE WITNESS:  They wanted $15,500 per kilo.

16:56:30  2    BY MS. LAKE:

16:56:30  3    Q.   Who told you that?

16:56:32  4    A.   Raymond.

16:56:33  5    Q.   And 15 -- I don't?

16:56:35  6    A.   $15,500.

16:56:37  7    Q.   For what?

16:56:38  8    A.   For one kilo of cocaine.

16:56:40  9    Q.   And did you and Raymond Brown discuss how many

16:56:43  10   kilos?

16:56:43  11   A.   We discussed how many kilos, yes, we did.

16:56:47  12   Q.   And now playing Exhibit 14.

16:57:27  13        (Exhibit published.)

16:57:31  14   Q.   Who's speaking?

16:57:32  15   A.   Raymond Brown and myself.

16:57:33  16   Q.   And what are you two talking about?

16:57:35  17   A.   We were talking about a purchase of about 24 kilos.

16:57:40  18   Q.   And who supplied the 24 kilograms?

16:57:45  19   A.   That, I can't tell you.

16:57:47  20              MR. WATLINGTON:  Objection, Your Honor.

16:57:48  21              THE COURT:  Sustained.

16:57:48  22   BY MS. LAKE:

16:57:49  23   Q.   What else, if anything, did you --

16:57:51  24              MR. WATLINGTON:  Objection, Your Honor --

16:57:52  25              THE COURT:  Let's hear the question first.

16:57:55  1  BY MS. LAKE:

16:57:55  2  Q.   What else, if anything, did you and Raymond Brown

16:57:58  3  discuss regarding the 24 kilograms?

16:58:00  4          MR. WATLINGTON:  Objection, Your Honor, because

16:58:01  5  this in fact is a question that already assumed the

16:58:04  6  first answer that he gave, which was sustained by this

16:58:09  7  Court.

16:58:09  8          THE COURT:  All right.  Overruled.

16:58:13  9          THE WITNESS:  We discussed where -- more or

16:58:21  10  less -- we discussed where I would pick up this

16:58:25  11  24 kilos.

16:58:25  12  BY MS. LAKE:

16:58:25  13  Q.   And what did you and Raymond Brown agree to?

16:58:29  14  A.   Well, we didn't agree.  He just told me --

16:58:32  15          MR. WATLINGTON:  Objection, Your Honor.

16:58:32  16  There's been no testimony about an agreement.  And

16:58:35  17  there's been nothing that has been published about any

16:58:39  18  agreement to do anything.

16:58:41  19          THE COURT:  All right.  Rephrase your question.

16:58:43  20  BY MS. LAKE:

16:58:44  21  Q.   What else, if anything, did you and Raymond Brown

16:58:46  22  discuss regarding this 24 kilos of cocaine?

16:58:51  23  A.   We discussed where I would, would retrieve the

16:58:55  24  24 kilos of cocaine.

16:58:57  25  Q.   And what was communicated to you by Raymond Brown?

16:59:01  1    A.   The last communication we had was just the price,

16:59:04  2    and that was it.

16:59:06  3    Q.   And what was the price for the 24 kilograms of

16:59:09  4    cocaine?

16:59:09  5    A.   15,500.

16:59:12  6    Q.   And playing Exhibit 16.

16:59:28  7         (Exhibit published.)

16:59:29  8    Q.   Who is speaking?

16:59:30  9    A.   Raymond Brown and myself.

16:59:32  10   Q.   And what, if anything, are you two talking about?

16:59:34  11   A.   I was upstairs in my office, and I told him I'll

16:59:37  12   meet him downstairs.

16:59:39  13   Q.   And where is your office?

16:59:40  14   A.   At the airport.

16:59:41  15   Q.   And did you in fact meet with Raymond Brown?

16:59:44  16   A.   Yes, we did.

16:59:45  17   Q.   And what, if anything, did you and Raymond Brown

16:59:48  18   discuss?

16:59:50  19   A.   We discussed that, you know, that there would be a

16:59:55  20   car at the Market Square, and I've seen this car before,

17:00:01  21   and the cocaine would be there.  I would take the

17:00:05  22   cocaine out, put the money in and leave.

17:00:07  23   Q.   Who told you this?

17:00:09  24   A.   Raymond told me this.

17:00:12  25   Q.   And did Raymond tell you how much cocaine would be

17:00:15  1    in the car?

17:00:16  2    A.    No, he did not.  I assumed it would be the 24 that

17:00:19  3    I asked for.

17:00:20  4    Q.    Why did you assume that?

17:00:22  5    A.    Because that's what we discussed.

17:00:26  6    Q.    And who was the buyer for these 24 kilograms?

17:00:29  7          MR. WATLINGTON:  Objection, Your Honor.

17:00:31  8          THE COURT:  Overruled.

17:00:33  9          THE WITNESS:  The money came from Pee Wee.

17:00:36  10   BY MS. LAKE:

17:00:36  11   Q.    And is Pee Wee -- well, who is Pee Wee?

17:00:39  12   A.    That is Angel Negron-Beltran.  He is my contact

17:00:51  13   person in Puerto Rico.

17:00:51  14   Q.    And who, if anyone, were you in contact -- were you

17:00:54  15   in contact with anyone in Puerto Rico regarding the

17:00:58  16   24-kilo purchase?

17:00:58  17   A.    It would be Pee Wee.

17:01:04  18   Q.    And what, if anything, happened after you and

17:01:07  19   Raymond Brown met and discussed the 24 kilograms?

17:01:14  20   A.    What happened, we discussed the price and that was

17:01:17  21   it.  He left about two hours later.  I was waiting at, I

17:01:25  22   passed by the Market Square, which is at the bottom of

17:01:31  23   Fire Burn Hill.  There's a little open parking lot on

17:01:35  24   the side.  A car would be parked there.

17:01:38  25         I made the first pass and it was not there.  I made

17:01:41  1    the second pass and the car was there.  I went and

17:01:45  2    retrieved the bag, left the bag that I had, locked the

17:01:49  3    car back and I left.

17:01:50  4    Q.   Now what was in the bag that you had?

17:01:53  5    A.   The money to purchase the cocaine.

17:01:56  6    Q.   And where did you get that bag from?

17:01:58  7    A.   I got that from Pee Wee.

17:02:00  8    Q.   And how much money was it?

17:02:09  9    A.   I'm doing the math right now, but it was about

17:02:14  10   10 -- about $250,000 or something like that.

17:02:17  11   Q.   And what did you do with that bag?

17:02:19  12   A.   I left it in the car.

17:02:21  13   Q.   Which car?

17:02:22  14   A.   The blue Honda Civic that was there.

17:02:26  15   Q.   And why did you do that?

17:02:28  16   A.   I was told to leave the money there.

17:02:30  17   Q.   By whom?

17:02:32  18   A.   By Raymond.

17:02:33  19   Q.   Raymond who?

17:02:34  20   A.   Raymond Brown.

17:02:35  21   Q.   And what did you do after you left the bag of money

17:02:38  22   in that car?

17:02:39  23   A.   I took the bag of money.  I took -- I left the

17:02:43  24   money.  I took the cocaine and I took it to the end of

17:02:49  25   the dock, took it back down to the end of the dock.

17:02:52  1    Q.   And how much cocaine was inside of that bag?

17:02:56  2    A.   I counted.  It was 24.

17:02:59  3    Q.   24 what?

17:03:00  4    A.   24 kilos.

17:03:01  5    Q.   Of what?

17:03:02  6    A.   Of cocaine.

17:03:02  7    Q.   Why did you -- how did you know there would be

17:03:05  8    24 kilograms of cocaine in that car?

17:03:07  9    A.   That is what I discussed or that is what I brokered

17:03:12  10   for, was 24 kilos.

17:03:13  11   Q.   By who?

17:03:14  12   A.   By who?

17:03:16  13   Q.   Who told you that, that 24 kilos would be in that

17:03:19  14   car?

17:03:21  15   A.   Raymond Brown told me 24 kilos would be in the car.

17:03:26  16   Q.   Raymond who?

17:03:27  17   A.   Raymond Brown.

17:03:28  18   Q.   Now, did you do any additional drug deals with

17:03:32  19   Raymond Brown?

17:03:36  20   A.   I did one more transaction with Raymond.

17:03:41  21   Q.   And how much -- what was it for?  What type of

17:03:44  22   transaction was it?

17:03:45  23   A.   It was for two kilos of cocaine.

17:03:52  24   Q.   And who was the buyer of that cocaine?

17:03:55  25   A.   Pee Wee, Angel Beltran.

17:03:58  1    Q.    And what was your role in the

17:04:04  2    two-kilograms-of-cocaine deal?

17:04:05  3    A.    My role was Raymond gave me two kilos and I gave

17:04:10  4    them to Pee Wee, or I gave them to the courier.

17:04:15  5    Q.    Now, I've previously shown you -- have you reviewed

17:04:31  6    Exhibits 25 through 53?

17:04:33  7    A.    Yes, I have.

17:04:34  8    Q.    And where have you reviewed them?

17:04:36  9    A.    At the District Attorney's Office.

17:04:37  10   Q.    And after you reviewed these disks, what, if

17:04:40  11   anything, did you do, if anything, to the disks?

17:04:43  12   A.    I initialed it and put the date on it.

17:04:45  13   Q.    And whose voice -- whose voices are on the calls,

17:04:50  14   Exhibit 25 through 53?

17:04:53  15   A.    If I remember clearly, they are mine and Pee Wee's

17:04:57  16   and a Nene, and I think Raymond Brown.

17:05:03  17   Q.    And what, if anything, is discussed between you,

17:05:06  18   Pee Wee, El Nene and Raymond Brown?

17:05:14  19   A.    In those tapes, El Nene and I, we discussed about

17:05:19  20   another purchase of 24, 25 --

17:05:22  21          THE COURT:  When you say "those tapes," which

17:05:23  22   tapes are you referring to, what numbers, so the record

17:05:25  23   is clear.

17:05:28  24          MS. LAKE:  Between Exhibits 25 and 53.

17:05:28  25   BY MS. LAKE:

17:05:33  1    Q.   What is being discussed on Exhibits 25 through 53?

17:05:37  2         MR. WATLINGTON:  Your Honor, I would object to

17:05:39  3    this line of questioning and publishing of 25 through

17:05:44  4    53.

17:05:44  5         THE COURT:  Nothing is being published.

17:05:47  6    Overruled.

17:05:47  7    BY MS. LAKE:

17:05:47  8    Q.   What, if anything, is being discussed on the calls

17:05:51  9    reflecting 25 through 53?

17:05:53  10   A.   The calls on 25 through 53 would be me discussing

17:05:57  11   with El Nene another purchase of 24 keys, 24 kilograms

17:06:02  12   of cocaine.  There will be also, in those numbers there

17:06:07  13   will be a discussion with Raymond and myself about two

17:06:12  14   kilograms of cocaine, and also with Pee Wee and myself

17:06:17  15   about eight kilograms of cocaine.

17:06:20  16   Q.   And --

17:06:21  17   A.   I should say six kilograms of cocaine.

17:06:23  18   Q.   And specifically the two kilograms of cocaine from

17:06:26  19   Raymond Brown, who was the buyer for those two

17:06:29  20   kilograms?

17:06:33  21   A.   Angel --

17:06:37  22   Q.   Go ahead?

17:06:38  23        THE COURT:  The question has been asked before.

17:06:40  24   Next question.

17:06:40  25   BY MS. LAKE:

17:06:40   1    Q.   And what is your role in the communication between

17:06:44   2    you and Pee Wee?

17:06:47   3    A.   My communication between me and him was to let him

17:06:50   4    know that these two kilograms belonged to Raymond and

17:06:53   5    that he needed to pay for them.

17:06:54   6    Q.   And what's your role in your communication between

17:06:57   7    you and Defendant Raymond Brown?

17:07:00   8    A.   I just told him that I delivered the two kilograms

17:07:06   9    and -- of cocaine, and he will have to purchase it -- I

17:07:11   10   mean retrieve the money himself.

17:07:13   11           MS. LAKE:  Your Honor, I ask that Exhibits 25

17:07:15   12   through 53 be received into evidence.

17:07:18   13           THE COURT:  Attorney Mingolla.

17:07:20   14           MR. MINGOLLA:  I would object, Your Honor.

17:07:21   15           MR. WATLINGTON:  Same objection, Your Honor.

17:07:22   16           THE COURT:  All right.  25 through 53 are

17:07:25   17   admitted -- let me ask counsel to come to sidebar.

17:07:46   18       (Sidebar discussion held as follows:)

17:07:46   19           THE COURT:  Okay.  With respect to the calls

17:07:49   20   that have been in, they were statements of a party

17:07:55   21   opponent, so they're not hearsay.

17:07:58   22       With respect to 25 through 53, the Court will make

17:08:02   23   a Bourjaily finding and finds that by a preponderance of

17:08:07   24   the evidence, there's sufficient evidence to indicate

17:08:11   25   that there is a conspiracy to traffic in narcotics and

17:08:20   1       that involved in that were Tapia, a person referred to

17:08:22   2       as Pee Wee, is Mr. Beltran, or the witness testified as

17:08:26   3       Beltran, El Nene and Raymond Brown.

17:08:32   4            The petition before the Court is to move in 25

17:08:34   5       through 53.  They are -- I think I already asked if you

17:08:41   6       have objections, correct?

17:08:42   7                 MR. WATLINGTON:  Yes.

17:08:42   8                 THE COURT:  All right.  25 through 53 are

17:08:44   9       admitted.  To the extent there are Spanish language

17:08:49   10      conversations, the b portion is admitted.  If it is

17:08:54   11      English, there is -- there will be no transcript that

17:08:57   12      will be scrolled.

17:08:59   13           Did you -- you wish to move in the b portion as

17:09:02   14      well?

17:09:02   15                MS. LAKE:  On the Spanish language calls, yes,

17:09:04   16      please, Your Honor.

17:09:05   17                THE COURT:  All right.  Those are admitted.

17:09:06   18           Thank you, Counsel.

17:09:07   19           (End of sidebar, open court as follows:)

17:09:14   20                THE COURT:  All right.  25a through 53a are

17:09:16   21      admitted.

17:09:16   22           (Government's Exhibits 25a through 53a admitted

17:09:16   23      into evidence.)

17:09:17   24                THE COURT:  25b through 53b are admitted,

17:09:20   25      insofar as the statements are in Spanish.

17:09:20  1          (Government's Exhibits 25b through 53b, Spanish

17:09:20  2    translations only, admitted into evidence.)

17:09:26  3          THE COURT:  Ladies and gentlemen, you will

17:09:29  4    hear, and see in some cases a transcript that will

17:09:34  5    scroll as a phone call is being played.

17:09:37  6          The transcript is for your consideration.  It is

17:09:44  7    for the conversations that took place in Spanish.

17:09:47  8    English conversations will have no transcript that will

17:09:50  9    be scrolled, just the Spanish ones.

17:09:54  10          And you may weigh that conversation, the

17:09:59  11    translation and the transcription in light of all of the

17:10:01  12    evidence that you received today.

17:10:03  13          That is, in terms of accuracy, you may weigh that

17:10:08  14    as you feel appropriate.

17:10:10  15          All right.  Go ahead.

17:10:11  16          MS. LAKE:  Thank you.  May I have a moment,

17:10:12  17    Your Honor?

17:10:13  18          THE COURT:  Yes.

17:10:13  19          (Pause.)

17:10:36  20          MS. LAKE:  Thank you, Your Honor.  I would ask

17:10:36  21    to play Exhibit 25a only.

17:11:36  22          (Exhibit published.)

17:11:40  23    BY MS. LAKE:

17:11:40  24    Q.   Mr. Tapia, who is speaking?

17:11:42  25    A.   Raymond Brown and myself.

17:11:43  1    Q.    What are you two discussing?

17:11:46  2    A.    We are discussing the two kilograms that he wanted

17:11:49  3    me to give to Pee Wee.

17:11:51  4    Q.    And what, if anything, did Mr. Brown say to you?

17:11:54  5    A.    He told me he was waiting -- he will wait until I

17:11:59  6    receive confirmation that Pee Wee was coming.

17:12:05  7    Q.    And why?

17:12:06  8    A.    So that I can either give him --

17:12:10  9          MR. WATLINGTON:  Objection, Your Honor.  She's

17:12:12  10   asking him to speculate as to what is in somebody's

17:12:16  11   mind.

17:12:17  12         THE COURT:  Sustained.

17:12:18  13   BY MS. LAKE:

17:12:18  14   Q.    Did Mr. Brown tell you why?

17:12:22  15   A.    Yes.  He told me he wanted to know when -- if and

17:12:26  16   when Pee Wee was coming with payment for the two

17:12:30  17   kilograms.

17:12:33  18         MS. LAKE:  Now I would ask to play Exhibits 26a

17:12:36  19   and b.

17:16:08  20        (Exhibit published.)

17:16:09  21   BY MS. LAKE:

17:16:10  22   Q.    Mr. Tapia, who was speaking?

17:16:12  23   A.    Pee Wee and myself.

17:16:13  24   Q.    What are you two discussing?

17:16:16  25   A.    We are discussing the purchase of six kilograms of

17:16:18   1   cocaine.

17:16:18   2   Q.   And what, if anything, did you two discuss

17:16:22   3   regarding those six kilograms?

17:16:24   4   A.   We discussed whether he will be able to retrieve

17:16:27   5   the six kilograms as I get -- receive the money, because

17:16:31   6   I had to go to the end of the island to pick it up, or

17:16:35   7   if they would give me the money and then they'll have to

17:16:38   8   come back the next day to retrieve the kilograms.

17:16:43   9   Q.   And now what's the relationship between the six

17:16:46   10  kilograms that you're discussing with Pee Wee and the

17:16:49   11  two kilograms that you got from Raymond Brown?

17:16:52   12           MR. WATLINGTON:  Objection, Your Honor.

17:16:53   13           MR. MINGOLLA:  Objection.  Leading.

17:16:54   14           THE COURT:  Rephrase.

17:16:59   15  BY MS. LAKE:

17:16:59   16  Q.   What, if anything, was the relationship between the

17:17:01   17  six kilograms and two kilograms?

17:17:03   18           MR. WATLINGTON:  Objection, your Honor.

17:17:04   19           THE COURT:  Overruled.

17:17:06   20           THE WITNESS:  The six kilograms -- I was

17:17:08   21  getting the six kilograms from someone else, Alsenio.

17:17:14   22      The two kilograms that I was talking about were the

17:17:18   23  ones that belonged to Raymond.  And I was discussing

17:17:20   24  that they wanted $20,000 per kilogram.

17:17:26   25      And Pee Wee was telling me that the price has

17:17:28   1   dropped out there and that the price was, you know -- he

17:17:31   2   could not have get, you know, pay 20,000, and he

17:17:34   3   couldn't bring that extra 40,000 up.

17:17:41   4          MS. LAKE:  Now I would like to play Exhibits

17:17:43   5   27a and b.

17:18:25   6          (Exhibit published.)

17:18:26   7   BY MS. LAKE:

17:18:27   8   Q.   Mr. Tapia, who is speaking?

17:18:28   9   A.   Pee Wee and myself.

17:18:29   10  Q.   What, if anything, were you two discussing?

17:18:31   11  A.   Verifying if it was going to be six or

17:18:35   12  five kilograms that he wanted to purchase.

17:18:37   13  Q.   Now let's play Exhibit 28a and 28b.

17:19:07   14         (Exhibit published.)

17:19:09   15  Q.   Mr. Tapia, who is speaking?

17:19:10   16  A.   That is Pee Wee and myself.

17:19:12   17  Q.   What are you two discussing?

17:19:14   18  A.   We were discussing speaking on another line.

17:19:17   19         MS. LAKE:  And now I would like to play only

17:19:20   20  Exhibit 29a only.

17:19:41   21         (Exhibit published.)

17:19:42   22  BY MS. LAKE:

17:19:42   23  Q.   Mr. Tapia, who is speaking?

17:19:44   24  A.   That's me and Raymond Brown.

17:19:45   25  Q.   What, if anything, are you two discussing?

17:19:47  1    A.    I was in a meeting.  I couldn't discuss anything

17:19:50  2    with him at that point.

17:19:51  3    Q.    All right.  I would like to play Exhibit 30a only.

17:19:55  4          (Exhibit published.)

17:20:52  5    Q.    Mr. Tapia, who is speaking?

17:20:55  6    A.    Raymond Brown and I.

17:20:56  7    Q.    And what are you two talking about?

17:20:58  8    A.    Him delivering the two kilograms of cocaine to me.

17:21:01  9    Q.    And did you meet with Mr. Brown after this phone

17:21:04  10   call?

17:21:05  11   A.    Yes, we did.

17:21:06  12   Q.    And where did you meet?

17:21:07  13   A.    At my business.

17:21:10  14   Q.    In what --

17:21:11  15   A.    In front of Nisky School, around that area.

17:21:15  16   Q.    What, if anything, happened when you and Defendant

17:21:17  17   Brown met?

17:21:18  18   A.    He gave me a box containing two kilograms of

17:21:21  19   cocaine.

17:21:21  20   Q.    And now playing Exhibit 31a only.

17:21:26  21         (Exhibit published.)

17:22:10  22   Q.    Mr. Tapia, who is speaking?

17:22:12  23   A.    Raymond Brown and myself.

17:22:14  24   Q.    And what are you two talking about?

17:22:15  25   A.    He called me to -- said he needed to retrieve the

17:22:20  1    two kilograms of cocaine.

17:22:21  2    Q.    And did he tell you why?

17:22:25  3    A.    He say he may have had someone to take care of it

17:22:28  4    here.

17:22:28  5    Q.    And what does that mean?

17:22:29  6    A.    He may have had a buyer here.

17:22:32  7    Q.    And were you and Mr. Brown speaking in coded

17:22:35  8    language?

17:22:38  9    A.    Yes, we were.

17:22:40  10    Q.    And what was that coded language?

17:22:42  11    A.    It was nothing specific, just not to, to say he

17:22:49  12    said he wanted two applications.  I know the only two

17:22:53  13    applications that I had was the two kilograms of

17:22:56  14    cocaine.  And the prescriptions was just meet on him,

17:23:01  15    I'll fill it out for him later on.

17:23:03  16    Q.    Fill what for him later on?

17:23:06  17    A.    The two applications, meaning the two kilograms of

17:23:09  18    cocaine.

17:23:10  19    Q.    Now I would like to play Exhibit 32a only.

17:23:26  20         (Exhibit published.)

17:23:40  21    Q.    Who is speaking?

17:23:41  22    A.    Raymond and myself.

17:23:42  23    Q.    And what are you two discussing?

17:23:44  24    A.    That I will be able -- available to return the

17:23:47  25    stuff to him.

17:23:48  1    Q.   What stuff?

17:23:49  2    A.   The -- return the kilograms to him.   The cocaine.

17:23:52  3    Q.   I'm sorry?

17:23:53  4    A.   To return the two kilograms of cocaine to him.

17:23:56  5    Q.   Now I would like to play Exhibit 33a, 33a only.

17:24:31  6         (Exhibit published.)

17:24:31  7    Q.   Who is speaking?

17:24:33  8    A.   Raymond and myself.

17:24:34  9    Q.   And what are you talking about?

17:24:35  10   A.   I told him I was at my -- I was in Contant, my

17:24:39  11   mother's place, waiting on him.

17:24:40  12   Q.   For what?   For what purpose?

17:24:42  13   A.   To return the two kilograms of cocaine to him.

17:24:44  14   Q.   Now, I'd like to play Exhibit 34a only.

17:24:57  15        (Exhibit published.)

17:25:06  16   Q.   Who is speaking?

17:25:07  17   A.   Raymond and myself.

17:25:08  18   Q.   And what are you talking about?

17:25:10  19   A.   I was late.   I was -- it was 3:30 and I had --

17:25:14  20   something came up and I was running a few minutes late.

17:25:17  21   Q.   Now I would like to play Exhibit 35a.

17:25:30  22        (Exhibit published.)

17:26:02  23   Q.   Who is speaking?

17:26:03  24   A.   Raymond and myself.

17:26:04  25   Q.   What are you talking about?

17:26:07   1    A.   He was going to return the two kilograms of cocaine

17:26:09   2    to me.

17:26:10   3    Q.   For what purpose?

17:26:11   4    A.   To have it taken to Puerto Rico.

17:26:14   5    Q.   In exchange for what?

17:26:18   6    A.   The price was not negotiated at the time because

17:26:22   7    that was not, you know, it was not available.  It was a

17:26:25   8    last-minute thing, so the money was not brought up.

17:26:28   9    Q.   And after this phone call, did you in fact meet

17:26:31   10   with Raymond Brown?

17:26:32   11   A.   Yes, I did.

17:26:33   12   Q.   And what, if anything, did you do when you met with

17:26:36   13   Raymond Brown?

17:26:37   14   A.   He gave me back the two kilograms of cocaine.  I

17:26:40   15   put it with the bag with the six that I already had, and

17:26:44   16   I left.

17:26:47   17   Q.   And you left him where --

17:26:50   18   A.   I left the area.

17:26:51   19   Q.   Oh.  And now I would like to play 36a and b.

17:28:05   20        (Exhibit published.)

17:28:06   21   Q.   Who is speaking?

17:28:07   22   A.   Pee Wee and myself.

17:28:08   23   Q.   What are you two discussing?

17:28:09   24   A.   We are discussing if I would be able to have the

17:28:12   25   cocaine available when he gave me the money.

17:28:16  1          And I told him that was not possible.  I needed to

17:28:18  2     have the money first to purchase the cocaine, and then

17:28:21  3     he will get it.

17:28:23  4          So he told me he would see me the next day.

17:28:25  5               MS. LAKE:  I would like to play Exhibits 37a

17:28:30  6     and b.

17:29:15  7          (Exhibit published.)

17:29:15  8     BY MS. LAKE:

17:29:15  9     Q.   Who is speaking?

17:29:16  10    A.   Pee Wee and myself.

17:29:17  11    Q.   What are you talking about?

17:29:18  12    A.   The first part of the conversation dealt with me

17:29:21  13    going to Four Star.  He was shipping up some Formica

17:29:27  14    from Puerto Rico for me, and he needed to get to Four

17:29:30  15    Star in Puerto Rico so he could have, get a price and

17:29:34  16    let me know the price to ship the box up here.

17:29:39  17    Q.   What was the second half?

17:29:41  18    A.   The second half of the conversation was me letting

17:29:43  19    him know that I can meet his courier at Sail Rock in the

17:29:51  20    morning, the following morning.

17:29:52  21    Q.   For what purpose?

17:29:53  22    A.   To retrieve the money to purchase the six kilograms

17:29:57  23    of cocaine.

17:29:57  24    Q.   Now, I'd like to play Exhibit 38a only.

17:30:21  25          (Exhibit published.)

17:31:03  1   Q.   Who is speaking?

17:31:04  2   A.   Raymond and myself.

17:31:05  3   Q.   And what are you talking about?

17:31:06  4   A.   We talking about meeting each other.

17:31:08  5   Q.   For what purpose?

17:31:10  6   A.   To retrieve the two kilograms of cocaine.

17:31:13  7   Q.   And did you in fact meet with him?

17:31:15  8   A.   Yes, I did.

17:31:16  9   Q.   And what did you do when you met with him?

17:31:19  10  A.   We met at Jackie's food van.  I retrieved the two

17:31:25  11  kilograms and we left.

17:31:28  12  Q.   I would like to play Exhibit 39a only.

17:31:32  13       (Exhibit published.)

17:32:07  14  Q.   Who is speaking?

17:32:08  15  A.   Raymond and myself.

17:32:10  16  Q.   What are you talking about?

17:32:11  17  A.   Me meeting him at Jackie's.

17:32:15  18  Q.   I would like to play Exhibit 40a and b.

17:32:20  19       (Exhibit published.)

17:36:15  20  Q.   Mr. Tapia, who is speaking?

17:36:19  21  A.   Pee Wee and myself.

17:36:20  22  Q.   And what are you talking about?

17:36:21  23  A.   We are talking about price that has dropping down

17:36:27  24  in Puerto Rico, the prices dropped tremendously.  So the

17:36:30  25  same amount of money that they was asking for the

17:36:33  1    kilograms, he wanted me to find out if I could have get

17:36:35  2    a lower price on it.

17:36:36  3    Q.   And what else, if anything, did you two talk about?

17:36:39  4    A.   We talked about the moneys coming up to purchase

17:36:44  5    the six kilograms and some Formica that was coming up on

17:36:49  6    the next day for me.

17:36:51  7    Q.   Did you and Pee Wee ever discuss the price for the

17:36:55  8    two kilograms provided by Raymond Brown?

17:36:57  9    A.   We discussed the price about the --

17:37:01  10        MR. WATLINGTON:  Objection, Your Honor.

17:37:02  11        THE COURT:  Sustained.

17:37:02  12   BY MS. LAKE:

17:37:02  13   Q.   What else, if anything, did you discuss?

17:37:05  14   A.   We discussed the price of the two kilograms that I

17:37:09  15   was talking about with Raymond.  We wanted the 20,000

17:37:18  16   for each one, and he wanted them to know that the price

17:37:20  17   had dropped over there.  It was, you know, he couldn't

17:37:23  18   afford to give him 20,000 for each one.

17:37:27  19   Q.   Who is "he"?

17:37:28  20   A.   "He" meaning Pee Wee.

17:37:29  21   Q.   And he couldn't give who?

17:37:31  22   A.   He couldn't give $20,000 per kilogram for the two

17:37:36  23   kilograms that Raymond was sending.

17:37:40  24   Q.   And now I would like to play Exhibit 41a and b.

17:37:49  25        (Exhibit published.)

17:39:44  1    Q.   Mr. Tapia, who is speaking?

17:39:46  2    A.   Pee Wee and myself.

17:39:47  3    Q.   What are you talking about?

17:39:48  4    A.   We're talking about kilograms that were to be sent

17:39:52  5    down and the money was coming up.  We also discussed the

17:39:57  6    price.  He wanted me to see if we could have gotten a

17:40:01  7    lower price, because the bottom was falling out in

17:40:04  8    Puerto Rico and he wanted me to know that he could not

17:40:07  9    have paid the 20,000 for the two kilograms that I was

17:40:11  10   receiving from Raymond.

17:40:14  11   Q.   What else did you discuss regarding price?

17:40:17  12   A.   We discussed how much the freight was going to be,

17:40:21  13   which was $1,300.

17:40:25  14   Q.   When you say "freight," what do you mean?

17:40:28  15   A.   The -- you would pay 13 to 15 hundred dollars to

17:40:36  16   take one kilogram from St. Thomas to Puerto Rico.  So

17:40:38  17   that was the freight.  I had to convey that whatever

17:40:45  18   price they had, it had to be subtracted.

17:40:48  19   Q.   Now I would like to play Exhibit 42a and b.

17:42:10  20        (Exhibit published.)

17:42:12  21   Q.   Who is speaking?

17:42:12  22   A.   Pee Wee and myself.

17:42:14  23   Q.   What are you discussing?

17:42:15  24   A.   We are discussing the time and the price of the six

17:42:20  25   kilograms, and I was asking him if he's sure he was

17:42:24　1　　sending up all the money for the six kilograms; also to

17:42:27　2　　include my money.

17:42:28　3　　Q.　And what was the response?

17:42:29　4　　A.　He said yes, he was sending everything but he was

17:42:32　5　　not sending the money for the other two, and that the

17:42:35　6　　price was real low.

17:42:40　7　　　And I told him, okay, we'll talk about it tomorrow.

17:42:43　8　　Q.　And now I would like to play Exhibit 43a only.

17:43:25　9　　　(Exhibit published.)

17:43:26　10　　Q.　Mr. Tapia, who is speaking?

17:43:28　11　　A.　Raymond and myself.

17:43:29　12　　Q.　What are you two discussing?

17:43:31　13　　A.　We are discussing where we would meet, what time I

17:43:33　14　　was going and what time we could meet to retrieve the

17:43:36　15　　two kilograms from him.

17:43:38　16　　Q.　And now I would like to play Exhibit 44a only.

17:44:12　17　　　(Exhibit published.)

17:44:13　18　　　THE COURT:　We're going to pause right there.

17:44:16　19　　I think it's time for us to end for the day.

17:44:18　20　　　Let me give you these instructions before I let you

17:44:21　21　　go.

17:44:21　22　　　First of all, you've heard a lot of information

17:44:24　23　　today.　It's been a -- we started late, but I think we

17:44:27　24　　moved through a lot of testimony.　You've heard a lot of

17:44:30　25　　information.

17:44:30  1       It is important that you keep this in mind and that

17:44:34  2   you operate it and be guided by it.  Do not do any

17:44:39  3   investigation.  Do not do any sort of inquiry.  Do not

17:44:44  4   do any Google searches or anything about it at all.

17:44:49  5       The only thing that should guide you is what comes

17:44:52  6   from the witness stand or other items I admit into

17:44:55  7   evidence.

17:44:56  8       Do not read, do not look at anything touching on

17:44:59  9   this case in any way.  That will be a violation of your

17:45:01  10  duty.  You are only to focus on what is happening here

17:45:05  11  in court, not what other people are saying out of court.

17:45:09  12      Keep an open mind.  The evidence is still coming

17:45:15  13  in.

17:45:15  14      We're going to resume tomorrow at 9:00 a.m.  That

17:45:18  15  doesn't mean get here at 9:00 a.m.  That means get here

17:45:23  16  at 8:45 so you could put in your lunch order and get you

17:45:26  17  a better lunch than you had today.

17:45:27  18      There are a lot of people here that need to be

17:45:31  19  seated and taken care of, so you need to be here no

17:45:34  20  later than 8:45.

17:45:34  21      If one person is late we simply can't start.  If

17:45:40  22  one person is late, we have to wait.  Don't be that

17:45:44  23  person that causes us to be late, please.  Be here at

17:45:47  24  8:45.  We'll all be here and we'll start promptly at

17:45:51  25  9:00 a.m.

17:45:52  1          If anyone attempts to -- excuse me.  Please have a

17:45:56  2     seat.

17:45:56  3          If anyone attempts to discuss this case with you in

17:45:59  4     any way at all, bring it to the Court's attention

17:46:02  5     promptly.  We take that very seriously here.  We do not

17:46:06  6     broker any favors to anyone who does anything like that.

17:46:11  7     That is not permitted.

17:46:12  8          All right.  Have a pleasant evening, and we'll see

17:46:14  9     you tomorrow morning.

17:46:15  10         (Juries out)

17:47:04  11            THE COURT:  All right.  Mr. Tapia, we're going

17:47:05  12    to resume at 9:00 a.m. tomorrow morning.

17:47:08  13         Do not discuss your testimony with anyone between

17:47:10  14    now and then.  Do you understand?

17:47:12  15            THE WITNESS:  Yes, I do, Your Honor.

17:47:15  16            THE COURT:  All right.  Then we'll resume at

17:47:17  17    9:00 a.m.

17:47:18  18         You can leave now.  Thank you.

17:47:45  19         (Witness stood aside.)

17:47:47  20            THE COURT:  All right, Counsel, anything we

17:47:48  21    need to address before we adjourn for the evening?

17:47:51  22         Attorney Lake?

17:47:52  23            MS. LAKE:  No, Your Honor.

17:47:53  24            THE COURT:  Attorney Mingolla?

17:47:54  25            MR. MINGOLLA:  No, Your Honor.

17:47:55  1                   MR. WATLINGTON:  Nothing from Defendant Brown,

17:47:56  2       Your Honor.

17:47:56  3                   THE COURT:  Let me ask counsel one question

17:48:00  4       about the Pee Wee phone calls.  Other than it

17:48:03  5       establishes that the price of contraband and the market

17:48:08  6       is going down in Puerto Rico, what's the theory in terms

17:48:12  7       of these other phone calls with respect to Pee Wee?

17:48:19  8                   MS. LAKE:  He is the buyer of the two kilograms

17:48:21  9       that Raymond Brown provided.

17:48:23  10                  THE COURT:  Other than that.  He is the buyer.

17:48:26  11      I've heard a lot about the market is going down and

17:48:30  12      Formica is being sent down.  Other than that, is there

17:48:33  13      more to the phone calls involving Pee Wee that bears

17:48:36  14      anything, any added, anything?

17:48:42  15           Yes or no, and if so, if the answer is yes, then

17:48:45  16      tell me what.  So yes or no.

17:48:47  17                  MS. LAKE:  Yes.

17:48:47  18                  THE COURT:  All right.  Tell me what.

17:48:50  19                  MS. LAKE:  Regarding the transportation of

17:48:53  20      picking up -- dropping off the dope, the narcotics to

17:48:57  21      Pee Wee, after he received it --

17:48:59  22                  THE COURT:  That's not very clear.  Help me

17:49:01  23      out.  Make it clearer.

17:49:04  24           What is he going to say that is relevant that adds

17:49:07  25      to the examination and the inquiry here?

17:49:10  1          MS. LAKE:  The completion of the drug deal.

17:49:12  2     The receiving, the negotiating the price, the receiving

17:49:16  3     of the kilograms --

17:49:17  4          THE COURT:  I don't want something generic.

17:49:19  5     Just tell me what -- is he going to speak about picking

17:49:21  6     up something --

17:49:22  7          MS. LAKE:  Yes, sir.

17:49:22  8          THE COURT:  -- from someone, something that is

17:49:24  9     tied to one these defendants?

17:49:26  10         MS. LAKE:  After Roberto Tapia --

17:49:28  11         THE COURT:  Let me repeat my question.  Is he

17:49:31  12    going to say something about picking up something from

17:49:34  13    one of these defendants?  Yes or no.

17:49:35  14         MS. LAKE:  Picking up something from one these

17:49:38  15    defendants -- may I have a moment, Your Honor?

17:49:40  16         THE COURT:  When you say "transportation,"

17:49:42  17    that's what I'm thinking.  If I'm off, then tell me what

17:49:46  18    it is you referring to as transportation.

17:49:48  19    Transportation of what, first.

17:49:49  20         MS. LAKE:  Roberto Tapia's transportation by

17:49:52  21    vessel to meet with Pee Wee in between Puerto Rico to

17:49:57  22    deliver the two kilograms of cocaine.

17:50:00  23         THE COURT:  Okay.  So Mr. Pee Wee is going to

17:50:02  24    talk about meeting Mr. Tapia to transport two kilograms

17:50:08  25    that are associated with Mr. Brown.

17:50:11    1          MS. LAKE:  Yes.

17:50:12    2          THE COURT:  All right.  That's your theory.

17:50:13    3          MS. LAKE:  Yes.

17:50:14    4          THE COURT:  Okay.  All right.

17:50:16    5      Let me, to the extent that there are other calls

17:50:20    6    that just deal with the market going through the floor,

17:50:22    7    I think that point has been made.  There's no need to

17:50:25    8    repeat that.  Otherwise we run afoul of 403.  It's been

17:50:29    9    said.  It's been said again.  It doesn't need to be said

17:50:31   10    again.

17:50:31   11      So if that helps in guiding you on how you put

17:50:34   12    these in, that's fine.  If it adds to the inquiry,

17:50:37   13    that's fine.  If it's just repeating what we already

17:50:40   14    know, which is that the market has fallen, that's done.

17:50:43   15          All right?

17:50:44   16          MS. LAKE:  Yes, Your Honor.

17:50:45   17          THE COURT:  Okay.  Very good.

17:50:46   18      All right.  Thank you, Counsel.  I'll see you

17:50:49   19    tomorrow morning.  We start at 9:00 a.m.

17:50:51   20      Let me ask counsel to be here at 8:45 in the event

17:50:55   21    we have any other matters we need to tend to before we

17:50:58   22    start taking testimony.

17:50:59   23      Thank you.  Have a good evening.

           24      (Court in recess, 5:51 p.m.)

           25

1                              ---
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3                              <u>CERTIFICATE</u>

4

5              This document is hereby certified

6           to be a true and accurate transcript

7              of the foregoing proceedings.

8

9

10      /s_____     <u>September 8, 2014</u>
             Chandra Kean, RMR                  DATE
11           Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25