```
                  IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                      DIVISION OF ST. THOMAS AND ST. JOHN

                                   ---

UNITED STATES OF AMERICA,          )
                                   )
                     Plaintiff,    )
                                   )
vs.                                )   CRIM. NO. 2013-22
                                   )
                                   )
RAYMOND BROWN, WALTER HILL,        )
                                   )
                     Defendants.   )
_____   )

                         REPORTER'S TRANSCRIPT

                              JURY TRIAL

                      Tuesday, March 25, 2014

                                   ---

BEFORE:        THE HONORABLE CURTIS V. GOMEZ
               District Judge

APPEARANCES:   OFFICE OF THE UNITED STATES ATTORNEY
               BY:  KELLY LAKE, AUSA
                    NELSON JONES, AUSA

                    For the Government

               ARTURO WATLINGTON, ESQ.

                    For Defendant Brown

               JOSEPH MINGOLLA, ESQ.
               LAW OFFICES OF JOSEPH MINGOLLA

                    For Defendant Hill

                                   ---

COURT REPORTER:    CHANDRA R. KEAN, RMR
                   Official Court Reporter
                   Virgin Islands District Court
                   St. Thomas, Virgin Islands
```

```
 1                            INDEX

 2

 3     WITNESS (Government)     DIRECT   CROSS   REDIRECT   RECROSS

 4     Roberto Tapia (Cont'd)     5       82      152       ---

 5     Angel Negron-Beltran     161      189      192       ---

 6     Eric Barnard             194      ---      ---       ---

 7     Mark Joseph              203      216      ---       ---

 8     Shawn Querrard           226      231      ---       ---

 9

10          (Court recessed)

11                            ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           EXHIBITS

 2

 3    GOVERNMENT'S
      EXHIBIT NO.        MARKED         ADMITTED

 4    80e                  36            ---

 5    55a through 75a     ---            44

 6    59b, 61b, 66b       ---            60
      67b, 74b, 75b
 7    (Translations from Spanish)

 8    80f                  70            79

 9    80g                  71            79

10    89a                 163           ---

11    89b                 164           ---

12    80d                 197           202

13    80c                 208           210

14    80h                 209           210

15    86a                 212           ---

16    86b                 213           ---

17    86c-1               215           ---

18    86c-2               229           ---

19

20    DEFENDANT'S
       EXHIBIT           MARKED         ADMITTED

21    A                   102           ---

22    B                   243           ---

23    C                   246           ---

24    D                   248           ---

25                                 ---
```

<u>PROCEEDINGS</u>

1

2

3        (Court called to order at 9:09 a.m.)

4        (Jury present.)

5        (Witness resumed stand.)

09:09:14   6        THE COURT:  Good morning, ladies and gentlemen.

09:09:16   7   Good morning, Counsel.

09:09:18   8        MR. MINGOLLA:  Good morning, Judge.

09:09:19   9        THE COURT:  As you know, ladies and gentlemen,

09:09:20  10   we are in the direct examination of Mr. Tapia.  That's

09:09:23  11   where we'll resume.

09:09:24  12    Is the government ready to proceed?

09:09:28  13        MS. LAKE:  Yes, Your Honor.

09:09:28  14        THE COURT:  Good morning, Mr. Tapia.

09:09:29  15        THE WITNESS:  Good morning, sir.

09:09:30  16        THE COURT:  Please speak into the microphone,

09:09:32  17   please.

09:09:32  18    You understand you're under oath; you remain under

09:09:35  19   oath.

09:09:35  20        THE WITNESS:  Yes, Your Honor.

09:09:35  21        THE COURT:  Go right ahead.

09:09:37  22        MS. LAKE:  Thank you sir.

09:09:37  23

09:09:37  24

09:09:37  25

| | | |
|---|---|---|
| 09:09:37 | 1 | THEREUPON, ROBERTO TAPIA, previously sworn, was |
| 09:09:39 | 2 | examined and testified further as follows: |
| 09:09:39 | 3 | DIRECT EXAMINATION (Continued) |
| 09:09:39 | 4 | BY MS. LAKE: |
| 09:09:42 | 5 | Q.   Mr. Tapia, continuing from yesterday, where did you |
| 09:09:44 | 6 | meet with Mr. Raymond Brown by the mango tree? |
| 09:09:48 | 7 | A.   I didn't meet him at the mango tree.  I was waiting |
| 09:09:52 | 8 | for someone else to -- for them to drop something off |
| 09:09:55 | 9 | at -- for the car to be put at the Market Square.  I |
| 09:09:58 | 10 | didn't meet him there at all. |
| 09:10:01 | 11 | Q.   And did you -- when did you meet with Raymond Brown |
| 09:10:05 | 12 | to receive the two kilograms of cocaine? |
| 09:10:08 | 13 | MR. WATLINGTON:  Objection, Your Honor. |
| 09:10:09 | 14 | MR. MINGOLLA:  Objection.  Leading. |
| 09:10:10 | 15 | THE COURT:  Sustained. |
| 09:10:11 | 16 | BY MS. LAKE: |
| 09:10:11 | 17 | Q.   What, if anything, happened in relationship -- in |
| 09:10:14 | 18 | relation to the two kilograms of cocaine? |
| 09:10:16 | 19 | A.   I met Raymond at my mother's place and we |
| 09:10:22 | 20 | exchanged -- we met by Jackie's food van and she gave -- |
| 09:10:30 | 21 | he gave me the two kilograms there. |
| 09:10:33 | 22 | Q.   And what, if anything, did you do next? |
| 09:10:35 | 23 | A.   I already had six other kilograms that were put -- |
| 09:10:43 | 24 | there were other two in the bag and I waited for the |
| 09:10:46 | 25 | courier to come and pick them up. |

09:10:48  1    Q.   What, if anything, did you do next?

09:10:52  2    A.   That was my involvement.

09:10:53  3         After that, I just waited for the phone call from

09:10:56  4    the courier.  He told me he was at the area.  I stopped

09:11:03  5    by, I gave it to him and I went back to work.

09:11:37  6    BY MS. LAKE:

09:11:38  7    Q.   And showing you -- playing for you Exhibit Number

09:11:49  8    47.

09:11:51  9         (Exhibit published.)

09:11:53  10        MS. LAKE:  Can I stop it here.

09:11:55  11        I apologize.  Plaintiff's Exhibit 47a and b.

09:12:09  12        MR. WATLINGTON:  Your Honor --

09:12:12  13        (Exhibit published.)

09:12:13  14        THE COURT:  Hold on one second.

09:12:14  15        Is there an objection?

09:12:15  16        MR. MINGOLLA:  Yes.

09:12:16  17        MR. WATLINGTON:  Yes, Your Honor.  I don't

09:12:16  18    believe this document has been introduced into evidence.

09:12:18  19        I'm not sure.  If it has, then I would withdraw my

09:12:23  20    objection.

09:12:23  21        THE COURT:  This is 47 --

09:12:25  22        MR. WATLINGTON:  47.

09:12:27  23        THE COURT:  -- a and b?  Yes, it's admitted.

09:12:32  24        MR. WATLINGTON:  Thank you.

09:12:35  25        MS. LAKE:  Can you play it from the beginning,

09:12:39  1    please?

09:13:54  2    BY MS. LAKE:

09:13:54  3    Q.   Mr. Tapia, who is speaking?

09:13:56  4    A.   Pee Wee and myself.

09:13:57  5    Q.   And you two were speaking on December 6th, 2012?

09:14:01  6    A.   That is correct.

09:14:01  7    Q.   And what are you two -- what are you discussing in

09:14:03  8    this call?

09:14:04  9    A.   The courier was late, and I was -- we was just

09:14:10  10   missing each other.

09:14:11  11   Q.   And where were you located at the time this call,

09:14:13  12   you made -- this call was made?  This conversation was

09:14:16  13   made?

09:14:17  14   A.   I was off of Saba Island.  Saba, right off of St.

09:14:23  15   Thomas.

09:14:23  16   Q.   Were you on the vessel?

09:14:24  17   A.   Yes, I was.

09:14:25  18   Q.   What vessel?

09:14:26  19   A.   I was on the DPNR patrol vessel.

09:14:30  20   Q.   And what were you doing?

09:14:31  21   A.   I was on patrol at the time, and at the same time I

09:14:38  22   was going to drop the kilograms to the courier.

09:14:40  23   Q.   Kilograms of what?

09:14:41  24   A.   Of cocaine.

09:14:42  25   Q.   And the total kilograms you were dropping off to

09:14:46  1    the courier is what?

09:14:47  2    A.   Was six -- eight, eight total.

09:14:51  3    Q.   And two of those were from Defendant Raymond Brown;

09:14:54  4    is that correct?

09:14:54  5              MR. WATLINGTON:  Objection, Your Honor.

09:14:55  6              THE COURT:  Sustained.

09:14:56  7    BY MS. LAKE:

09:14:56  8    Q.   And where did you get two of those kilograms from?

09:15:00  9    A.   I got two of those kilograms from Raymond.

09:15:03  10   Q.   And now, jumping ahead to call -- Exhibit 49 -- and

09:15:17  11   in the call, what, if anything, are you saying to Pee

09:15:20  12   Wee in the call that I just played for you,

09:15:23  13   specifically?

09:15:23  14   A.   I was telling him that I was in the area and I

09:15:27  15   wasn't seeing the courier.  And he said there was a big

09:15:30  16   vessel that was going up that they thought it might have

09:15:33  17   been a Coast Guard vessel, but it was not.

09:15:35  18   Q.   And what, if anything, did you do when Pee Wee said

09:15:40  19   that to you?

09:15:40  20   A.   I told him that I, he didn't see me because I

09:15:44  21   wasn't seeing the same -- I saw the vessel and it was

09:15:47  22   not a Coast Guard vessel.

09:15:48  23   Q.   And in your conversation with Pee Wee, did you use

09:15:53  24   another word for your boat?

09:15:58  25   A.   Just grande, meaning the big -- that's -- grande,

09:16:03   1    which means big.

09:16:04   2    Q.   Okay.  And now jumping ahead to call Exhibit Number

09:16:07   3    47 [sic].  I'd like to play call a and b.

09:17:27   4             THE COURT:  What exhibit is this?

09:17:31   5             MS. LAKE:  I apologize.  I would ask to play

09:17:33   6    Exhibit 49a and b.  I think I misspoke.

09:17:37   7        Could you play Exhibit 49a and b, please?

09:17:45   8        (Exhibit published.)

09:18:41   9    BY MS. LAKE:

09:18:41   10   Q.   Mr. Tapia, who was speaking?

09:18:45   11            MR. WATLINGTON:  Your Honor, at this point I

09:18:47   12   would object.  At this point it's clear this was not the

09:18:50   13   proffer that was given at sidebar as to what is the

09:18:53   14   content of 49.

09:18:57   15            THE COURT:  Okay.  Overruled.

09:18:58   16   BY MS. LAKE:

09:18:59   17   Q.   Mr. Tapia, who was speaking?

09:19:02   18   A.   Pee Wee and myself.

09:19:03   19   Q.   And what are you two discussing?

09:19:05   20   A.   We couldn't -- they -- we was discussing what time

09:19:14   21   the courier would be at the point we normally be at, and

09:19:17   22   I was asking him to describe the car.  When I say

09:19:20   23   "describe the car," was describing the vessel, which was

09:19:25   24   a red vessel with a black top.

09:19:27   25   Q.   What eventually happened next?

| | | |
|---|---|---|
| 09:19:29 | 1 | A.   Eventually we, we, I made contact with the vessel |
| 09:19:32 | 2 | and we made the transfer. |
| 09:19:34 | 3 | Q.   And how was that accomplished? |
| 09:19:39 | 4 | A.   We just transferred the money and I gave him the |
| 09:19:41 | 5 | kilograms. |
| 09:19:42 | 6 | Q.   And did this occur on the water? |
| 09:19:46 | 7 | A.   Yes, it did. |
| 09:19:47 | 8 | Q.   And I'd like to play Exhibit 50a and b. |
| 09:20:23 | 9 | (Exhibit published.) |
| 09:20:24 | 10 | Q.   Mr. Tapia, who is speaking? |
| 09:20:26 | 11 | A.   Pee Wee and myself. |
| 09:20:27 | 12 | Q.   And what are you two discussing? |
| 09:20:28 | 13 | A.   That I made contact with the courier.  I gave him |
| 09:20:31 | 14 | the bag containing eight kilograms of cocaine. |
| 09:20:34 | 15 | Q.   And I'd like to play Exhibit 51a only. |
| 09:21:03 | 16 | (Exhibit published.) |
| 09:21:04 | 17 | Q.   Mr. Tapia, who is speaking? |
| 09:21:06 | 18 | A.   Raymond and myself. |
| 09:21:07 | 19 | Q.   And what are you two discussing? |
| 09:21:09 | 20 | A.   That we was going to meet at my mother's place. |
| 09:21:12 | 21 | Q.   Why? |
| 09:21:15 | 22 | A.   I think it was to discuss the two kilograms. |
| 09:21:19 | 23 | Q.   And what happened next? |
| 09:21:23 | 24 | A.   We met at my mother's place. |
| 09:21:25 | 25 | Q.   And what, if anything, did you discuss when you met |

09:21:28  1    with the Defendant Raymond Brown?

09:21:32  2    A.   I'm not too sure if it was at that time, but we

09:21:35  3    discussed that he needed to -- we was discussing the

09:21:40  4    price, and him retrieving -- how he was going to

09:21:44  5    retrieve his money.

09:21:46  6    Q.   And did you two discuss and confirm how that was

09:21:50  7    going to be accomplished?

09:21:52  8    A.   We discussed that he was going to make a trip to

09:21:57  9    Puerto Rico himself, and they was going to talk about

09:22:00  10   the price and make their own arrangements.

09:22:03  11   Q.   And when you say "he," who are you referring to?

09:22:05  12   A.   Raymond.

09:22:06  13   Q.   And when you said they were going to discuss the

09:22:09  14   price, who were you referring to?

09:22:10  15   A.   Raymond and Pee Wee.

09:22:15  16   Q.   And I'd like to play Exhibit 53a and b.

09:22:24  17        (Exhibit published.)

09:23:30  18        MS. LAKE:  Can we stop here?

09:23:32  19   BY MS. LAKE:

09:23:32  20   Q.   What are you -- who is speaking?

09:23:33  21   A.   Pee Wee and myself.

09:23:34  22   Q.   And at this point, what are you two discussing?

09:23:37  23   A.   At this particular point right now?

09:23:40  24   Q.   Yes, sir.

09:23:42  25   A.   I was discussing that Raymond was going to make a

09:23:45  1    trip down to Puerto Rico, either Friday that week, and

09:23:49  2    they was going to meet each other.

09:23:51  3    Q.    And how did you refer to Raymond, to Pee Wee?

09:23:56  4    A.    They have exotic birds.

09:23:59  5    Q.    Who is they?

09:24:00  6    A.    Raymond's family, his family have exotic birds, and

09:24:07  7    they're parrots.  And in Spanish the name of the parrots

09:24:11  8    are (Spanish).

09:24:13  9    Q.    And is that how you refer to Raymond Brown when

09:24:16  10   speaking to Pee Wee?

09:24:17  11   A.    At that point, yes.

09:24:20  12         MR. LAKE:  If we can continue playing the call.

09:24:58  13   Can you stop it here.

09:25:00  14   BY MS. LAKE:

09:25:00  15   Q.    Mr. Tapia, at this point what are you and Pee Wee

09:25:02  16   discussing?

09:25:04  17   A.    At this point we're discussing the price and what,

09:25:09  18   what the price is going to be, if they are going to go

09:25:13  19   down on the price that they were discussing earlier --

09:25:16  20   that I was discussing with him earlier, or if they would

09:25:23  21   just pay for transportation and they was going to take

09:25:26  22   care of it themselves.

09:25:27  23   Q.    And when you say "they," who are you referring to?

09:25:29  24   A.    When I say "they" I'm referring to Raymond.  When I

09:25:32  25   say "they" is because he was traveling down with his

09:25:35   1    family.

09:25:35   2    Q.   And so when you say "they" and were traveling with

09:25:40   3    the family -- and he was traveling with the family,

09:25:42   4    you're talking about Raymond Brown?

09:25:44   5    A.   Yes, I am.

09:25:44   6    Q.   And Raymond Brown was going to discuss the price

09:25:47   7    with who?

09:25:48   8    A.   With Pee Wee.

09:25:50   9    Q.   And have you introduced Pee Wee to Raymond Brown

09:25:53   10   before?

09:25:54   11          MR. WATLINGTON:   Objection, Your Honor.

09:25:55   12          THE COURT:   Sustained.

09:25:55   13   BY MS. LAKE:

09:25:55   14   Q.   To your knowledge, has Pee Wee Brown and -- Pee Wee

09:26:00   15   and Raymond Brown met before?

09:26:02   16          MR. WATLINGTON:   Objection, Your Honor.

09:26:03   17   BY MS. LAKE:

09:26:04   18   Q.   What else are you discussing at this point in the

09:26:06   19   phone call?

09:26:07   20   A.   At this point we are discussing when they're

09:26:09   21   going -- when he gets there what he's going to discuss

09:26:12   22   with them and they were going to talk about the price.

09:26:17   23          MS. LAKE:   Can we continue playing this call.

09:27:33   24   BY MS. LAKE:

09:27:33   25   Q.   And what else are you and Pee Wee discussing in the

09:27:37  1    rest of this phone call?

09:27:38  2    A.    We're discussing the price of the two kilograms of

09:27:45  3    cocaine that was sent, and was asking if -- they was

09:27:50  4    asking for 20.  I asked him if he will take it for 18.

09:27:53  5         He said he may have taken -- he may take it for 18.

09:27:59  6         And I said okay, I will let him know.  I will pass

09:28:02  7    that information on.

09:28:03  8    Q.    Now, when you testified yesterday, you indicated

09:28:07  9    you had a number of points of contact; is that correct?

09:28:10  10   A.    That's correct.

09:28:11  11   Q.    And who are your other points of contact in total?

09:28:15  12   A.    How many points of contacts that I have?

09:28:18  13   Q.    Who are they?

09:28:20  14   A.    Who are they?  I got Alsenio Hall.  I've got Angelo

09:28:26  15   Hill.

09:28:26  16   Q.    Now, let's stop with Alsenio.  What's the time

09:28:31  17   frame that Alsenio would supply you --

09:28:36  18   A.    I --

09:28:37  19   Q.    -- in general?

09:28:38  20   A.    In general, I really can't --

09:28:40  21        THE COURT:  Stop, stop.

09:28:41  22        Why is my mike not...

09:28:44  23        Don't assume facts not in evidence.  Don't lead the

09:28:47  24   witness.  Go ahead.  Ask your question.

09:28:49  25

BY MS. LAKE:

Q.   What, if anything, was your relation with Alsenio?

A.   Alsenio was a point of contact that I will call and ask him if he had anything available.

Q.   And when you say "anything," what are you referring to?

A.   Talking about cocaine.

Q.   And what was the time frame that you would contact Alsenio for this purpose?

A.   This was not a regular-basis thing.  It will be like every eight months so, in between eight months, you know.  We would talk several times before the eight months, before actually anything would happen.

Q.   Well, was it a year?

A.   About -- about every eight months in the year, you know, at the end of the year.  It all depends.  It wasn't a constant thing.

Q.   I understand.  What year is what I'm asking?

A.   What year.  Okay.  That would be -- we're in '14; '13, '12.

Q.   And who were your other points of contact?

A.   I had Eddie Monsanto.

Q.   And what relationship -- when you say "point of contact," what did Eddie Monsanto do?

A.   Well, I would call Eddie and ask him if he also had

09:30:04  1    anything available.  And we would try to get those -- or

09:30:07  2    if he didn't, he would lead me where I could.

09:30:09  3    Q.   When you say "anything," what are you referring to?

09:30:11  4    A.   I'm talking about cocaine.

09:30:12  5    Q.   And what was the general time frame that

09:30:15  6    Mr. Monsanto would, you would deal with him?

09:30:19  7    A.   Again, I can't, it's not a specific date or time,

09:30:27  8    but it would be within 2011 to 2013.

09:30:40  9    Q.   And who are other points of contact?

09:30:43  10   A.   I had Raymond --

09:30:46  11   Q.   Well, let's stop with Raymond.  Raymond Brown, you

09:30:49  12   indicated, was a point of contact?

09:30:50  13   A.   Uhm-hmm.

09:30:51  14   Q.   What was the general time frame that Raymond Brown

09:30:55  15   was a point of contact?

09:30:57  16   A.   I may have spoke to Raymond several times, him

09:31:02  17   giving me -- we talked about getting information, where,

09:31:06  18   where, you know, where, can he get it or -- not we, if

09:31:13  19   he know where he would be able to direct me or make a

09:31:16  20   phone call for me or something of that fashion.  We

09:31:19  21   talked several times about several things that didn't

09:31:24  22   materialize, and we also talked about certain things

09:31:27  23   that did materialize.

09:31:29  24   Q.   When you say "it," what are you referring to?

09:31:31  25   A.   Me getting the purchase of, getting some cocaine.

09:31:35   1   Q.   And of the times that it did materialize, what was

09:31:38   2   the time frame?

09:31:43   3   A.   Maybe in between seven months.

09:31:48   4   Q.   What year?

09:31:50   5   A.   2013.

09:31:53   6   Q.   And was it before that also?

09:31:56   7            MR. WATLINGTON:   Objection, Your Honor.

09:31:57   8            THE COURT:   Sustained.

09:32:02   9   BY MS. LAKE:

09:32:02   10   Q.   And now the calls you just testified to, the

09:32:04   11   two kilograms, what was the time frame that Raymond

09:32:07   12   Brown provided those two kilograms to you?

09:32:11   13   A.   That was late, I can't remember the dates.  It's

09:32:18   14   late 2013.

09:32:25   15   Q.   And you reviewed the transcript of these calls,

09:32:27   16   correct?

09:32:27   17   A.   Yes, I did.

09:32:28   18   Q.   And the calls were true and accurate, correct?

09:32:32   19   A.   Yes, they are.

09:32:33   20   Q.   And the call date, the dates of those calls, are

09:32:36   21   true and accurate?

09:32:36   22   A.   Yes, they are.

09:32:37   23   Q.   And in reviewing the calls, did you see the dates

09:32:41   24   of the calls?

09:32:41   25   A.   Yes, I did.

| | | |
|---|---|---|
| 09:32:42 | 1 | Q.    And that date was true and accurate? |
| 09:32:48 | 2 | A.    Yes, it was. |
| 09:32:49 | 3 | Q.    And again playing for you Exhibit 50a and b. |
| 09:32:57 | 4 | (Exhibit published.) |
| 09:32:58 | 5 | THE COURT:  Hold on. |
| 09:33:00 | 6 | Has this been played before? |
| 09:33:02 | 7 | MR. WATLINGTON:  Yes.  Yes, Your Honor. |
| 09:33:03 | 8 | THE COURT:  All right.  Move on. |
| 09:33:04 | 9 | BY MS. LAKE: |
| 09:33:04 | 10 | Q.   What was the date of this call? |
| 09:33:06 | 11 | MR. WATLINGTON:  Your Honor.  When you say |
| 09:33:09 | 12 | "move on," Your Honor, you're saying go ahead with this |
| 09:33:12 | 13 | call, or that it should not be played? |
| 09:33:13 | 14 | THE COURT:  No, move on.  It's been played. |
| 09:33:15 | 15 | Move on. |
| 09:33:15 | 16 | BY MS. LAKE: |
| 09:33:16 | 17 | Q.   What was the date of that call, Mr. Tapia? |
| 09:33:19 | 18 | A.   I think I just saw it was December 2013. |
| 09:33:30 | 19 | THE COURT:  Let me see counsel at sidebar. |
| 09:33:41 | 20 | Counsel, sidebar. |
| 09:33:52 | 21 | (Sidebar discussion held as follows:) |
| 09:33:58 | 22 | THE COURT:  There's a question about a certain |
| 09:34:00 | 23 | time frame that occurred.  The witness should testify. |
| 09:34:06 | 24 | I don't think that it's proper to feed him the date in |
| 09:34:10 | 25 | the manner that was just -- in fact, I think it's |

| | | |
|---|---|---|
| 09:34:15 | 1 | improper.  And so I don't expect the government to do |
| 09:34:17 | 2 | that again.  All right? |
| 09:34:18 | 3 | MS. LAKE:  Okay. |
| 09:34:19 | 4 | THE COURT:  All right. |
| 09:34:21 | 5 | (End of sidebar, open court as follows:) |
| 09:34:34 | 6 | THE COURT:  Go ahead. |
| 09:34:34 | 7 | BY MS. LAKE: |
| 09:34:35 | 8 | Q.   Now jumping back, when approximately did you first |
| 09:34:38 | 9 | meet Pee Wee? |
| 09:34:49 | 10 | A.   Maybe in 1995, '96. |
| 09:34:57 | 11 | Q.   And would Pee Wee ever come to St. Thomas to visit |
| 09:35:02 | 12 | you? |
| 09:35:03 | 13 | MR. WATLINGTON:  Objection, Your Honor. |
| 09:35:04 | 14 | MR. MINGOLLA:  Objection.  Leading. |
| 09:35:04 | 15 | THE COURT:  Sustained. |
| 09:35:05 | 16 | BY MS. LAKE: |
| 09:35:05 | 17 | Q.   And where would you interact with Pee Wee? |
| 09:35:09 | 18 | A.   I met him through Carnival boat races, because he |
| 09:35:13 | 19 | normally come up for Carnival. |
| 09:35:16 | 20 | Q.   When you say "come up," come up where? |
| 09:35:18 | 21 | A.   Come from Puerto Rico to St. Thomas. |
| 09:35:21 | 22 | Q.   And when Pee Wee would be in St. Thomas, would you |
| 09:35:24 | 23 | interact with him? |
| 09:35:24 | 24 | A.   Yes, I would. |
| 09:35:25 | 25 | Q.   And would you introduce him to other people? |

09:35:28  1          MR. WATLINGTON:  Objection, Your Honor.

09:35:29  2          THE COURT:  Sustained.

09:35:32  3          MR. MINGOLLA:  Second the objection, Your

09:35:33  4  Honor.

09:35:33  5  BY MS. LAKE:

09:35:33  6  Q.    What, if anything -- what, if anything, would you

09:35:36  7  do with Pee Wee while he was on St. Thomas?

09:35:40  8  A.    We would be in a restaurant, at the Village, and as

09:35:48  9  casual folks would come by, you know, they see me there,

09:35:52  10  I'll introduce him.

09:35:53  11  Q.    And who would you introduce him to, if anyone?

09:35:56  12  A.    I would introduce him to, I introduced him to

09:36:00  13  Raymond.  I introduced him to a lot of people.  I mean,

09:36:04  14  I can't, you know, say right now.

09:36:06  15  Q.    Approximately when did you introduce him to

09:36:08  16  Raymond?

09:36:09  17  A.    I would say between Two Thousand and -- a Carnival

09:36:25  18  between 2010 and 2012.

09:36:35  19  Q.    Now jumping ahead, you were arrested in the case,

09:36:38  20  correct?

09:36:39  21  A.    Yes, I was.

09:36:39  22  Q.    Approximately when were you arrested?

09:36:41  23  A.    I was arrested on May 17th.

09:36:43  24  Q.    Of what year?

09:36:44  25  A.    2013.

| 09:36:55 | 1 | Q.   And before -- before being arrested -- strike that. |
| 09:36:58 | 2 |      What, if anything, was your relationship with |
| 09:37:00 | 3 | Raymond Brown before your arrest? |
| 09:37:05 | 4 | A.   I have -- first, understand, this is a very |
| 09:37:12 | 5 | wrenching thing for me.  I have a clear conscience and a |
| 09:37:14 | 6 | heavy heart -- |
| 09:37:14 | 7 |      MR. WATLINGTON:  Objection, Your Honor. |
| 09:37:16 | 8 |      MS. LAKE:  I'll rephrase. |
| 09:37:17 | 9 |      THE COURT:  Sustained. |
| 09:37:18 | 10 | BY MS. LAKE: |
| 09:37:18 | 11 | Q.   The phone calls that you listened to? |
| 09:37:20 | 12 | A.   Yes. |
| 09:37:21 | 13 | Q.   Were those -- did you engage in those phone calls |
| 09:37:23 | 14 | before your arrest? |
| 09:37:24 | 15 | A.   Yes. |
| 09:37:26 | 16 | Q.   So the phone calls were made before May 2013? |
| 09:37:29 | 17 |      MR. WATLINGTON:  Objection, Your Honor. |
| 09:37:30 | 18 |      MR. MINGOLLA:  Objection, Your Honor. |
| 09:37:31 | 19 |      THE COURT:  Sustained. |
| 09:37:36 | 20 | BY MS. LAKE: |
| 09:37:36 | 21 | Q.   Now directing your attention to May 2013, |
| 09:37:42 | 22 | surrounding your arrest, what, if anything, did you do |
| 09:37:46 | 23 | right around the time you were arrested, in terms of |
| 09:37:48 | 24 | your points of contact? |
| 09:37:50 | 25 |      MR. WATLINGTON:  Objection, Your Honor.  She's |

09:37:51  1    leading the witness.

09:37:53  2            THE COURT:  Overruled.

09:37:58  3            THE WITNESS:  I, I made some contact calls to

09:38:01  4    several people.  I was looking to get seven kilograms of

09:38:07  5    cocaine, and I called several people to see who had

09:38:13  6    available -- if they had any availability of it.  And

09:38:19  7    that's what I did.

09:38:20  8    BY MS. LAKE:

09:38:20  9    Q.   And who did you contact?

09:38:23  10   A.   I contact -- I may have contacted Eddie, G.  I'm

09:38:36  11   not too sure if I contacted Raymond, but I may have.

09:38:39  12   But I contacted Angelo, and he did, said he had it

09:38:44  13   available.

09:38:44  14   Q.   And how did you contact Angelo?

09:38:47  15   A.   We met in the parking lot and I told him about it.

09:38:50  16   And then we made a couple of phone calls.

09:38:58  17   Q.   What contact did you use?

09:39:00  18   A.   I used my personal phone, which was 690-1220.

09:39:03  19   Q.   Who, if anyone, else were you in contact with as it

09:39:09  20   relates to the seven kilograms?

09:39:11  21            MR. MINGOLLA:  Your Honor, asked and answered.

09:39:13  22   Objection.

09:39:13  23            THE COURT:  Come to sidebar.

09:40:13  24        (Sidebar discussion held as follows:)

09:40:22  25            THE COURT:  Where were you going with the

09:40:23  1    seven kilograms?

09:40:24  2            MS. LAKE:  Making a foundation for the next

09:40:28  3    series of calls.

09:40:29  4            THE COURT:  But where is the seven kilograms

09:40:31  5    going?

09:40:32  6        Is it going to any of the defendants on trial?

09:40:35  7            MS. LAKE:  Going -- I don't understand.

09:40:36  8            THE COURT:  Are the seven kilograms related to

09:40:38  9    any of the defendants on trial?

09:40:40  10           MS. LAKE:  Yes.

09:40:40  11           THE COURT:  Okay.  Which one?

09:40:42  12           MS. LAKE:  Walter Hill.

09:40:43  13           THE COURT:  Okay.  All right.  Thank you.

09:40:44  14       (End of sidebar, open court as follows:)

09:40:55  15           THE COURT:  Okay.  Overruled.

09:40:56  16   BY MS. LAKE:

09:40:56  17   Q.   Who else, if anyone, did you contact as it relates

09:41:00  18   to the seven kilograms?

09:41:07  19   A.   I contact -- I contacted Angelo.  I contacted

09:41:17  20   Eddie, Alsenio.  But none of them had.  And I contact --

09:41:22  21   I -- when Angelo told me he had them available.

09:41:24  22   Q.   And who else, if anyone, did you contact?

09:41:27  23   A.   I contact no one else.

09:41:30  24   Q.   Were you in contact with buyers in this instance?

09:41:35  25   A.   I had feelers out if they were, you know, if they

09:41:39    1    had availability they would have called me and let me

09:41:43    2    know if they had it or didn't.

09:41:46    3    Q.   Now showing you calls 54 through 75.

09:42:01    4         Again, I previously showed you calls 3 through 78,

09:42:04    5    but specifically calls 54 through 75, have you reviewed

09:42:07    6    those calls?

09:42:07    7    A.   Yes, I have.

09:42:08    8    Q.   Where have you reviewed those calls?

09:42:10    9    A.   At the district attorney's office.

09:42:13   10    Q.   What, if anything, did you do with the disks of the

09:42:15   11    calls after you reviewed them?

09:42:17   12    A.   I initialed every disk after they were reviewed.

09:42:21   13    Q.   And were the calls a true and accurate recording of

09:42:26   14    phone conversations you had?

09:42:29   15    A.   They was accurate to my conversation.

09:42:33   16    Q.   And who is speaking on these calls?

09:42:39   17    A.   It has to be me and Angelo, me and Pee Wee, me and

09:42:46   18    Angelo.  That's about it.  And I think that was in those

09:42:52   19    calls.

09:42:54   20    Q.   And what, if anything, did you do -- were you in

09:42:56   21    contact with Pee Wee?

09:42:57   22    A.   Yes, I was.

09:42:58   23    Q.   And what, if anything, did you do after you were in

09:43:00   24    contact with Pee Wee?

09:43:04   25    A.   I met the courier -- prearranged, we meet.  I got

09:43:14  1    the moneys from the courier.  I picked that up at about,

09:43:21  2    at Sail Rock.  I came to St. Thomas with the moneys.

09:43:25  3    Q.   Let me stop you here.  How did you meet with the

09:43:28  4    couriers to get the money?

09:43:32  5    A.   While on patrol, I went to the area of Sail Rock.

09:43:35  6    Q.   In what manner?

09:43:36  7    A.   In the vessel, the DPNR vessel.

09:43:40  8    Q.   What happened next?

09:43:41  9    A.   What happened next, I met this vessel, they gave me

09:43:45  10   a bag.  I took the bag and I came back to base, which is

09:43:51  11   Crown Bay.

09:43:52  12   Q.   And what, if anything, happened next?

09:43:54  13   A.   I went, I had some paperwork to do.  I went back to

09:43:58  14   the office.  I got some T-shirts I had to pick up, got

09:44:02  15   that squared away.  I was going to try to catch the 6:00

09:44:08  16   boat, but I couldn't get through the work I was doing at

09:44:11  17   the office.  So I ended up catching the 7:00 boat.

09:44:18  18         In between there I called Angelo and let him know

09:44:22  19   that I missed the ferry -- the barge that was going to

09:44:25  20   take me over, and I was coming back -- I was going to

09:44:29  21   come up on the ferry.

09:44:31  22         MS. LAKE:  Your Honor, I would ask that

09:44:33  23   Exhibits 54 -- or 55 through 75 be received in evidence

09:44:40  24   at this time.

09:44:44  25         THE COURT:  Okay.  Attorney Mingolla?

09:44:47  1          MR. MINGOLLA:  Just, just give me a second,

09:44:49  2   Judge, please.

09:44:50  3          THE COURT:  Attorney Watlington?

09:44:51  4          MR. WATLINGTON:  No objections, Your Honor.

09:44:56  5          MR. MINGOLLA:  Yeah, no, no objections, Judge.

09:44:59  6          MS. LAKE:  I'd like to play Exhibit 59a and b.

09:45:08  7          THE COURT:  All right.  It's under advisement.

09:45:13  8          MS. LAKE:  59, Your Honor.

09:45:16  9          THE COURT:  Yes, you're moving 55 through 75

09:45:19  10  into evidence, correct?

09:45:22  11         MS. LAKE:  Yes, Your Honor.

09:45:23  12         THE COURT:  And I just asked if the attorneys

09:45:25  13  had any objections, and I said I'm taking it under

09:45:27  14  advisement.

09:45:28  15      Go ahead.

09:45:29  16         MS. LAKE:  I would ask to play the call 68 a.

09:45:34  17         THE COURT:  They are under advisement, so move

09:45:37  18  on.

09:45:38  19  BY MS. LAKE:

09:45:38  20  Q.   These calls are a true and accurate reflection of

09:45:41  21  the recordings that were made?

09:45:42  22  A.   Yes, they are.

09:45:43  23  Q.   And did you review the transcripts, Exhibits 55

09:45:48  24  through 75b, did you review those transcripts?

09:45:52  25  A.   Yes, I did.

| | | |
|---|---|---|
| 09:45:53 | 1 | Q.   And showing you these transcripts.  Do you see them |
| 09:45:58 | 2 | in front of you? |
| 09:45:59 | 3 | A.   Yes.  Not on my monitor, but I see them with your |
| 09:46:02 | 4 | hand, yes. |
| 09:46:02 | 5 | Q.   And did you review these transcripts in connection |
| 09:46:05 | 6 | with the disks? |
| 09:46:06 | 7 | A.   Yes, I did. |
| 09:46:07 | 8 | MR. MINGOLLA:  Objection, Your Honor. |
| 09:46:08 | 9 | THE COURT:  Okay.  Overruled. |
| 09:46:09 | 10 | BY MS. LAKE: |
| 09:46:10 | 11 | Q.   Are they a true and accurate reflection of the |
| 09:46:12 | 12 | recording that you listened to? |
| 09:46:14 | 13 | A.   Yes, they are. |
| 09:46:26 | 14 | MS. LAKE:  May I have a moment, Your Honor? |
| 09:46:28 | 15 | THE COURT:  Yes. |
| 09:46:31 | 16 | BY MS. LAKE: |
| 09:46:31 | 17 | Q.   And the recordings that you listened to, are there |
| 09:46:34 | 18 | any changes, deletions or additions to the recordings |
| 09:46:37 | 19 | that you listened to? |
| 09:46:38 | 20 | A.   No, they're not. |
| 09:46:39 | 21 | Q.   Are they true, complete and accurate? |
| 09:46:41 | 22 | A.   Yes, they are. |
| 09:46:42 | 23 | Q.   And these calls that you listened to, who, again, |
| 09:46:45 | 24 | were you speaking to? |
| 09:46:46 | 25 | A.   I was speaking to Angelo, Pee Wee -- that's about |

09:46:54   1    it.

09:46:55   2              MS. LAKE:  Your Honor, I would ask that

09:46:56   3    Exhibits 55 through 75 be received into evidence.

09:46:59   4              THE COURT:  Okay.  Under advisement.

09:47:02   5    BY MS. LAKE:

09:47:02   6    Q.   So what, if anything, happened after you picked up

09:47:05   7    the money and met with the couriers -- what, if

09:47:08   8    anything, did you do next?

09:47:14   9    A.   I guess I went to the office to take care of some

09:47:17   10   work, but I caught the 7:00 ferry from St. Thomas to St.

09:47:24   11   John.  I called Angelo.  I met him at the corner by the

09:47:28   12   bank, FirstBank.  He picked me up and he took me to an

09:47:35   13   area just off the inspection lane by a standpipe.  There

09:47:41   14   I met with Mr. Hill.

09:47:45   15   Q.   Let me stop you here.  When you say "Mr. Hill," who

09:47:47   16   are you referring to?

09:47:48   17   A.   Walter Hill.

09:47:49   18   Q.   And do you see Walter Hill in the courtroom here

09:47:54   19   today?

09:47:54   20   A.   Yes.

09:47:54   21   Q.   And could you --

09:47:55   22   A.   He is sitting next to his attorney behind you, in

09:47:57   23   the brown suit.

09:47:58   24   Q.   And could you please point to him?

09:48:00   25   A.   He is sitting right there (indicating).

09:48:02  1    Q.   And where exactly is he located?

09:48:04  2    A.   Where is he located?

09:48:05  3    Q.   Yes, right now.

09:48:06  4    A.   Right behind you, sitting next to his attorney.

09:48:09  5    Q.   And what color is he wearing?

09:48:13  6    A.   He was wearing -- he is wearing a beige suit.

09:48:16  7    Q.   Is there anything else distinctive about him?

09:48:19  8    A.   He has a clean cut.  He's wearing glasses.  He has

09:48:23  9    a tie on.

09:48:24  10         MS. LAKE:  Your Honor, I ask that the record

09:48:26  11   reflect that the defendant -- that the witness

09:48:29  12   identified the Defendant Walter Hill.

09:48:30  13         THE COURT:  Yes.  The record will reflect the

09:48:32  14   Defendant Walter Hill has been identified.

09:48:33  15   BY MS. LAKE:

09:48:33  16   Q.   And so what, if anything, happened next?

09:48:36  17   A.   I met with Walter.  I gave him the money.  I

09:48:44  18   stepped out, I got a box that had in seven keys of

09:48:50  19   cocaine.  I got back in the vehicle.  I transferred it

09:48:56  20   from the box to the backpack that I had, and he dropped

09:49:01  21   me back to the inspection lane by Angelo, and I caught

09:49:06  22   the 8:00 ferry to come back home.

09:49:10  23   Q.   Now, let me ask you, where exactly did you meet

09:49:12  24   with Walter Hill?

09:49:18  25   A.   The fire station in St. John, if you go down, maybe

09:49:22  1   40 yards, there's an open area there just after the

09:49:27  2   inspection lane.  You make --

09:49:32  3   Q.   And --

09:49:32  4   A.   -- and you make a, a sharp, not a sharp right, but

09:49:35  5   I make a bearing right, and there is an open area there.

09:49:39  6   Q.   And how did you travel from the -- that area on St.

09:49:45  7   John where you met with Walter Hill?

09:49:46  8   A.   Angelo picked me up at the corner of the bank in

09:49:50  9   Cruz Bay and took me to the area.

09:49:52  10  Q.   And how did you get to the area of Cruz Bay?

09:49:55  11  A.   How did I get back?

09:49:57  12  Q.   How did you get to St. John?

09:49:58  13  A.   I got to St. John on the ferry.

09:50:01  14  Q.   Okay?

09:50:01  15  A.   And after I got off the ferry I called Angelo.  He

09:50:07  16  picked me up and he took me to the area.

09:50:08  17  Q.   Okay.  And so what happened next?

09:50:10  18       What was exactly the next thing that happened after

09:50:13  19  you took Angelo Hill?

09:50:17  20  A.   After Angelo Hill picked me up, we -- he took me to

09:50:22  21  the area.  I got out of Angelo's car.  I got into

09:50:26  22  Walter's car.

09:50:27  23  Q.   And what kind of car did you get into?

09:50:30  24  A.   I want to -- it's an SUV.

09:50:34  25  Q.   And where was Walter -- or was Walter inside the

09:50:36  1    vehicle?

09:50:37  2    A.   He was sitting in the vehicle, yes.

09:50:39  3    Q.   Where was Walter inside the vehicle?

09:50:40  4    A.   He was in the driver's seat.

09:50:42  5    Q.   And what, if anything, do you next?

09:50:44  6    A.   Anything -- what I did next, I asked him if he had

09:50:47  7    any -- if he was ready.

09:50:49  8         He said yes.

09:50:50  9         I discussed the price --

09:50:51  10   Q.   Let me stop you.  When you say you asked him if you

09:50:55  11   were ready, what does that mean?

09:50:57  12   A.    If he had the seven kilos of -- seven kilograms of

09:51:00  13   cocaine.

09:51:00  14   Q.   And what, if anything, did Walter Hill say to you?

09:51:02  15   A.   He said yes.

09:51:03  16   Q.   And what, if anything, happened next?

09:51:06  17   A.   I discussed a price with him, tried to change the

09:51:11  18   price.  And the price was not negotiable.

09:51:19  19   Q.   Let me stop you here.  What was the price?

09:51:21  20   A.   15,500.

09:51:23  21   Q.   And 15,500 for what?

09:51:25  22   A.   Each kilogram.

09:51:28  23   Q.   What, if anything, did you say to Walter Hill

09:51:30  24   specifically regarding the price?

09:51:31  25   A.   And I asked him if he could have taken off $500.

09:51:35   1    Q.    What, if anything, did Walter Hill say to you?

09:51:38   2    A.    He said that could not be -- it was not possible.

09:51:41   3    Q.    What was the next thing that happened?

09:51:43   4    A.    I stepped out the vehicle, I went to another

09:51:46   5    vehicle.

09:51:46   6    Q.    Let me stop you.  Why did you get out the vehicle

09:51:49   7    of Walter Hill?

09:51:50   8    A.    Because the cocaine was in another vehicle parked

09:51:53   9    next to the car.

09:51:55   10   Q.    How did you know that?

09:51:56   11   A.    Walter told me.

09:51:58   12   Q.    Okay.  So what did you do next?

09:51:59   13   A.    I picked up the box and I got back in the car.  I

09:52:02   14   opened the box.  I checked it.

09:52:05   15   Q.    Let me stop you.  Where was the box?

09:52:08   16   A.    The box was inside the blue Suzuki.

09:52:11   17   Q.    And where was that blue Suzuki?

09:52:14   18   A.    Parked right next to the SUV.

09:52:16   19   Q.    Which SUV?

09:52:18   20   A.    The one that Walter Hill was driving.

09:52:20   21   Q.    Okay.  So what happened next?

09:52:21   22   A.    I got back in the car with Walter.  I opened the

09:52:25   23   box.  I opened the bag with the money.  I dropped the

09:52:27   24   bag of money.  I took the money out --

09:52:29   25   Q.    Let me stop you.  Let me stop you.

| | | |
|---|---|---|
| 09:52:31 | 1 | When you opened the box, what did you see inside? |
| 09:52:33 | 2 | A.   It had seven kilograms of cocaine. |
| 09:52:35 | 3 | Q.   What did you do next? |
| 09:52:37 | 4 | A.   I looked at them.  I took the money out.  Take the |
| 09:52:41 | 5 | cocaine and put it in the bag. |
| 09:52:42 | 6 | Q.   Okay.  And then what did you do next? |
| 09:52:45 | 7 | A.   What did I do next?  Walter dropped me to the |
| 09:52:48 | 8 | inspection lane.  I got out and I got in the car with |
| 09:52:52 | 9 | Angelo.  Angelo dropped me back to the ferry.  I caught |
| 09:52:56 | 10 | the 8:00 ferry.  And as I was stopping off the 8:00 |
| 09:53:01 | 11 | ferry, I was arrested. |
| 09:53:02 | 12 | Q.   Now let me take you back a little bit.  You |
| 09:53:04 | 13 | indicated you had a bag with you in the vehicle with |
| 09:53:07 | 14 | Walter Hill? |
| 09:53:08 | 15 | A.   Yes. |
| 09:53:08 | 16 | Q.   What, if anything, was inside of that bag? |
| 09:53:11 | 17 | A.   The money. |
| 09:53:12 | 18 | MR. MINGOLLA:  Object -- |
| 09:53:13 | 19 | THE COURT:  Overruled. |
| 09:53:17 | 20 | BY MS. LAKE: |
| 09:53:17 | 21 | Q.   And where did you get that money from? |
| 09:53:19 | 22 | A.   From the courier, from Pee Wee. |
| 09:53:21 | 23 | Q.   And what, if anything, did you do with the money? |
| 09:53:25 | 24 | A.   I took the money, I checked it, they count it, but |
| 09:53:32 | 25 | I checked -- it comes in bundles.  I checked that it was |

09:53:37   1   -- I don't remember whatever the amount was, but I took

09:53:40   2   it there.

09:53:40   3   Q.   And seated inside the car with Walter Hill, what,

09:53:43   4   if anything, did you do with the bag of money?

09:53:45   5   A.   I took the money out of the bag.  I placed it

09:53:51   6   somewhat into the same box the cocaine was in.  And it

09:53:56   7   was -- it was a quick transaction, you know, and that

09:54:01   8   was it.

09:54:01   9   Q.   What, if anything else, happened in the vehicle

09:54:06   10   with you and Walter Hill?

09:54:11   11   A.   I couldn't get the cocaine put in the bag properly.

09:54:14   12   He just assisted me in getting the cocaine.  It was a

09:54:18   13   very -- it wasn't a big bag, so we had to place it in

09:54:21   14   correctly.  So, you know, we had to -- I had to put it

09:54:26   15   in in a certain manner.

09:54:28   16   Q.   And what, if anything, happened with -- inside of

09:54:30   17   the vehicle with the money?

09:54:31   18   A.   I left the money with Walter.  He, again, just

09:54:35   19   briefly checked it, and that was it.

09:54:38   20   Q.   And so what, if anything, happened next?

09:54:44   21   A.   After he checked it briefly and we put the stuff in

09:54:47   22   the bag, he dropped me to the inspection lane where I

09:54:52   23   met Angelo.  I got in the car with Angelo.  Angelo drove

09:54:58   24   me back to Cruz Bay and I got -- and I caught the 8:00

09:55:01   25   ferry.

| | | |
|---|---|---|
| 09:55:02 | 1 | Q. And what, if anything, did you do with your phone |
| 09:55:05 | 2 | as you're taking the ferry back to St. Thomas? |
| 09:55:10 | 3 | A. When I was going back to St. Thomas, I -- not too |
| 09:55:17 | 4 | sure if I got a call from Pee Wee, or Pee Wee called or |
| 09:55:19 | 5 | I called him, and let him know that everything was okay |
| 09:55:23 | 6 | and I was on my way back down. |
| 09:55:24 | 7 | Q. And what did you mean by everything was okay? |
| 09:55:27 | 8 | A. That I had made the transfer, I purchased the |
| 09:55:31 | 9 | seven kilograms and I was on my way back down. |
| 09:55:34 | 10 | Q. And what else, if anything, did you discuss with |
| 09:55:36 | 11 | Pee Wee regarding the seven kilograms? |
| 09:55:39 | 12 | A. It was real noisy on the boat. I told him I would |
| 09:55:45 | 13 | call him when I was slowing down in St. Thomas. I |
| 09:55:47 | 14 | called him and I let him know that we needed to meet |
| 09:55:52 | 15 | earlier than the 10:00 agreed, because I had some things |
| 09:55:55 | 16 | to do for work and I needed to be out of there a lot |
| 09:55:58 | 17 | earlier. |
| 09:56:00 | 18 | MS. LAKE: Your Honor, I would ask to play call |
| 09:56:04 | 19 | Exhibit 59a and b. |
| 09:56:06 | 20 | THE COURT: It's under advisement. |
| 09:56:08 | 21 | MS. LAKE: May we approach, Your Honor? |
| 09:56:10 | 22 | THE COURT: Not yet. Thank you. |
| 09:56:10 | 23 | BY MS. LAKE: |
| 09:56:11 | 24 | Q. So what, if anything, happened next? |
| 09:56:16 | 25 | A. After the phone call with Pee Wee, I hanged up. I |

09:56:22   1    went to -- the ferry had reached the dock.  I stepped

09:56:27   2    off the dock and I was arrested exiting the ferry.

09:56:32   3    Q.   And showing you what's been marked as --

09:56:42   4         MS. LAKE:  Your Honor, I would ask to show the

09:56:44   5    witness Government's Exhibit 80e, as in Edward.

09:56:44   6    (Government's Exhibit 80e marked for

09:57:01   7    identification.)

09:57:01   8    BY MS. LAKE:

09:57:02   9    Q.   Do you see that in front of you?

09:57:03   10   A.   Yes, I do.

09:57:04   11   Q.   And what is that?

09:57:04   12   A.   That is a stack of disks that I listened to --

09:57:11   13        MS. LAKE:  Oh, I apologize.

09:57:16   14   BY MS. LAKE:

09:57:17   15   Q.   Do you see 80e, as in Edward, in front of you?

09:57:20   16   A.   Yes, I do.

09:57:21   17   Q.   And what do you see in front of you?

09:57:22   18   A.   That is me at the terminal in Red Hook, getting

09:57:28   19   ready to go to St. John.

09:57:30   20        MS. LAKE:  Your Honor, I ask that 80e be

09:57:33   21   received into evidence.

09:57:36   22        THE COURT:  Attorney Mingolla?

09:57:41   23        MR. MINGOLLA:  I object to that, Your Honor.  I

09:57:42   24   object, Your Honor.

09:57:44   25        THE COURT:  Attorney Watlington?

09:57:46  1          MR. WATLINGTON:  Objection, Judge.

09:57:49  2          THE COURT:  Okay.  It's under advisement.

09:57:52  3  BY MS. LAKE:

09:57:52  4  Q.   And what is the time frame that, that you indicated

09:57:58  5  you traveled to St. John?

09:57:59  6  A.   The ferry normally takes, depending on which ferry

09:58:03  7  you're running, it takes anywhere between 10 to

09:58:11  8  13 minutes to St. John.  Sometimes -- just depending on

09:58:15  9  the ferry.  This particular evening the ferry was late.

09:58:22  10  I was -- so I was late again.  I got to St. John, I was

09:58:27  11  able to do what I had to do and get back to catch the

09:58:30  12  8:00 ferry.

09:58:31  13  Q.   And before you left for St. John, what -- who, if

09:58:36  14  anyone, did you speak to?

09:58:39  15  A.   I may have spoken to, I spoke to Angelo and I let

09:58:45  16  him know that the ferry was late, that we were -- that

09:58:48  17  the ferry was going to be late, and I was going to be a

09:58:51  18  few minutes late getting to St. John, and I was at the

09:58:54  19  dock waiting for the ferry to arrive.

09:58:58  20  Q.   And in reference to the seven kilograms, was there

09:59:01  21  an agreement regarding the seven kilograms, that whole

09:59:04  22  purchase?

09:59:05  23          MR. MINGOLLA:  Objection, Your Honor.

09:59:05  24          THE WITNESS:  Yes.

09:59:06  25          THE COURT:  Sustained.  Rephrase.

09:59:07  1

09:59:07  2    BY MS. LAKE:

09:59:07  3    Q.   What, if anything, was discussed regarding the

09:59:09  4    seven kilograms?

09:59:11  5    A.   I discussed with Angelo the price of the seven

09:59:18  6    kilograms, and asking him if they could -- if he would

09:59:22  7    have talked to Walter concerning the price.

09:59:25  8        He told me that was not available.  That he could

09:59:30  9    not budge on the price.

09:59:32  10       I told him well, I did have what he was asking for,

09:59:35  11   but it didn't matter, but I would still ask.

09:59:37  12   Q.   And what was your understanding of the conversation

09:59:40  13   that you had with Angelo?

09:59:42  14   A.   That --

09:59:43  15           MR. MINGOLLA:  Objection, Your Honor.

09:59:46  16           THE COURT:  Rephrase.

09:59:47  17   BY MS. LAKE:

09:59:47  18   Q.   And what, if anything, was your understanding --

09:59:50  19   what, if anything, did you mean when you said that to

09:59:53  20   Angelo?

09:59:54  21   A.   That I was prepared to pay the $1,500 -- 15,500 per

10:00:02  22   kilo.

10:00:02  23   Q.   And was that -- and who were you doing that on

10:00:05  24   behalf of?

10:00:06  25   A.   I was doing that on behalf of Pee Wee.

| 10:00:08 | 1 | Q.   And what, if anything, was discussed with Pee Wee |

Q.   And what, if anything, was discussed with Pee Wee
regarding the seven kilograms?

A.   I wanted to make sure that the kilograms were not
spoiled.  And I really didn't have time to do all of
that.  But I did tell him yes, it was done, and
everything was fine.

Q.   And in general what, if anything, did you discuss
with Pee Wee regarding the seven kilograms?

A.   Regarding the seven kilograms, I told him the
brand, I told him what time we had to meet, and that
everything was fine.

Q.   And before you met with Angelo, what, if anything,
was discussed with Pee Wee regarding the seven
kilograms?

A.   Before we talked about making sure that the
kilograms were good, there was some bad kilograms that
were floating around that would not, not working out, so
we wanted to make sure they were not the same marking.

Q.   And who, if anyone, provided the money for the
seven kilograms?

A.   I don't know where -- my point of contact was Pee
Wee.  I don't know how, I don't know how and where he
got the money, but my point of contact was Pee Wee, and
the courier was the boat people.

     Sometimes I -- it would not be the same person all

10:01:38  1   the time, so I can't say it would be John every time.

10:01:44  2   And again, this was in the space of eight -- every

10:01:47  3   eight months, sometimes a year.  So it wouldn't be the

10:01:49  4   same person.

10:01:50  5   Q.   And in regards to the price of the seven kilograms,

10:01:53  6   who, if anyone, on the Puerto Rican side would you

10:02:01  7   discuss that with?

10:02:02  8   A.   I would discuss it with Pee Wee --

10:02:05  9              MR. MINGOLLA:  Objection.  Asked and answered.

10:02:06  10              THE COURT:  Sustained.

10:02:08  11              MS. LAKE:  Your Honor, I would ask now that

10:02:10  12   calls 86, 86 through 75 -- 85 through 75 be received in

10:02:23  13   evidence -- 55, I'm sorry, Exhibits 55 through 75 be

10:02:28  14   received in evidence.

10:02:29  15              MR. MINGOLLA:  I'm going to object, Your Honor.

10:02:31  16              THE COURT:  All right.  It's under advisement.

10:02:34  17        Let me see counsel at sidebar.

10:02:45  18        (Sidebar discussion held as follows:)

10:02:52  19              THE COURT:  Based on the state of the evidence,

10:02:53  20   at this point the Court is prepared to make a Bourjaily

10:02:57  21   finding that there has been, by a preponderance of the

10:03:02  22   evidence, sufficient evidence to establish that Tapia,

10:03:07  23   Angelo Hill, Walter Hill, and Pee Wee were engaged in a

10:03:13  24   conspiracy to traffic in the contraband here in issue,

10:03:22  25   cocaine.

10:03:22  1      All right.  Okay.

10:03:25  2           MS. LAKE:  I would ask that the calls be

10:03:26  3  received in evidence, Your Honor.

10:03:27  4           THE COURT:  Right.  They're under advisement.

10:03:31  5           MS. LAKE:  If I can ask for some direction.  I

10:03:33  6  believe at this point I've made the Bourjaily finding

10:03:37  7  that there's an agreement.  I've laid the foundation for

10:03:40  8  the admissibility of the calls.  I've established the

10:03:42  9  relevance in terms of the admissibility of the calls,

10:03:45  10  and I've laid the foundation for the calls and the

10:03:49  11  transcripts.  I've laid the foundation.

10:03:50  12    I understand that you don't want the calls played,

10:03:56  13  the English-speaking calls.  I'm just asking to play

10:03:58  14  the --

10:03:58  15           THE COURT:  Tell me what the witness said to

10:04:00  16  establish relevance of the calls, 55 through 75.

10:04:05  17           MS. LAKE:  He indicated that these calls were

10:04:07  18  related to the 7-kilogram --

10:04:09  19           THE COURT:  He said that.

10:04:10  20           MS. LAKE:  I seem to recall that.  I'll ask him

10:04:13  21  again.

10:04:13  22           THE COURT:  That's not my question.  You said

10:04:16  23  ask again.  I don't know if you asked it in the first

10:04:19  24  place.

10:04:19  25           MS. LAKE:  I believe I asked him in the first

10:04:20   1    place, Your Honor.

10:04:23   2            THE COURT:  Well, I'll check the record.  It's

10:04:25   3    under advisement.  I don't recall that question, that 55

10:04:28   4    through 75 dealt with that.  I don't recall any inquiry

10:04:30   5    about relevance, quite frankly.

10:04:32   6        Does counsel recall any, Attorney Mingolla?

10:04:35   7            MR. MINGOLLA:  No.

10:04:36   8            MR. WATLINGTON:  Truthfully, yes.

10:04:37   9            THE COURT:  I'll check the record.  That's why

10:04:39   10   I took it under advisement.

10:04:41   11           MS. LAKE:  I specifically asked, who were you

10:04:43   12   speaking to in these calls?

10:04:44   13       And he said Pee Wee, Angelo Hill, regarding seven

10:04:48   14   kilograms.

10:04:48   15           THE COURT:  Okay.  And that was with respect to

10:04:52   16   the 20 calls, 55 through 75.

10:04:56   17           MS. LAKE:  Yes.

10:04:56   18           THE COURT:  55 through 75.

10:04:59   19       We'll do a search.  We'll see if 55 through 75 has

10:05:03   20   that question.  I just don't recall.  But we'll check.

10:05:05   21       All right.  Anything else?

10:05:06   22           MS. LAKE:  That's it.

10:05:07   23           THE COURT:  All right.  Thank you, counsel.

10:05:09   24       (End of sidebar, open court as follows:)

10:08:36   25       (Pause.)

```
10:08:37   1              THE COURT:  All right.  Same ruling.  Go ahead.
10:08:39   2    BY MS. LAKE:
10:08:39   3    Q.   And Mr. Tapia, what I've previously shown you --
10:08:49   4              THE COURT:  Ladies and gentlemen, when we're at
10:08:51   5    sidebar, I know that sometimes we have these discussions
10:08:54   6    and they deal with legal matters to which you're not a
10:08:58   7    party.  But we're trying to resolve certain things to
10:09:01   8    make the trial move a little more efficiently.  So I
10:09:05   9    just ask you to bear with us when we have those
10:09:07  10    sidebars.
10:09:08  11        If you feel like you need to stretch, because I
10:09:11  12    know sometimes you're sitting in that position, go right
10:09:13  13    ahead and stretch.  You don't have to wait for me to
10:09:16  14    stretch, stand up or whatever.  I would ask you to go
10:09:18  15    back and sit down after you've stretched, though, and
10:09:21  16    then we'll resume.  All right?
10:09:23  17        Go ahead, Attorney Lake.
10:09:26  18    BY MS. LAKE:
10:09:26  19    Q.   Mr. Tapia, again, 55 through 75, what, if anything,
10:09:34  20    was being discussed on Exhibits 55 through 75?
10:09:38  21    A.   That is the price I was discussing with Angelo, the
10:09:44  22    arrangements I was making with Pee Wee to get the seven
10:09:50  23    kilograms to Puerto Rico.
10:09:52  24              MS. LAKE:  Your Honor, I would ask that
10:09:54  25    Government's Exhibits 55 through 75 be received in
```

| | | |
|---|---|---|
| 10:09:58 | 1 | evidence. |
| 10:09:59 | 2 | MR. MINGOLLA:  I object Your Honor. |
| 10:10:00 | 3 | THE COURT:  All right.  55 through 75 are |
| 10:10:04 | 4 | admitted. |
| 10:10:04 | 5 | (Government's Exhibits 55 through 75 admitted into |
| 10:10:06 | 6 | evidence.) |
| 10:10:06 | 7 | MS. LAKE:  I would like to play Exhibit 59a and |
| 10:10:11 | 8 | b. |
| 10:10:11 | 9 | THE COURT:  You haven't asked any questions |
| 10:10:14 | 10 | about b.  I assumed it was about a. |
| 10:10:21 | 11 | MS. LAKE:  I asked for 55 through 75, Your |
| 10:10:23 | 12 | Honor. |
| 10:10:23 | 13 | THE COURT:  You're asking about 55, the a |
| 10:10:25 | 14 | parts.  You didn't ask him anything about any b parts, |
| 10:10:28 | 15 | did you? |
| 10:10:28 | 16 | MS. LAKE:  I did, but can I ask it again? |
| 10:10:30 | 17 | THE COURT:  I don't think you did just now. |
| 10:10:36 | 18 | You asked 55 generally.  b, I don't think, is a phone |
| 10:10:42 | 19 | call, is it? |
| 10:10:43 | 20 | MS. LAKE:  It is, Your Honor. |
| 10:10:44 | 21 | BY MS. LAKE: |
| 10:10:45 | 22 | Q.   Mr. Tapia, showing you Exhibits 55b -- |
| 10:10:47 | 23 | THE COURT:  The thing that they showed before, |
| 10:10:50 | 24 | were they not disks that you were showing? |
| 10:10:52 | 25 | MS. LAKE:  Yes, Your Honor. |

| | | |
|---|---|---|
| 10:10:52 | 1 | THE COURT:  All right.  The thing that you're |
| 10:10:54 | 2 | holding now, it is not a disk, correct? |
| 10:10:56 | 3 | MS. LAKE:  That is correct. |
| 10:10:56 | 4 | THE COURT:  Now with respect to the b portions, |
| 10:10:58 | 5 | you're asking for all b, or certain b's? |
| 10:11:02 | 6 | MS. LAKE:  Certain b's; but I will lay the |
| 10:11:04 | 7 | foundation for all of them. |
| 10:11:05 | 8 | THE COURT:  Okay. |
| 10:11:06 | 9 | BY MS. LAKE: |
| 10:11:06 | 10 | Q.   Mr. Tapia, showing you Government's Exhibits 55b |
| 10:11:09 | 11 | through 75b, do you see what's in my hand? |
| 10:11:12 | 12 | A.   Yes, I do. |
| 10:11:12 | 13 | Q.   And what's in my hand? |
| 10:11:14 | 14 | A.   Those are the transcripts of the telephone |
| 10:11:19 | 15 | interviews that I did. |
| 10:11:21 | 16 | Q.   And -- |
| 10:11:22 | 17 | THE COURT:  Counsel, come to sidebar. |
| 10:11:40 | 18 | (Sidebar discussion held as follows:) |
| 10:11:40 | 19 | THE COURT:  All right.  55 through 75, b |
| 10:11:43 | 20 | subpart, you're not trying to get them all in, correct? |
| 10:11:46 | 21 | MS. LAKE:  No, just the Spanish parts. |
| 10:11:48 | 22 | THE COURT:  Okay.  So are you going to separate |
| 10:11:50 | 23 | those? |
| 10:11:50 | 24 | MS. LAKE:  No.  I'm just going to lay the |
| 10:11:52 | 25 | foundation that he reviewed all of them and that he |

10:11:55  1    confirmed the accuracy of all of them.  But just like he

10:11:58  2    did yesterday, I will simply ask that the b part of the

10:12:01  3    Spanish calls be played.  I'm only playing those calls.

10:12:05  4        But it seems a bit more efficient to ask for all of

10:12:07  5    these, since he did review all of them, as opposed to

10:12:11  6    segregating out five or six.  I'm not asking to admit

10:12:16  7    the English ones.  I understand the Court's ruling from

10:12:20  8    yesterday.

10:12:20  9             THE COURT:  Can't you list the calls that you

10:12:22  10   want admitted?  Didn't we do that yesterday?

10:12:25  11            MS. LAKE:  I laid the foundation for all of

10:12:28  12   them, and I simply omitted the ones when I asked the

10:12:34  13   Court to play them.

10:12:35  14            THE COURT:  I seem to recall at the beginning

10:12:37  15   you were playing specific --

10:12:39  16            MS. LAKE:  That's correct.  I only played --

10:12:41  17            THE COURT:  -- portions, correct?

10:12:42  18            MS. LAKE:  I specifically played the b portion

10:12:46  19   for the Spanish calls, not the English translation.  I'm

10:12:48  20   not going to ask the Court to play the English

10:12:51  21   translation simply for efficiency, because Mr. Tapia

10:12:57  22   waived and confirmed the accuracy of all the disks.

10:13:00  23   It's simpler and easier to ask him, did he confirm the

10:13:03  24   accuracy of these transcripts, are they -- that's what I

10:13:09  25   did yesterday.

| | | |
|---|---|---|
| 10:13:09 | 1 | THE COURT:  But yesterday you were displaying |
| 10:13:11 | 2 | specific things, like 9a, 12a, 14a, 16a, which were |
| 10:13:16 | 3 | English.  You didn't seek to get the b portion. |
| 10:13:19 | 4 | MS. LAKE:  That's correct. |
| 10:13:20 | 5 | THE COURT:  All right. |
| 10:13:21 | 6 | MS. LAKE:  But I did lay the foundation for |
| 10:13:23 | 7 | those. |
| 10:13:23 | 8 | THE COURT:  Well.  Hold on for one second. |
| 10:13:26 | 9 | Is there going to be an objection, Attorney |
| 10:13:28 | 10 | Mingolla? |
| 10:13:29 | 11 | MR. MINGOLLA:  Yes, there is. |
| 10:13:30 | 12 | THE COURT:  All right.  So in order to minimize |
| 10:13:32 | 13 | the scope of what is being waged here, wouldn't it be |
| 10:13:39 | 14 | perhaps more efficient to just focus on the few things, |
| 10:13:43 | 15 | if there are a few that you wish to bring in?  You're |
| 10:13:47 | 16 | focusing the Court now on 21 Exhibits, correct? |
| 10:13:51 | 17 | MS. LAKE:  Correct. |
| 10:13:52 | 18 | THE COURT:  All of which Attorney Mingolla |
| 10:13:53 | 19 | objects to, correct? |
| 10:13:56 | 20 | Okay.  But you don't want all 21 of them in.  I've |
| 10:14:00 | 21 | already admitted the calls themselves.  What you want |
| 10:14:02 | 22 | are the transcriptions of translations, correct? |
| 10:14:07 | 23 | MS. LAKE:  Correct. |
| 10:14:07 | 24 | THE COURT:  So for those, is there a way to |
| 10:14:10 | 25 | just focus on those so we could just train our attention |

| | | |
|---|---|---|
| 10:14:13 | 1 | on that and deal with that? |
| 10:14:15 | 2 | MS. LAKE:  Yes, I can ask the exact same |
| 10:14:18 | 3 | question and limit it to the specific exhibit numbers. |
| 10:14:21 | 4 | THE COURT:  All right.  And Attorney Mingolla, |
| 10:14:23 | 5 | you understand she's not going to try to get in the -- |
| 10:14:26 | 6 | she's not moving in generally for all the English stuff, |
| 10:14:30 | 7 | just the Spanish. |
| 10:14:31 | 8 | MR. MINGOLLA:  I would revisit -- |
| 10:14:33 | 9 | THE COURT:  Let me do this... |
| 10:14:33 | 10 | (End of sidebar, open court as follows:) |
| 10:14:37 | 11 | THE COURT:  Ladies and gentlemen, it's time for |
| 10:14:38 | 12 | our morning break.  We're going to take a 15-minute |
| 10:14:41 | 13 | break and then we'll resume.  All rise. |
| 10:15:20 | 14 | (Juries out.) |
| 10:15:21 | 15 | THE COURT:  Mr. Tapia, we're going to take a |
| 10:15:23 | 16 | 15-minute break.  Do not discuss your testimony with |
| 10:15:25 | 17 | anyone during the break. |
| 10:15:26 | 18 | Do you understand? |
| 10:15:27 | 19 | THE WITNESS:  Yes.  Yes, sir. |
| 10:15:29 | 20 | THE COURT:  All right.  You can be back on the |
| 10:15:32 | 21 | stand in 15 minutes.  You can step down. |
| 10:15:38 | 22 | (Witness stood aside.) |
| 10:15:55 | 23 | THE COURT:  All right.  Attorney Lake, you want |
| 10:15:56 | 24 | to move in all the b portions, but I suspect you really |
| 10:16:00 | 25 | only want to move in the Spanish portions, correct? |

10:16:04  1    Just the b Spanish language, correct?

10:16:07  2           MS. LAKE:  Yes, Your Honor.  I'm not trying to

10:16:08  3    move in all of the b portions.  I'm simply laying a

10:16:12  4    foundation in an effort to be efficient.  I'm simply

10:16:14  5    laying the foundation of all of the b portions, because

10:16:18  6    Mr. Tapia did in fact review all of the b portions.  But

10:16:21  7    similar to how I did yesterday, I'm only asking the

10:16:24  8    Court to admit the b portion of the Spanish language

10:16:27  9    calls that I hope to play.

10:16:29  10          THE COURT:  Okay.

10:16:31  11          MS. LAKE:  I'm not asking to admit the English

10:16:34  12   calls.

10:16:34  13          THE COURT:  There's two concerns.  Attorney

10:16:36  14   Mingolla indicated he is going to object to everything.

10:16:41  15       There is another concern, and that is something I

10:16:44  16   addressed yesterday, and that making sure that all the

10:16:46  17   calls are relevant.  That is, I don't know if we're

10:16:48  18   going to have the issue of price or repetition of

10:16:51  19   pricing.

10:16:51  20       I don't know if that's the case here, but if that's

10:16:54  21   already --

10:16:55  22          MS. LAKE:  No, Your Honor.

10:16:58  23          THE COURT:  All right.  What are the numbers?

10:16:59  24   There are 21 of them that you want to lay the foundation

10:17:02  25   for.

| | | |
|---|---|---|
| 10:17:02 | 1 | I suspect there are only a few of them that are |
| 10:17:04 | 2 | going to be in issue.  Which ones are going to be in |
| 10:17:06 | 3 | issue in this? |
| 10:17:07 | 4 | MS. LAKE:  I'm only asking to play -- in terms |
| 10:17:09 | 5 | of the Spanish language calls, Your Honor?  59 -- |
| 10:17:12 | 6 | THE COURT:  What is it you want in evidence? |
| 10:17:15 | 7 | MS. LAKE:  59b, 61b, 66b, 67b, 68b, and 74b. |
| 10:17:33 | 8 | THE COURT:  Okay.  That's it? |
| 10:17:35 | 9 | MS. LAKE:  Yes, Your Honor. |
| 10:17:36 | 10 | MR. MINGOLLA:  I'm sorry, Your Honor.  I didn't |
| 10:17:37 | 11 | hear, after 59b she -- I didn't catch that next one |
| 10:17:41 | 12 | after 59b. |
| 10:17:42 | 13 | THE COURT:  Let me urge counsel to please pay |
| 10:17:46 | 14 | attention when we're going through this.  It's a very |
| 10:17:49 | 15 | short version.  It's only 6, not 21.  So you only have |
| 10:17:54 | 16 | six things you want to bring in for Spanish language. |
| 10:17:57 | 17 | Have you looked at those, Attorney Mingolla?  59, |
| 10:18:00 | 18 | 61 66, 67, 68, 74.  It's a short list. |
| 10:18:06 | 19 | MS. LAKE:  I apologize, Your Honor.  68 is not |
| 10:18:08 | 20 | Spanish. |
| 10:18:10 | 21 | THE COURT:  It's an even shorter list.  It is |
| 10:18:12 | 22 | only five things. |
| 10:18:13 | 23 | This is not a debate on 21 things, as may be |
| 10:18:16 | 24 | suggested by what may have been the foundation that was |
| 10:18:21 | 25 | going to be, that we're going to go through. |

10:18:24   1          This is only a question of five tapes, or five

10:18:29   2   translations.  Have you looked at those, Attorney

10:18:34   3   Mingolla?

10:18:39   4          MR. MINGOLLA:  Yes, I have, Your Honor.  But

10:18:40   5   let me point out --

10:18:42   6          THE COURT:  You need to stand up when you're

10:18:44   7   speaking.

10:18:44   8          MR. MINGOLLA:  I'm sorry.

10:18:45   9      Let me point out the fact that my hearing, thanks

10:18:48  10   to a hand grenade going off, is kind of impaired.  And

10:18:54  11   I've been putting off getting a hearing aid because I

10:18:56  12   don't want to look like an old man --

10:18:58  13          THE COURT:  Well, what we'll do is --

10:19:00  14          MR. MINGOLLA:  Sometimes I don't hear very

10:19:02  15   well.  It's not that I'm not paying attention.  It's

10:19:05  16   just that my hearing is impaired.

10:19:07  17          THE COURT:  That's fine.  I'll just make sure

10:19:11  18   everyone speaks clearly into the microphone.

10:19:13  19      So it's clear, Attorney Lake is seeking not to move

10:19:16  20   in 21 things, as may be suggested by the number 55

10:19:20  21   through 75.  So the question to Mr. Tapia properly

10:19:24  22   framed should not be with respect to the b portions,

10:19:28  23   everything, but just those five things, 59, 61, 66, 67

10:19:34  24   and 74.

10:19:34  25      Is that right, Attorney Lake, just those five,

10:19:37  1      correct?

10:19:38  2              MS. LAKE:  74 and 75, Your Honor.

10:19:44  3              THE COURT:  There's an additional one, 75?

10:19:48  4              MS. LAKE:  Yes, Your Honor.

10:19:49  5              THE COURT:  All right.  And 75.  All right.  So

10:19:51  6      it's -- we're back up to six.

10:19:57  7              MR. MINGOLLA:  Very well, thank you.  And

10:19:59  8      forgive my explanation, but that's the bottom line.

10:20:01  9              THE COURT:  No, that's fine.

10:20:03  10             MR. MINGOLLA:  I've got to get a hearing aid.

10:20:05  11             THE COURT:  That's fine.

10:20:06  12         Attorney Mingolla, with respect to those six items,

10:20:11  13     are there any issues that you have with that?

10:20:14  14         That is, the underlying raw data has already been

10:20:18  15     admitted by the Court for all of the phone calls, 55

10:20:23  16     through 75.  These are calls that are translated, and

10:20:31  17     the translations transcribed in the b exhibits of the

10:20:36  18     numbers we just, that the Court just listed.

10:20:44  19         So the question isn't whether you have an objection

10:20:46  20     to the phone call, which is in evidence.  The question

10:20:50  21     is whether you have an objection to the translation, or

10:20:56  22     rather the transcript of the translation.

10:20:59  23             MR. MINGOLLA:  Yes, Your Honor.  You're aware

10:21:00  24     that I have objections to all of these transcripts.

10:21:03  25             THE COURT:  Tell me what the objection -- what

10:21:04  1    is the issue?

10:21:06  2         Before you do that, let me ask the government -- I

10:21:11  3    notice that in some of the transcripts of translations,

10:21:17  4    there was the English and the Spanish.  But in the last

10:21:22  5    several, there was only English.  Is the Spanish

10:21:25  6    attached to all of these that the government seeks to

10:21:27  7    move in?

10:21:29  8              MS. LAKE:  No, not on the --

10:21:31  9              THE COURT:  No, but is there a Spanish next to

10:21:34  10   an English in the written version?  For each of them?

10:21:41  11             MS. LAKE:  No.

10:21:42  12             THE COURT:  Okay.  Which ones of the six do not

10:21:44  13   have that?

10:21:49  14             MS. LAKE:  If I could have a moment, Your

10:21:51  15   Honor?

10:21:51  16             THE COURT:  Yes.

10:23:02  17        (Pause)

10:23:03  18             THE COURT:  So just tell me which ones don't

10:23:06  19   and which ones do have the Spanish and English.

10:23:10  20             MS. LAKE:  They all have the Spanish.

10:23:11  21             THE COURT:  So they've all got it.

10:23:12  22        So Attorney Mingolla, you've got the English and

10:23:15  23   you've got the Spanish.  Tell me what the objection is.

10:23:24  24             MR. MINGOLLA:  For starters, there's

10:23:28  25   different -- bear with me one minute, Judge, please.

```
10:24:11   1            THE COURT:  Yes.
10:24:12   2        Attorney Lake, were each of these transcripts,
10:24:15   3   English and the -- or rather Spanish transcripts and the
10:24:21   4   translation of the transcript into English, was that
10:24:25   5   provided to the defense?
10:24:28   6            MS. LAKE:  Yes.
10:24:29   7            THE COURT:  All right.  Before trial?
10:24:31   8            MS. LAKE:  Yes.
10:24:33   9            THE COURT:  All right.
10:24:34  10        Attorney Watlington, do you have any objection?
10:24:38  11            MR. WATLINGTON:  Your Honor, given the fact
10:24:40  12   that this information applies solely to the St. John
10:24:43  13   transaction, it has nothing to do with my client, I
10:24:46  14   don't believe that in fact I should take the position
10:24:49  15   for or against.
10:24:50  16            THE COURT:  Okay.  So do you have an objection?
10:24:53  17            MR. WATLINGTON:  No, Your Honor.
10:24:54  18            THE COURT:  I'm sorry?
10:25:01  19            MR. WATLINGTON:  No, Your Honor.
10:25:03  20            THE COURT:  Attorney Mingolla, you have an
10:25:05  21   objection.  Let me see if I have understand the basis of
10:25:09  22   that.  The government has provided you with English and
10:25:13  23   Spanish translation and the raw recording.
10:25:14  24        Is that correct, Attorney Lake?
10:25:15  25            MS. LAKE:  Yes, Your Honor.
```

| | | |
|---|---|---|
| 10:25:15 | 1 | THE COURT:  You've got the English and Spanish |
| 10:25:18 | 2 | translation and the raw recording in Spanish, and then |
| 10:25:20 | 3 | the translation of that transcription, also all |
| 10:25:24 | 4 | provided. |
| 10:25:27 | 5 | MR. MINGOLLA:  And this initials, Your Honor, |
| 10:25:33 | 6 | the initials at the bottom of the page, of the, |
| 10:25:37 | 7 | ostensibly of the translator, this ECM.  I thought this |
| 10:25:42 | 8 | was translated -- these were translated by Fernandez. |
| 10:25:51 | 9 | I'm curious as to who ECM is, for starters.  Whether |
| 10:25:58 | 10 | that's -- who is ECM. |
| 10:26:04 | 11 | I would query who made this translation.  Who is |
| 10:26:07 | 12 | ECM? |
| 10:26:10 | 13 | THE COURT:  Well, I don't know who you're |
| 10:26:12 | 14 | asking that.  Certainly not me.  But I don't -- I mean, |
| 10:26:17 | 15 | the reason I ask the government if it was provided |
| 10:26:20 | 16 | beforehand is I wanted to make sure that there's not a |
| 10:26:25 | 17 | discovery issue here.  So all the information was |
| 10:26:32 | 18 | provided. |
| 10:26:33 | 19 | MR. MINGOLLA:  Judge -- |
| 10:26:33 | 20 | THE COURT:  I understand you have an issue with |
| 10:26:36 | 21 | the admission of this.  I'm just trying to understand so |
| 10:26:39 | 22 | our record is very clear what the basis of the objection |
| 10:26:46 | 23 | is. |
| 10:26:46 | 24 | MR. MINGOLLA:  Judge, I -- I want to brief -- |
| 10:26:51 | 25 | revisit the objection that I have had consistently with |

10:26:56  1    the government's production of these phone calls.  I may

10:27:02  2    have misspoke -- you were addressing -- I had ventured

10:27:09  3    yesterday or -- yesterday, I believe, that at the

10:27:12  4    suppression hearing Attorney Lindquist had indicated

10:27:24  5    that he was not going to -- I filed a motion in limine

10:27:30  6    on -- to suppress the telephone conversations.

10:27:37  7         Attorney -- I said yesterday -- I said yesterday

10:27:42  8    that at the suppression hearing, and it may have been a

10:27:46  9    status hearing, that the agent -- that AUSA Lindquist

10:27:55  10   had said it doesn't, that doesn't matter, that's

10:27:59  11   irrelevant, we're not going to use the phone call or

10:28:05  12   phone calls for Mr. Hill.

10:28:09  13        THE COURT:  When you say phone call, phone call

10:28:13  14   involving Mr. Hill, that is where Mr. Hill is a

10:28:19  15   participant.  Is that what you're referring to?

10:28:21  16        MR. MINGOLLA:  Yes, sir.

10:28:21  17        THE COURT:  I don't believe that any of the

10:28:22  18   phone calls here involve -- or rather have Walter Hill

10:28:30  19   as a participant.

10:28:32  20        If I'm not mistaken, I think that the voices --

10:28:36  21        MR. MINGOLLA:  No.  You're right, sir.

10:28:38  22        THE COURT:  -- that Mr. Tapia testified as

10:28:42  23   being on these phone calls were Tapia, Pee Wee and

10:28:45  24   Angelo.  Or those were the names.  Mr. Angelo Hill, Pee

10:28:48  25   Wee, who I believe is Mr. Negron-Beltran, and Tapia.  So

10:29:02  1    I don't believe the government seeks to move any calls

10:29:05  2    with your client's voice on it into evidence.

10:29:08  3         Is that right, Attorney Lake?

10:29:10  4             MS. LAKE:  That's correct.

10:29:10  5             THE COURT:  All right.

10:29:11  6             MR. MINGOLLA:  Very well, Judge.  But if they

10:29:13  7    attempt to --

10:29:13  8             THE COURT:  Well, we don't need to cross

10:29:15  9    bridges that, you know, that aren't even in our presence

10:29:19  10   yet.

10:29:20  11            MR. MINGOLLA:  Very well.

10:29:20  12            THE COURT:  The question squarely, because the

10:29:22  13   reason I'm focusing some attention on this is because I

10:29:25  14   know you had an issue about phone calls, and I wanted to

10:29:29  15   be sure we're all clear as we go forward.

10:29:30  16        Right now the government has sought to admit, and I

10:29:33  17   have admitted, Exhibits 55 through 75.  That's raw

10:29:36  18   evidence.  That's in.

10:29:36  19        Some of those phone calls are in Spanish.

10:29:40  20   Notwithstanding, the witness has given a proper

10:29:43  21   foundation.  He said what they're about, who is

10:29:45  22   participating in them, and significantly they go towards

10:29:48  23   trafficking in narcotics.

10:29:49  24        Right now, the only issue is with respect to the

10:29:55  25   transcripts and the translation of that transcript,

| | | |
|---|---|---|
| 10:30:01 | 1 | where the transcribed utterance was in Spanish.  The |
| 10:30:06 | 2 | government has provided it to you.  They've provided the |
| 10:30:11 | 3 | transcript of the raw Spanish and a translation of the |
| 10:30:14 | 4 | raw Spanish into English.  That's been provided. |
| 10:30:17 | 5 | The only question right now, since you said you |
| 10:30:19 | 6 | have an objection, which I think you uttered at sidebar, |
| 10:30:24 | 7 | I just want to know the basis for it, or do you still |
| 10:30:26 | 8 | have the objection now that some of these other things |
| 10:30:29 | 9 | have been discussed as to calls involving your client? |
| 10:30:42 | 10 | MR. MINGOLLA:  I'll withdraw my objection. |
| 10:30:43 | 11 | THE COURT:  All right. |
| 10:30:44 | 12 | So I just want to be clear.  So there's no |
| 10:30:46 | 13 | objection to the 59, 61, 66, 67, 74 and 75 portions, the |
| 10:30:56 | 14 | b portions. |
| 10:30:56 | 15 | MR. MINGOLLA:  I'll withdraw on that. |
| 10:30:57 | 16 | THE COURT:  All right.  Those are in without |
| 10:30:59 | 17 | objection, then.  Ten minutes, Counsel. |
| 10:31:02 | 18 | Wait.  Before we break, is there anything we need |
| 10:31:04 | 19 | to cover before we take our break? |
| 10:31:06 | 20 | MS. LAKE:  No, Your Honor. |
| 10:31:07 | 21 | THE COURT:  Attorney -- |
| 10:31:08 | 22 | MR. MINGOLLA:  No, sir. |
| 10:31:10 | 23 | THE COURT:  Attorney Watlington? |
| 10:31:12 | 24 | MR. WATLINGTON:  Nothing that I know of, Your |
| 10:31:19 | 25 | Honor. |

| | | |
|---|---|---|
| 10:31:20 | 1 | THE COURT:  Then those six will be admitted. |
| 10:31:23 | 2 | Thank you, Counsel. |
| 10:31:24 | 3 | (Court in recess, 10:31 a.m.) |
| 10:43:56 | 4 | (After recess, 10:43 a.m., jury present, defense |
| 10:43:59 | 5 | counsel not present.) |
| 10:44:03 | 6 | (Witness resumed stand.) |
| 10:44:03 | 7 | (Pause.) |
| 10:45:27 | 8 | (Attorney Watlington not present.) |
| 10:46:20 | 9 | THE COURT:  Government ready to proceed? |
| 10:46:22 | 10 | MS. LAKE:  Yes, Your Honor. |
| 10:46:23 | 11 | THE COURT:  Go right ahead. |
| 10:46:24 | 12 | MS. LAKE:  I would ask to play Government's 59a |
| 10:46:31 | 13 | and b. |
| 10:46:32 | 14 | THE COURT:  You wanted to move in specific |
| 10:46:33 | 15 | items first? |
| 10:46:34 | 16 | MS. LAKE:  Yes.  I would ask that 55 through 75 |
| 10:46:39 | 17 | be admitted into evidence. |
| 10:46:40 | 18 | THE COURT:  55 through 75, or did you want some |
| 10:46:42 | 19 | b components? |
| 10:46:43 | 20 | MS. LAKE:  Yes.  Government's 59b, 61b, as in |
| 10:46:47 | 21 | boy, 66b, 67b, 74b and 75b. |
| 10:46:57 | 22 | THE COURT:  All right.  Those, without |
| 10:47:01 | 23 | objection -- Attorney Mingolla, any objection? |
| 10:47:04 | 24 | MR. MINGOLLA:  No objection. |
| 10:47:04 | 25 | THE COURT:  Attorney Watlington? |

10:47:07  1           MR. WATLINGTON:  No objection.

10:47:07  2           THE COURT:  Attorney Watlington.

10:47:08  3           MR. WATLINGTON:  None, Your Honor.

10:47:09  4           THE COURT:  59b, 61b, 66b, 67b, 74b, and 75b

10:47:16  5   are admitted.

10:47:16  6       (Government's Exhibits 59b, 61b, 66b, 67b, 74b, 75b

10:47:16  7   admitted into evidence.)

10:47:18  8           THE COURT:  Go ahead.

10:47:19  9           MS. LAKE:  I would ask to play Government's

10:47:22 10   Exhibit 59a and b.

10:47:23 11       (Exhibit published)

10:48:56 12   BY MS. LAKE:

10:48:56 13   Q.   Mr. Tapia, who is speaking?

10:48:58 14   A.   Me and Pee Wee.

10:48:59 15   Q.   What are you two discussing?

10:49:01 16   A.   What time the courier would be at the rendezvous

10:49:06 17   point.

10:49:07 18   Q.   For what purpose?

10:49:07 19   A.   For him to give me some money.

10:49:10 20   Q.   Money for what?

10:49:13 21   A.   To purchase the seven keys.

10:49:15 22   Q.   Keys of what?

10:49:16 23   A.   Keys of cocaine.

10:49:18 24   Q.   And I would like to play Exhibit 61a and b.

10:49:32 25       (Exhibit published.)

10:50:40   1      Q.    Who is speaking, Mr. Tapia?

10:50:41   2      A.    Pee Wee and I.

10:50:42   3      Q.    And what are you two discussing?

10:50:44   4      A.    The time I'm going to meet the courier.

10:50:47   5      Q.    And what -- what else do you discuss?

10:50:53   6      A.    We discuss what time we was going to be there and

10:50:57   7      if I -- it would have been a clear exchange.

10:51:00   8      Q.    What does that mean?

10:51:02   9      A.    Meaning I would have to bring the drugs at the same

10:51:07  10      time I'm receiving the money.

10:51:08  11      Q.    And what, if anything, did you two agree on?

10:51:11  12      A.    We agreed it couldn't be done.  If they couldn't

10:51:14  13      wait three hours.  They had to come back the next day.

10:51:16  14      Q.    And did you discuss anything else?

10:51:21  15      A.    We discussed if any more was coming, and if they

10:51:24  16      could have arranged on the price.

10:51:27  17      Q.    When you say any more, what are you talking about?

10:51:29  18      A.    If they were going to be -- excuse me -- if there

10:51:35  19      were going to be any more coming, meaning if I was going

10:51:38  20      to get any without paying for it.

10:51:40  21      Q.    Any what?

10:51:41  22      A.    Any cocaine, any other kilos, without paying for

10:51:41  23      it.

10:51:44  24      Q.    And was there some sort of agreement?

10:51:46  25      A.    No, there weren't.  I was just trying to make an

10:51:49  1    agreement, try to get something going.

10:51:53  2    Q.   So then what, if anything, happened after this?

10:51:58  3    A.   After I make contact with the, with the courier and

10:52:04  4    we met at Sail Rock.

10:52:09  5    Q.   And what, if anything, happened next?

10:52:11  6    A.   We met at Sail Rock.  The courier gave me a bag and

10:52:15  7    he went east and I went west.

10:52:19  8         MS. LAKE:  I would like to play Exhibit 66a and

10:52:24  9    b.

10:52:24  10        (Exhibit published.)

10:53:17  11   BY MS. LAKE:

10:53:18  12   Q.   Mr. Tapia, who is speaking?

10:53:19  13   A.   Pee Wee and myself.

10:53:20  14   Q.   And what are you two discussing?

10:53:22  15   A.   Discussing what time, I've already received the

10:53:27  16   transfer from the courier, and I told him that we would

10:53:30  17   meet the next day at 10:30.

10:53:33  18   Q.   And meet the next day to do what?

10:53:35  19   A.   To give him the seven kilograms of cocaine.

10:53:38  20   Q.   And now I would like to play Government Exhibit 68a

10:53:44  21   only.

10:53:46  22        (Exhibit published.)

10:54:40  23   Q.   Mr. Tapia, who is speaking?

10:54:42  24   A.   Angelo Hill and myself.

10:54:43  25   Q.   And what are you two discussing?

10:54:46  1    A.   Discussing if he had the seven kilograms of cocaine

10:54:49  2    available.

10:54:50  3    Q.   And did you use another word for kilograms?

10:54:53  4    A.   Yes.  I asked him if he had the seven girls

10:54:56  5    already.

10:54:56  6    Q.   What did you mean by "seven girls"?

10:54:58  7    A.   The seven kilograms of cocaine.

10:55:00  8    Q.   What, if anything, did you two discuss?

10:55:05  9    A.   What time I was going to be arriving.  And I told

10:55:08  10   him I was going to try to catch the barge, but I missed

10:55:11  11   the barge.

10:55:11  12   Q.   So what, if anything, happened next?

10:55:19  13   A.   I missed the 6:00 o'clock or the 5:30 barge -- one

10:55:24  14   of those barges that leave at that time, because I had

10:55:27  15   to be doing some work -- I had to finish some work at

10:55:30  16   the office.  So I called him and told him I would be

10:55:32  17   coming on the 6:00 o'clock ferry.

10:55:36  18        I did not get through with what I was doing at the

10:55:38  19   office to catch the 6:00 o'clock ferry.  So I end up

10:55:43  20   calling him again and telling him I would be on the 7:00

10:55:46  21   o'clock ferry.

10:55:47  22        MS. LAKE:  I would like to play Government's

10:55:54  23   Exhibit 70a only.

10:55:56  24        (Exhibit published.)

10:56:53  25   BY MS. LAKE:

10:56:53   1    Q.   Mr. Tapia, who is speaking?

10:56:54   2    A.   Angelo Hill and myself.

10:56:55   3    Q.   And what are you two discussing?

10:56:58   4    A.   Discussing what time I was going to arrive, and if

10:57:03   5    the -- to let him know that I'll be there and the

10:57:08   6    kilograms would be available.

10:57:11   7    Q.   I would like to play Exhibit 72a only.

10:58:35   8         (Exhibit published.)

10:58:37   9    Q.   Mr. Tapia, who is speaking?

10:58:38   10   A.   Angelo Hill and myself.

10:58:39   11   Q.   What are you two discussing?

10:58:41   12   A.   What time I was going to be arriving on St. John

10:58:45   13   and the price that I was going to get, if I could get a

10:58:49   14   better price.

10:58:49   15   Q.   And what specifically did you discuss regarding

10:58:52   16   price?

10:58:52   17   A.   I needed the price to see if he would drop the

10:58:55   18   price $500.

10:58:58   19   Q.   And did you say on the call what the price you were

10:59:01   20   looking for was?

10:59:05   21   A.   I think I said 14, 5.

10:59:11   22   Q.   And what, if anything, did Angelo say in response

10:59:14   23   to that?

10:59:15   24   A.   He said he don't think that the seller would go for

10:59:18   25   any negotiation.

10:59:18    1      Q.   And what, if anything, did you say in response?

10:59:21    2      A.   I told him that I had what he was asking for, but I

10:59:24    3    still had to talk to him when I got there.

10:59:27    4      Q.   And what is -- what was he asking for?

10:59:31    5      A.   He was asking 15, 5 -- 14, 5.

10:59:39    6      Q.   And when you say "he," who are you talking about,

10:59:43    7    that you have what he wants?

10:59:44    8      A.   At the time it was Walter Hill.

10:59:52    9      Q.   So what, if anything, happened next?

10:59:55   10      A.   I caught the 7:00 ferry, and I got to Cruz Bay.  I

11:00:04   11    walked up to the corner.  I met Angelo -- actually, I

11:00:08   12    called him and he told me to walk up to the corner.

11:00:11   13      Q.   Let me stop you here.

11:00:13   14           MS. LAKE:  Let's play Government's Exhibit 73a

11:00:17   15    only.

11:00:17   16      (Exhibit published.)

11:00:49   17    BY MS. LAKE:

11:00:49   18      Q.   Who is speaking?

11:00:49   19      A.   Angelo and myself.

11:00:51   20      Q.   What are you two discussing?

11:00:53   21      A.   Where I was going to meet him to pick me up,

11:00:56   22    because he wasn't there when I got off the ferry.

11:00:58   23      Q.   So what happened next?

11:01:00   24      A.   I walked up to the bank.  I got into the car that

11:01:03   25    he was there, an SUV.  We drove --

11:01:07  1    Q.   Who is "he"?

11:01:07  2    A.   Angelo.

11:01:08  3    Q.   Okay.

11:01:09  4    A.   We drove over to the area of the fire station, just

11:01:14  5    below the fire station.  I got out the car.  I got into

11:01:19  6    another SUV that Walter was in.  I talked to him about

11:01:23  7    the price.  We decided that the price was going to be

11:01:29  8    what it was.

11:01:30  9         I said fine.  I got out.  I retrieved -- he told me

11:01:35  10   where there was a box in another car.  I retrieved the

11:01:39  11   box, came in the vehicle, gave him the money -- took the

11:01:44  12   money out of the bag, gave it to him, put the seven keys

11:01:48  13   in the bag.

11:01:49  14        And he took me back to inspection lane, where I got

11:01:52  15   out of the car and got into Angelo's car.

11:01:54  16   Q.   And then what happened next after you got into

11:01:58  17   Angelo's car?

11:01:58  18   A.   After I got in Angelo's car, Angelo drove me to

11:02:01  19   Cruz Bay, where I could catch the 8:00 o'clock ferry.

11:02:05  20   Q.   And did you?

11:02:06  21   A.   Yes, I did.

11:02:07  22   Q.   And then -- I'd like to play Government's

11:02:10  23   Exhibit 74a and b.

11:03:02  24        (Exhibit published.)

11:03:03  25   Q.   Who is speaking?

11:03:04  1      A.    Pee Wee and myself.

11:03:05  2      Q.    And what are you two discussing?

11:03:07  3      A.    We're discussing -- I told him -- he called me.  I

11:03:10  4      really couldn't understand him.  I let him know that I

11:03:13  5      did have the stuff and I was on my way back down, and I

11:03:16  6      would call him once I got to Red Hook.

11:03:18  7      Q.    And when you say "stuff," what are you referring

11:03:21  8      to?

11:03:21  9      A.    The seven kilograms.

11:03:22  10     Q.    And when you say "back down," what do you mean?

11:03:24  11     A.    I left St. John and I was going back to St. Thomas.

11:03:30  12           MS. LAKE:  I'd like to play Government's

11:03:33  13     Exhibit 75a and b.

11:04:58  14           (Exhibit published.)

11:04:58  15           MS. LAKE:  Can you stop it here?

11:05:00  16     BY MS. LAKE:

11:05:00  17     Q.    Who is speaking?

11:05:01  18     A.    Pee Wee and myself.

11:05:02  19     Q.    At this point, what are you two discussing?

11:05:05  20     A.    We're discussing that, what time we will meet the

11:05:09  21     courier that was going to meet me at 10:00 the next

11:05:13  22     morning.  And we were discussing that, the thing -- the

11:05:18  23     money was short.

11:05:21  24     Q.    And what, if anything, else were you discussing?

11:05:25  25     A.    What time I would, I would get back to him.

11:05:32  1          MS. LAKE:  Can we keep playing the call,

11:05:34  2    please?

11:06:19  3       (Exhibit published.)

11:06:19  4          MS. LAKE:  Can you stop here?

11:06:20  5    BY MS. LAKE:

11:06:20  6    Q.   At this point, what are you two discussing?

11:06:23  7    A.   We're discussing the -- he asked me if I check the

11:06:30  8    brand, the quality, if it was all good.

11:06:32  9          I told him they were all good.

11:06:34  10         And we also discussed the time that I was going to

11:06:39  11   meet the courier.  The courier was going to be there

11:06:42  12   before 10:00.

11:06:44  13         And the conversation got in about me coming to

11:06:47  14   Puerto Rico, if I was going to retrieve my moneys or if

11:06:50  15   I was coming to a party that was going to be held at

11:06:54  16   Puerto Rico.

11:06:54  17   Q.   When you say check the brand, what do you mean?

11:07:00  18   A.   The cocaine kilos come with a stamp on it.  It can

11:07:06  19   be anything from a spider to a dolphin to a Cadillac to

11:07:12  20   a playboy bunny.  So it's just, you know, a certain

11:07:17  21   brand, wherever it originated from, it comes stamped.

11:07:21  22   Q.   And you indicated that you said it was all good?

11:07:26  23   A.   They were all good.  Because at the time there were

11:07:29  24   some that were coming up bad.  They were, I think it was

11:07:35  25   JR-- you know, a different brand.  And he didn't want

11:07:38  1    that brand.

11:07:40  2    Q.   What, if anything, did you tell him regarding --

11:07:47  3    A.   Oh, I told him I checked every one, that I cut and

11:07:51  4    I checked every one.  Which in, actually, I just wanted

11:07:53  5    to get the conversation done with.

11:07:57  6    Q.   And what, if anything, happened next?

11:08:01  7    A.   I hanged up my phone.  The ferry was about to reach

11:08:06  8    to the dock.  The passengers got up, I got up.  I

11:08:10  9    started to exit the vessel.  I was surrounded with about

11:08:15  10   10, 12, 15 agents.  They arrested me at Red Hook dock.

11:08:21  11   Q.   And now showing you Government's Exhibit 80c -- I'm

11:08:40  12   sorry -- 80e as in Edward.

11:08:42  13        Do you see that in front of you?

11:08:43  14   A.   Yes, I do.

11:08:44  15   Q.   What's depicted in Government's Exhibit 80e, as in

11:08:47  16   Edward?

11:08:47  17   A.   That me standing with a backpack at Red Hook

11:08:52  18   terminal.

11:08:52  19   Q.   And when -- in relation to what you just testified

11:08:56  20   to, what is the relevance --

11:08:58  21   A.   This is before I made it to St. John.

11:09:00  22   Q.   And how were you clothed?

11:09:02  23   A.   I was in my uniform.

11:09:04  24   Q.   And were you armed?

11:09:06  25   A.   Yes.  My uniform requires me to be armed.

11:09:10  1   Q.   And what, if anything, are you carrying with you?

11:09:12  2   A.   I'm carrying a backpack with the money in it.

11:09:15  3   Q.   And is that the same one you got from the couriers?

11:09:18  4   A.   That's the same bag I got from the couriers.

11:09:24  5        MS. LAKE:  I would ask that Exhibit 80e be

11:09:29  6   received into evidence.

11:09:30  7        THE COURT:  Attorney Mingolla?

11:09:31  8        MR. MINGOLLA:  I'm going to object, Your Honor.

11:09:32  9        THE COURT:  Attorney Watlington?

11:09:35 10        MR. WATLINGTON:  Objection, Your Honor.

11:09:36 11        THE COURT:  Okay.  It's under advisement.

11:09:36 12        (Government's Exhibit 80f marked for

11:09:38 13   identification.)

11:09:38 14   BY MS. LAKE:

11:09:38 15   Q.   I now show you Government's Exhibit 80f.  What is

11:09:42 16   Government's Exhibit 80f?

11:09:43 17   A.   That is the backpack that I was carrying when I

11:09:49 18   came back from St. John.

11:09:51 19   Q.   And when you say "the backpack," what, if anything,

11:09:54 20   did you do with this backpack?

11:09:56 21   A.   That's the backpack I put the seven kilos in, the

11:10:00 22   seven kilos of cocaine I put in that bag.

11:10:03 23   Q.   That you got from whom?

11:10:05 24   A.   That I got from Walter.

11:10:07 25   Q.   And initially when you went to St. John, what, if

11:10:11  1    anything, was inside of this backpack?

11:10:13  2    A.   That's the backpack --

11:10:16  3              MR. MINGOLLA:  Objection.  Asked and answered.

11:10:20  4              THE COURT:  Okay.  Sustained.

11:10:21  5    BY MS. LAKE:

11:10:21  6    Q.   The backpack as depicted in Government's

11:10:25  7    Exhibit 80f, as in Frank, what, if anything, was inside

11:10:29  8    of this bag that's depicted in Government's Exhibit 80f

11:10:33  9    when you traveled to St. John?

11:10:34  10             MR. MINGOLLA:  Again object.  Asked and

11:10:36  11   answered.

11:10:36  12             THE COURT:  Overruled.

11:10:37  13             THE WITNESS:  That's the same backpack I got

11:10:39  14   from the couriers.  It contained the money for the seven

11:10:43  15   kilograms of cocaine that I transferred moneys out of

11:10:48  16   that bag and put the cocaine in, back in.

11:10:53  17   BY MS. LAKE:

11:10:54  18   Q.   Where did this happen?

11:10:55  19   A.   In the vehicle that Walter Hill was driving.

11:10:55  20        (Government's Exhibit 80g marked for

11:10:55  21   identification.)

11:10:58  22   BY MS. LAKE:

11:10:58  23   Q.   And I would ask -- and again, I would like to show

11:11:02  24   you Government's Exhibit 80g.  And what is depicted in

11:11:06  25   Government's 80g?

| | | |
|---|---|---|
| 11:11:09 | 1 | A.   It depicts the contents of the bag and -- |
| 11:11:16 | 2 | Q.   What bag is this? |
| 11:11:17 | 3 | A.   This is the same backpack that I had. |
| 11:11:20 | 4 | Q.   Excuse me.  That you had -- |
| 11:11:22 | 5 | A.   That I had when I came from St. John. |
| 11:11:23 | 6 | Q.   And is it the same backpack that's depicted in |
| 11:11:26 | 7 | Government's Exhibit 80- -- |
| 11:11:27 | 8 | A.   Yes, it is. |
| 11:11:28 | 9 | Q.   -- -f, as in Frank? |
| 11:11:29 | 10 | A.   Yes, it is. |
| 11:11:30 | 11 | Q.   Is it the same backpack depicted in Government's -- |
| 11:11:34 | 12 | MR. MINGOLLA:  Objection.  Leading. |
| 11:11:35 | 13 | THE COURT:  Sustained. |
| 11:11:36 | 14 | BY MS. LAKE: |
| 11:11:36 | 15 | Q.   And what's the relationship between the backpack |
| 11:11:39 | 16 | depicted in Government's Exhibit 80e, f and g? |
| 11:11:42 | 17 | A.   The backpack, the exhibit is -- |
| 11:11:45 | 18 | MR. MINGOLLA:  Objection, leading. |
| 11:11:47 | 19 | THE COURT:  Overruled. |
| 11:11:48 | 20 | THE WITNESS:  The backpack, the Exhibit 80f and |
| 11:11:53 | 21 | g depicts the bag that I had when it was taken from me, |
| 11:11:57 | 22 | and it shows the contents of the bag, which I don't know |
| 11:12:00 | 23 | if you could see it clearly.  It has the seven kilograms |
| 11:12:04 | 24 | of cocaine in there. |
| 11:12:05 | 25 | BY MS. LAKE: |

| | | |
|---|---|---|
| 11:12:05 | 1 | Q.   And now showing you again Government's Exhibit 80e, |
| 11:12:08 | 2 | as in Edward.  What is the relationship between the bag |
| 11:12:14 | 3 | that's depicted in Government's Exhibit 80e, as in |
| 11:12:18 | 4 | Edward, compared to the photograph that you just viewed, |
| 11:12:22 | 5 | Government's Exhibit 80f, as in Frank? |
| 11:12:24 | 6 | MR. MINGOLLA:  Objection, Your Honor. |
| 11:12:25 | 7 | THE COURT:  Overruled. |
| 11:12:28 | 8 | THE WITNESS:  This backpack is the same |
| 11:12:30 | 9 | backpack.  This is a backpack with the money in it. |
| 11:12:33 | 10 | It's not as bulky and it's not as heavy as the backpack |
| 11:12:37 | 11 | when I was returning it. |
| 11:12:39 | 12 | BY MS. LAKE: |
| 11:12:39 | 13 | Q.   And again, what's the relationship between the |
| 11:12:41 | 14 | backpack depicted in Government's Exhibit 80e, and the |
| 11:12:44 | 15 | photograph you viewed in Government's Exhibit 80g? |
| 11:12:49 | 16 | A.   It's both backpacks are the same.  One depicts the |
| 11:12:53 | 17 | money going to St. John, and the other one depicts me |
| 11:12:56 | 18 | coming back with the cocaine in the same bag. |
| 11:13:00 | 19 | MS. LAKE:  And again, Your Honor, I would ask |
| 11:13:02 | 20 | that Government's Exhibit 80e, f and g be received into |
| 11:13:05 | 21 | evidence. |
| 11:13:07 | 22 | MR. MINGOLLA:  I'm going to object, Judge. |
| 11:13:08 | 23 | THE COURT:  Okay.  It's under advisement. |
| 11:13:17 | 24 | BY MS. LAKE: |
| 11:13:17 | 25 | Q.   And what, if anything, happened after you were |

11:13:19   1    arrested?

11:13:20   2    A.    The backpack was taken from me, my cell phone, the

11:13:27   3    keys for the vehicle, government vehicle I was driving.

11:13:34   4    I was arrested on the way to --

11:13:42   5    Q.    Well, let me stop you here.

11:13:43   6          Of the photographs that you viewed in Government's

11:13:46   7    Exhibits 80e, f and g, are they an accurate depiction of

11:13:50   8    the circumstances when you traveled to St. John?  Is it

11:13:55   9    an accurate reflection of what you experienced when you

11:13:58   10   traveled to St. John with that backpack?

11:14:00   11   A.    Yes, it is.

11:14:01   12         THE COURT:  What was it -- was that question?

11:14:05   13         MS. LAKE:  The true and accurate reflection --

11:14:06   14         THE COURT:  No, what -- were you asking a

11:14:08   15   general question about several exhibits or were you

11:14:11   16   asking about a specific one?

11:14:14   17         MS. LAKE:  A specific one going --

11:14:19   18         THE COURT:  So a general one going to three

11:14:22   19   specific exhibits.

11:14:23   20   BY MS. LAKE:

11:14:23   21   Q.    I ask you about 80e.  Is that photograph a true and

11:14:26   22   accurate reflection of your observations and experiences

11:14:28   23   when you were at St. John, the ferry terminal?

11:14:31   24   A.    Yes, it is.

11:14:31   25   Q.    And referring you specifically to Government's

11:14:33  1    Exhibit 80f, as in Frank, is that a true and accurate

11:14:36  2    depiction of what you observed when you were in

11:14:40  3    possession of that backpack?

11:14:41  4    A.   Yes, it is.

11:14:42  5    Q.   And now showing you, which you reviewed in

11:14:46  6    Government's Exhibit 80g, is that a true and accurate

11:14:48  7    reflection of the state of the backpack when you were

11:14:51  8    returning from St. John?

11:14:52  9    A.   Yes, it is.

11:14:53  10              MS. LAKE:  Again, Your Honor, I ask that

11:14:56  11   Government's 80e, f and g be received into evidence.

11:14:59  12              MR. MINGOLLA:  Your Honor --

11:14:59  13              THE COURT:  Let me see counsel at sidebar.

11:15:14  14        (Sidebar discussion held as follows:)

11:15:14  15              THE COURT:  All right.  It's important that the

11:15:19  16   witness give the testimony about what the thing is.  My

11:15:23  17   notes reflect that the witness was saying -- was saying

11:15:37  18   that, for instance, what was being observed was the

11:15:41  19   backpack.  The photo didn't come in until you recently

11:15:46  20   used the word "photo."

11:15:48  21        Ordinarily it's the witness who says it's a

11:15:51  22   photograph.  And then ordinarily the specific item, the

11:15:58  23   query is usually, is it a fair and accurate depiction of

11:16:02  24   whatever it is that it purports to be, to authenticate

11:16:06  25   it.  So those are just some procedural things I think

11:16:13  1   you want to be careful with.

11:16:15  2         This witness didn't say it was a photo.  I guess

11:16:17  3   you incorporated it in your question, but he didn't say

11:16:20  4   it, significantly.

11:16:21  5         The other thing significant is you said, "I'm

11:16:24  6   showing you," "I'm showing you," "I'm showing you."

11:16:26  7         I have my monitor on.  Those items that you say you

11:16:29  8   were showing him, did any defense counsel see them?

11:16:33  9               MR. WATLINGTON:  No, not on mine.

11:16:34  10              THE COURT:  It didn't show on mine, either.

11:16:37  11              MR. WATLINGTON:  I'm sorry, 80e, f and --

11:16:41  12              THE COURT:  G.

11:16:41  13              MR. WATLINGTON:  G did come up on my monitor.

11:16:44  14              THE COURT:  For the most recent set of

11:16:47  15   questions, they did not, when you were going through and

11:16:49  16   saying "photograph," they were not.  When at the very

11:16:53  17   beginning when you went through, they were.  But when

11:16:55  18   you say 80, it's a photograph, and however you posed the

11:16:58  19   question, it wasn't on the monitor.  When you went to f,

11:17:00  20   it wasn't on the monitor.

11:17:02  21         So he was answering questions about things that

11:17:04  22   were supposedly before him, but they weren't before him.

11:17:08  23         So, you know, I think you might need to revisit

11:17:14  24   that.

11:17:15  25              MR. MINGOLLA:  There was no foundation, I don't

```
11:17:17   1    believe, Judge.

11:17:18   2              THE COURT:  That's a decision for the Court to

11:17:20   3    make.  But it just seems to me that I think you want to

11:17:24   4    be careful in asking questions, and be sure that the

11:17:28   5    witness is making the utterance on what the thing is and

11:17:30   6    not the questioner.  That is, if it's a photograph, he's

11:17:36   7    got to say it, not you.  Otherwise, you're telling him

11:17:39   8    it's a photograph.

11:17:39   9         All right.  Let's see if you can, you might want to

11:17:42   10   revisit those.

11:17:43   11        Yes, Attorney Mingolla.  You had something to say?

11:17:47   12              MR. MINGOLLA:  Only that --

11:17:48   13              THE COURT:  It's under advisement.

11:17:50   14              MR. MINGOLLA:  Okay.

11:17:51   15              THE COURT:  You object.  It's under advisement,

11:17:54   16   80e, f and g.

11:17:55   17        Is there something else you wanted to add?

11:17:57   18              MR. MINGOLLA:  No, sir.

11:17:58   19              THE COURT:  Okay.  All right.

11:17:59   20        (End of sidebar, open court as follows:)

11:18:11   21              THE COURT:  Attorney Lake, if you'll look and

11:18:13   22   you'll see what -- if you move your book, you look at

11:18:16   23   the monitor there, you'll see what's depicted.

11:18:20   24   BY MS. LAKE:

11:18:20   25   Q.   Mr. Tapia, I would like to show you Government's
```

11:18:22  1    Exhibit 80e.

11:18:28  2         What is this?

11:18:29  3    A.   That is a picture of me from the back, with the

11:18:33  4    backpack, in my uniform, standing at the Red Hook

11:18:37  5    terminal.

11:18:37  6    Q.   And showing you Government's Exhibit 80f.  What is

11:18:41  7    this?

11:18:42  8    A.   This is the backpack that they took from me when I

11:18:46  9    came back from St. John, that they took from me at Red

11:18:46  10   Hook.

11:18:50  11   Q.   What are you actually looking at, though, on

11:18:52  12   Government's Exhibit 80f?

11:18:54  13   A.   I'm looking at the backpack.

11:18:55  14   Q.   What are you actually looking at, though?

11:18:58  15   A.   I'm actually looking at the seven kilograms of

11:19:01  16   cocaine.

11:19:02  17   Q.   No, I mean what is the thing that's popped in front

11:19:06  18   of you?

11:19:06  19   A.   I'm just seeing a picture of the backpack sitting

11:19:09  20   on the table.

11:19:09  21   Q.   And now showing you Government's Exhibit 80 g.

11:19:14  22        What are you looking at, what are you seeing here?

11:19:16  23   A.   I'm looking at the backpack opened up displaying

11:19:19  24   the seven kilograms of cocaine inside.

11:19:22  25   Q.   What is the actual thing that just popped up in

11:19:24   1    front of you that you're looking at?

11:19:26   2              MR. MINGOLLA:  Objection, Your Honor.

11:19:26   3              THE COURT:  Overruled.

11:19:29   4              THE WITNESS:  What popped up in front of me is

11:19:31   5    a picture of the backpack that I had when I came from

11:19:36   6    St. John, that was taken from me at Red Hook, with it

11:19:39   7    unzippered, exposing the seven kilograms of cocaine.

11:19:44   8              MS. LAKE:  I would ask that Government's

11:19:46   9    Exhibit 80e, f and g be received into evidence.

11:19:48   10             THE COURT:  Attorney Mingolla.

11:19:50   11             MR. MINGOLLA:  I renew my objection, Your

11:19:52   12   Honor.

11:19:52   13             THE COURT:  Attorney Watlington?

11:19:54   14             MR. WATLINGTON:  Your Honor, I only object in

11:19:56   15   terms of the accuracy of what is shown in the photograph

11:19:58   16   as opposed to what the defendant -- what the witness is

11:20:01   17   actually saying.  So I would --

11:20:03   18             THE COURT:  All right.  80e is under

11:20:05   19   advisement.  80f and 80g are admitted.

11:20:05   20        (Government's Exhibits 80f, 80g admitted into

11:20:10   21   evidence.)

11:20:10   22   BY MS. LAKE:

11:20:10   23   Q.   Showing you again Government's Exhibit 80e.  What

11:20:14   24   are you actually looking at?  What's the thing that

11:20:16   25   you're looking at?

11:20:17  1    A.    I'm looking at me -- this is a picture of me

11:20:22  2    standing in line, from the rear, with me having this

11:20:28  3    backpack with the money slipped over my left shoulder.

11:20:32  4    Q.    And at what point is -- is this photograph taken of

11:20:36  5    you?

11:20:38  6    A.    This had to be taken --

11:20:41  7              MR. MINGOLLA:  Objection, Your Honor.  Calls

11:20:42  8    for speculation.

11:20:44  9              THE COURT:  Okay.  Sustained.

11:20:49  10   BY MS. LAKE:

11:20:49  11   Q.    What are you actually doing in the photograph as

11:20:51  12   depicted in Government's Exhibit 80e?

11:20:53  13   A.    If I'm not mistaken, at that time I was calling

11:20:56  14   Angelo to let him know the ferry was late.

11:20:58  15   Q.    And what, if anything --

11:21:01  16             MS. LAKE:  Actually, Your Honor, I would ask

11:21:03  17   that Government's Exhibit 80e be received into evidence

11:21:05  18   at this time.

11:21:06  19             THE COURT:  All right.

11:21:07  20             MR. MINGOLLA:  I object, Your Honor.

11:21:08  21             THE COURT:  All right.  It's under advisement.

11:21:12  22             MS. LAKE:  I would ask to publish Government's

11:21:14  23   Exhibit 80f.

11:21:15  24             THE COURT:  All right.

11:21:18  25             MR. MINGOLLA:  Yes, I renew my objection, Your

11:21:21   1    Honor.

11:21:21   2            THE COURT:  Okay.  It's in evidence.

11:21:23   3    BY MS. LAKE:

11:21:23   4    Q.   What are we looking at here?

11:21:24   5    A.   We're looking at the backpack that I had when I

11:21:27   6    returned from St. John.

11:21:30   7    Q.   And now showing Government's Exhibit 80g?

11:21:36   8    A.   That is the backpack opened up, exposing the

11:21:40   9    contents the backpack, which contained seven

11:21:44   10   kilograms of cocaine.

11:21:45   11   Q.   And who did you -- who, if anyone, did you get the

11:21:49   12   seven kilograms from?

11:21:49   13   A.   I gave the money from -- I gave the money to Walter

11:21:57   14   Hill, and I retrieved the seven kilograms from a vehicle

11:22:02   15   that was parked right next to his.

11:22:03   16   Q.   And why did you get the kilograms that was parked

11:22:06   17   in the vehicle next to his?

11:22:08   18           MR. MINGOLLA:  Objection, Your Honor.

11:22:12   19           THE COURT:  Okay.  Overruled.

11:22:17   20           THE WITNESS:  Walter told me that the package

11:22:19   21   that I needed was in the vehicle.

11:22:21   22       I went, I retrieved the package, I brought it to

11:22:23   23   the vehicle that we were in, and I took the money out of

11:22:27   24   that same bag, gave it to Walter, put the cocaine in

11:22:32   25   that bag.  We had to fight a little bit because it's a

11:22:43  1    small bag, and zipped it up.  And he took me back to

11:22:46  2    Angelo Hill.

11:22:47  3    BY MS. LAKE:

11:22:47  4    Q.   And what was in that package?

11:22:49  5    A.   The package that I got out of the car?

11:22:51  6    Q.   Yes.

11:22:52  7    A.   The seven kilograms.

11:22:53  8            MR. MINGOLLA:  Your Honor, I object.  What

11:22:54  9    package are we referencing?

11:22:57  10           THE COURT:  All right.  Sustained.

11:22:58  11   BY MS. LAKE:

11:22:58  12   Q.   You indicated that Walter Hill told you something

11:23:02  13   regarding a package, is that correct?

11:23:03  14   A.   That's correct.  He told me -- I indicated to him

11:23:06  15   that I was ready.  He said the package was in the car.

11:23:10  16           THE COURT:  Okay.  Let's move on.  We've been

11:23:11  17   over this.  Let's move on.

11:23:11  18   BY MS. LAKE:

11:23:13  19   Q.   I just want to ask you, what was in the package?

11:23:15  20   A.   The seven kilograms --

11:23:18  21   Q.   Thank you --

11:23:18  22   A.   -- of cocaine.

11:23:19  23           MS. LAKE:  Thank you.  I have nothing further.

11:23:20  24           THE COURT:  Attorney Mingolla.

11:23:58  25                    CROSS-EXAMINATION

11:23:59  1   BY MR. MINGOLLA:

11:23:59  2   Q.   Good afternoon, Mr. Tapia.

11:24:00  3   A.   Good afternoon.

11:24:01  4   Q.   Mr. Tapia, I would like to go over -- to start by

11:24:09  5   going over some testimony that you gave yesterday.

11:24:23  6        You -- it's true that you were working for DPNR in

11:24:28  7   1996, correct?

11:24:31  8   A.   In 1996, I transferred from DPNR to VIPD.

11:24:43  9   Q.   Okay.  And in 1996, were you or your wife in charge

11:24:51  10  of the Carnival boat activities?

11:24:58  11  A.   In 1996, yes, I was the chairperson for the

11:25:05  12  Carnival committee for the water sports activities.

11:25:07  13  Q.   Okay.  And isn't it true that you gave testimony to

11:25:09  14  the government that you were involved with smuggling

11:25:15  15  cocaine with a Puerto Rican gentleman who was bringing

11:25:21  16  racing boats over to St. Thomas for Carnival?

11:25:24  17  A.   No, I -- I told them that I knew of that, when that

11:25:30  18  happened -- I was aware of that happening once.  Yes, I

11:25:33  19  did say that.

11:25:38  20  Q.   And you were a law enforcement officer at that time

11:25:41  21  and you did nothing about it?

11:25:42  22  A.   I -- yes, that is correct.  I was not sure, but

11:25:45  23  I -- afterwards I realized my suspicion was true.

11:25:49  24  Q.   And you still did nothing about it?

11:25:50  25  A.   That's correct.

11:25:56  1    Q.    And then, going back before that, you were in the

11:26:09  2    Blue Lightning Task Force, correct?

11:26:14  3    A.    From '89 to '96 I was with DPNR.  In '96 I

11:26:21  4    transferred over to the VIPD.

11:26:24  5    Q.    When was Blue Lightning?

11:26:25  6    A.    '96.

11:26:27  7    Q.    Okay.  And isn't it true that Blue Lightning was

11:26:32  8    dissolved because of corruption in the Blue Lightning

11:26:35  9    team?

11:26:36  10           THE COURT:  Let's move on.

11:26:50  11   BY MR. MINGOLLA:

11:26:50  12   Q.    Now, you mentioned -- you were queried, you were

11:27:01  13   asked by the government yesterday if you were promised

11:27:03  14   anything for your cooperation in this matter, correct?

11:27:08  15   A.    That's correct.

11:27:11  16   Q.    And you responded that you weren't promised

11:27:14  17   anything; is that correct?

11:27:15  18   A.    That is correct.

11:27:15  19   Q.    Isn't it true that you had a series of debriefings

11:27:32  20   with various agents from different agencies?  Correct?

11:27:35  21   A.    Yes, sir.

11:27:36  22   Q.    Debriefings being interrogations, if you will?

11:27:52  23   A.    Yes.

11:27:52  24   Q.    And at that time or during those interviews, you

11:27:56  25   mentioned, did you not, that you had had dealings with a

11:28:01   1    cocaine --

11:28:03   2             MS. LAKE:  Objection.  Relevance.  Improper

11:28:06   3    form of the question.

11:28:06   4             THE COURT:  Okay.  Overruled.

11:28:08   5    BY MR. MINGOLLA:

11:28:08   6    Q.   Did you not indicate to them that you had dealings

11:28:10   7    with a cocaine trafficker from Culebra?

11:28:25   8    A.   No.  There is a gentleman that is from Culebra that

11:28:31   9    we talked about.  He is a courier.

11:28:36  10    Q.   A courier --

11:28:37  11    A.   Yes, yes.

11:28:39  12    Q.   Yes, what, courier of what?

11:28:42  13    A.   Courier of products, cocaine.

11:28:45  14    Q.   What kind of products?

11:28:46  15    A.   Cocaine.  Whatever was available at the time.

11:28:56  16    Q.   Now, you indicated that you also had dealings -- in

11:29:00  17    your testimony yesterday that you had dealings with a --

11:29:09  18    strike that.

11:29:14  19         You had dealings with a gentleman by the name of

11:29:18  20    Franco, did you not?

11:29:20  21             MS. LAKE:  Objection.  Relevance.

11:29:21  22             THE COURT:  Franco?

11:29:26  23             MR. MINGOLLA:  Franco.

11:29:26  24             THE COURT:  Come to sidebar, please.

11:29:28  25             Stop.

| 11:29:36 | 1 | (Sidebar discussion held as follows:) |

11:29:36  1    (Sidebar discussion held as follows:)

11:29:36  2        THE COURT:  Attorney Mingolla, tell me where

11:29:38  3    we're going with this.

11:29:40  4        MR. MINGOLLA:  I'm trying to show that this man

11:29:42  5    is a bald-faced liar.  That he's indicated that he has

11:29:47  6    all, like a, if you will, peripheral involvement with

11:29:52  7    narcotics, and only since 2001.  But in reality, his

11:29:55  8    involvement with narcotics goes back to the '90s, if not

11:29:59  9    before then.

11:30:02  10    And so I'm pointing out that his testimony is

11:30:08  11    basically:  Well, I really didn't get involved until

11:30:13  12    yesterday, or:  I really didn't get involved in

11:30:16  13    narcotics until 2001, 2002.

11:30:18  14        It's not true.

11:30:18  15        THE COURT:  Let me ask you, you mentioned a

11:30:21  16    specific name.  I don't want this to run afoul of 403.

11:30:25  17    I don't want this to be a trial of another issue or

11:30:28  18    bring in issues that will confuse the jury.

11:30:31  19        It is perfectly fine to impeach the witness on a

11:30:33  20    theory that he might be singing for his supper, or if

11:30:37  21    you believe he is not being credible, you can certainly

11:30:39  22    bring up things to show that he is untruthful.

11:30:41  23        But I want you to bear in mind, though, that you

11:30:45  24    need to be careful not to create subtrials, mini-issues,

11:30:50  25    confusing things that might take the jurors' focus away

11:30:55  1    from what they need to focus on, which is whether or not

11:30:58  2    the defendant has done the things that the government

11:31:00  3    has accused him of, and whether the government has met

11:31:04  4    its burden.

11:31:04  5        So I want you to be careful of that.  That's why I

11:31:07  6    asked where you were heading with this because -- when I

11:31:09  7    heard the name -- I don't want this to become a

11:31:13  8    mini-trial of that other, or create an issue of that

11:31:17  9    other person.  If you have evidence on direct that you

11:31:21  10   have something -- there's some contradiction to what he

11:31:24  11   said, that's fair game.

11:31:25  12       If you want to show that he is singing for his

11:31:28  13   supper, that's fair game.

11:31:29  14       As you do that, just be cautious of what I said.

11:31:33  15           MR. WATLINGTON:  Your Honor, I have a question,

11:31:34  16   a comment along the same lines.

11:31:36  17       I do have a couple questions regarding another

11:31:41  18   convicted drug trafficker who I know he has had contact

11:31:47  19   with as a point of contact, that he has not mentioned in

11:31:50  20   any of this testimony here.

11:31:51  21       He's mentioned only certain ones in this particular

11:31:55  22   case.  But there --

11:31:56  23           THE COURT:  Like I said, if you believe he

11:31:57  24   uttered something on direct that you want to impeach

11:32:00  25   him, that's fair game.

| | | |
|---|---|---|
| 11:32:02 | 1 | MR. WATLINGTON:  Or left something out.  Or |
| 11:32:05 | 2 | left someone out. |
| 11:32:06 | 3 | THE COURT:  If he's done it by commission or |
| 11:32:08 | 4 | omission, you can explore that. |
| 11:32:09 | 5 | MR. WATLINGTON:  Yes. |
| 11:32:10 | 6 | THE COURT:  What I don't want is an exploration |
| 11:32:12 | 7 | and a dig-down into someone else's conduct, that is, I |
| 11:32:16 | 8 | don't -- I forgot the name that you mentioned, Attorney |
| 11:32:20 | 9 | Mingolla. |
| 11:32:20 | 10 | MR. MINGOLLA:  Franco. |
| 11:32:21 | 11 | THE COURT:  I don't want to dig down into that |
| 11:32:24 | 12 | and I don't want to dig down in why, let's say, whatever |
| 11:32:26 | 13 | it was, was disbanded, narcotics strike force was |
| 11:32:30 | 14 | disbanded for whatever reason.  Those sorts of things |
| 11:32:33 | 15 | are issues that just bring in things that are not |
| 11:32:36 | 16 | properly before the jury.  All right.  So we're clear. |
| 11:32:39 | 17 | Thank you. |
| 11:32:40 | 18 | MR. MINGOLLA:  Okay. |
| 11:32:41 | 19 | (End of sidebar, open court as follows:) |
| 11:32:57 | 20 | THE COURT:  Go ahead. |
| 11:33:05 | 21 | BY MR. MINGOLLA: |
| 11:33:05 | 22 | Q.   Mr. Tapia, you, you've indicated that you've had |
| 11:33:15 | 23 | more or less a minimum of five meetings, debriefings |
| 11:33:22 | 24 | with government agents and officers from the U.S. |
| 11:33:32 | 25 | Attorney's Office, correct? |

11:33:34  1    A.    Yes, sir.

11:33:36  2    Q.    And are you trying to tell me or are you saying

11:33:46  3    that you cooperated just out of the goodness of your

11:33:56  4    heart?

11:33:58  5         Or moreover, were you not told that you, if you

11:34:04  6    cooperated that you could avail yourself of a

11:34:09  7    significant reduction in a potential jail sentence?

11:34:16  8    A.    Those -- that conversation did happen, but there

11:34:21  9    were no guarantees.  When I made my guilty plea, I could

11:34:35  10   remember my guilty plea has zero to life.  That's --

11:34:40  11            THE COURT:  Come to sidebar.

11:34:42  12            THE WITNESS:  That's --

11:34:43  13            THE COURT:  Be quiet.

11:34:51  14        (Sidebar discussion held as follows:)

11:34:57  15            THE COURT:  Let me suggest something.  This is

11:35:01  16   cross-examination.  Leading questions are permitted.  In

11:35:03  17   fact, they help sometimes develop the testimony and put

11:35:07  18   the witness wherever you want the witness.  You can ask

11:35:11  19   whatever question you want.

11:35:13  20        When you're going down the line like this and the

11:35:15  21   witness runs off to the races, he does something that's

11:35:19  22   impermissible, like talk about a sentence, and I don't

11:35:21  23   want him to talk about a sentence.

11:35:22  24        I'm going to give a curative right now to the jury

11:35:27  25   to tell them to disregard.  It is improperly before

11:35:29   1    them.  That's not something they are to consider.

11:35:32   2    That's the Court's business only.

11:35:33   3         Any objection of that from the government?

11:35:36   4              MS. LAKE:  No.

11:35:37   5              THE COURT:  Attorney Watlington?

11:35:39   6              MR. WATLINGTON:  No.

11:35:40   7              MR. MINGOLLA:  I didn't solicit --

11:35:43   8              MR. WATLINGTON:  Your Honor, can we

11:35:45   9    specifically question him as to the levels?

11:35:47  10              THE COURT:  You can question him as to a

11:35:49  11    reduction.  We don't want things like numbers, I don't

11:35:52  12    want things like life.

11:35:55  13              MR. MINGOLLA:  No, I wasn't going there.

11:35:57  14              THE COURT:  You can certainly inquire a

11:35:59  15    significant reduction, a benefit and so forth.  I don't

11:36:02  16    think the jury needs to know he is exposed to life or

11:36:06  17    anyone here is exposed to life.  That is not properly

11:36:08  18    before them.  That's why I bring it up during my closing

11:36:13  19    instructions.

11:36:13  20              MR. MINGOLLA:  I wasn't going to bring it up,

11:36:15  21    Judge.

11:36:15  22              MR. WATLINGTON:  I don't want to run afoul of

11:36:17  23    any of the Court's rulings, so my question specifically

11:36:21  24    is, am I permitted to question of a certain level that

11:36:25  25    is embodied in his supplemental plea agreement, which

11:36:31  1    was not present in the initial plea agreement?

11:36:34  2             THE COURT:  When you say "a level," what do you

11:36:36  3    mean?  A guideline level?

11:36:38  4             MR. WATLINGTON:  He has got -- it is stated

11:36:40  5    that he will receive possibly, and this happened this

11:36:44  6    month, he would receive possibly a reduction in his

11:36:49  7    guideline level from blank to blank.  It doesn't say

11:36:56  8    anything about time --

11:36:57  9             THE COURT:  Let me say this.  I would think

11:36:59  10   that that might get a 403 issue.  Because I don't want

11:37:02  11   this to become an issue about the, discussion about the

11:37:05  12   Guidelines.  That would invite the government to get up

11:37:07  13   and talk about the Guidelines, and I'm not going to -- I

11:37:10  14   don't want to go down there.

11:37:12  15      You can inquire as much as you want to on benefits,

11:37:15  16   sentencing reductions, lowering his sentence, exposure.

11:37:19  17   But don't go specific -- don't go to the Guidelines.  I

11:37:22  18   don't want a sentencing discussion.

11:37:24  19             MR. WATLINGTON:  Okay.  Thank you.

11:37:25  20      (End of sidebar, open court as follows:)

11:37:29  21             THE COURT:  All right.  Ladies and gentlemen,

11:37:30  22   you may have heard a reference to certain exposure.

11:37:35  23   That is improperly before you.  You are not to consider

11:37:38  24   any possible exposure of any kind of anyone.

11:37:42  25      So, you may have heard an utterance from the

11:37:45  1   witness stand.  You are instructed to disregard that

11:37:46  2   utterance with respect to what the witness's view of

11:37:51  3   what may or may not be any sentencing exposure.  That is

11:37:56  4   the business of the Court.  That is not something that

11:37:58  5   you as judges of the facts are to be concerned with.  So

11:38:02  6   you are instructed to disregard that last statement from

11:38:05  7   the witness.

11:38:06  8        Go ahead, Attorney Mingolla.

11:38:10  9             MR. MINGOLLA:  Thank you.  Thank you, Your

11:38:11  10  Honor.

11:38:15  11  BY MR. MINGOLLA:

11:38:15  12  Q.   So you just testified that there were no

11:38:18  13  guarantees, correct?

11:38:19  14  A.   That's correct.

11:38:21  15  Q.   And there were no guarantees because you were going

11:38:25  16  to have to first testify or bring information, more

11:38:33  17  information to the government, and then based upon what

11:38:37  18  information you provided the government, that might have

11:38:40  19  a determinative effect upon your sentence, correct?

11:38:51  20  A.   Correct.

11:38:56  21  Q.   So the more people that you implicated, the better

11:38:59  22  off you would be; is that right?

11:39:00  23  A.   I have not implicated anyone other than what was

11:39:03  24  already in this case.

11:39:09  25  Q.   Right.  Which is approximately nine people,

11:39:11    1    correct?

11:39:11    2    A.    They implicated themselves.  I didn't implicate

11:39:11    3    them.

11:39:17    4    Q.    But you mentioned their names, you gave their names

11:39:20    5    up to the government?

11:39:20    6    A.    I did that after they were all -- after we were all

11:39:23    7    arrested.

11:39:24    8    Q.    And then you expanded upon information about those

11:39:28    9    defendants, did you not?

11:39:29    10   A.    I expanded on what information I had.

11:39:33    11   Q.    Which was substantial information, correct?

11:39:39    12   A.    That is correct.

11:39:39    13   Q.    And you did this out of the goodness of your heart

11:39:43    14   because you've had a change of heart, correct?

11:39:47    15   A.    I did this because it's the right thing to do.

11:39:53    16   Q.    Right.  And your -- so it can be assumed, in

11:40:07    17   essence, that the more people you implicated, the more

11:40:10    18   the merrier and the better off you would be, correct?

11:40:14    19   A.    That is incorrect, sir.

11:40:17    20   Q.    Oh?

11:40:18    21   A.    I am not implicating anyone or testifying against

11:40:21    22   anyone that is not in this case.  I have not implicated

11:40:26    23   anyone other than who were all in this case.  I don't

11:40:29    24   know where more people or less more -- or more or less

11:40:37    25   everyone that's in this case is who I'm talking about.

11:40:39  1  Q.   But we only have your word for that.   And your word

11:40:44  2  is, shall we say, dubious?

11:40:48  3          MS. LAKE:   Objection.   No answer -- the answer

11:40:51  4  is --

11:40:52  5          THE COURT:   Sustained.

11:40:53  6  BY MR. MINGOLLA:

11:40:53  7  Q.   You --

11:41:34  8          MR. MINGOLLA:   Bear with me a second, Judge.

11:41:34  9  BY MR. MINGOLLA:

11:41:36  10  Q.   You indicated in a report given to Agent Querrard

11:41:51  11  on July 21, 2013, that you basically were involved in

11:42:06  12  the illegal arrival or -- strike that -- the illegal

11:42:11  13  transportation, rather, of three women from

11:42:17  14  off-island --

11:42:18  15          MS. LAKE:   Objection.   Relevance.

11:42:20  16          MR. MINGOLLA:   -- to St. Thomas, correct?

11:42:22  17          THE COURT:   Okay.   Overruled.

11:42:30  18  BY MR. MINGOLLA:

11:42:30  19  Q.   Are you married?

11:42:31  20  A.   I'm --

11:42:32  21          MS. LAKE:   Objection.   Relevance.

11:42:33  22          THE COURT:   Come to sidebar.

11:42:45  23      (Sidebar discussion held as follows:)

11:42:46  24          MR. MINGOLLA:   He doesn't have any efforts,

11:42:49  25  Judge --

| | | |
|---|---|---|
| 11:42:49 | 1 | THE COURT:  Tell me where you're going with |
| 11:42:51 | 2 | this.  What's the question that was objected to about |
| 11:42:54 | 3 | the transport of women, what does that have to do with |
| 11:42:57 | 4 | this case?  Or what does this have to do -- |
| 11:43:00 | 5 | MR. MINGOLLA:  It all goes to his ethics and |
| 11:43:03 | 6 | his illegal acts. |
| 11:43:04 | 7 | I'm trying, trying to paint a mosaic that he has |
| 11:43:11 | 8 | been involved in multiple criminal acts, not just this |
| 11:43:16 | 9 | incident with, alleged incident with Mr. Brown and |
| 11:43:26 | 10 | Mr. Hill -- |
| 11:43:27 | 11 | THE COURT:  Let me see if I can focus. |
| 11:43:29 | 12 | MR. MINGOLLA:  -- and multiple -- |
| 11:43:30 | 13 | THE COURT:  Stop.  Let me see if I can focus |
| 11:43:33 | 14 | this.  I asked a question about the transport of women. |
| 11:43:36 | 15 | Tell me where -- |
| 11:43:37 | 16 | MR. MINGOLLA:  Because they were illegal.  He |
| 11:43:39 | 17 | brought them over illegally on a DPNR boat. |
| 11:43:42 | 18 | THE COURT:  Okay.  Is this something that was |
| 11:43:43 | 19 | proved up?  Is it something that he admitted to? |
| 11:43:47 | 20 | MR. MINGOLLA:  Yes.  It's in the reports, Your |
| 11:43:50 | 21 | Honor. |
| 11:43:50 | 22 | MR. WATLINGTON:  Your Honor -- |
| 11:43:51 | 23 | THE COURT:  You'll get your turn, Attorney |
| 11:43:54 | 24 | Watlington. |
| 11:43:56 | 25 | MR. MINGOLLA:  It's in his report to Agent |

11:43:58  1    Querrard.

11:43:58  2              THE COURT:  So he made a statement to the

11:44:00  3    government that he was involved in the transport of --

11:44:02  4    okay.  That question was asked.

11:44:04  5         What's the question about him being married?  What

11:44:07  6    does that have to do --

11:44:09  7              MR. MINGOLLA:  Because one of the women that he

11:44:11  8    brought up is a girlfriend from Nevis with whom he has a

11:44:16  9    child.  So once again, I'm going, I'm trying to paint a

11:44:20  10   mosaic of his lack of ethics, morality and his sense of

11:44:26  11   illegality.

11:44:27  12        He illegally brings three aliens to St. Thomas in a

11:44:30  13   DPNR boat, one of whom was a woman --

11:44:34  14             THE COURT:  You don't have to go on.  I think I

11:44:36  15   understand your position.

11:44:36  16        The question about his marriage or whether he is or

11:44:39  17   he isn't, or has a girlfriend or not, I'm not going to

11:44:42  18   allow that.  I think it would run afoul of 403.  I'm not

11:44:46  19   going to have this jury go into some sort of domestic

11:44:51  20   sort of inquiry or concern about this witness, number

11:44:54  21   one.

11:44:55  22        Number two, specific instances of conduct may not

11:44:58  23   be proved with extrinsic evidence.  I don't want us to

11:45:01  24   run afoul of Rule 608, either.

11:45:04  25        Now, if you've got some admission that he has made,

| | | |
|---|---|---|
| 11:45:07 | 1 | you've asked that question, whether he's transported |
| 11:45:09 | 2 | people illegally. |
| 11:45:11 | 3 | MR. MINGOLLA:  Okay. |
| 11:45:12 | 4 | THE COURT:  That's by his own admission? |
| 11:45:14 | 5 | MR. MINGOLLA:  Uhm-hmm.  Yes, sir.  Yes, sir. |
| 11:45:16 | 6 | THE COURT:  All right.  I'm not going to have |
| 11:45:19 | 7 | you go into this other stuff about marriage and those |
| 11:45:22 | 8 | sorts of questions.  It's arguably harassing, but |
| 11:45:25 | 9 | significantly in any event it's afoul of 403. |
| 11:45:29 | 10 | What else do you want to get from this witness, so |
| 11:45:32 | 11 | I need to be aware, so -- |
| 11:45:34 | 12 | MR. WATLINGTON:  Your Honor, so you could |
| 11:45:36 | 13 | know -- |
| 11:45:36 | 14 | THE COURT:  I'm asking Attorney Mingolla, since |
| 11:45:38 | 15 | it's his exam. |
| 11:45:41 | 16 | MR. MINGOLLA:  Well, I'm going to wrap up his |
| 11:45:43 | 17 | prior criminal acts, if you will. |
| 11:45:45 | 18 | THE COURT:  Okay. |
| 11:45:46 | 19 | MR. MINGOLLA:  With the -- and shortly.  Then |
| 11:45:48 | 20 | I'm going to get into the discrepancies in his -- |
| 11:45:53 | 21 | THE COURT:  Okay.  That's fair. |
| 11:45:54 | 22 | MR. MINGOLLA:  -- testimony. |
| 11:45:55 | 23 | THE COURT:  All right.  I just want to make |
| 11:45:57 | 24 | sure that counsel is aware of 608 and 403 and the limits |
| 11:46:02 | 25 | imposed by those rules.  403 is concerned with those |

11:46:05  1     things that cause a waste of time, confuse an issue for

11:46:08  2     the jury, among other things.

11:46:09  3         We don't want mini-trials here.  All right.  This

11:46:12  4     is not divorce court.

11:46:16  5         Attorney Lake, you wanted to be heard?

11:46:18  6             MS. LAKE:  No, that's enough.

11:46:20  7             THE COURT:  Attorney Watlington.

11:46:21  8             MR. WATLINGTON:  Yes, Judge.  I more than

11:46:23  9     likely will be following the same type of trend, because

11:46:26  10    he did say on direct that he's involved -- he has been

11:46:30  11    involved in a number of illegal activities --

11:46:35  12            MS. LAKE:  That's --

11:46:36  13            MR. WATLINGTON:  -- to include, to include drug

11:46:38  14    trafficking.  And I know from his --

11:46:41  15            THE COURT:  That's fine.  I already said you

11:46:42  16    can go into that.  And you said there are some omissions

11:46:45  17    that he made, and there are some things --

11:46:47  18            MR. WATLINGTON:  Yes.

11:46:47  19            THE COURT:  That's fair game.  I just don't,

11:46:49  20    again this divorce court sort of stuff is not going to

11:46:53  21    happen in this Court.  All right?

11:46:54  22            MR. WATLINGTON:  Okay.

11:46:57  23            THE COURT:  All right.

11:46:58  24        (End of sidebar, open court as follows:)

11:47:07  25        Was there an objection to the last question?

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:47:09 | 1  | MS. LAKE:  Yes, Your Honor.                              |
| 11:47:09 | 2  | THE COURT:  All right.  Sustained.  Go ahead.            |
| 11:47:23 | 3  | BY MR. MINGOLLA:                                          |
| 11:47:24 | 4  | Q.   You -- all right.  So going back to the report of   |
| 11:47:29 | 5  | Officer -- Agent Querrard in July, you, you admit to     |
| 11:48:02 | 6  | smuggling illegal aliens, correct?  In a DPNR boat from  |
| 11:48:08 | 7  | down island?                                             |
| 11:48:09 | 8  | A.   From down island?                                   |
| 11:48:12 | 9  | Q.   Yes.                                                |
| 11:48:13 | 10 | A.   I don't think so.                                   |
| 11:48:17 | 11 | Q.   You didn't bring people in from Nevis or St. Kitts? |
| 11:48:22 | 12 | A.   No, I did not.                                      |
| 11:48:25 | 13 | Q.   That cannot be in there?                            |
| 11:48:34 | 14 | MR. MINGOLLA:  I --                                      |
| 11:48:35 | 15 | MS. LAKE:  Objection.  Argumentative.                    |
| 11:48:36 | 16 | THE COURT:  Sustained.  Avoid the editorial             |
| 11:48:39 | 17 | comments.  Just ask questions.                          |
| 11:48:41 | 18 | MR. MINGOLLA:  I'll move on.  I'll move on,              |
| 11:48:43 | 19 | Judge.                                                   |
| 11:49:00 | 20 | BY MR. MINGOLLA:                                          |
| 11:49:00 | 21 | Q.   Now, you indicated prior to -- strike that.        |
| 11:49:05 | 22 | You had an interview or a debriefing with Agent          |
| 11:49:13 | 23 | Shawn Querrard and Agent Rafael Hernandez [sic] on March |
| 11:49:27 | 24 | the 10th at 9:30 at the U.S. Attorney's Office; is that  |
| 11:49:33 | 25 | correct?                                                 |

11:49:38  1    A.   That is correct.

11:49:39  2    Q.   And at that time your attorney was not present,

11:49:45  3    correct?  Initially?

11:49:47  4    A.   That is correct.

11:49:48  5    Q.   Your attorney being Mr., Attorney Gabriel Villegas,

11:49:52  6    correct?

11:49:52  7    A.   That's correct.

11:49:53  8    Q.   The Federal Public Defender.

11:49:58  9         So you were basically sitting there at the U.S.

11:50:02  10   Attorney's Office in one of their conference rooms.  And

11:50:13  11   in addition to Fernandez, Querrard -- I should say Agent

11:50:19  12   Fernandez, Agent Querrard, there was also a paralegal,

11:50:28  13   Stephanie Siegriest, correct?

11:50:31  14   A.   That is correct.

11:50:35  15   Q.   And while -- and you were, you were awaiting -- all

11:50:42  16   of you were awaiting the appearance or the arrival, if

11:50:47  17   you will, of your attorney, Mr. Villegas, correct?

11:50:50  18   A.   That is correct.

11:50:53  19   Q.   So you had a casual -- using your words, you had a

11:51:04  20   casual conversation with them, an informal conversation

11:51:08  21   with these agents --

11:51:12  22        MS. LAKE:  Objection at this point.  Relevance,

11:51:14  23   Your Honor.

11:51:15  24        THE COURT:  All right.  Overruled.

11:51:17  25   BY MR. MINGOLLA:

11:51:18  1   Q.   You had a, what we'll call a casual conversation

11:51:20  2   with these agents while you were waiting for -- while

11:51:24  3   everyone was waiting for Attorney Villegas to arrive,

11:51:26  4   correct?

11:51:27  5   A.   That is correct.

11:51:28  6   Q.   Okay.  And in that conversation, that casual

11:51:40  7   conversation, you were asked -- you expressed

11:52:02  8   dissatisfaction with the way that you were -- that you

11:52:05  9   and your case were being handled, correct?

11:52:07  10       MS. LAKE:  Objection.  Relevance.

11:52:10  11       THE COURT:  Overruled.

11:52:16  12   BY MR. MINGOLLA:

11:52:16  13   Q.   Isn't that correct?

11:52:17  14   A.   That is not --

11:52:17  15   Q.   That you expressed dissatisfaction that you didn't

11:52:23  16   -- that this wasn't the direction that you wanted to go?

11:52:25  17   A.   That is not correct.  What happened -- if you want

11:52:28  18   me to explain to you what happened, I will.

11:52:30  19   Q.   No, I don't.

11:52:31  20   A.   Okay.  Well --

11:52:31  21   Q.   I want you to answer my questions, and that's it.

11:52:33  22   A.   Well, what is your question?

11:52:34  23   Q.   You just answered it.  You said no.

11:52:47  24       Isn't it true that you told these people, this is

11:52:54  25   in the absence of your attorney --

| | | |
|---|---|---|
| 11:52:56 | 1 | A.    In the casual conversation. |
| 11:52:57 | 2 | Q.    In the casual conversation. |
| 11:52:58 | 3 | A.    Uh-huh. |
| 11:52:59 | 4 | Q.    -- that you had had constant arguments with your |
| 11:53:05 | 5 | attorney? |
| 11:53:06 | 6 | MS. LAKE:  Objection.  Relevance. |
| 11:53:08 | 7 | THE COURT:  Sustained. |
| 11:53:30 | 8 | BY MR. MINGOLLA: |
| 11:53:30 | 9 | Q.    Did you not say at that same casual meeting that if |
| 11:53:37 | 10 | you were governor for 60 days -- |
| 11:53:39 | 11 | MS. LAKE:  Objection.  Relevance. |
| 11:53:42 | 12 | THE COURT:  Let's hear the question. |
| 11:53:42 | 13 | BY MR. MINGOLLA: |
| 11:53:49 | 14 | Q.    -- that if you were the governor for 60 days, you |
| 11:53:51 | 15 | would go after all the assets that the government could |
| 11:53:53 | 16 | acquire subject to drug seizures, correct? |
| 11:53:56 | 17 | THE COURT:  Sustained.  Next question. |
| 11:54:03 | 18 | BY MR. MINGOLLA: |
| 11:54:04 | 19 | Q.    Now, then you went on to say in the casual |
| 11:54:08 | 20 | conversation, at least according to Agent Querrard's |
| 11:54:11 | 21 | report -- which I shall mark as Exhibit A. |
| 11:54:11 | 22 | (Defendant's Exhibit A marked for identification.) |
| 11:54:11 | 23 | BY MR. MINGOLLA: |
| 11:54:21 | 24 | Q.    You went on to say that this wasn't the direction |
| 11:54:25 | 25 | you wanted to go, and that the seven kilos that were |

11:54:32    1    seized on May 17th had been mislabeled as two pounds,

11:54:37    2    which is under a kilo, is it not?

11:54:39    3         How much is a kilo?  How much weight in a kilo?

11:54:43    4         Isn't it 2.2 pounds?

11:54:46    5    A.    That's about right.

11:54:49    6    Q.    So you point out in the casual conversation that it

11:54:55    7    had been mislabeled as two pounds, which is under a key,

11:54:59    8    according to your definition of the weight, by the DEA.

11:55:04    9         Did you not also then say that in the course of

11:55:10   10    shipping -- you can put your head in this direction,

11:55:13   11    please?

11:55:13   12         Thank you.

11:55:15   13         Did you also not say that in the course of the DEA

11:55:21   14    shipping the seven kilos to a lab, that the package had

11:55:27   15    been stopped in another state, possibly Wyoming, and

11:55:36   16    that there the package had been opened, resealed, and

11:55:41   17    then continued on to the lab.

11:55:43   18         Do you recall saying that?

11:55:45   19    A.    I recall the conversation, yes.

11:55:51   20    Q.    And do you also recall then saying, whilst

11:55:56   21    laughing, where is the chain of custody?

11:55:59   22    A.    I recall that.

11:56:01   23    Q.    Now, would you, chain of custody for the benefit of

11:56:09   24    the jury --

11:56:11   25              MS. LAKE:  Objection, argumentative.

11:56:13  1          THE COURT:  Sustained.  Just ask a question of

11:56:15  2     the witness.

11:56:16  3     BY MR. MINGOLLA:

11:56:16  4     Q.   What is your definition of chain of custody?

11:56:19  5          MS. LAKE:  Objection.  Relevance.

11:56:20  6          THE COURT:  Sustained.

11:56:34  7     BY MR. MINGOLLA:

11:56:35  8     Q.   Was any explanation given to you as to why the

11:56:38  9     cocaine was sent to Wyoming?

11:56:44  10         MS. LAKE:  Objection.  Calls for hearsay.

11:56:47  11         THE COURT:  Overruled.

11:56:49  12         THE WITNESS:  Repeat the question, please.

11:56:50  13    BY MR. MINGOLLA:

11:56:50  14    Q.   Was there any explanation given to you by anyone as

11:56:53  15    to why this package of cocaine that was supposed to go

11:56:57  16    to a lab ended up in Wyoming?

11:57:00  17         MS. LAKE:  Again, assumes facts not in evidence

11:57:02  18    and calls for hearsay.

11:57:03  19         THE COURT:  Okay.  Overruled.

11:57:04  20      You're asking for admissions or statements by the

11:57:08  21    government, not by anyone.  Are you asking by the

11:57:11  22    government or by anyone?

11:57:14  23         MR. MINGOLLA:  No, forgive me.  By the

11:57:17  24    government.

11:57:17  25         THE COURT:  All right.

| | | |
|---|---|---|
| 11:57:17 | 1 | THE WITNESS:  The government has not given me |
| 11:57:19 | 2 | any question pertaining to any lab or travel or it going |
| 11:57:26 | 3 | anywhere. |
| 11:57:31 | 4 | BY MR. MINGOLLA: |
| 11:57:32 | 5 | Q.   Curiously, that doesn't comport -- |
| 11:57:34 | 6 | MS. LAKE:  Objection, argumentative. |
| 11:57:36 | 7 | BY MR. MINGOLLA: |
| 11:57:37 | 8 | Q.   -- with Mr. Querrard's report. |
| 11:57:40 | 9 | THE COURT:  Sustained.  Don't argue with the |
| 11:57:42 | 10 | witness.  Just ask questions. |
| 11:57:44 | 11 | MR. MINGOLLA:  Okay. |
| 11:57:52 | 12 | BY MR. MINGOLLA: |
| 11:57:52 | 13 | Q.   Isn't it true that, that you also stated that the |
| 11:58:14 | 14 | seven kilos that were seized on May 17th had been |
| 11:58:18 | 15 | mislabeled as two pounds by the DEA, two pounds being |
| 11:58:21 | 16 | under a key?  Correct? |
| 11:58:25 | 17 | MS. LAKE:  Objection.  Asked and answered. |
| 11:58:27 | 18 | THE COURT:  Overruled. |
| 11:58:29 | 19 | THE WITNESS:  Can you repeat that question, |
| 11:58:30 | 20 | please. |
| 11:58:33 | 21 | BY MR. MINGOLLA: |
| 11:58:34 | 22 | Q.   All right. |
| 11:58:36 | 23 | Did you not say that the seven kilos, kilo being |
| 11:58:40 | 24 | 2.2 pounds, that were seized on May 17th had been |
| 11:58:44 | 25 | mislabeled as two pounds, which is under a kilo, by the |

| | | |
|---|---|---|
| 11:58:49 | 1 | DEA? |
| 11:58:50 | 2 | A.   That is incorrect. |
| 11:58:54 | 3 | Q.   So are you saying that Agent Querrard is lying? |
| 11:59:01 | 4 | A.   No, he's not. |
| 11:59:03 | 5 | THE COURT:  Stop.  No, don't answer that. |
| 11:59:04 | 6 | Next question. |
| 11:59:06 | 7 | MR. MINGOLLA:  Okay.  All right. |
| 11:59:09 | 8 | BY MR. MINGOLLA: |
| 11:59:10 | 9 | Q.   And again, I would ask your definition as a police |
| 11:59:27 | 10 | officer, a law enforcement officer, of, what, 25 years, |
| 11:59:32 | 11 | 30 years, what is chain of custody? |
| 11:59:35 | 12 | MS. LAKE:  Objection.  Relevance. |
| 11:59:36 | 13 | THE COURT:  Sustained. |
| 11:59:45 | 14 | BY MR. MINGOLLA: |
| 11:59:45 | 15 | Q.   Now, originally you -- originally? |
| 12:00:02 | 16 | MR. MINGOLLA:  Excuse me, Judge.  I'm sorry. |
| 12:00:10 | 17 | I'm going to turn my back on you. |
| 12:00:29 | 18 | BY MR. MINGOLLA: |
| 12:00:30 | 19 | Q.   Originally, in your debriefings, you never |
| 12:00:32 | 20 | mentioned Walter Hill; isn't that correct? |
| 12:00:36 | 21 | A.   That is correct. |
| 12:00:40 | 22 | Q.   And in point of fact you signed, you have signed at |
| 12:00:45 | 23 | least two plea agreements with the government, correct? |
| 12:00:49 | 24 | A.   That is correct. |
| 12:00:57 | 25 | Q.   And you signed the first one shortly after your |

12:01:01    1    arrest, correct?  Plea agreement?

12:01:07    2    A.    No.

12:01:14    3    Q.    And -- but you did sign a first plea agreement?

12:01:19    4    A.    Yes, I did.

12:01:20    5    Q.    And in that first plea agreement, as in all plea

12:01:27    6    agreements with prosecutorial authorities --

12:01:34    7                MS. LAKE:  Objection.  Argumentative.  Assumes

12:01:37    8    facts not in evidence.

12:01:38    9                THE COURT:  Just ask the question without the

12:01:40    10    editorial.

12:01:41    11                MR. MINGOLLA:  Okay.

12:01:41    12    BY MR. MINGOLLA:

12:01:42    13    Q.    You vowed to tell the truth, correct?

12:01:45    14    A.    That's correct.

12:01:45    15    Q.    And you vowed to tell all the truth?

12:01:48    16    A.    That is correct.

12:01:50    17    Q.    And you vowed to tell about everything, every crime

12:01:59    18    that you were involved with or knew about, correct?

12:02:05    19    A.    That is correct.

12:02:06    20    Q.    And yet you didn't mention Walter Hill, correct?

12:02:10    21    A.    That is correct.

12:02:13    22    Q.    But you did mention innumerable other individuals,

12:02:20    23    correct?

12:02:21    24    A.    That is correct.

12:02:25    25    Q.    At least you indicated at least ten other

12:02:40  1    individuals, correct?

12:02:41  2    A.   I don't recall, but that's possible, yes.

12:02:46  3    Q.   Isn't it also possible there was more than ten

12:02:49  4    individuals?

12:02:52  5    A.   Is it possible that it's more than ten?

12:02:58  6    Q.   Yeah.

12:02:58  7    A.   Anything is possible.

12:02:59  8    Q.   That's not -- that's unresponsive.

12:03:01  9    A.   Well, I can't tell you what I don't know.

12:03:11  10   Q.   Okay.  And so then you have --

12:03:23  11        MR. MINGOLLA:  Bear with me, Judge.

12:03:23  12   BY MR. MINGOLLA:

12:03:38  13   Q.   So then you found out, you ascertained that the

12:03:43  14   government was going to use the contents, that is to say

12:03:49  15   the -- well, the contents -- the contents of your casual

12:03:54  16   conversation where your attorney was not present against

12:03:59  17   you, correct?

12:04:01  18   A.   That is incorrect.

12:04:04  19   Q.   Were you not disturbed -- let me rephrase.  Were

12:04:10  20   you not disturbed that what you thought was a casual

12:04:15  21   conversation absent your attorney was going to be, could

12:04:20  22   be used against you?  Yes or no?

12:04:26  23   A.   Yes.

12:05:07  24   Q.   You then --

12:05:08  25        MR. MINGOLLA:  Excuse me a second, Judge.

12:05:10  1          THE COURT:  Yes.

12:05:23  2   BY MR. MINGOLLA:

12:05:23  3   Q.   You say -- well, then there comes a time on March,

12:05:30  4   I believe 14th, where you do -- strike that -- where you

12:05:41  5   enter into another plea agreement, correct?

12:05:44  6   A.   That is correct.

12:05:52  7   Q.   And isn't it also true that you entered into that

12:05:55  8   second plea agreement because the government was

12:05:56  9   dissatisfied with your not mentioning Mr. Walter Hill in

12:06:02  10  any of your previous conversations with them?

12:06:05  11  A.   That is incorrect.

12:06:10  12  Q.   Is it not true that they were dissatisfied that you

12:06:14  13  had not mentioned certain individuals?

12:06:19  14  A.   I was asked a question why.

12:06:24  15  Q.   I'm sorry, I don't understand what you -- what?

12:06:27  16  A.   I was asked why I didn't mention Walter Hill

12:06:30  17  before.

12:06:34  18  Q.   And so were you not apprised -- let me rephrase

12:06:44  19  that.

12:06:45  20       Were you not informed that if you didn't mention

12:06:50  21  Mr. Walter Hill, that that would constitute a breach of

12:06:56  22  your first plea agreement?

12:06:57  23  A.   That is incorrect.

12:07:13  24  Q.   And further you, you indicated that -- you

12:07:37  25  indicated that -- well, you indicated that you vowed, I

12:07:48  1   think you used the word you vowed, or you promised that

12:07:52  2   henceforth you would give the complete and utter truth?

12:07:58  3   A.    That is not how that conversation went.

12:08:03  4   Q.    Are you denying that you told the government

12:08:11  5   that -- strike that.

12:08:23  6        Didn't you become a little concerned when the

12:08:30  7   government in essence said that you were, or implied or

12:08:37  8   told you that you were not being completely open?

12:08:49  9             MS. LAKE:  Objection.  Assumes facts not in

12:08:51  10  evidence.

12:08:52  11            THE COURT:  Overruled.

12:08:59  12            THE WITNESS:  The government, the casual

12:09:02  13  conversation that I had with the agents started with a

12:09:13  14  newspaper article and cases that they were talking

12:09:15  15  about.  That's where that casual conversation came

12:09:18  16  about, and I made some comments.  That's where it

12:09:22  17  started.

12:09:25  18       Agent Querrard made some notes.  I was questioned

12:09:28  19  about it the next day, and I informed them it was a

12:09:33  20  casual conversation.  It was nothing to it.

12:09:38  21       They asked me why I didn't mention about

12:09:44  22  Mr. Williams -- I mean Mr. Hill.  And I explained to

12:09:51  23  them that I was a -- fearful for my life to implicate

12:09:58  24  anyone --

12:09:58  25            THE COURT:  Stop.

12:09:58  1          Let's move on.

12:10:00  2    BY MR. MINGOLLA:

12:10:01  3    Q.   Curiously, that's not reflected in any of these

12:10:04  4    reports.

12:10:04  5              MS. LAKE:  Objection.  Argumentative.

12:10:09  6              THE COURT:  All right.  Just ask the question

12:10:11  7    without the editorial comment.

12:10:12  8    BY MR. MINGOLLA:

12:10:12  9    Q.   Would it surprise you that what you just said is

12:10:14  10   not mentioned in any of these reports?

12:10:17  11   A.   A lot of what's in that report is not what was

12:10:21  12   said, either, so nothing surprises me.  We had a casual

12:10:26  13   conversation.

12:10:26  14   Q.   So you're saying that what's contained in these

12:10:30  15   reports is basically nonsense?

12:10:32  16   A.   No.  What I'm saying in those reports are accurate.

12:10:37  17   What I said, what is said is accurate.  All of it is in

12:10:41  18   there, no.  But it is accurate of what I said.

12:10:43  19   Q.   But you just said they weren't, they weren't

12:10:45  20   accurate?

12:10:46  21   A.   I said it doesn't contain everything.  That's what

12:10:50  22   I said.  I didn't say --

12:10:52  23   Q.   And you don't think that it would be important

12:10:58  24   enough to mention, if you mention something about

12:11:03  25   feeling threatened, that Agent Querrard would put that

12:11:06  1   in his report?

12:11:08  2   A.   That did not happen that day.  That was the very

12:11:12  3   next day.

12:11:14  4   Q.   Would it surprise you that that's not mentioned in

12:11:17  5   any reports?

12:11:21  6   A.   I don't know how -- you're asking me to speculate

12:11:24  7   of Agent Querrard.

12:11:25  8   Q.   Haven't you seen these reports?

12:11:28  9   A.   I've seen a report that he wrote, yes.

12:11:31  10  Q.   All right.

12:11:32  11  A.   The next day.

12:11:33  12  Q.   Did you see anything about threat with a gun or any

12:11:35  13  other weapon?

12:11:36  14  A.   No, I did not.

12:11:37  15  Q.   Being killed?

12:11:37  16  A.   No.

12:11:38  17  Q.   Uhm-hmm.  And so you're -- basically you're making

12:11:49  18  that up right now, aren't you?

12:11:51  19  A.   Making what up right now?

12:11:53  20  Q.   This business about being worried about being

12:11:56  21  killed?

12:11:56  22  A.   I'm not making that up.

12:11:58  23  Q.   I see.

12:11:59  24       Well, you know, I'm under the distinct impression,

12:12:04  25  correct me if I'm wrong, and I am perplexed about this,

12:12:12   1   you had been able, unlike my client and unlike the other

12:12:20   2   coconspirators, the alleged -- well, the other

12:12:25   3   conspirators that you had implicated, that you had been

12:12:33   4   able to walk around town, footloose and fancy free for

12:12:38   5   the most part, correct?

12:12:39   6   A.   I don't understand that statement at all.

12:12:41   7   Q.   Well, let me rephrase it.  Ordinarily, you're a

12:12:49   8   police -- you're a law enforcement officer?

12:12:52   9   A.   That's correct.

12:12:52   10   Q.   Have you ever dealt with people that cooperated

12:12:55   11   before?

12:12:56   12            MS. LAKE:  Objection.  Relevance.

12:12:58   13            THE COURT:  Sustained.

12:13:02   14   BY MR. MINGOLLA:

12:13:02   15   Q.   If a person is in fear, if a witness is in fear of

12:13:05   16   his life, isn't he ordinarily put into protective

12:13:13   17   custody?

12:13:13   18            MS. LAKE:  Objection.  Relevance.

12:13:14   19            THE COURT:  Sustained.

12:13:20   20   BY MR. MINGOLLA:

12:13:20   21   Q.   Isn't it true that you had been at liberty to, for

12:13:24   22   the most part, until recently, to walk around -- to walk

12:13:28   23   around St. Thomas?

12:13:30   24            MS. LAKE:  Objection.  Relevance.

12:13:31   25            THE COURT:  Overruled.

12:13:34  1              THE WITNESS:  No.

12:13:35  2    BY MR. MINGOLLA:

12:13:35  3    Q.    No?

12:13:36  4    A.    I was remanded.  Bail was posted.  I was put on

12:13:43  5    house arrest.  I was on house arrest for two months, if

12:13:51  6    I'm not mistaken, maybe three, whereas I asked to be

12:13:56  7    allowed to go to work.  I worked from Monday to Saturday

12:14:05  8    from 9:00 to 3:00, and I report back to home.

12:14:11  9         I was -- I stayed home on Saturdays, evening,

12:14:16  10   Sundays.  I go to church, which was from 10:30 to

12:14:21  11   9:00 [sic], and I needed -- from 10:30 in the morning

12:14:27  12   until 1:00, I needed to be back home by 2:00 that

12:14:31  13   afternoon.  And that schedule would be there until I was

12:14:35  14   remanded on January 13th.

12:14:41  15   Q.    So, if I understand what you've just said, you

12:14:47  16   asked to be able to go back to work, correct?

12:14:51  17   A.    I -- not -- asked to go back to work at my mother's

12:14:54  18   business, yes.

12:14:56  19   Q.    Okay.  And wouldn't that have exposed you to being

12:15:05  20   potentially killed, if you were working at your mother's

12:15:09  21   business or out on the street?

12:15:11  22            MS. LAKE:  Objection.  Relevance.  Calls for

12:15:13  23   speculation.

12:15:14  24            THE COURT:  Sustained.

12:15:21  25   BY MR. MINGOLLA:

12:15:21  1    Q.   If you thought that you were going to be killed or

12:15:23  2    there was a possibility that you were going to be

12:15:25  3    killed, why would you want to be out in the -- out in

12:15:30  4    the open where you could be targeted?

12:15:32  5         MS. LAKE:   Objection.   Relevance.   Calls for

12:15:34  6    speculation.

12:15:35  7         THE COURT:   Okay.   Overruled.

12:15:37  8         THE WITNESS:   I had a responsibility.   I

12:15:43  9    needed -- I have four young children I needed to

12:15:47  10   support, and I will have to work.

12:15:54  11   BY MR. MINGOLLA:

12:15:54  12   Q.   How much money did you make?

12:15:56  13        MS. LAKE:   Objection.   Relevance.

12:15:58  14        THE COURT:   Overruled.

12:16:01  15        THE WITNESS:   I would make, it depends on the

12:16:03  16   maintenance job I was doing, anywhere between $300 a

12:16:09  17   week to $400 a week, sometimes $200, sometimes $150.   It

12:16:15  18   all depends on the amount of work I had to do.

12:16:18  19   BY MR. MINGOLLA:

12:16:19  20   Q.   So you figured your life was worth about $150, $300

12:16:24  21   a week?

12:16:25  22        MS. LAKE:   Objection.   Argumentative.

12:16:28  23        THE COURT:   Sustained.

12:16:53  24   BY MR. MINGOLLA:

12:16:53  25   Q.   Now, did you -- you say that you put, if I

12:16:59   1    understand you properly, you indicated that you put, you

12:17:13   2    put money in St. John into a vehicle, correct?

12:17:24   3    A.   I said I took the money out of the bag in

12:17:30   4    Mr. Hill's car.  I took the box containing the seven

12:17:36   5    kilograms out of another car and sat in the car while I

12:17:39   6    made that exchange.

12:17:42   7    Q.   But Mr. Hill was not in the car with the cocaine,

12:17:46   8    was he?

12:17:47   9    A.   No, he was not.

12:17:52   10   Q.   And -- now you were, you were told, obviously, that

12:18:36   11   you were going to be testifying in this trial, correct?

12:18:38   12   A.   That is correct.

12:18:39   13   Q.   And to that end, or in light of that, you had, as

12:18:52   14   you pointed out, numerous conversations with -- well,

12:18:58   15   you didn't tell that -- strike that.

12:19:01   16       Did you have numerous conversations with FBI agents

12:19:07   17   and DEA agents or agents of HIDTA?

12:19:15   18   A.   I --

12:19:16   19   Q.   HIDTA being the drug --

12:19:19   20          MS. LAKE:  Objection, argumentative.

12:19:21   21          THE COURT:  Avoid the commentary.  Just go

12:19:29   22   straight to the question.  Go ahead.

12:19:31   23   BY MR. MINGOLLA:

12:19:31   24   Q.   So you had numerous conversations with agents of

12:19:33   25   HIDTA?

12:19:33   1    A.   I don't know what agents they were.  I did have

12:19:35   2    conversations with several people at the district

12:19:37   3    attorney's office with my attorney.

12:19:42   4    Q.   And in none of those conversations -- bear with me

12:20:03   5    a second, please.

12:20:43   6    You indicated on July 24th, 2013, what I believe is

12:20:51   7    your second interview, that you were obtaining kilos of

12:20:57   8    cocaine or utilizing as an intermediary a Mr. Monsanto,

12:21:07   9    correct?

12:21:11  10    A.   That is correct.

12:21:13  11    Q.   And you indicated that Mr. Monsanto could get you

12:21:18  12    those keys for $13,500 and 14,000, correct?

12:21:28  13    A.   That's correct.

12:21:28  14    Q.   And that you purchased kilograms of cocaine from

12:21:32  15    Monsanto approximately three or four times during a

12:21:36  16    two-year period, correct?

12:21:40  17    A.   Yes, I would say that.

12:21:44  18    Q.   And simultaneously, that is to say at the same time

12:21:48  19    that you're dealing in these kilos of cocaine, you, your

12:21:53  20    position was a sergeant of plaintiff in VIPD in St.

12:22:02  21    John, correct?

12:22:03  22    A.   That's incorrect.

12:22:05  23    Q.   Okay.  Then you were working for DPNR at that time,

12:22:12  24    correct?

12:22:12  25    A.   That's correct.

12:22:13  1    Q.   And DPNR is a law enforcement agency, correct?

12:22:17  2    A.   Yes.

12:22:20  3    Q.   Of law enforcement?

12:22:22  4    A.   Correct.

12:22:22  5    Q.   And you've also indicated that you were

12:23:22  6    dissatisfied with your commission, if you will, for

12:23:24  7    being an intermediary in cocaine transactions, correct?

12:23:29  8    A.   No, I -- you throw me off there.  What is that

12:23:36  9    about?

12:23:37  10   Q.   It's about bribes.

12:23:38  11   A.   Excuse me?

12:23:39  12   Q.   It's about bribes, it's about commission --

12:23:41  13        THE COURT:  All right.

12:23:42  14        MS. LAKE:  Objection.  Argumentative.

12:23:43  15        THE COURT:  Sustained.  The questions come from

12:23:45  16   the lectern to the witness.  The witness answers the

12:23:47  17   question.  Let's proceed according to that.

12:23:49  18        Go ahead.  Ask your next question.

12:23:51  19        MR. MINGOLLA:  Yeah.

12:23:52  20   BY MR. MINGOLLA:

12:24:03  21   Q.   Let's go back and visit these plea bargains again.

12:24:15  22        Again, as a law enforcement officer, you've been

12:24:18  23   involved -- by "involved," I mean you've been involved

12:24:20  24   in cases where plea bargains were entered, correct?

12:24:24  25        MS. LAKE:  Objection.  Relevance.  Assumes

12:24:26   1    facts not in evidence.

12:24:27   2                THE COURT:  Sustained.

12:24:30   3    BY MR. MINGOLLA:

12:24:31   4    Q.   Wouldn't you say it's rather unusual to have

12:24:34   5    multiple plea bargains?

12:24:37   6                MS. LAKE:  Objection.  Relevance.

12:24:38   7                THE COURT:  Sustained.

12:24:49   8    BY MR. MINGOLLA:

12:24:50   9    Q.   When you were, when you were informed that you were

12:24:53   10   going to be testifying -- or actually, strike that.

12:25:00   11        When you indicated that you were willing to testify

12:25:09   12   against various individuals in your, in your plea

12:25:18   13   agreement and in conversations with agents, you

12:25:41   14   indicated that you would tell them and would testify to

12:25:48   15   certain things, correct?

12:25:54   16                MS. LAKE:  Objection.  Vague.

12:25:55   17                THE COURT:  Overruled.

12:25:55   18                THE WITNESS:  I didn't understand that

12:25:57   19   question.

12:25:57   20   BY MR. MINGOLLA:

12:25:57   21   Q.   All right.  Well, let me rephrase the question.

12:26:00   22   Let me put it more simply.

12:26:04   23        Were you advised -- or moreover, weren't you

12:26:08   24   advised by government agents as to whom you should be

12:26:18   25   discussing with, with them or in court or with them?

12:26:22  1    Let's just say with them?

12:26:33  2         Were you prepped -- let's put it real simple.  Were

12:26:38  3    you prepped?

12:26:39  4    A.   No, I was not prepped.

12:26:42  5    Q.   Well then, let me use another word.  Were you

12:26:46  6    advised as to what would be helpful to you to discuss?

12:26:57  7    A.   My attorney, Attorney Villegas, told me when I

12:27:02  8    testify I must testify of the truth.

12:27:05  9         THE COURT:  Stop.

12:27:06  10        Let's move on.  Next question.

12:27:21  11   BY MR. MINGOLLA:

12:27:21  12   Q.   And isn't it also true that you entered into this

12:27:39  13   second plea agreement because you were threatened by the

12:27:45  14   government that if you didn't change your testimony or

12:27:49  15   expand upon your testimony, that all bets were off on

12:27:55  16   sentencing?

12:27:57  17   A.   That is incorrect.

12:28:01  18   Q.   So why would there be a necessity for you to sign

12:28:08  19   the second plea agreement?

12:28:12  20        MS. LAKE:  Objection.  Calls for speculation.

12:28:13  21        THE COURT:  You're asking why he signed it?

12:28:17  22        MR. MINGOLLA:  Yeah.  Yes, sir.

12:28:21  23        THE COURT:  Overruled.

12:28:21  24        THE WITNESS:  I signed the second plea

12:28:24  25   arrangement because we didn't sign it prior.

```
12:28:32   1

12:28:32   2    BY MR. MINGOLLA:

12:28:33   3    Q.   You're telling me that you didn't sign the first

12:28:37   4    plea agreement?

12:28:37   5    A.   I signed the first plea agreement.

12:28:40   6    Q.   Right.  Thank you.

12:28:46   7         So the first plea agreement was executed, and then

12:28:52   8    there's a second plea agreement executed months later.

12:28:54   9    In fact, about, what, two weeks ago?

12:28:58  10    A.   That is incorrect.

12:29:03  11    Q.   On the --

12:29:04  12    A.   Two weeks ago I signed it, yes.  But that second

12:29:08  13    plea arrange- -- agreement was done months ago.  I just

12:29:13  14    didn't sign it.  I was housed in Puerto Rico.  I wasn't

12:29:17  15    housed over here.

12:29:19  16    Q.   The point is that there was a second plea

12:29:24  17    agreement?

12:29:24  18    A.   That second plea agreement was already in.  I just

12:29:26  19    didn't sign it.

12:29:29  20    Q.   But you said that you signed a plea agreement, you

12:29:31  21    signed the first plea agreement.  Why did you need to

12:29:34  22    sign a second plea agreement?

12:29:35  23    A.   You need to talk to my attorney about that.  I

12:29:39  24    can't answer that one.

12:30:02  25    Q.   And isn't it true that basically in order to get
```

12:30:08  1    kind consideration at sentencing, that you would

12:30:15  2    basically have implicated your mother if you thought it

12:30:18  3    would help you?

12:30:21  4            MS. LAKE:  Objection.  Argumentative.

12:30:23  5            THE COURT:  Overruled.

12:30:27  6            THE WITNESS:  Attorney Bengoa [sic] --

12:30:29  7    BY MR. MINGOLLA:

12:30:29  8    Q.   It's Mingolla?

12:30:30  9    A.   Okay.  Let me tell you something.

12:30:33  10   Q.   Kindly don't address me like that.

12:30:36  11   A.   Because you don't know my mother.  You can't even

12:30:38  12   walk in her shoes.

12:30:39  13           THE COURT:  All right.

12:30:39  14           THE WITNESS:  So don't go that way.

12:30:43  15           THE COURT:  Mr. Tapia, you need to stop now.

12:30:47  16       Next question.

12:30:48  17           MR. MINGOLLA:  And it's Attorney Mingolla.

12:30:50  18           THE COURT:  All right.  Let's just ask

12:30:52  19   questions and get answers.  That's what the evidence is

12:30:55  20   supposed to flow from, questions and answers from the

12:31:01  21   witness stand.  So let's move on.

12:31:02  22           MR. MINGOLLA:  Yes, sir.

12:31:05  23       May I have just a moment, please?

12:31:08  24           THE COURT:  Yes.

12:31:48  25       (Counsel conferring.)

| 12:32:02 | 1 | MR. MINGOLLA:  Okay, Judge.  I'm almost done, |
| 12:32:04 | 2 | believe it or not. |
| 12:32:18 | 3 | BY MR. MINGOLLA: |
| 12:32:18 | 4 | Q.   So the bottom line, or the upshot here regarding |
| 12:32:26 | 5 | you, Sergeant, is that you would have done basically |
| 12:32:48 | 6 | anything and implicated anyone that you thought you |
| 12:32:58 | 7 | could implicate and get away with it in order to get |
| 12:33:04 | 8 | kind consideration at sentencing, which by the way -- |
| 12:33:10 | 9 | MS. LAKE:  Objection. |
| 12:33:11 | 10 | BY MR. MINGOLLA: |
| 12:33:12 | 11 | Q.   -- when is your sentencing? |
| 12:33:14 | 12 | MS. LAKE:  Objection.  Argumentative. |
| 12:33:16 | 13 | Compound. |
| 12:33:16 | 14 | THE COURT:  Overruled.  If the witness can |
| 12:33:18 | 15 | understand it, he can answer it.  Overruled. |
| 12:33:23 | 16 | THE WITNESS:  My sentencing is April 17th, if |
| 12:33:29 | 17 | I'm not mistaken. |
| 12:33:30 | 18 | THE COURT:  I think the question is a yes or no |
| 12:33:34 | 19 | question. |
| 12:33:34 | 20 | THE WITNESS:  No. |
| 12:33:55 | 21 | BY MR. MINGOLLA: |
| 12:33:55 | 22 | Q.   You're aware -- just a couple more questions. |
| 12:33:59 | 23 | You're aware of the fact -- |
| 12:34:02 | 24 | THE COURT:  You know what we are going to do is |
| 12:34:04 | 25 | this.  We're going to break for lunch, ladies and |

12:34:07  1    gentlemen.  Lunch is here.  So enjoy your lunch.  We

12:34:14  2    will break for 1 hour and 10 minutes.  All right.  Enjoy

12:34:18  3    your lunch.

12:34:19  4        (Jury out).

12:35:06  5            THE COURT:  All right.  Mr. Tapia, we're going

12:35:08  6    to take a break for 1 hour and 10 minutes.  Do not

12:35:11  7    discuss your testimony during that break.  Do you

12:35:14  8    understand?

12:35:15  9            THE WITNESS:  Yes, I do, Your Honor.

12:35:16  10            THE COURT:  All right.  You can step out with

12:35:18  11    the marshal.

12:35:19  12        (Witness stood aside)

12:35:30  13            THE COURT:  All right.  Is there anything we

12:35:31  14    need to cover during our -- before our break, Attorney

12:35:36  15    Lake?

12:35:36  16            MS. LAKE:  No, Your Honor.

12:35:37  17            MR. WATLINGTON:  Yes, Your Honor.

12:35:38  18            THE COURT:  Okay.  Attorney Mingolla?

12:35:39  19            MR. MINGOLLA:  No, sir.

12:35:40  20            THE COURT:  Attorney --

12:35:42  21            MR. WATLINGTON:  Yes, sir.

12:35:44  22            THE COURT:  Yes.

12:35:44  23            MR. WATLINGTON:  I may have a witness who is in

12:35:47  24    the Court who may have to testify, according to what

12:35:51  25    Mr. Angel Beltran-Negron might say.  It was not

12:35:57  1    something I was anticipating until the testimony of

12:36:01  2    Mr. Tapia came up today.

12:36:04  3        So I would, I want to inform the Court and the

12:36:08  4    government of that, and basically ask to have that

12:36:12  5    person sequestered when Mr. Angel Beltran-Negron

12:36:18  6    testifies.

12:36:19  7              THE COURT:  All right.  So you're saying that

12:36:20  8    the witness is in the courtroom or --

12:36:23  9              MR. WATLINGTON:  Yes.

12:36:23  10             THE COURT:  -- or was in the courtroom.

12:36:24  11             MR. WATLINGTON:  Yes.

12:36:25  12             THE COURT:  All right.  I don't believe there

12:36:27  13   was a request for invoking the rule, but I suspect that

12:36:32  14   you're saying that you're going to have the witness

12:36:34  15   leave the courtroom.

12:36:35  16             MR. WATLINGTON:  Yes.  Yes, Your Honor, when,

12:36:38  17   if in fact, if he testifies to certain information that

12:36:42  18   we believe is of a surprise nature to us, that we didn't

12:36:47  19   anticipate would have been necessary for her to testify.

12:36:50  20             MS. LAKE:  I would ask that all defense

12:36:52  21   witnesses be excused from the courtroom.

12:36:53  22             MR. WATLINGTON:  And that would be our only

12:36:55  23   witness, and that person is Latoya Springette.

12:36:59  24             THE COURT:  Well, the rule wasn't sought

12:37:01  25   initially.  It is now, so we'll make it reciprocal.  So

| | | |
|---|---|---|
| 12:37:06 | 1 | all parties should know, no witnesses should be in the |
| 12:37:11 | 2 | courtroom. |
| 12:37:11 | 3 | MS. LAKE:  I would ask that my case agent be |
| 12:37:13 | 4 | allowed to remain. |
| 12:37:14 | 5 | THE COURT:  Of course, yes.  The case agent |
| 12:37:16 | 6 | absolutely gets to remain. |
| 12:37:17 | 7 | All right.  Is that it? |
| 12:37:18 | 8 | MR. WATLINGTON:  That's it, Your Honor. |
| 12:37:21 | 9 | THE COURT:  Attorney Watlington -- Attorney |
| 12:37:24 | 10 | Mingolla, do you have much more with this witness? |
| 12:37:26 | 11 | MR. MINGOLLA:  No, not very much more --  I'm |
| 12:37:28 | 12 | sorry, sir.  Forgive me.  Not very much more, no, sir. |
| 12:37:31 | 13 | THE COURT:  All right.  Very good.  All right, |
| 12:37:33 | 14 | counsel.  Enjoy your lunch.  1 hour and 5 minutes. |
| 12:37:37 | 15 | (Court in recess, 12:37 p.m.) |
| 13:50:23 | 16 | (After recess, 1:50, jury present, defense counsel |
| 13:50:31 | 17 | not present.) |
| 13:53:05 | 18 | (Attorney Watlington present.) |
| 13:56:07 | 19 | (Mingolla and defendant present.) |
| 13:56:11 | 20 | THE COURT:  Good afternoon, ladies and |
| 13:56:13 | 21 | gentlemen. |
| 13:56:13 | 22 | How was lunch? |
| 13:56:14 | 23 | An improvement over yesterday? |
| 13:56:14 | 24 | (Jurors indicating.) |
| 13:56:17 | 25 | THE COURT:  I like to see thumbs up. |

13:56:19  1          First, let me apologize for the period of silence.

13:56:23  2     As you may have noticed, everything that occurs during a

13:56:25  3     trial is of record.  We create a record.  That's why

13:56:29  4     there's a court reporter here.  We cannot begin to

13:56:33  5     create that record until everyone is here.  So I

13:56:35  6     apologize for the period of silence.

13:56:37  7          So it appears that we may proceed at this time.

13:56:40  8          I think we're still in the cross-examination of

13:56:42  9     Mr. Tapia by Attorney Mingolla.

13:56:45  10          Attorney Mingolla, proceed?

13:56:47  11          MR. MINGOLLA:  Yes, sir.

13:56:47  12          THEREUPON ROBERT TAPIA, previously duly sworn,

13:57:17  13     was examined and testified further as follows:

13:57:17  14               CROSS-EXAMINATION (Continued)

13:57:17  15     BY MR. MINGOLLA:

13:57:19  16     Q.   Good afternoon again, Sergeant.

13:57:25  17          Earlier -- I just want to clarify something quickly

13:57:28  18     here.

13:57:28  19          Earlier I had said that you had, that you had -- I

13:57:38  20     asked whether or not you had brought some women in from

13:57:44  21     down island --

13:57:46  22          MS. LAKE:  Objection.  Relevance.

13:57:51  23     BY MR. MINGOLLA:

13:57:51  24     Q.   -- and you said no.  And what I meant to say was

13:57:54  25     Tortola, not, not Nevis.

13:57:58  1          Did you bring three, three women in illegally from

13:58:03  2   Tortola?

13:58:04  3          MS. LAKE:  Objection.  Relevance.

13:58:06  4   Argumentative.

13:58:07  5          THE COURT:  Overruled.

13:58:07  6          THE WITNESS:  No, I did not.

13:58:10  7   BY MR. MINGOLLA:

13:58:11  8   Q.   So you were lying to Agent Querrard when you told

13:58:15  9   him you had brought these three women in?

13:58:17  10  A.   I did not bring them in.

13:58:19  11  Q.   Were you in a boat?

13:58:21  12  A.   No, I was not.

13:58:23  13  Q.   So again, you were lying when you told --

13:58:27  14  A.   I have not told Agent Querrard that, either.

13:58:30  15  Q.   Have you told anybody from the government?

13:58:32  16  A.   Excuse me?

13:58:33  17  Q.   It's in the government's reports.  How did they get

13:58:36  18  that --

13:58:36  19         MS. LAKE:  Objection.  Argumentative.

13:58:38  20         THE COURT:  Sustained.  Don't testify.  Ask a

13:58:41  21  question.

13:58:41  22  BY MR. MINGOLLA:

13:58:41  23  Q.   How do you suspect that got into the government's

13:58:43  24  reports, if you didn't admit to it?

13:58:45  25         MS. LAKE:  Objection.

| | | |
|---|---|---|
| 13:58:45 | 1 | THE COURT:  Sustained.  You cannot ask the |
| 13:58:50 | 2 | witness to speculate, nor assume facts not in evidence. |
| 13:58:55 | 3 | Next question. |
| 13:58:57 | 4 | BY MR. MINGOLLA: |
| 13:59:08 | 5 | Q.   And -- so are you saying you never brought in any |
| 13:59:15 | 6 | illegal aliens on a DPNR boat? |
| 13:59:18 | 7 | MS. LAKE:  Objection.  Relevance. |
| 13:59:20 | 8 | THE COURT:  Sustained. |
| 13:59:21 | 9 | BY MR. MINGOLLA: |
| 13:59:24 | 10 | Q.   And -- |
| 13:59:31 | 11 | MR. MINGOLLA:  Bear with me.  I'm sorry. |
| 13:59:41 | 12 | BY MR. MINGOLLA: |
| 13:59:41 | 13 | Q.   And you, you recognize that you changed your -- you |
| 13:59:49 | 14 | changed your story several times regarding this alleged |
| 13:59:54 | 15 | encounter with Mr. Hill at the -- over in St. John, |
| 13:59:58 | 16 | correct? |
| 13:59:58 | 17 | MS. LAKE:  Objection.  Assumes facts not in |
| 14:00:00 | 18 | evidence. |
| 14:00:01 | 19 | THE COURT:  Okay.  Overruled. |
| 14:00:05 | 20 | THE WITNESS:  I've changed my story, you said? |
| 14:00:08 | 21 | BY MR. MINGOLLA: |
| 14:00:08 | 22 | Q.   Uhm-hmm. |
| 14:00:09 | 23 | A.   No, I haven't. |
| 14:00:10 | 24 | Q.   But you never mentioned -- you never mentioned that |
| 14:00:13 | 25 | you had gotten into a car with Mr. Hill before? |

14:00:16  1    A.    That is correct.

14:00:18  2    Q.    So it's only after you did your second plea bargain

14:00:26  3    that now suddenly you were in the car with Mr. Hill.

14:00:32  4    Correct?

14:00:32  5    A.    That is incorrect.

14:00:39  6    Q.    And one last --

14:01:08  7              MR. MINGOLLA:  Just one second, Judge, I

14:01:13  8    promise.  And I'll wrap up.

14:01:15  9              MS. LAKE:  Objection.  Argumentative.

14:01:17  10             MR. MINGOLLA:  Argumentative?

14:01:22  11             MS. LAKE:  Objection.  Argumentative.

14:01:24  12             THE COURT:  Counsel, be quiet.

14:01:26  13        Wait for a question.

14:01:47  14   BY MR. MINGOLLA:

14:01:47  15   Q.    Now --

14:01:48  16             MR. MINGOLLA:  No further questions for this

14:01:49  17   witness.  Thank you.

14:01:50  18             THE COURT:  Thank you, Attorney Mingolla.

14:01:53  19        Attorney Watlington.

14:02:04  20             MR. WATLINGTON:  Thank you, Your Honor.  Good

14:02:07  21   afternoon.

14:02:07  22                  FURTHER CROSS-EXAMINATION

14:02:07  23   BY MR. WATLINGTON:

14:02:08  24   Q.    Good afternoon, Mr. Tapia.

14:02:09  25   A.    Good afternoon, sir.

14:02:12  1    Q.   Mr. Tapia, under cross-examination from

14:02:15  2    Attorney Mingolla, you told him that you were not

14:02:21  3    prepped for your testimony here today.  Did you

14:02:25  4    understand what he meant when he said "prepped"?

14:02:30  5    A.   Yes, I did.

14:02:33  6    Q.   Were you interviewed prior to today by the U.S.

14:02:39  7    attorneys and other agents of the United States of

14:02:42  8    America to in fact be prepared to testify today?

14:02:44  9    A.   That is correct.

14:02:47  10   Q.   And you don't consider that to be prepped for

14:02:49  11   testimony?

14:02:51  12   A.   No, I do not.

14:03:01  13   Q.   You testified that you placed some $250,000 in a

14:03:07  14   car that you don't know who it belonged to, you don't

14:03:11  15   know how it got there -- you don't know who it belonged

14:03:14  16   to, correct?

14:03:14  17   A.   That is correct.

14:03:16  18   Q.   And you don't know how it got there, is that

14:03:20  19   correct?

14:03:20  20   A.   That is correct.

14:03:20  21   Q.   And you placed $250,000 in that car?

14:03:23  22   A.   That is correct.

14:03:25  23   Q.   And tell me, I don't recall if you testified or

14:03:31  24   not, that $250,000 represented what?

14:03:36  25   A.   24 keys of cocaine.

14:03:40   1   Q.   Okay.  So if it was $15,000 for a key of cocaine,

14:03:45   2   that wouldn't -- that would be a lot more than 250,000,

14:03:48   3   wouldn't it be?

14:03:49   4   A.   It wasn't 15,000.

14:03:52   5   Q.   But there was never a price, correct?  You never

14:03:55   6   testified about a price, correct?

14:03:57   7   A.   No, I did testify a price in different occasions.

14:04:02   8   Q.   A number of occasions, not about any communication

14:04:05   9   or conversation with Mr. Brown; isn't that correct?

14:04:07   10  A.   That is correct.

14:04:08   11  Q.   And isn't it also correct that you never had a

14:04:12   12  conversation on any recorded exhibit with Mr. Brown

14:04:17   13  regarding any price for any 24 kilos of cocaine?  Isn't

14:04:21   14  that correct?

14:04:23   15  A.   That is correct.

14:04:24   16  Q.   And isn't it further correct that at no time did

14:04:36   17  you have a conversation -- or let me put it this way.

14:04:40   18  Isn't it true that Mr. Brown never told you, or you

14:04:45   19  never said to Mr. Brown in any communication that's an

14:04:49   20  exhibit before this -- before these ladies and gentlemen

14:04:51   21  of the jury, that in fact you completed a deal with him?

14:04:57   22  A.   I had one communication with him --

14:04:59   23  Q.   You understand my question?

14:05:00   24  A.   No, repeat your question.

14:05:03   25  Q.   Isn't it true, sir --

14:05:05  1    A.   Yes.

14:05:05  2    Q.   -- that on any -- that on none of the exhibits that

14:05:09  3    are recordings of communication between you and

14:05:14  4    Mr. Brown, was there any confirmation that you, you

14:05:20  5    consumed -- or consummated a deal for 24 kilos of

14:05:25  6    cocaine with Mr. Brown?  Isn't that correct?

14:05:27  7    A.   Yes, it is.

14:05:28  8    Q.   Thank you.

14:05:42  9         Isn't it further true, sir, that at no time and on

14:05:45  10   no recording did Mr. Beltran have any conversation with

14:05:49  11   you that confirmed that he consummated any payment to

14:05:55  12   Mr. Brown for any cocaine on any of those exhibits

14:06:01  13   that's been admitted before this Court?  Isn't that

14:06:03  14   true?

14:06:03  15   A.   No, that's not true.

14:06:15  16   Q.   Now, Attorney Mingolla questioned you about your

14:06:25  17   plea agreement.  Are you familiar with the plea

14:06:28  18   agreement?

14:06:28  19   A.   I am familiar with two agreements that I signed,

14:06:32  20   yes.

14:06:32  21   Q.   I asked you one --

14:06:34  22   A.   Yes.

14:06:34  23   Q.   I asked you one question.  Are you familiar with

14:06:36  24   the plea agreement?

14:06:36  25   A.   Yes, I am.

14:06:37  1    Q.   It consists of how many documents in your mind?

14:06:44  2    A.   It might be four or five documents -- four or five

14:06:48  3    pages.

14:06:48  4    Q.   How many separate documents, if you recall?

14:06:53  5    A.   Two separate documents.

14:06:58  6         MR. WATLINGTON:  May I, Your Honor?

14:07:02  7         THE COURT:  Yes, go right ahead.

14:07:10  8    BY MR. WATLINGTON:

14:07:10  9    Q.   Have you seen those documents recently?

14:07:13  10   A.   Yes, I have.

14:07:14  11   Q.   When was that?

14:07:18  12   A.   I saw the first one several months ago.  The second

14:07:26  13   one also several months ago.

14:07:31  14   Q.   Okay.

14:07:32  15   A.   But it was after the first one.

14:07:34  16   Q.   Okay.  So you haven't seen them recently.  You

14:07:36  17   haven't seen them since 2014?

14:07:39  18   A.   No, I saw them about a week ago.

14:07:41  19   Q.   Okay.  So you've seen them recently?

14:07:43  20   A.   Yes, I have.

14:07:45  21   Q.   Now, you were arrested May 17th, you said, correct?

14:07:53  22   A.   That's correct.

14:07:54  23   Q.   And you started being a cooperating witness when?

14:07:58  24   If you recall?

14:07:59  25   A.   I don't recall.

14:08:01   1    Q.   You testified before the Grand Jury?

14:08:03   2    A.   No, I did not.

14:08:11   3    Q.   Would it be fair to say that two months after you

14:08:13   4    were arrested, you started offering information to the

14:08:18   5    United States Government in return for your first plea

14:08:25   6    agreement?

14:08:25   7    A.   It's fair to say that, yes.

14:08:27   8    Q.   So you executed the first agreement on

14:08:32   9    September 19th, 2013, correct?

14:08:37   10   A.   Yes.

14:08:38   11   Q.   That was after you started to implicate other

14:08:43   12   persons who were in fact involved in this -- allegedly

14:08:46   13   involved in this conspiracy?

14:08:49   14   A.   That was after everyone was --

14:08:54   15   Q.   Is that a yes or no?

14:08:55   16   A.   No.

14:08:56   17   Q.   It was not?

14:08:57   18   A.   Yes, it was.  After everyone was already arrested.

14:09:07   19   Q.   When did you start cooperating?

14:09:09   20        When you say "after everyone was arrested," when

14:09:11   21   did you start offering information to the government?

14:09:18   22   Do you recall?

14:09:19   23   A.   No, I do not.

14:09:21   24   Q.   Now, you executed a second agreement -- I'm not --

14:09:27   25   I'm sorry, a second document called a supplement to a

14:09:32  1    plea agreement?

14:09:32  2    A.   That's correct.

14:09:34  3    Q.   What is your understanding of the supplement to the

14:09:41  4    plea agreement?

14:09:41  5    A.   From my understanding it has to do with points, and

14:09:46  6    one was 13 and one was 17.  Something in there.  I

14:09:50  7    really don't know what that's about.

14:09:52  8    Q.   So the second agreement was somewhat like a reward

14:09:56  9    for offering information?  Little bit more of a reward?

14:10:01  10   A.   No, it's not.  This was something that was done

14:10:05  11   prior to this.  It's just that I didn't have an

14:10:07  12   opportunity to sign it.

14:10:08  13   Q.   When you say prior to this?

14:10:09  14   A.   In other words, when I, when I say prior to this --

14:10:12  15   Q.   Prior to this case?

14:10:14  16   A.   No.

14:10:15  17   Q.   It wasn't prior to this case, Mr. Tapia?

14:10:17  18   A.   You want me to answer or you don't want me to

14:10:20  19   answer?

14:10:20  20   Q.   Well, I'm asking the question.  It's yes or no.

14:10:22  21   A.   What's the question?

14:10:23  22   Q.   I asked was it prior to this case?

14:10:26  23   A.   It is prior to this case, yes.

14:10:27  24   Q.   And wasn't your last -- the supplement to your

14:10:29  25   agreement executed on March 17th of 2014?

14:10:33  1    A.   Yes, it was.

14:10:34  2    Q.   And isn't it true that your supplement to the

14:10:39  3    agreement gives you a little more of a benefit than the

14:10:46  4    first, or your original plea agreement?  Yes or no?

14:10:51  5    A.   Yes.

14:10:57  6    Q.   You know what it means when we say you make a

14:11:01  7    contract, when you make a contract, consideration is

14:11:05  8    given?

14:11:06  9    A.   Yes.

14:11:06  10   Q.   You know what that means?

14:11:08  11   A.   Yes.

14:11:09  12   Q.   So this supplement is consideration for more

14:11:16  13   alleged accurate information; is that correct?

14:11:22  14   A.   No, it's not correct.

14:11:25  15   Q.   Well, if it's not consideration, why do you get a

14:11:30  16   bigger reward in the supplement than in the prior?

14:11:38  17   A.   The first one was done -- from my understanding,

14:11:42  18   the first one was not, was done and the -- most of the

14:11:49  19   information was not in, and I think like they just

14:11:51  20   reviewed it and they did it, and this is what it came --

14:11:54  21   Q.   That's what you -- that's your --

14:11:55  22   A.   That's my recollection.

14:11:56  23   Q.   But as you just testified, you received different

14:12:02  24   levels in the supplement than you received in the first,

14:12:07  25   correct?

14:12:08  1    A.   That is correct.

14:12:09  2    Q.   And you know, based on your education, your

14:12:13  3    training, your experience, what a supplement to an

14:12:18  4    agreement is?  It adds to the first one?

14:12:21  5             MS. LAKE:  Objection.  Relevance as to the

14:12:26  6    cause of the question, Your Honor.

14:12:27  7             THE COURT:  Overruled.

14:12:28  8             MS. LAKE:  Objection.  He is not an expert

14:12:29  9    witness, Your Honor.

14:12:30  10            THE COURT:  Overruled.

14:12:36  11   BY MR. WATLINGTON:

14:12:36  12   Q.   You want me to repeat the question?

14:12:38  13   A.   Please.  Please repeat the question.

14:12:45  14   Q.   Based on your education, your training, your

14:12:49  15   experience, isn't it true that you know this supplement

14:12:53  16   is an additional reward?

14:12:56  17            MS. LAKE:  Objection.  Relevance.

14:12:58  18            THE COURT:  Overruled.

14:13:01  19   BY MR. WATLINGTON:

14:13:01  20   Q.   Yes or no?

14:13:02  21   A.   Yes.

14:13:13  22   Q.   I guess turning in some family member is not one of

14:13:19  23   the deals that you've made, based upon your reaction to

14:13:24  24   Mr. Mingolla's question this morning -- or this

14:13:27  25   afternoon?

| | | |
|---|---|---|
| 14:13:29 | 1 | A.   That is correct. |
| 14:13:32 | 2 | Q.   Do you know -- let me ask you, you talked about |
| 14:13:35 | 3 | your points of contact for various sources of cocaine |
| 14:13:42 | 4 | over the last -- how many years you've been running |
| 14:13:45 | 5 | drugs.  You don't like my terminology? |
| 14:13:51 | 6 | A.   No, I don't, but I would answer you. |
| 14:13:54 | 7 | Q.   Okay.  How would you term your activity? |
| 14:13:55 | 8 | A.   It's been about maybe four, five years. |
| 14:14:00 | 9 | Q.   Four or five years.  That would put it to 2009 at |
| 14:14:04 | 10 | the long -- at the -- |
| 14:14:06 | 11 | A.   It started in, in about 2002, between 2002 and |
| 14:14:12 | 12 | 2003. |
| 14:14:12 | 13 | Q.   Let me remind you of your testimony, Mr. Tapia. |
| 14:14:15 | 14 | You said you started in 2001? |
| 14:14:18 | 15 | A.   Two Thousand -- |
| 14:14:21 | 16 | Q.   'One? |
| 14:14:22 | 17 | A.   I could swear I said 2002. |
| 14:14:24 | 18 | Q.   That's like 13 years ago. |
| 14:14:30 | 19 | Now, and in those 13 years, you allege that my |
| 14:14:36 | 20 | client was only one of four points of contact.  Is that |
| 14:14:42 | 21 | true?  Is that correct? |
| 14:14:49 | 22 | A.   That is not correct. |
| 14:14:50 | 23 | Q.   There's a lot more points of contact?  Is that your |
| 14:14:54 | 24 | answer? |
| 14:14:55 | 25 | A.   No, that is not my answer. |

14:15:05  1    Q.   Was Mr. Kent Bernier one of your points of contact?

14:15:09  2    A.   No, he was not.

14:15:10  3    Q.   Was Mr. John Lynch, Jr., one of your points of

14:15:18  4    contact?

14:15:19  5         MS. LAKE:  Objection.  Relevance, Your Honor.

14:15:20  6         THE WITNESS:  No.

14:15:22  7         THE COURT:  Overruled.

14:15:22  8         THE WITNESS:  No, he was not.

14:15:23  9    BY MR. WATLINGTON:

14:15:24  10   Q.   Do you know any of those two persons?

14:15:26  11   A.   Yes, I do.

14:15:28  12   Q.   Which one -- or, do you know --

14:15:31  13   A.   I know them both.

14:15:32  14   Q.   How do you know Mr. Kent Bernier?

14:15:35  15   A.   Mr. Kent Bernier worked with me at DPNR.

14:15:38  16   Q.   That's Kent Bernier, Jr.?

14:15:39  17   A.   Kent Bernier, Jr.

14:15:40  18   Q.   So when we refer to Kent Bernier, who would we be

14:15:44  19   referring to in any document that is involved in this

14:15:47  20   case?

14:15:47  21   A.   Kent Bernier, Jr.

14:15:48  22   Q.   It would be Kent Bernier, Jr.?

14:15:51  23   A.   Yes.

14:15:52  24   Q.   And he worked for you at DPNR?

14:15:55  25   A.   We worked together at DPNR.

| | | |
|---|---|---|
| 14:15:57 | 1 | Q.   Out on the boat? |
| 14:15:58 | 2 | A.   At times he would be on the boat, yes. |
| 14:16:00 | 3 | Q.   And Mr. John Lynch, Jr.? |
| 14:16:03 | 4 | A.   Yes.  He is my cousin. |
| 14:16:04 | 5 | Q.   He's your cousin. |
| 14:16:06 | 6 | A.   Yes. |
| 14:16:06 | 7 | Q.   And he's a convicted drug dealer, also? |
| 14:16:11 | 8 | A.   He's been convicted here recently. |
| 14:16:14 | 9 | Q.   Well -- |
| 14:16:14 | 10 | A.   Yes. |
| 14:16:15 | 11 | Q.   Yes? |
| 14:16:15 | 12 | A.   Yes. |
| 14:16:16 | 13 | Q.   And he was one of your points of contact? |
| 14:16:19 | 14 | A.   He was not a point of contact. |
| 14:16:21 | 15 | Q.   No? |
| 14:16:22 | 16 | A.   No. |
| 14:16:23 | 17 | Q.   Isn't it true, sir, that the reason you used that |
| 14:16:27 | 18 | blue Honda Civic to describe the alleged transaction is |
| 14:16:34 | 19 | because you know that blue Honda Civic from being in the |
| 14:16:36 | 20 | yard of John Lynch, Jr.? |
| 14:16:41 | 21 | A.   That is not so. |
| 14:16:42 | 22 | Q.   So you've never seen that car before?  You just |
| 14:16:45 | 23 | wanted to go and put $250,000 in a car because you say |
| 14:16:50 | 24 | someone tell you put $250,000 in a car that you know |
| 14:16:53 | 25 | nothing about?  That's your testimony today? |

14:16:55   1    A.   That is not my testimony today.

14:17:02   2    Q.   Now, I heard you testify, Mr. Tapia, that Mr. Brown

14:17:09   3    made a number of calls to you, and you made a number of

14:17:12   4    calls to him, and some of them were about, just about,

14:17:20   5    about nothing?

14:17:21   6    A.   That is correct.

14:17:21   7    Q.   Did you tell the U.S. attorney that?

14:17:23   8    A.   Yes, I did.

14:17:26   9    Q.   You know what he's charged with?

14:17:30   10   A.   No, I don't.

14:17:31   11   Q.   You don't?

14:17:33   12   A.   No.

14:17:33   13   Q.   If you don't know what he's charged with, then how

14:17:37   14   is it -- well, let me put it this way:  If you don't

14:17:41   15   know what he's charged with, isn't it strange that you

14:17:44   16   would be testifying against him?

14:17:48   17   A.   No.

14:17:52   18   Q.   So you just say things just for the sake of saying

14:17:57   19   them; that's what you're telling us?

14:17:59   20        That's what you're telling the ladies and

14:18:01   21   gentlemen -- you don't know what Raymond Brown is

14:18:03   22   charged with, but you are testifying just because you

14:18:08   23   have a deal to reduce your sentence.  Is that correct?

14:18:13   24   A.   That is not correct.

14:18:18   25   Q.   Mr. Tapia?

14:18:20  1    A.    Yes.

14:18:22  2    Q.    Does your plea agreement prohibit you from speaking

14:18:26  3    to anyone else about what you're going to testify about

14:18:30  4    or what's in this plea agreement?

14:18:37  5    A.    No, it does not.

14:18:38  6    Q.    It does not?  When last have you read it?

14:18:40  7    A.    I reviewed it about two weeks ago.

14:18:43  8    Q.    Okay.  And you said it does not prohibit you from

14:19:06  9    speaking to anyone about the provisions that are in this

14:19:10  10   agreement, that there's not a provision in here, in

14:19:14  11   Exhibit 89a, Government Exhibit 89a, that says you

14:19:20  12   should not discuss your proposed testimony with anyone?

14:19:26  13   A.    To my recollection, yes.

14:19:28  14   Q.    Excuse me?

14:19:28  15   A.    To my recollection, no.

14:19:33  16   Q.    Well, let me ask you this.  Have you discussed your

14:19:37  17   testimony with anyone other than the U.S. Attorney's

14:19:43  18   Office?

14:19:46  19   A.    I discussed it with my attorney and the U.S.

14:19:50  20   Attorney's Office.

14:19:50  21   Q.    So other than those persons, you're saying you have

14:19:52  22   not discussed your testimony with any other persons

14:19:57  23   other than officials of the U.S. government and your

14:20:00  24   attorney?

14:20:01  25   A.    That is correct.

14:20:07  1    Q.    And you haven't discussed it with anybody else

14:20:09  2    because you know from your training, experience, and

14:20:15  3    education that you shouldn't discuss it?  That's what

14:20:18  4    you're telling us?

14:20:20  5    A.    Yes.

14:20:37  6    Q.    If this agreement or the agreement or the

14:20:40  7    supplement thereto does contain the language that you

14:20:43  8    should not discuss information or your possible

14:20:46  9    testimony with anyone, would you be mistaken now, or is

14:20:52  10   it just an oversight on your part?

14:20:55  11   A.    It could be an oversight on my part.

14:21:15  12   Q.    Now, you testified on direct examination by

14:21:24  13   Attorney Lake that on four different occasions, four

14:21:30  14   different occasions you took, or Mr. Brown retrieved,

14:21:44  15   allegedly, two kilos of cocaine from you?

14:21:47  16   A.    That is correct.

14:21:48  17   Q.    Four different occasions.  You testified that you

14:21:55  18   had four different occasions wherein that exchange went

14:21:59  19   back and forth.  That is what you want this jury to

14:22:03  20   believe?

14:22:03  21   A.    Yes.

14:22:22  22   Q.    You also want the ladies and gentlemen of the jury

14:22:24  23   to believe that you sent cocaine allegedly belonging to

14:22:32  24   Mr. Brown to Puerto Rico, and then he was supposed to go

14:22:39  25   down and pick it up?

14:22:41   1          That's what you're telling this ladies and

14:22:44   2     gentlemen of the jury, pick up the money for those

14:22:46   3     proceeds?

14:22:47   4     A.   Yes.

14:22:47   5     Q.   That's what you're telling them?

14:22:48   6     A.   Yes.

14:22:49   7     Q.   And you made those arrangements?

14:22:50   8     A.   I made the arrangements to --

14:22:52   9     Q.   You made the arrangements for him to go down and

14:22:54  10     pick up the alleged money; is that correct?

14:22:57  11     A.   I made the arrangements to get.

14:22:59  12     Q.   Yes, I know you made the -- sorry?

14:23:01  13          You made the arrangements to do what?

14:23:02  14     A.   To get the cocaine to Puerto Rico.

14:23:05  15     Q.   And you made the arrangements for him to collect

14:23:08  16     his money.  Is that what you're telling the ladies and

14:23:11  17     gentlemen of the jury?

14:23:11  18     A.   Yes.

14:23:14  19     Q.   And you know that took place?  That's what you're

14:23:17  20     saying, too?

14:23:19  21     A.   I don't know if it took place.

14:23:39  22     Q.   Do you know what it means that the US of A will

14:23:49  23     make a motion after this case to allow a departure from

14:23:55  24     how you would be handled to a level 17?  Do you know

14:24:01  25     what that means?

14:24:02  1    A.   No, I do not.

14:24:03  2    Q.   You didn't discuss that with your attorney?

14:24:09  3    A.   My attorney and I haven't had much time to discuss

14:24:12  4    a lot of things, because I'm housed in Puerto Rico.

14:24:14  5    He's the only Public Defender here and I think he's

14:24:17  6    quite overwhelmed.

14:24:18  7    Q.   So when you signed this document that has that

14:24:23  8    provision therein, you -- let me ask you this.

14:24:26  9         You agree that I'm not making up a story, correct?

14:24:29  10   A.   I agree.

14:24:30  11   Q.   So what I just referred to is in one of your, one

14:24:38  12   or two documents that you signed?

14:24:39  13   A.   Yes.

14:24:40  14   Q.   And isn't it further true that what I'm referring

14:24:43  15   to is in the document you signed on March 17th?

14:24:52  16   March 17th --

14:24:52  17   A.   Two weeks ago.

14:24:53  18   Q.   Two weeks?

14:24:54  19   A.   A week ago.

14:24:55  20   Q.   Yeah, March 17th is eight days ago?

14:25:00  21   A.   A week ago.  Okay.

14:25:01  22   Q.   And you're saying that you signed it, your attorney

14:25:05  23   signed it, but you didn't know what's in it?

14:25:09  24   A.   I did not review it completely.  We discussed it

14:25:16  25   and I signed it.

14:25:17  1    Q.   Well, let me ask you this:  These documents, aren't

14:25:22  2    these two documents very important to you?  Your future?

14:25:25  3    A.   Yes, it is.

14:25:26  4    Q.   And you're telling me that you and your attorney

14:25:30  5    did not review it before you signed it?

14:25:33  6    A.   I have confidence in my attorney and my attorney

14:25:37  7    reviewed it and told me it was something I could sign,

14:25:41  8    and I did.

14:25:41  9    Q.   Have you read it?

14:25:43  10   A.   I read half -- I read most of it.

14:25:46  11   Q.   And you don't know what certain important pieces of

14:25:53  12   information and language in here means?

14:25:55  13   A.   I have not read the complete document.  I browsed

14:26:03  14   through it, speed read it as they call it, and I signed

14:26:06  15   it.

14:26:08  16   Q.   What's the difference between a level 34 and a

14:26:12  17   level 17?  Do you know?

14:26:13  18   A.   I do not know.

14:26:14  19   Q.   Do you know how it would affect you, though?

14:26:16  20   A.   No, I do not.

14:26:17  21   Q.   You don't remember that it means that you will get

14:26:22  22   less --

14:26:23  23   A.   I know I'm going to get -- if -- if, and it's not

14:26:28  24   up to -- I will get less time, yes.

14:26:30  25   Q.   Let me put it this way.  The U.S. attorney agrees

14:26:33  1   that they will recommend something different in the

14:26:38  2   supplement than they would recommend in the initial plea

14:26:44  3   agreement?

14:26:44  4   A.   That is correct.

14:26:45  5   Q.   And one is seemingly much better than the other,

14:26:51  6   correct?

14:26:51  7   A.   Yes.

14:26:52  8   Q.   And the one that's seemingly much better than the

14:26:54  9   other is the supplement you signed on March 17th?

14:26:56  10  A.   Yes.

14:27:01  11  Q.   Now, you talked about --

14:27:09  12       MR. WATLINGTON:  Your Honor, may I have a

14:27:10  13  minute, please.

14:27:11  14       THE COURT:  Yes.

14:27:23  15  (Pause.)

14:27:23  16  BY MR. WATLINGTON:

14:27:23  17  Q.   You initially talked that in addition to your other

14:27:27  18  drug running activities, that you were involved in other

14:27:29  19  illegal activities.

14:27:30  20       Do you remember that statement?  Your first

14:27:32  21  statement?  When you were questioned by Attorney Lake?

14:27:38  22  A.   Yes.

14:27:41  23  Q.   That other illegal activities were trafficking in

14:27:47  24  people, correct?

14:27:48  25  A.   No.

14:27:48   1   Q.   You never trafficked -- you never brought illegal

14:27:51   2   aliens in on that same DPNR boat?

14:27:55   3   A.   No, I have not done that.

14:27:56   4   Q.   You don't recall the pick-up from Hans Lollik after

14:28:03   5   the big accident out there?

14:28:04   6   A.   I didn't pick no one up.

14:28:06   7   Q.   You didn't pick anyone up?  You brought them in?

14:28:09   8   A.   Hans Lollik?

14:28:10   9   Q.   Yes.  Up by Mandahl Beach, in 2007?

14:28:14  10   A.   2007 boat --

14:28:20  11   Q.   Do you remember that incident?

14:28:21  12   A.   Yes, I do.

14:28:21  13   Q.   Don't you recall when you picked up people and you

14:28:24  14   somewhat kept them for yourself?

14:28:27  15   A.   No.  Those people crashed a boat into Hans Lollik.

14:28:32  16   The U.S. Coast Guard came and retrieved the one person

14:28:37  17   who was injured, and the other --

14:28:41  18   Q.   Well --

14:28:43  19   A.   -- one was taken --

14:28:45  20   Q.   I'm sorry?

14:28:45  21   A.   The other one was taken to Immigration Office,

14:28:49  22   where -- the other two women were taken to Immigration

14:28:52  23   Office --

14:28:52  24        THE COURT:  All right.  Let's move on.

14:28:57  25   BY MR. WATLINGTON:

14:28:57   1   Q.   But you say you just happened to be on the scene.
14:29:00   2   Nothing else?
14:29:00   3   A.   I was working.  And while working, that call came
14:29:03   4   in of a vessel being in distress that ran aground on
14:29:08   5   Hans Lollik.
14:29:08   6          THE COURT:  All right.  Wait for a question.
14:29:10   7   BY MR. WATLINGTON:
14:29:10   8   Q.   All right.  But you've been working while you were
14:29:12   9   moving drugs, also, correct?
14:29:14   10  A.   Yes.
14:29:19   11  Q.   So when it says you were working, it doesn't mean
14:29:22   12  that you were not involved in illegal activities.
14:29:31   13      You've only been convicted once, right?
14:29:37   14  A.   That's correct.
14:29:55   15  Q.   And is it your testimony that of the -- how many
14:29:57   16  phone calls do you know that you reviewed since your
14:30:02   17  telephone was wiretapped from sometime in 2012?
14:30:12   18  A.   How many?
14:30:13   19  Q.   Telephone calls did you review with officials of
14:30:16   20  the U.S. Government since your --
14:30:18   21  A.   I can't --
14:30:18   22  Q.   -- telephone was tapped?
14:30:19   23  A.   I don't remember the number, but I can tell you it
14:30:22   24  took three hours to do.
14:30:23   25  Q.   Three hours to do --

14:30:27  1    A.    To go through all the tapes, all the taps.

14:30:32  2    Q.    All the calls, or just these calls that in fact the

14:30:35  3    government has introduced into evidence?

14:30:37  4    A.    All the calls.

14:30:51  5    Q.    So when you, when you called Mr. Brown and asked

14:30:53  6    him, "Where are you," and he says, "I'm going home,"

14:31:00  7    he's helping you procure drugs?

14:31:03  8    A.    No, he's not.

14:31:07  9    Q.    When you call Mr. Brown and say, "How things going

14:31:17  10   today?  Can you meet me?"  And he says no, or yes, that

14:31:22  11   isn't procuring drugs, is it?

14:31:24  12   A.    We were not procuring drugs at the time, no.

14:31:36  13   Q.    So other than my client and the other client that

14:31:40  14   is in court today, you don't have to turn in anybody

14:31:43  15   else to get this level reward in your supplement, your

14:31:54  16   plea agreement?

14:31:54  17   A.    I have --

14:31:55  18   Q.    Yes or no?

14:31:56  19   A.    No.

14:32:13  20   Q.    But your supplement to your agreement says that,

14:32:16  21   that if you can you will get additional rewards,

14:32:21  22   correct?

14:32:21  23   A.    Yes.

14:32:30  24   Q.    So there's still an opportunity for you to even get

14:32:32  25   a better deal?  Right?

14:32:36  1    A.    Yes.

14:32:40  2    Q.    May I ask if you're working on that, too?

14:32:43  3    A.    If I'm working on it?

14:32:45  4    Q.    On it, yes?

14:32:46  5         MS. LAKE:  Objection.

14:32:48  6         THE WITNESS:  I'm incarcerated.

14:32:49  7         THE COURT:  Overruled.

14:32:51  8    BY MR. WATLINGTON:

14:32:51  9    Q.    Well, are you saying that because you're

14:32:53  10   incarcerated, you can't give information?

14:32:55  11   A.    No, I was being sarcastic.

14:33:04  12        (Laughter)

14:33:09  13        MR. WATLINGTON:  I yield the witness at this

14:33:10  14   time, Judge.

14:33:11  15        THE COURT:  All right.  Redirect?

14:33:25  16                    REDIRECT EXAMINATION

14:33:26  17   BY MS. LAKE:

14:33:26  18   Q.    Good afternoon, Mr. Tapia.

14:33:28  19   A.    Good afternoon.

14:33:32  20   Q.    Do you recall, do you recall Attorney Watlington

14:33:35  21   asking you what you and Mr. Brown were talking about

14:33:39  22   when Mr. Brown would say, "I'm going home"?  Do you

14:33:43  23   recall that question?

14:33:43  24   A.    Yes, I do.

14:33:45  25   Q.    What were you and Mr. Brown talking about when

14:33:49  1    Mr. Brown and you are discussing 24?

14:33:53  2    A.    We were discussing the 24 kilograms of cocaine.

14:33:56  3    Q.    So you and Mr. Brown were in fact discussing the

14:33:59  4    procuring of cocaine, correct?

14:34:02  5    A.    That is correct.

14:34:03  6    Q.    And so when you and Mr. Brown were discussing

14:34:07  7    meeting by Cape Air, what were you two discussing?

14:34:15  8            MR. WATLINGTON:  Objection, Your Honor.

14:34:16  9    There's been no testimony -- no cross in regard to

14:34:20  10   anything about Cape Air.

14:34:21  11           THE COURT:  All right.  Sustained.

14:34:23  12           MS. LAKE:  May I be heard, Your Honor?

14:34:24  13           THE COURT:  No.  Ask your next question.

14:34:26  14   BY MS. LAKE:

14:34:26  15   Q.    So when Attorney Watlington asked you if there was

14:34:30  16   no conversations regarding the procurement of drugs --

14:34:33  17   do you recall that question?

14:34:34  18           MR. WATLINGTON:  Objection, Your Honor.

14:34:35  19           THE COURT:  Overruled.

14:34:37  20   BY MS. LAKE:

14:34:37  21   Q.    Do you recall that question?

14:34:37  22   A.    Yes, I do.

14:34:38  23   Q.    So the conversations between you and Mr. Brown

14:34:41  24   regarding meeting at Cape Air, do you recall that

14:34:45  25   conversation?

14:34:46   1          MR. WATLINGTON:  Objection, Your Honor.

14:34:47   2   There's been no cross in regards to Cape Air.  None

14:34:50   3   whatsoever.

14:34:50   4          THE COURT:  Sustained.

14:34:53   5   BY MS. LAKE:

14:34:53   6   Q.   Are there any other conversation that you had with

14:34:55   7   Mr. Brown regarding the procurement of cocaine?

14:34:58   8          MR. WATLINGTON:  Objection, Your Honor.  She's

14:34:59   9   leading the witness.

14:35:00   10          THE COURT:  Okay.  Overruled.

14:35:06   11          THE WITNESS:  Yes.

14:35:06   12   BY MS. LAKE:

14:35:06   13   Q.   And what conversation did you and Mr. Brown have

14:35:09   14   regarding the acquisition or procurement of cocaine?

14:35:14   15   A.   We spoke about where it might, that if a vehicle

14:35:21   16   that I, that would be parked at the Market Square would

14:35:26   17   be, and I would, that I must go by there, and if it's

14:35:32   18   there that the bag would be in the car and I would make

14:35:35   19   the transfer.

14:35:35   20   Q.   And what was the conversation that you had with

14:35:38   21   Mr. Brown on the recorded conversations that led to

14:35:42   22   that?

14:35:44   23   A.   I -- on the recorded conversation it asked -- it

14:35:47   24   has where I was asking him if there is, if he had any

14:35:52   25   possibility of knowing of anything that I can procure

14:35:56  1   these kilograms from.

14:35:58  2   Q.   So the conversation that you had with Mr. Brown did

14:36:02  3   relate to the procurement of cocaine; is that correct?

14:36:06  4        MR. WATLINGTON:  Objection, Your Honor.

14:36:06  5        THE COURT:  Sustained.

14:36:12  6   BY MS. LAKE:

14:36:12  7   Q.   And how did you know -- well, do you recall

14:36:15  8   Attorney Watlington asking you regarding picking up

14:36:20  9   money from a blue car?

14:36:21  10  A.   Yes, I do.

14:36:22  11  Q.   And how did you know to pick up money from that

14:36:24  12  car?

14:36:29  13        MR. WATLINGTON:  Objection, Your Honor.

14:36:30  14  Mischaracterization of the facts and the question.

14:36:32  15  There's no question about picking up money from a blue

14:36:34  16  car.

14:36:35  17        THE COURT:  All right.  Overruled.

14:36:36  18  BY MS. LAKE:

14:36:36  19  Q.   How did you know to pick up that money from that

14:36:38  20  blue car?

14:36:42  21  A.   I was picking -- I wasn't picking up the money.  I

14:36:46  22  was picking the kilograms out of the car and leaving the

14:36:49  23  money there.

14:36:49  24  Q.   And how did you know to leave the money and pick up

14:36:52  25  the drugs from that blue car?

14:36:54   1    A.   That blue car is a car that I've seen before, and

14:37:02   2    it's been in that area before.   And I knew that car,

14:37:07   3    that particular car.

14:37:08   4    Q.   And how did you know to get the drugs out of that

14:37:10   5    car?

14:37:13   6    A.   I was told, I was told that it would be in the car.

14:37:16   7    Q.   Who told you that?

14:37:18   8    A.   Raymond told me they would, it would be in the car.

14:37:28   9    Q.   And do you recall Attorney Mingolla asking you

14:37:36   10   about Walter Hill?   Do you recall those lines of

14:37:39   11   questions?

14:37:40   12   A.   Yes, I do.

14:37:41   13   Q.   And do you recall asking Mr. -- Attorney Mingolla

14:37:48   14   asking you why you didn't mention Walter Hill initially?

14:37:52   15   Do you recall those questions?

14:37:53   16   A.   Yes, I do.

14:37:54   17   Q.   And why did you not mention Walter Hill initially?

14:38:02   18   A.   Maybe I was fearful for my life.

14:38:05   19   Q.   Why were you fearful for your life?

14:38:10   20   A.   In this -- this kind of business, certain things

14:38:13   21   you would rather take to your grave than to reveal it.

14:38:17   22   Q.   And why did you eventually tell us, tell the

14:38:22   23   government about Walter Hill?

14:38:29   24   A.   I eventually told you because I was, I was housed

14:38:37   25   and, you know, going through everything, I just said let

14:38:42  1    me just do this.

14:38:45  2    Q.   So what do you mean, let me just do this?  What

14:38:47  3    does that mean?

14:38:53  4    A.   Well, I didn't -- in testifying, in doing the

14:38:55  5    proffers, as they say, I mentioned getting the cocaine

14:39:01  6    from St. John.  I never mentioned where I got it from.

14:39:07  7    And I did so on the eight or nine days ago, whenever I

14:39:14  8    came here.

14:39:14  9    Q.   And is Walter Hill known by a nickname to you?

14:39:19  10   A.   Yes.

14:39:20  11   Q.   And what is that nickname?

14:39:23  12   A.   Bigs.

14:39:25  13   Q.   And had you previously mentioned Bigs before?

14:39:27  14   A.   Yes, I have.

14:39:29  15   Q.   And what did you previously mention about Bigs?

14:39:32  16   A.   I mentioned where I took him to Puerto Rico.

14:39:38  17   Q.   And for what purpose?

14:39:39  18   A.   Well, we had, we had some bags, some black bags in

14:39:43  19   the car, in the boat, and we took them to Puerto Rico.

14:39:46  20   Q.   And what were in the black bags?

14:39:49  21   A.   That, I never looked in them, I can't say what was

14:39:53  22   in the bags.  But I took him and the bags out there.

14:39:58  23   Q.   And what happened after you took him with -- let me

14:40:01  24   stop you.  Who are -- who is him?

14:40:04  25   A.   Bigs.

14:40:05  1    Q.   And who is Bigs?

14:40:07  2    A.   Walter Hill.

14:40:08  3    Q.   So what happened after you took Walter Hill and the

14:40:11  4    black bags?

14:40:12  5    A.   Left him in Puerto Rico and I came back to St.

14:40:15  6    Thomas.

14:40:15  7    Q.   And what, if anything, happened after that?

14:40:17  8    A.   After that I was, I was paid five, $5,000.

14:40:22  9    Q.   By who?

14:40:24  10   A.   By -- I'm trying to remember.  I think Angelo

14:40:32  11   brought the money for me, if I'm not mistaken.  Angelo

14:40:36  12   brought the money for me.

14:40:37  13   Q.   And that money was for what?

14:40:38  14   A.   For taking him to Puerto Rico.

14:40:40  15   Q.   And how did you get in contact with Bigs?

14:40:44  16        MR. MINGOLLA:  Objection, Your Honor.  That's

14:40:46  17   speculation.

14:40:46  18        THE COURT:  For that question?  No.  Overruled.

14:40:46  19   BY MS. LAKE:

14:40:49  20   Q.   How did you get in contact with Bigs?

14:40:51  21   A.   I did not.  Angelo made that contact.

14:40:55  22   Q.   And had you ever been in contact with Bigs?

14:40:58  23   A.   No, I have not.

14:41:08  24   Q.   And the conversations that you had with Mr. Brown,

14:41:19  25   what were the purposes of the conversation that you had

14:41:22  1    with Mr. Brown?

14:41:23  2            MR. WATLINGTON:  Your Honor, objection.

14:41:24  3            THE COURT:  Overruled.

14:41:29  4            THE WITNESS:  I had several conversations with

14:41:30  5    Mr. Brown, some pertaining to nothing, some pertaining

14:41:34  6    to inquiries, and some pertaining to the two kilograms

14:41:39  7    and the 24 kilograms.

14:41:41  8    BY MS. LAKE:

14:41:45  9    Q.   Were there any additional deals that you did with

14:41:47  10   Raymond Brown?

14:41:49  11           MR. WATLINGTON:  Objection, Your Honor.

14:41:50  12           THE COURT:  Sustained.

14:41:51  13           MR. MINGOLLA:  Yeah, I second that objection,

14:41:53  14   Judge.

14:41:58  15           MS. LAKE:  Thank you.  I have nothing further.

14:41:59  16           THE COURT:  Mr. Tapia, thank you for your

14:42:01  17   testimony.

14:42:01  18        You may step down.

14:42:01  19        (Witness withdrew from stand.)

14:42:03  20           THE COURT:  Next witness.

14:42:05  21           MS. LAKE:  The government calls Angel

14:42:10  22   Negron-Beltran.

14:42:13  23           MR. WATLINGTON:  Your Honor, we would ask that

14:42:14  24   Mr. Tapia still be held in case there are additional

14:42:19  25   questions.

14:42:20  1           THE COURT:  All right.  He is not excused,

14:42:23  2  then.

14:42:24  3           MS. LAKE:  I ask that the witnesses before

14:42:26  4  Mr. Tapia be excused.

14:42:27  5           MR. WATLINGTON:  No objection, Your Honor.

14:42:28  6           THE COURT:  Attorney Mingolla?

14:42:30  7           MR. MINGOLLA:  I'm sorry, sir?

14:42:31  8           THE COURT:  Yes.  The government asked to have

14:42:33  9  the witnesses before Mr. Tapia excused.  Do you have any

14:42:38  10  further need for any of those witnesses?  Other than

14:42:41  11  Mr. Tapia?

14:42:44  12       Do you have any objection to them being --

14:42:46  13           MR. MINGOLLA:  No, just about Mr. Tapia.

14:42:48  14           THE COURT:  So you have no objection to them --

14:42:50  15  the others besides Tapia being excused?

14:42:53  16           MR. MINGOLLA:  No, Your Honor.

14:42:53  17           THE COURT:  All right.  They're excused.

14:43:41  18       Do you need an interpreter for this?

14:43:44  19           MS. LAKE:  Yes, Your Honor.

14:43:44  20           THE COURT:  She's in the audience.

14:43:46  21       You can swear the interpreter now.

14:43:58  22           THE CLERK:  Please state your name for the

14:44:00  23  record.

14:44:00  24           THE INTERPRETER:  Myra Solomon.

14:44:03  25       (Spanish interpreter sworn.)

14:44:08   1               THE INTERPRETER:  I do.

14:44:35   2               THE CLERK:  Please raise your right hand to

14:44:37   3   take the oath.

14:44:39   4        (Witness sworn.)

14:44:44   5               THE WITNESS:  I do.

14:44:58   6               THE COURT:  Let me see counsel at sidebar.

14:45:19   7        (Sidebar discussion held as follows:)

14:45:43   8               THE COURT:  I just want to make sure that the

14:45:47   9   interpreter speaks English for publication.  We don't

14:45:51   10   need to have Spanish.  She needs to have Spanish

14:45:56   11   discussion with the witness, not with everyone else.

14:46:03   12      Good afternoon.

14:46:04   13               THE INTERPRETER:  Good afternoon, Your Honor.

14:46:05   14               THE COURT:  I want to make sure that the

14:46:07   15   translation, we don't need to hear Spanish over the

14:46:10   16   mike.  So you only need to speak to the witness when it

14:46:12   17   comes to Spanish.  But English, that's what I want you

14:46:15   18   to turn towards the mike and speak the English into the

14:46:18   19   mike.  Nothing else into the mike except English.

14:46:21   20               THE INTERPRETER:  Yes, Your Honor.

14:46:22   21               THE COURT:  All right.  Thank you.

14:46:22   22              THEREUPON, ANGEL NEGRON-BELTRAN, having been

14:46:44   23   duly sworn, was examined and testified as follows:

14:46:44   24                     DIRECT EXAMINATION

14:46:44   25   BY MS. LAKE:

14:46:44   1    Q.   Good afternoon, Mr. Beltran.

14:46:47   2    A.   Good afternoon.

14:46:47   3    Q.   How old are you?

14:46:51   4    A.   53.

14:46:53   5    Q.   And where were you born?

14:46:55   6         THE COURT:  Hold on one second.  You can pull

14:47:00   7    the mike down to your level so you don't have to keep

14:47:03   8    reaching.

14:47:03   9         THE WITNESS:  In San Juan, Puerto Rico.

14:47:05  10    BY MS. LAKE:

14:47:05  11    Q.   And where were you raised?

14:47:07  12    A.   Rio Piedras.

14:47:10  13    Q.   Is that also in Puerto Rico?

14:47:15  14    A.   Yes.

14:47:15  15    Q.   And what do you do for a living?

14:47:22  16    A.   I have my own business, food business.

14:47:25  17    Q.   And did you engage in other activities aside from

14:47:29  18    the food business?

14:47:38  19    A.   Yes.  I was also an auto mechanic.

14:47:40  20    Q.   And did you do anything else aside being an auto

14:47:44  21    mechanic?

14:47:53  22    A.   I rented homes.

14:47:54  23    Q.   Were you involved in drug trafficking?

14:47:58  24         MR. WATLINGTON:  Objection, Your Honor.

14:48:00  25         THE COURT:  Okay.  Overruled.

14:48:08  1          THE WITNESS:  Yes, I was.

14:48:09  2     BY MS. LAKE:

14:48:09  3     Q.   And what was the general time frame that you were

14:48:11  4     involved in that activity?

14:48:18  5     A.   For about two or three years.

14:48:20  6     Q.   Beginning what year, approximately?

14:48:25  7     A.   Around 2008.

14:48:32  8     Q.   And were you charged in this case?

14:48:37  9     A.   Yes.

14:48:37 10     Q.   And did you plead guilty?

14:48:41 11     A.   Yes.

14:48:41 12     Q.   And what did you plead guilty to?

14:48:43 13     A.   Possession and conspiracy.

14:48:43 14          (Government's Exhibit 89a marked for

14:48:43 15     identification.)

14:48:56 16     BY MS. LAKE:

14:48:56 17     Q.   Now showing you what's in front of you, what's been

14:48:59 18     marked as Government's 89a.  Do you see that in front of

14:49:08 19     you?

14:49:08 20     A.   Yes.

14:49:09 21     Q.   What is Government's Exhibit 89a?

14:49:20 22     A.   I can't really read it because it's in English.

14:49:24 23     Q.   Showing you the last page.  Do you see the last

14:49:46 24     page in front of you?

14:49:48 25     A.   Yes.

14:49:49  1    Q.   And do you see your signature?

14:49:53  2    A.   Yes.

14:49:54  3    Q.   And is it your understanding that this is your plea

14:50:00  4    agreement?

14:50:00  5    A.   Yes.

14:50:00  6         (Government's Exhibit 89b marked for

14:50:00  7    identification.)

14:50:00  8    Q.   And now showing you Government's Exhibit 89b.  Do

14:50:10  9    you see Government's Exhibit 89b in front of you?

14:50:19  10   A.   Yes.

14:50:20  11   Q.   And what is that?

14:50:21  12   A.   It's my plea agreement that I signed.

14:50:24  13   Q.   And is it your understanding that this is a

14:50:28  14   portion --

14:50:28  15        THE COURT:  He just said what it is.  Don't

14:50:30  16   testify.

14:50:32  17   BY MS. LAKE:

14:50:32  18   Q.   And have you agreed to cooperate in this case,

14:50:35  19   Mr. Beltran?

14:50:38  20   A.   Yes.

14:50:39  21   Q.   And why have you agreed to cooperate in this case?

14:50:51  22   A.   The evidence was enough and sufficient for me to

14:50:54  23   make this plea agreement.

14:50:58  24   Q.   And what is your understanding of your cooperation?

14:51:12  25   A.   I understand that I will receive less time.

| | | |
|---|---|---|
| 14:51:14 | 1 | Q.   And what must you do? |
| 14:51:22 | 2 | A.   I have to tell the truth. |
| 14:51:27 | 3 | Q.   And what was your involvement in cocaine |
| 14:51:29 | 4 | trafficking? |
| 14:51:37 | 5 | A.   I used to buy. |
| 14:51:39 | 6 | Q.   And do you know someone named Roberto Tapia? |
| 14:51:46 | 7 | A.   Yes. |
| 14:51:47 | 8 | Q.   How do you know Mr. Tapia? |
| 14:51:54 | 9 | A.   For about 20 years ago, I met him at boat racing. |
| 14:52:00 | 10 | Q.   And where was that? |
| 14:52:05 | 11 | A.   In San Juan and here. |
| 14:52:09 | 12 | Q.   When you say "here," do you mean St. Thomas? |
| 14:52:13 | 13 | A.   Yes. |
| 14:52:13 | 14 | Q.   And did you and Mr. Tapia have any sort of |
| 14:52:17 | 15 | relationship as it relates to cocaine trafficking? |
| 14:52:27 | 16 | A.   Yes. |
| 14:52:28 | 17 | Q.   And what was that -- |
| 14:52:34 | 18 | THE COURT:  Let me see counsel at sidebar. |
| 14:52:36 | 19 | THE WITNESS:  Repeat, please. |
| 14:52:37 | 20 | THE COURT:  Let me see counsel at sidebar. |
| 14:52:51 | 21 | (Sidebar discussion held as follows:) |
| 14:52:52 | 22 | THE COURT:  Let me see the interpreter, too. |
| 14:53:07 | 23 | Okay.  Two things.  One, don't have any exchange |
| 14:53:09 | 24 | with the witness unless it's what someone says, one of |
| 14:53:11 | 25 | the lawyers or me or the witness. |

14:53:13  1          Two, I want you to do a rolling interpretation, if

14:53:16  2     you can.  So when the question is being asked, you can

14:53:20  3     begin the translation.  Can you do that?

14:53:24  4                THE INTERPRETER:  Yes.

14:53:24  5                THE COURT:  So don't wait until it's done, or

14:53:27  6     else it will take twice as long for this to happen.  It

14:53:30  7     will take the attorney ask the question, then you ask

14:53:32  8     the question, then the witness to answer in Spanish, and

14:53:35  9     then you to say it in English.  So if you can do a

14:53:39  10    rolling as it is coming in, just say it off mike, as he

14:53:42  11    is speaking into your ear, if you can translate it.

14:53:47  12         Thank you.

14:53:51  13               MS. LAKE:  Your Honor --

14:53:52  14               THE COURT:  All right.  Now again, Attorney

14:53:54  15    Lake, I want you to beware with those questions.

14:53:59  16               MS. LAKE:  I'm sorry?

14:54:00  17               THE COURT:  I want you to beware with those

14:54:03  18    questions because ordinarily one would expect a

14:54:05  19    nonleading question or a question that doesn't assume a

14:54:08  20    fact not in evidence.

14:54:10  21         For instance, in the last question I would have

14:54:13  22    expected like:  What, if any, relationship did you have

14:54:15  23    with Mr. Tapia; as opposed to:  What is your

14:54:18  24    relationship with respect to cocaine.

14:54:21  25               MS. LAKE:  I --

14:54:22   1          THE COURT:  So relationship with respect to

14:54:24   2   cocaine, I don't recall this witness previously saying

14:54:29   3   that he had a cocaine relationship with Mr. Tapia.

14:54:32   4          The question that preceded that was, how do you

14:54:35   5   know Mr. Tapia, do you know Mr. Tapia?

14:54:38   6          I met him at a boat race 20 years ago.

14:54:40   7          And what is your relationship with respect to

14:54:42   8   cocaine?

14:54:43   9          Again, let the witness testify, especially about

14:54:46   10   issues that are germane and significant to this case.

14:54:51   11   All right.

14:54:51   12          MS. LAKE:  I believe I asked:  What, if any,

14:54:53   13   relationship did you have with Mr. Tapia in relation to

14:54:56   14   cocaine trafficking?

14:54:57   15          But if I did not I apologize and I will rephrase

14:54:59   16   the question.

14:55:00   17          THE COURT:  "What if any" does not cure the

14:55:02   18   defect that I'm pointing out, which is assuming a fact

14:55:05   19   not in evidence, and there is some relationship with

14:55:07   20   respect to cocaine.  "What if any" sometimes assumes a

14:55:11   21   cure-all for a leading question.

14:55:13   22          It is not a cure-all for all leading questions, but

14:55:16   23   significantly when it comes to a question that assumes

14:55:18   24   something not in evidence, and that is a relationship

14:55:21   25   with respect to cocaine.  "What if any" doesn't cure it.

| | | |
|---|---|---|
| 14:55:25 | 1 | MS. LAKE:  I understand. |
| 14:55:25 | 2 | THE COURT:  All right.  Thank you. |
| 14:55:27 | 3 | MS. LAKE:  Your Honor, at some point is it |
| 14:55:29 | 4 | possible that we can take a restroom break? |
| 14:55:32 | 5 | THE COURT:  We just got here. |
| 14:55:34 | 6 | MS. LAKE:  I know.  I apologize, but I really |
| 14:55:36 | 7 | need to use the restroom.  It won't take long, but I |
| 14:55:40 | 8 | really need to use the restroom. |
| 14:55:42 | 9 | THE COURT:  We might have a break for the |
| 14:55:44 | 10 | jurors, so... |
| 14:55:44 | 11 | MS. LAKE:  Okay. |
| 14:55:45 | 12 | (End of sidebar, open court as follows:) |
| 14:55:59 | 13 | BY MS. LAKE: |
| 14:56:00 | 14 | Q.   Mr. Negron, what, if any, was your relationship |
| 14:56:03 | 15 | with Mr. Tapia? |
| 14:56:07 | 16 | A.   You mean the friendship or the drug trafficking? |
| 14:56:12 | 17 | THE COURT:  All right.  Let's -- we're going to |
| 14:56:14 | 18 | take a break now, ladies and gentlemen.  All rise. |
| 14:56:16 | 19 | Ten minutes. |
| 14:57:02 | 20 | (Jury out) |
| 14:57:03 | 21 | THE COURT:  Okay.  Mr. Negron, we're going to |
| 14:57:06 | 22 | take a 15-minute break -- actually a 10-minute break. |
| 14:57:11 | 23 | Do not discuss your testimony with anyone during the |
| 14:57:14 | 24 | break.  Do you understand? |
| 14:57:24 | 25 | THE WITNESS:  Yes. |

14:57:27   1           THE COURT:  You can step down.

14:57:41   2        (Witness stood aside)

14:57:43   3           THE COURT:  All right.  Counsel, 10 minutes.

15:16:24   4        (Court in recess, 2:58 p.m.)

15:16:24   5        (After recess, jury present, 3:16 p.m.)

15:16:29   6           THE COURT:  Attorney Lake, ready to proceed?

15:16:31   7           MS. LAKE:  Yes, Your Honor.

15:16:31   8           THE COURT:  Go right ahead.

15:16:33   9              DIRECT EXAMINATION (Continued)

15:16:33  10    BY MS. LAKE:

15:16:33  11    Q.   Mr. Negron-Beltran, please discuss the friendship

15:16:38  12    you had with Mr. Tapia first.  Explain that.

15:16:45  13    A.   The friendship was with respect to the trafficking.

15:16:52  14    He will look for me and ask me to go and buy, buy it for

15:16:58  15    him.

15:16:58  16    Q.   Buy what?

15:17:01  17    A.   In this case cocaine.

15:17:03  18    Q.   And he -- approximately how many times would you

15:17:13  19    buy?

15:17:16  20    A.   Three or four times.

15:17:18  21    Q.   When was the first time?

15:17:23  22    A.   Around 2008.

15:17:26  23    Q.   And how many kilograms was it for?

15:17:34  24    A.   Two or three only.

15:17:36  25    Q.   And for what exactly did you buy, were you trying

15:17:43  1    to buy?  Exactly what type of drug, what type of

15:17:48  2    narcotic were you trying to buy?

15:18:01  3    A.   It was cocaine.

15:18:02  4    Q.   And did Mr. Tapia tell you who supplied --

15:18:07  5         THE COURT:  Don't lead your witness.

15:18:11  6    BY MS. LAKE:

15:18:11  7    Q.   Who, if anyone, was part of that, that first drug

15:18:14  8    deal?

15:18:15  9         MR. WATLINGTON:  Objection, Your Honor.

15:18:17  10        THE COURT:  Overruled.

15:18:27  11        THE WITNESS:  I always deal with Tapia.

15:18:29  12   BY MS. LAKE:

15:18:29  13   Q.   Who, if anyone, was the supplier?

15:18:33  14        MR. WATLINGTON:  Objection, Your Honor.

15:18:34  15        THE COURT:  Sustained.

15:18:37  16   BY MS. LAKE:

15:18:38  17   Q.   What was your understanding of that first deal?

15:18:46  18        MR. WATLINGTON:  Your Honor, I would object as

15:18:50  19   to we have no clue as to what we're talking about, what

15:18:54  20   first deal we're referring to and what deal we're

15:19:00  21   talking to.

15:19:01  22        MR. MINGOLLA:  I second that motion as well,

15:19:04  23   Your Honor.  What foundation --

15:19:05  24        THE COURT:  All right.  Overruled.

15:19:10  25        THE WITNESS:  He would always inform me when he

15:19:14  1    have the drugs.

15:19:15  2              MR. WATLINGTON:  Your Honor, I object to the

15:19:17  3    response as nonresponsive.

15:19:19  4              THE COURT:  Okay.  Overruled.

15:19:22  5    BY MS. LAKE:

15:19:22  6    Q.   What else would Mr. Tapia inform you?

15:19:26  7    A.   Tapia told me that, that he had the drugs with him

15:19:33  8    and that he was going to sell it to me.

15:19:37  9    Q.   Were you aware of Tapia's points of contact?

15:19:45  10             MR. WATLINGTON:  Objection, Your Honor.

15:19:46  11             THE COURT:  Okay.  Overruled.

15:19:53  12             THE WITNESS:  Around that time, I did not know.

15:19:55  13   BY MS. LAKE:

15:19:55  14   Q.   And did you ever learn who they were?

15:20:02  15   A.   Yes, on this case I did.

15:20:03  16   Q.   And who were the points of contact in this case?

15:20:09  17             THE COURT:  Stop.  Come to sidebar.

15:20:26  18        (Sidebar discussion held as follows:)

15:20:41  19             THE COURT:  He didn't know at the time who any

15:20:43  20   points of the contact were for Mr. Tapia.  And then he

15:20:46  21   said he learned with this case.  Tell me how is it you

15:20:55  22   would want information to come in through this witness?

15:20:58  23   That is, what rule are we talking about?

15:21:02  24             MS. LAKE:  When he said "this case," and I will

15:21:05  25   clarify, it's my understanding that he means in this

15:21:09  1    drug deal associated with this case, that he had

15:21:11  2    personal knowledge who the points of contact were.

15:21:14  3         THE COURT:  He hasn't said any of that, though,

15:21:15  4    what you just said.

15:21:17  5         MS. LAKE:  I was trying to lay the foundation

15:21:18  6    for that, trying to get an understanding of what "this

15:21:22  7    case" means.  But the foundation, to answer the Court's

15:21:27  8    questions, the foundation is to his own personal

15:21:30  9    statements and statements of the coconspirator.

15:21:32  10        THE COURT:  My question was, what rule?  What

15:21:34  11   rule is -- what rule, you're trying to say that he

15:21:40  12   learned it through what.

15:21:40  13        MS. LAKE:  The coconspirator statement.

15:21:42  14        THE COURT:  Coconspirator statement.  So you

15:21:43  15   don't want -- okay.  Well, there's been nothing laid at

15:21:46  16   this point for any statements to come in, so...

15:21:52  17        MS. LAKE:  At this point, Your Honor, he

15:21:53  18   testified to an agreement with Roberto Tapia regarding

15:21:56  19   three or four drug deals.  And that, I was asking what,

15:22:00  20   if anything, Mr. Tapia said regarding the agreement of

15:22:04  21   those drug deals.

15:22:05  22        THE COURT:  Right.  An agreement with Mr. Tapia

15:22:07  23   or any conduct with Mr. Tapia doesn't necessarily

15:22:10  24   implicate these defendants, correct?

15:22:12  25        MS. LAKE:  That's correct.

15:22:13  1          THE COURT:  All right.  So you would appreciate

15:22:18  2    why there would be an objection to why it would be

15:22:20  3    relevant.

15:22:20  4          MS. LAKE:  I understand that.  But I'm asking

15:22:22  5    for a little bit of leeway just to lay the foundation,

15:22:25  6    the Bourjaily foundation -- well, I'm not asking for the

15:22:28  7    content of their statements quite yet.  I'm asking

15:22:31  8    who -- I guess they are the statements, who were members

15:22:35  9    of the conspiracy in order to get the statements.

15:22:37  10          THE COURT:  How would he know it?

15:22:38  11          MR. WATLINGTON:  It would have to be through

15:22:39  12    hearsay --

15:22:40  13          THE COURT:  Hold on, Counsel.

15:22:42  14          MR. WATLINGTON:  Sorry.

15:22:42  15          THE COURT:  How would he know it?

15:22:45  16          MS. LAKE:  Through his coconspirator,

15:22:47  17    Mr. Tapia.  And at this point there's an agreement

15:22:49  18    between Mr. Tapia, so those are two conspirators; now

15:22:53  19    how it relates to the defendants in the current case.

15:22:55  20          THE COURT:  But Attorney Lake, one agreement

15:22:56  21    doesn't necessarily mean that everyone has joined that

15:22:58  22    agreement.

15:22:59  23       So the fact that there may have been some

15:23:01  24    understanding, when he says 20 years ago, doesn't

15:23:04  25    necessarily mean there was an understanding

15:23:06   1    significantly with these defendants for the appropriate

15:23:09   2    things that are under examination in this case.  So you

15:23:14   3    need to lay your foundation.

15:23:16   4        I don't want the witness to be running off to the

15:23:19   5    races with something that may have come in at some point

15:23:21   6    other than is appropriate.  Now if it's something during

15:23:25   7    and in relation to a conspiracy, that's fine.  I've

15:23:28   8    already made a Bourjaily finding that there was some

15:23:32   9    agreement and some conspiracy involving the person,

15:23:37  10    Mr. Beltran.  But I don't know if what he's talking

15:23:40  11    about is the same thing, and nor is there any evidence

15:23:44  12    on the record, at least at this stage, that what he's

15:23:47  13    talking about is that.

15:23:48  14            MS. LAKE:  Okay.

15:23:49  15            THE COURT:  Okay.  Thank you, Counsel.

15:23:58  16        (End of sidebar, open court as follows:)

15:23:59  17            THE COURT:  The objection is sustained.

15:24:01  18    BY MS. LAKE:

15:24:02  19    Q.   Mr. Beltran, were you arrested in this case?

15:24:08  20    A.   Yes.

15:24:08  21    Q.   And what were the circumstances?  Why were you

15:24:12  22    arrested?  What were the circumstances surrounding the

15:24:14  23    arrest?

15:24:21  24    A.   I was arrested because I was found with Mr. Tapia

15:24:24  25    with seven kilos.

15:24:26  1    Q.   And what was your agreement with Mr. Tapia

15:24:28  2    regarding those seven kilos?

15:24:35  3    A.   He was going to supply it for me and I will buy it

15:24:42  4    from him.

15:24:43  5    Q.   And did you and Mr. Tapia agree on a price?

15:24:47  6    A.   Yes.  We agreed on $13,500.

15:25:01  7    Q.   And what was your understanding regarding the

15:25:04  8    details of that agreement?

15:25:12  9    A.   I understand that --

15:25:13  10         THE COURT:  Stop, stop.  Stop.

15:25:15  11         Come to sidebar.

15:25:32  12         (Sidebar discussion held as follows:)

15:25:33  13         THE COURT:  All right.  Attorney Lake, tell me

15:25:34  14    why this is coming in now.

15:25:37  15         MS. LAKE:  I'm trying to lay the foundation

15:25:40  16    like we discussed on our earlier sidebar, regarding the

15:25:43  17    involvement of any of these defendants regarding this

15:25:46  18    case.  And --

15:25:46  19         THE COURT:  But you're asking him questions

15:25:48  20    like what is his understanding.  An understanding could

15:25:51  21    come with a discussion from an agent.  It could be

15:25:54  22    post-arrest.  It could be from reading something.  It

15:25:56  23    could be during a debriefing.

15:25:59  24         So, you say you're laying the foundation.  What I

15:26:02  25    think is actually happening is he's just stating

15:26:06  1    information that could have been gleaned from any number

15:26:08  2    of sources or at any time.  So, you know, I don't know

15:26:16  3    if you're quite getting there in a way that doesn't run

15:26:19  4    afoul.

15:26:20  5        I was under the impression that you were going to

15:26:22  6    ask questions about what, what he did.  And during the

15:26:27  7    course of what he did, he would say what he said and

15:26:30  8    what other people said, and who was involved in those

15:26:32  9    things that he was undertaking as opposed to some

15:26:38  10   understanding from something that is not clear, the time

15:26:42  11   when he got that understanding.

15:26:45  12        So what's coming in now, or where it seems it's

15:26:52  13   headed is not pegged to a time that is pre-arrest.  It's

15:26:56  14   not pegged to utterances made during and in furtherance

15:27:01  15   of a conspiracy, if that's where you're headed.

15:27:04  16                MS. LAKE:  I will ask him where you're headed.

15:27:08  17                MR. MINGOLLA:  That's hearsay.

15:27:08  18                THE COURT:  Excuse me?

15:27:10  19                MR. MINGOLLA:  That is hearsay.

15:27:10  20                THE COURT:  If it's something that is

15:27:12  21   nonhearsay or doesn't fall within an exception, it would

15:27:14  22   be hearsay.  That's his statement.  So at this point I

15:27:18  23   think I stopped him, information was translated or

15:27:23  24   significant portions were translated.  But the question

15:27:25  25   was what was his understanding.  I think that may have

15:27:28  1    been the last question.

15:27:37  2         Is that right?  Yes.  All right.  Thank you,

15:27:40  3    Counsel.

15:27:54  4         (End of sidebar, open court as follows:)

15:27:55  5    BY MS. LAKE:

15:27:55  6    Q.   Mr. Negron-Beltran, what did you do after you

15:27:59  7    agreed with Mr. Tapia regarding the seven kilos?

15:28:10  8    A.   I, I get some money and I send it to him.  And

15:28:16  9    after I give him the money, he was going to give me the,

15:28:24  10   he was going to give me the job.

15:28:26  11   Q.   How did you get the money to Mr. Tapia?

15:28:35  12   A.   I used another person and I send the money to him.

15:28:38  13   Q.   And how did Mr. Tapia get that money?

15:28:47  14   A.   I used, there were some fisherman, and I gave the

15:28:51  15   money to a fisherman, who in turn would give it to

15:28:55  16   Mr. Tapia.

15:28:55  17   Q.   And were you in contact with Mr. Tapia?

15:28:58  18   A.   Yes.

15:28:59  19   Q.   And how were you in contact with Mr. Tapia?

15:29:02  20   A.   By telephone.

15:29:04  21   Q.   And what, if anything, did you say to Mr. Tapia by

15:29:08  22   telephone regarding this process?

15:29:14  23   A.   I told him it was ready, and that the people were

15:29:18  24   ready to meet with him.

15:29:21  25   Q.   And then what happened next?

15:29:28  1   A.   I called Tapia and Tapia said he was ready.  He had

15:29:31  2   it in his hand.

15:29:32  3   Q.   He had what in his hand?

15:29:36  4   A.   The drugs.

15:29:41  5   Q.   And --

15:29:42  6        MS. LAKE:  Your Honor, I would ask to play

15:29:44  7   what's been admitted into evidence as Government's

15:29:46  8   Exhibit 59a and b.

15:30:21  9        (Exhibit published.)

15:31:47  10  BY MS. LAKE:

15:31:47  11  Q.   Mr. Negron-Beltran, who is speaking?

15:31:51  12  A.   Tapia and I.

15:31:55  13  Q.   And what are you two discussing?

15:31:58  14  A.   We were discussing how I was going to deliver the

15:32:00  15  money to him.

15:32:05  16  Q.   And what happened next?

15:32:07  17  A.   He confirmed to me that he had the money.

15:32:10  18  Q.   And what happened next?

15:32:15  19  A.   He called me on the following day and he told me

15:32:19  20  that he had the drugs.

15:32:23  21  Q.   And then what happened next?

15:32:28  22  A.   The guys went by to pick him up.

15:32:51  23  Q.   And what happened after that?

15:32:53  24  A.   After that, we lost communication with each other.

15:32:57  25       After that call, we called, he called me after that

15:33:06  1    and he said that he has the drug in his hand and that

15:33:09  2    the boys were going to come to pick it up on the

15:33:14  3    following day.

15:33:34  4              MS. LAKE:  May I have a brief moment, Your

15:33:39  5    Honor?

15:33:39  6              THE COURT:  Yes.

15:33:39  7              MS. LAKE:  I would like to play what's admitted

15:33:43  8    as Government's 66a and b.

15:34:45  9         (Exhibit published.)

15:34:47  10   BY MS. LAKE:

15:34:47  11   Q.   Mr. Tapia -- I'm sorry.  Mr. Negron-Beltran, who is

15:34:50  12   speaking?

15:34:50  13             THE COURT:  Before you go on, Counsel, did you

15:34:52  14   ever ask the witness his name?

15:34:58  15             MS. LAKE:  Yes, Your Honor, I -- Your Honor,

15:35:00  16   Mr. Negron-Beltran -- I'll ask again.

15:35:03  17   BY MS. LAKE:

15:35:05  18   Q.   Mr. Negron-Beltran --

15:35:06  19             THE COURT:  Stop.  Not "again."  You didn't ask

15:35:08  20   it.  You can ask it now.

15:35:09  21   BY MS. LAKE:

15:35:10  22   Q.   Mr. Negron-Beltran, please state your name for the

15:35:13  23   record.

15:35:13  24   A.   Angel Luis Negron-Beltran.

15:35:17  25   Q.   Can you please spell your full name for the record?

15:35:22   1    A.   A-n-g-e-l; L-u-i-s, Luis; Negron, N-e-g-r-o-n;

15:35:40   2    Beltran, B-e-l-t-r-a-n.

15:35:45   3    Q.   And do you go by -- do you have a nickname?

15:35:50   4    A.   Pee Wee.

15:35:53   5    Q.   And do you recall hearing the phone call that was

15:35:56   6    just played?

15:36:03   7    A.   Yes.  He was confirming that he received the money.

15:36:06   8    Q.   And who is "he"?

15:36:09   9    A.   Mr. Tapia.

15:36:11  10    Q.   And the money for what?

15:36:16  11    A.   To buy (Spanish) kilos -- seven kilos.

15:36:21  12    Q.   And what, if anything, happened next?

15:36:28  13    A.   I told him to call me back, that I was going to

15:36:34  14    give it to him on the following day at 10:00 a.m.

15:36:38  15    Q.   Give what?

15:36:41  16    A.   The seven kilos.

15:36:43  17    Q.   And what happened next?

15:36:50  18    A.   After that, he called me and said he was ready.

15:36:55  19    Q.   And then what happened after that?

15:36:58  20    A.   On the following day, I sent the guys to pick it

15:37:07  21    up.

15:37:08  22    Q.   And what happened?

15:37:11  23    A.   I do not remember if they, if they give it to him

15:37:15  24    on that day or the following day.  I'm not sure.

15:37:19  25    Q.   Now, Mr. Negron Beltran, how many -- well, did you

15:37:26  1    engage in more than just -- you testified that you and

15:37:31  2    Mr. Tapia engaged in more than just one deal, is that

15:37:34  3    correct?

15:37:38  4    A.   Yes.

15:37:38  5    Q.   Approximately how many?

15:37:41  6    A.   About three.

15:37:42  7    Q.   And what was Mr. Tapia's role in these deals?

15:37:54  8    A.   He will get the drug and give it to me.

15:37:58  9    Q.   And what was your role in these deals?

15:38:04  10   A.   I will purchase it for myself.

15:38:07  11   Q.   And so when was the first time you and Mr. Tapia

15:38:11  12   engaged in a deal?

15:38:16  13   A.   Around 2008.

15:38:16  14   Q.   So what happened?  Describe what happened.  What's

15:38:21  15   the first thing that happened?

15:38:25  16   A.   Well, nothing.  He will provide the drug for me and

15:38:31  17   I will pay him for it.

15:38:33  18   Q.   And how -- what quantity of drugs were involved in

15:38:36  19   the first deal?

15:38:39  20          MR. WATLINGTON:  Objection, Your Honor.

15:38:40  21          THE WITNESS:  Two and three kilos.

15:38:42  22          THE COURT:  Overruled.

15:38:43  23   BY MS. LAKE:

15:38:44  24   Q.   And what, if anything, did you give Mr. Tapia in

15:38:47  25   exchange for those kilograms?

15:38:56   1   A.   I usually will give him some -- he will usually

15:38:58   2   make some profit.

15:39:00   3   Q.   And do you know -- how much, if any, did you give

15:39:06   4   Mr. Tapia?

15:39:10   5   A.   $2,000 off.

15:39:15   6   Q.   Was anyone else involved in this two-or-three-kilo

15:39:21   7   drug deal?

15:39:22   8           MR. WATLINGTON:  Objection, Your Honor.

15:39:23   9           THE COURT:  Overruled.

15:39:26   10          THE WITNESS:  At that time it was only him.

15:39:27   11   BY MS. LAKE:

15:39:28   12   Q.   And so when was the next time that you and

15:39:30   13   Mr. Tapia engaged in a deal?

15:39:42   14   A.   I do not remember very good when was the last time,

15:39:44   15   but that one was the last time one I made with him.

15:39:48   16   Q.   Well, do you recall before this last one?

15:39:56   17   A.   No.

15:39:58   18   Q.   Do you recall ever a time that there was anyone

15:40:00   19   else besides Mr. Tapia involved in a drug deal with you?

15:40:14   20   A.   At that time, no.  Later on, yes.

15:40:17   21   Q.   So tell us about the later on.  What happened?

15:40:28   22   A.   At that time it was only with Mr. Tapia.

15:40:32   23   Q.   And at some point, did you learn about someone else

15:40:35   24   who was involved?

15:40:37   25          MR. WATLINGTON:  Objection, Your Honor.

15:40:38  1          MR. MINGOLLA:  Yeah, objection.  Leading.

15:40:39  2          MR. WATLINGTON:  Objection.

15:40:40  3          THE COURT:  Sustained.

15:40:41  4          MS. LAKE:  Your Honor, I would ask to play

15:40:43  5     government -- what's been admitted as Government

15:40:46  6     Exhibit 53a and b.

15:40:51  7          THE COURT:  53, is that in?

15:40:55  8          MS. LAKE:  Yes, Your Honor.

15:41:05  9          MR. WATLINGTON:  I'll object to the publishing.

15:41:08  10    I don't think it's been admitted.

15:41:10  11         MR. MINGOLLA:  It hasn't, Judge -- I'm sorry.

15:41:13  12    Forgive me.

15:41:15  13         MR. WATLINGTON:  It hasn't been admitted into

15:41:19  14    evidence, Your Honor.

15:41:21  15         MS. LAKE:  It has, Your Honor.

15:41:22  16         THE COURT:  Hold on.  I'll check.  There's no

15:41:24  17    need to go back and forth.

15:41:32  18        All right.  25 through 53, it appears.  Okay.  It's

15:42:00  19    already been published, too.

15:42:02  20        All right.  It's in.  It's already been published,

15:42:05  21    though.

15:42:06  22         MS. LAKE:  May I please play it again, Your

15:42:08  23    Honor?

15:42:08  24         THE COURT:  Let me see counsel at sidebar?  I

15:42:11  25    believe that everything that we've played already has

15:42:14   1    been published, too, with this witness.  Come to

15:42:21   2    sidebar.

15:42:49   3

15:42:49   4        (Sidebar discussion held as follows:)

15:42:49   5           THE COURT:  Everything that has been played

15:42:51   6    with this witness has already been played.

15:42:53   7        We're not going to play all of these all over.

15:42:55   8           MS. LAKE:  No, just this last one.

15:42:57   9           THE COURT:  All right.  Okay.

15:43:08   10       (End of sidebar, open court as follows:)

15:43:16   11          MS. LAKE:  Your Honor, may I play Government's

15:43:18   12   Exhibit -- what has been admitted as Government's

15:43:21   13   Exhibit 53a and b.

15:43:24   14          THE COURT:  Go ahead.

15:44:30   15       (Exhibit published.)

15:44:32   16   BY MS. LAKE:

15:44:32   17   Q.   Mr. Negron-Beltran, who is speaking?

15:44:38   18   A.   Roberto Tapia.

15:44:39   19   Q.   And who else is speaking?

15:44:41   20   A.   And I.

15:44:41   21   Q.   And what are you two discussing?

15:44:47   22   A.   At that time we are talking about two things.

15:44:51   23   First was a Formica that was supposed to be delivered.

15:44:58   24   And there was some people that was supposed to meet me

15:45:01   25   at home.

15:45:02    1    Q.    Who were those people that were supposed to meet

15:45:04    2    you at home?

15:45:05    3    A.    Some of my friends.

15:45:08    4    Q.    Who is La Catora?

15:45:16    5    A.    La Catora is one of my friends who live here in St.

15:45:20    6    Thomas.

15:45:20    7    Q.    And what, if any, relationship do you have with La

15:45:28    8    Catora?

15:45:28    9    A.    A good friendship between him and the family and

15:45:32   10    myself.

15:45:32   11    Q.    Do you have any other relationship with La Catora?

15:45:37   12    A.    Not at that time.

15:45:41   13    Q.    Did you have some other relationship with La Catora

15:45:45   14    later?

15:45:52   15    A.    Well, at that time what Tapia had given to me, he

15:46:01   16    was going to charge me for it.

15:46:04   17    Q.    And what had Mr. Tapia given to you?

15:46:11   18    A.    He was going to visit me where we was going to

15:46:15   19    discuss the prices.

15:46:16   20    Q.    The prices of what?

15:46:19   21    A.    The prices of the drugs.

15:46:21   22    Q.    And what drugs were they specifically?

15:46:27   23    A.    Some kilos.

15:46:28   24    Q.    Kilos of what?

15:46:32   25          MR. WATLINGTON:  Objection at this point, Your

15:46:34  1    Honor.  I believe all of this testimony is hearsay.

15:46:37  2            THE COURT:  Okay.  Overruled.

15:46:38  3            THE WITNESS:  Cocaine.

15:46:38  4    BY MS. LAKE:

15:46:40  5    Q.   And when you say he was going to -- he was going to

15:46:44  6    charge you for it?  Is that what you testified to?

15:46:53  7    A.   Yes.  Because I was discussing the prices and Tapia

15:46:57  8    told me I had to discuss it with him.

15:47:00  9            MR. WATLINGTON:  Objection, Your Honor.

15:47:01  10           THE COURT:  Okay.  Overruled.

15:47:02  11   BY MS. LAKE:

15:47:02  12   Q.   And who is him?

15:47:08  13   A.   La Catora.

15:47:12  14   Q.   And do you see La Catora in the courtroom today?

15:47:18  15   A.   Yes.

15:47:19  16   Q.   Can you please point to where La Catora is located

15:47:23  17   and describe something La Catora is wearing?

15:47:30  18   A.   The young man that is dressed with the gray jacket

15:47:33  19   and the white shirt.

15:47:34  20   Q.   And again, could you point to where he's located?

15:47:39  21   A.   (Indicating) Over there.

15:47:41  22           MS. LAKE:  Your Honor, for the record I would

15:47:42  23   ask that the record reflect that the witness has

15:47:44  24   identified the Defendant Raymond Brown.

15:47:46  25           THE COURT:  Yes.  The record will reflect that

15:47:47    1    the Defendant Brown has been identified by the witness.

15:47:51    2    BY MS. LAKE:

15:47:51    3    Q.   And how much did the Defendant Raymond Brown charge

15:47:56    4    you?

15:47:57    5               MR. WATLINGTON:   Objection, Your Honor.

15:47:58    6               THE COURT:   Overruled.

15:47:59    7    BY MS. LAKE:

15:48:00    8    Q.   How much did the Defendant Raymond Brown --

15:48:02    9               THE COURT:   Stop.   The -- rephrase your

15:48:09   10    question.

15:48:09   11    BY MS. LAKE:

15:48:10   12    Q.   What, if anything, was discussed with you and

15:48:14   13    Mr. La Catora, the defendant Raymond Brown?

15:48:19   14               MR. WATLINGTON:   Objection, Your Honor.

15:48:20   15    There's been no testimony of a discussion.

15:48:22   16               THE COURT:   All right.   What happened next.

15:48:25   17    BY MS. LAKE:

15:48:25   18    Q.   What happened next?

15:48:31   19    A.   Nothing.  I, only one person went home.

15:48:40   20    Q.   And what happened?

15:48:44   21    A.   We talk and we could not reach an agreement.

15:48:52   22    Q.   And what was the agreement?

15:48:57   23    A.   I was trying to ask him to give me a lower price.

15:49:00   24    Q.   And did you reach an agreement?

15:49:05   25    A.   At that time, no.

15:49:08   1   Q.   And who provided you with these -- strike that.

15:49:12   2        Did Mr. Tapia supply you with these two kilograms?

15:49:17   3             MR. WATLINGTON:  Objection, Your Honor.

15:49:18   4             MR. MINGOLLA:  Yeah, I object as well.

15:49:19   5             THE COURT:  Sustained.

15:49:22   6             MS. LAKE:  Can you play the rest of the call,

15:49:23   7   of Government's Exhibit 53a and b.

15:49:41   8        (Exhibit published.)

15:49:41   9   BY MS. LAKE:

15:51:26  10   Q.   What else did you and Mr. Tapia talk about in the

15:51:29  11   rest of this conversation?

15:51:38  12   A.   In that conversation I talk to him about the kilos

15:51:44  13   being too expensive.  And I told him to speak to the

15:51:47  14   owners and ask for a reduced price.  And he told me that

15:51:52  15   if 18 was okay.

15:51:53  16   Q.   And who were the owners?

15:51:55  17             MR. WATLINGTON:  Objection, Your Honor.

15:51:58  18             THE COURT:  Overruled.

15:52:04  19             THE WITNESS:  The owner, the owner of those

15:52:07  20   two kilos he told me was La Catora.

15:52:10  21             MS. LAKE:  Thank you.

15:52:11  22        I have nothing further.

15:52:12  23             THE COURT:  Attorney Mingolla.

15:52:16  24             MR. WATLINGTON:  Your Honor, for the record I

15:52:17  25   would like to again ask for an objection and that be

15:52:21  1    stricken for the record as being hearsay.

15:52:22  2            THE COURT:  All right.  Overruled.

15:52:28  3

15:52:29  4                    CROSS-EXAMINATION

15:52:29  5    BY MR. MINGOLLA:

15:52:34  6    Q.   Good afternoon, Mr. Negron-Beltran.

15:52:41  7         Mr. Negron-Beltran, prior to, prior to this case,

15:52:50  8    have you ever, have you ever met my client?

15:52:58  9    A.   Yes.  Yes.

15:53:05  10   Q.   And did you, do you know my client's name?

15:53:23  11   A.   Yes, I know him now.

15:53:25  12   Q.   Well, you know him now because you've been

15:53:29  13   arrested?

15:53:35  14   A.   Yes.

15:53:36  15           MS. LAKE:  Objection.  Argumentative.

15:53:38  16           THE COURT:  Sustained.  Ask your question

15:53:39  17   without the introduction or comment editorial.

15:54:06  18   BY MR. MINGOLLA:

15:54:06  19   Q.   I guess I should have -- I overlooked something.

15:54:09  20        Prior -- I thought I said this, but apparently I

15:54:15  21   didn't.  Prior to the commencement of this arrest

15:54:22  22   scenario, this case, you had never known my client,

15:54:32  23   correct?

15:54:34  24   A.   Yes, I have seen him.

15:54:37  25   Q.   You've seen him?

15:54:41  1    A.    Yes.  I had spend time with him at his house.

15:54:53  2    Q.    And can you describe my client's house?

15:55:32  3    A.    Yes.

15:55:35  4    Q.    Describe it.

15:55:41  5    A.    They invited us for lunch and we went to his house.

15:55:46  6    His mother's house.  The lady that live at that house

15:55:52  7    was someone that he had as his mother.  And I know him

15:56:00  8    like a friend, not doing business.

15:56:09  9    Q.    Anything particularly distinctive about that house?

15:56:17  10   A.    The parrots and the birds.

15:56:29  11          MR. MINGOLLA:  No further questions of this

15:56:31  12   witness.

15:56:34  13          THE COURT:  Attorney Watlington?

15:56:46  14          MR. WATLINGTON:  Yes.

15:56:47  15                FURTHER CROSS-EXAMINATION

15:56:54  16   BY MR. WATLINGTON:

15:56:55  17   Q.    Good afternoon, Mr. Beltran.

15:56:58  18   A.    Good afternoon.

15:57:00  19   Q.    Mr. Beltran, how many sons do La Catora have?

15:57:06  20   A.    I really can't tell you about his personal life.

15:57:14  21   Q.    But you said that you are friends with La Catora?

15:57:22  22   A.    Yes.  Yes, at that time when I used to come to the

15:57:26  23   Carnival and he invite me.  That is the type of

15:57:30  24   relationship that we have.

15:57:32  25   Q.    So when, when Tapia indicated that he's coming with

15:57:38  1    his sons, that wasn't true?

15:57:44  2              THE COURT:  Stop.  Stop.

15:57:45  3              THE WITNESS:  I did not --

15:57:46  4              THE COURT:  No, stop.

15:57:47  5         Next question.

15:57:52  6         You're asking him whether Mr. Tapia was telling him

15:57:55  7    the truth?  Is that what you're asking him?  Yes or no.

15:57:59  8              MR. WATLINGTON:  Yes.

15:57:59  9              THE COURT:  All right.  Only the jury

15:58:01  10   determines credibility.

15:58:02  11        Next question.

15:58:03  12   BY MR. WATLINGTON:

15:58:04  13   Q.   Do you know whether or not the person who you

15:58:07  14   referred to as La Catora has sons?

15:58:14  15   A.   I do not know.

15:58:17  16   Q.   So you do not know whether or not what Mr. Tapia

15:58:24  17   was telling you was the truth or false?

15:58:36  18   A.   Mr. Tapia told me that that belongs to Mr. --

15:58:39  19   Q.   But you don't know of your own knowledge whether or

15:58:41  20   not it was true or false, correct?

15:58:51  21   A.   Yes.  We know it belongs to La Catora.

15:58:56  22   Q.   That's not my question.  You don't know of your own

15:58:58  23   knowledge.  You only know what supposedly Mr. Tapia told

15:59:01  24   you; is that correct?

15:59:10  25   A.   Yes.

| | | |
|---|---|---|
| 15:59:11 | 1 | Q.   Only what Mr. Tapia told you? |
| 15:59:14 | 2 | A.   Yes. |
| 15:59:22 | 3 | MR. WATLINGTON:  I have nothing further. |
| 15:59:23 | 4 | THE COURT:  All right.  Attorney Lake. |
| 15:59:30 | 5 | REDIRECT EXAMINATION |
| 15:59:30 | 6 | BY MS. LAKE: |
| 15:59:31 | 7 | Q.   Mr. Negron-Beltran, do you recall when the first |
| 15:59:33 | 8 | man stood up and asked you a couple of questions?  Do |
| 15:59:36 | 9 | you recall that? |
| 15:59:42 | 10 | A.   About what? |
| 15:59:44 | 11 | Q.   Just now two gentlemen asked you questions.  Do you |
| 15:59:48 | 12 | recall that? |
| 15:59:56 | 13 | A.   Yes. |
| 15:59:57 | 14 | Q.   The first gentleman asked you a question, do you |
| 16:00:01 | 15 | recall a question about the defendant -- the gentleman |
| 16:00:05 | 16 | said:  Do you know my client? |
| 16:00:07 | 17 | Do you recall that question? |
| 16:00:14 | 18 | A.   Yes. |
| 16:00:14 | 19 | Q.   Who did you think that gentleman was asking you |
| 16:00:19 | 20 | about, when he asked you:  Do you know my client? |
| 16:00:32 | 21 | A.   I understood he meant the one La Catora. |
| 16:00:37 | 22 | Q.   And could you please point to the person that you |
| 16:00:40 | 23 | thought that first gentleman was asking you about. |
| 16:00:44 | 24 | Point to where that person is located. |
| 16:00:51 | 25 | A.   Yes.  The gentleman dressing with the gray, gray |

| | | |
|---|---|---|
| 16:00:57 | 1 | jacket and the white shirt. |
| 16:01:00 | 2 | MS. LAKE:  And for the record, Your Honor, the |
| 16:01:01 | 3 | witness has identified -- |
| 16:01:02 | 4 | THE COURT:  Yes, the record will reflect that |
| 16:01:04 | 5 | the witness was referring to Defendant Brown. |
| 16:01:09 | 6 | BY MS. LAKE: |
| 16:01:09 | 7 | Q.   So that's who you were referring to when asked |
| 16:01:11 | 8 | those questions, correct? |
| 16:01:16 | 9 | A.   Yes. |
| 16:01:17 | 10 | MS. LAKE:  Thank you.  Nothing further. |
| 16:01:20 | 11 | THE COURT:  All right.  Mr. Negron-Beltran, |
| 16:01:21 | 12 | thank you for your testimony. |
| 16:01:23 | 13 | You may step down. |
| 16:01:23 | 14 | (Witness withdrew from stand.) |
| 16:01:24 | 15 | THE COURT:  Next witness. |
| 16:01:28 | 16 | MS. LAKE:  The government calls Eric Barnard. |
| 16:01:37 | 17 | Your Honor, I would ask that Angel Negron-Beltran |
| 16:01:41 | 18 | be excused. |
| 16:01:42 | 19 | THE COURT:  Attorney Mingolla? |
| 16:01:44 | 20 | MR. MINGOLLA:  I have -- |
| 16:01:45 | 21 | THE COURT:  Any further need? |
| 16:01:48 | 22 | Attorney Watlington? |
| 16:01:50 | 23 | MR. WATLINGTON:  We would ask that he be |
| 16:01:52 | 24 | reserved, Your Honor. |
| 16:01:53 | 25 | THE COURT:  All right.  He is not excused. |

16:02:48  1          THE CLERK:  Stand and raise your right hand to

16:02:50  2   take the oath.

16:02:52  3       (Witness sworn.)

16:02:53  4          THE WITNESS:  Yes.

16:02:56  5          THEREUPON, ERIC BARNARD, having been duly

16:03:03  6   sworn, was examined and testified as follows:

16:03:03  7                      DIRECT EXAMINATION

16:03:04  8   BY MS. LAKE:

16:03:06  9   Q.   Please state your name for the record?

16:03:07  10  A.   Eric Barnard.

16:03:09  11  Q.   And can you please spell your full name?

16:03:11  12  A.   E-r-i-c; last name, B- as in boy, a-r-n-a-r-d.

16:03:19  13  Q.   Agent Barnard, who do you work for?

16:03:21  14  A.   The Drug Enforcement Administration.

16:03:23  15  Q.   And where are you assigned?

16:03:25  16  A.   St. Thomas.

16:03:26  17  Q.   And what are your duties as being employed by the

16:03:31  18  Drug Enforcement agency [sic]?

16:03:31  19  A.   Well, I'm the resident agent in charge for St.

16:03:34  20  Thomas, St. John.  My job is to supervise the Drug

16:03:40  21  Enforcement Administration, all the special agents that

16:03:43  22  work there, intel analysts as well as the task force

16:03:46  23  officers assigned to the HIDTA task force.

16:03:48  24  Q.   Is the agency commonly known as DEA?

16:03:51  25  A.   Correct, DEA.

16:03:51  1    Q.   And where were you assigned before St. Thomas?

16:03:54  2    A.   Well, I've been in the job possibly 15 years.

16:03:58  3    Before that I was assigned to South America.  I was in

16:04:01  4    Ecuador for the past four years before this assignment.

16:04:05  5    Prior to that, I was in Houston.  Prior to that,

16:04:07  6    Washington, DC, Colorado.  And then prior to that I was

16:04:11  7    actually a state police officer in Texas.

16:04:15  8    Q.   And just briefly describe your education?

16:04:18  9    A.   I have a bachelor's degree in criminal justice in

16:04:22  10   Texas, from a university in Texas.

16:04:23  11   Q.   And what, if any, was your involvement in the

16:04:25  12   Roberto Tapia investigation?

16:04:27  13   A.   I supervised the investigation upon my arrival in

16:04:30  14   St. Thomas.

16:04:31  15   Q.   And were you involved in the arrest of Roberto

16:04:35  16   Tapia?

16:04:36  17   A.   Yes, I was.

16:04:36  18   Q.   And directing your attention to May 16, 2013,

16:04:40  19   please describe -- please explain what happened?

16:04:42  20   A.   On May 17th, we had prior information based on

16:04:46  21   Title III intercepts that Mr. Roberto Tapia was

16:04:48  22   returning from St. John and would be arriving in St.

16:04:52  23   Thomas in Red Hook at the ferry dock.  Upon his arrival,

16:04:55  24   we believed he would be in possession of seven kilograms

16:04:58  25   of cocaine.

16:05:00  1        When he arrived, Mr. Tapia exited the ferry

16:05:04  2    terminal, and as he exited, myself with several other

16:05:08  3    agents that were at the scene arrested Mr. Tapia as he

16:05:13  4    exited, in possession -- he had a green backpack.  I

16:05:17  5    pulled the green backpack from his shoulder, looked

16:05:20  6    inside the green backpack and located seven suspected

16:05:23  7    kilograms of cocaine.

16:05:24  8    Q.   And what, if anything, happened next?

16:05:27  9    A.   At that point Mr. Tapia was taken into custody.  He

16:05:30  10   was transported.  He, himself, was transported, myself

16:05:34  11   and one other agent, Jackson Purkey, the FBI, who

16:05:37  12   transported him to the HIDTA Task Force here in St.

16:05:42  13   Thomas with the seven kilograms of cocaine and the

16:05:45  14   backpack.

16:05:46  15       When we arrived at my office at the HIDTA task

16:05:50  16   force, we transferred -- I transferred -- Jackson

16:05:53  17   Purkey, the special agent in the car, transferred

16:05:55  18   custody of those kilograms of cocaine to Task Force

16:05:58  19   Officer TFO Mark Joseph.

16:06:00  20   Q.   And was that in your presence?

16:06:01  21   A.   Yes, it was.

16:06:02  22   Q.   So you witnessed that?  In what condition did you,

16:06:06  23   you and Agent Purkey provide those items?

16:06:10  24   A.   Exactly in the same condition it was when we

16:06:12  25   obtained it from Mr. Tapia.

16:06:14   1    Q.   And what, if anything, happened next, to your

16:06:18   2    knowledge?

16:06:18   3    A.   At that point Mr. Mark Joseph took the --

16:06:26   4         THE COURT:   You're asking him what he observed

16:06:27   5    or what he did?

16:06:28   6    BY MS. LAKE:

16:06:29   7    Q.   What you observed or what you did.

16:06:29   8    A.   I observed the green backpack containing the seven

16:06:34   9    kilograms of cocaine, Mr. -- correction -- Agent Purkey

16:06:38   10   transferred that to TFO Mark Joseph, and Mark Joseph

16:06:43   11   walked upstairs to our office.

16:06:43   12        (Government's Exhibit 80d marked for

16:06:43   13   identification.)

16:06:49   14   BY MS. LAKE:

16:06:49   15   Q.   Now showing you what has been marked as

16:06:57   16   Government's Exhibit 80d.

16:07:14   17        It should be on the screen right in front of you.

16:07:16   18   A.   No, there's nothing there.

16:07:25   19        MR. MINGOLLA:   Your Honor, I wonder if we might

16:07:27   20   take a look at the exhibit prior to it being --

16:07:29   21        THE COURT:   No, everyone will see it once it's

16:07:33   22   on the Elmo.

16:07:45   23        MS. LAKE:   May I have a moment, Your Honor?

16:07:47   24        THE COURT:   Yes.

16:08:11   25        MS. LAKE:   I apologize.   May I have a moment?

16:08:13  1          THE COURT:  Yes.

16:09:16  2          (Pause.)

16:09:17  3          MS. LAKE:  Thank you, Your Honor.

16:09:29  4          THE COURT:  Go ahead.

16:09:47  5          MS. LAKE:  If possible, Your Honor, may I just

16:09:48  6   approach the witness with the item?

16:09:50  7          THE COURT:  Yes.

16:10:06  8          MS. LAKE:  Thank you, Your Honor.

16:10:07  9   BY MS. LAKE:

16:10:07  10  Q.   Agent Barnard, I've just handed you what's been

16:10:10  11  marked as Government's Exhibit 80 --

16:10:14  12  A.   D.

16:10:15  13  Q.   -- d.  What is that in front you?

16:10:18  14  A.   That is a green backpack.

16:10:20  15  Q.   And how do you recognize that green backpack?

16:10:23  16  A.   It's the same one that Mr. Tapia was carrying when

16:10:26  17  he exited the ferry dock.

16:10:28  18  Q.   And now showing you what's been marked as

16:10:30  19  Government's Exhibit -- may I have a moment, Your Honor?

16:10:42  20  I apologize.

16:10:43  21          THE COURT:  Yes.

16:10:55  22  BY MS. LAKE:

16:10:55  23  Q.   Showing you what's been marked as Government's

16:10:57  24  Exhibit 80e.  Do you see that in front of you?

16:10:59  25  A.   No -- oh, yes.

16:11:04   1   Q.   Now showing you what's been marked as Government's

16:11:06   2   Exhibit 80f, as in Frank.  Do you see that in front of

16:11:10   3   you?

16:11:10   4   A.   Yes, I do.

16:11:11   5   Q.   And what is that?

16:11:12   6   A.   That is the same green backpack.

16:11:14   7            MS. LAKE:  And this has actually been received

16:11:16   8   into evidence, Your Honor.  I would ask that it be

16:11:19   9   published to the jury.

16:11:21   10            MR. MINGOLLA:  Your Honor, I'm going to object.

16:11:23   11   All, all we see is a plastic bag --

16:11:26   12            THE COURT:  All right.  Hold on.  Your question

16:11:28   13   is about 80f, correct?

16:11:31   14            MS. LAKE:  F.

16:11:31   15            THE COURT:  You want to publish that?

16:11:33   16            MS. LAKE:  Yes, Your Honor.

16:11:34   17            THE COURT:  80f is in evidence.  That can be

16:11:36   18   published.

16:11:41   19        That's overruled.  Go ahead.

16:11:43   20   BY MS. LAKE:

16:11:43   21   Q.   Do you see what's been marked as Government's

16:11:45   22   Exhibit 80f?

16:11:46   23   A.   Yes, I do.

16:11:47   24   Q.   And what is that?

16:11:48   25   A.   The green backpack.

16:11:49  1    Q.   And what is the relationship between Government's

16:11:52  2    Exhibit 80f and what's been placed in front of you

16:11:56  3    Government's Exhibit 80d, as in dog?

16:11:58  4    A.   It is the same exhibit.  Same backpack.

16:12:02  5    Q.   And now showing you what's been received into

16:12:04  6    evidence as Government's Exhibit 80g?

16:12:11  7            THE COURT:  What -- did -- let me see counsel

16:12:13  8    at sidebar.

16:13:25  9         (Sidebar discussion held as follows:)

16:13:25  10           THE COURT:  What's the purpose of going through

16:13:27  11   80f -- what's the purpose of going through 80f and g?

16:13:33  12           MS. LAKE:  Just to identify it's the same

16:13:34  13   backpack.

16:13:35  14           THE COURT:  What is -- he already said that.

16:13:37  15   Didn't he -- I just looked.  I wanted to check my own

16:13:40  16   recollection.  The first question was, what is it.  He

16:13:43  17   said that's the green backpack that Mr. Tapia had.

16:13:47  18           MS. LAKE:  I'm trying to make sure all the I's

16:13:49  19   and T's are crossed.  It's the same backpack as f and g.

16:13:55  20   That's all I'll ask him.  That's the last question I

16:13:58  21   have of this witness.

16:13:59  22           THE COURT:  Okay.  All right.  Let's move on.

16:14:16  23        (End of sidebar, open court as follows:)

16:14:19  24   BY MS. LAKE:

16:14:19  25   Q.   And finally showing you what's been marked as

| | | |
|--|--|--|
| 16:14:21 | 1 | Government's Exhibit 80g.  What is that? |
| 16:14:24 | 2 | THE COURT:  Let's move on.  We've been over |
| 16:14:27 | 3 | 80g.  Next question. |
| 16:14:29 | 4 | MS. LAKE:  I have no further questions. |
| 16:14:31 | 5 | THE COURT:  It's time for our afternoon break, |
| 16:14:33 | 6 | ladies and gentlemen. |
| 16:14:33 | 7 | Ten minutes. |
| 16:15:13 | 8 | (Jury out) |
| 16:15:30 | 9 | THE COURT:  Agent Barnard, we're going to take |
| 16:15:33 | 10 | a ten-minute break.  Do not discuss your testimony |
| 16:15:35 | 11 | during the break.  Do you understand? |
| 16:15:36 | 12 | THE WITNESS:  Yes, sir. |
| 16:15:36 | 13 | THE COURT:  And be back on the witness stand in |
| 16:15:39 | 14 | 10 minutes.  Do you understand? |
| 16:15:41 | 15 | THE WITNESS:  Yes, sir. |
| 16:15:41 | 16 | THE COURT:  Okay.  Thank you.  You can leave |
| 16:15:43 | 17 | through the side. |
| 16:15:51 | 18 | (Witness stood aside) |
| 16:15:53 | 19 | THE COURT:  All right.  Anything we need to |
| 16:15:54 | 20 | cover before we come back from our break, Attorney Lake? |
| 16:15:58 | 21 | MS. LAKE:  No. |
| 16:15:59 | 22 | THE COURT:  Attorney Mingolla? |
| 16:16:06 | 23 | MR. MINGOLLA:  No, I guess not, Judge. |
| 16:16:09 | 24 | THE COURT:  Attorney Watlington? |
| 16:16:10 | 25 | MR. WATLINGTON:  No, Your Honor. |

16:16:11   1            THE COURT:  All right.  Ten minutes, Counsel.

16:16:11   2            (Court in recess, 4:16 p.m.)

16:39:37   3

16:39:38   4            (After recess, jury present, 4:39 p.m.)

16:39:39   5            THE COURT:  All right.  I believe we are in the

16:39:42   6   cross-examination; is that correct?

16:39:44   7        Did the government yield the witness?

16:39:46   8            MS. LAKE:  May I ask that Government's

16:39:48   9   Exhibit 80d be received into evidence.

16:39:50  10            THE COURT:  Attorney Mingolla, any objection?

16:39:53  11            MR. MINGOLLA:  No, Judge.

16:39:54  12            THE COURT:  Attorney Watlington?

16:39:55  13            MR. WATLINGTON:  No, Your Honor.

16:39:56  14            THE COURT:  All right.  80d, like David, is

16:40:00  15   admitted.

16:40:02  16        (Government's Exhibit 80d admitted into evidence.)

16:40:02  17            MS. LAKE:  I yield the witness, Your Honor.

16:40:03  18            THE COURT:  Attorney Mingolla?

16:40:26  19            MR. MINGOLLA:  I -- no, I have no questions for

16:40:27  20   this witness.

16:40:28  21            THE COURT:  All right.  Attorney Watlington.

16:40:30  22            MR. WATLINGTON:  No questions, Your Honor.

16:40:32  23            THE COURT:  All right.  There's no redirect.

16:40:37  24        Agent Barnard, thank you for your testimony.  You

16:40:41  25   may step down.

16:40:43    1              THE WITNESS:  Your Honor, may I be dismissed?

16:40:45    2              THE COURT:  Any further need for Agent Barnard?

16:40:48    3              MS. LAKE:  No, Your Honor.

16:40:48    4              THE COURT:  Attorney Mingolla?

16:40:49    5              MR. MINGOLLA:  No, Your Honor.

16:40:50    6              MR. WATLINGTON:  No, Your Honor.

16:40:51    7              THE COURT:  Yes, you're excused.  Thank you.

16:40:51    8         (Witness withdrew from stand.)

16:40:53    9              THE COURT:  Next witness.

16:40:56   10              MS. LAKE:  The government calls Officer Mark

16:41:01   11    Joseph.

16:41:43   12              THE CLERK:  Please stand and raise your right

16:41:45   13    hand to take the oath.

16:41:49   14         (Witness sworn.)

16:41:51   15              THE WITNESS:  I do.

16:41:52   16              THEREUPON, MARK JOSEPH, having been duly sworn,

16:41:56   17    was examined and testified as follows:

16:41:56   18                        DIRECT EXAMINATION

16:41:57   19    BY MS. LAKE:

16:41:59   20    Q.   Please state your name for the record.

16:42:01   21    A.   Mark Joseph.

16:42:02   22    Q.   Can you please spell your full name?

16:42:04   23    A.   M-a-r-k, J-o-s-e-p-h.

16:42:09   24    Q.   What do you do for a living?

16:42:10   25    A.   I'm employed by the Virgin Islands Police

16:42:13  1    Department as a detective.  And my current assignment is

16:42:17  2    a federally-deputized task force agent with the Drug

16:42:22  3    Enforcement Administration.

16:42:22  4    Q.    Agent Joseph, where are you assigned?

16:42:25  5    A.    I'm assigned the St. Thomas DEA office.

16:42:27  6    Q.    What are some of your duties?

16:42:29  7    A.    I am a criminal investigator, and we are assigned

16:42:33  8    to investigate violations of Title 21 USC, which is the

16:42:37  9    drug statutes of the United States, and also the

16:42:41  10   violations of the local drug statutes.

16:42:42  11   Q.    And were you involved in the Roberto Tapia

16:42:48  12   investigation?

16:42:48  13   A.    Yes, I was.

16:42:49  14   Q.    And were you involved in the arrest of Roberto

16:42:52  15   Tapia?

16:42:52  16   A.    Yes, I was.

16:42:54  17   Q.    And directing your attention to May 17th, 2013,

16:42:58  18   what, if any, was your involvement on May 17th, 2013?

16:43:02  19   A.    I was involved with other units in the surveillance

16:43:05  20   of the, at the Red Hook area, where Mr. Tapia boarded a

16:43:10  21   passenger ferry from St. Thomas to St. John, and

16:43:14  22   returned from St. John to St. Thomas.

16:43:17  23   Q.    And was Mr. Tapia arrested?

16:43:19  24   A.    Yes.  Mr. Tapia was arrested when he arrived back

16:43:22  25   in St. Thomas from St. John.

16:43:23  1   Q.   And after the arrest, what, if any, was --

16:43:26  2   anything, did you do, after the arrest?

16:43:28  3   A.   After the arrest, we traveled back to our office

16:43:33  4   where the, a backpack, a green backpack that was taken

16:43:39  5   from Mr. Tapia was transferred to my custody.

16:43:41  6   Q.   And what, if anything, did you do next?

16:43:48  7   A.   The backpack and its contents were photographed.

16:43:50  8   The contents were removed, which were several

16:43:53  9   rectangular-shaped objects wrapped in plastic.

16:43:57  10       The objects was field tested by myself, with a

16:44:02  11  positive return for the presence of --

16:44:04  12           THE COURT:   Stop.

16:44:05  13       Next question.

16:44:06  14  BY MS. LAKE:

16:44:06  15  Q.   What, if anything, was the result of the field

16:44:09  16  test?

16:44:10  17  A.   It was --

16:44:11  18           THE COURT:   No, let's move on.   Next question.

16:44:14  19  BY MS. LAKE:

16:44:15  20  Q.   What, if anything, did you do next?

16:44:17  21       Well, strike that.

16:44:18  22       Do you have any training in terms of background

16:44:22  23  training or experience as it relates to field testing

16:44:25  24  narcotics?

16:44:25  25  A.   Yes.

16:44:26   1              THE COURT:  No.  Come to sidebar.

16:44:38   2          (Sidebar discussion held as follows:)

16:44:43   3              THE COURT:  Tell me what's the purpose of this

16:44:44   4      witness?

16:44:45   5              MS. LAKE:  All he is going to testify in this

16:44:49   6      regard is he field tested the narcotics and that he took

16:44:52   7      the -- he gave the narcotics to another agent, and that

16:44:57   8      agent then packaged the narcotics and shipped them off.

16:45:00   9              THE COURT:  Who is that other agent?

16:45:02  10              MS. LAKE:  The next agent, I believe, is going

16:45:03  11      to be Agent Ott.

16:45:05  12              THE COURT:  Is that agent -- were you planning

16:45:07  13      to call that agent?

16:45:08  14              MS. LAKE:  Yes, Your Honor.

16:45:08  15              THE COURT:  All right.  So that agent would

16:45:10  16      testify that he received whatever exhibit it is from

16:45:12  17      this witness, correct?

16:45:14  18              MS. LAKE:  That's correct.

16:45:15  19              THE COURT:  Okay.  Other than saying which, I

16:45:18  20      think agent Barnard already said, which is that this

16:45:22  21      witness, Mr. Joseph, took the package of stuff upstairs

16:45:27  22      and, is this agent going to add anything else of value?

16:45:31  23              MS. LAKE:  Just that he field tested the items.

16:45:33  24              THE COURT:  He's already said that.

16:45:34  25              MS. LAKE:  And they came back positive for

16:45:36  1    cocaine.

16:45:36  2              THE COURT:  But a field test is not conclusive

16:45:38  3    evidence of the presence of a controlled substance.  So

16:45:41  4    we're not going to get into that, correct?

16:45:43  5              MS. LAKE:  If you say so, okay.

16:45:47  6              THE COURT:  He already said he field tested it.

16:45:50  7    You seem to want him to say he field tested for cocaine,

16:45:53  8    which could or can't -- it is not conclusive.

16:45:57  9        Besides, you're going to have a chemist that you

16:46:00  10   would hope is conclusive proof that it is a controlled

16:46:04  11   substance, correct?

16:46:05  12             MS. LAKE:  That's correct.

16:46:07  13             THE COURT:  Okay.  So -- is he just going to

16:46:08  14   hand it off to Mr. Ott?

16:46:10  15             MS. LAKE:  That's correct.

16:46:11  16             THE COURT:  Okay.  Let's try to move as

16:46:13  17   efficiently as possible.

16:46:14  18             MS. LAKE:  I only have a couple more questions

16:46:17  19   in that regard.

16:46:18  20             THE COURT:  Okay.  Good.  Thank you.

16:46:20  21        (End of sidebar, open court as follows:)

16:46:31  22   BY MS. LAKE:

16:46:32  23   Q.   And then what do you next?

16:46:34  24   A.   After -- I'm sorry.

16:46:36  25   Q.   After the field test, what did you do next?

16:46:38  1    A.    I turned the bag and the contents of the bag over

16:46:42  2    to the non-drug evidence custodian, myself and Special

16:46:50  3    Agent Jason Allen.

16:46:51  4    Q.    You and Jason Allen did what, exactly?

16:46:53  5    A.    We turned the bag and the contents of the bag,

16:46:55  6    which were the packages that were removed from the bag,

16:46:58  7    over to the non-drug evidence custodian for storage and

16:47:02  8    safekeeping.

16:47:02  9         (Government's Exhibit 80c marked for

16:47:02  10   identification.)

16:47:03  11   BY MS. LAKE:

16:47:03  12   Q.    Showing you what's been marked as Government's

16:47:05  13   Exhibit 80c, do you see that in front of you?

16:47:08  14   A.    Yes.

16:47:09  15   Q.    And what is 80c?

16:47:11  16   A.    That is a photograph of the packages that were

16:47:14  17   removed from the green knapsack.

16:47:17  18   Q.    And now showing you Government's Exhibit 80e, do

16:47:20  19   you see Government's Exhibit 80e in front of you?

16:47:24  20   A.    Yes.

16:47:24  21   Q.    What is Government's Exhibit 80e?

16:47:26  22   A.    It's a photograph of Mr. Tapia carrying the green

16:47:29  23   knapsack on his shoulder, left shoulder.

16:47:33  24   Q.    And how do you recognize this photograph?

16:47:36  25   A.    Because I saw it.

16:47:38   1    Q.    Do you know who, if anyone, took this photograph?

16:47:41   2    A.    No, I do not.

16:47:42   3    Q.    And now showing you Government's Exhibit 80f, as in

16:47:52   4    Frank.  What is this?

16:47:53   5    A.    This is a photograph of the green knapsack at our

16:47:58   6    office in St. Thomas.

16:47:59   7    Q.    And now Government's Exhibit 80g, as in George?

16:48:04   8    A.    This is an additional photograph with the bag open,

16:48:08   9    showing the contents that are inside the bag.

16:48:08   10        (Government's Exhibit 80h marked for

16:48:08   11   identification.)

16:48:10   12   BY MS. LAKE:

16:48:10   13   Q.    And Government's Exhibit 80h?

16:48:14   14   A.    And this is another photograph of the bag, along

16:48:19   15   with the contents side by side together.

16:48:21   16   Q.    And who took this photograph?

16:48:23   17   A.    I did.

16:48:23   18   Q.    And finally, Government's Exhibit 80c, what is

16:48:28   19   this?

16:48:28   20        THE COURT:  I think you already went over this.

16:48:30   21   BY MS. LAKE:

16:48:30   22   Q.    Who took this photograph?

16:48:31   23   A.    I did.

16:48:34   24        MS. LAKE:  Your Honor, at this time I would ask

16:48:35   25   that Government's Exhibit 80h and c be received into

16:48:41  1   evidence.

16:48:42  2              THE COURT:  Attorney Mingolla?

16:48:43  3              MR. MINGOLLA:  No objection.

16:48:45  4              THE COURT:  Attorney Watlington?

16:48:47  5              MR. WATLINGTON:  No objection, Your Honor.

16:48:49  6              THE COURT:  Okay.  80c and 80h are admitted.

16:48:49  7        (Government's Exhibits 80c, 80h admitted into

16:48:54  8   evidence.)

16:48:54  9              MS. LAKE:  I would ask that they be published

16:48:56  10  to the jurors.

16:48:58  11             THE COURT:  Yes.

16:48:58  12             MS. LAKE:  I would ask to show the jurors

16:49:01  13  Government's Exhibit 80h, as in Harry.

16:49:07  14  BY MS. LAKE:

16:49:07  15  Q.   And again, what is this?

16:49:09  16  A.   This is a photograph of the bag that was removed

16:49:11  17  from Mr. Tapia, along with the rectangular ones that

16:49:19  18  were taken out of the bag.

16:49:20  19  Q.   And next, Government's Exhibit 80c?

16:49:22  20  A.   And that's the photograph of just the objects that

16:49:24  21  were removed from the bag.

16:49:27  22  Q.   Thank you.

16:49:28  23       And did you have another involvement in the Roberto

16:49:30  24  Tapia investigation?

16:49:31  25  A.   Yes, I did.

16:49:32  1    Q.   And directing your attention to October 22nd, 2013,

16:49:37  2    what, if anything, did you do?  What was your

16:49:40  3    involvement in this investigation on October 22nd, 2013?

16:49:44  4    A.   Myself and another agent, Agent Querrard, traveled

16:49:48  5    to St. John to meet with Mr. Angelo Hill for the purpose

16:49:53  6    of outfitting him with an audio recording device for a

16:49:58  7    meeting with Mr. Walter Hill.

16:50:01  8    Q.   And what, if anything, did you do?

16:50:03  9    A.   I outfitted Mr. Angelo Hill with the audio

16:50:08  10   recording device and turned it on before Mr. Hill left

16:50:14  11   for the meeting with Mr. Walter Hill.

16:50:17  12   Q.   And are you familiar with this type of recording

16:50:19  13   device?

16:50:20  14   A.   Yes.  It's equipment that we used in our office and

16:50:23  15   I've used it many times in the past.

16:50:25  16   Q.   And what, if anything, did you do next?

16:50:29  17   A.   When the meeting with Mr. Hill was -- with

16:50:32  18   Mr. Walter Hill was concluded, Mr. Angelo Hill returned

16:50:36  19   to the location where we had decided to meet.  The

16:50:40  20   device was turned off and removed from Mr. Angelo Hill.

16:50:45  21   Q.   And what, if anything, did you do next?

16:50:48  22   A.   I kept custody of the device until we returned to

16:50:54  23   our office in St. Thomas, where the device, the data

16:50:57  24   from the device was downloaded to a DVD disk.

16:51:01  25   Q.   And what, if anything, did you do next?

16:51:04  1    A.   The DVD disk was copied for a working copy and was

16:51:10  2    placed into evidence.

16:51:10  3

16:51:10  4         (Government's Exhibit 86a marked for

16:51:10  5    identification.)

16:51:11  6    BY MS. LAKE:

16:51:11  7    Q.   Showing you what has been marked as Government's

16:51:35  8    Exhibit 86a.  Do you see this item in front of you?

16:51:38  9    A.   Yes.  Could you turn it?  It's upside down.

16:51:44  10   Q.   Well, first do you see the sticker, 86a?

16:51:47  11   A.   Yes.

16:51:47  12   Q.   And then do you see -- what do you see in front of

16:51:49  13   you right now?

16:51:50  14   A.   This is the evidence sticker from the packaging

16:51:52  15   that is used to process non-drug evidence.

16:51:57  16   Q.   And now showing you the contents of Government's

16:52:01  17   Exhibit 86a.  What do you see?

16:52:05  18   A.   This is the original DVD that was downloaded from

16:52:08  19   the device from the meeting with Mr. Angelo Hill and

16:52:11  20   Walter Hill in October of 2013.

16:52:14  21   Q.   And have you reviewed this item?

16:52:16  22   A.   Yes, I have.

16:52:17  23   Q.   In its entirety?

16:52:18  24   A.   Yes, I have.

16:52:20  25   Q.   And is it a true and accurate reflection of the

16:52:23   1   conversation or recording that occurred?

16:52:25   2   A.   Yes, it is.

16:52:27   3   Q.   Are there any deletions, corrections, additions to

16:52:29   4   this item?

16:52:30   5   A.   No, there are not.

16:52:31   6   Q.   And the recording device that you outfitted

16:52:34   7   Mr. Angelo Hill with, it records this conversation?

16:52:36   8   A.   Yes, it did.

16:52:38   9   Q.   Now, showing you what's been marked as Government's

16:52:42   10  Exhibit, and I apologize --  how do you recognize this

16:52:46   11  specific disk?

16:52:46   12  A.   It has my initial and the date that I wrote on it.

16:52:46   13       (Government's Exhibit 86b marked for

16:52:46   14  identification.)

16:52:52   15  BY MS. LAKE:

16:52:52   16  Q.   Now showing what you has been marked as

16:52:54   17  Government's Exhibit 86b.  Do you see that in front of

16:52:58   18  you?

16:52:59   19  A.   Yes.

16:52:59   20  Q.   And what is it?

16:53:01   21  A.   This is a copy, a working copy of the original

16:53:07   22  video DVD disk.

16:53:09   23  Q.   And what is a working copy?

16:53:10   24  A.   A working copy is just a copy -- the original is

16:53:14   25  placed into evidence, but before it's placed into

16:53:17  1    evidence a copy is made so that you can view it, make

16:53:22  2    any other copies that you need while the original copy

16:53:26  3    stays in evidence.

16:53:28  4    Q.   So in essence, what is the relationship between

16:53:32  5    Government's 86a and Government's 86b?

16:53:34  6    A.   It's a copy.  One is a copy of the other.

16:53:38  7    Q.   And what, if anything, did you do with this item --

16:53:41  8    well, first, have you reviewed Government's 86a in its

16:53:45  9    entirety?

16:53:46  10   A.   Yes, I have.

16:53:46  11   Q.   What did you do with the disk after you reviewed

16:53:48  12   the contents of the disk?

16:53:49  13   A.   I put my signature on it and the date.

16:53:51  14   Q.   And are there any additions, deletions, corrections

16:53:56  15   to this disk?

16:53:57  16   A.   No.

16:53:58  17         THE COURT:  So the record is clear, when you

16:54:00  18   say "this," use an exhibit number.

16:54:03  19         MS. LAKE:  Government's 86b.

16:54:05  20   BY MS. LAKE:

16:54:05  21   Q.   Are there any additions, deletions or corrections

16:54:07  22   to Government's Exhibit 86b?

16:54:09  23   A.   No, there are not.

16:54:10  24   Q.   Is it a true and accurate reflection of the

16:54:12  25   recording that took place in the conversation on

16:54:15  1    October 22nd --

16:54:15  2    A.    Yes.

16:54:16  3    Q.    -- 2013?

16:54:17  4    A.    Yes.

16:54:17  5         (Government's Exhibit 86c-1 marked for

16:54:17  6    identification.)

16:54:18  7    BY MS. LAKE:

16:54:18  8    Q.    And now, finally, showing you Government's

16:54:20  9    Exhibit 86c, do you see that sticker in front of you?

16:54:23  10   A.    Yes.

16:54:24  11   Q.    And now what is Government's Exhibit 86c?

16:54:28  12   A.    This is an edited version of the working and

16:54:32  13   original copy.

16:54:33  14   Q.    And have you reviewed Government's 86c-1 in its

16:54:38  15   entirety?

16:54:38  16   A.    Yes, I have.

16:54:39  17   Q.    And what did you do after you reviewed it?

16:54:43  18   A.    I put my initials and the date on it.

16:54:45  19   Q.    And what is the relationship between Government's

16:54:48  20   86b and 86c-1?

16:54:55  21   A.    This, this version of the CD is the same CD with

16:55:01  22   portions removed.  It's not the entire, the entire video

16:55:06  23   that was on the other -- the original and the working

16:55:09  24   copy.

16:55:10  25   Q.    Now, you've reviewed it in its entirety?

16:55:12  1    A.    Yes.

16:55:13  2    Q.    Are there any additions to government's 86c-1?

16:55:19  3    A.    No additions.

16:55:20  4    Q.    Is it shortened from Government's 86b?

16:55:22  5    A.    Yes, it's shortened -- it is a shortened version.

16:55:25  6    Q.    How long is Government's 86b?

16:55:30  7    A.    86b is, it's long.  I think it's over an hour.

16:55:33  8    Q.    And what's the length of Government's

16:55:38  9    Exhibit 86c-1?

16:55:39  10   A.    I don't remember the duration, but it's

16:55:42  11   considerably shorter in length.

16:55:48  12            MS. LAKE:  May I have just a brief moment, Your

16:55:51  13   Honor?

16:55:52  14            THE COURT:  Yes.

16:56:00  15            MS. LAKE:  I have nothing further, Your Honor.

16:56:01  16       I would ask that Government's Exhibit 86c-1 --

16:56:05  17   well, strike that.  I have nothing further of this

16:56:07  18   witness, Your Honor.

16:56:08  19            THE COURT:  Okay.

16:56:09  20       Attorney Mingolla?

16:56:15  21                    CROSS-EXAMINATION

16:56:15  22   BY MR. MINGOLLA:

16:56:16  23   Q.    Agent Joseph, you just indicated that you, if I

16:56:21  24   heard you properly, that you helped to put the device on

16:56:29  25   Mr. Angelo Hill?

16:56:30  1    A.   Yes, that's correct.

16:56:32  2    Q.   And are you -- and what was the device?  You said

16:56:37  3    it was a recording device, I understand that.  What form

16:56:40  4    was the device in?

16:56:41  5              MS. LAKE:  Objection.  Relevance.

16:56:45  6              THE COURT:  All right.  Overruled.

16:56:46  7              THE WITNESS:  I'm sorry.  What form --

16:56:49  8              THE COURT:  No commentary.

16:56:50  9    BY MR. MINGOLLA:

16:56:50  10   Q.   What form was the device?

16:56:51  11             THE COURT:  Let me remind counsel no

16:56:53  12   commentary.  Just ask the questions.

16:56:54  13             MR. MINGOLLA:  Sorry.

16:56:55  14             THE WITNESS:  What it was?  I'm not

16:56:58  15   understanding what you're asking, the form.

16:56:59  16   BY MR. MINGOLLA:

16:56:59  17   Q.   You've got a device.  What's it look like?

16:57:02  18   A.   It's a recording device.

16:57:05  19   Q.   Was it -- we've heard testimony previously, in

16:57:10  20   previous hearing, it was a cup or a can or something of

16:57:14  21   that nature?

16:57:15  22             MS. LAKE:  Objection.  Relevance.

16:57:17  23             THE COURT:  Overruled.

16:57:19  24             THE WITNESS:  The device was a watch.

16:57:23  25   BY MR. MINGOLLA:

| | | |
|---|---|---|
| 16:57:23 | 1 | Q.   And that's it? |
| 16:57:24 | 2 | A.   That's correct. |
| 16:57:30 | 3 | Q.   And so you're telling me that there was no cup or |
| 16:57:39 | 4 | can or liquid container with another bug in it? |
| 16:57:43 | 5 | A.   No, it was not. |
| 16:57:45 | 6 | Q.   So it's just a watch? |
| 16:57:47 | 7 | A.   That's correct. |
| 16:57:53 | 8 | Q.   Would it surprise you if one of your colleagues |
| 16:57:59 | 9 | said you had two devices? |
| 16:58:01 | 10 | A.   You asked me what I put on Mr. Hill.  I gave him a |
| 16:58:05 | 11 | watch. |
| 16:58:05 | 12 | Q.   Did any of your other agents put another device |
| 16:58:08 | 13 | somewhere, somewhere in this scenario? |
| 16:58:11 | 14 |         MS. LAKE:  Objection.  Relevance. |
| 16:58:11 | 15 | BY MR. MINGOLLA: |
| 16:58:13 | 16 | Q.   A bugging device, let's be very specific. |
| 16:58:15 | 17 |         MS. LAKE:  Objection.  Relevance. |
| 16:58:16 | 18 |         THE COURT:  Are you asking him what he observed |
| 16:58:18 | 19 | or did? |
| 16:58:20 | 20 |         MR. MINGOLLA:  Whether he knows whether there |
| 16:58:22 | 21 | was another device placed, if not by him, by someone |
| 16:58:25 | 22 | else. |
| 16:58:25 | 23 |         THE COURT:  All right.  Overruled. |
| 16:58:27 | 24 |         THE WITNESS:  I'm sorry, would you say it one |
| 16:58:29 | 25 | more time? |

16:58:30   1                    MR. MINGOLLA:  Okay.  No, that's it.  No, I

16:58:44   2      have no further questions for -- wait a minute.  Yes I

16:58:47   3      do.  What's the matter with me?

16:58:51   4      BY MR. MINGOLLA:

16:58:51   5      Q.    86 -- Government's Exhibit 86b is a, is a working

16:58:55   6      copy, correct?

16:58:55   7      A.    That's correct.

16:58:58   8      Q.    And 86c is an edited version of the government's

16:59:01   9      copy -- I mean of the original, correct?

16:59:03   10     A.    Yes, yes.  That's correct.

16:59:04   11     Q.    All right.  And when you say "edited," you know, do

16:59:10   12     you mean edited as in portions had been taken out?

16:59:14   13     A.    Yes.

16:59:15   14     Q.    And just out of curiosity, who does the editing?

16:59:21   15     A.    It was not me.

16:59:22   16     Q.    Who was it?

16:59:23   17     A.    I don't know.

16:59:24   18     Q.    Where was it done?

16:59:25   19     A.    I don't know.  I didn't do it.

16:59:28   20     Q.    Well, in your position you have no idea who does

16:59:31   21     the shortening of these things?

16:59:34   22                    MS. LAKE:  Objection.  Relevance, Your Honor.

16:59:35   23                    THE COURT:  Sustained.

16:59:39   24     BY MR. MINGOLLA:

16:59:39   25     Q.    And do you know how it was shortened?  I don't mean

| | | |
|---|---|---|
| 16:59:42 | 1 | the mechanical aspects of that.  I mean the criteria for |
| 16:59:46 | 2 | shortening this disk? |
| 16:59:48 | 3 | MS. LAKE:  Your Honor, may we approach briefly? |
| 16:59:49 | 4 | THE COURT:  Not yet. |
| 16:59:50 | 5 | THE WITNESS:  I'm sorry, the -- I don't |
| 16:59:53 | 6 | understand the question. |
| 16:59:54 | 7 | BY MR. MINGOLLA: |
| 16:59:54 | 8 | Q.   What is the -- I'm perplexed as to why there is an |
| 16:59:59 | 9 | edited disk.  Why is a disk edited?  You can tell me |
| 17:00:05 | 10 | that, surely. |
| 17:00:06 | 11 | A.   It could be any number of reasons -- |
| 17:00:09 | 12 | THE COURT:  Are you asking him to speculate? |
| 17:00:11 | 13 | You're not asking him to speculate, are you?  You're |
| 17:00:13 | 14 | asking him what he knows, correct? |
| 17:00:14 | 15 | BY MR. MINGOLLA: |
| 17:00:15 | 16 | Q.   Do you know why this disk was shortened?  You say |
| 17:00:17 | 17 | it was -- you indicated -- you testified with the |
| 17:00:20 | 18 | prosecution that it -- I think you said it was an hour |
| 17:00:25 | 19 | originally? |
| 17:00:25 | 20 | A.   Yes. |
| 17:00:26 | 21 | Q.   But then it got edited down to Exhibit 86c and 86c |
| 17:00:31 | 22 | is infinitely [sic] shorter than that, correct? |
| 17:00:35 | 23 | A.   Yes. |
| 17:00:36 | 24 | Q.   Okay.  Now, first off, did you have anything to do |
| 17:00:40 | 25 | with the editing? |

17:00:43   1    A.   I did not.

17:00:44   2    Q.   Second, are you telling me that you don't know who

17:00:48   3    in your office does, would be doing the editing?

17:00:53   4           MS. LAKE:  Objection.  Relevance, Your Honor.

17:00:55   5           THE COURT:  I think that we've been over this

17:00:57   6    but --

17:00:58   7           MR. MINGOLLA:  I, I, I don't think so, Judge.

17:01:02   8           THE COURT:  Do you know -- can you answer that

17:01:04   9    question?

17:01:04  10           THE WITNESS:  Your Honor, I answered that I did

17:01:05  11    not do it.  I don't know who did it.  And it was not

17:01:08  12    done in our office, the DEA office.

17:01:13  13    BY MR. MINGOLLA:

17:01:13  14    Q.   Well, do you know where it was done?  Was it done

17:01:17  15    in Quantico?  Was it done in --

17:01:21  16           THE COURT:  All right.  Let's move on.

17:01:22  17           MR. MINGOLLA:  Well, I think this is important,

17:01:24  18    Your Honor.  We're talking about taking --

17:01:26  19           THE COURT:  I understand, but let's move on.

17:01:32  20    BY MR. MINGOLLA:

17:01:33  21    Q.   How often are these disks, these types of recorded

17:01:36  22    conversations, these disks, how often are they edited,

17:01:41  23    generally speaking?

17:01:42  24           MS. LAKE:  Objection.  Relevance.

17:01:44  25           THE COURT:  Sustained.

17:01:44   1   BY MR. MINGOLLA:

17:01:45   2   Q.   How many times have you been -- to the best of your

17:01:47   3   recollection, how many times have you personally been

17:01:49   4   involved with disks that have been edited?

17:01:52   5           MS. LAKE:  Objection.  Relevance.

17:01:53   6           THE COURT:  Sustained.

17:02:03   7   BY MR. MINGOLLA:

17:02:03   8   Q.   And I'm sorry, I must not have -- my hearing is not

17:02:07   9   that great.  You took the unedited version and you gave

17:02:15  10   it to whom?

17:02:17  11   A.   I gave to it the non-drug evidence custodian.

17:02:21  12   Q.   And do you know his name?

17:02:25  13   A.   At the time I believe it was Mr. Fred Ott.

17:02:37  14   Q.   And --

17:02:40  15           MR. MINGOLLA:  This is my last question.

17:02:42  16   BY MR. MINGOLLA:

17:02:42  17   Q.   And -- so that was the end of your involvement?

17:02:45  18   A.   Yes.

17:02:47  19   Q.   I should be more specific.  That was the end of

17:02:49  20   your involvement with this recording?

17:02:53  21   A.   Yes.

17:02:59  22   Q.   Was it the end of your involvement in the case,

17:03:01  23   outside of your contributions today?

17:03:07  24   A.   No.

17:03:07  25   Q.   What other aspects of this case were you involved

17:03:09   1    in then?

17:03:12   2    A.   Surveillances, writing reports.

17:03:17   3    Q.   What kind of reports?

17:03:19   4         MS. LAKE:  Objection.  Relevance, Your Honor.

17:03:20   5    BY MR. MINGOLLA:

17:03:20   6    Q.   Surveillance reports?

17:03:22   7         MS. LAKE:  Exceeds the scope of direct.

17:03:24   8         THE COURT:  Overruled.

17:03:25   9         THE WITNESS:  I'm sorry?

17:03:27   10   BY MR. MINGOLLA:

17:03:27   11   Q.   What kind of reports?  Surveillance reports?

17:03:29   12   A.   Reports relating to anything that was done -- that

17:03:31   13   I was involved in.

17:03:34   14   Q.   Interview reports?

17:03:35   15   A.   Interview reports?

17:03:36   16   Q.   DEA 6's?

17:03:38   17   A.   Yes.

17:03:38   18   Q.   I'm talking about -- and specifically DEA 6's?

17:03:42   19   A.   Yes.

17:03:43   20   Q.   That's --

17:03:44   21   A.   Yes.

17:03:44   22   Q.   That's what they're called, aren't they, the form

17:03:46   23   for the DEA, DEA 6's?

17:03:48   24   A.   Yes.

17:03:49   25   Q.   For reports, do you know how many you were involved

17:03:52   1    in, in this case?

17:03:55   2    A.   Several --

17:03:56   3              THE COURT:  Let's --

17:03:56   4              THE WITNESS:  I can't give you an exact --

17:03:58   5              THE COURT:  Stop.  Let's move on.  The number

17:04:02   6    isn't relevant.

17:04:02   7         Move on.

17:04:15   8    BY MR. MINGOLLA:

17:04:16   9    Q.   So it's fair to say that -- this is the last

17:04:18   10   question.  You seem to indicate, you seem to indicate to

17:04:30   11   the government that your involvement was pretty much

17:04:34   12   just attaching this, as you've described, a watch,

17:04:40   13   recording device, and then you handed it over to the

17:04:45   14   non- --the non-evidence [sic] custodian.  And you seem

17:04:51   15   to indicate that was it.

17:04:54   16        But then now you're saying that you continued on in

17:04:57   17   your involvement in the case, and you did surveillance,

17:05:02   18   you wrote reports.  Did you conduct interviews?

17:05:07   19             MS. LAKE:  Objection.  Relevance, Your Honor.

17:05:09   20   Exceeds the scope of direct.

17:05:10   21             THE COURT:  Okay.  Overruled.

17:05:11   22             THE WITNESS:  I believe I did.  What I was

17:05:15   23   referring to when I said my involvement was referring to

17:05:18   24   that specific incident.

17:05:19   25   BY MR. MINGOLLA:

17:05:19  1    Q.   Incident or disk?

17:05:20  2    A.   The entire -- the incident of obtaining the disk.

17:05:24  3    Not the investigation.

17:05:34  4    Q.   I see.

17:05:34  5            MR. MINGOLLA:  That's it.  Thank you,

17:05:37  6    Mr. Joseph, Agent Joseph.

17:05:39  7            THE COURT:  Attorney Watlington?

17:05:41  8            MR. WATLINGTON:  No questions, Your Honor.

17:05:42  9            THE COURT:  Redirect?

17:05:43  10           MS. LAKE:  No, Your Honor.

17:05:44  11           THE COURT:  Agent Joseph, thank you for your

17:05:47  12   testimony.

17:05:47  13       You may step down.

17:05:49  14           THE WITNESS:  Your Honor, am I excused?

17:05:50  15           THE COURT:  Attorney Mingolla.

17:05:53  16           MR. MINGOLLA:  If you don't mind, I would like

17:05:55  17   him to stick around, maybe.

17:05:57  18           THE COURT:  You're not excused.

17:05:57  19       (Witness withdrew from stand.)

17:05:59  20           THE COURT:  Next witness.

17:06:01  21           MS. LAKE:  The government calls the case agent,

17:06:04  22   Shawn Querrard.

17:06:05  23       May we approach very, very briefly, Your Honor?

17:06:08  24           THE COURT:  Not yet.

17:06:23  25       (Witness sworn.)

17:06:25  1            THE WITNESS:  I do.

17:06:25  2

17:06:26  3

17:06:26  4            THEREUPON, SHAWN QUERRARD, having been duly

17:06:27  5    sworn, was examined and testified as follows:

17:06:27  6                     DIRECT EXAMINATION

17:06:28  7    BY MS. LAKE:

17:06:33  8    Q.    Please state your name for the record?

17:06:35  9    A.    Shawn Querrard.

17:06:37  10   Q.    Please spell your full name?

17:06:39  11   A.    Shawn, S-h-a-w-n; Querrard, Q-u-e-r-r-a-r-d.

17:06:45  12   Q.    Who do you work for?

17:06:46  13   A.    I work for the Virgin Islands Police Department.

17:06:49  14   Q.    And are you assigned -- where are you assigned?

17:06:52  15   A.    I'm a detective and I'm a deputized federal task

17:06:55  16   force agent assigned to the DEA HIDTA Task Force.

17:07:02  17   Q.    What are some of your duties in general?

17:07:03  18   A.    As a task force officer, my responsibility is to

17:07:08  19   investigate violations of the Controlled Substances Act,

17:07:11  20   L21, and other violations of all local and federal law.

17:07:15  21   Q.    Now, are you familiar with the Roberto Tapia

17:07:18  22   investigation?

17:07:19  23   A.    Yes, I am.

17:07:20  24   Q.    And did you have any involvement in that

17:07:23  25   investigation?

17:07:23   1   A.   Yes, I did.

17:07:23   2   Q.   What was your involvement in that investigation?

17:07:25   3   A.   I am the case agent.  This investigation start,

17:07:31   4   started in 2012.  I wrote affidavits, prepared reports,

17:07:41   5   conducted surveillance.

17:07:42   6   Q.   And you had multiple roles; is that correct?

17:07:44   7   A.   Correct.

17:07:45   8   Q.   I'm just going to focus on a couple of roles.

17:07:48   9        Directing your attention to Government's

17:07:54   10  Exhibit 80a.

17:08:10   11       Do you see Government's Exhibit 80a?

17:08:12   12  A.   Yes, I do.

17:08:13   13  Q.   What am I holding?

17:08:14   14  A.   That is the evidence box that returned from the lab

17:08:21   15  on the 21st of March.

17:08:27   16  Q.   And what, if anything, did you do with Government's

17:08:30   17  Exhibit 80a?

17:08:31   18  A.   That was returned from the lab.  I accepted it into

17:08:35   19  my custody, opened the outer shipping box, inspected the

17:08:40   20  content, and then relinquished, in the presence of drug

17:08:44   21  evidence custodian, Andy Niermeier, and then I

17:08:49   22  relinquished it into custody.

17:08:52   23  Q.   What else did you do, if anything, prior to

17:08:57   24  Exhibit 80a?

17:08:58   25  A.   Prior to coming to court, I met with Andy

17:09:01  1   Niermeier.  He relinquished it to me and I brought it

17:09:06  2   here to the Court.

17:09:07  3   Q.   Drawing your attention to October 22, 2013, what,

17:09:11  4   if anything, was your involvement in this investigation

17:09:13  5   on October 22nd, 2013?

17:09:15  6   A.   October 22nd, myself and Mark Joseph met with

17:09:22  7   Angelo Hill.  He was outfitted with an audio/video

17:09:26  8   recording device and then he proceeded to meet with

17:09:29  9   Walter Hill.

17:09:29  10  Q.   What, if anything, happened next?

17:09:33  11  A.   In conclusion of that meeting, he returned to meet

17:09:36  12  with us.  The audio-video recording device was removed

17:09:39  13  from his person.  It was transported to the HIDTA

17:09:42  14  office, where Officer Joseph downloaded it and created

17:09:45  15  the original disk that's in evidence.

17:09:46  16  Q.   And what, if anything, did you do next?

17:09:50  17  A.   After acquiring a working copy, I reviewed the

17:09:54  18  working copy in its entirety and I created -- I prepared

17:09:58  19  a transcript.

17:09:58  20  Q.   And was the transcript that you prepared a true and

17:10:02  21  accurate representation of the recorded conversation?

17:10:04  22  A.   Yes, it was.

17:10:05  23  Q.   And did you identify the speakers in that recorded

17:10:08  24  conversation?

17:10:08  25  A.   Yes, I did.

17:10:09  1    Q.   Now showing you what has been marked as

17:10:12  2    Government's Exhibit 8- -- well, first let me show you

17:10:18  3    Government's Exhibit 86c-1?

17:10:30  4              MS. LAKE:  May I have a moment, Your Honor?

17:10:32  5              THE COURT:  Yes.

17:11:02  6    BY MS. LAKE:

17:11:03  7    Q.   Showing you Government's Exhibit 86b, do you see

17:11:05  8    that in front of you?

17:11:06  9    A.   Yes.

17:11:26  10   Q.   Can you see Government's Exhibit 86b in front of

17:11:30  11   you?

17:11:30  12   A.   Yes, I do.

17:11:31  13   Q.   And what, if anything, is Government's 86b?

17:11:33  14   A.   That is a working copy of the original disk.

17:11:37  15   Q.   And now showing you Government's Exhibit 86c-1.  Do

17:11:44  16   you see that sticker in front of you?

17:11:47  17   A.   Yes.

17:11:47  18   Q.   And now showing you -- what is Government's

17:11:51  19   Exhibit 86c-1?

17:11:52  20   A.   It is a shortened version of the original edited --

17:11:55  21   the original disk.

17:11:56  22   Q.   And what, if anything, did you do with 86b, the

17:12:03  23   working copy?

17:12:04  24   A.   86b, I reviewed it in its entirety and created a

17:12:08  25   transcript.

| | | |
|---|---|---|
| 17:12:08 | 1 | (Government's Exhibit 86c-2 marked for |
| 17:12:08 | 2 | identification.) |
| 17:12:08 | 3 | |
| 17:12:08 | 4 | BY MS. LAKE: |
| 17:12:08 | 5 | Q.   And showing you Government's Exhibit 86c-2.  Do you |
| 17:12:24 | 6 | see Government's Exhibit 86c-2 in front of you? |
| 17:12:29 | 7 | A.   Yes. |
| 17:12:29 | 8 | Q.   What is that? |
| 17:12:30 | 9 | A.   That is the transcript that I prepared. |
| 17:12:31 | 10 | Q.   And how do you recognize it? |
| 17:12:33 | 11 | A.   I have my initials on it, on the bottom left |
| 17:12:36 | 12 | corner. |
| 17:12:36 | 13 | Q.   And what is the relationship between Government's |
| 17:12:39 | 14 | 86c-2 and Government's Exhibit 86c-1? |
| 17:12:44 | 15 | A.   The transcript is of the audio recording on the CD |
| 17:12:50 | 16 | that I reviewed. |
| 17:12:52 | 17 | Q.   And is this a true and accurate reflection of the |
| 17:12:55 | 18 | recording? |
| 17:12:56 | 19 | A.   Yes. |
| 17:13:00 | 20 | MR. MINGOLLA:  I object, Your Honor. |
| 17:13:02 | 21 | THE COURT:  Overruled. |
| 17:13:06 | 22 | BY MS. LAKE: |
| 17:13:07 | 23 | Q.   And now showing you 86c-1.  Is this a shortened |
| 17:13:10 | 24 | disk? |
| 17:13:13 | 25 | A.   Yes. |

17:13:14  1    Q.    And showing you 86c-2.  Does 86c-2 conform to the

17:13:25  2    shortened disk in the transcript?

17:13:26  3    A.    Yes.

17:13:27  4    Q.    And again, is it a true and accurate reflection of

17:13:29  5    the recording on 86c-1?

17:13:32  6    A.    Correct.

17:13:33  7          MS. LAKE:  Thank you.  I have nothing further.

17:13:36  8          THE COURT:  Attorney Mingolla.

17:13:37  9          MR. MINGOLLA:  Oh yes, Your Honor.  But I'll

17:13:41  10   need a moment.

17:14:12  11       I didn't realize we would be at this point this

17:14:15  12   quickly, Judge.  Sorry.

17:14:26  13          THE COURT:  Attorney Watlington, do you have

17:14:28  14   any questions for this witness?

17:14:29  15          MR. WATLINGTON:  None, Your Honor.

17:14:30  16          THE COURT:  All right.

17:15:00  17                          CROSS-EXAMINATION

17:15:00  18   BY MR. MINGOLLA:

17:15:01  19   Q.    Good afternoon, Agent Querrard.

17:15:02  20   A.    Good afternoon.

17:15:03  21   Q.    I'm going to have a few questions for you, I'm

17:15:08  22   afraid.

17:15:09  23       Do you recall, do you recall testifying at the --

17:15:19  24          THE COURT:  Stop -- come to sidebar.

17:15:34  25       (Sidebar discussion held as follows:)

| | | |
|---|---|---|
| 17:15:36 | 1 | THE COURT:  Attorney Mingolla, you're going to |
| 17:15:41 | 2 | ask him what question, if he recalls testifying at what? |
| 17:15:47 | 3 | Because when we speak of another proceeding, we usually |
| 17:15:49 | 4 | use the term "a prior proceeding." |
| 17:15:51 | 5 | MR. MINGOLLA:  I'm sorry. |
| 17:15:52 | 6 | THE COURT:  A trial -- |
| 17:15:53 | 7 | MR. MINGOLLA:  I'm sorry. |
| 17:15:53 | 8 | THE COURT:  What were you going to ask him? |
| 17:15:56 | 9 | MR. MINGOLLA:  Does he recall testifying at a |
| 17:15:58 | 10 | prior proceeding that there were two devices. |
| 17:16:01 | 11 | THE COURT:  All right.  I just want to make |
| 17:16:03 | 12 | sure we didn't get -- |
| 17:16:04 | 13 | MR. MINGOLLA:  No. |
| 17:16:04 | 14 | THE COURT:  -- into the weeds. |
| 17:16:06 | 15 | MS. LAKE:  Your Honor, may we address one other |
| 17:16:08 | 16 | issue? |
| 17:16:08 | 17 | THE COURT:  Sure. |
| 17:16:09 | 18 | MS. LAKE:  The reason I asked for a sidebar, |
| 17:16:11 | 19 | Attorney Mingolla was asking the witness why the disk |
| 17:16:14 | 20 | was shortened in the matter.  So the Court is aware, the |
| 17:16:18 | 21 | disk was shortened, I filed a motion regarding this |
| 17:16:20 | 22 | notice -- |
| 17:16:21 | 23 | THE COURT:  No, I saw the two items.  One was a |
| 17:16:23 | 24 | drug conviction and two was a reference to the jury. |
| 17:16:26 | 25 | MR. MINGOLLA:  That's it. |

17:16:27  1          THE COURT:  I'm not -- that's what I seem to

17:16:29  2     recall.  I'm not saying that is the -- there's no

17:16:33  3     reference to this drug conviction and there's no

17:16:36  4     reference to the bad remark about juries, correct?

17:16:39  5          MS. LAKE:  That's correct.

17:16:40  6          THE COURT:  All right.  Let's deal with this

17:16:41  7     and go forward.

17:16:42  8          MR. MINGOLLA:  Judge, please let me put this

17:16:44  9     out, how it can go for an hour long --

17:16:47  10         THE COURT:  Attorney Mingolla, we're not

17:16:49  11    arguing this now.  Let's go on with the testimony.

17:16:51  12    There will be a time when you can argue it.

17:16:53  13         MR. MINGOLLA:  All right.

17:17:11  14         (End of sidebar, open court as follows:)

17:17:11  15    BY MR. MINGOLLA:

17:17:11  16    Q.   Agent Querrard, do you recall at a previous hearing

17:17:18  17    in this matter testifying that there were two devices,

17:17:25  18    bugging -- let me be specific -- bugging devices planted

17:17:32  19    at that site that day?

17:17:35  20    A.   That's not what I testified to.  I testified that

17:17:38  21    there was two audio-video recording devices.

17:17:41  22    Q.   Okay, okay.  But an audio-video recording device

17:17:45  23    for the benefit of the jury is often referred to as a

17:17:49  24    bug, is it not?

17:17:50  25    A.   Not to my knowledge.

| | | |
|---|---|---|
| 17:17:57 | 1 | Q.   Have you ever heard the description of an office |
| 17:18:00 | 2 | being bugged or someone bugging someone else, like say |
| 17:18:04 | 3 | in Watergate? |
| 17:18:05 | 4 | MS. LAKE:  Objection.  Relevance. |
| 17:18:06 | 5 | THE COURT:  Sustained. |
| 17:18:08 | 6 | BY MS. LAKE: |
| 17:18:08 | 7 | Q.   You've never heard the term in all of your life? |
| 17:18:10 | 8 | A.   I heard the term, but I don't -- I don't |
| 17:18:13 | 9 | intermingle the two. |
| 17:18:14 | 10 | Q.   All right.  Well, let's, let's ask.  You know that |
| 17:18:19 | 11 | a bug isn't the same as a telephone tap, right? |
| 17:18:22 | 12 | A.    That is -- well, once again, you're using the term |
| 17:18:28 | 13 | "bug."  That's not what I know it as.  It's an |
| 17:18:31 | 14 | audio-video recording device.  If that's what you're |
| 17:18:34 | 15 | speaking of, then yes. |
| 17:18:36 | 16 | Q.   How long you have worked on the street? |
| 17:18:38 | 17 | MS. LAKE:  Objection.  Relevance, Your Honor. |
| 17:18:39 | 18 | THE COURT:  Overruled. |
| 17:18:39 | 19 | THE WITNESS:  I've been a police officer for |
| 17:18:41 | 20 | 18 years. |
| 17:18:41 | 21 | BY MR. MINGOLLA: |
| 17:18:41 | 22 | Q.   And in 18 years, you've never ever heard the term, |
| 17:18:44 | 23 | a bugging device? |
| 17:18:45 | 24 | A.   Once again, like I stated, I heard -- |
| 17:18:48 | 25 | THE COURT:  Stop.  Stop. |

17:18:48  1          Let's move on.  We've been through this.  Next

17:18:55  2     question.

17:18:56  3

17:18:56  4     BY MR. MINGOLLA:

17:18:56  5     Q.    Now you indicated there were two -- what you're

17:18:58  6     calling them audio-visual [sic] devices -- there were

17:19:01  7     two audio-visual devices.  Do you remember saying that?

17:19:04  8     A.    Yes.

17:19:05  9     Q.    Okay.  And we know that one, from the testimony of

17:19:11  10    Mr. -- I believe he's your boss, Agent Joseph, just now,

17:19:18  11    that there was one audio-visual device?

17:19:24  12    A.    There was one that Agent Joseph activated or placed

17:19:29  13    on Angelo Hill.

17:19:31  14    Q.    Okay.  Okay.  Are you aware that Agent Joseph --

17:19:36  15    well, you were sitting here.  You're aware that Agent

17:19:39  16    Joseph thought that was the only device, one device,

17:19:43  17    that being this wrist -- not "this" wrist watch, but a

17:19:48  18    wrist watch?

17:19:49  19    A.    That's not what I understood him to say.

17:19:51  20    Q.    Did you understand him to say there was only one

17:19:54  21    recording device?

17:19:54  22    A.    I understood him to say that he testified that he

17:19:57  23    only put one recording device on Angelo Hill.

17:20:02  24    Q.    Okay.  Did you inform your superior that you and

17:20:10  25    Agent Mark Joseph were going to install or place or

17:20:15  1    construct another audio recording device?

17:20:19  2    A.   My office --

17:20:20  3             MS. LAKE:  Objection to relevance.  Your Honor.

17:20:21  4             THE COURT:  Sustained.  403.  Go ahead.

17:20:28  5    BY MS. LAKE:

17:20:28  6    Q.   Was Agent Joseph aware of any other recording

17:20:31  7    devices?

17:20:32  8             MS. LAKE:  Objection.  Assumes facts not in

17:20:34  9    evidence.  Calls for speculation.

17:20:36  10            THE COURT:  It's not assuming, but you're

17:20:39  11   asking the witness to speak about the knowledge inside

17:20:42  12   someone else's head?

17:20:44  13            MR. MINGOLLA:  I'm asking whether he

17:20:46  14   apprised --

17:20:47  15            THE COURT:  My question is a yes or no.  Is

17:20:48  16   that what you're asking him?

17:20:50  17            MR. MINGOLLA:  No.

17:20:50  18            THE COURT:  All right.

17:20:51  19   BY MR. MINGOLLA:

17:20:51  20   Q.   I'm asking, did you --

17:20:53  21            THE COURT:  Then rephrase your question.

17:20:55  22            MR. MINGOLLA:  Yes, sir.  I was, sir.  I'm

17:20:56  23   sorry.

17:20:57  24   BY MR. MINGOLLA:

17:20:57  25   Q.   Did you tell your boss -- and when I say "boss" it

17:21:04    1    might not -- let me not be colloquial.  Did you tell

17:21:10    2    your superior, Agent Joseph, that you and Agent --

17:21:13    3    strike that -- not Agent Joseph Grossman -- did you

17:21:30    4    apprise -- did you inform Attorney [sic] Grossman, your

17:21:33    5    superior -- he is your superior, right?

17:21:35    6    A.   He is a fellow special agent within the DEA task

17:21:40    7    force.

17:21:40    8    Q.   Well, the hierarchy in all of these things, is he

17:21:45    9    above you or below you?  Does he give you orders or you

17:21:48   10    give him orders?

17:21:50   11            MS. LAKE:  Objection to relevance, Your Honor.

17:21:51   12            THE COURT:  Overruled.

17:21:51   13            THE WITNESS:  We work together.  I don't

17:21:53   14    consider anybody below or each other when it comes to

17:21:57   15    agents.

17:21:57   16    BY MR. MINGOLLA:

17:21:58   17    Q.   What GE scale are you?

17:22:01   18            MS. LAKE:  Objection.

17:22:01   19            THE COURT:  All right.  Let's move on.

17:22:03   20    Sustained.

17:22:08   21    BY MR. MINGOLLA:

17:22:08   22    Q.   All right.  So you and Agent Joseph prepare or --

17:22:16   23    strike that.

17:22:17   24        You and Agent Joseph, seemingly without informing

17:22:24   25    anyone, prepared another recording device, audio --

17:22:27   1   audio-visual device, correct?

17:22:30   2         MS. LAKE:  Objection.  Argumentative and

17:22:32   3   assumes facts not in evidence.

17:22:34   4         THE COURT:  Ask the question without the intro

17:22:36   5   or the editorial.

17:22:38   6         MR. MINGOLLA:  Okay.

17:22:39   7   BY MR. MINGOLLA:

17:22:39   8   Q.   Did you and Agent Joseph install another

17:22:43   9   audio-visual device somewhere in -- on that scene?

17:22:49   10   A.   As I stated before, there were two audio-video

17:22:52   11   recording devices used for that meeting.

17:22:55   12   Q.   Okay.  One was a watch.  What was the other one?

17:22:59   13         MS. LAKE:  Objection to relevance.

17:23:00   14         THE COURT:  Okay.  Overruled.

17:23:02   15         THE WITNESS:  One was a cup.

17:23:04   16   BY MR. MINGOLLA:

17:23:04   17   Q.   One was a cup.  And so I presume that there was a

17:23:13   18   disk made from that audio-visual device as well, a disk?

17:23:20   19   A.   Correct.

17:23:22   20   Q.   So now we have two disks, we have a watch disk and

17:23:27   21   we've got a cup disk, correct?

17:23:30   22   A.   Correct.

17:23:35   23   Q.   Okay.  So that might explain -- well, strike that.

17:23:43   24         And you said, you testified -- well, first off, do

17:23:46   25   you have any kind of certification in being an

17:23:51  1    interpreter or transcriber or anything of that nature?

17:23:56  2    A.   Certification?

17:23:58  3    Q.   Yes.

17:23:59  4    A.   I'm transcribing my native language.

17:24:03  5    Q.   That's it?

17:24:03  6    A.   Yeah.

17:24:05  7    Q.   So you've never had any formal training in

17:24:09  8    transcription or translation?

17:24:13  9    A.   I'm transcribing my native language or English.

17:24:17  10   Q.   That's not my question.  Answer my question.

17:24:19  11        Do you or do you not have any certification or

17:24:23  12   training in translation or transcribing conversations

17:24:28  13   that you hear?

17:24:29  14   A.   No.

17:24:30  15   Q.   Outside of the fact that they happen to be in your

17:24:32  16   native language, right?  Nothing?

17:24:37  17        THE COURT:  Let's avoid the editorial -- let's

17:24:40  18   move on.

17:24:44  19        THE WITNESS:  No.

17:24:44  20   BY MR. MINGOLLA:

17:24:45  21   Q.   So you translate in your native language for which

17:24:52  22   you have no training, you make a translation of this

17:25:00  23   disk that you placed in the cup, or this -- forgive me,

17:25:05  24   not disk, the audio-visual device that was placed in a

17:25:08  25   cup, correct?

17:25:09   1   A.   No, the one that I did the transcription of was the

17:25:13   2   watch recording.

17:25:13   3   Q.   Okay.  Who did the one of the, of the cup?

17:25:18   4   A.   None was done of the cup, because it recorded two

17:25:22   5   identical things.  It was at the same place, same time,

17:25:25   6   same recording.

17:25:30   7   Q.   Okay.  You're telling me, if I understand you

17:25:32   8   properly, that even though you didn't really apprise

17:25:39   9   your colleagues -- let's call Mr. Grossman a colleague,

17:25:42   10  as opposed to your superior -- even though you didn't

17:25:47   11  apprise him that you put one in a cup, and a recording

17:25:51   12  was done without his knowledge, by you and Agent Joseph,

17:26:00   13  that wasn't used?

17:26:02   14          MS. LAKE:   Objection.  Assumes facts not in

17:26:04   15  evidence, Your Honor.

17:26:05   16          THE COURT:  All right.  Rephrase.  Ask the

17:26:07   17  question without all the commentary.

17:26:13   18  BY MR. MINGOLLA:

17:26:15   19  Q.   You and Agent Joseph were acting in your own accord

17:26:18   20  and on your own initiative when you did this second

17:26:21   21  recording, correct?

17:26:21   22  A.   No, that's not correct.

17:26:22   23  Q.   The second audio-visual device recording?

17:26:25   24  A.   That is not correct.

17:26:27   25  Q.   Who else was involved?

17:26:29  1    A.   Numerous agents.

17:26:33  2    Q.   And how many numerous agents?

17:26:40  3    A.   I don't know exactly.  Between eight and ten

17:26:43  4    additional.

17:26:45  5    Q.   And you informed these ten individuals that you

17:26:53  6    were going, that you and Agent Joseph were going to be

17:26:57  7    installing a secondary audio-visual device, is that what

17:27:01  8    you're saying?

17:27:03  9    A.   I don't know if they exactly knew what we -- which

17:27:09  10   particular recording device was being used, but they

17:27:11  11   knew there was going to be a recorded meeting.

17:27:14  12   Q.   I'm not asking that.  I'm asking, did they know

17:27:18  13   there was going to be a second audio-visual device?

17:27:25  14   A.   Specifically how much recording devices were being

17:27:27  15   used was not, I don't think was known.

17:27:32  16   Q.   To anybody but you and Agent Joseph, who knew there

17:27:36  17   were two, right?

17:27:37  18   A.   Myself, Agent Joseph and Special Agent Rafi

17:27:42  19   Fernandez.

17:27:44  20   Q.   Okay.  So this -- because there's -- you're

17:28:01  21   familiar, obviously -- you did it in your native tongue?

17:28:05  22        MS. LAKE:  Objection.  Argumentative, Your

17:28:07  23   Honor.

17:28:07  24        THE COURT:  Sustained.

17:28:07  25        MR. MINGOLLA:  No, I'm just trying to point

17:28:09   1      something out here, Judge.

17:28:10   2              THE COURT:  Sustained.  Just ask the question.

17:28:10   3

17:28:10   4      BY MR. MINGOLLA:

17:28:12   5      Q.   I have a transcript in my hand which is done in --

17:28:21   6      how do I want to call it -- a West Indian dialect.  Is

17:28:25   7      that your, your native tongue translation?

17:28:30   8      A.   I would need to see the transcript that you have.

17:28:34   9              MR. MINGOLLA:  May I approach?

17:28:35   10             THE COURT:  You can use the Elmo.

17:28:51   11             MR. MINGOLLA:  I've never used an Elmo before.

17:28:53   12     Can somebody show me?

17:28:55   13         I have to ask the jury how to show me.

17:28:58   14             THE COURT:  Attorney Mingolla, just ask your

17:29:01   15     questions.

17:29:01   16             MR. MINGOLLA:  I'm not going to go through this

17:29:03   17     whole transcript, Judge.  Don't worry.  I just want

17:29:07   18     to -- I'm terrible with machines.

17:29:13   19     BY MR. MINGOLLA:

17:29:14   20     Q.   All right.  So -- it's in English.  So you say

17:29:22   21     here, just as an example, on page --

17:29:24   22             THE COURT:  Attorney Mingolla, is there an

17:29:27   23     exhibit number that you're referring to?

17:29:30   24             MR. MINGOLLA:  I'm going to make it -- this is

17:29:32   25     Exhibit B.

17:29:32   1          THE COURT:  Is this an item that's in evidence?

17:29:35   2          MR. MINGOLLA:  No.  But it's an item that I

17:29:39   3   received as evidence.

17:29:45   4      (Defendant's Exhibit B marked for identification.)

17:29:45   5   BY MR. MINGOLLA:

17:29:45   6   Q.   Now we're going to call this one B.

17:29:47   7      So this is the beginning of the recording

17:29:52   8   transcript.  And -- can you see it on your screen?

17:29:55   9   A.   Yes.

17:29:55   10  Q.   Okay.  Good.  Cool.

17:29:58   11     So here we go with, and A. Hill is who, Angelo

17:30:10   12  Hill, I assume, correct?

17:30:12   13  A.   Correct.

17:30:12   14  Q.   And W. Hill is Walter Hill, correct?

17:30:17   15  A.   Correct.

17:30:18   16  Q.   And then you say, the first sentence is Angelo

17:30:21   17  Hill --

17:30:21   18         THE COURT:  Attorney Mingolla, are you

17:30:25   19  referring to something that is not in evidence?  Yes or

17:30:28   20  no.

17:30:28   21         MR. MINGOLLA:  I'm referring to a rogue

17:30:31   22  transcript.  That's what I'm referring to.  I'm

17:30:35   23  referring to a rogue recording that was then

17:30:37   24  transcribed.

17:30:38   25         THE COURT:  All right.  My question is a yes or

17:30:40  1    no question.  Is the item in evidence?

17:30:43  2              MR. MINGOLLA:  A transcript is in evidence.

17:30:45  3              THE COURT:  All right.  That's not my question.

17:30:46  4        Come to sidebar.

17:30:58  5        (Sidebar discussion held as follows:)

17:31:30  6              THE COURT:  Attorney Mingolla, the document

17:31:33  7    that you're referring to is not in evidence and it

17:31:35  8    sounded to me like you were either reading or about to

17:31:38  9    read from something that is not in evidence.  Is that

17:31:41  10   what you were doing or planning to do?

17:31:43  11             MR. MINGOLLA:  Yes.  Yes, Judge.

17:31:45  12             THE COURT:  All right.  You realize if

17:31:47  13   something isn't in evidence, you can't just read it into

17:31:50  14   evidence.

17:31:51  15             MR. MINGOLLA:  I was merely going to -- okay.

17:31:53  16   I'll, I'll --

17:31:55  17             THE COURT:  This thing is not in evidence,

17:31:57  18   number one.  So I think you're -- it sounds to me like

17:32:01  19   you're attacking the manner in which a transcription was

17:32:07  20   done, when the transcription isn't -- hasn't been moved

17:32:10  21   into evidence.  It hasn't been moved into evidence,

17:32:14  22   correct, Attorney Lake?

17:32:15  23             MS. LAKE:  That's correct.

17:32:15  24             THE COURT:  Yes.  I think all this witness

17:32:17  25   testified to is that he did this.

17:32:19   1          MR. MINGOLLA:  Okay.

17:32:19   2          THE COURT:  If he did, go ahead and impeach

17:32:23   3   him.  But I always have some pause when I hear someone

17:32:27   4   reading something that isn't in evidence, and I don't

17:32:29   5   think you're appreciating the Court's concern.  It

17:32:32   6   cannot go before the jury unless it is admitted into

17:32:35   7   evidence.

17:32:36   8      It is not admitted into evidence, so I can't allow

17:32:40   9   you to put it before the jury if it's not in evidence.

17:32:43  10   So I don't know how you plan to use it.

17:32:45  11          You can use anything to impeach a witness during

17:32:48  12   cross-examination, but it sounded like you were doing

17:32:51  13   something beyond that, which was putting something

17:32:54  14   before the jury that was not in evidence.  All right.

17:32:58  15   So let's just keep that in mind.  All right.  Thank you.

17:33:07  16          (End of sidebar, open court as follows:)

17:33:14  17   BY MR. MINGOLLA:

17:33:15  18   Q.   Attorney Querrard, you -- we won't be needing Elmo

17:33:26  19   right now, thank God.

17:33:28  20          You did a translation, correct?

17:33:32  21   A.   I did a transcription of a recorded call, recorded

17:33:35  22   meeting.

17:33:35  23   Q.   And you did it in dialect, correct?

17:33:39  24          You know what I mean by "dialect," West Indian

17:33:46  25   dialect.  Let's be specific:  Dem, dose, dese, dat?

17:33:53  1          MS. LAKE:  Objection, Your Honor.  Calls for

17:33:54  2     speculation.

17:33:56  3          MR. MINGOLLA:  No, I'm asking, Judge.

17:33:57  4          THE COURT:  Hold on.  Stop.  Overruled.

17:33:58  5          THE WITNESS:  I transcribed what I heard.

17:34:01  6     BY MR. MINGOLLA:

17:34:01  7     Q.    Uhm-hmm.

17:34:04  8          And as you said, you transcribed it, what you

17:34:07  9     thought you heard with, with West Indian terms like

17:34:15  10    what, w-a-h, for example?

17:34:19  11    A.    That's not what -- I don't recall that's what I

17:34:25  12    wrote.  I need to see the transcript.

17:34:25  13    Q.    Or "geh," instead, g-e-h, what is that supposed to

17:34:31  14    mean?

17:34:31  15    A.    Repeat it again.

17:34:33  16    Q.    What would g-e-h mean?

17:34:35  17    A.    I don't believe that's what I wrote.  Could I see

17:34:38  18    the transcript?

17:34:40  19    Q.    Would it mean get?

17:34:45  20          THE COURT:  No, no.

17:34:46  21          Attorney Mingolla, please stay at the lectern.

17:34:49  22          MR. MINGOLLA:  Let me move on.

17:34:51  23    BY MR. MINGOLLA:

17:34:51  24    Q.    So you do this transcript.  I'm going to enter this

17:34:57  25    into evidence as exhibit -- I forgot whether I'm going

17:35:04  1    alphabetically or by number, but I think it would be

17:35:10  2    Exhibit C, Defense Exhibit C in the Hill case.

17:35:10  3         (Defendant's Exhibit C marked for identification.)

17:35:10  4    BY MR. MINGOLLA:

17:35:15  5    Q.   Did you do that?

17:35:16  6         Then -- and there's no -- you didn't date it, did

17:35:22  7    you?

17:35:24  8    A.   I can't testify because I can't see if that is the

17:35:26  9    one that I prepared.

17:35:40  10   Q.   All right.  Then we have something transcribed, a

17:35:44  11   document, another transcript dated October 22nd, with

17:35:52  12   the participants, and this would appear to have been

17:36:04  13   prepared by someone else.  Did someone else prepare this

17:36:07  14   one?

17:36:08  15        This, was another dialect, West Indian dialect

17:36:13  16   transcription done?

17:36:15  17   A.   I don't know if one was done by some other intel

17:36:22  18   analyst, but once again I can't see if it's the one that

17:36:29  19   I created.

17:36:30  20        MR. MINGOLLA:  Your Honor, you sure I can't

17:36:31  21   show him the first page -- strike that.  Let's say

17:36:34  22   page --

17:36:34  23        THE COURT:  You can show the witness whatever

17:36:36  24   you wish to.

17:36:38  25        MR. MINGOLLA:  Yeah.

17:36:42  1          THE COURT:  No, from the Elmo, not --

17:36:49  2          MR. MINGOLLA:  Sorry.  It's not showing -- yes,

17:37:20  3   it is showing.  By gosh, it worked.

17:37:22  4   BY MR. MINGOLLA:

17:37:22  5   Q.   Okay.  Just quickly, you see all of these little

17:37:25  6   marks that are made, circles and checks and asterisks,

17:37:29  7   et cetera?

17:37:29  8   A.   Uhm-hmm.

17:37:30  9   Q.   Yes, correct?

17:37:31  10  A.   Yes.

17:37:31  11  Q.   Okay.  Good.

17:37:35  12          MR. MINGOLLA:  Now we'll call that Exhibit D.

17:37:35  13      (Defendant's Exhibit D marked for identification.)

17:37:35  14  BY MR. MINGOLLA:

17:37:45  15  Q.   Now, the same page -- just a moment.

17:38:31  16      All right.  Now you see this page that's on the

17:38:35  17  Elmo.  That's the same page -- that's the same number

17:38:40  18  page as the previous exhibit that I showed you.  And you

17:38:46  19  also see all of the circles and the, and the little

17:38:51  20  quotes and words that are written where it says things

17:39:02  21  such as missing on --

17:39:04  22          MS. LAKE:  Objection.

17:39:05  23          THE COURT:  Let me see counsel at sidebar.

17:39:24  24      (Sidebar discussion held as follows:)

17:39:27  25          THE COURT:  Is this -- the government planning

17:39:30  1    to seek the introduction of the transcription?

17:39:37  2                MS. LAKE:  86c-1 yes, Your Honor.

17:39:39  3                THE COURT:  It is in English, correct?

17:39:41  4                MS. LAKE:  Yes, Your Honor.

17:39:41  5                THE COURT:  All right.  I'm not inclined to

17:39:44  6    allow it if the recorded utterances are in English, if I

17:39:48  7    recall from the suppression hearing, it's that tape, is

17:39:50  8    that correct?

17:39:51  9                MS. LAKE:  That's correct.

17:39:52  10               THE COURT:  All right.  That's English, if I'm

17:39:53  11   not mistaken, correct?

17:39:54  12               MS. LAKE:  Correct.

17:39:55  13               THE COURT:  All right.  Yeah, I'm not inclined

17:39:57  14   to allow the transcription in, just as I did with the

17:40:01  15   other English recordings involving Mr. Brown.  There was

17:40:09  16   no transcript because it's in English.  The jury

17:40:11  17   understands English.

17:40:12  18               MS. LAKE:  As an alternative to admitting it

17:40:16  19   in, I would simply ask that it be used as an aid to the

17:40:20  20   jury, as I ask the Court to play the audio, but not have

17:40:23  21   it admitted into evidence and not --

17:40:26  22               THE COURT:  I'm disinclined to do that.

17:40:28  23   They're speaking English.  I've heard the tape.  I've

17:40:32  24   seen the transcripts.  So I'm not inclined to.

17:40:34  25               All right?  I don't know if that affects your

17:40:36  1    examination.

17:40:37  2              MR. MINGOLLA:  Yeah, it sure does.  I'll

17:40:39  3    shorten things up right quick.

17:40:42  4         Good.  Thank you, Judge.

17:40:44  5         (End of sidebar, open court as follows:)

17:40:57  6              MR. MINGOLLA:  We won't discuss the

17:40:59  7    transcripts.  We don't need to discuss transcripts any

17:41:02  8    more.

17:41:02  9    BY MR. MINGOLLA:

17:41:03  10   Q.   Now, did you and -- did you -- you were at the

17:41:14  11   site -- when I say "site," let me be more specific.  You

17:41:18  12   were at this alleged meeting between my client,

17:41:25  13   Mr. Hill, and the other Mr. -- Mr. Walter Hill and

17:41:32  14   Mr. Angelo Hill.  Were you there?

17:41:33  15   A.   At the actual meeting?

17:41:37  16   Q.   Yes.

17:41:37  17   A.   No, I was not present.

17:41:38  18   Q.   Okay.  So you never saw, you never saw them

17:41:41  19   converse?

17:41:41  20   A.   At that physical meeting?  No, I did not see them

17:41:46  21   together.

17:41:47  22   Q.   Okay.  And so really your only involvement

17:42:00  23   regarding that meeting, which I'm, if I'm correct here,

17:42:05  24   was, and this is the last time I'll mention the word

17:42:08  25   transcript, was to do this, was to do your little

17:42:11  1   translation thing, correct?

17:42:13  2   A.   I was with Angelo Hill before and I was with

17:42:17  3   Mr. Angelo Hill after the fact.   But I was not at the

17:42:20  4   actual meeting.

17:42:20  5   Q.   Okay.   And do you know -- never mind.   Strike that.

17:42:40  6        Were you, were you -- I asked you and you answered

17:42:43  7   me, you know, properly, whether you were a visual --

17:42:50  8   whether you visually saw that meeting between those two

17:42:54  9   gentlemen.   You responded no?

17:42:55  10  A.   Correct.

17:42:56  11  Q.   Did you -- isn't it true that you met with them --

17:43:00  12  strike that.

17:43:01  13       Isn't it true that you met with Mr. Angelo Hill

17:43:04  14  just prior to that meeting?

17:43:05  15  A.   Yes, I met with him prior to the meeting.

17:43:08  16  Q.   Uhm-hmm.   And at that meeting that you had with

17:43:12  17  him, at that meeting that you had with Mr. Angelo Hill

17:43:17  18  prior to this setup --

17:43:19  19       MS. LAKE:   Objection.   Argumentative, Your

17:43:22  20  Honor.

17:43:22  21       THE COURT:   Overruled.

17:43:23  22  BY MR. MINGOLLA:

17:43:23  23  Q.   -- did you brief him as to what to say?

17:43:25  24  A.   No, I did not.

17:43:27  25  Q.   What did you talk about?

17:43:29  1    A.   We just outfitted him with the audio-video device,

17:43:36  2    and then he proceeded to go down.

17:43:41  3    Q.   And -- all right.  But you had, at least as best I

17:43:50  4    can discern, at least four or five meetings with

17:43:57  5    Mr. Angelo Hill, correct?

17:43:59  6    A.   Yes.

17:44:00  7    Q.   Okay.  And these meetings took place at the -- at

17:44:05  8    the U.S. Attorney's Office or at HIDTA or where?

17:44:09  9    A.   The, I believe they were at the attorney's offices,

17:44:16  10   his attorney's office.

17:44:17  11   Q.   At his attorney's office?

17:44:19  12   A.   Yes.

17:44:20  13   Q.   So he -- I infer from that that he was not in

17:44:23  14   custody, or was he in custody?

17:44:25  15   A.   He was not in custody.

17:44:28  16   Q.   So there were no handcuffs or things of this

17:44:30  17   nature?

17:44:30  18   A.   No.

17:44:33  19   Q.   And during those meetings, let's say, five, how

17:44:43  20   long did they last, approximately?

17:44:46  21        I'm not asking for each individual one, just in

17:44:49  22   general, would they be an hour long, two hours long?

17:44:53  23   Three?  Four?  All day?

17:44:58  24   A.   My recollection is an hour or two, depending on

17:45:01  25   which meeting it was.

17:45:05  1    Q.   And during the course of those conversations with

17:45:12  2    Mr. Angelo Hill, who was asking the questions?

17:45:24  3    A.   Myself and the attorneys.

17:45:27  4    Q.   And the attorneys being who?

17:45:31  5    A.   The AUSA.

17:45:32  6    Q.   Would that be Lindquist?

17:45:34  7    A.   I believe so.

17:45:38  8    Q.   And the nature of the questions that you asked, did

17:45:49  9    they, did any of them -- strike that.

17:45:55  10        What was the nature of these conversations that you

17:46:00  11   had with Angelo Hill?

17:46:02  12   A.   Basically they regarded the, Angelo Hill's

17:46:08  13   involvement in the activities that took place on

17:46:12  14   May 17th and prior.

17:46:17  15   Q.   They concern the activities that involve Angelo

17:46:21  16   Hill on the 17th, right?

17:46:24  17   A.   Correct.

17:46:27  18   Q.   And did you, bearing in mind, bearing in mind

17:46:37  19   you're under oath, did you at any given moment discuss,

17:46:41  20   or any given meeting, did you make any suggestions to

17:46:50  21   Mr. Angelo Hill about this -- excuse me -- his

17:46:59  22   testimony, suggestions as to how he might respond?

17:47:04  23   A.   No.  I did not.

17:47:07  24   Q.   Okay.  Did anybody else?

17:47:11  25   A.   Not that I'm aware.

17:47:13   1   Q.   Including Agent Joseph?

17:47:15   2   A.   Not that I'm aware.

17:47:17   3   Q.   How about AUSA Lindquist?

17:47:19   4   A.   Not that I'm aware, except telling the truth.

17:47:25   5   That's basically all we ever asked of him.

17:47:30   6   Q.   And isn't it true, isn't it true that Mr. Angelo

17:47:45   7   Hill was informed, let's put it that way, that if he

17:47:55   8   cooperated, that he would receive certain -- could,

17:48:01   9   could receive certain benefits at sentencing?

17:48:05  10   A.   I was not present at those meetings.  That was

17:48:07  11   discussed between the AUSA's office and his attorney.

17:48:14  12   Q.   Was it your impression that that was -- no, strike

17:48:18  13   that.

17:48:21  14       Is it a common thing for a cooperator to receive

17:48:29  15   credit for cooperation at sentencing?

17:48:31  16           MS. LAKE:  Objection.  Relevance.

17:48:32  17           THE COURT:  Sustained.

17:48:53  18   BY MR. MINGOLLA:

17:48:54  19   Q.   Now --

17:48:55  20           MR. MINGOLLA:  Bear with me.

17:49:01  21   BY MR. MINGOLLA:

17:49:01  22   Q.   Now, there were approximately, there were

17:49:11  23   approximately, as best I can ascertain, about eight

17:49:17  24   other agents present at that, at that alleged meeting

17:49:24  25   between my client, Walter Hill, and Angelo Hill.  Does

17:49:31  1    that sound about right to you?  Agents of different

17:49:34  2    agencies, IRS, DEA?

17:49:39  3    A.   Correct.

17:49:40  4    Q.   And none of them heard anything, did they?

17:49:48  5         MS. LAKE:  Objection.  Calls for speculation.

17:49:49  6         THE COURT:  Sustained.

17:49:55  7    BY MR. MINGOLLA:

17:49:56  8    Q.   I won't go into where they were hiding, but I will

17:50:00  9    ask this.  What -- did they say anything?

17:50:05  10        MS. LAKE:  Objection.  Calls for speculation.

17:50:07  11        THE COURT:  Sustained.

17:50:11  12   BY MR. MINGOLLA:

17:50:11  13   Q.   Were any reports written to you or Agent Joseph

17:50:18  14   from any of these agents that were there that day?

17:50:23  15        And when I say "reports," let's broaden that up a

17:50:26  16   little bit.  Any raw notes, data, you know, scribbles?

17:50:31  17        MS. LAKE:  Objection.  Relevance.  Exceeds the

17:50:33  18   scope.

17:50:34  19        THE COURT:  Overruled.

17:50:37  20        THE WITNESS:  No.  All I can testify is no

17:50:40  21   notes were turned over to myself.

17:50:41  22   BY MR. MINGOLLA:

17:50:41  23   Q.   I'm sorry, I didn't catch the beginning?

17:50:43  24   A.   All I can say is no notes were turned over to

17:50:46  25   myself.

17:50:46  1    Q.   How about, do you know whether they were turned

17:50:56  2    over to Agent Joseph?

17:50:57  3            MS. LAKE:  Objection.  Calls for speculation.

17:50:59  4            THE COURT:  Sustained.

17:51:05  5    BY MR. MINGOLLA:

17:51:05  6    Q.   Did you and -- well, I'll just come right out with

17:51:16  7    it -- whose idea was it to put this -- we know that

17:51:20  8    Grossman -- Agent Grossman --

17:51:22  9            MS. LAKE:  Objection.  Argumentative at this

17:51:24  10   point.

17:51:24  11           THE COURT:  Let's hear the question.

17:51:26  12           MR. MINGOLLA:  I asked the question.

17:51:27  13   BY MR. MINGOLLA:

17:51:27  14   Q.   We know that Agent Grossman was fully aware of the

17:51:30  15   fact that Mr. Angelo Hill was wearing a wrist watch.

17:51:40  16   Whose idea was it to set up this secondary device?

17:51:45  17           MS. LAKE:  Objection.  Assumes facts not in

17:51:47  18   evidence.

17:51:48  19           THE COURT:  Sustained.

17:51:50  20           MR. MINGOLLA:  But, Your Honor, not to be

17:51:52  21   argument- --

17:51:53  22           THE COURT:  Please don't.

17:51:54  23           MR. MINGOLLA:  Okay.

17:51:55  24           THE COURT:  I've ruled.  Ask your next

17:51:56  25   question.

17:51:56   1              MR. MINGOLLA:  Very well.

17:52:06   2   BY MR. MINGOLLA:

17:52:06   3   Q.   This was yours and Mark Joseph's idea, correct?

17:52:11   4   The second device?

17:52:14   5   A.   As agents, we discuss what is going to be best to

17:52:17   6   make a particular operation or something successful, and

17:52:20   7   we decided to proceed to -- as a secondary possibility,

17:52:27   8   to make sure that we got a good recording, that we would

17:52:32   9   use two.  And that was the gist of it.

17:52:33   10  Q.   So it was you and he, Mark Joseph, you and he --

17:52:41   11  well, before I forget, you just testified it was your

17:52:45   12  determination that you wanted to make -- I'm

17:52:49   13  paraphrasing -- and I'm -- correct me if I

17:52:52   14  mischaracterize this -- that you wanted to make

17:52:55   15  abundantly sure that there was a good recording,

17:52:58   16  correct?

17:52:59   17  A.   Correct.

17:52:59   18  Q.   And you never saw fit to apprise Grossman or anyone

17:53:05   19  else that you were going to be putting this secondary

17:53:08   20  device in, correct?

17:53:10   21  A.   Like I said, myself and Mark Joseph.

17:53:13   22  Q.   And Fernandez?  Sorry, I forgot Fernandez.

17:53:18   23  A.   Special Agent -- the agents knew it was going to be

17:53:20   24  recorded, but it wasn't necessary to know which devices

17:53:23   25  or if we decided to use an additional.

17:53:28   1    Q.   Well, are you normally in a position where you,

17:53:46   2    with all due respect, and I'm under the impression that

17:53:49   3    you're not in the top hierarchy?

17:53:52   4          MS. LAKE:  Objection.  Argumentative, Your

17:53:54   5    Honor.

17:53:54   6          THE COURT:  All right.  Let's move on.

17:53:56   7    BY MR. MINGOLLA:

17:53:56   8    Q.   You're not in the high top hierarchy?

17:54:01   9          MS. LAKE:  Objection, Your Honor.

17:54:04   10         MR. MINGOLLA:  I'm asking a question.

17:54:05   11         THE COURT:  Let me hear the question.

17:54:07   12         MR. MINGOLLA:  Thank you, Your Honor.

17:54:07   13   BY MR. MINGOLLA:

17:54:07   14   Q.   Are you in the command structure of HIDTA?

17:54:11   15         MS. LAKE:  Objection, relevance.

17:54:12   16         THE COURT:  Overruled.

17:54:12   17         THE WITNESS:  I'm not a supervisor, if that's

17:54:14   18   what you're asking.

17:54:15   19   BY MR. MINGOLLA:

17:54:16   20   Q.   That's what I'm asking.

17:54:17   21        So, but you're basically just a -- and don't -- I

17:54:21   22   have to be careful how I phrase it.  I don't want to

17:54:25   23   insult you, because I -- I don't want to insult you, but

17:54:30   24   you're basically kind of like a field --

17:54:34   25         THE COURT:  All right.  Let's move on.

| | | |
|---|---|---|
| 17:54:34 | 1 | BY MR. MINGOLLA: |
| 17:54:36 | 2 | Q.   -- a field guy -- |
| 17:54:36 | 3 |         THE COURT:  Let's move on. |
| 17:54:36 | 4 | BY MR. MINGOLLA: |
| 17:54:38 | 5 | Q.   -- a field -- |
| 17:54:39 | 6 |         THE COURT:  Maybe I'm not clear.  Let's move |
| 17:54:42 | 7 | on. |
| 17:54:48 | 8 | BY MR. MINGOLLA: |
| 17:54:49 | 9 | Q.   Do you know, and then I'll -- |
| 17:54:51 | 10 |         MR. MINGOLLA:  Then I promise, Judge, I'll wrap |
| 17:54:59 | 11 | things up. |
| 17:54:59 | 12 | BY MR. MINGOLLA: |
| 17:55:09 | 13 | Q.   Do you know who prepared -- no, strike that. |
| 17:55:23 | 14 |         You're aware that -- no, I can't ask that either. |
| 17:55:29 | 15 |         Do you often -- I'll ask this then.  This is pretty |
| 17:55:35 | 16 | much about it. |
| 17:55:39 | 17 |         Do you often act on your own initiative during |
| 17:55:43 | 18 | operations, doing kind of merrily what you please to do, |
| 17:55:48 | 19 | without discussing with your superiors? |
| 17:55:51 | 20 |         MS. LAKE:  Objection.  Argumentative, Your |
| 17:55:53 | 21 | Honor.  Assumes facts not in evidence. |
| 17:55:55 | 22 |         THE COURT:  Overruled. |
| 17:55:56 | 23 |         THE WITNESS:  As case agent of this |
| 17:55:59 | 24 | investigation, I supervise this investigation.  As case |
| 17:56:02 | 25 | agent, it is my duty and responsibility to supervise |

17:56:04   1   this investigation.  So I had the ability to make

17:56:07   2   decisions that affected this investigation, as the case

17:56:11   3   agent.

17:56:11   4   BY MR. MINGOLLA:

17:56:11   5   Q.   Without apprising your superiors?

17:56:13   6   A.   My superiors and everyone within the office were

17:56:18   7   aware of all activities, because this is a joint

17:56:20   8   operation that's done within the office.

17:56:22   9   Q.   Yeah, but you keep -- you said that they didn't

17:56:26   10   know --

17:56:27   11        THE COURT:  All right.  Let's move on.

17:56:27   12   BY MR. MINGOLLA:

17:56:28   13   Q.   You said that they didn't know there was a second

17:56:30   14   recording device.  It was you, Fernandez and Joseph?

17:56:35   15        THE COURT:  Let's --

17:56:36   16   BY MR. MINGOLLA:

17:56:36   17   Q.   You never told anybody else?

17:56:40   18        THE COURT:  Ask your next question.

17:56:43   19   BY MR. MINGOLLA:

17:56:45   20   Q.   So basically you were kind of just doing what you

17:56:52   21   pleased, isn't that fair to say?

17:56:59   22        MS. LAKE:  Objection.  Argumentative.

17:57:00   23        THE COURT:  Sustained.

17:57:10   24   BY MR. MINGOLLA:

17:57:11   25   Q.   And you didn't have any concerns -- last question,

17:57:14  1    I promise.

17:57:16  2         Well, I don't quite promise.  Pretty close.

17:57:20  3         You didn't have any concerns of what you might be

17:57:23  4    doing -- strike that -- that what you were doing might,

17:57:28  5    might -- I'm not saying is, was or anything, I'm not

17:57:32  6    casting aspersions --

17:57:35  7              MS. LAKE:  Objection.  Argumentative, Your

17:57:37  8    Honor.

17:57:37  9              MR. MINGOLLA:  No, but I haven't asked the

17:57:39  10   question.

17:57:39  11   BY MR. MINGOLLA:

17:57:39  12   Q.   You didn't have any concerns that what you were

17:57:41  13   doing might be wrong?

17:57:44  14        When I say wrong, I don't want to use the word

17:57:47  15   "illegal," but not --

17:57:49  16              THE COURT:  Attorney Mingolla, ask the

17:57:50  17   question.

17:57:50  18   BY MR. MINGOLLA:

17:57:51  19   Q.   Did you have any concerns what you were doing might

17:57:53  20   be improper?

17:57:54  21   A.   Using a second recording device --

17:57:58  22              THE COURT:  Stop.  Stop.  Let's move on.

17:58:00  23   That's under 403.  Next question.

17:58:17  24              MR. MINGOLLA:  Just one second, Judge.

17:58:19  25              THE COURT:  Yes.

17:58:26  1            MR. MINGOLLA:  Oh.  Believe it or not, I'm

17:58:30  2    done.

17:58:30  3            THE COURT:  All right.  Attorney Watlington.

17:58:32  4            MR. WATLINGTON:  No questions, Your Honor.

17:58:33  5            THE COURT:  Any redirect?

17:58:34  6            MS. LAKE:  No, Your Honor.

17:58:35  7            THE COURT:  Agent Querrard, thank you for your

17:58:38  8    testimony.

17:58:38  9        You may step down.

17:58:39 10            THE WITNESS:  Thank you, Your Honor.

17:58:40 11        (Witness withdrew from stand.)

17:58:40 12            THE COURT:  Who is the government's next

17:58:41 13    witness?

17:58:43 14            MS. LAKE:  Angelo Hill.

17:58:59 15            THE COURT:  Ladies and gentlemen, it seems like

17:59:00 16    this is a good time for us to break for the evening.

17:59:04 17        Let me give you some instructions before we break

17:59:07 18    for the evening.

17:59:07 19        First of all, do not do any research, make any

17:59:11 20    inquiries, Google anything.  The only information you

17:59:16 21    are to consider is the information that comes in through

17:59:18 22    the witness stand, the evidence or other things that I

17:59:20 23    admit into evidence, not what you may be inclined to

17:59:24 24    look into when you leave the courtroom.

17:59:27 25        If someone speaks to you about this case, attempts

17:59:31  1    to speak to you about this case, bring it to the Court's

17:59:34  2    attention promptly.

17:59:35  3        You are not to discuss this case.  You might have

17:59:37  4    an urge, an inclination, an invitation even, to discuss

17:59:41  5    this case.  Please refrain from doing that.  It would be

17:59:44  6    a violation of your sworn duty.

17:59:46  7        The time to discuss this case is when you begin

17:59:49  8    your deliberations.  That's at the end of the case,

17:59:52  9    after you've been instructed on the law, not now.

17:59:57  10       One other thing.  I know that there are some

18:00:00  11   moments in the trial where there might be some

18:00:03  12   examination that's going on, and I just urge you to try

18:00:06  13   as best as possible, try to minimize the amount of

18:00:12  14   discussion that you might feel inclined to have or

18:00:18  15   response that you might have.  Just to make sure that

18:00:21  16   everyone can focus on the testimony that's coming in.

18:00:26  17   Again, the evidence is still coming in.  So keep an open

18:00:29  18   mind.

18:00:30  19       We will start again at 9:00 a.m. promptly, so be

18:00:33  20   here at 8:45.  You can place your lunch order and we

18:00:37  21   will start at 9:00 a.m.

18:00:38  22       So at five minutes to 9:00, you should start

18:00:42  23   thinking about lining up so we can start promptly.  All

18:00:46  24   right?  With that, let me wish you a pleasant evening

18:00:48  25   and I'll see you tomorrow morning.

| | | |
|---|---|---|
| 18:00:50 | 1 | (Juries out.) |
| 18:01:29 | 2 | THE COURT:  Attorney Lake, anything we need to |
| 18:01:31 | 3 | cover? |
| 18:01:31 | 4 | MS. LAKE:  No, Your Honor. |
| 18:01:32 | 5 | THE COURT:  Attorney Mingolla? |
| 18:01:33 | 6 | MR. MINGOLLA:  No, sir. |
| 18:01:34 | 7 | THE COURT:  Attorney Watlington? |
| 18:01:36 | 8 | MR. WATLINGTON:  Yes, Your Honor. |
| 18:01:37 | 9 | Your Honor, I would like to ask the government if |
| 18:01:38 | 10 | they would be willing to stipulate to the admission of |
| 18:01:43 | 11 | Government's Exhibit 87a and 87b, which is -- |
| 18:01:47 | 12 | THE COURT:  All right.  Well, you can make that |
| 18:01:49 | 13 | arrangement, and just let me know what your stipulation |
| 18:01:52 | 14 | is, if you have reached one. |
| 18:01:53 | 15 | I understand there might have been a stipulation |
| 18:01:55 | 16 | with respect to the chemist today.  Is there a |
| 18:01:57 | 17 | stipulation with respect to the chemist?  Yes or no? |
| 18:01:59 | 18 | MR. MINGOLLA:  Yes, sir. |
| 18:02:01 | 19 | THE COURT:  Tell me what the stipulation is and |
| 18:02:02 | 20 | I'll make sure that the jury is apprised of it in the |
| 18:02:05 | 21 | morning. |
| 18:02:07 | 22 | MS. LAKE:  Counsel will stipulate that |
| 18:02:09 | 23 | Government's Exhibit 8a were analyzed by DEA chemist and |
| 18:02:15 | 24 | that they came back a -- one moment, Your Honor. |
| 18:02:32 | 25 | THE COURT:  Yes.  I would expect there would be |

18:02:34  1    a stipulation on the drug, what it is and the weight.

18:02:36  2    Is that correct?

18:02:39  3           MS. LAKE:  That's correct, Your Honor.

18:02:40  4        Can I have just one moment, Your Honor, to get the

18:02:42  5    exact weight.  I believe it is -- I can draft something

18:02:45  6    for you tomorrow morning and have it first thing

18:02:47  7    tomorrow morning, but just simply that Government's

18:02:51  8    Exhibit 8a was analyzed and it came back as, I believe,

18:02:55  9    7.2 kilograms containing cocaine hydrochloride.

18:02:58  10       But I will have the exact language written and

18:03:00  11   presented to the Court first thing in the morning.  And

18:03:02  12   I believe there's going to be two stipulations -- three

18:03:04  13   stipulations; one to the drugs, and to custodian of

18:03:09  14   records regarding phone records, and I'll have all those

18:03:14  15   things first thing in the morning.

18:03:15  16          THE COURT:  All right.  We'll deal with that in

18:03:17  17   the morning, then.

18:03:24  18       Yes, Attorney Mingolla, do you have something to

18:03:26  19   add?

18:03:27  20          MR. MINGOLLA:  Do I understand correctly that

18:03:28  21   the government is going to, from the sidebar, that the

18:03:32  22   government is going to be showing -- first, my first

18:03:38  23   query is whether the government is going to be showing a

18:03:42  24   video, and secondly is it the watch video or --

18:03:53  25          THE COURT:  All right.  That's something that

| | | |
|---|---|---|
| 18:03:54 | 1 | doesn't need to take -- the Court doesn't need to be |
| 18:03:57 | 2 | involved in that at this point.  The parties can make -- |
| 18:03:59 | 3 | if there's some agreement as to what will be published, |
| 18:04:02 | 4 | to the extent something is admitted, then you can have |
| 18:04:04 | 5 | that discussion and then share it with the Court after |
| 18:04:07 | 6 | you've had the discussion.  We don't need to have the |
| 18:04:10 | 7 | live discussion right here. |
| 18:04:12 | 8 | MR. MINGOLLA:  Sure. |
| 18:04:12 | 9 | THE COURT:  Same thing goes for stipulations. |
| 18:04:15 | 10 | I thought there was one for the chemist because the |
| 18:04:18 | 11 | chemist, we wanted to have the chemist travel first |
| 18:04:20 | 12 | thing in the morning and wanted to have that stipulation |
| 18:04:22 | 13 | on record before.  But we can deal with it first thing |
| 18:04:31 | 14 | tomorrow morning, as well. |
| 18:04:33 | 15 | Besides stipulation, is there anything else we need |
| 18:04:35 | 16 | to tend to before we leave for the evening? |
| 18:04:40 | 17 | MS. LAKE:  No, Your Honor. |
| 18:04:41 | 18 | MR. WATLINGTON:  No, Your Honor. |
| 18:04:41 | 19 | MR. MINGOLLA:  No, Your Honor. |
| 18:04:42 | 20 | THE COURT:  Here are a few things I want the |
| 18:04:44 | 21 | parties to be aware of. |
| 18:04:46 | 22 | First of all, I'm fully aware of the rules, I have |
| 18:04:49 | 23 | a pretty good handle on the rules, and I urge the |
| 18:04:52 | 24 | parties to be aware of the rules when it comes to |
| 18:04:55 | 25 | bringing in certain types of evidence, number one. |

18:05:00   1          Number two, if the Court makes a ruling you have
18:05:04   2    preserved your record.  You have made an objection.  Do
18:05:07   3    not attempt to argue it before the jury.  Do not attempt
18:05:10   4    to argue it with me.
18:05:11   5          My ruling, if it is made, you have preserved your
18:05:15   6    record.  It is done.  There is nothing else to do except
18:05:18   7    have me ask you to be quiet in front of the jury, which
18:05:25   8    I would rather not do, but will do if you persist.
18:05:27   9          The other thing is, I think that it would certainly
18:05:33  10    have -- make for a clearer record if questions were
18:05:37  11    posed without long introductions, editorials or
18:05:40  12    commentary, and there are several reasons why we want to
18:05:43  13    avoid that.  One, it prolongs the trial needlessly.
18:05:47  14    Two, it places information before the jury that need not
18:05:51  15    be before them.
18:05:52  16          And the other thing I think it does is it invites
18:05:54  17    the Court to respond to it in a way that I'm sure you
18:05:59  18    probably wouldn't want the Court -- it becomes
18:06:02  19    repetitive after a while and it runs afoul of 403, waste
18:06:08  20    of time, needless confusion, baseless, and gets into
18:06:14  21    issues the jury need not to get into it.
18:06:16  22          So I would urge counsel to please ask direct
18:06:20  23    questions.  Questions are not an opportunity or should
18:06:23  24    not be taken as an opportunity to make your argument.
18:06:25  25    That's what the closing argument is for.

18:06:27  1          If you need to establish a piece of evidence,

18:06:30  2     establish the evidence on the record.

18:06:33  3          And one final note with respect to the sidebars.

18:06:36  4     The sidebars, while you might ask for them, you're not

18:06:40  5     going to get them all.  I hope that there's some

18:06:43  6     arrangement that you can come to with respect to the

18:06:46  7     remaining evidence that needs to come in, so that we can

18:06:48  8     obviate the need for the many sidebars that we have had.

18:06:53  9          And I'll urge all counsel to make sure that you

18:06:55  10     have all your predicate information in, because most of

18:07:00  11     the times when I call for a sidebar it's because there's

18:07:02  12     a deficiency.  If I call for a sidebar it's because I

18:07:05  13     have a recollection of some deficiency, I've checked my

18:07:09  14     notes, I've probably checked it with two other people

18:07:13  15     and possibly checked it with the record.

18:07:15  16          So if you do as best you can to make sure you cure

18:07:17  17     the deficiency that's raised at sidebar, I think it will

18:07:21  18     make for a more efficient presentation of the testimony.

18:07:25  19          All right.  Any questions or concerns or

18:07:28  20     clarification needed based on what I just said, Attorney

18:07:31  21     Lake?

18:07:31  22               MS. LAKE:  No.

18:07:32  23               THE COURT:  Attorney Mingolla?

18:07:34  24               MR. MINGOLLA:  No, Your Honor.

18:07:35  25               THE COURT:  Attorney Watlington?

18:07:37  1          MR. WATLINGTON:  No, Your Honor.

18:07:37  2          THE COURT:  All right.

18:07:38  3    And the final thing, when I say that we're coming

18:07:41  4  back at a certain time, I'm going to urge counsel to be

18:07:44  5  here and all parties to be here at that time.  We have

18:07:49  6  two juries.  I've already shared with counsel the

18:07:51  7  difficulty in maintaining juries, the difficulty in

18:07:55  8  maintaining them for an extended period of time, and the

18:07:59  9  risk that is faced if we needlessly prolong this.

18:08:02  10    And when I set a time, if I am here and the jury is

18:08:06  11  here waiting, I don't think we do good service or honor

18:08:09  12  to the jury to not abide by the time.  If they are here

18:08:14  13  waiting, counsel should be here first, not the jury

18:08:17  14  waiting for counsel to get here.

18:08:21  15    If that happens again, I think counsel runs the

18:08:23  16  risk of the Court asking counsel to show cause why

18:08:26  17  counsel shouldn't be held in contempt.  So I trust we

18:08:30  18  won't need to get to that.  So I just share that for

18:08:34  19  counsel's information.

18:08:36  20          MR. WATLINGTON:  Your Honor.

18:08:37  21          THE COURT:  Yes.

18:08:37  22          MR. WATLINGTON:  In regards to the last

18:08:42  23  statement, Your Honor, I wanted to -- I would apologize

18:08:47  24  if the Court felt that I delayed any startup.  But my

18:08:50  25  recollection of time was 1:42, or 12:42 is when we

18:08:59  1    broke.

18:08:59  2            THE COURT:  No, it was 12:37.  We keep a record

18:09:02  3    of it.  And I think the time that I gave was a precise

18:09:06  4    time.  But I don't know if your point is you want to

18:09:11  5    discuss the time but we keep a record of it and we know

18:09:13  6    precisely when we break and precisely when we come back.

18:09:17  7    And I know when I came back it was after the time that

18:09:21  8    everyone should have been here.

18:09:23  9            MR. WATLINGTON:  That's what I was going to

18:09:24  10   say, Your Honor.  Maybe if the Court can say let's be

18:09:27  11   back at 1:20 -- because my recollection and my

18:09:30  12   calculation was that we were supposed to be back here

18:09:34  13   for 12:52, 1:52 and you are saying it was, it was 12:37.

18:09:40  14       So I, you know, because you said an hour and

18:09:44  15   20 minutes, when we left off it was an hour and

18:09:47  16   10 minutes.

18:09:47  17           THE COURT:  No, I did not -- no, no.  I think

18:09:50  18   that might be the error.  I'm not going to ask the

18:09:53  19   parties to synchronize watches, so I can say at 1:30.

18:09:56  20   If I say 1:30 or 12:37, I would presume that everyone

18:10:00  21   has the same time on their watch.

18:10:02  22       I like to say 1 hour and 5 minutes or 1 hour and

18:10:07  23   15 minutes or 1 hour and 15 minutes.  I gave the jury

18:10:09  24   more time when they left.  When counsel left, I gave a

18:10:12  25   specific time.  It was less than the time for the jury

18:10:16   1   because we had spent time discussing things.  I don't

18:10:18   2   want to belabor the point.  I think I understand what

18:10:20   3   you're saying.  I appreciate --

18:10:23   4          MR. MINGOLLA:  These marshals downstairs,

18:10:25   5   Judge, with all due respect, these marshals practically

18:10:27   6   made me take all my clothes off.  And it's the same

18:10:30   7   thing with all of us.  We have to take off all our

18:10:33   8   jewelry --

18:10:33   9          THE COURT:  Attorney Mingolla.

18:10:34   10          MR. MINGOLLA:  I mean --

18:10:35   11          THE COURT:  Attorney Mingolla --

18:10:36   12          MR. MINGOLLA:  Ten minutes --

18:10:37   13          THE COURT:  Attorney Mingolla.

18:10:41   14          MR. MINGOLLA:  Sorry.

18:10:41   15          THE COURT:  The marshals are doing a job to

18:10:45   16   ensure the security of everyone.  And I don't think that

18:10:46   17   what they're doing is anything new.  It is known.

18:10:49   18          MR. MINGOLLA:  It is not new.

18:10:50   19          THE COURT:  So I'm going to ask everyone, to

18:10:52   20   the extent you are an officer of the court, to factor

18:10:56   21   that into your time.  If you know that there is going to

18:10:59   22   be some screening required and you know that it takes

18:11:05   23   some time, you need to factor that in.

18:11:08   24          You know, I don't know if what you're suggesting is

18:11:10   25   that somehow I suggest to the marshals that they should

18:11:15  1    reduce the level of security for this building.  It

18:11:18  2    benefits everyone.  I wouldn't do that.

18:11:21  3              MR. MINGOLLA:  No, no.

18:11:22  4              THE COURT:  So I appreciate what you're saying.

18:11:23  5    I would just ask that the parties factor that in, that

18:11:27  6    things take time and frequently things take longer than

18:11:30  7    you anticipate.

18:11:31  8         All right.  Thank you, Counsel.  Have a pleasant

18:11:33  9    evening.  I'll see you in the morning.

18:11:34  10        Let me ask counsel to make sure they're available

18:11:36  11   at 8:45 in the event we have any other things that we

18:11:39  12   need to tend to.

18:11:41  13             MR. MINGOLLA:  In here.

18:11:42  14             THE COURT:  Yes.  Be in the courthouse at 8:45,

18:11:44  15   in the event there are things we need to tend to.  Have

18:11:48  16   a pleasant evening.

          17             (Court in recess, 6:12 p.m.)

          18                           ---

          19

          20

          21

          22

          23

          24

          25

1                        CERTIFICATE

2

3           This document is hereby certified

4          to be a true and accurate transcript

5             of the foregoing proceedings.

6

7    /s_____    September 10, 2014
           Chandra Kean, RMR              DATE
8        Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25