```
            IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                DIVISION OF ST. THOMAS AND ST. JOHN

                              ---

UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )
                                   )
vs.                                )   CRIM. NO. 2013-22
                                   )
                                   )
RAYMOND BROWN, WALTER HILL,        )
                                   )
                  Defendants.      )
                                   )

                     REPORTER'S TRANSCRIPT

                           JURY TRIAL

                   Wednesday, March 26, 2014

                              ---

BEFORE:       THE HONORABLE CURTIS V. GOMEZ
              District Judge

APPEARANCES:  OFFICE OF THE UNITED STATES ATTORNEY
              BY:  KELLY LAKE, AUSA
                   NELSON JONES, AUSA

                   For the Government

              ARTURO WATLINGTON, ESQ.

                   For Defendant Brown

              JOSEPH MINGOLLA, ESQ.
              LAW OFFICES OF JOSEPH MINGOLLA

                   For Defendant Hill

                              ---

COURT REPORTER:   CHANDRA R. KEAN, RMR
                  Official Court Reporter
                  Virgin Islands District Court
                  St. Thomas, Virgin Islands
```

INDEX

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Angelo Hill | 4 | 43 | 75 | --- |
| Fred Ott | 84 | 91 | --- | --- |

RULE 29 MOTIONS BY THE DEFENDANTS                    108

| WITNESS ( Brown ) (Defendant) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Latoya Springette | 121 | 127 | --- | --- |

JURY INSTRUCTIONS BY THE COURT                       132

CLOSING ARGUMENT BY THE GOVERNMENT (Def. Brown)      158

CLOSING ARGUMENT BY DEFENDANT BROWN                  164

REBUTTAL ARGUMENT BY THE GOVERNMENT (Def. Brown)     175

FURTHER JURY INSTRUCTIONS BY THE COURT (Brown)       178

CLOSING ARGUMENT BY THE GOVERNMENT (Def. Hill)       189

CLOSING ARGUMENT BY DEFENDANT HILL                   193

REBUTTAL ARGUMENT BY THE GOVERNMENT (Def. Hill)      208

FURTHER JURY INSTRUCTIONS BY THE COURT (Hill)        212

(Court recessed)

---

```
 1                              EXHIBITS

 2
        GOVERNMENT'S
 3      EXHIBIT NO.         MARKED          ADMITTED

 4      88a                    7             ---

 5      88b                    8             ---

 6      86c-1                 ---             33

 7      80a                   87             90

 8      85a, b, c             95             ---

 9      85d-1                102             ---

10      85d-2                102             ---

11
        DEFENDANT'S
12        EXHIBIT          MARKED          ADMITTED

13        (None)

14
                                ---
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS

 2

 3          (Court called to order at 9:15 a.m.)

 4          (Juries present)

 5             THE COURT:  Good morning, ladies and gentlemen.

 6       I hope you had a pleasant evening.

 7       We are still in the government's case-in-chief.

 8   The government is still presenting testimony.

 9       Good morning, Counsel.

10       Is the government ready to proceed?

11             MS. LAKE:  Yes, Your Honor.

12             THE COURT:  Call your next witness.

13             MS. LAKE:  The government calls Louis Hill.

14       I'm sorry, the government calls Angelo Hill.  I

15   apologize.

16             THE CLERK:  Please stand and raise your right

17   hand to take the oath.

18          (Witness sworn.)

19             THE WITNESS:  I do.

20             THEREUPON, ANGELO HILL, having been duly sworn,

21   was examined and testified as follows:

22                      DIRECT EXAMINATION

23   BY MS. LAKE:

24   Q.   Good morning.

25   A.   Good morning.
```

| | | |
|---|---|---|
| 09:19:11 | 1 | Q.   Please state your name for the record. |
| 09:19:13 | 2 | A.   Angelo Hill. |
| 09:19:15 | 3 | Q.   And can you please spell your full name? |
| 09:19:17 | 4 | A.   A-n-g-e-l-o, H-i-l-l. |
| 09:19:20 | 5 | Q.   Mr. Hill, how old are you? |
| 09:19:24 | 6 | A.   51. |
| 09:19:25 | 7 | Q.   And where were you born? |
| 09:19:26 | 8 | A.   St. Thomas. |
| 09:19:27 | 9 | Q.   And where were you raised? |
| 09:19:29 | 10 | A.   St. Thomas. |
| 09:19:31 | 11 | Q.   And can you briefly describe your educational |
| 09:19:37 | 12 | background? |
| 09:19:38 | 13 | A.   Attended Julius Sprauve School in St. John, |
| 09:19:42 | 14 | Charlotte Amalie High School, class of '81, Florida A&M |
| 09:19:48 | 15 | University, class of '85, and online master's program. |
| 09:19:53 | 16 | Q.   Can you describe your work background? |
| 09:19:57 | 17 | A.   Worked Customs part-time, as a part-time inspector, |
| 09:20:02 | 18 | and then joined the Police Department in 1987 until |
| 09:20:08 | 19 | August of last year. |
| 09:20:11 | 20 | Q.   And where were you assigned while you worked for |
| 09:20:14 | 21 | the VIPD? |
| 09:20:17 | 22 | A.   I was assigned to patrol, Intel Unit, Investigation |
| 09:20:25 | 23 | Unit, DEA Task Force, deputy chief, assistant |
| 09:20:33 | 24 | commissioner, acting commander. |
| 09:20:35 | 25 | Q.   And what was your last assignment? |

09:20:38  1    A.    A sergeant in the Investigation Bureau.

09:20:41  2    Q.    And where were you assigned?

09:20:43  3    A.    St. John.

09:20:46  4    Q.    And how long had you been assigned to St. John?

09:20:51  5    A.    Approximately nine months to a year, I'm not sure.

09:20:56  6    Q.    And while you were employed with VIPD, did you also

09:20:59  7    engage in other activities?

09:21:01  8    A.    Yes.

09:21:02  9    Q.    What were those activities?

09:21:05  10   A.    Illegal activities with drugs.

09:21:10  11   Q.    And was the -- when did you start engaging in drug

09:21:14  12   activity?

09:21:17  13   A.    I'd probably say maybe in '93, '95, when I met

09:21:26  14   Tapia.

09:21:28  15   Q.    And where did you meet Mr. Tapia?

09:21:31  16   A.    When I was assigned to the Marine Unit.

09:21:34  17   Q.    And describe the circumstances that you first got

09:21:39  18   into drugs?

09:21:41  19   A.    When I was there I was supervisor and I would

09:21:44  20   always notice him doing things different by himself.

09:21:49  21   And I confronted him one time.  And he didn't come out

09:21:53  22   and admit to it, but he did lean to that direction.  And

09:21:58  23   then he gave me some money and said, you know, I do

09:22:01  24   certain things, and I could assist you with money.

09:22:03  25   Q.    And did you take the money?

09:22:05    1    A.    Yes.

09:22:05    2    Q.    And how much was it, if you can recall?

09:22:08    3    A.    Between $4,000 and $5,000.

09:22:11    4    Q.    And so what was your role at that time as it

09:22:15    5    relates to drugs?

09:22:18    6    A.    I didn't have a role per se.  I just knew about it.

09:22:24    7    Q.    And were you charged in this current case?

09:22:26    8    A.    Yes.

09:22:27    9    Q.    And did you plead guilty?

09:22:28   10    A.    Yes, I did.

09:22:29   11    Q.    And what did you plead guilty to?

09:22:31   12    A.    Conspiracy.

09:22:32   13    Q.    Conspiracy to do what?

09:22:34   14    A.    I think it's possession with intent to distribute.

09:22:38   15    Q.    And why did you plead guilty?

09:22:40   16    A.    Because I was guilty.

09:22:40   17          (Government's Exhibit 88a marked for

09:22:40   18    identification.)

09:22:43   19    BY MS. LAKE:

09:22:43   20    Q.    And now showing you on the screen in front of you

09:22:46   21    Government's Exhibit 88a.  Do you see that in front of

09:22:54   22    you?

09:22:54   23    A.    Yes.

09:22:54   24    Q.    And showing you the last page.

09:23:00   25          Do you see that in front of you?

| | | |
|---|---|---|
| 09:23:02 | 1 | A.   Yes. |
| 09:23:02 | 2 | Q.   What is Government's Exhibit 88a? |
| 09:23:06 | 3 | A.   It's a plea agreement. |
| 09:23:07 | 4 | Q.   And did you sign this plea agreement? |
| 09:23:09 | 5 | A.   Yes, I did. |
| 09:23:09 | 6 | (Government's Exhibit 88b marked for |
| 09:23:09 | 7 | identification.) |
| 09:23:10 | 8 | BY MS. LAKE: |
| 09:23:10 | 9 | Q.   And now showing you Government's Exhibit 88b. |
| 09:23:17 | 10 | Do you see that in front of you? |
| 09:23:19 | 11 | A.   Yes. |
| 09:23:19 | 12 | Q.   And showing you the last page.  Do you see that in |
| 09:23:31 | 13 | front of you? |
| 09:23:32 | 14 | A.   Yes. |
| 09:23:32 | 15 | Q.   And what is Government's Exhibit 88b? |
| 09:23:35 | 16 | A.   Supplemental plea agreement. |
| 09:23:37 | 17 | Q.   And what is a supplemental -- what is the |
| 09:23:40 | 18 | supplemental plea agreement? |
| 09:23:43 | 19 | A.   My understanding would be a recommendation that the |
| 09:23:47 | 20 | Court -- well, the prosecution would give to the Court. |
| 09:23:50 | 21 | Q.   And did you sign this supplemental plea agreement? |
| 09:23:53 | 22 | A.   Yes. |
| 09:23:53 | 23 | Q.   And what, what do you need to do? |
| 09:23:58 | 24 | A.   I need to be honest.  I need to tell the truth. |
| 09:24:02 | 25 | And hope that I get a reduction. |

09:24:05   1   Q.   And why did you agree to the supplemental plea

09:24:10   2   agreement?   Why did you agree to cooperate?

09:24:14   3   A.   After a while you have a conscience and you got to

09:24:17   4   do what's right.

09:24:20   5   Q.   Now, in this case that you've pled to, what, if

09:24:25   6   anything, did you do in this case?   What were the

09:24:28   7   circumstances?

09:24:30   8   A.   This case, I was aware that my family members

09:24:36   9   involved in drug trafficking, and I knew that -- well,

09:24:41   10   Tapia had made contact with me that he was trying to get

09:24:44   11   some drugs and make -- I should make contact with my

09:24:48   12   family member, which I did.

09:24:49   13   Q.   And who was the family member that you made contact

09:24:51   14   with?

09:24:52   15   A.   My cousin, Walter.

09:24:54   16   Q.   And do you see Walter in the courtroom today?

09:24:59   17   A.   Yes.

09:25:00   18   Q.   Could you please point to where he is located and

09:25:03   19   describe something that he is wearing?

09:25:07   20   A.   He is sitting right there with, it's a tan-colored

09:25:12   21   jacket.

09:25:12   22   Q.   And where is he seated?

09:25:14   23   A.   Between -- next to the gentleman in the black

09:25:18   24   jacket and the other gentleman.

09:25:20   25   Q.   And what's the other gentleman wearing?

09:25:24   1    A.    Seems like a tan, from where I'm at, jacket also.

09:25:28   2    Q.    And is there anything unique about how your cousin

09:25:31   3    looks?

09:25:32   4    A.    Anything unique?

09:25:33   5    Q.    Yeah, just to describe what he looks like right

09:25:36   6    now?

09:25:37   7    A.    He's wearing glasses.

09:25:41   8              MR. MINGOLLA:   I object, Your Honor, on

09:25:43   9    relevance grounds.

09:25:44   10             THE COURT:   Overruled.

09:25:45   11   BY MS. LAKE:

09:25:45   12   Q.    What does he look like right now?

09:25:47   13   A.    He's wearing glasses, nothing different.

09:25:51   14             THE COURT:   All right.   The record will reflect

09:25:53   15   that the witness has identified the Defendant Walter

09:25:59   16   Hill.

09:25:59   17   BY MS. LAKE:

09:25:59   18   Q.    And how did Tapia, Mr. Tapia contact you?

09:26:02   19   A.    By cell phone.

09:26:03   20   Q.    And when he contacted you, what, if anything, did

09:26:06   21   he say to you?

09:26:08   22   A.    I don't remember verbatim what he said, but he said

09:26:13   23   something to the expression that he was needing to get

09:26:16   24   seven girls, and if I could make contact with the person

09:26:22   25   that he needed to talk to.

| | | |
|---|---|---|
| 09:26:24 | 1 | MR. MINGOLLA:  Your Honor, objection.  Lack of |
| 09:26:26 | 2 | foundation here. |
| 09:26:27 | 3 | THE COURT:  Overruled. |
| 09:26:27 | 4 | BY MS. LAKE: |
| 09:26:27 | 5 | Q.   What does "seven girls" mean? |
| 09:26:29 | 6 | A.   I interpret that as seven kilos. |
| 09:26:31 | 7 | Q.   And what, if anything, did you do next? |
| 09:26:35 | 8 | A.   I made a phone call to my cousin. |
| 09:26:41 | 9 | Q.   And when you say your cousin, who do you mean? |
| 09:26:44 | 10 | A.   To Walter. |
| 09:26:45 | 11 | Q.   And what, if anything, happened next? |
| 09:26:47 | 12 | A.   I told him what Tapia requested and he agreed to |
| 09:26:49 | 13 | meet with him. |
| 09:26:49 | 14 | Q.   And what, if anything, happened next? |
| 09:26:54 | 15 | A.   If I recall correctly, I called Tapia again to make |
| 09:26:58 | 16 | sure he was still coming to St. John, and, I don't |
| 09:27:03 | 17 | remember what boat he said he was coming on.  It was |
| 09:27:06 | 18 | some -- a mix-up between the boat and the barge.  But |
| 09:27:09 | 19 | actually -- he came up on the barge -- on the ferry, I'm |
| 09:27:12 | 20 | sorry, either 6:00 or 7:00.  I think it was the 7:00 |
| 09:27:16 | 21 | ferry. |
| 09:27:16 | 22 | And he called me again and asked me to pick him up. |
| 09:27:20 | 23 | I told him I would.  And I came down the street.  When I |
| 09:27:23 | 24 | came down the street, he wasn't there.  So I circled the |
| 09:27:26 | 25 | block and he called again, said he was on the bench. |

| | | |
|---|---|---|
| 09:27:30 | 1 | And I told him to walk up the street towards the bank. |
| 09:27:33 | 2 | Q.   What, if anything, happened next? |
| 09:27:37 | 3 | A.   He came up and got into the car. |
| 09:27:38 | 4 | Q.   In whose car? |
| 09:27:39 | 5 | A.   In the car that I was operating. |
| 09:27:41 | 6 | Q.   What happened next? |
| 09:27:42 | 7 | A.   I drove him down to a prearranged location that I |
| 09:27:45 | 8 | had spoke to my cousin about by the inspection lane in |
| 09:27:50 | 9 | Cruz Bay.  And when I got there, a marked police unit |
| 09:27:55 | 10 | had pulled me over, requesting some keys for another |
| 09:27:59 | 11 | vehicle that I had access to. |
| 09:28:01 | 12 | Q.   Let me stop you here.  What kind of vehicle were |
| 09:28:04 | 13 | you in? |
| 09:28:04 | 14 | A.   I was in an unmarked police vehicle. |
| 09:28:07 | 15 | Q.   And were you on duty? |
| 09:28:10 | 16 | A.   No, I had already punched out. |
| 09:28:12 | 17 | Q.   And why would -- why did -- or why would a police |
| 09:28:16 | 18 | vehicle contact you? |
| 09:28:16 | 19 | A.   Because I was the acting supervisor at that time. |
| 09:28:19 | 20 | The supervisor was out sick. |
| 09:28:21 | 21 | Q.   And when you say "keys," what did you mean by this |
| 09:28:24 | 22 | officer asked you for keys? |
| 09:28:26 | 23 | A.   No, keys for a vehicle. |
| 09:28:27 | 24 | Q.   Okay.  And so when you said -- so what happened |
| 09:28:33 | 25 | next? |

09:28:33  1    A.   I told him that I would, you know, come and get the

09:28:36  2    keys in a few minutes.  And at that time I observed a

09:28:42  3    vehicle I know that my cousin would operate, drive by.

09:28:45  4    Q.   Let me stop you here.  When you say "my cousin,"

09:28:49  5    who are you referring to?

09:28:49  6    A.   Walter.

09:28:50  7    Q.   The Defendant Walter Hill?

09:28:51  8    A.   Yes.

09:28:52  9    Q.   Okay.  And what happened next?

09:28:53  10   A.   I saw the vehicle drive by, passed where I was

09:28:58  11   supposed to drop off Tapia, and went further down the

09:29:03  12   street.  And when I finish speaking with the officers I

09:29:06  13   went towards that direction.

09:29:07  14        I saw the vehicle parked on the left, so I pulled

09:29:12  15   up towards the vehicle.  And Tapia got out the vehicle

09:29:16  16   and -- got out the vehicle I was driving and got into

09:29:19  17   the other vehicle.

09:29:19  18   Q.   And who was in the other vehicle?

09:29:21  19   A.   I couldn't tell.  It was dark and the car was

09:29:24  20   tinted.  My assumption it was Walter.

09:29:27  21   Q.   And why did --

09:29:30  22        MR. MINGOLLA:  Objection.  Calls for

09:29:30  23   speculation.

09:29:31  24        THE COURT:  Sustained.

09:29:31  25

09:29:31  1      BY MS. LAKE:

09:29:32  2      Q.   Is the car that you observed familiar to you?

09:29:34  3      A.   Yes.

09:29:34  4      Q.   And how is it familiar to you?

09:29:36  5      A.   It's the car that Walter operates.

09:29:38  6      Q.   And did you have an agreement with Walter regarding

09:29:41  7      transporting Roberto Tapia?

09:29:43  8            THE COURT:  Stop leading your witness.

09:29:45  9      BY MS. LAKE:

09:29:46  10     Q.   What, if anything, was your agreement -- did you

09:29:47  11     have an agreement with Walter Hill?

09:29:49  12     A.   Yes.

09:29:51  13     Q.   What --

09:29:52  14            THE COURT:  Leading.

09:29:53  15            MR. MINGOLLA:  Yes, it's leading.

09:29:53  16     BY MS. LAKE:

09:29:54  17     Q.   What, if anything, was your agreement?

09:29:57  18            THE COURT:  Stop assuming facts not in

09:29:59  19     evidence.

09:29:59  20     BY MS. LAKE:

09:29:59  21     Q.   What, if anything -- why did you bring Roberto

09:30:02  22     Tapia to that area?

09:30:03  23     A.   To meet with Walter.

09:30:05  24     Q.   And was that an agreement that you had?

09:30:06  25     A.   Yes.

09:30:07   1    Q.   With who?

09:30:08   2    A.   With Walter.

09:30:09   3    Q.   So what, if anything, happened next?

09:30:11   4    A.   He exited the vehicle I was operating and he got

09:30:15   5    into the other vehicle.

09:30:16   6    Q.   And who is he?

09:30:17   7    A.   Tapia.

09:30:18   8    Q.   And what, if anything, happened next?

09:30:21   9    A.   I drove away.

09:30:23   10   Q.   So what did you do next?

09:30:24   11   A.   I went back into town, drove around for a while.

09:30:28   12   And then when I was coming back towards the inspection

09:30:31   13   lane area I saw a lady that we usually stop, a Hispanic

09:30:37   14   lady that never have a driver's license from the last

09:30:40   15   time I met her.  And I pulled her over and started

09:30:43   16   communicating with her.

09:30:45   17   Q.   What, if anything, did you do next?

09:30:47   18   A.   At that time my passenger side door opened and

09:30:52   19   Tapia came in and said:  Take me back to the ferry.

09:30:56   20   Q.   And what did you do?

09:30:57   21   A.   I dropped him back to the ferry.

09:31:01   22   Q.   Now showing you what's been admitted into evidence,

09:31:05   23   Government's Exhibit 68a.  I would like to play

09:31:13   24   Government's Exhibit 68a.

09:31:46   25        (Exhibit published.)

| | | |
|---|---|---|
| 09:32:17 | 1 | Q.   Mr. Hill, who was speaking? |
| 09:32:21 | 2 | A.   Roberto Tapia and myself. |
| 09:32:23 | 3 | Q.   And what were you two discussing? |
| 09:32:25 | 4 | A.   About coming to St. John to pick up seven kilos. |
| 09:32:28 | 5 | Q.   And now playing you what's been marked and admitted |
| 09:32:31 | 6 | as Government's Exhibit 72a only. |
| 09:32:38 | 7 |      (Exhibit published.) |
| 09:34:00 | 8 | Q.   Mr. Hill, who was speaking? |
| 09:34:02 | 9 | A.   Myself and Tapia again. |
| 09:34:03 | 10 | Q.   And what are you two discussing? |
| 09:34:05 | 11 | A.   What time ferry he was coming, and that he wanted a |
| 09:34:09 | 12 | lower price to purchase the kilos. |
| 09:34:16 | 13 | Q.   And kilos of what? |
| 09:34:17 | 14 | A.   Cocaine. |
| 09:34:18 | 15 | Q.   And what price did Mr. Tapia want? |
| 09:34:20 | 16 | A.   I think he said 14-5. |
| 09:34:25 | 17 | Q.   And what, if anything, did you say in response to |
| 09:34:27 | 18 | that? |
| 09:34:27 | 19 | A.   I don't think my cousin would do that. |
| 09:34:29 | 20 | Q.   And why did you say that? |
| 09:34:31 | 21 | A.   Because I know he wouldn't.  He would probably want |
| 09:34:35 | 22 | 15 and not 14-5. |
| 09:34:37 | 23 | Q.   And what else, if anything, did you talk about? |
| 09:34:46 | 24 | A.   I don't recall anything else. |
| 09:34:47 | 25 | Q.   And when you say "my cousin," who are you referring |

09:34:50   1   to?

09:34:51   2   A.   Walter.

09:34:51   3   Q.   And now, after you took Mr. Tapia back to the

09:35:00   4   ferry, what else, if anything, did you do?  What

09:35:04   5   happened next?

09:35:05   6   A.   I got a phone call, I -- maybe an hour or so later

09:35:12   7   from Ed, Ed Monsanto, telling me that he heard that

09:35:16   8   Tapia had been arrested at Red Hook.

09:35:19   9   Q.   And what did you do next?

09:35:21   10  A.   I called Walter and told him.

09:35:24   11  Q.   And what, if anything, happened after that?

09:35:27   12  A.   Then we met and I explained to him what Ed had told

09:35:32   13  me.  And he gave me $3,500.

09:35:36   14  Q.   Who gave you $3,500?

09:35:38   15  A.   Walter.

09:35:39   16  Q.   And why did he give that to you?

09:35:41   17  A.   As for assisting in the transaction.

09:35:45   18  Q.   And what, if anything, did you two discuss?

09:35:49   19  A.   We tried to figure out what would be next, whether

09:35:55   20  he -- what would happen, if he would talk, if he

09:35:58   21  would -- we don't know what actually happened.

09:36:02   22  Q.   So after -- did you take the money?

09:36:04   23  A.   Yes.

09:36:05   24  Q.   And did anything else happen at that point in time?

09:36:08   25  A.   Yes.  He had some more drugs -- some more cocaine,

09:36:13  1    and we agreed to hide it.

09:36:18  2    Q.   And where did you agree to hide it?

09:36:21  3    A.   We were trying to figure out where.  We weren't

09:36:24  4    sure.  So I called a girlfriend and got her keys, and I

09:36:27  5    hid them in, unknown to her, in her pump room.

09:36:32  6    Q.   I'm sorry, say it again, where?

09:36:36  7    A.    It's a small room, separate from a house that she

09:36:40  8    doesn't live in.  There's a pump room with pumps and

09:36:44  9    paint and stuff, and I hid it in there.

09:36:47  10   Q.   And who was the owner of -- what did you call them,

09:36:52  11   the kilos?  Who owned those drugs?

09:36:54  12   A.   Walter.

09:36:55  13   Q.   And approximately, do you know how much they were?

09:36:59  14   How many there were?

09:36:59  15   A.   No.

09:37:02  16   Q.   And what, if anything, happened next?

09:37:06  17   A.   That was it, basically.

09:37:13  18   Q.   And why did you and Walter agree to hide the drugs?

09:37:16  19   A.   Well, we didn't know what, what Tapia was going to

09:37:20  20   do, what would happen next.  We didn't know.

09:37:25  21            MR. MINGOLLA:  Your Honor, I'm going to object

09:37:28  22   on speculation here.

09:37:29  23            THE COURT:  Overruled.

09:37:35  24   BY MS. LAKE:

09:37:35  25   Q.   And when Mr. Tapia contacted you for the seven

09:37:38   1    girls, for the seven kilos of cocaine, why did you

09:37:44   2    contact Walter Hill?

09:37:48   3    A.   I knew that he had cocaine.

09:37:51   4    Q.   How did you know that he had cocaine?

09:37:56   5    A.   We were close, we was, would always look out for me

09:38:00   6    and we were close, and I knew that he had it.  I knew

09:38:03   7    he -- from things that he had shared with me being

09:38:10   8    close, you know, what he was involved in.

09:38:13   9    Q.   Had you ever been involved with drugs with

09:38:17   10   Mr. Walter Hill prior to this event?

09:38:20   11   A.   Yes.

09:38:21   12            MR. MINGOLLA:  Objection.  Leading.

09:38:23   13            THE COURT:  Sustained.

09:38:26   14   BY MS. LAKE:

09:38:26   15   Q.   What, if anything, happened between you and Walter

09:38:30   16   Hill prior to this event regarding drugs?

09:38:35   17   A.   He had shared with me that he transported kilos --

09:38:41   18            MR. MINGOLLA:  Objection, leading.

09:38:42   19            THE COURT:  Rephrase.

09:38:46   20   BY MS. LAKE:

09:38:46   21   Q.   Has Walter Hill ever told you anything about drugs?

09:38:51   22            MR. MINGOLLA:  Objection.  Leading.

09:38:58   23            THE COURT:  Rephrase.

09:39:01   24   BY MS. LAKE:

09:39:01   25   Q.   Regarding drugs, what, if anything, has Walter Hill

```
09:39:04   1   told you --
09:39:05   2           THE COURT:  Come to sidebar.
09:39:20   3       (End of sidebar, open court as follows:)
09:39:31   4           THE COURT:  Okay.  I'm sustaining the objection
09:39:32   5   but you're asking leading questions where you're
09:39:35   6   suggesting or you're assuming facts not in evidence.
09:39:38   7   You're presuming that there's a discussion about drugs
09:39:41   8   or you're putting it into the head of this witness.
09:39:43   9       I think you need to find a way to ask your
09:39:46  10   question.  That's why it's eliciting an objection.  You
09:39:49  11   keep saying, "what did they talk about drugs?"  You're
09:39:52  12   assuming there was a discussion about drugs, or you're
09:39:54  13   suggesting there was a discussion about drugs.  In any
09:39:56  14   event, it's objectionable.  So you need to rephrase your
09:39:58  15   question.
09:39:58  16           MS. LAKE:  Your Honor, I said what, if any,
09:40:01  17   conversations have you had regarding drugs.  I'm not
09:40:04  18   presuming there's a conversation.
09:40:05  19           THE COURT:  That's like someone -- it's like
09:40:07  20   someone saying what, if any, discussion did you have
09:40:10  21   after you beat the person over the head.  "What, if
09:40:13  22   anything," doesn't necessarily cure it.
09:40:17  23       If you want to ask him a question -- in any event,
09:40:20  24   it's sustained.  So you need to find a way to rephrase
09:40:23  25   it.  If you want to ask him about discussions and you
```

09:40:25  1    want to narrow into those discussions, that's generally

09:40:27  2    how you go into those.

09:40:31  3         It's an inverse, where you ask about something,

09:40:34  4    general discussions, what is the nature -- what, if

09:40:35  5    anything, you discussed.  Then it goes down, he'll give

09:40:38  6    a list, and then you can ask him about the list.  I

09:40:41  7    think that's ordinarily how it goes.

09:40:43  8              MS. LAKE:  I understand.  Just for the record,

09:40:45  9    I disagree, respectfully disagree --

09:40:46  10             THE COURT:  Well, it doesn't matter if you

09:40:48  11   disagree, because I've sustained the objection.  The

09:40:50  12   record is made.  You need to rephrase the question.

09:40:53  13        All right.  Thank you.

09:40:54  14        (End of sidebar, open court as follows:)

09:41:06  15   BY MS. LAKE:

09:41:06  16   Q.   What else, if anything, have you and Walter Hill

09:41:10  17   discussed?

09:41:12  18   A.   Family matters, relationships, life.

09:41:17  19   Q.   Have you discussed anything aside from family

09:41:21  20   matters?

09:41:22  21             MR. MINGOLLA:  Objection.  Asked and answered.

09:41:24  22             THE COURT:  Overruled.

09:41:25  23             THE WITNESS:  Drug trafficking.

09:41:27  24   BY MS. LAKE:

09:41:27  25   Q.   What have you discussed regarding drug trafficking?

```
09:41:31   1    A.   He had shared with me --
09:41:32   2              MR. MINGOLLA:  Objection.  Leading.
09:41:34   3              THE COURT:  Overruled.
09:41:35   4              THE WITNESS:  He had shared with me that he
09:41:40   5    had, that he, you know, traffics kilos of cocaine to
09:41:45   6    Puerto Rico.
09:41:45   7    BY MS. LAKE:
09:41:45   8    Q.   And has Mr. Walter Hill told you how he's done
09:41:49   9    that?
09:41:50  10    A.   Yes.
09:41:51  11    Q.   What, if anything, did he tell you?
09:41:55  12    A.   He had told me that he would use the ferry company
09:42:00  13    that does charters to Fajardo, that he would put the
09:42:07  14    cocaine on the ferry and take it down to Fajardo.
09:42:10  15    Q.   And what else, if anything, has he told you?
09:42:17  16    A.   It would be hidden, and the manner that he would
09:42:20  17    get it off the boat, and stuff like that.
09:42:22  18    Q.   Has he told you how many times he's done that?
09:42:26  19    A.   Not how many -- several times, but not how many
09:42:30  20    times.
09:42:32  21    Q.   Has Walter Hill told you anything else?
09:42:39  22              MR. MINGOLLA:  Objection.  Asked and answered.
09:42:41  23    This is redundant.  It's the third questions.
09:42:48  24              THE COURT:  All right.  Overruled.
09:42:49  25              THE WITNESS:  Anything else regarding?  I
```

| | | |
|---|---|---|
| 09:42:52 | 1 | don't -- |
| 09:42:53 | 2 | BY MS. LAKE: |
| 09:42:53 | 3 | Q.   In general, has Mr. Hill -- Walter Hill told you |
| 09:42:56 | 4 | anything else? |
| 09:43:03 | 5 | A.   Just talk.  We talk almost everyday. |
| 09:43:07 | 6 | Q.   And has, how do you, have you had any conversations |
| 09:43:10 | 7 | with Mr. Tapia? |
| 09:43:12 | 8 | A.   Yes. |
| 09:43:13 | 9 | Q.   Had Mr. Tapia ever told you anything? |
| 09:43:17 | 10 | A.   I know that he had assisted in taking cocaine to |
| 09:43:22 | 11 | Puerto Rico also with Walter. |
| 09:43:24 | 12 | Q.   And what, if anything, did Mr. Tapia tell you |
| 09:43:28 | 13 | regarding that? |
| 09:43:34 | 14 | A.   I know that they had met -- |
| 09:43:36 | 15 | THE COURT:  Counsel, are you going to establish |
| 09:43:42 | 16 | a time frame? |
| 09:43:43 | 17 | BY MS. LAKE: |
| 09:43:44 | 18 | Q.   When did this happen, Mr. Hill? |
| 09:43:45 | 19 | A.   Prior to the last transaction.  I don't remember |
| 09:43:48 | 20 | the date. |
| 09:43:48 | 21 | Q.   When you say "prior," can you estimate -- |
| 09:43:50 | 22 | A.   Prior to May 17th.  A month, two months.  I don't |
| 09:43:58 | 23 | remember exactly the time frame. |
| 09:44:00 | 24 | Q.   But it was around that time frame? |
| 09:44:03 | 25 | A.   Yes, I would say that. |

09:44:05 1    Q.    What, if anything, did Mr. Tapia tell you?

09:44:08 2    A.    I know that we, he had came to St. John.  And I

09:44:11 3    took him by Walter's house and we all met there.  And he

09:44:17 4    discussed his ability to take cocaine from St. John to

09:44:22 5    Fajardo via the DPNR vessel.

09:44:27 6    Q.    And what else, if anything, was said?

09:44:33 7    A.    They discussed, you know, how much it would be and

09:44:37 8    discussed that, I think Tapia had told us that he

09:44:42 9    couldn't be boarded on the way down.  I think they

09:44:46 10   were -- as far as I know, there were two occasions that

09:44:50 11   they went down.

09:44:50 12   Q.    And do you know the time frame of those two

09:44:52 13   occasions?

09:44:54 14   A.    No.  I don't remember the time frame.

09:44:57 15   Q.    And what, if anything, has Mr. Walter Hill told you

09:45:01 16   regarding those two occasions?

09:45:04 17          MR. MINGOLLA:  You know, Judge, I'm going to

09:45:06 18   object to this line of questioning on relevancy.  We're

09:45:08 19   talking about a specific incident --

09:45:10 20          THE COURT:  Hold on.

09:45:11 21          MR. MINGOLLA:  -- against my client.

09:45:12 22          THE COURT:  Hold on.

09:45:13 23          MR. MINGOLLA:  -- on May 17th.

09:45:14 24          THE COURT:  Hold on -- Attorney.  Hold on.

09:45:16 25   Overruled.

| | | |
|---|---|---|
| 09:45:17 | 1 | BY MS. LAKE: |
| 09:45:17 | 2 | Q.   What else, if anything, has Mr. Walter Hill told |
| 09:45:20 | 3 | you regarding these two occasions? |
| 09:45:23 | 4 | A.   He told me that -- I don't remember if it was -- I |
| 09:45:26 | 5 | think the first time they went down, everything went |
| 09:45:28 | 6 | well.  And then the second time it went down there was a |
| 09:45:33 | 7 | problem with Customs had stopped them somewhere outside |
| 09:45:37 | 8 | of Fajardo, and they had decided to turn around and come |
| 09:45:41 | 9 | back. |
| 09:45:42 | 10 | Q.   And what else -- did he tell you why? |
| 09:45:48 | 11 | A.   Customs had stopped them and were questioning them. |
| 09:45:50 | 12 | Q.   When you say "them," who is them? |
| 09:45:52 | 13 | A.   I'm sorry.  Questioning Walter and Tapia. |
| 09:45:58 | 14 | Q.   And what else, if anything, was, did Mr. Walter |
| 09:46:03 | 15 | Hill tell you? |
| 09:46:04 | 16 | A.   Just that they had to come back. |
| 09:46:08 | 17 | Q.   Has Mr. Walter Hill told you the quantity? |
| 09:46:11 | 18 | A.   No, no. |
| 09:46:16 | 19 | THE COURT:  Stop leading. |
| 09:46:27 | 20 | BY MS. LAKE: |
| 09:46:28 | 21 | Q.   Now showing you what has been marked as Government |
| 09:46:28 | 22 | Exhibit -- |
| 09:46:35 | 23 | MS. LAKE:  I'll just have a brief moment. |
| 09:46:44 | 24 | MR. MINGOLLA:  In that brief moment, I'm going |
| 09:46:45 | 25 | to renew my objection to this line of questioning, |

| | | |
|---|---|---|
| 09:46:48 | 1 | Your Honor, as to not being relevant. |
| 09:46:51 | 2 | THE COURT:  All right.   Okay.   Overruled. |
| 09:46:52 | 3 | BY MS. LAKE: |
| 09:46:52 | 4 | Q.   Showing what you has been marked as Government's |
| 09:46:56 | 5 | Exhibit 86b, as in boy. |
| 09:46:59 | 6 | Do you see what's in front of you? |
| 09:47:01 | 7 | A.   Yes. |
| 09:47:02 | 8 | Q.   What is Government's Exhibit 86b, as in boy? |
| 09:47:08 | 9 | A.   It's a CD. |
| 09:47:11 | 10 | Q.   And have you reviewed this? |
| 09:47:13 | 11 | A.   Yes. |
| 09:47:13 | 12 | Q.   And how do you know that you've reviewed this? |
| 09:47:16 | 13 | A.   My initials and the date are on it. |
| 09:47:22 | 14 | Q.   And now showing you -- and have you reviewed it in |
| 09:47:25 | 15 | its entirety? |
| 09:47:25 | 16 | A.   I'm sorry? |
| 09:47:26 | 17 | Q.   Have you reviewed it in its entirety? |
| 09:47:28 | 18 | A.   Yes. |
| 09:47:32 | 19 | Q.   Now, let me ask you, directing your attention to |
| 09:47:35 | 20 | October 22, 2013, what else -- what, if anything, did |
| 09:47:39 | 21 | you do on October 22, 2013? |
| 09:47:43 | 22 | A.   I don't remember the date. |
| 09:47:50 | 23 | Q.   At some point -- well, showing you Government's |
| 09:47:54 | 24 | Exhibit 86c-1.  Do you see that in front of you? |
| 09:47:57 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:47:59 | 1 | Q.   And have you reviewed this -- what is it? |
| 09:48:02 | 2 | A.   This would be a CD.  It's a video, with my initials |
| 09:48:07 | 3 | and date on it. |
| 09:48:08 | 4 | Q.   And why did you initial and date it? |
| 09:48:10 | 5 | A.   Because I reviewed it. |
| 09:48:11 | 6 | Q.   And now what are the contents -- what's on |
| 09:48:15 | 7 | Government's Exhibit 86b?  What is it? |
| 09:48:20 | 8 | THE COURT:  86 what? |
| 09:48:21 | 9 | MS. LAKE:  B as in boy. |
| 09:48:23 | 10 | THE WITNESS:  It should be a meeting between |
| 09:48:26 | 11 | myself and Walter. |
| 09:48:27 | 12 | BY MS. LAKE: |
| 09:48:28 | 13 | Q.   And what are the circumstances regarding your |
| 09:48:32 | 14 | meeting with Walter?  What happened? |
| 09:48:38 | 15 | A.   I had agreed to wear a wire.  I met with some DEA |
| 09:48:44 | 16 | agents and FBI agents and attorneys.  And I agreed to |
| 09:48:49 | 17 | wear a wire to show that I was telling the truth. |
| 09:48:54 | 18 | Q.   And why did you agree to wear the wire? |
| 09:49:02 | 19 | A.   I was just tired. |
| 09:49:05 | 20 | Q.   Tired of what? |
| 09:49:06 | 21 | A.   The accusations, the lies, the, just tired of it. |
| 09:49:14 | 22 | Just tired. |
| 09:49:14 | 23 | Q.   So then what, if -- what happened? |
| 09:49:18 | 24 | A.   I agreed to meet with the agents on St. John, and |
| 09:49:24 | 25 | they wired me for audio and video.  And they gave me a |

| | | |
|---|---|---|
| 09:49:29 | 1 | telephone to call him and ask -- call Walter to come |
| 09:49:39 | 2 | where I was working at my dad car rental, and to come |
| 09:49:43 | 3 | there, meet with me, and engage in conversation |
| 09:49:45 | 4 | regarding drug trafficking. |
| 09:49:46 | 5 | Q.   So then what did you do next? |
| 09:49:50 | 6 | A.   After they wired me, I went to the car rental -- |
| 09:49:54 | 7 | well, I called, I went to the car rental, and he showed |
| 09:49:57 | 8 | up. |
| 09:49:57 | 9 | Q.   And what, if anything, happened next? |
| 09:49:59 | 10 | A.   We engaged in conversation. |
| 09:50:01 | 11 | Q.   And what, if anything, did you talk about? |
| 09:50:05 | 12 | A.   We talked about the events on May 17th, the |
| 09:50:11 | 13 | transaction between him and Tapia. |
| 09:50:14 | 14 | Q.   When you say "him," who -- |
| 09:50:16 | 15 | A.   Between Walter and Tapia. |
| 09:50:18 | 16 | Q.   And what, if anything, was discussed? |
| 09:50:22 | 17 | A.   He basically -- I basically brought up the event, |
| 09:50:29 | 18 | and he took over the conversation and said what had |
| 09:50:34 | 19 | happened that night.  Like I said, I dropped him off and |
| 09:50:37 | 20 | I left. |
| 09:50:37 | 21 | Q.   You dropped who off? |
| 09:50:38 | 22 | A.   I dropped off Tapia and I left, and they did their |
| 09:50:44 | 23 | transaction. |
| 09:50:45 | 24 | Q.   When you say "they," who are you referring to? |
| 09:50:47 | 25 | A.   Walter and Tapia did the transaction. |

| | | |
|---|---|---|
| 09:50:49 | 1 | Q.   And what else, if anything, did you and Walter |
| 09:50:52 | 2 | discuss? |
| 09:50:54 | 3 | A.   We spoke about, recalling he spoke about the boat |
| 09:51:02 | 4 | trip down to Fajardo with Tapia.  And I think those are |
| 09:51:12 | 5 | the only things -- two things I could recall right now, |
| 09:51:14 | 6 | you know. |
| 09:51:15 | 7 | Q.   Now showing you Government's 86b, as in boy.  Is |
| 09:51:20 | 8 | this a true, complete and accurate recording of the |
| 09:51:24 | 9 | conversation that you had with Walter Hill that you just |
| 09:51:26 | 10 | discussed? |
| 09:51:27 | 11 | A.   Yes. |
| 09:51:29 | 12 | Q.   I should say that you just testified to? |
| 09:51:32 | 13 | MR. MINGOLLA:  Objection, Your Honor.  No |
| 09:51:33 | 14 | foundation. |
| 09:51:34 | 15 | THE COURT:  You need to stop leading your |
| 09:51:35 | 16 | witness. |
| 09:51:37 | 17 | All right.  Ask your next -- overruled.  Ask your |
| 09:51:41 | 18 | next question. |
| 09:51:41 | 19 | BY MS. LAKE: |
| 09:51:42 | 20 | Q.   Is this a true and accurate and complete |
| 09:51:44 | 21 | representation -- |
| 09:51:44 | 22 | THE COURT:  What is the exhibit, Mr. Hill? |
| 09:51:48 | 23 | THE WITNESS:  Your Honor, it's Exhibit 86b. |
| 09:51:53 | 24 | THE COURT:  What is 86b.  B, like baby. |
| 09:51:58 | 25 | THE WITNESS:  This says I said working. |

09:52:00  1              THE COURT:  I didn't ask you to read what's
09:52:02  2      there.  What is it?
09:52:04  3              THE WITNESS:  This would be of the meeting with
09:52:07  4      myself and Walter Hill.
09:52:12  5              THE COURT:  Ask your next question.
09:52:13  6      BY MS. LAKE:
09:52:13  7      Q.   And have you reviewed it?
09:52:14  8      A.   Yes.
09:52:14  9      Q.   In its entirety?
09:52:15 10      A.   Yes.
09:52:15 11      Q.   Is it true and accurate?
09:52:17 12      A.   Yes.  My initials are on it and date.
09:52:21 13      Q.   And now showing you Government's -- are there any
09:52:29 14      changes, deletions, additions to that recording?
09:52:32 15              MR. MINGOLLA:  Objection.  Leading.
09:52:34 16              THE COURT:  Overruled.  It's foundational.
09:52:36 17              THE WITNESS:  Not that I'm aware of, no.
09:52:38 18      BY MS. LAKE:
09:52:39 19      Q.   And who is speaking on this recording?
09:52:42 20      A.   Myself and Walter Hill.
09:52:46 21      Q.   And --
09:52:48 22              MR. MINGOLLA:  Objection, Your Honor.  Which
09:52:49 23      recording are we referencing?  Which disk.
09:52:52 24              THE COURT:  Again.  So the record is clear,
09:52:55 25      refer to the exhibit number that we're talking about,

09:52:57   1   Attorney Lake.

09:52:58   2   BY MS. LAKE:

09:52:59   3   Q.   86b, who is speaking?

09:53:02   4   A.   Myself and Walter Hill.

09:53:03   5   Q.   Now showing you Government's Exhibit 86c, do you

09:53:06   6   see 86c-1 in front of you?

09:53:09   7   A.   Yes.

09:53:10   8   Q.   And have you reviewed Government's Exhibit 86c-1?

09:53:14   9   A.   Yes.

09:53:15   10   Q.   Have you reviewed it in its entirety?

09:53:17   11   A.   Yes.

09:53:17   12   Q.   And what, if anything, did you do after you

09:53:20   13   reviewed it?

09:53:21   14   A.   Initialed it and put the date on it.

09:53:24   15   Q.   And what is Government's 86c-1?  What is it?

09:53:28   16   A.   It's an edited video of a meeting with myself and

09:53:33   17   Walter Hill.

09:53:34   18   Q.   And what is the relationship between 86c-1 and 86b?

09:53:44   19   A.   I think one of them is edited and the other not --

09:53:47   20   is not edited.

09:53:49   21   Q.   And is it complete and accurate?

09:53:54   22   A.   Yes.

09:53:55   23   Q.   When I say "it," I mean government's 86c-1.  Is the

09:53:59   24   recording complete and accurate?

09:54:01   25   A.   Yes.

| 09:54:03 | 1 | Q.   And how is it shortened?  How is it edited? |

09:54:03   1    Q.   And how is it shortened?  How is it edited?

09:54:10   2           MR. MINGOLLA:  Objection, leading.  There's

09:54:11   3    been nothing laid to say it's been edited.

09:54:14   4           THE COURT:  Overruled.

09:54:18   5           THE WITNESS:  I think the sections of me just

09:54:24   6    driving were taken out.

09:54:31   7           MS. LAKE:  Your Honor, I would ask that

09:54:32   8    Government's Exhibit 86c-1 be received in evidence.

09:54:36   9           THE COURT:  Okay.  Were you going to inquire on

09:54:37   10   relevance?

09:54:38   11   BY MS. LAKE:

09:54:38   12   Q.   And on 86c-1, what, if anything, were you and

09:54:42   13   Walter discussing?

09:54:43   14   A.   The transaction between, between Walter Hill and

09:54:51   15   Mr. Tapia, he was discussing it with me.

09:54:54   16   Q.   What transaction?

09:54:55   17   A.   The transaction on May 17th.

09:54:58   18   Q.   The transaction -- what is the transaction that

09:55:00   19   you're talking about?

09:55:02   20   A.   Of seven kilos of cocaine.

09:55:05   21           MS. LAKE:  Your Honor, I would ask that

09:55:06   22   Government's Exhibit 86c-1 be received in evidence.

09:55:09   23           THE COURT:  Attorney Mingolla.

09:55:10   24           MR. MINGOLLA:  I object, Your Honor.

09:55:12   25           THE COURT:  Attorney Watlington.

| | | |
|---|---|---|
| 09:55:14 | 1 | MR. WATLINGTON:  No objections, Your Honor. |
| 09:55:15 | 2 | THE COURT:  86c-1 is admitted. |
| 09:55:15 | 3 | (Government's Exhibit 86c-1 admitted into |
| 09:55:18 | 4 | evidence.) |
| 09:55:18 | 5 | MS. LAKE:  I would ask that it be published for |
| 09:55:21 | 6 | the jury. |
| 09:55:21 | 7 | THE COURT:  Yes. |
| 09:55:22 | 8 | (Exhibit published.) |
| 09:55:49 | 9 | MR. MINGOLLA:  Your Honor -- |
| 09:55:51 | 10 | MS. LAKE:  Can you stop it? |
| 09:55:53 | 11 | THE COURT:  Let me see counsel briefly. |
| 09:56:09 | 12 | (Sidebar discussion held as follows:) |
| 09:56:14 | 13 | THE COURT:  All right.  There is a portion |
| 09:56:18 | 14 | where there's a reference to a, I think Raymond or |
| 09:56:24 | 15 | someone on this.  What is that? |
| 09:56:27 | 16 | MS. LAKE:  There's a reference to a Brown. |
| 09:56:29 | 17 | THE COURT:  Or a Brown. |
| 09:56:31 | 18 | MS. LAKE:  It's not a defendant. |
| 09:56:32 | 19 | THE COURT:  It's generic reference. |
| 09:56:34 | 20 | MS. LAKE:  It's a generic reference to someone |
| 09:56:37 | 21 | named Brown, and there's no reference to this defendant. |
| 09:56:38 | 22 | They're referencing, I think, maybe a boat employee or a |
| 09:56:42 | 23 | federal employee. |
| 09:56:46 | 24 | MR. WATLINGTON:  Judge, then we would need an |
| 09:56:49 | 25 | instruction to that effect. |

| | | |
|---|---|---|
| 09:56:51 | 1 | MS. LAKE:  I can ask him who he was referring |
| 09:56:53 | 2 | to and he will clearly say that it is not your client. |
| 09:56:57 | 3 | THE COURT:  All right.  How does the reference |
| 09:56:58 | 4 | come up? |
| 09:57:00 | 5 | MS. LAKE:  If I can get a moment to grab the |
| 09:57:07 | 6 | transcript. |
| 09:57:08 | 7 | THE COURT:  Let me see if I can get page 5. |
| 09:57:24 | 8 | MR. MINGOLLA:  Your Honor, I'm going to be |
| 09:57:25 | 9 | making a Bruton objection to this entire transcript as |
| 09:57:28 | 10 | being unduly prejudicial. |
| 09:58:05 | 11 | (Pause.) |
| 09:58:06 | 12 | THE COURT:  All right. |
| 09:58:08 | 13 | (Court reading.) |
| 09:58:11 | 14 | So there's your Brown reference. |
| 09:58:15 | 15 | MR. WATLINGTON:  It might be a police. |
| 09:58:16 | 16 | THE COURT:  So you say you're going to ask him |
| 09:58:19 | 17 | some inquiry there of what he's talking about. |
| 09:58:22 | 18 | MS. LAKE:  I can, Your Honor, considering that |
| 09:58:25 | 19 | Brown is a generic name, but I know for sure, |
| 09:58:28 | 20 | 100 percent, it is not the defendant or it is not |
| 09:58:31 | 21 | Raymond Brown.  And the witness will say that it's |
| 09:58:34 | 22 | clearly not -- |
| 09:58:35 | 23 | THE COURT:  Who is it? |
| 09:58:36 | 24 | MS. LAKE:  I don't know who the Brown is.  I |
| 09:58:38 | 25 | think it's somebody that, I believe, given the context, |

```
09:58:42   1    it might be somebody that Walter Hill works with, but
09:58:45   2    it's not somebody that's related to the case and who is
09:58:50   3    charged in the case or who's --
09:58:58   4              MR. MINGOLLA:  If there's any insinuation that
09:59:01   5    he works with my client, I'm going to object.
09:59:05   6              THE COURT:  All right.  This is page 5.
09:59:07   7              MR. WATLINGTON:  It might be a little long, it
09:59:09   8    might be --
09:59:11   9              MS. LAKE:  As I think about it, I'm not sure.
09:59:12  10    I don't want to make any misrepresentations, but it
09:59:15  11    might have been the officer that Walter Hill testified
09:59:21  12    stopped him that night and asked for keys.  I'm not
09:59:23  13    positive, but I can inquire.  But it's definitely not.
09:59:26  14              THE COURT:  Okay.  You're going to play this
09:59:27  15    portion that appears on page 5 of the transcript?
09:59:31  16              MS. LAKE:  Yes.
09:59:32  17              MR. MINGOLLA:  Walter Hill asked --
09:59:33  18              THE COURT:  What I'm going to do, this is --
09:59:35  19    I'm going to let panel A go to the deliberation room and
09:59:42  20    then we'll continue.  All right.
09:59:44  21         (End of sidebar, open court as follows:)
09:59:50  22              THE COURT:  All right.  For those of you who
09:59:51  23    are on panel A, we are going to take a break.
09:59:53  24         So panel A, you can head to the deliberation room.
09:59:59  25    Panel A.
```

| | | |
|---|---|---|
| 10:00:30 | 1 | (Panel A not present). |
| 10:00:35 | 2 | THE COURT:  Okay.  Go ahead. |
| 10:00:37 | 3 | MS. LAKE:  Let's start from the beginning, |
| 10:00:39 | 4 | please.  86c-1. |
| 10:00:41 | 5 | (Exhibit published.) |
| 10:01:18 | 6 | MS. LAKE:  Can we stop it here? |
| 10:01:20 | 7 | BY MS. LAKE: |
| 10:01:20 | 8 | Q.   Mr. Hill, who is speaking? |
| 10:01:21 | 9 | A.   Myself and Walter. |
| 10:01:23 | 10 | MS. LAKE:  Can you keep playing it, please? |
| 10:03:22 | 11 | Can you stop it here? |
| 10:03:22 | 12 | BY MS. LAKE: |
| 10:03:23 | 13 | Q.   Mr. Hill, what are you two discussing here? |
| 10:03:26 | 14 | A.   We were discussing about Roberto Tapia being out on |
| 10:03:32 | 15 | bail, and the status of the case. |
| 10:03:34 | 16 | Q.   And why are you discussing -- |
| 10:03:36 | 17 | MR. MINGOLLA:  Your know, Your Honor, I'm going |
| 10:03:38 | 18 | to object to this.  The jury has ears.  The jury speaks |
| 10:03:43 | 19 | English.  The tape is in English -- |
| 10:03:49 | 20 | THE COURT:  All right.  Overruled. |
| 10:03:50 | 21 | BY MS. LAKE: |
| 10:03:50 | 22 | Q.   Why were you discussing that? |
| 10:03:51 | 23 | A.   We were trying to figure out what's going on with |
| 10:03:53 | 24 | the case, if Tapia was cooperating, why he was out on |
| 10:03:59 | 25 | bail and stuff like that. |

10:04:01  1    Q.   And --

10:04:02  2              MR. MINGOLLA:  Objection.  Calls for

10:04:03  3    speculation.

10:04:04  4              THE COURT:  Sustained.

10:04:04  5    BY MS. LAKE:

10:04:05  6    Q.   And why are you discussing this?

10:04:08  7    A.   Concerned about, you know, if something would

10:04:13  8    happen to him if Tapia was speaking, just trying to

10:04:16  9    figure out what was going on with the investigation.

10:04:18  10             MR. MINGOLLA:  Objection.  Speculation.

10:04:20  11             THE COURT:  Sustained.

10:04:24  12             MS. LAKE:  Can you continue playing the tape,

10:04:26  13   please?

10:05:41  14        Can we stop here?

10:05:42  15   BY MS. LAKE:

10:05:43  16   Q.   What are you and -- what are you and Mr. Walter

10:05:46  17   Hill discussing here?

10:05:47  18   A.   The events that took place on the 17th.  It was --

10:05:54  19   I had, I had initiated the conversation, going to start

10:05:58  20   saying what actually happened that night.

10:06:04  21             MS. LAKE:  Can we keep playing it?

10:06:54  22        Can you stop it here?

10:06:55  23   BY MS. LAKE:

10:06:55  24   Q.   What is Mr. Walter Hill saying at this point?

10:07:02  25             MR. MINGOLLA:  I would object --

| | | |
|---|---|---|
| 10:07:03 | 1 | THE COURT:  Sustained. |
| 10:07:04 | 2 | Rephrase your question. |
| 10:07:05 | 3 | BY MS. LAKE: |
| 10:07:06 | 4 | Q.   What are you and Mr. Hill talking about? |
| 10:07:08 | 5 | MR. MINGOLLA:  Again, I object, Your Honor. |
| 10:07:09 | 6 | THE COURT:  Overruled. |
| 10:07:09 | 7 | THE WITNESS:  We're discussing the events of |
| 10:07:12 | 8 | May 17th.  He is saying what actually took place, that I |
| 10:07:17 | 9 | had dropped off Tapia by his vehicle, and that I had |
| 10:07:23 | 10 | left. |
| 10:07:25 | 11 | BY MS. LAKE: |
| 10:07:25 | 12 | Q.   And what else, if anything, is being said at this |
| 10:07:28 | 13 | point? |
| 10:07:29 | 14 | MR. MINGOLLA:  Your Honor, asked and answered. |
| 10:07:31 | 15 | Objection. |
| 10:07:32 | 16 | THE COURT:  Sustained. |
| 10:07:34 | 17 | MS. LAKE:  Can we keep playing the video, |
| 10:07:36 | 18 | please? |
| 10:08:01 | 19 | Can you stop it right here? |
| 10:08:03 | 20 | BY MS. LAKE: |
| 10:08:03 | 21 | Q.   Who is speaking right now? |
| 10:08:04 | 22 | A.   Myself and Walter Hill. |
| 10:08:05 | 23 | Q.   And what, if anything, is being said? |
| 10:08:08 | 24 | A.   Discussing the events of May 17th, that I had |
| 10:08:12 | 25 | dropped off Tapia to the vehicle that he was operating, |

10:08:18  1    that Walter was operating.  And that I left and they had

10:08:26  2    pulled off -- I spotted the lady, and they happened to

10:08:30  3    be back by the inspection lane.

10:08:32  4         So when I pulled in, I pulled in forward.  I pulled

10:08:35  5    in more or less side to side by her, and that's when

10:08:38  6    Tapia came from between the cars and got into my

10:08:43  7    vehicle.

10:08:43  8    Q.   And what --

10:08:44  9    A.   He was not where I had left him.

10:08:46  10   Q.   And what, if anything, is Mr. Walter Hill saying at

10:08:51  11   this point?

10:08:52  12   A.   He is just --

10:08:54  13        MR. MINGOLLA:  Your Honor, objection.

10:08:55  14        THE COURT:  Sustained.  It's not leading, but

10:08:57  15   sustained.

10:08:58  16        Next question.

10:08:59  17        MS. LAKE:  Can you keep playing it, please?

10:10:41  18        Can you stop it here?

10:10:42  19   BY MS. LAKE:

10:10:42  20   Q.   Who is speaking right at this point?

10:10:45  21   A.   Myself and Walter.

10:10:46  22   Q.   And what, if anything, is being said?

10:10:50  23        MR. MINGOLLA:  Objection, Your Honor.  Leading.

10:10:52  24        THE COURT:  Sustained.

10:10:53  25

```
10:10:53   1    BY MS. LAKE:

10:10:53   2    Q.   What is being said right now?

10:10:54   3         THE COURT:  Sustained.

10:10:55   4         MR. MINGOLLA:  Objection, Your Honor.  Leading.

10:10:56   5         THE COURT:  It's not leading.  Sustained.

10:10:59   6    BY MS. LAKE:

10:10:59   7    Q.   What, if --

10:11:01   8         THE COURT:  403.

10:11:03   9         MS. LAKE:  Keep playing the video, please.

10:13:26  10         Can you stop it here?

10:13:28  11    BY MS. LAKE:

10:13:28  12    Q.   Who is speaking right now?

10:13:30  13    A.   Myself and Walter.

10:13:32  14    Q.   And can you see the video in front of you?

10:13:34  15    A.   Yes.

10:13:34  16    Q.   Who is that right now?

10:13:36  17    A.   Walter.

10:13:38  18         MS. LAKE:  Can we keep playing, please?

10:17:21  19         THE COURT:  All right.  We're going to take a

10:17:23  20    break now, ladies and gentlemen.

10:17:23  21         Ladies and gentlemen, it is time for our morning

10:17:26  22    break.

10:17:58  23         (Jury out).

10:18:03  24         THE COURT:  Mr. Hill, we're going to take a

10:18:05  25    ten-minute break.  Do not discuss your testimony during
```

```
10:18:08    1    the break.  Do you understand?

10:18:10    2               THE WITNESS:  Yes, sir.

10:18:11    3               THE COURT:  All right.  Thank you.  You can

10:18:12    4    step down with the marshal.

10:18:14    5        (Witness stood aside).

10:18:39    6               THE COURT:  Attorney Lake, how much longer is

10:18:40    7    this tape?  How long is the tape in total?

10:18:49    8               MS. LAKE:  In total, the tape is 33 minutes,

10:18:52    9    Your Honor.

10:18:54   10               THE COURT:  And what minute are we at right

10:18:56   11    now?

10:18:57   12               MS. LAKE:  If I could have a moment?

10:19:03   13        There's 16 minutes left.

10:19:05   14               THE COURT:  All right.  Okay.  Anything we need

10:19:07   15    to cover before our break?

10:19:09   16               MS. LAKE:  No, Your Honor.

10:19:10   17               THE COURT:  Attorney Mingolla.

10:19:12   18               MR. MINGOLLA:  I'm going to renew the 403

10:19:17   19    motion that I made at sidebar.

10:19:20   20               THE COURT:  Okay.  Very well.

10:19:21   21        Attorney Watlington?

10:19:23   22               MR. WATLINGTON:  Nothing, Your Honor.

10:19:24   23               THE COURT:  Very good.  Ten minutes, Counsel.

10:19:26   24        (Court in recess, 10:19 a.m.)

10:35:34   25        (After recess, Jury Panel B present, 10:35 a.m.)
```

| | | |
|---|---|---|
| 10:35:42 | 1 | THE COURT:  Attorney Lake, go ahead. |
| 10:35:44 | 2 | MS. LAKE:  Can you please continue playing |
| 10:35:49 | 3 | Government's 86c-1. |
| 10:51:35 | 4 | (Pause). |
| 10:51:37 | 5 | MS. LAKE:  If we can just have a moment, Your |
| 10:51:40 | 6 | Honor? |
| 10:51:40 | 7 | THE COURT:  Yes. |
| 10:53:53 | 8 | MS. LAKE:  Can we stop it here? |
| 10:53:55 | 9 | BY MS. LAKE: |
| 10:53:55 | 10 | Q.   Who is speaking now? |
| 10:53:58 | 11 | A.   Myself and Walter. |
| 10:53:59 | 12 | Q.   Is there anyone else talking right now? |
| 10:54:02 | 13 | A.   I had a phone call, and my sister-in-law walked by. |
| 10:54:07 | 14 | Q.   And did you leave the presence of Walter Hill to |
| 10:54:09 | 15 | take that phone call? |
| 10:54:11 | 16 | MR. MINGOLLA:  Excuse me.  Objection, Your |
| 10:54:13 | 17 | Honor. |
| 10:54:14 | 18 | THE COURT:  Sustained. |
| 10:54:15 | 19 | BY MS. LAKE: |
| 10:54:15 | 20 | Q.   What, if anything, did you do? |
| 10:54:18 | 21 | A.   I just walked away, asked my father to pass the |
| 10:54:23 | 22 | cordless phone, and I took the call. |
| 10:54:24 | 23 | Q.   And what happened next? |
| 10:54:26 | 24 | A.   And then we started talking again. |
| 10:54:29 | 25 | Q.   And how did you start talking again? |

| | | |
|---|---|---|
| 10:54:32 | 1 | A.   I don't remember what I said, but we just started |
| 10:54:35 | 2 | talking about the transactions again. |
| 10:54:38 | 3 | MS. LAKE:  Can we keep playing it? |
| 10:57:07 | 4 | BY MS. LAKE: |
| 10:57:07 | 5 | Q.   What, if anything, happened at the conclusion of |
| 10:57:10 | 6 | your conversation with Walter Hill? |
| 10:57:13 | 7 | A.   Went back and met with the agents, and they took |
| 10:57:16 | 8 | off the recording device. |
| 10:57:22 | 9 | Q.   So what are you and Walter Hill talking about |
| 10:57:26 | 10 | specifically? |
| 10:57:27 | 11 | A.   The events of May 17th, going down on the boat |
| 10:57:34 | 12 | to -- |
| 10:57:35 | 13 | THE COURT:  All right.  We've been over this. |
| 10:57:36 | 14 | Let's move on. |
| 10:57:37 | 15 | MS. LAKE:  Thank you.  I have nothing further. |
| 10:57:39 | 16 | THE COURT:  Okay.  Attorney Mingolla? |
| 10:57:41 | 17 | MR. MINGOLLA:  Yes, sir. |
| 10:57:59 | 18 | Just two seconds, Judge, please. |
| 10:59:29 | 19 | CROSS-EXAMINATION |
| 10:59:29 | 20 | BY MR. MINGOLLA: |
| 10:59:39 | 21 | Q.   Good morning -- |
| 10:59:41 | 22 | A.   Good morning. |
| 10:59:46 | 23 | Q.   -- Mr. Hill. |
| 10:59:47 | 24 | MR. MINGOLLA:  Good morning, ladies and |
| 10:59:49 | 25 | gentlemen. |

| | | |
|---|---|---|
| 10:59:51 | 1 | BY MR. MINGOLLA: |
| 10:59:53 | 2 | Q.   Now, Mr. Hill, you've indicated in your testimony, |
| 11:00:10 | 3 | your prior testimony here, that you worked for Customs, |
| 11:00:18 | 4 | then you worked again in '87, and then you were in an |
| 11:00:25 | 5 | investigation unit, then you were an assistant |
| 11:00:29 | 6 | commissioner, a deputy chief, and in, and then assigned |
| 11:00:37 | 7 | to St. John nine months or so ago.  So you've been a |
| 11:00:46 | 8 | police officer or a law enforcement officer for, since |
| 11:00:51 | 9 | 1987, in essence, if you include Customs, correct? |
| 11:00:55 | 10 | A.   Correct. |
| 11:00:57 | 11 | Q.   And you -- you indicated that, in your testimony |
| 11:01:29 | 12 | that, well, strike that. |
| 11:01:38 | 13 | You have, you have been friends with Mr. Walter |
| 11:01:49 | 14 | Hill personally all your life, correct? |
| 11:01:52 | 15 | A.   More or less, yes. |
| 11:01:54 | 16 | Q.   And Mr. Hill has -- my client, Mr. Hill, has been |
| 11:02:11 | 17 | your sort of, let's call him your go-to guy when you |
| 11:02:16 | 18 | need to borrow money or when you need help with |
| 11:02:19 | 19 | mechanical problems on vehicles and so forth, because |
| 11:02:23 | 20 | he's a mechanic, correct? |
| 11:02:24 | 21 | A.   Yes. |
| 11:02:29 | 22 | Q.   And he's always come through for you with lending |
| 11:02:33 | 23 | you money when you've asked for it, or fixing your |
| 11:02:36 | 24 | jeeps.  You do have some jeeps, right? |
| 11:02:40 | 25 | A.   My father has a car rental, yes. |

11:02:43  1    Q.   But you own them?

11:02:44  2    A.   If I own them?

11:02:46  3    Q.   Yes.

11:02:46  4    A.   No.

11:02:47  5    Q.   And so he would, you know, try and help you out

11:02:58  6    whenever he could, correct?

11:03:01  7    A.   Correct.

11:03:04  8    Q.   And you --

11:03:18  9         MR. MINGOLLA:   Just a moment, Judge.

11:03:30  10   BY MR. MINGOLLA:

11:03:30  11   Q.   Now, you were arrested in May, correct?  May of

11:03:41  12   2013?

11:03:42  13   A.   Yes.

11:03:42  14   Q.   And you were arrested when you arrived in St.

11:03:51  15   Thomas, correct?

11:03:53  16   A.   No.  I was arrested at the, in the afternoon at the

11:03:59  17   Paragon building, coming from the doctor's office.

11:04:05  18   Q.   Okay.  All right.  Fine.  And you had, from that

11:04:14  19   point on, from the time of your arrest on, you had at

11:04:27  20   least, at the very least, six meetings, if not

11:04:37  21   significantly more, with government agents and/or

11:04:42  22   government attorneys, correct?

11:04:44  23   A.   No.

11:04:49  24   Q.   Isn't it true that you met with Agents Querrard and

11:04:53  25   Joseph?

| | | |
|---|---|---|
| 11:04:55 | 1 | A.   Yes. |
| 11:04:57 | 2 | Q.   And they work for the government, don't they? |
| 11:05:00 | 3 | A.   Yes. |
| 11:05:00 | 4 | Q.   And they work with the HIDTA Task Force, don't |
| 11:05:06 | 5 | they? |
| 11:05:06 | 6 | A.   Correct. |
| 11:05:07 | 7 | Q.   And you met with AUSA, Assistant U.S. Attorney |
| 11:05:11 | 8 | Lindquist -- |
| 11:05:12 | 9 | A.   Yes. |
| 11:05:13 | 10 | Q.   -- correct? |
| 11:05:13 | 11 | A.   Yes.  Uhm-hmm. |
| 11:05:16 | 12 | Q.   And you met with at least three other, let's call |
| 11:05:31 | 13 | them government agents, correct? |
| 11:05:35 | 14 | A.   I did two proffers and met with the task force |
| 11:05:41 | 15 | agents and agents twice. |
| 11:05:44 | 16 | Q.   I'm sorry; you met with whom? |
| 11:05:46 | 17 | A.   I had two proffers and I met with, as I recall, two |
| 11:05:50 | 18 | proffers, and I met with task force agents and other |
| 11:05:53 | 19 | agents, I think twice. |
| 11:05:57 | 20 | Q.   Are you trying to tell me that you only met with |
| 11:06:03 | 21 | government agents between all of that time and today, |
| 11:06:07 | 22 | twice? |
| 11:06:07 | 23 | A.   Yes. |
| 11:06:08 | 24 | Q.   And when were those times? |
| 11:06:10 | 25 | A.   I had the two proffers with the U.S. attorney, |

| | | |
|---|---|---|
| 11:06:15 | 1 | and -- the assistant U.S. attorney twice, along with FBI |
| 11:06:25 | 2 | and DEA agents.  And then I met and did two wires.  I |
| 11:06:31 | 3 | don't recall any other meetings. |
| 11:06:33 | 4 | Q.   And those meetings took place where? |
| 11:06:38 | 5 | A.   The proffers took place at Attorney King's office. |
| 11:06:43 | 6 | And the wires were done -- |
| 11:06:47 | 7 | Q.   Who is Attorney King? |
| 11:06:48 | 8 | A.   My attorney. |
| 11:06:52 | 9 | Q.   Go on. |
| 11:06:54 | 10 | A.   The wires were done up at the -- well, they were |
| 11:06:58 | 11 | placed on me up at the rear of the gentleman who have a |
| 11:07:03 | 12 | Witness' church on St. John. |
| 11:07:06 | 13 | Q.   And isn't it true that you were instructed -- isn't |
| 11:07:25 | 14 | it true that you were instructed, based on reports by |
| 11:07:30 | 15 | Querrard and Joseph, to contact my client to arrange a |
| 11:07:38 | 16 | meeting between you and my client at Delbert Hill's Jeep |
| 11:07:43 | 17 | Rental? |
| 11:07:43 | 18 | A.   Yes. |
| 11:07:50 | 19 | Q.   And isn't it true that you were somewhat reluctant |
| 11:07:53 | 20 | to do that? |
| 11:07:54 | 21 | A.   Reluctant? |
| 11:07:56 | 22 | Q.   Yes. |
| 11:07:57 | 23 | A.   No. |
| 11:08:02 | 24 | Q.   And were you aware of the fact that -- well, you've |
| 11:08:10 | 25 | indicated that a recording device, you had a recording |

11:08:13  1    device placed on you?

11:08:15  2    A.    Yes.

11:08:16  3    Q.    Where?

11:08:19  4    A.    I wore a watch with a camera, and a mug with a

11:08:24  5    mike.

11:08:25  6    Q.    And a what?

11:08:27  7    A.    A mug.

11:08:29  8    Q.    A mouth?

11:08:31  9    A.    A mug, a drinking mug.

11:08:32  10   Q.    Oh, a mug.  I'm sorry, I'm sorry.  A mug.  Okay.

11:08:36  11         So there were two devices?

11:08:38  12   A.    Yes.

11:08:39  13   Q.    And had you been told that there were two devices

11:08:47  14   or one device, in advance?  You had been told one or

11:08:51  15   two, three, five?

11:08:52  16   A.    No, I didn't know what they would be.

11:08:57  17   Q.    Now, you -- did you -- where did you hear these

11:09:16  18   working copies of the Government's Exhibit 86, disk 86b

11:09:27  19   and 86c, the 86b, I don't know if it's b-1 or -- we'll

11:09:34  20   say 86b and 86c.  Where did you hear those?

11:09:38  21   A.    At the US Attorney's Office.

11:09:40  22   Q.    And were you asked, isn't it true that you were

11:09:46  23   asked to make comments about these, what you were

11:09:51  24   hearing?

11:09:53  25   A.    I don't understand, "comments."

| | | |
|---|---|---|
| 11:09:55 | 1 | Q.   You what? |
| 11:09:56 | 2 | A.   I don't understand the question.  You said comments |
| 11:10:00 | 3 | about? |
| 11:10:00 | 4 | Q.   Were you questioned about the contents of the disk, |
| 11:10:07 | 5 | what you were hearing? |
| 11:10:08 | 6 | A.   Yes. |
| 11:10:11 | 7 | Q.   And isn't it true that initially you made -- |
| 11:10:31 | 8 | MR. MINGOLLA:  Bear with me, Judge. |
| 11:10:52 | 9 | BY MR. MINGOLLA: |
| 11:10:52 | 10 | Q.   You indicated that -- did, did the -- at these |
| 11:11:07 | 11 | debriefings, let's call them, you keep, you referenced |
| 11:11:11 | 12 | them as proffers, I believe.  I refer to them as |
| 11:11:14 | 13 | debriefings.  So if I say debriefings, what you've been |
| 11:11:19 | 14 | referring to as proffers, during these proffers slash |
| 11:11:24 | 15 | debriefings, were you asked about other individuals |
| 11:11:30 | 16 | involved in narcotics trafficking? |
| 11:11:34 | 17 | A.   Yes. |
| 11:11:41 | 18 | Q.   And did you cooperate in identifying other |
| 11:11:46 | 19 | individuals involved in narcotics trafficking? |
| 11:11:50 | 20 | MS. LAKE:  Objection.  Relevance. |
| 11:11:51 | 21 | THE COURT:  Overruled. |
| 11:11:55 | 22 | THE WITNESS:  Could you repeat the question? |
| 11:11:57 | 23 | BY MR. MINGOLLA: |
| 11:11:57 | 24 | Q.   Did you identify other individuals involved in |
| 11:12:01 | 25 | narcotics trafficking? |

| | | |
|---|---|---|
| 11:12:02 | 1 | A.   Yes. |
| 11:12:08 | 2 | Q.   More than, more than four individuals? |
| 11:12:18 | 3 | A.   I don't think more than four, no. |
| 11:12:21 | 4 | Q.   And why, as a police officer or a law enforcement |
| 11:12:39 | 5 | officer, had you -- you didn't take action against those |
| 11:12:44 | 6 | individuals because you were basically working in |
| 11:12:47 | 7 | conjunction with those individuals in one way or |
| 11:12:51 | 8 | another, correct? |
| 11:12:52 | 9 | A.   Which individuals? |
| 11:12:53 | 10 | Q.   The individuals whom you identified as being |
| 11:12:56 | 11 | involved in narcotics trafficking? |
| 11:12:58 | 12 | A.   No.  No, the individuals that I identified were |
| 11:13:07 | 13 | individuals that may have been involved in that same |
| 11:13:15 | 14 | investigation. |
| 11:13:15 | 15 | Q.   All right.  Did you investigate them? |
| 11:13:22 | 16 | A.   No. |
| 11:13:23 | 17 | Q.   You didn't? |
| 11:13:23 | 18 | A.   No. |
| 11:13:24 | 19 | Q.   No.  And yet you were at that time, when you were |
| 11:13:34 | 20 | identifying these people -- I'm sorry, you were starting |
| 11:13:43 | 21 | with the investigation in St. John, correct? |
| 11:13:45 | 22 | A.   When I identified them, you say? |
| 11:13:47 | 23 | Q.   Yes, to the government? |
| 11:13:49 | 24 | A.   No, I was on bail. |
| 11:13:51 | 25 | Q.   But you were hitherto -- |

11:13:54   1    A.   I'm sorry?

11:13:55   2    Q.   Prior to that, you had been acting as a police

11:13:59   3    officer, correct?  Before your arrest?

11:14:04   4    A.   Yes.  I was a sergeant, yes.

11:14:09   5    Q.   And you took no action?  You took no action to

11:14:13   6    investigate those four individuals, these four

11:14:16   7    individuals that you're -- you, whose names you

11:14:19   8    mentioned to the government?

11:14:21   9    A.   The individuals that I identified were from a photo

11:14:25   10   album that was shown to me by the task force --

11:14:29   11   Q.   That's not what I asked.  I asked:  Did you take

11:14:32   12   any action against the individuals whom you mentioned to

11:14:36   13   the government?

11:14:36   14   A.   How would I take action?  I was under arrest.  I

11:14:41   15   don't understand your question.

11:14:42   16   Q.   When you were acting in your capacity --

11:14:45   17   A.   I had no knowledge of those people being involved

11:14:48   18   in anything until I was told.

11:14:53   19   Q.   I see.  And you say that you indicated that you

11:15:03   20   had -- let's go to the context of the meeting that you

11:15:28   21   had with my client.

11:15:35   22        Agents Querrard and Joseph instructed you to meet

11:15:38   23   with him, correct?

11:15:39   24   A.   Correct.

11:15:40   25   Q.   And Agent Grossman, I believe, who testified

11:15:45  1    yesterday, indicated that he, that he was the one who

11:15:50  2    attached this wrist watch audio-visual device, correct?

11:16:01  3              MS. LAKE:  Objection.  Misstates the evidence.

11:16:04  4              THE COURT:  Overruled.

11:16:04  5              THE WITNESS:  No, I think it was Mark, Mark

11:16:08  6    Joseph, that put the watch on.

11:16:09  7    BY MR. MINGOLLA:

11:16:10  8    Q.   Okay.  And was it your impression that that watch

11:16:17  9    was going to be the only audio-visual device that was to

11:16:21  10   be used?

11:16:23  11   A.   No.

11:16:26  12   Q.   So it was your impression that in addition to this

11:16:33  13   watch audio-visual device, that there was going to be a

11:16:39  14   secondary audio-visual device employed at that meeting?

11:16:44  15   A.   No.  To my understanding the watch was just video,

11:16:49  16   and the mug was audio.

11:17:09  17   Q.   And would it surprise you that the watch was both

11:17:11  18   an audio-visual device?

11:17:13  19   A.   No.

11:17:16  20   Q.   And would it surprise you that no one, say, for

11:17:22  21   Agents Querrard, FBI Agent Fernandez and Mark Joseph,

11:17:27  22   who is Agent Querrard's partner, were the only ones who

11:17:32  23   knew about this cup?

11:17:35  24             MS. LAKE:  Objection.  Relevance.  Exceeds the

11:17:37  25   scope of direct.  Calls for speculation.

| | | |
|---|---|---|
| 11:17:39 | 1 | THE COURT:  403.  Sustained. |
| 11:17:39 | 2 | BY MR. MINGOLLA: |
| 11:18:03 | 3 | Q.   And you -- where do you live? |
| 11:18:04 | 4 | A.   I live on St. John. |
| 11:18:16 | 5 | Q.   And you, you recently built a home there, did you |
| 11:18:19 | 6 | not? |
| 11:18:20 | 7 | A.   Not recently, no. |
| 11:18:21 | 8 | Q.   Well, within the past -- let me redefine |
| 11:18:25 | 9 | "recently."  Within the past, let's say, three or |
| 11:18:28 | 10 | four years? |
| 11:18:29 | 11 | A.   No. |
| 11:18:31 | 12 | Q.   Do you know -- aren't you currently under |
| 11:18:37 | 13 | investigation for other alleged crimes? |
| 11:18:41 | 14 | A.   Not that I'm aware of, no. |
| 11:18:45 | 15 | Q.   Are you saying you're unaware of the fact that |
| 11:18:48 | 16 | you're under investigation for -- |
| 11:18:49 | 17 | THE COURT:  Stop. |
| 11:18:50 | 18 | Next question. |
| 11:18:57 | 19 | BY MR. MINGOLLA: |
| 11:18:57 | 20 | Q.   And the -- you've told people your home in -- that |
| 11:19:05 | 21 | this new home that you had built is worth about two |
| 11:19:10 | 22 | hundred -- $2.5 million, or approximately that? |
| 11:19:15 | 23 | MS. LAKE:  Objection, relevance. |
| 11:19:17 | 24 | THE COURT:  Overruled. |
| 11:19:18 | 25 | THE WITNESS:  No. |

| | | |
|---|---|---|
| 11:19:18 | 1 | BY MR. MINGOLLA: |
| 11:19:21 | 2 | Q.   And didn't you boast to people that it only cost |
| 11:19:25 | 3 | you $250,000 to build it? |
| 11:19:29 | 4 | MS. LAKE:  Objection.  Relevance.  Calls for |
| 11:19:31 | 5 | hearsay. |
| 11:19:32 | 6 | THE WITNESS:  No. |
| 11:19:32 | 7 | THE COURT:  Overruled. |
| 11:19:34 | 8 | BY MR. MINGOLLA: |
| 11:19:34 | 9 | Q.   And didn't that house get constructed more or less |
| 11:19:38 | 10 | at the same time that the new police station was being |
| 11:19:41 | 11 | constructed in St. John? |
| 11:19:43 | 12 | A.   No. |
| 11:19:50 | 13 | Q.   So it's not true that you were assisted in the |
| 11:19:52 | 14 | construction of your $2-1/2 million home by the same |
| 11:19:58 | 15 | contractors working on the police station in St. John? |
| 11:20:03 | 16 | MS. LAKE:  Objection.  Assumes facts not in |
| 11:20:05 | 17 | evidence, Your Honor. |
| 11:20:06 | 18 | THE COURT:  All right.  403, sustained. |
| 11:20:09 | 19 | THE WITNESS:  No, attorney, I think you're |
| 11:20:12 | 20 | confused -- |
| 11:20:13 | 21 | THE COURT:  Stop. |
| 11:20:14 | 22 | THE WITNESS:  Oh, sorry. |
| 11:20:16 | 23 | THE COURT:  Next question. |
| 11:20:17 | 24 | BY MR. MINGOLLA: |
| 11:20:18 | 25 | Q.   And you, you indicated that, you indicated that, in |

11:20:39  1    your testimony today, actually, that you picked up

11:20:46  2    Mr. Tapia in St. John, correct, in your police vehicle,

11:20:52  3    correct?

11:20:52  4    A.   Yes.

11:20:53  5    Q.   And you drove him to a certain spot, certain

11:21:01  6    location, correct?

11:21:02  7    A.   Yes.

11:21:06  8    Q.   And when you got to that location initially --

11:21:11  9    strike that.

11:21:12  10        When you got to that location, it was dark.  You

11:21:16  11   testified to that, correct?

11:21:18  12   A.   Yes.

11:21:18  13   Q.   And that you could not identify -- you saw, you saw

11:21:24  14   vehicles, you couldn't identify anyone in the vehicles?

11:21:29  15   A.   No, I could not see in the vehicle.

11:21:33  16   Q.   You, you -- all right.

11:21:39  17        So you could not identify my client, Walter Hill,

11:21:42  18   as being in a vehicle, correct?

11:21:43  19   A.   Correct.

11:21:44  20   Q.   And you indicate that -- you indicate that -- you

11:22:12  21   indicate that, you indicated that you saw a, you saw an

11:22:30  22   SUV in the area when you arrived?

11:22:43  23   A.   I don't recall saying that, no.

11:22:53  24   Q.   Okay.  You -- so you drop off Mr. Tapia.  It's

11:23:10  25   dark.  Can't identify my client.  Then you drove, you

11:23:15   1   drove away, correct?  You drove sort of around the block

11:23:20   2   or somewhere, correct?

11:23:22   3   A.   I dropped him off to the vehicle that I know that

11:23:26   4   my cousin -- that Walter operates.

11:23:32   5   Q.   I see.  And what vehicle would that be?  What kind

11:23:41   6   of vehicle?  What make?

11:23:44   7   A.   A blue Ford -- not an Escape.  I can't remember

11:23:53   8   the -- it's an SUV, but I can't remember the model.

11:23:58   9   Q.   That's a Ford?

11:23:59   10  A.   Yes.

11:23:59   11  Q.   Does it surprise you that in his testimony,

11:24:02   12  Mr. Tapia said it was a blue Suzuki?

11:24:05   13  A.   I don't know what he saw.  I know where I dropped

11:24:08   14  him.

11:24:09   15  Q.   Did you see a blue Suzuki?

11:24:13   16  A.   No.

11:24:13   17  Q.   When I say a Suzuki, I mean a Suzuki SUV, those

11:24:19   18  little --

11:24:20   19  A.   Yeah, I know what you mean.

11:24:24   20  Q.   And you -- Agent Querrard and perhaps Agent Joseph,

11:24:43   21  but let's say Agent Querrard, I'll restrict it to Agent

11:24:51   22  Querrard, instructed you to get a hold of Mr. Hill and

11:24:56   23  arrange a meeting, correct?

11:24:57   24  A.   Yes.

11:25:01   25  Q.   And he instructed you as to where the meeting was

| | | |
|---|---|---|
| 11:25:03 | 1 | to take place, correct? |
| 11:25:06 | 2 | A.   Yes. |
| 11:25:07 | 3 | Q.   And that meeting was to take place at your -- |
| 11:25:13 | 4 | MR. MINGOLLA:  One moment, Judge. |
| 11:25:18 | 5 | THE COURT:  Yes. |
| 11:25:18 | 6 | BY MR. MINGOLLA: |
| 11:25:18 | 7 | Q.   At your father's car -- jeep, I don't know the |
| 11:25:24 | 8 | other stuff, but primarily jeep rental agency, correct? |
| 11:25:29 | 9 | A.   Correct. |
| 11:25:30 | 10 | Q.   And you -- are you aware also that -- so -- strike |
| 11:26:09 | 11 | that. |
| 11:26:09 | 12 | So you proceed to arrange a meeting or, you know, |
| 11:26:15 | 13 | attempt to arrange a meeting with Mr. Walter Hill, |
| 11:26:18 | 14 | correct? |
| 11:26:21 | 15 | A.   Yes. |
| 11:26:22 | 16 | Q.   And you did that by telephone, correct? |
| 11:26:24 | 17 | A.   Yes. |
| 11:26:25 | 18 | Q.   And approximately how long did it take from the |
| 11:26:40 | 19 | time that you called Mr. Hill, my client, to have a |
| 11:26:52 | 20 | meet, for him to arrive, approximately? |
| 11:26:58 | 21 | A.   Fifteen minutes; ten, fifteen minutes. |
| 11:27:01 | 22 | Q.   And isn't it true that you made up to 12 telephone |
| 11:27:07 | 23 | calls to Mr. Hill, asking him, "Why aren't you here? |
| 11:27:14 | 24 | Hurry up," you know, and you made 12 phone calls to him |
| 11:27:18 | 25 | in that period of time? |

```
11:27:19   1    A.   No.

11:27:25   2    Q.   Are you sure?

11:27:25   3    A.   Positive.

11:27:26   4    Q.   If not 12, then, let us say you made more than one

11:27:36   5    call to him, did you not?

11:27:37   6    A.   If he wasn't in, yes, I made more than one call.

11:27:41   7    Q.   And it could have been as many as, notwithstanding

11:27:46   8    whether he was in or not in, it could have been as many

11:27:54   9    as up to ten phone calls in that period of time?

11:27:57  10    A.   No, I don't -- no.

11:28:04  11    Q.   Now, is it customary -- now, I'm sorry, you said

11:28:13  12    what, the time line between the last call and his

11:28:16  13    arrival was, what, 18 minutes?

11:28:19  14         I'm sorry, I --

11:28:20  15    A.   I don't understand your question.

11:28:21  16    Q.   You indicated that between the time of your last

11:28:24  17    call to Mr. Hill, of the numerous calls you made to

11:28:28  18    Mr. Hill, it took how long for him to arrive at

11:28:32  19    Delbert's jeep rental?

11:28:35  20         MS. LAKE:   Objection.  Misstates the testimony.

11:28:37  21    Assumes facts not in evidence.

11:28:39  22         THE COURT:   Overruled.

11:28:40  23         THE WITNESS:   I think it's like 10, 15 minutes

11:28:44  24    for him to get there.

11:28:46  25
```

```
11:28:46   1    BY MR. MINGOLLA:

11:28:46   2    Q.   Do you ordinarily -- if you're going to meet with

11:28:48   3    someone, anyone, a friend or, you know, relative,

11:28:57   4    whatever, is it customary for you to make, in 15 to

11:29:01   5    18 minutes, up to 8 phone calls to ask where they are?

11:29:08   6              MS. LAKE:  Objection.  Relevance.

11:29:10   7              THE COURT:  Sustained.

11:29:11   8              THE WITNESS:  I never ask him --

11:29:12   9              THE COURT:  Stop.

11:29:13  10              THE WITNESS:  Sorry.

11:29:15  11              MR. MINGOLLA:  I'm sorry?

11:29:16  12              THE COURT:  Sustained.  Next question.

11:29:25  13    BY MR. MINGOLLA:

11:29:25  14    Q.   You were -- isn't it fair to say you were extremely

11:29:29  15    anxious that this meeting take place?  Correct?

11:29:33  16    A.   No.

11:29:40  17    Q.   Had you been, had you been, had you been

11:29:53  18    instructed -- excuse me.

11:29:54  19         Had you been instructed by Agent Querrard as to

11:30:06  20    what you were to be asking my client?

11:30:10  21    A.   Instructed?

11:30:13  22    Q.   Suggestions made by Agent Querrard as to what you

11:30:18  23    should be asking my client?

11:30:20  24    A.   We discussed the proffer that I did.  I don't

11:30:27  25    know -- there were two different occasions, Attorney.
```

11:30:30  1    We discussed the --

11:30:32  2    Q.   You've asked the question -- you've answered the

11:30:36  3    question.

11:30:42  4         So basically you were prompted -- Do you know what

11:30:45  5    I mean by "prompted"?  You were coached by Agent

11:30:49  6    Querrard as to what you would be discussing, correct?

11:30:51  7    A.   No.

11:30:52  8    Q.   Or Agent Joseph?

11:30:53  9    A.   I wasn't coached by anyone what I should be asking.

11:30:56  10   Q.   But what --

11:30:57  11   A.   No, I was not coached by anyone as to what I should

11:31:00  12   ask.

11:31:04  13   Q.   So, are you to have us believe that you were just

11:31:09  14   told to go and meet with Mr. Hill and just have a

11:31:13  15   conversation?

11:31:14  16   A.   No.

11:31:17  17   Q.   So, somehow it was conveyed to you by someone as to

11:31:25  18   what types of questions you should be asking, correct?

11:31:29  19   A.   Not what type of questions, no.

11:31:38  20   Q.   And you never -- strike that.

11:31:53  21        It was not unusual for you and Mr. Hill, Walter

11:32:00  22   Hill, to discuss current events, correct, during the

11:32:06  23   course of your relationship?

11:32:07  24   A.   No.

11:32:08  25   Q.   And this case involving Mr. Tapia and the other

| | | |
|---|---|---|
| 11:32:18 | 1 | codefendants, that was a current event, correct? |
| 11:32:26 | 2 | A.   Yes. |
| 11:32:26 | 3 | Q.   And so it wasn't particularly unusual for, it |
| 11:32:45 | 4 | wouldn't have been unusual for you and your cousin to |
| 11:32:53 | 5 | discuss, you know, current events, one of which is the |
| 11:32:59 | 6 | Tapia, I'll call it the Tapia case, or the Tapia arrest, |
| 11:33:05 | 7 | correct? |
| 11:33:06 | 8 | A.   Correct. |
| 11:33:06 | 9 | Q.   And, and you testified that you never saw, because |
| 11:33:19 | 10 | you drove away, you never saw, A, my client at this |
| 11:33:26 | 11 | alleged exchange because it was too dark; and B, that |
| 11:33:39 | 12 | you discussed current events frequently, and that you |
| 11:33:47 | 13 | were seeking information from my client concerning the |
| 11:33:57 | 14 | case and your own exposure in said case, in that case? |
| 11:34:04 | 15 | MS. LAKE:  Objection.  Asked and answered. |
| 11:34:06 | 16 | Compound. |
| 11:34:07 | 17 | THE COURT:  Rephrase. |
| 11:34:10 | 18 | BY MR. MINGOLLA: |
| 11:34:10 | 19 | Q.   Isn't it true that you got -- that you were |
| 11:34:13 | 20 | interested on, on that, on that meeting that took place |
| 11:34:21 | 21 | on October 20th, isn't it, isn't it true that you were |
| 11:34:24 | 22 | interested in what my client might know about your |
| 11:34:31 | 23 | exposure in that, you know, your, the weight of the |
| 11:34:38 | 24 | evidence or your exposure in that case?  Correct? |
| 11:34:41 | 25 | A.   No. |

11:34:52  1    Q.   And the reason that -- well, strike that.

11:35:04  2          On, in the course of the -- this goes back a bit.

11:35:28  3    I neglected to -- would it surprise you that agents

11:35:34  4    reported that you had met with them more than the two

11:35:37  5    times that you're saying you met with them?

11:35:44  6    A.   If it would surprise me, yes, because that's all I

11:35:47  7    recall meeting with them.

11:35:49  8    Q.   So they're in essence lying when they --

11:35:51  9          THE COURT:  No, stop.  Next question.

11:35:54  10         MR. MINGOLLA:  Okay.  Sorry.

11:35:55  11   BY MR. MINGOLLA:

11:35:55  12   Q.   And you -- so you never saw, just to wrap up this

11:36:10  13   aspect of things -- you never saw any transactions

11:36:16  14   between Mr. Tapia and Mr. Hill, correct?

11:36:20  15   A.   Correct.

11:36:25  16   Q.   And you said in this, on Exhibit 80b [sic], the

11:36:46  17   disk we just heard -- you say, you're referencing

11:37:44  18   someone called Fat Boy.  I'm mistaken.  You're

11:38:05  19   referencing someone else.  It could be a chap named

11:38:17  20   Cranston.  And you say -- strike that.

11:38:30  21         Mr. Hill says my -- Mr. Hill says:  They're putting

11:38:36  22   it on me, you know.  And why is Fat Boy calling them?

11:38:55  23         And you say:  It got to be -- I understand what

11:38:58  24   you're saying.  It got to be he trying to fuck you.

11:39:02  25         Do you remember that?

11:39:05  1   A.   I remember -- I think that's the essence of that,

11:39:11  2   yes.

11:39:11  3   Q.   So by trying to -- the expression -- forgive me,

11:39:15  4   jury for using the word -- so when you're talking about

11:39:24  5   he trying to fuck you, doesn't that mean he's trying to

11:39:30  6   frame you?

11:39:30  7   A.   No.

11:39:39  8   Q.   And did you, did you provide any assistance -- or

11:40:10  9   isn't it true that you provided assistance to the

11:40:17  10  government -- and I'll make that generic -- in terms of

11:40:23  11  interpreting that -- the video we just saw?

11:40:27  12  A.   Yes.

11:40:32  13  Q.   And it would be in your best interest, would it

11:40:39  14  not, logically, to interpret that video to make it

11:40:42  15  reflect you in a good light, right?

11:40:47  16  A.   No, to reflect the truth as to what happened.

11:40:50  17  Q.   Because you have a conscience, as I recall you

11:40:55  18  saying?

11:40:55  19  A.   Just like you, yeah.

11:41:02  20  Q.   I don't have a conscience.

11:41:05  21       THE COURT:  All right.  Let's just ask

11:41:07  22  questions that are germane and move this along.

11:41:10  23       MR. MINGOLLA:  Okay.

11:41:16  24  BY MR. MINGOLLA:

11:41:17  25  Q.   Now, you, like Mr. Tapia, you executed -- strike

```
11:41:21    1    that.
11:41:21    2         It's true you entered into a -- you spoke with your
11:41:26    3    attorney and sought his advice in this matter, correct?
11:41:29    4               MS. LAKE:  Objection, relevance.
11:41:30    5               THE COURT:  Overruled.
11:41:37    6               THE WITNESS:  Yes.
11:41:38    7    BY MR. MINGOLLA:
11:41:38    8    Q.   And you concluded that it was in your best interest
11:41:44    9    to cooperate, correct?
11:41:45   10    A.   Yes, that was my decision.
11:41:49   11    Q.   And were -- and you were made aware that there
11:41:59   12    were, that these were serious charges that you were
11:42:03   13    facing, correct?
11:42:03   14    A.   Correct.
11:42:04   15    Q.   Very serious charges?
11:42:07   16    A.   Yes.
11:42:08   17    Q.   And a lot of them?
11:42:09   18    A.   A lot of them?
11:42:10   19    Q.   Uhm-hmm.
11:42:11   20    A.   Yes.
11:42:14   21    Q.   And so notwithstanding your conscience, which I
11:42:22   22    don't doubt you have a conscience --
11:42:24   23               THE COURT:  Stop the editorial, just ask the
11:42:25   24    question.
11:42:26   25               MR. MINGOLLA:  Sorry.
```

| | | |
|---|---|---|
| 11:42:27 | 1 | BY MR. MINGOLLA: |
| 11:42:27 | 2 | Q.   You -- it was in your best interest, you felt, to |
| 11:42:36 | 3 | cooperate in this investigation, correct? |
| 11:42:38 | 4 | MS. LAKE:  Objection.  Asked and answered. |
| 11:42:40 | 5 | THE COURT:  Overruled. |
| 11:42:43 | 6 | THE WITNESS:  Yes. |
| 11:42:43 | 7 | BY MR. MINGOLLA: |
| 11:42:50 | 8 | Q.   And to that end you signed a plea agreement which |
| 11:42:56 | 9 | the government has marked as Exhibit -- |
| 11:43:02 | 10 | MR. MINGOLLA:  Just a second, please. |
| 11:43:02 | 11 | BY MR. MINGOLLA: |
| 11:43:12 | 12 | Q.   -- which the government has marked -- you signed a |
| 11:43:14 | 13 | plea agreement on December the 16th of 2013, you signed |
| 11:43:22 | 14 | a plea agreement, correct? |
| 11:43:23 | 15 | A.   I don't remember the date, but yes, I signed a plea |
| 11:43:23 | 16 | agreement. |
| 11:43:26 | 17 | Q.   And that would be, for the record, Government's |
| 11:43:30 | 18 | Exhibit 88a.  And that agreement was signed by, to the |
| 11:43:45 | 19 | best of your recollection, Mr. Lindquist, correct? |
| 11:43:50 | 20 | A.   I think so, yes. |
| 11:43:51 | 21 | Q.   And Prosecutor Lake, correct? |
| 11:43:56 | 22 | A.   I don't remember all the signatures on it, but |
| 11:44:01 | 23 | there was a few -- |
| 11:44:04 | 24 | MS. LAKE:  Objection.  Relevance, Your Honor. |
| 11:44:06 | 25 | THE COURT:  Overruled. |

11:44:07  1    BY MR. MINGOLLA:

11:44:07  2    Q.   And do you recall signing your own name to it?

11:44:11  3    A.   Yes.  I just said that.

11:44:15  4    Q.   And do you remember your attorney signing it?

11:44:17  5    A.   Yes.

11:44:24  6    Q.   Okay.  Now that was, as we've established -- or

11:44:28  7    maybe we haven't.  That was on or about December 16th,

11:44:34  8    2013, correct?

11:44:34  9    A.   I don't remember the date.

11:44:35  10   Q.   Well, if I told you that it was December 16th,

11:44:39  11   would you disagree?

11:44:40  12             THE COURT:  Let's move on.  He says he doesn't

11:44:43  13   remember the date.

11:44:44  14        Next question.

11:44:49  15   BY MR. MINGOLLA:

11:44:50  16   Q.   Now, curiously on the same day you signed another

11:44:58  17   plea agreement, did you not, which is Government's

11:45:03  18   Exhibit 88b.  Do you recall signing it?

11:45:11  19   A.   I don't recall the date.  I saw the agreements,

11:45:15  20   yes, but I don't remember the dates.

11:45:17  21   Q.   But you agree there was a second plea agreement?

11:45:19  22   A.   I know there was a supplemental, yes.

11:45:23  23   Q.   Uhm-hmm.  And isn't it true that you signed this --

11:45:44  24   just a second.

11:45:46  25        Isn't it true that you signed this second plea

11:45:48  1   agreement because you were being pressured to implicate

11:45:58  2   certain individuals which you had not implicated, and

11:46:06  3   that unless you did implicate them, then the first plea

11:46:12  4   bargain would be out the window and would no longer be

11:46:17  5   relevant or no longer be employed or used, or whatever?

11:46:26  6   A.   No, not -- no.

11:46:29  7   Q.   Isn't it true that you signed the second agreement

11:46:34  8   after it was pointed out to you that maybe you should

11:46:37  9   refresh your memory a little bit and try and include

11:46:43  10  other individuals in your -- in the -- to the

11:46:51  11  investigators?

11:46:52  12  A.   No, Attorney.

11:46:59  13  Q.   You're a law enforcement officer, have been for a

11:47:02  14  long time.  I know you're not a lawyer, but you are

11:47:04  15  familiar with plea agreements, right?

11:47:09  16  A.   I --

11:47:09  17  Q.   You know what a plea agreement is, obviously,

11:47:13  18  right?

11:47:13  19  A.   Somewhat, yes.

11:47:19  20  Q.   And you're aware of the fact that it's rather

11:47:22  21  unusual to sign two plea agreements on the same day, are

11:47:26  22  you not?

11:47:27  23          MS. LAKE:  Objection.  Relevance.

11:47:28  24          THE COURT:  Sustained.

11:47:29  25          THE WITNESS:  I --

| | | |
|---|---|---|
| 11:47:30 | 1 | THE COURT:  Stop. |
| 11:47:31 | 2 | Next question. |
| 11:47:39 | 3 | BY MR. MINGOLLA: |
| 11:47:39 | 4 | Q.   You were -- isn't it true that after you signed the |
| 11:47:45 | 5 | first one, the government was not happy with the |
| 11:47:51 | 6 | information that you were providing; and after you |
| 11:48:00 | 7 | agreed to provide information that they wanted, that's |
| 11:48:05 | 8 | when the supplemental agreement, plea agreement was |
| 11:48:10 | 9 | signed? |
| 11:48:11 | 10 | A.   No. |
| 11:48:14 | 11 | Q.   And was it suggested to you -- I'm not saying |
| 11:48:19 | 12 | guaranteed -- was it suggested to you by your attorney |
| 11:48:32 | 13 | that this would benefit you? |
| 11:48:34 | 14 | MS. LAKE:  Objection, Your Honor. |
| 11:48:35 | 15 | THE COURT:  Sustained. |
| 11:48:36 | 16 | BY MR. MINGOLLA: |
| 11:48:37 | 17 | Q.   Was it suggested to you by the government or -- |
| 11:48:41 | 18 | when I say "the government," I mean government agents or |
| 11:48:45 | 19 | members of the U.S. attorney's staff -- that by |
| 11:48:53 | 20 | cooperating you would receive benefits in terms of your |
| 11:48:56 | 21 | potential jail sentence? |
| 11:48:59 | 22 | A.   Yes. |
| 11:49:01 | 23 | Q.   So it wasn't just the fact that you have an acute |
| 11:49:04 | 24 | conscience.  It was the fact that you were desperate to |
| 11:49:08 | 25 | get your jail sentence, your potential jail sentence |

11:49:12  1   reduced by naming names?

11:49:20  2   A.   It was a fact for both.

11:49:22  3   Q.   I'm sorry?

11:49:23  4   A.   Both situations.

11:49:26  5   Q.   Okay.  But you certainly didn't want to go to

11:49:30  6   prison, correct?

11:49:32  7   A.   I know I was going to prison.

11:49:34  8   Q.   But you would obviously, logically, would have

11:49:42  9   preferred it be less, lesser than greater?

11:49:45  10   A.   Who wouldn't?

11:49:48  11   Q.   That's right.

11:49:50  12        MS. LAKE:  Objection.  Argumentative, Your

11:49:53  13   Honor.

11:49:53  14        THE COURT:  Overruled.

11:49:54  15   BY MR. MINGOLLA:

11:49:55  16   Q.   And do you know who -- do you know who made the --

11:50:32  17   strike that.

11:51:00  18        MR. MINGOLLA:  Just a minute, Judge, please?

11:51:02  19        THE COURT:  Yes.

11:51:22  20        (Counsel conferring).

11:51:41  21   BY MR. MINGOLLA:

11:51:41  22   Q.   I asked this yesterday of --

11:51:43  23        THE COURT:  Just ask the question.

11:51:50  24   BY MR. MINGOLLA:

11:51:50  25   Q.   -- Mr. Tapia, Agent Tapia -- or whatever his title,

| | | |
|---|---|---|
| 11:51:56 | 1 | Tapia -- policeman Tapia, DPNR Tapia -- |
| 11:52:07 | 2 | THE COURT:  Just ask the question, please. |
| 11:52:09 | 3 | BY MR. MINGOLLA: |
| 11:52:10 | 4 | Q.   -- testified yesterday that he would basically turn |
| 11:52:16 | 5 | in anybody to get a reduced sentence.  Isn't that the |
| 11:52:21 | 6 | same situation with you? |
| 11:52:22 | 7 | MS. LAKE:  Objection.  Relevance. |
| 11:52:25 | 8 | THE COURT:  Overruled. |
| 11:52:28 | 9 | THE WITNESS:  No. |
| 11:52:34 | 10 | BY MR. MINGOLLA: |
| 11:52:34 | 11 | Q.   And that that is the reason that you would |
| 11:52:43 | 12 | implicate my client amongst -- I won't say many other |
| 11:52:54 | 13 | people -- you say around four, I believe -- and that is |
| 11:53:03 | 14 | why you would implicate, not just Walter, Walter Hill, |
| 11:53:10 | 15 | your benefactor, as well as other individuals, correct? |
| 11:53:19 | 16 | A.   I don't understand the question. |
| 11:53:25 | 17 | Q.   Well, it's pretty simple.  Maybe I didn't phrase it |
| 11:53:30 | 18 | simply enough. |
| 11:53:33 | 19 | You would have turned anyone in, or implicated |
| 11:53:38 | 20 | anybody, to get a lesser sentence, correct? |
| 11:53:44 | 21 | A.   No, Attorney.  There is nobody in the process that |
| 11:53:49 | 22 | I didn't use in my proffer that -- it wasn't simple.  I |
| 11:53:53 | 23 | did a proffer and proved my proffer.  That's it. |
| 11:53:55 | 24 | Q.   How many proffers did you make? |
| 11:53:58 | 25 | A.   Two. |

11:53:58    1    Q.    I'm not sure the jury knows what a proffer is?

11:54:02    2              MS. LAKE:  Objection.  Argumentative, Your

11:54:05    3    Honor.

11:54:05    4              THE COURT:  It's not argumentative, but, no,

11:54:09    5    ask your next question.

11:54:10    6    BY MR. MINGOLLA:

11:54:10    7    Q.    What's a proffer?

11:54:11    8    A.    It's -- my understanding is a meeting with the

11:54:17    9    prosecutor and the investigating agents --

11:54:20   10              THE COURT:  All right.  Next question.

11:54:33   11              MR. MINGOLLA:  I think that's about it, Judge.

11:54:35   12    Just give me one second, please.

11:55:05   13    BY MR. MINGOLLA:

11:55:05   14    Q.    Isn't it true that you were just as interested as

11:55:12   15    to what the government might have on you that you would,

11:55:27   16    you would question my client, your good friend, as to

11:55:32   17    what he had heard about, you know, on the street, let's

11:55:36   18    say, about your situation?

11:55:43   19    A.    Then I wouldn't need a wire.

11:55:50   20    Q.    But you still wanted to know what he heard?

11:55:55   21    A.    No.

11:56:02   22    Q.    Are you trying to tell us that you didn't ask him

11:56:05   23    anything about what he heard concerning your situation?

11:56:08   24    A.    When?

11:56:09   25    Q.    On these disks?  In that conversation?

11:56:14   1    A.   All the disks reflected is what I said in my

11:56:18   2    proffer, nothing else.

11:56:28   3              MR. MINGOLLA:   Okay.   Thank you.   No more

11:56:29   4    questions.

11:56:30   5              THE COURT:   Thank you, Attorney Mingolla.

11:56:33   6         Attorney Watlington.

11:56:36   7              MR. WATLINGTON:   Yes, Your Honor.   I think if I

11:56:39   8    ask him questions, it would not be --

11:56:42   9              THE COURT:   Do you have any questions?

11:56:44   10             MR. WATLINGTON:   I think I have two or three.

11:56:49   11             THE COURT:   All right.   Come to sidebar.

11:56:57   12        (Sidebar discussion held as follows:)

11:57:01   13             MR. WATLINGTON:   Let me say, let me say --

11:57:03   14             THE COURT:   Do you have a question?

11:57:04   15             MR. WATLINGTON:   Yes, yes.

11:57:05   16             THE COURT:   This is evidence that doesn't

11:57:06   17    pertain to your client.

11:57:07   18             MR. WATLINGTON:   Yes, what -- ready for me,

11:57:12   19    Judge?

11:57:13   20             THE COURT:   Yes, go ahead.

11:57:16   21             MR. WATLINGTON:   I believe Joey and John is

11:57:19   22    John Lynch, Jr.   I want to ask him if he knows about,

11:57:24   23    that John Lynch, Jr., and Tapia were drug dealing

11:57:29   24    associates.

11:57:30   25             THE COURT:   No, I don't think I allowed --

```
11:57:32   1    why --
11:57:34   2           MR. WATLINGTON:  Because Tapia said he
11:57:35   3    doesn't -- that's not so.  And I believe if this witness
11:57:39   4    can implicate --
11:57:40   5           THE COURT:  Whether he knows if they were drug
11:57:42   6    dealers?  No, that's not conclusive -- no, I'm not going
11:57:46   7    to allow that.
11:57:47   8           MR. WATLINGTON:  I would just like to have my
11:57:49   9    objection noted for the record.
11:57:50  10           THE COURT:  That was your one question?
11:57:52  11           MR. WATLINGTON:  That's the nature of my
11:57:54  12    question.
11:57:54  13           THE COURT:  Whether he knows John Lynch is a
11:57:57  14    drug dealer?
11:57:57  15           MR. WATLINGTON:  No, no, no.  Whether he knows
11:57:59  16    if John Lynch and Tapia were associates in drug dealing.
11:58:04  17    Tapia said, no, he was not, his point of impact [sic]
11:58:07  18    when I asked him on direct examination.  I believe
11:58:11  19    that's a lie.  And in fact, I wanted to find out if he
11:58:15  20    knows.  And if anybody knows, he knows.
11:58:17  21           THE COURT:  And how would this person know?
11:58:21  22           MR. WATLINGTON:  From his associations from
11:58:24  23    Tapia and his conversations with Tapia.
11:58:26  24           THE COURT:  So he would know it by hearsay.
11:58:29  25           MR. WATLINGTON:  Maybe, but that's impeaching a
```

11:58:31   1    witness who specifically says no.  And he is telling

11:58:34   2    it -- he is saying that that same witness --

11:58:37   3             THE COURT:  It's still not clear how the answer

11:58:39   4    would avoid any hearsay problems.

11:58:41   5             MR. WATLINGTON:  Well, it goes --

11:58:42   6             THE COURT:  It is not a statement in

11:58:43   7    furtherance of a conspiracy, so it's not non-hearsay.

11:58:46   8    It is not an admission of a party opponent, so it's not

11:58:49   9    non-hearsay.  So tell me how it's not hearsay.

11:58:55  10             MR. WATLINGTON:  Because, in fact, Tapia said

11:58:57  11    he is not a point of impact -- a point of contact.  And

11:59:00  12    if he knows he was Tapia's point of contact, just like

11:59:02  13    he knows Hill was, Walter Hill was a person of contact,

11:59:10  14    then it would, in fact, in fact impeach Tapia.

11:59:13  15             THE COURT:  All right.  Well, I think I

11:59:14  16    understand your position.  I'm not persuaded by it,

11:59:18  17    though --

11:59:18  18             MR. WATLINGTON:  Okay.

11:59:19  19             THE COURT:  -- for several reasons,

11:59:23  20    significantly 403.

11:59:27  21             MR. WATLINGTON:  Okay.  Thank you.

11:59:28  22             THE COURT:  Is that the only question?

11:59:29  23             MR. WATLINGTON:  That was the only question.

11:59:31  24             THE COURT:  Okay.

11:59:32  25             MR. MINGOLLA:  Judge, I have something I must

| | | |
|---|---|---|
| 11:59:34 | 1 | simply point out, and I'll be quick. |
| 11:59:36 | 2 | THE COURT:  Lunch is going to be here.  So |
| 11:59:39 | 3 | you've rest- -- you've passed the witness, and then |
| 11:59:42 | 4 | we'll get to your issue. |
| 11:59:46 | 5 | MS. LAKE:  And then we have stipulations after |
| 11:59:48 | 6 | this. |
| 11:59:48 | 7 | THE COURT:  We'll get there. |
| 11:59:48 | 8 | (End of sidebar, open court as follows:) |
| 11:59:50 | 9 | THE COURT:  All right.  Attorney Watlington, no |
| 11:59:52 | 10 | questions other than the matter we discussed at sidebar? |
| 11:59:55 | 11 | MR. WATLINGTON:  No questions other than we |
| 11:59:57 | 12 | discussed at sidebar, Judge. |
| 11:59:58 | 13 | THE COURT:  Very good.  All right.  Any |
| 12:00:00 | 14 | redirect? |
| 12:00:06 | 15 | MS. LAKE:  Yes, Your Honor. |
| 12:00:07 | 16 | THE COURT:  All right. |
| 12:00:07 | 17 | REDIRECT EXAMINATION |
| 12:00:07 | 18 | BY MS. LAKE: |
| 12:00:08 | 19 | Q.   Just very briefly, Mr. Hill, do you recall Attorney |
| 12:00:10 | 20 | Mingolla asking you regarding you borrowing money from |
| 12:00:15 | 21 | Walter Hill? |
| 12:00:17 | 22 | A.   Yes. |
| 12:00:17 | 23 | BY MS. LAKE: |
| 12:00:17 | 24 | Q.   Can you please describe the circumstances of you |
| 12:00:20 | 25 | borrowing money from Walter Hill? |

12:00:24  1          MR. MINGOLLA:  I object, Your Honor.

12:00:27  2          THE COURT:  Okay.  Overruled.

12:00:30  3          THE WITNESS:  I had some financial difficulties

12:00:33  4     and I asked him to borrow some money, and he did.

12:00:35  5     BY MS. LAKE:

12:00:35  6     Q.   And what happened next?

12:00:38  7     A.   I owed him the money, and during discussions he

12:00:45  8     would, you know, talk about --

12:00:46  9          THE COURT:  All right.  Let's move on.  Next

12:00:48  10    question.

12:00:49  11    BY MS. LAKE:

12:00:49  12    Q.   What, if any, were the circumstances of you paying

12:00:51  13    Mr. Walter Hill back?

12:00:54  14         MR. MINGOLLA:  Again objection, Your Honor.

12:00:57  15    Relevance.

12:00:57  16         THE COURT:  Overruled.

12:01:01  17         THE WITNESS:  Mr. Tapia would take him to

12:01:06  18    Puerto Rico with cocaine.

12:01:07  19    BY MS. LAKE:

12:01:08  20    Q.   And what was the result of that?

12:01:11  21    A.   He did that, and he said that we were okay.

12:01:14  22    Q.   What does that mean?

12:01:15  23    A.   I didn't owe him any money.

12:01:22  24    Q.   And why would you not owe Walter Hill any money as

12:01:26  25    a result of that?

12:01:28  1          MR. MINGOLLA:  Calls for speculation, Your

12:01:29  2  Honor.  Objection.

12:01:30  3          THE COURT:  All right.  Sustained.

12:01:32  4  BY MS. LAKE:

12:01:32  5  Q.   Do you recall Attorney Mingolla asking you a

12:01:38  6  question regarding a statement on the recording?

12:01:42  7  Government's 86c-1, quote -- or paraphrasing, Fat Boy

12:01:48  8  trying to F you up.  Do you recall those questions?

12:01:52  9  A.   Yes.

12:01:52  10  Q.   And do you recall Attorney Mingolla asking you what

12:01:55  11  that meant?

12:01:56  12  A.   Yes.

12:01:57  13  Q.   What does that statement mean?  And as I

12:02:01  14  paraphrase, Fat Boy trying to F you up, what does that

12:02:05  15  statement mean?

12:02:08  16          MR. MINGOLLA:  Objection, Your Honor.  Calls

12:02:10  17  for speculation.

12:02:11  18          THE COURT:  All right.  Who is the person --

12:02:15  19  it's not clear who uttered it.  Are you asking what he

12:02:18  20  understands it or what he said?  It hasn't been

12:02:20  21  established who said the words, and whether it's an

12:02:22  22  understanding or whether it's his intention to convey

12:02:25  23  some message -- whether the witness' intention to convey

12:02:28  24  some message.

12:02:29  25

| | | |
|---|---|---|
| 12:02:29 | 1 | BY MS. LAKE: |
| 12:02:29 | 2 | Q.   Who made that statement? |
| 12:02:32 | 3 | A.   I think I made that statement. |
| 12:02:33 | 4 | Q.   And what did you -- what did you mean when you made |
| 12:02:38 | 5 | the statement, Fat Boy trying to F you up? |
| 12:02:44 | 6 | A.   Walter had informed me Fat Boy, somebody referred |
| 12:02:49 | 7 | to as his supplier, and that the seven kilos that he had |
| 12:02:56 | 8 | sold to Tapia needed to be replaced for the buyer in |
| 12:03:00 | 9 | Puerto Rico.  And there was some sort of dispute or |
| 12:03:04 | 10 | misunderstanding, because he was short in giving the |
| 12:03:11 | 11 | buyer in Puerto Rico the seven -- |
| 12:03:14 | 12 | MR. MINGOLLA:  I'm going to object on all of |
| 12:03:15 | 13 | this, Your Honor, as speculation. |
| 12:03:17 | 14 | THE COURT:  All right.  Overruled. |
| 12:03:19 | 15 | BY MS. LAKE: |
| 12:03:19 | 16 | Q.   And what else did Walter Hill say to you? |
| 12:03:23 | 17 | A.   I can't remember exactly all the recording, but he |
| 12:03:27 | 18 | was short -- |
| 12:03:28 | 19 | THE COURT:  All right.  You don't have to |
| 12:03:29 | 20 | repeat the recording. |
| 12:03:30 | 21 | Next question. |
| 12:03:31 | 22 | BY MS. LAKE: |
| 12:03:31 | 23 | Q.   And again -- and following up and finishing your |
| 12:03:35 | 24 | answer, what did you mean when you said Fat Boy trying |
| 12:03:39 | 25 | to F you up? |

```
12:03:41    1              MR. MINGOLLA:  Your Honor, asked and answered.
12:03:42    2        Objection.
12:03:44    3              THE COURT:  All right.  I think we've covered
12:03:47    4        this ground.
12:03:51    5           Do you have anything to add, Mr. Hill?
12:03:53    6        BY MS. LAKE:
12:03:54    7        Q.   Is there any --
12:03:55    8              THE COURT:  Let him answer my question.
12:03:57    9           Do you have anything to add to that question -- to
12:03:59   10        your answer to that question?
12:04:00   11              THE WITNESS:  Not really, Your Honor, just --
12:04:02   12              THE COURT:  All right.  Next question.
12:04:07   13              MS. LAKE:  Thank you.  Nothing further.
12:04:09   14              THE COURT:  All right.  Mr. Hill.  Thank you
12:04:11   15        for your testimony.
12:04:11   16           (Witness withdrew from stand.)
12:04:16   17              THE COURT:  Next witness.
12:04:19   18              MS. LAKE:  Your Honor, I would ask that
12:04:20   19        Mr. Hill be excused.
12:04:21   20              THE COURT:  Is there any need for Mr. Hill?
12:04:23   21              MR. MINGOLLA:  I would object to that.  I would
12:04:25   22        like Mr. Hill --
12:04:26   23              THE COURT:  All right.  He's not excused.
12:04:28   24              MR. MINGOLLA:  I'm sorry?
12:04:29   25              THE COURT:  He is not excused.
```

12:04:30  1          MR. MINGOLLA:  Thank you.

12:04:31  2          THE COURT:  You can leave.

12:04:36  3          MS. LAKE:  The government calls Fred Ott.

12:04:41  4          THE COURT:  All right.

12:04:59  5      Let me see counsel while we're waiting for Mr. Ott.

12:05:02  6      Come to sidebar.

12:05:05  7      (Sidebar discussion held as follows:)

12:05:05  8          THE COURT:  Is Mr. Ott someone whose testimony

12:05:10  9  is related to Mr. Hill only?

12:05:14  10          MR. WATLINGTON:  Yes.

12:05:15  11          MS. LAKE:  Yes, just the drugs, yes.

12:05:18  12          THE COURT:  He is the person who -- Attorney

12:05:22  13  Mingolla, you're on the record.  If I'm talking, try not

12:05:28  14  to.

12:05:28  15          MR. MINGOLLA:  I'm sorry, sir, I'm trying to --

12:05:30  16          THE COURT:  Well, let me finish.  Mr. Ott is

12:05:32  17  the person who received the contraband from --

12:05:36  18          MR. MINGOLLA:  Oh, that's right.

12:05:37  19          THE COURT:  Again, Attorney Mingolla, you've

12:05:39  20  got to try to refrain from --

12:05:41  21          MR. MINGOLLA:  I'll shut up.

12:05:43  22          THE COURT:  All right.  There is some testimony

12:05:46  23  on the record from Mark Joseph, I believe, and I believe

12:05:49  24  he turned the contraband over to Mr. Ott.  Is that

12:05:52  25  correct?

12:05:54  1          MS. LAKE:  Yes.

12:05:55  2          THE COURT:  All right.  Very good.  This should

12:05:56  3  be a short witness.

12:05:57  4          MS. LAKE:  Very short, Your Honor.

12:05:58  5      And if I can just say, the stipulation will

12:06:01  6  alleviate the need for any further witnesses in this

12:06:04  7  regard.  So it will just --

12:06:07  8          THE COURT:  So after Mr. Ott, do you want to

12:06:10  9  place a stipulation on the record?

12:06:12  10         MS. LAKE:  Please.

12:06:12  11         THE COURT:  Does that relate to Attorney

12:06:16  12  Watlington's client?

12:06:17  13         MR. WATLINGTON:  No, but I've signed it anyway.

12:06:19  14         THE COURT:  All right.  And then any other

12:06:20  15  witnesses after that?

12:06:22  16         MS. LAKE:  One final witness.

12:06:23  17         THE COURT:  What is that witness?

12:06:25  18         MS. LAKE:  Agent Grossman, just regarding a

12:06:28  19  toll analysis.  The stipulation --

12:06:32  20         THE COURT:  Does that -- who does that apply

12:06:34  21  to?  Both defendants?

12:06:40  22         MS. LAKE:  No, just Walter Hill.

12:06:41  23         THE COURT:  Okay.  Is there any more

12:06:43  24  information with respect to Attorney Watlington's

12:06:46  25  client?

12:06:46   1          MS. LAKE:  Not really, even though

12:06:49   2    Mr. Watlington did sign the stipulation to the drugs and

12:06:52   3    custodian of records.

12:06:54   4          THE COURT:  I want to know if I need to bring

12:06:55   5    in his jury now.  Is there anything that applies to --

12:06:59   6          MR. WATLINGTON:  I don't think so.

12:07:00   7          THE COURT:  Ott is going to testify about drugs

12:07:02   8    that were received, which is not the case with respect

12:07:03   9    to Mr. Brown.  The chemist is going to speak about the

12:07:05   10   test of those drugs, which do not apply -- append to

12:07:10   11   Mr. Brown.  And you have phone records.  Do those relate

12:07:15   12   to anything with Mr. Brown?

12:07:17   13         MS. LAKE:  No, Your Honor.

12:07:17   14         THE COURT:  Okay.  And that's your last

12:07:18   15   witness?

12:07:19   16         MS. LAKE:  Yes.  And the stipulation also is

12:07:22   17   custodian of records to the phone records, and that

12:07:25   18   again, to answer your question, does not relate to

12:07:27   19   Mr. Brown.

12:07:27   20         THE COURT:  Okay.  All right.

12:07:29   21      So when the government rests, it would rest as to

12:07:31   22   all defendants then?

12:07:32   23         MS. LAKE:  Yes, Your Honor.

12:07:33   24         THE COURT:  All right.  So we'll try to get

12:07:34   25   that testimony on very quickly, and then we will bring

| | | |
|---|---|---|
| 12:07:37 | 1 | the Panel A in.  You can rest in front of the jury. |
| 12:07:43 | 2 | I'll let them know what it means.  I'll hear you, send |
| 12:07:45 | 3 | them off to lunch, and then we'll resume. |
| 12:07:49 | 4 | MR. WATLINGTON:  Your Honor, is it all right |
| 12:07:50 | 5 | for me to step out into the bathroom while he's |
| 12:07:53 | 6 | testifying now? |
| 12:07:54 | 7 | THE COURT:  Well, why don't you step out now. |
| 12:07:56 | 8 | I don't like you to miss any of this. |
| 12:07:59 | 9 | MR. WATLINGTON:  Okay.  I don't -- because it's |
| 12:08:01 | 10 | not applicable to me at all. |
| 12:08:02 | 11 | THE COURT:  Notwithstanding, when you heard the |
| 12:08:04 | 12 | testimony of Mr. Hill you were thinking there were some |
| 12:08:08 | 13 | questions that you might want to ask. |
| 12:08:10 | 14 | MR. WATLINGTON:  Yes. |
| 12:08:11 | 15 | THE COURT:  So I don't want to promise your |
| 12:08:14 | 16 | client -- |
| 12:08:15 | 17 | MR. WATLINGTON:  But this is just chain of |
| 12:08:17 | 18 | custody for the clients that are in fact -- only for the |
| 12:08:21 | 19 | Hills -- |
| 12:08:21 | 20 | THE COURT:  Why don't you do this.  You can |
| 12:08:24 | 21 | step out during the stipulation -- well, actually, no, I |
| 12:08:26 | 22 | need you for the stipulation.  Why don't you -- |
| 12:08:29 | 23 | MR. WATLINGTON:  I just don't want to hold up |
| 12:08:33 | 24 | everything -- |
| 12:08:33 | 25 | THE COURT:  Can you hold off for a few minutes? |

| | | |
|---|---|---|
| 12:08:36 | 1 | MR. WATLINGTON:  Yes.  No problem, Judge. |
| 12:08:44 | 2 | (End of sidebar, open court as follows:) |
| 12:08:45 | 3 | THE COURT:  All right. |
| 12:08:52 | 4 | THE CLERK:  Please step into the witness box. |
| 12:08:57 | 5 | (Witness sworn.) |
| 12:08:58 | 6 | THE WITNESS:  I do. |
| 12:08:58 | 7 | THEREUPON, FRED OTT, having been duly sworn, |
| 12:09:00 | 8 | was examined and testified as follows: |
| 12:09:00 | 9 | DIRECT EXAMINATION |
| 12:09:01 | 10 | BY MS. LAKE: |
| 12:09:07 | 11 | Q.   Good morning, Mr. Ott. |
| 12:09:08 | 12 | A.   Good morning. |
| 12:09:10 | 13 | Q.   Who do you work for? |
| 12:09:11 | 14 | A.   The Drug Enforcement Administration. |
| 12:09:13 | 15 | Q.   And -- |
| 12:09:15 | 16 | THE COURT:  Do you want to ask the witness his |
| 12:09:17 | 17 | name? |
| 12:09:17 | 18 | MS. LAKE:  I apologize. |
| 12:09:18 | 19 | BY MS. LAKE: |
| 12:09:19 | 20 | Q.   Please state your name for the record. |
| 12:09:20 | 21 | A.   My name is Fred Ott, O-t-t. |
| 12:09:25 | 22 | Q.   And Fred is common? |
| 12:09:26 | 23 | A.   It is. |
| 12:09:27 | 24 | Q.   Who do you work for? |
| 12:09:28 | 25 | A.   I work for the Drug Enforcement Administration or |

12:09:30  1    DEA.

12:09:30  2    Q.   And where are you assigned?

12:09:33  3    A.   Right now I'm assigned to the Mobile, Alabama,

12:09:36  4    resident office.

12:09:36  5    Q.   And before that where were you assigned?

12:09:38  6    A.   I was assigned to the St. Thomas resident office

12:09:40  7    from June of 2010 to June of 2013.

12:09:43  8    Q.   And how long have you been, have you worked for law

12:09:46  9    enforcement?

12:09:46  10   A.   I've been in law enforcement for 20 years.

12:09:49  11   Q.   And are you a special agent?

12:09:53  12   A.   I am.

12:09:53  13   Q.   And Agent Ott, what is your, if any, was your

12:09:56  14   involvement in the Roberto Tapia investigation?

12:09:59  15   A.   I was involved with some surveillances and arrests,

12:10:03  16   but also as the drug evidence custodian and non-drug

12:10:07  17   evidence custodian.

12:10:08  18   Q.   And what, if -- directing your attention to

12:10:12  19   May 17th, 2013, what, if any, involvement did you have

12:10:17  20   regarding items that were seized on May 17th, 2013?

12:10:21  21   A.   I placed some drug and non-drug evidence that were

12:10:26  22   seized on May 17th, placed them into evidence.

12:10:29  23   Q.   And directing your attention to what's been

12:10:32  24   received into evidence as Government's Exhibit 80h, as

12:10:36  25   in Harry, do you see this on the screen in front of you?

12:10:40  1    A.    I do.

12:10:41  2         MS. LAKE:  And this has been received into

12:10:43  3    evidence, Your Honor.  I ask that it be published to the

12:10:48  4    jury.

12:10:48  5    BY MS. LAKE:

12:10:52  6    Q.    What is Government's Exhibit 80h?

12:10:53  7    A.    It is seven kilograms of cocaine and a green and

12:10:57  8    black backpack that were seized from Mr. Tapia on the

12:11:02  9    17th.

12:11:03  10   Q.    What, if anything, did you do with these items?

12:11:05  11   A.    These items were later turned over to me as the

12:11:08  12   drug evidence custodian.  I kept them in the vault in

12:11:10  13   the St. Thomas office, and later mailed them out to our

12:11:13  14   lab.

12:11:14  15   Q.    And showing you what's been marked as --

12:11:21  16        THE COURT:  Why don't you take the box up to

12:11:23  17   the witness stand, leave it there and then examine from

12:11:26  18   the lectern.

12:11:28  19        MS. LAKE:  May I approach?

12:11:29  20        THE COURT:  Yes.

12:11:33  21     Agent Ott, you can place the box down.

12:11:36  22        THE WITNESS:  Down.  Yes, sir.  Like down on

12:11:39  23   the floor?

12:11:40  24        THE COURT:  Yes.

12:11:42  25        THE WITNESS:  Okay.

12:11:42   1          THE COURT:  Go ahead.

12:11:42   2          (Government's Exhibit 80a marked for

12:11:43   3      identification.)

12:11:43   4      BY MS. LAKE:

12:11:43   5      Q.   What is Government's Exhibit 80a?

12:11:48   6      A.   80a is the box that I have here, right?

12:11:51   7      Q.   Do you see something on top of the box, in terms of

12:11:54   8      sticker?

12:11:54   9      A.   Yes.  I'm sorry, I see it.  This is the box that

12:11:58   10     the cocaine was mailed to our lab in.

12:12:01   11     Q.   And what's the relationship between Government's

12:12:04   12     Exhibit 80a and the photograph you just viewed,

12:12:07   13     Government's Exhibit 80h?

12:12:08   14     A.   The cocaine itself was placed into this box and

12:12:11   15     mailed to our lab.

12:12:12   16     Q.   And how do you know that?

12:12:14   17     A.   Because I mailed them.

12:12:15   18     Q.   And are any initials on that box?

12:12:17   19     A.   There are.  Mine.

12:12:21   20     Q.   And so that's the same?

12:12:24   21     A.   Yes.

12:12:24   22          MS. LAKE:  And thank you.  I have nothing

12:12:25   23     further, Your Honor.

12:12:26   24          THE COURT:  Were you going to inquire about the

12:12:27   25     contents of the box?

12:12:28  1    BY MS. LAKE:

12:12:28  2    Q.   What are the contents of the box, Agent Ott?

12:12:30  3    A.   The contents of the box were the seven kilograms of

12:12:33  4    cocaine that were seized from Mr. Tapia; not the

12:12:36  5    backpack, but the cocaine.

12:12:38  6              MS. LAKE:  And may I open -- may I ask Agent

12:12:42  7    Ott to open it for the jury?

12:12:43  8              THE COURT:  Yes, go ahead.

12:12:45  9    BY MS. LAKE:

12:12:45  10   Q.   Agent Ott, is there a way for you to open the box?

12:12:48  11   A.   I'm going to need like a knife or something to cut

12:12:52  12   the tape.

12:12:53  13             MS. LAKE:  May I have a moment, Your Honor?

12:12:55  14             MR. MINGOLLA:  Do you have a key --

12:12:56  15             THE COURT:  Attorney Mingolla, you'll have a

12:12:59  16   chance to examine the witness, so please be quiet.  You

12:13:13  17   can examine the witness.

12:13:15  18        Ms. Brann, can you give him the scissors?

12:13:17  19             THE WITNESS:  Thank you.

12:13:18  20   BY MS. LAKE:

12:13:18  21   Q.   Agent Ott, can you please describe for the record

12:13:20  22   what you are doing?

12:13:21  23   A.   Okay.  I'm actually -- we seize these -- when we

12:13:25  24   submit the boxes we put tape around the box, so we can

12:13:29  25   realize if it's been tampered with or not.  So I'm

12:13:36  1    having to cut the seal.

12:13:38  2    Q.   Please do that.

12:13:39  3    A.   Okay.

12:14:05  4         Okay.  It's opened.

12:14:06  5    Q.   What are the contents of Government's Exhibit 80a?

12:14:10  6    A.   The contents are three self-sealing evidence

12:14:16  7    envelopes.

12:14:16  8    Q.   And what do those three envelopes contain?

12:14:20  9    A.   They contain kilograms of cocaine, opened.

12:14:25 10    Q.   And what are they?  How -- what exactly are they?

12:14:29 11    A.   It's the -- these are the seven kilograms of

12:14:39 12    cocaine that were seized from Mr. Tapia.

12:14:41 13         MS. LAKE:  Your Honor, I would ask that

12:14:43 14    Government's Exhibit 80a be published to the jury.

12:14:45 15         THE COURT:  Do you want to move it into

12:14:46 16    evidence first?

12:14:47 17         MS. LAKE:  I ask that Government's Exhibit 80a

12:14:50 18    be received into evidence.

12:14:51 19         THE COURT:  Attorney Mingolla?

12:14:54 20         MR. MINGOLLA:  No objection.  No objection.

12:14:58 21         THE COURT:  Attorney Watlington.

12:14:59 22         MR. WATLINGTON:  No objection, Your Honor.

12:15:00 23         THE COURT:  It's 80a, like apple?

12:15:04 24         MS. LAKE:  A like apple, yes, Your Honor.

12:15:07 25         THE COURT:  80a, apple, is admitted.

| | | |
|---|---|---|
| 12:15:10 | 1 | (Government's Exhibit 80a admitted into evidence.) |
| 12:15:10 | 2 | MS. LAKE:  I would ask this be published to the |
| 12:15:12 | 3 | jury. |
| 12:15:12 | 4 | THE COURT:  Yes. |
| 12:15:14 | 5 | BY MS. LAKE: |
| 12:15:15 | 6 | Q.    Agent Ott -- |
| 12:15:16 | 7 | THE COURT:  You can place it on the table now, |
| 12:15:18 | 8 | Agent Ott.  You can show it to the jury.  Put the box |
| 12:15:43 | 9 | down -- |
| 12:15:43 | 10 | MR. MINGOLLA:  Your Honor, the -- |
| 12:15:44 | 11 | THE COURT:  Agent Ott, you can put the box |
| 12:15:46 | 12 | down. |
| 12:15:46 | 13 | THE WITNESS:  Put the box down? |
| 12:15:50 | 14 | MR. MINGOLLA:  Your Honor, could the defense |
| 12:15:51 | 15 | have a glance at that, as well as the jury? |
| 12:15:54 | 16 | THE COURT:  All right. |
| 12:15:55 | 17 | Any questions, Attorney Lake? |
| 12:15:56 | 18 | MS. LAKE:  No further questions, Your Honor. |
| 12:15:58 | 19 | Thank you. |
| 12:15:58 | 20 | THE COURT:  All right.  Attorney Mingolla? |
| 12:15:58 | 21 | MR. MINGOLLA:  Just a couple questions. |
| 12:16:06 | 22 | First off, may I approach and just see what this |
| 12:16:11 | 23 | is? |
| 12:16:11 | 24 | THE COURT:  You wish to retrieve the exhibits |
| 12:16:14 | 25 | for examination? |

12:16:15  1            MR. MINGOLLA:  Can I look at it right up there?

12:16:17  2  I don't have to take it back to the table there.

12:16:19  3            THE COURT:  Why don't you start your

12:16:21  4  examination, and then we'll get it --

12:16:21  5            MR. MINGOLLA:  All right.

12:16:21  6                    CROSS-EXAMINATION

12:16:21  7  BY MR. MINGOLLA:

12:16:27  8  Q.    Agent Ott, where is the lab?

12:16:28  9  A.    It's in Miami, Florida.

12:16:31  10  Q.    And isn't it true that these exhibits got sent to

12:16:36  11  Wyoming first, and then ended up in Miami, Florida?

12:16:39  12  A.    I don't believe they were.

12:16:43  13  Q.    And you're telling us that these are the exact

12:16:52  14  kilos of cocaine that were picked up in this

12:16:56  15  investigation?

12:16:57  16  A.    They're the unwrapped kilos.

12:17:02  17  Q.    These are the wrapping?

12:17:03  18  A.    Yes.

12:17:03  19            MR. MINGOLLA:  Again, Your Honor, can I just --

12:17:05  20  that's the questions.  But I would like to --

12:17:09  21            THE COURT:  All right.  I would -- yes, you can

12:17:11  22  put them in the box, Agent Ott.

12:17:13  23      You can take the box and take it with you, Attorney

12:17:16  24  Mingolla.

12:17:17  25      Put the exhibits into the box.

| | | |
|---|---|---|
| 12:17:18 | 1 | And Attorney Mingolla, you can approach, retrieve |
| 12:17:21 | 2 | the box if you wish to. |
| 12:17:26 | 3 | MR. MINGOLLA:  Thank you, Judge. |
| 12:17:35 | 4 | THE COURT:  Attorney Mingolla, you can take the |
| 12:17:37 | 5 | box and go back to the lectern. |
| 12:17:39 | 6 | MR. MINGOLLA:  Oh, I'm sorry. |
| 12:18:05 | 7 | (Pause) |
| 12:18:15 | 8 | MR. MINGOLLA:  Is there any reason -- may I |
| 12:18:18 | 9 | place this over here? |
| 12:18:20 | 10 | THE COURT:  You put it on the floor by the |
| 12:18:21 | 11 | lectern, so you can use it if you need to during your |
| 12:18:24 | 12 | examination. |
| 12:18:24 | 13 | MR. MINGOLLA:  I don't really need to use it |
| 12:18:26 | 14 | during my exam.  I just have one question. |
| 12:18:26 | 15 | BY MR. MINGOLLA: |
| 12:18:29 | 16 | Q.   This is not the form in which -- let me rephrase. |
| 12:18:33 | 17 | You say you unwrapped them? |
| 12:18:35 | 18 | A.   The lab unwrapped them. |
| 12:18:37 | 19 | Q.   Okay.  And what I'm seeing here is just bits and |
| 12:18:45 | 20 | pieces of things, which I've stipulated that the |
| 12:18:49 | 21 | chemist -- we've stipulated -- |
| 12:18:51 | 22 | THE COURT:  All right.  Let's -- just ask the |
| 12:18:57 | 23 | question. |
| 12:18:57 | 24 | BY MR. MINGOLLA: |
| 12:18:59 | 25 | Q.   Why aren't these in brick form?  Why are they all |

12:19:04   1   broken up into shards?

12:19:06   2   A.   They're still in brick form.   Some are broken, I

12:19:09   3   assume after analysis.

12:19:12   4   Q.   And how long did it take to have that analysis

12:19:14   5   done?

12:19:14   6   A.   I don't know.

12:19:17   7   Q.   And is this the same lab that you always use?

12:19:20   8   A.   It is.

12:19:21   9   Q.   In Miami?

12:19:22   10   A.   It is.

12:19:23   11   Q.   And forgive me, but whose lab is it?

12:19:26   12   A.   It's the DEA lab.

12:19:29   13        MR. MINGOLLA:  Okay.  Okay.  No further

12:19:31   14   questions, Judge.

12:19:32   15        THE COURT:  Agent Ott, thank you -- I'm sorry.

12:19:36   16   Any questions, Attorney Watlington?

12:19:37   17        MR. WATLINGTON:  No, Your Honor.

12:19:38   18        THE COURT:  Any redirect?

12:19:39   19        MS. LAKE:  No, Your Honor.

12:19:40   20        THE COURT:  Agent Ott, thank you for your

12:19:41   21   testimony.

12:19:41   22      You may step down.

12:19:42   23        THE WITNESS:  Thank you, sir.  Am I dismissed?

12:19:44   24        THE COURT:  Is there any need for Agent Ott?

12:19:46   25        MS. LAKE:  No, Your Honor.  I ask that he be

| | | |
|---|---|---|
| 12:19:47 | 1 | excused. |
| 12:19:48 | 2 | MR. MINGOLLA:  No objection, Judge. |
| 12:19:50 | 3 | THE COURT:  Attorney Watlington, any further |
| 12:19:52 | 4 | need for Agent Ott? |
| 12:19:54 | 5 | MR. WATLINGTON:  No, Your Honor. |
| 12:19:55 | 6 | THE COURT:  You're excused. |
| 12:19:55 | 7 | (Witness withdrew from stand.) |
| 12:19:57 | 8 | THE COURT:  Next witness. |
| 12:19:58 | 9 | MS. LAKE:  Your Honor, we have a stipulation. |
| 12:20:05 | 10 | THE COURT:  All right.  You can place it on the |
| 12:20:10 | 11 | record. |
| 12:20:11 | 12 | MS. LAKE:  Thank you, Your Honor. |
| 12:20:13 | 13 | All parties have stipulated that DEA Forensic |
| 12:20:18 | 14 | Chemist Carolyn Hudson received and analyzed |
| 12:20:20 | 15 | Government's Exhibit 80a, and determined it to be |
| 12:20:23 | 16 | cocaine hydrochloride weighing 7,003 grams. |
| 12:20:26 | 17 | Next, all parties -- |
| 12:20:28 | 18 | THE COURT:  Hold on.  That's one stipulation. |
| 12:20:32 | 19 | All right.  Is that your understanding of the |
| 12:20:34 | 20 | stipulation, Attorney Mingolla? |
| 12:20:36 | 21 | MR. MINGOLLA:  Sir? |
| 12:20:37 | 22 | THE COURT:  Is that your -- |
| 12:20:38 | 23 | MR. MINGOLLA:  No, I don't object to that |
| 12:20:40 | 24 | stipulation. |
| 12:20:40 | 25 | THE COURT:  All right.  Attorney Watlington, is |

12:20:42    1    that your understanding?

12:20:42    2                 MR. WATLINGTON:  Yes, Your Honor.

12:20:43    3                 THE COURT:  All right.  Ladies and gentlemen, a

12:20:46    4    stipulation is an agreement between two parties in a

12:20:49    5    case, or parties to a case.  In this case there is a

12:20:52    6    stipulation among and between the parties to a fact.

12:20:56    7    And the fact that they have stipulated to or agreed to

12:21:00    8    is that the substance that is Exhibit 80a is cocaine

12:21:08    9    hydrochloride.  They've also stipulated to the weight of

12:21:11   10    that, that it's in excess of 7,000 grams or in excess of

12:21:17   11    7 kilos.

12:21:17   12          All right.  Is there another stipulation?

12:21:20   13                 MS. LAKE:  Yes, Your Honor.

12:21:20   14          (Government's Exhibits 85a, 85b, 85c marked for

12:21:20   15    identification.)

12:21:21   16                 MS. LAKE:  All parties stipulate that the

12:21:24   17    documents contained in Government's Exhibits 85a, 85b

12:21:32   18    and 85c, telephone records, are true and accurate

12:21:35   19    records made at or near the time of the occurrence set

12:21:39   20    forth by a person with knowledge, were made and kept by

12:21:42   21    the company in the regular course of company business

12:21:46   22    activity, and it was a regular practice of the company

12:21:49   23    to make and keep such documents.

12:21:51   24                 THE COURT:  That's 85a, b and c?

12:21:56   25                 MS. LAKE:  Yes, Your Honor.

| | | |
|---|---|---|
| 12:21:59 | 1 | THE COURT:  That's a stipulation to |
| 12:22:00 | 2 | authenticity.  What about the relevance? |
| 12:22:05 | 3 | MS. LAKE:  That will be the next witness, Your |
| 12:22:08 | 4 | Honor. |
| 12:22:08 | 5 | THE COURT:  All right.  So it's just |
| 12:22:09 | 6 | authenticity.  All right. |
| 12:22:10 | 7 | Same instruction with respect to the stipulation. |
| 12:22:15 | 8 | There's a stipulation to Exhibits 85a, 85b and 85c, with |
| 12:22:21 | 9 | respect to those terms that were outlined by the |
| 12:22:23 | 10 | government. |
| 12:22:23 | 11 | Is there any objection to that, Attorney Mingolla? |
| 12:22:27 | 12 | MR. MINGOLLA:  No, sir. |
| 12:22:28 | 13 | THE COURT:  Attorney Watlington? |
| 12:22:29 | 14 | MR. WATLINGTON:  No, Your Honor. |
| 12:22:30 | 15 | THE COURT:  All right.  Next witness. |
| 12:22:33 | 16 | MS. LAKE:  The government calls agent Michael |
| 12:22:35 | 17 | Grossman. |
| 12:23:30 | 18 | THE CLERK:  Please step into the witness box. |
| 12:23:37 | 19 | Please stand and raise your right hand to take the |
| 12:23:40 | 20 | oath. |
| 12:23:43 | 21 | (Witness sworn.) |
| 12:23:44 | 22 | THE WITNESS:  I do. |
| 12:23:44 | 23 | |
| 12:23:44 | 24 | |
| 12:23:46 | 25 | |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 12:23:46 | 1  |        THEREUPON, MICHAEL GROSSMAN, having been duly |
| 12:23:47 | 2  | sworn, was examined and testified as follows: |
| 12:23:47 | 3  |         DIRECT EXAMINATION |
| 12:23:48 | 4  | BY MS. LAKE: |
| 12:23:54 | 5  | Q.   Good afternoon -- or good morning -- or good |
| 12:23:56 | 6  | afternoon. |
| 12:23:56 | 7  | A.   Good afternoon. |
| 12:23:56 | 8  | Q.   Please state your name for the record. |
| 12:23:58 | 9  | A.   Michael Grossman. |
| 12:23:59 | 10 | Q.   Please spell your full name for the record. |
| 12:24:01 | 11 | A.   M-i-c-h-a-e-l, G-r-o-s-s-m-a-n. |
| 12:24:06 | 12 | Q.   And Agent Grossman, who do you work for? |
| 12:24:09 | 13 | A.   The Drug Enforcement Administration. |
| 12:24:11 | 14 | Q.   Is that commonly known as DEA? |
| 12:24:13 | 15 | A.   Yes. |
| 12:24:13 | 16 | Q.   And are you a special agent? |
| 12:24:16 | 17 | A.   Yes. |
| 12:24:16 | 18 | Q.   And where are you assigned? |
| 12:24:18 | 19 | A.   To the St. Thomas resident office. |
| 12:24:19 | 20 | Q.   And briefly describe some of your duties as a |
| 12:24:22 | 21 | special agent. |
| 12:24:23 | 22 | A.   To enforce federal drug laws. |
| 12:24:25 | 23 | Q.   And how long have you been an agent with DEA? |
| 12:24:29 | 24 | A.   Ten years. |
| 12:24:30 | 25 | Q.   And how long have you worked in law enforcement? |

12:24:32  1    A.    Ten years.

12:24:36  2    Q.    And can you -- were you involved in the Roberto

12:24:38  3    Tapia investigation?

12:24:39  4    A.    Yes, I was.

12:24:40  5    Q.    Can you briefly describe explain your involvement

12:24:44  6    in the Roberto Tapia investigation?

12:24:46  7    A.    I was involved in most of the aspects of the

12:24:48  8    investigation, to include surveillance, arrest, regular

12:24:53  9    enforcement activities, report writing, evidence

12:24:57  10   processing.

12:24:58  11   Q.    Does that include telephone data analysis?

12:25:02  12   A.    Yes, it did.

12:25:02  13   Q.    And what is that?

12:25:03  14   A.    That's when we analyze the telephone records of

12:25:07  15   those that are under investigation, and perhaps even

12:25:11  16   those they're in contact with.

12:25:13  17   Q.    And generally how do you do that?

12:25:16  18   A.    I generally -- well, we discover a telephone number

12:25:19  19   that an individual is using that is a target of the

12:25:22  20   investigation.  We'll typically order telephone tolls,

12:25:25  21   telephone subscriber reports on those devices and that,

12:25:29  22   that tells us who the phone is subscribed to, as well as

12:25:33  23   the activity of the phone, who they're in contact with

12:25:35  24   and such.

12:25:36  25   Q.    And now showing you what's been marked as

12:25:38  1    Government's Exhibit 85a.

12:26:05  2         Do you see Government's Exhibit 85a in front of

12:26:08  3    you?

12:26:08  4    A.   Yes, ma'am.

12:26:09  5    Q.   And showing you the top of the document?

12:26:13  6    A.   Yes.

12:26:13  7    Q.   Do you recognize this?

12:26:14  8    A.   Yes, I do.

12:26:15  9    Q.   And what is Government's Exhibit 85a?

12:26:17  10   A.   That's a telephone subscriber report from AT&T.

12:26:21  11   Q.   For whom?

12:26:22  12   A.   That's for telephone that's subscribed to the

12:26:25  13   number 340-690-7076.

12:26:30  14   Q.   And showing you the second part of Government's

12:26:34  15   Exhibit 85a, do you recognize that item?

12:26:37  16   A.   Yes, I do.

12:26:37  17   Q.   And what is Government's Exhibit 85a, part 2?

12:26:41  18   A.   That's a telephone toll record, and there in the

12:26:49  19   top left-hand corner you can see that's the telephone

12:26:52  20   toll record for a number assigned to a 340-690 -- I

12:26:58  21   think that says 1220.

12:27:05  22   Q.   And now showing you Government's Exhibit 85b.  Do

12:27:11  23   you see this in front of you?

12:27:15  24   A.   Yes, I do.

12:27:16  25   Q.   And showing you page 2 of that item.  Do you

12:27:20  1    recognize this?

12:27:21  2    A.   Yes.  That's telephone toll record for Sprint.

12:27:25  3    Q.   And for whom?  Or for what?

12:27:28  4    A.   It looks like it's the telephone toll records for

12:27:33  5    assigned 340-998-9189.

12:27:39  6    Q.   And now finally showing you Government's

12:27:47  7    Exhibit 85c.

12:27:49  8         Do you see that document in front of you?

12:27:51  9    A.   Yeah.  Can you scroll up there.

12:27:59  10   Q.   Do you recognize Government's Exhibit 85c?

12:28:01  11   A.   Yes.  That's a portion of the subscriber record.

12:28:05  12   And I'm having a hard time seeing the number, though.

12:28:09  13   Q.   And showing you page 2 of the document.

12:28:14  14        Do you see that in front of you?

12:28:15  15   A.   Yes.  This is just a continuation of the subscriber

12:28:18  16   record.

12:28:23  17   Q.   And showing you page -- I think page 10, do you see

12:28:32  18   that in front of you?

12:28:33  19   A.   Yes, I do.

12:28:33  20   Q.   And what is page 10 of Government's Exhibit 85c?

12:28:38  21   A.   That's the toll record for number 939-268-2857.

12:28:44  22   Q.   And have you seen these documents before?

12:28:46  23   A.   Yes, I have.

12:28:47  24   Q.   And of the phone numbers you've just testified to,

12:28:49  25   are you familiar with those phone numbers?

12:28:51  1    A.    Yes, I am.

12:28:51  2    Q.    And how are you familiar with them?

12:28:53  3    A.    They're assigned to the targets of this

12:28:56  4    investigation.

12:28:57  5    Q.    And what, if anything, did you do when you received

12:29:01  6    and reviewed these documents?

12:29:04  7    A.    Once I received them, myself and my intel analyst,

12:29:12  8    Janet Hines, placed them into our database that we have,

12:29:14  9    that we use at the DEA called PenLink.  And what PenLink

12:29:19  10   stores, it stores the telephone toll records as well as

12:29:22  11   the subscriber records.  And we're then able to see in a

12:29:25  12   simplified form which phones are in contact with one

12:29:29  13   another, the times of day, the duration of the call,

12:29:32  14   whether it's an incoming or outgoing call.

12:29:34  15        And you can run all sorts of various reports.  It

12:29:37  16   just sort of simplifies these toll records, because it

12:29:42  17   is rather monotonous, seeing all these phone records.

12:29:46  18   Q.    What did you do next?

12:29:48  19   A.    Myself and Agent Hines created a simplified chart

12:29:52  20   of the relevant data related to the events of May 17th,

12:29:56  21   2013, and May 18th, 2013, that showed us the telephone

12:30:01  22   contacts between the targets, Angelo Hill, Walter Hill,

12:30:04  23   Roberto Tapia, and the target that we knew at that time

12:30:07  24   as Pee Wee.

12:30:08  25   Q.    And showing you what's been marked as Government's

12:30:12   1     Exhibit 85a -- I'm sorry -- Government's Exhibit 85d-1.

12:30:12   2          (Government's Exhibit 85d-1 marked for

12:30:12   3     identification.)

12:30:12   4     BY MS. LAKE:

12:30:21   5     Q.   Do you see this in front of you?

12:30:22   6     A.   Yes, I do.

12:30:23   7     Q.   And what is Government's Exhibit 85d-1?

12:30:26   8     A.   That's a portion of the chart that we created to

12:30:28   9     sort of simplify the relevant data that I just

12:30:33   10    described.

12:30:33   11    Q.   Does it reflect a certain date?

12:30:35   12    A.   Yes.  This is the relevant telephone data for

12:30:38   13    May 17th, 2013.

12:30:38   14         (Government's Exhibit 85d-2 marked for

12:30:38   15    identification.)

12:30:40   16    BY MS. LAKE:

12:30:40   17    Q.   And showing you what's been marked as Government's

12:30:43   18    Exhibit 85d-2.

12:30:45   19         Do you recognize this item?

12:30:46   20    A.   I do.

12:30:46   21    Q.   And what is Government's Exhibit 85d-2?

12:30:49   22    A.   This is just a simplification of the form you just

12:30:53   23    showed me, that shows the actual telephone calls, the

12:30:56   24    duration, the times.  And this shows the amount of

12:30:58   25    contacts between the telephones that are assigned to the

12:31:01  1    various targets that I've described.

12:31:03  2    Q.   And how does the chart in Government's Exhibits

12:31:08  3    85d-1 and d-2, do they contain or relate -- how do they

12:31:11  4    contain or relate to the underlying information in

12:31:14  5    Government's Exhibit 85 --

12:31:18  6              MR. MINGOLLA:  Objection.

12:31:19  7              THE COURT:  Overruled.

12:31:20  8              THE WITNESS:  This is just a simplified chart

12:31:25  9    that shows you the number of calls between the

12:31:27  10   particular telephone devices.

12:31:30  11   BY MS. LAKE:

12:31:30  12   Q.   And does the correlation of these documents, 85d-1

12:31:37  13   and d-2, show information that cannot be conveniently

12:31:39  14   established by bringing the underlying records in Court?

12:31:42  15   A.   Well, it's certainly a simpler way of seeing it.

12:31:47  16   You can discover the same amount of data looking through

12:31:49  17   the toll records, but it's rather monotonous and time

12:31:53  18   consuming.

12:31:55  19   Q.   Would it be possible to conveniently analyze the

12:31:58  20   records in Government's Exhibit 85a, b and c in Court?

12:32:02  21   A.   Conveniently, yes.

12:32:03  22   Q.   Government's 85a, b and c, would it be convenient

12:32:07  23   for the Court -- the data in Government's Exhibit 85d-1

12:32:13  24   and d-2, is it a simplified way to conveniently review

12:32:17  25   the information and the relevant information in

12:32:19   1    Government's Exhibits 85a, b and c?

12:32:22   2    A.   Yes, it is.

12:32:23   3         MS. LAKE:  Your Honor, I would ask that

12:32:24   4    Government's Exhibit 85d-1 and d-2 be received into

12:32:29   5    evidence.

12:32:30   6         THE COURT:  Any objection, Attorney Mingolla?

12:32:32   7         MR. MINGOLLA:  Yes, I do have an objection.

12:32:34   8         THE COURT:  Attorney Watlington, any objection?

12:32:36   9         MR. WATLINGTON:  None, Your Honor.

12:32:37   10        THE COURT:  All right.  It's under advisement.

12:32:39   11   Next question.

12:32:40   12   BY MS. LAKE:

12:32:40   13   Q.   And can you please explain the information that's

12:32:42   14   contained in Government's Exhibit 85d-1 and d-2?

12:32:46   15   A.   Yes.  That's the, as I said earlier, the number of

12:32:51   16   telephone calls that are between the devices that were

12:32:54   17   used by Angelo Hill, Walter Hill, the target that we

12:32:58   18   knew as Pee Wee, who was Beltran, and Roberto Tapia on

12:33:03   19   May 17th throughout the day, the times that the phones

12:33:05   20   were in contact with one another, the duration of the

12:33:07   21   telephone call, whether it was an incoming or outgoing

12:33:12   22   call to the other person.

12:33:13   23   Q.   And what, if anything, did you determine based on

12:33:16   24   your analysis of Government's Exhibit 85a, b and c?

12:33:20   25   A.   Well, it just shows us who was talking to who on

12:33:23  1    that day, and what times.

12:33:24  2    Q.   And what is that information?

12:33:31  3    A.   It shows that on that day, May 17th, that the

12:33:34  4    telephone used by Roberto Tapia was in contact with the

12:33:37  5    phone used by Angelo Hill six times.  That that same

12:33:40  6    telephone used by Angelo Hill was in contact with the

12:33:43  7    telephone used by Walter Hill 12 times.  And that the

12:33:46  8    telephone used by Roberto Tapia was in contact with the

12:33:49  9    telephone used by Beltran 13 times.

12:33:53  10   Q.   And what is the significance of this information?

12:33:58  11   A.   Well, if you put this against the events that day,

12:34:02  12   as far as the surveillance that was conducted on Roberto

12:34:05  13   Tapia --

12:34:06  14             THE COURT:  No, no.

12:34:07  15             MR. MINGOLLA:  I would object to leading.

12:34:08  16             THE COURT:  Sustained.  It's not leading.

12:34:10  17        Next question.

12:34:10  18   BY MS. LAKE:

12:34:13  19   Q.   And what, if anything, happened on May 17th, 2013?

12:34:17  20   A.   That's when Roberto Tapia was surveyed going out on

12:34:20  21   his boat to meet with another vessel --

12:34:22  22             THE COURT:  Let's move on.  Next question.

12:34:25  23             MS. LAKE:  Thank you.  I have nothing further,

12:34:27  24   Your Honor.

12:34:27  25             Again, I would ask that Government's Exhibit 85d-1

12:34:30    1    and d-2 be received into evidence.

12:34:34    2              THE COURT:  Thank you.  It's under advisement.

12:34:36    3        Attorney Mingolla, any questions?

12:34:39    4              MR. MINGOLLA:  No.  No, Judge.

12:34:39    5              THE COURT:  Attorney Watlington?

12:34:41    6              MR. WATLINGTON:  No questions, Your Honor.

12:34:42    7              THE COURT:  Agent Grossman, thank you for your

12:34:43    8    testimony.

12:34:44    9        You may step down.

12:34:45   10              THE WITNESS:  Thank you, Judge.  Am I

12:34:46   11    dismissed?

12:34:47   12              THE COURT:  Attorney Mingolla, any need for

12:34:50   13    Agent Grossman?

12:34:50   14              MR. MINGOLLA:  No.

12:34:51   15              THE COURT:  Attorney Watlington?

12:34:52   16              MR. WATLINGTON:  None.

12:34:53   17              THE COURT:  You're excused.  Thank you.

12:34:53   18        (Witness excused.)

12:34:55   19              THE COURT:  Next witness?

12:34:57   20              MS. LAKE:  The government has no further

12:34:58   21    witnesses, Your Honor.

12:35:00   22              THE COURT:  Okay.

12:35:21   23        (Pause).

12:38:57   24        (Jury Panel A present.)

12:39:03   25              THE COURT:  Good afternoon.  Welcome back,

12:39:04  1    Panel A.

12:39:05  2         Let me explain something.  One of the reasons

12:39:08  3    Panel A was excused for the moment is because there were

12:39:11  4    certain things that pertained just to the defendant that

12:39:14  5    you will not be considering during your deliberations.

12:39:17  6    So that is why Panel A was excused for the moment.

12:39:21  7         At this point, I believe, does the government have

12:39:24  8    any further witnesses?

12:39:26  9              MS. LAKE:  No.  We just ask that Government's

12:39:30  10   Exhibit 85a, b and c be received into evidence.

12:39:33  11             THE COURT:  Notwithstanding that, the

12:39:34  12   government rests?

12:39:35  13             MS. LAKE:  Yes, Your Honor.

12:39:36  14             THE COURT:  All right.  Ladies and gentlemen,

12:39:37  15   the government rests.  That means that all the

12:39:40  16   government's evidence in its case-in-chief is now before

12:39:42  17   you.

12:39:42  18        There are some matters we need to tend to, but we

12:39:46  19   will tend to them after lunch.

12:39:47  20        So importantly, your lunch is here.  It is time for

12:39:51  21   lunch.  We will break for 1 hour and 20 minutes.

12:39:59  22        All right.  Enjoy your lunch.

12:40:02  23        (Juries out.)

12:40:35  24             THE COURT:  Does counsel want to be heard,

12:40:37  25   Attorney Mingolla?

12:40:40  1          MR. MINGOLLA:  Obviously you're not referencing

12:40:43  2    closing argument, so no, I have nothing to say, sir.

12:40:46  3          MR. WATLINGTON:  Yes, Your Honor.

12:40:47  4          THE COURT:  I'm sure you wish to make a

12:40:49  5    petition of some sort?

12:40:51  6          MR. MINGOLLA:  Well, there's an issue I wanted

12:40:53  7    to raise, and that's the following.  There's

12:40:56  8    information --

12:40:57  9          THE COURT:  Not that kind of motion -- let

12:40:59  10   me -- Attorney Watlington, you want to be heard?

12:41:02  11         MR. WATLINGTON:  Yes, Your Honor.

12:41:03  12         THE COURT:  Come to the lectern, please.

12:41:08  13         RULE 29 MOTIONS BY THE DEFENDANTS

12:41:08  14         MR. WATLINGTON:  Yes, Your Honor.  At this time

12:41:10  15   the Defendant Brown would make a motion for Rule 29 in

12:41:15  16   regards to Counts Number 4 through 29, in regards to the

12:41:20  17   use of the telephone in facilitating -- or electronic

12:41:27  18   device in facilitating a drug transaction.

12:41:29  19       Your Honor, I don't think there's been a prima

12:41:32  20   facie showing that the government has proven the counts

12:41:34  21   in Counts Number 4, 5, 6, 7, 8, 9, 10, specifically in

12:41:40  22   regards to the November 26, two telephone calls;

12:41:44  23   December 2, one; December 3rd, two; and December 6th,

12:41:51  24   two telephone calls, all being in the year 2012.

12:41:56  25       In addition thereto, the defendant would also make

12:41:59  1    a motion for a rule, motion for judgment of acquittal

12:42:04  2    pursuant to Rule 29 as it regards Count Number 3.

12:42:09  3            THE COURT:  That's the conspiracy count?

12:42:11  4            MR. WATLINGTON:  No, that's the possession,

12:42:13  5    federal distribution of possession of cocaine with the

12:42:20  6    intent to distribute of more than five kilos.

12:42:27  7        I don't believe, Your Honor, that based on the

12:42:29  8    testimony there has been any, any evidence that has been

12:42:31  9    put forth by the government to send to the jury that in

12:42:37  10   fact Defendant Brown was at any time in possession of

12:42:42  11   24 kilos of cocaine.

12:42:44  12       At best, you have the testimony of Mr. Tapia, who

12:42:49  13   said that he told him he can pick up 24, 24 kilos in a

12:42:55  14   car that was parked in the Market Square area, a blue

12:43:01  15   Honda.  That, in and of itself, is not possession of any

12:43:07  16   cocaine, more than five kilograms, as is charged in

12:43:10  17   Count Number 3.

12:43:10  18       There is absolutely nothing in the record that

12:43:14  19   would in fact suggest any possession of any cocaine more

12:43:21  20   than five kilos as is stated in the indictment.

12:43:25  21       I would submit, Your Honor, that I don't want to

12:43:28  22   waste the Court's time by making frivolous motions for

12:43:32  23   Rule 29 as opposed to the conspiracy, because there has

12:43:36  24   been testimony by Mr. Tapia in regards to some planning

12:43:40  25   or alleged agreement between the parties, even though we

| | | |
|---|---|---|
| 12:43:44 | 1 | believe that's incredible.  We know that at this point |
| 12:43:47 | 2 | in time credibility is not an issue. |
| 12:43:49 | 3 | And we in fact cannot contest Mr. Tapia's |
| 12:43:55 | 4 | testimony, even though we believe it's incredible and |
| 12:44:02 | 5 | false, that he had some exchange with Mr. Brown in |
| 12:44:04 | 6 | regards to some two kilos.  Even though again we believe |
| 12:44:07 | 7 | that's incredible, we don't want to waste the Court's |
| 12:44:10 | 8 | time in making arguments when in fact there has been |
| 12:44:13 | 9 | some prima facie showing that has been placed in front |
| 12:44:16 | 10 | of the judge and the jury. |
| 12:44:17 | 11 | THE COURT:  All right.  Thank you, Attorney |
| 12:44:19 | 12 | Watlington. |
| 12:44:20 | 13 | Attorney Mingolla, you want to be heard? |
| 12:44:23 | 14 | MR. MINGOLLA:  Yes, I do, sir. |
| 12:44:24 | 15 | THE COURT:  Briefly. |
| 12:44:25 | 16 | MR. MINGOLLA:  Yes, sir.  I'll discuss later an |
| 12:44:29 | 17 | issue that's bothering me greatly. |
| 12:44:32 | 18 | I'm going -- I also am going to make a Rule 29 |
| 12:44:36 | 19 | motion that the government has not proven its case |
| 12:44:39 | 20 | against my client, Mr. Walter Hill. |
| 12:44:47 | 21 | They, the -- in terms of the conspiracy, there's |
| 12:44:53 | 22 | insufficient evidence to show that he conspired with -- |
| 12:44:59 | 23 | there's been no evidence presented to show or indicate |
| 12:45:01 | 24 | that he conspired, really, with anyone.  We're -- we, I |
| 12:45:12 | 25 | share my brother's reservations about Mr. Tapia's |

12:45:17  1    testimony.

12:45:21  2         Furthermore, I would take exception to the fact

12:45:26  3    that when the government presented the telephone logs to

12:45:35  4    Mr. Ott, that the first one that they put down as an

12:45:41  5    exhibit --

12:45:41  6              THE COURT:  I think Mr. Grossman presented

12:45:45  7    those.  Ott was --

12:45:48  8              MR. MINGOLLA:  Yes, Mr. Grossman put down --

12:45:50  9    well, strike that.

12:45:51  10        The government presented the first exhibit for

12:45:53  11   Mr. Walter Hill, and it's clearly for Mr. Walter Hill.

12:46:02  12   Then they present several more exhibits with innumerable

12:46:05  13   phone calls, with the implication being that all of

12:46:08  14   those -- since they began with Walter Hill, who only had

12:46:12  15   either five or six, I'm sorry, I've forgotten, only had

12:46:16  16   five or six calls, where, but then they proceed to show,

12:46:20  17   without identifying at the top of the subsequent

12:46:27  18   exhibits of phone calls, who made those phone calls,

12:46:30  19   none of which involve my client.

12:46:32  20        But the jury doesn't know that.  And so the

12:46:36  21   implication to the jury, which would obviously be

12:46:38  22   prejudicial, is that since they showed Walter Hill's

12:46:43  23   name on the first exhibit, that all of those subsequent

12:46:47  24   calls may or may not have involved, they didn't identify

12:46:52  25   who those phones belonged to.

| | | |
|---|---|---|
| 12:46:55 | 1 | And the implication would be, at least to me, or to |
| 12:46:59 | 2 | the jury, that since it was captioned, if you will, in |
| 12:47:03 | 3 | the first document, Walter Hill, and there's no other |
| 12:47:07 | 4 | captions on the subsequent exhibits of the telephone |
| 12:47:10 | 5 | records, then every one of those, or the majority of |
| 12:47:14 | 6 | them or even a portion of them, involve my client, when |
| 12:47:20 | 7 | they don't. |
| 12:47:20 | 8 | THE COURT:  All right.  Thank you, Attorney |
| 12:47:21 | 9 | Mingolla. |
| 12:47:23 | 10 | MR. MINGOLLA:  One minute, Your Honor -- |
| 12:47:25 | 11 | THE COURT:  Well, I think I understand your |
| 12:47:26 | 12 | position with respect to Rule 29. |
| 12:47:28 | 13 | All right.  Before the Court are the petitions for |
| 12:47:31 | 14 | Rule 29 relief.  Of course when the Court is addressing |
| 12:47:34 | 15 | such a motion the Court is required to view the evidence |
| 12:47:37 | 16 | in the light most favorable to the government and give |
| 12:47:40 | 17 | the government all favorable inferences. |
| 12:47:44 | 18 | Credibility is not in issue at the Rule 29 stage. |
| 12:47:47 | 19 | The Court is really tasked with determining whether |
| 12:47:50 | 20 | there's sufficient basis for a reasonable jury to |
| 12:47:52 | 21 | conclude that there has been guilt proven beyond a |
| 12:47:57 | 22 | reasonable doubt. |
| 12:47:57 | 23 | And again, the standard that the Court is required |
| 12:48:00 | 24 | to apply is one that requires the Court to view the |
| 12:48:04 | 25 | evidence in the light most favorable to the government |

12:48:06  1    and give the government every favorable inference.

12:48:08  2        Applying that standard, the Court is persuaded that

12:48:12  3    with respect to Count 37 involving Walter Hill, that is

12:48:15  4    a conspiracy count, that there's sufficient evidence,

12:48:18  5    there's been sufficient testimony adduced throughout the

12:48:22  6    course of this trial, at least up to this stage, to

12:48:24  7    indicate that a reasonable jury could conclude beyond a

12:48:30  8    reasonable doubt that Mr. Walter Hill was engaged in a

12:48:33  9    conspiracy to possess with the intent to distribute a

12:48:35  10   controlled substance, that being cocaine.

12:48:39  11       Similarly with respect to Count 38 with respect to

12:48:43  12   Walter Hill, that is, possession with intent to

12:48:47  13   distribute, and there's been clearly sufficient

12:48:50  14   testimony to indicate that there was possession of an

12:48:54  15   amount that would indicate distribution, and giving the

12:48:59  16   government all favorable inferences and viewing the

12:49:02  17   light -- the evidence in the light most favorable to the

12:49:04  18   government, Rule 29 relief is not appropriate there,

12:49:06  19   either.

12:49:07  20       Nor is it with respect to Count 42, which is the

12:49:11  21   use of a communication facility to facilitate a drug

12:49:13  22   crime.  I think that is readily apparent on the record.

12:49:17  23   So Rule 29 relief is not appropriate under those

12:49:21  24   circumstances.

12:49:21  25       With respect to Count 1, Raymond Brown, I think

12:49:26  1    counsel appropriately sums it up, and with respect to

12:49:30  2    Mr. Brown, the Court has to view the evidence in the

12:49:34  3    light most favorable to the government and give the

12:49:36  4    government every favorable inference.  And there has

12:49:38  5    been more than enough testimony from which a reasonable

12:49:41  6    jury could conclude beyond a reasonable doubt that the

12:49:43  7    Defendant Raymond Brown was involved in a conspiracy to

12:49:46  8    possess with intent to distribute cocaine as alleged in

12:49:49  9    Count 1 of the indictment.  So Rule 29 relief is not

12:49:52  10   appropriate for that count.

12:49:54  11       With respect to Count 2, possession with intent to

12:49:58  12   distribute cocaine, the Court will keep that under

12:50:02  13   advisement, as it will Count 3 and Counts 4 through 10

12:50:10  14   with respect to Mr. Brown.

12:50:17  15       All right, Counsel.  Lunch will take place now for

12:50:24  16   one hour.  One hour from now.  All right, Counsel?

12:50:28  17            MR. MINGOLLA:  Judge?

12:50:29  18            THE COURT:  Yes.

12:50:29  19            MR. MINGOLLA:  I'm sorry.

12:50:30  20            THE COURT:  Yes, go ahead, Attorney Mingolla.

12:50:33  21            MR. MINGOLLA:  Judge, this is real quick.  It

12:50:37  22   has come to my attention, obviously this case is being

12:50:40  23   reported in the newspaper, and obviously the jury has

12:50:42  24   been instructed not to read media or newspapers, et

12:50:42  25   cetera.

12:50:47  1          But there's information that was reported in the

12:50:48  2     newspaper today that was not brought out in testimony

12:50:54  3     regarding Tapia and my client.  And the only conceivable

12:51:00  4     way that that information could have been obtained by

12:51:02  5     the reporter was by someone leaking to him, the

12:51:06  6     reporter, and I'm not saying who, because I don't know,

12:51:09  7     but it certainly wasn't me.

12:51:12  8          Somebody is leaking to a reporter these DEA 6

12:51:18  9     reports, or at least portions of the DEA 6 reports,

12:51:21  10    because there's no other conceivable way that the

12:51:25  11    newspaper reporter would have that information.  So I

12:51:28  12    would ask you --

12:51:28  13          THE COURT:  Are you saying that information

12:51:29  14    that was not made public in court --

12:51:34  15          MR. MINGOLLA:  Right.

12:51:35  16          THE COURT:  -- is being released by --

12:51:37  17          MR. MINGOLLA:  That's correct.  So it's got to

12:51:39  18    be coming from somebody, and that's improper.

12:51:41  19          THE COURT:  All right.

12:51:42  20          MR. MINGOLLA:  So I would ask you to admonish

12:51:43  21    the newspaper reporter, I don't know who he is, or she

12:51:47  22    is, to only, to keep their facts straight and to stick

12:51:51  23    with what the testimony is, and --

12:51:53  24          THE COURT:  Well, I think --

12:51:54  25          MR. MINGOLLA:  -- stop getting information --

12:51:56   1          THE COURT:  I think that is something that is

12:52:00   2    more a concern for the party that holds the information.

12:52:04   3    That is, if the government has information and it's

12:52:06   4    getting out in a way that it shouldn't, or if it's -- it

12:52:11   5    might be in the possession of any number of people who

12:52:14   6    may have disclosed the information.

12:52:16   7          But there's no prior restraint on the press to say

12:52:19   8    you can't publish something that's been placed in your

12:52:21   9    hands.  But if you're suggesting that someone who may

12:52:24  10    have the DEA 6 disclosed it, then that's a separate

12:52:29  11    issue.

12:52:29  12          It could be anyone.  I'm sure the DEA 6's must have

12:52:32  13    been shared with defense counsel, or some have, and

12:52:37  14    there could be any number of sources that may have

12:52:41  15    shared information.  I have not seen any article.  I

12:52:44  16    have not read any paper, so I have no idea what it is.

12:52:48  17          But to the extent the government finds it

12:52:53  18    appropriate to look into this, then I'll ask the

12:52:55  19    government to look into it, to see if there is anything.

12:52:57  20    I haven't seen it, but with respect to your petition to

12:53:02  21    admonish or direct the press, the Court is not inclined,

12:53:07  22    nor will it do that.

12:53:09  23          But if there is information that's improperly

12:53:10  24    disclosed, it's something that does concern the Court,

12:53:13  25    and I'll ask all parties to sort of make sure that they

12:53:20  1    have sufficient restraints on information so as not to

12:53:24  2    prejudice the rights of anyone who is on trial.

12:53:27  3              MR. MINGOLLA:  Thanks, Judge.

12:53:28  4              THE COURT:  All right.  I think I had said

12:53:30  5    one hour.  Why don't we make it one hour and

12:53:33  6    seven minutes for lunch.  All right.  Enjoy your lunch,

12:53:36  7    Counsel.

12:53:48  8         One other thing, the exhibit at Exhibit Number 80,

12:53:51  9    I believe, is that -- what is the contraband?  80?

12:53:56  10             MS. LAKE:  80a.

12:53:57  11             THE COURT:  80a, let me make sure that box is

12:54:00  12   sealed.

12:54:01  13             MS. LAKE:  Yes, Your Honor.

12:54:01  14             THE COURT:  Let me make sure it's sealed.

12:54:04  15   Thank you.

14:05:23  16        (Court in recess, 12:54 p.m.)

14:05:23  17        (After recess, juries not present, 2:05 p.m.)

14:05:23  18             THE COURT:  All right.  With respect to the --

14:05:23  19   I've ruled on Count 1, and the counts with respect to

14:05:23  20   Mr. Hill.

14:05:23  21        With respect to Counts 2 and 3, I'm going to grant

14:05:23  22   the petition for Rule 29 relief on those two counts.

14:05:23  23   And with respect to Counts 4 through 10, it is denied.

14:05:23  24   So the surviving count with respect to Mr. Brown will be

14:05:23  25   Count 1 and the phone counts; for the conspiracy and the

14:05:23  1    phone counts.

14:05:23  2            MR. WATLINGTON:  Thank you, Your Honor.

14:05:23  3            THE COURT:  All right.  So counsel is clear,

14:05:23  4    what I'd like to do is --

14:05:23  5            MS. LAKE:  Your Honor, may I be heard?

14:05:24  6            THE COURT:  Hold on a second.  Our jury is

14:05:26  7    lining up.

14:05:27  8        Let me ask Attorney Mingolla, are you planning to

14:05:30  9    put on any evidence, any witnesses?

14:05:33  10           MR. MINGOLLA:  No, Your Honor.

14:05:34  11           THE COURT:  Attorney Watlington?

14:05:35  12           MR. WATLINGTON:  One, Your Honor.

14:05:36  13           THE COURT:  What I'll do is let the jury know

14:05:41  14   that there's no obligation of counsel to present any

14:05:44  15   testimony or any evidence, but let them know that we

14:05:47  16   always give an opportunity to the defense to present any

14:05:49  17   matters.

14:05:49  18       Then I'll turn to Attorney Mingolla, who can rest

14:05:52  19   if you wish to at that time.  Then I'll turn to Attorney

14:05:58  20   Watlington, and you can indicate what you choose to do,

14:06:00  21   Attorney Watlington.

14:06:01  22       Do you expect it to be a long witness?

14:06:05  23           MR. WATLINGTON:  No, Your Honor, not --

14:06:06  24           THE COURT:  Hold on.  Hold on.

14:06:15  25       Let me ask counsel not to speak when the door is

14:06:17  1    open, because the jury is lined up here and they can

14:06:20  2    hear everything.  But yes, you expect your witness to be

14:06:22  3    short?

14:06:23  4              MR. WATLINGTON:  Yes, Your Honor.

14:06:23  5              THE COURT:  Then we will have the charge

14:06:25  6    immediately thereafter in chambers, and then we'll have

14:06:34  7    the Group A argument first.  And my hope is to do that

14:06:39  8    today, so that they can have it and either start

14:06:41  9    deliberation today or tomorrow morning.  And they will

14:06:50  10   of course be segregated of course for that.  And then

14:06:54  11   we'll go on to Group B and have that argument.

14:06:56  12       Yes, Attorney Watlington.

14:06:58  13             MR. WATLINGTON:  Nothing, Your Honor.

14:07:00  14             THE COURT:  All right.  Counsel should have --

14:07:03  15   well, you will have a copy shortly of the, of the jury

14:07:08  16   instructions.  There will be one charge.  The

14:07:28  17   instructions will be sufficiently generic so that there

14:07:41  18   won't be a need for two charges.

14:07:43  19       So the only thing that will be separate will be the

14:07:47  20   verdict forms and the arguments.

14:08:57  21             MS. LAKE:  Your Honor, I --

14:09:56  22       (Juries present.)

14:09:59  23             THE COURT:  All right.  Ladies and gentlemen,

14:10:01  24   how was lunch?

14:10:03  25       (Response.)

14:10:04  1              THE COURT:  Okay.  Good.  Another set of thumbs

14:10:07  2        up.

14:10:09  3              As you know, the government has presented the

14:10:12  4        evidence in its case-in-chief.  You may recall that I

14:10:15  5        indicated to you that the government has the burden of

14:10:19  6        proving, must prove the defendant's guilt beyond a

14:10:22  7        reasonable doubt.

14:10:22  8              The burden is with the government.  It is always

14:10:25  9        with the government.  It doesn't shift.

14:10:27  10             The defense has no obligation to present any

14:10:31  11       testimony, to present any witnesses at all.  And if the

14:10:35  12       defense chooses to present any matters to you, it

14:10:39  13       doesn't shift the burden.  The burden never shifts.

14:10:42  14             So notwithstanding that the defense has no

14:10:44  15       obligation to present any testimony, we always give the

14:10:47  16       defense an opportunity, if the defense chooses to, to

14:10:50  17       present any matters for your consideration.  So having

14:10:52  18       said that...

14:10:53  19             Attorney Mingolla?

14:10:55  20             MR. MINGOLLA:  Your Honor, we feel that this

14:10:58  21       case is so thin that we're not going to be presenting

14:11:02  22       any witnesses.

14:11:02  23             THE COURT:  So defense for Walter Hill rests,

14:11:06  24       then?

14:11:08  25             MR. MINGOLLA:  Yes, Your Honor.

14:11:08  1                    THE COURT:  Okay.  Very good.

14:11:10  2           Attorney Watlington.

14:11:13  3                    MR. WATLINGTON:  Yes, Your Honor.  We have one

14:11:14  4    witness, Latoya Springette.

14:11:17  5                    THE COURT:  All right.  You can call that

14:11:19  6    witness.

14:12:13  7                    THE CLERK:  Please step into the witness box.

14:12:16  8    Please stand and raise your right hand to take the oath.

14:12:18  9           (Witness sworn.)

14:12:24  10                   THE WITNESS:  Yes.

14:12:27  11                   THEREUPON, LATOYA SPRINGETTE, having been duly

14:12:29  12   sworn, was examined and testified as follows:

14:12:29  13                          DIRECT EXAMINATION

14:12:30  14   BY MR. WATLINGTON:

14:12:34  15   Q.   Good afternoon, Ms. Springette.

14:12:35  16   A.   Good afternoon.

14:12:36  17   Q.   Could you tell the ladies and gentlemen of the jury

14:12:38  18   your full name?

14:12:39  19   A.   Latoya Springette.

14:12:41  20   Q.   And could you give them your address?

14:12:43  21   A.   It's 13-E Dorothea, Estate Dorothea.

14:12:48  22   Q.   And are you employed?

14:12:49  23   A.   Yes, I am.

14:12:50  24   Q.   And where are you employed?

14:12:51  25   A.   Synergy Fitness and Wellness Center.

14:12:56  1    Q.    And how often is -- what are your hours of

14:12:58  2    employment?

14:12:58  3    A.    It varies, because I'm an office manager assistant.

14:13:03  4    Q.    You are the?

14:13:04  5    A.    Assistant manager.

14:13:07  6    Q.    And it's flexible?

14:13:08  7    A.    Uhm-hmm.

14:13:09  8    Q.    Okay.  Could you tell the ladies and gentlemen of

14:13:11  9    the jury what relationship you have, if any, to the

14:13:14  10   Lockhart -- to the Brown family?

14:13:17  11   A.    Raymond Brown is my boyfriend.

14:13:20  12   Q.    By that you mean what?

14:13:22  13   A.    We've been dating for eight years now.

14:13:25  14   Q.    And 13-E Dorothea is whose address?

14:13:30  15   A.    Raymond Brown's mother and his.

14:13:33  16   Q.    And that's where you live?

14:13:35  17   A.    Correct.

14:13:36  18   Q.    How long have you lived there?

14:13:37  19   A.    I've lived there now for seven years.

14:13:41  20   Q.    In addition to being his boyfriend [sic], is there

14:13:44  21   any other relationship that you have with Raymond and/or

14:13:47  22   the family?

14:13:48  23   A.    That's about it.  Just my boyfriend and they have

14:13:51  24   become my family.

14:13:52  25   Q.    And they have become -- they have become what, just

14:13:55  1    as a result of living together?

14:13:57  2    A.    Correct, and me being in a relationship with him.

14:14:00  3    Q.    Have -- is there any offsprings of that

14:14:02  4    relationship?

14:14:03  5    A.    Yes.  We have a 4-year-old daughter.

14:14:05  6    Q.    4-year-old daughter?

14:14:06  7    A.    Uhm-hmm.

14:14:07  8    Q.    Do you know Raymond to have -- well, let me ask you

14:14:11  9    this.  In addition to the 4-year-old daughter, does

14:14:15  10   Raymond have any other children?

14:14:16  11   A.    Not that I know of.

14:14:19  12   Q.    And you say you've known him for how long?

14:14:21  13   A.    Eight years.

14:14:22  14   Q.    Have you been monitoring over that -- monitoring

14:14:26  15   him over those eight years?

14:14:28  16   A.    You can kind of say so.

14:14:31  17   Q.    Drawing your attention to December of 2012, were

14:14:37  18   you and the family on any trips?

14:14:39  19   A.    Yes, me and Raymond and my 4-year-old daughter.

14:14:42  20   Q.    And where did you go?

14:14:44  21   A.    We went to Puerto Rico for Christmas shopping.

14:14:47  22   Q.    Okay.  And do you remember what date that was?

14:14:49  23   A.    I know it was just sometime around December, like

14:14:52  24   ending of December before Christmas.

14:14:54  25   Q.    Before Christmas?

14:14:55  1    A.   Uhm-hmm.

14:14:56  2    Q.   Well, Christmas is the ending of December, so it

14:14:59  3    had to have been before the ending?

14:15:00  4    A.   Yeah, before the ending.

14:15:04  5    Q.   When there, did you go to any place in Puerto Rico

14:15:07  6    that was not part of the shopping?

14:15:09  7    A.   Can you repeat the question?

14:15:11  8    Q.   Other than -- while you were in Puerto Rico, did

14:15:13  9    you go to any place else that was not part of your

14:15:16  10   shopping?

14:15:17  11   A.   Yes.

14:15:18  12   Q.   And where did you go?

14:15:20  13   A.   We attended a party.

14:15:21  14   Q.   And do you know whose party it was?

14:15:23  15   A.   I don't know who party it was.

14:15:26  16   Q.   Okay.  How did you get to that party?

14:15:28  17   A.   With Raymond.  We had a car.

14:15:30  18   Q.   Okay.

14:15:30  19   A.   A rental car.

14:15:31  20   Q.   And who invited you to the party, if you know?

14:15:33  21   A.   Actually, his mom told us about the party.  So of

14:15:38  22   course that's how he got to attend the party.

14:15:40  23   Q.   That's how you got there.  How long did you stay?

14:15:42  24   A.   It wasn't long, because it was the same day of our

14:15:45  25   departure back to St. Thomas.

14:15:46    1    Q.   And while you were there, did you, could you

14:15:49    2    explain to the ladies and gentlemen of the jury what you

14:15:52    3    did, where Raymond was, where your daughter was?

14:15:55    4    A.   We arrived to this house and we basically stayed on

14:15:58    5    the porch.  They had a roasted pig, so my daughter was

14:16:03    6    very infatuated with the pig.  So we basically stayed on

14:16:07    7    the porch and played pool.  We didn't know the people

14:16:11    8    that well, so we were just basically on the porch

14:16:15    9    playing pool.

14:16:15   10    Q.   So you said you were leaving the same day?

14:16:17   11    A.   Correct.

14:16:18   12    Q.   How long did you all stay in Puerto Rico?

14:16:20   13    A.   We left on a Friday evening and returned back to

14:16:25   14    St. Thomas on Sunday.

14:16:26   15    Q.   So is it safe to say that when you went to this,

14:16:31   16    this, this party that you referred to, was it in the

14:16:34   17    day?

14:16:35   18    A.   Yes, it was.

14:16:36   19    Q.   Okay.  You were already packed and your bags were

14:16:40   20    packed?

14:16:40   21    A.   Correct.

14:16:40   22    Q.   They were in the car?

14:16:42   23    A.   Yes --

14:16:42   24         THE COURT:  Stop leading the witness.

14:16:44   25         MR. WATLINGTON:  Thank you.

14:16:45  1    BY MR. WATLINGTON:

14:16:45  2    Q.   Where were your bags --

14:16:46  3    A.   In the car.

14:16:47  4    Q.   -- when you got to the party?

14:16:48  5    A.   In the car.

14:16:52  6    Q.   And did you -- what, if anything, did you --

14:16:57  7    well -- what -- was it the type of party that you would

14:17:00  8    receive any memorabilia or souvenirs therefrom?

14:17:04  9    A.   No.  It was maybe a get-together.

14:17:06  10   Q.   Yeah.

14:17:07  11   A.   I think it was more about this pig.  I guess

14:17:10  12   everyone was excited to see this big pig being roasted,

14:17:15  13   so no goody bag or anything.

14:17:17  14   Q.   And what, if anything, did you leave with after the

14:17:19  15   party?

14:17:20  16   A.   If I left with anything?

14:17:21  17   Q.   I said what, if anything?

14:17:23  18   A.   We didn't leave with anything.  Nothing was given

14:17:26  19   to leave with.

14:17:27  20   Q.   And when you say "we"?

14:17:31  21   A.   Meaning myself and Raymond Brown.

14:17:35  22   Q.   How did you know that?

14:17:36  23   A.   Because we were around each other the whole time.

14:17:38  24   We didn't know anyone there at the party that well, so

14:17:41  25   we just sat and he played pool and we sat with my

14:17:47  1    daughter.

14:17:48  2              MR. WATLINGTON:  No further questions.

14:17:48  3              THE COURT:  Attorney Mingolla, any questions?

14:17:50  4              MR. MINGOLLA:  No, Your Honor.

14:17:51  5              THE COURT:  Attorney Lake?

14:17:53  6              MS. LAKE:  Thank you.

14:17:54  7                          CROSS-EXAMINATION

14:17:54  8    BY MS. LAKE:

14:17:55  9    Q.   Just a few questions.  How large was the party?

14:17:58  10   A.   It wasn't a big party.

14:18:00  11   Q.   How many people were there?

14:18:01  12   A.   I can't recall, but I can say 10, the most, maybe

14:18:07  13   15.

14:18:07  14   Q.   What area?

14:18:09  15   A.   Of house?

14:18:11  16   Q.   Of Puerto Rico?

14:18:13  17   A.   I don't remember what area was it.  It was a very

14:18:17  18   far drive from where we were staying.

14:18:20  19   Q.   Where were you staying?

14:18:22  20   A.   In San Juan.

14:18:24  21   Q.   I thought you only went for a day?

14:18:26  22   A.   No.

14:18:26  23   Q.   You had a hotel?

14:18:27  24   A.   Yes, we did.

14:18:27  25   Q.   Where did you stay in the hotel?

14:18:29  1    A.    We stayed at the Marriott.

14:18:31  2    Q.    How long did you stay in Puerto Rico?

14:18:33  3    A.    We came the Friday and left the Sunday.

14:18:34  4    Q.    So you stayed two days?

14:18:36  5    A.    Correct.

14:18:36  6    Q.    And you were with Raymond Brown the entire time for

14:18:39  7    two days?

14:18:39  8    A.    The entire time.

14:18:41  9    Q.    You were in his presence the entire time?

14:18:42 10    A.    The entire time.

14:18:43 11    Q.    For 48 hours?

14:18:44 12    A.    For 48 hours.

14:18:45 13    Q.    Straight?

14:18:45 14    A.    Straight.

14:18:54 15    Q.    Do you live with the defendant?

14:18:55 16    A.    Yes, I do.

14:18:56 17    Q.    Who else lives there?

14:18:58 18    A.    Just me and him right now, and my daughter.

14:19:02 19    Q.    Does anyone else live on the property?

14:19:04 20    A.    On the property?

14:19:05 21    Q.    Yes.

14:19:06 22    A.    No.

14:19:07 23    Q.    How many homes are on the property?

14:19:09 24    A.    There's just one home on that property where I'm

14:19:13 25    living.

14:19:14  1    Q.   Are there any homes, other homes in the surrounding

14:19:16  2    property?

14:19:17  3    A.   Up the hill, but not on the property where I'm

14:19:19  4    living.

14:19:19  5    Q.   Who lives up the hill?

14:19:22  6    A.   Tenants.

14:19:23  7    Q.   Who owns the land, who owns the property you live

14:19:26  8    on?

14:19:27  9    A.   Omar Brown, Jr.

14:19:28  10   Q.   Who is that?

14:19:29  11   A.   Raymond's father.

14:19:30  12   Q.   Do you pay rent?

14:19:32  13   A.   No, I don't.

14:19:34  14   Q.   You live for free?

14:19:36  15   A.   My boyfriend is the one that provides, but I do

14:19:39  16   help.

14:19:39  17   Q.   So your boyfriend, the defendant, pays the rent?

14:19:42  18   A.   Correct.

14:19:43  19   Q.   How long did he live there?

14:19:45  20   A.   Excuse me?

14:19:47  21   Q.   How long have you lived there?

14:19:48  22   A.   I've lived there for eight years now.

14:19:50  23   Q.   What year was that?

14:19:55  24   A.   2007.

14:19:59  25   Q.   Are you a resident of St. Thomas?

14:20:00  1    A.   Yes, I am.

14:20:01  2    Q.   Why do you have a Florida driver's license?

14:20:04  3    A.   Because I used to live in Orlando.  That's where I

14:20:07  4    resided before coming back to St. Thomas.

14:20:09  5    Q.   So when did you come back from Florida?

14:20:11  6    A.   Excuse me?

14:20:12  7    Q.   When did you come back from Florida?

14:20:14  8    A.   2007, of July.

14:20:22  9    Q.   And you've been here for seven years now?

14:20:24  10   A.   Yes, I have.

14:20:25  11   Q.   And you still don't have a Virgin Islands' driver's

14:20:28  12   license?

14:20:28  13   A.   No, I didn't know that I'm supposed to switch it

14:20:30  14   over.  No one ever told me anything.

14:20:32  15   Q.   I'm sorry?

14:20:33  16   A.   No one ever told me anything about having a

14:20:35  17   stateside license.

14:20:38  18   Q.   But you're a resident of St. Thomas, right?

14:20:40  19   A.   Correct.

14:20:41  20        MR. WATLINGTON:  Objection, Your Honor.

14:20:43  21   Objection as to relevancy.

14:20:45  22        THE COURT:  All right.  Next question.

14:20:53  23        MS. LAKE:  I have nothing further.

14:20:55  24        MR. WATLINGTON:  Nothing further of this

14:20:56  25   witness, Your Honor.

14:20:58    1              THE COURT:  Okay.  Ms. Springette.  All right.

14:21:02    2    You may step down.

14:21:03    3         Thank you for your testimony.

14:21:09    4         (Witness withdrew from stand.)

14:21:09    5              MR. WATLINGTON:  I have nothing further, Your

14:21:10    6    Honor.  We would rest.

14:21:11    7              THE COURT:  All right.  Ladies and gentlemen,

14:21:13    8    the defense, Raymond Brown, rests.  That means that all

14:21:18    9    the evidence in this case is now before you.

14:21:22   10         There are a few legal matters that we need to tend

14:21:26   11    to, and then when we resume you will be charged, that

14:21:29   12    is, given the instructions on the law that will guide

14:21:32   13    you as you deliberate, and then you will hear closing

14:21:34   14    arguments.

14:21:35   15         All right.  That's going to take us a little bit --

14:21:37   16    a little while.  For one group it will be a 25-minute

14:21:47   17    break.  For another group it will be perhaps an hour and

14:21:52   18    25 minutes before we get back to you because you will

14:21:54   19    have separate closing arguments.  All right.  We'll

14:21:57   20    start with Group A first.  So for Group A you will have

14:22:01   21    a 25-minute break.

14:22:02   22         For Group B, you will have an hour and 20-minute

14:22:07   23    break or so.  All right?

14:22:10   24         Please don't discuss the case.  You haven't been

14:22:12   25    charged on the law and you haven't heard the arguments

14:22:15  1    yet.  All right.  We'll see you in a bit.

14:22:59  2         All right, Counsel, we're going to have the

14:23:01  3    charging conference in chambers in five minutes.  All

14:23:05  4    rise.

14:23:11  5         (Court in recess, 2:23 p.m.)

14:51:10  6         (After recess, juries present, 3:01 p.m.)

15:01:28  7              THE COURT:  Good afternoon again, ladies and

15:01:30  8    gentlemen.

15:01:30  9              JURY INSTRUCTIONS BY THE COURT

15:01:30  10             THE COURT:  Now, as I told you, we're at the

15:01:32  11   close of the case, so there are some instructions I need

15:01:35  12   to charge you with.

15:01:37  13        First, I want to thank you for your patience and

15:01:39  14   your cooperation.  I know that counsel appreciates it,

15:01:43  15   the Court certainly appreciates it.  We ask a lot of you

15:01:46  16   and you've given us everything we've asked for and more,

15:01:49  17   your attention, your time, your patience, your

15:01:51  18   cooperation.

15:01:52  19        Now, you may recall that I told you under our

15:01:55  20   system of criminal justice, the Court, represented by me

15:01:59  21   as judge, and you, the jury, have different jobs in a

15:02:01  22   case such as this.

15:02:02  23        I'm responsible for safeguarding both the rights of

15:02:05  24   the defendant and the interest of the public in the

15:02:07  25   administration of criminal justice.

15:02:09  1    I preside over the trial to make sure that it is

15:02:12  2  conducted in accordance with well-established principles

15:02:15  3  and rules of law.  I decide questions of law as they

15:02:18  4  arise in the trial.

15:02:19  5    I also charge or instruct the jury on the law that

15:02:22  6  applies to the case, as I'm doing right now.

15:02:25  7    Regarding the facts, on the other hand, you and you

15:02:27  8  alone are the sole judges of the facts.  I do not decide

15:02:30  9  the facts and you do not decide questions of law.

15:02:33  10    I want you to consider these instructions as a

15:02:35  11  whole.  Do not overemphasize one section over the other.

15:02:40  12    You must ignore any contrary interpretations of the

15:02:43  13  law that you may have heard in other cases.  Just as it

15:02:46  14  is my job to instruct you on the law that governs this

15:02:48  15  case, you must accept and follow these instructions.

15:02:51  16    As the judges of the facts, you may not be

15:02:53  17  concerned with the wisdom of any of these rules of law I

15:02:56  18  am stating to you.

15:02:57  19    Regardless of any opinion you may have on what the

15:02:59  20  law ought to be, to base a verdict upon any view of the

15:03:03  21  law other than what I instruct you would be a violation

15:03:04  22  of your sworn duty.

15:03:06  23    Questions, objections, statements, arguments and

15:03:09  24  statements of counsel incorporated in a question are not

15:03:12  25  evidence in this case.  You must entirely disregard any

15:03:16  1    proposed testimony or any proposed exhibit which I did

15:03:19  2    not admit, and any testimony or exhibit I ordered to be

15:03:22  3    stricken from the record.

15:03:22  4         You must also disregard anything you may have seen

15:03:25  5    or heard outside the courtroom.  I advise you, if a

15:03:29  6    particular item of evidence is received for a limited

15:03:32  7    purpose, you must follow that instruction.

15:03:41  8         Always remember that the defendant is not on trial

15:03:43  9    for any act or any conduct not specifically charged in

15:03:46  10   the indictment.  In your deliberations, you may consider

15:03:49  11   only the offenses charged against the defendant in the

15:03:54  12   indictment, and that is against the defendant that you

15:03:56  13   are considering with respect to your individual panels.

15:03:59  14        Evidence may be direct or circumstantial.  Direct

15:04:03  15   evidence directly proves a fact, such as testimony of an

15:04:06  16   eyewitness.  Circumstantial evidence indirectly proves a

15:04:09  17   fact by establishing a chain of facts from which you can

15:04:12  18   find that another fact exists.

15:04:14  19        From one or more facts you find have been proved,

15:04:17  20   you can use your reason, experience and common sense to

15:04:20  21   infer that some other fact exists and has been proved.

15:04:24  22   You may infer a fact, that is, draw a deduction or a

15:04:28  23   conclusion from the facts you find have been established

15:04:30  24   by either direct or even other circumstantial evidence.

15:04:35  25   This process of drawing inference from facts in evidence

is not a matter of guesswork or speculation.

I'll give you an example to illustrate the point. You're sitting in here.  Assume it was a sunny day when you came in.  Now assume that someone walks into the courtroom with an umbrella that is wet and a raincoat that is dripping.  You may infer from that circumstantial evidence and conclude that it is now raining outside.

The government can rely entirely on circumstantial evidence to prove the elements of any of the crimes charged in the indictment.

You are to consider both kinds of evidence, direct and circumstantial.  The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

The indictment is but a formal method of accusing a defendant of a crime.  It is not evidence of any kind against the accused.  It may not be considered by you as any evidence of the guilt of the defendant.

By their pleas of not guilty, each defendant denies that they are guilty of the charges in the indictment.

There's nothing particularly different in the way that a jury should consider the evidence in a trial from that in which any reasonable and careful person would treat any very important question that must be resolved

15:05:50  1    by examining facts and evidence.

15:05:51  2         You are expected to use your good sense in

15:05:53  3    considering evaluating the evidence in the case, for

15:05:57  4    only those purposes for which it has been admitted, and

15:05:59  5    to give such evidence a reasonable and fair construction

15:06:01  6    in the light of your common knowledge of the natural

15:06:04  7    tendencies and inclinations of human beings.

15:06:07  8         If the government proves the defendant is guilt

15:06:09  9    beyond a reasonable doubt, say so.  If the government

15:06:12  10   fails to prove the defendant is guilty beyond a

15:06:15  11   reasonable doubt, say so.

15:06:18  12        The government and the defendants have agreed that

15:06:28  13   Exhibit 80a, like apple, is in fact cocaine, and that it

15:06:33  14   weighs 7,003 grams, or 7.003 kilograms.

15:06:41  15        The government and the defendants also agree that

15:06:44  16   the phone records that were discussed during the

15:06:48  17   testimony of one of the witnesses, that those phone

15:06:51  18   records are authentic.

15:06:54  19        You should treat those stipulations as though they

15:06:57  20   are facts that have been proved.  You are not required

15:07:00  21   to do so, however, since you are the sole judges of the

15:07:03  22   facts.

15:07:04  23        An important part of your job will be making

15:07:07  24   judgments about the testimony of the witnesses who

15:07:09  25   testified in this case.  You should decide whether you

15:07:11  1    believe what each person had to say and how important

15:07:14  2    that testimony was.

15:07:15  3         In making that decision, I suggest that you ask

15:07:20  4    yourselves a few questions:

15:07:21  5         Did the person impress you as honest?

15:07:23  6         Did the person have any particular reason not to

15:07:25  7    tell the truth?

15:07:26  8         Did the witness have a good memory?  Did the

15:07:29  9    witness have the opportunity and ability to observe

15:07:31  10   accurately the things the witness testified about?

15:07:34  11        Did the witness appear to understand the questions

15:07:37  12   clearly and answer them directly?

15:07:39  13        Did a witness' testimony differ from the testimony

15:07:42  14   of other witnesses?

15:07:43  15        These are but a few of the considerations that will

15:07:46  16   help you determine the accuracy of what each witness

15:07:48  17   said.

15:07:49  18        The testimony of a witness may be discredited or,

15:07:52  19   as we sometimes say, impeached by showing that that

15:07:56  20   witness previously made statements which are different

15:07:58  21   than or inconsistent with the witness' testimony here in

15:08:01  22   court.

15:08:01  23        The earlier inconsistent or contradictory

15:08:07  24   statements are admissible only to impeach the

15:08:08  25   credibility of the witness, and not to establish the

15:08:10  1    truth of these earlier statements made somewhere earlier

15:08:13  2    than here during this trial.

15:08:15  3        If you find that a witness knowingly testified

15:08:17  4    falsely about any important or material matter, you may

15:08:20  5    distrust the witness' testimony about other matters.

15:08:23  6    You may reject all of the testimony of that witness or

15:08:26  7    give it such weight or credibility that you conclude it

15:08:29  8    deserves.

15:08:32  9        In making up your minds and reaching a verdict, do

15:08:36  10   not make any decisions simply because there were more

15:08:39  11   witnesses on one side than the other.

15:08:40  12       You must treat all witnesses alike.  That is, do

15:08:55  13   not give greater consideration to a government witness

15:08:58  14   than to a defense witness, if any was offered.  Your job

15:09:09  15   is to think about the testimony of each witness you

15:09:11  16   heard and decide how much you believe of what the

15:09:13  17   witness had to say.

15:09:15  18       You've heard the testimony of law enforcement

15:09:17  19   officials.  The fact that a witness may be employed by

15:09:19  20   the government as a law enforcement official does not

15:09:22  21   mean that his or her testimony is necessarily deserving

15:09:25  22   of more or less consideration or greater or lesser

15:09:29  23   weight than that of an ordinary witness.

15:09:31  24       At the same time, it is quite legitimate for

15:09:34  25   defense counsel to try to attack the credibility of law

enforcement witnesses on the grounds that their testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witnesses and to give to that testimony whatever weight, if any, you find it deserves.

You've heard the testimony from some witnesses who either received benefits from the government in connection with this case or were involved in the commission of the offenses related to the crimes alleged against the defendants.

You may give the testimony of those witnesses such weight you feel it deserves, keeping in mind that such testimony must be considered with greater caution and care than that of an ordinary witness.

You are instructed that an attorney is allowed, if the witness agrees, to talk to a witness to learn what testimony will be given.  Under certain circumstances it is not only proper, but it may be the duty of the prosecutor and defense counsel to interview any person who may be called as a witness in the case.

The fact that a witness has been interviewed by an attorney does not, by itself, affect the credibility of the witness.

15:10:54   1          Each of the defendants, Raymond Brown and Walter

15:10:57   2     Hill, chose not to testify in this case.

15:11:00   3          Under our Constitution the defendant has no

15:11:02   4     obligation to testify or to present any evidence,

15:11:05   5     because it is the government's burden to prove the

15:11:07   6     defendant's guilt beyond a reasonable doubt.

15:11:10   7          That burden never -- that burden remains with the

15:11:13   8     government throughout the entire trial and never shifts

15:11:15   9     to the defendant.

15:11:15  10          The defendant is not required to prove that he is

15:11:18  11     not guilty.  You cannot use the fact that the defendant

15:11:22  12     chose not to testify against that defendant in any way.

15:11:25  13          As I mentioned before, each defendant is presumed

15:11:27  14     to be innocent until he is proved to be guilty.  Thus, a

15:11:30  15     defendant, although charged by the indictment, begins

15:11:33  16     the trial with no evidence against him.  This

15:11:37  17     presumption of innocence continues until overcome by

15:11:40  18     evidence that establishes guilt to your satisfaction

15:11:42  19     beyond a reasonable doubt.

15:11:43  20          The burden of proving beyond a reasonable doubt

15:11:46  21     each and every essential element of the crimes charged

15:11:48  22     is upon the government and always upon the government.

15:11:56  23     The law never imposes upon a defendant the burden or

15:11:58  24     duty of calling any witnesses or producing any evidence.

15:12:01  25          If you have a reasonable doubt about whether the

15:12:04  1    defendant is guilty, you must find the defendant not

15:12:07  2    guilty.

15:12:07  3         A separate crime is alleged against each defendant

15:12:11  4    in each count of the indictment.  Each count and the

15:12:15  5    evidence pertaining to it should be considered

15:12:17  6    separately.  The case of each defendant should be

15:12:20  7    considered separately and individually.

15:12:29  8         The fact that you may find one defendant guilty or

15:12:32  9    not guilty of any crime charged should not control your

15:12:36  10   verdict as to any other crime charged against that

15:12:42  11   defendant.

15:12:42  12        You must give separate consideration to the

15:12:44  13   evidence as to each charge.

15:12:49  14        A reasonable doubt is a term often used, probably

15:12:51  15   well understood, but not easily defined.

15:12:53  16        Reasonable doubt is what the term implies.  A

15:12:55  17   reasonable doubt is a fair doubt, based upon reason and

15:12:58  18   common sense.

15:12:59  19        The government's evidence must be proof of such a

15:13:01  20   convincing character that you would be willing to rely

15:13:04  21   and act upon it unhesitatingly in the most important of

15:13:08  22   your own affairs.

15:13:09  23        The doubt must be reasonable.  It is not a mere

15:13:12  24   possible or imaginary doubt, because as you well know,

15:13:15  25   anything and everything relating to human affairs and

15:13:18  1    depending on oral testimony is open to some possible or

15:13:21  2    imaginary doubt.

15:13:22  3         The government is not required to produce evidence

15:13:24  4    that will exclude every possibility of the defendant's

15:13:28  5    innocence.  It is only required to prove a defendant's

15:13:31  6    guilt beyond a reasonable doubt, not beyond all possible

15:13:34  7    doubt.  The test is one of reasonable doubt.

15:13:36  8         The defendant is never to be convicted on mere

15:13:39  9    speculation, suspicion or conjecture, or indeed on proof

15:13:43  10   that is less than beyond a reasonable doubt.

15:13:44  11        Reasonable doubt may arise from a lack of credible

15:13:48  12   evidence or proof.  If you find that the government has

15:13:50  13   failed to produce evidence sufficient to satisfy you of

15:13:53  14   the guilt of the defendant beyond a reasonable doubt,

15:13:55  15   then that defendant is entitled to an acquittal or a

15:13:58  16   verdict of not guilty.

15:14:00  17        But if, after considering all of the evidence and

15:14:03  18   giving the accused the benefit of the reasonable doubt,

15:14:05  19   you are led to the conclusion that the defendant is

15:14:07  20   guilty, you should so declare by your verdict.

15:14:09  21        The crimes charged in this case are serious crimes

15:14:13  22   which require proof of the defendant's mental state or

15:14:17  23   intent before he can be convicted.  To establish mental

15:14:20  24   state or intent, the government must prove that the

15:14:22  25   defendant's actions were knowingly and intentionally

15:14:25  1    done.

15:14:25  2         The government is not required to prove that the

15:14:27  3    defendant knew that he was breaking the law when he did

15:14:30  4    the acts charged in the indictment.  You may determine

15:14:33  5    his mental state or intent from all the facts and

15:14:35  6    circumstances surrounding the case.

15:14:41  7         State of mind or knowledge ordinarily may only be

15:14:44  8    proved indirectly, that is, by circumstantial evidence,

15:14:47  9    because there's no way we can get inside to observe the

15:14:50  10   operations of the human mind.

15:14:52  11        While witnesses may be able to give direct evidence

15:14:55  12   of what the defendant said or did or failed to say or

15:14:58  13   do, there can be no eyewitness account of a state of a

15:15:01  14   person's mind at the time an act was done.  But what a

15:15:04  15   person does, says, or fails to say or do may indicate

15:15:08  16   the state of mind in which the person did the act.

15:15:11  17        Although you're not required to do so, you may

15:15:13  18   reasonably infer that a person ordinarily intends the

15:15:15  19   natural and probable consequences of his or her own

15:15:18  20   knowing and conscious acts.

15:15:20  21        As the judges of the facts, you may draw the

15:15:22  22   inference that the defendant knew and intended all the

15:15:25  23   consequences which someone in similar circumstances and

15:15:27  24   having the same or similar knowledge should reasonably

15:15:30  25   have expected to result from their intentional act or

conscious omission.

You can consider any such inference in determining whether the government has proved beyond a reasonable doubt that the defendant possessed the required criminal intent or state of mind.

Unless otherwise instructed, in determining the issue of state of mind of a defendant, you can consider any statements made and acts done by him, as well as other facts, inferences and circumstances in evidence which indicate the defendant's state of mind or intent.

The term "knowingly" as used in these instructions describes the state of mind of the defendant.  It means that the defendant was conscious and aware of the defendant's actions.  Whether or not a defendant had this knowledge is a question of fact to be determined by you on the basis of all the evidence.

An act is done knowingly only if it is done purposely and deliberately and not because of accident, mistake, negligence, or other innocent reason.

You can consider any statements made and acts done or omitted by a defendant, as well as other facts, inferences and circumstances in evidence which indicate the defendant acted knowingly.

In determining whether the government has met its burden of proving the defendant's guilty beyond a

15:16:48  1    reasonable doubt, you are only to consider the offenses

15:16:50  2    charged as to the defendant.  In assisting you in

15:16:57  3    reaching your determination I'll instruct you on the

15:17:01  4    elements of the offenses charged.

15:17:02  5        Counts 1 and 37 each charge that a defendant agreed

15:17:07  6    or conspired with one or more other persons to possess

15:17:09  7    with intent to distribute a controlled substance, which

15:17:12  8    is a violation of federal law.

15:17:14  9        In order to sustain its burden of proof for the

15:17:17  10   crime of conspiracy to possess with intent to distribute

15:17:19  11   a controlled substance, the government must prove the

15:17:23  12   following three essential elements beyond a reasonable

15:17:26  13   doubt:

15:17:26  14       First, that two or more persons agreed to possess

15:17:46  15   with the intent to distribute a controlled substance.

15:17:49  16       Second, that the defendant was a party to or member

15:17:52  17   of that agreement.

15:17:53  18       And third, that the defendant joined the agreement

15:17:56  19   or conspiracy knowing of its objective to possess with

15:17:59  20   the intent to distribute a controlled substance, and

15:18:03  21   intending to join together with at least one other

15:18:06  22   alleged conspirator to achieve that objective; that is,

15:18:10  23   that the defendant and at least one other alleged

15:18:12  24   conspirator shared a unity of purpose and the intent to

15:18:16  25   achieve that objective.

15:18:17  1        If you are convinced that each element has been

15:18:19  2    proved beyond a reasonable doubt for a particular

15:18:22  3    defendant with respect to a specific count, then it is

15:18:25  4    your duty to return a verdict of guilty as to that

15:18:28  5    defendant on that count.

15:18:29  6        However, if you have a reasonable doubt as to any

15:18:32  7    of these elements with respect to a particular count and

15:18:35  8    a particular defendant, then it is your duty to return a

15:18:38  9    verdict of not guilty as to that defendant on that

15:18:40  10   count.

15:18:40  11       A criminal conspiracy is an agreement or a mutual

15:18:45  12   understanding knowingly and intentionally made or

15:18:49  13   knowingly and intentionally entered into by at least two

15:18:52  14   people to violate the law by some joint or common plan

15:18:56  15   or course of action.

15:18:57  16       A conspiracy is, in a very true sense, a

15:19:02  17   partnership in crime.  The crime is the agreement or

15:19:06  18   understanding to do something unlawful.  It does not

15:19:20  19   matter whether the objectives of the conspiracy occurred

15:19:24  20   or not -- excuse me.  I don't think I can do this with a

15:19:46  21   mint in my mouth.

15:20:11  22       (Pause)

15:20:11  23           THE COURT:  Let me read that section again.

15:20:13  24       The crime is the agreement or understanding to do

15:20:15  25   something unlawful.  It does not matter whether the

15:20:17   1   objectives of the conspiracy occurred or not, or whether

15:20:19   2   the members of the conspiracy were successful in

15:20:22   3   achieving any or all of the objectives of the

15:20:25   4   conspiracy.

15:20:26   5       A conspiracy or agreement to violate the law, like

15:20:29   6   any other kind of agreement or understanding, need not

15:20:31   7   be formal, written or even expressed directly or in

15:20:35   8   every detail.  To prove the existence of a conspiracy.

15:21:59   9       (Pause.)

15:22:01   10      MR. WATLINGTON:  Sorry, Judge.  Sorry, ladies

15:22:05   11  and gentlemen.

15:22:53   12      (Pause.)

15:22:53   13      THE COURT:  I think that gave me a chance to

15:22:55   14  find my voice again.

15:22:57   15      All right.  A conspiracy or agreement to violate

15:22:59   16  the law, like any other kind of agreement or

15:23:01   17  understanding, need not be formal, written or even

15:23:04   18  expressed directly in every detail.

15:23:06   19      To prove the existence of a conspiracy or an

15:23:08   20  illegal agreement, the government is not required to

15:23:10   21  produce a written contract between the parties or even

15:23:13   22  produce evidence of an express oral agreement spelling

15:23:16   23  out of the details of the understanding.

15:23:18   24      To prove that a conspiracy existed, moreover, the

15:23:22   25  government is not required to show that all of the

15:23:24   1       members of the alleged conspiracy were named or charged,

15:23:27   2       or that all of the people who the evidence shows were

15:23:29   3       actual members of a conspiracy agreed to all of the

15:23:32   4       means or methods set out in the indictment.

15:23:35   5           You may infer the existence of a conspiracy from

15:23:37   6       the circumstances of the case and the conduct of the

15:23:41   7       parties involved.  In a very real sense in the context

15:23:45   8       of conspiracy cases, actions often speak louder than

15:23:51   9       words, and you may, in determining whether an agreement

15:23:54  10       existed here, consider the actions and statements of all

15:23:57  11       those you find to be participants as proof that a common

15:24:02  12       design existed --

15:24:11  13           Ma'am, you have to leave.

15:24:23  14           -- that a common design existed on their part to

15:24:25  15       act together for an accomplishment of an unlawful

15:24:29  16       purpose.

15:24:29  17           The government must prove that two or more persons

15:24:31  18       knowingly and intentionally arrived at some type of

15:24:35  19       agreement or understanding that they would violate the

15:24:36  20       law by means of some common plan or course of action as

15:24:40  21       alleged in Count 1 of the indictment.

15:24:42  22           It is proof of this conscious understanding and

15:24:45  23       knowing agreement by the alleged members that should be

15:24:48  24       central to your consideration of the charge of

15:24:52  25       conspiracy.

15:24:53  1        Before the jury may find that any defendant or any

15:24:55  2   other person became a member of the conspiracy charged

15:24:58  3   in the indictment, the evidence in the case must show

15:25:01  4   beyond a reasonable doubt that the defendant knew the

15:25:02  5   purpose or goal of the agreement or understanding and

15:25:06  6   deliberately entered into the agreement, intending in

15:25:08  7   some way to accomplish the goal or purpose of this

15:25:12  8   common plan or action.

15:25:13  9        In order to find a defendant guilty of the crime,

15:25:16  10  the government must prove beyond a reasonable doubt that

15:25:19  11  in addition to being present or knowing about the crime

15:25:21  12  charged in the indictment, the defendant knowingly

15:25:23  13  associated himself with the crime charged in some way as

15:25:26  14  a participant, someone who wanted the crime to be

15:25:30  15  committed, not as a mere spectator.

15:25:32  16       Merely associating with others and discussing

15:25:34  17  common goals, mere similarity of conduct between or

15:25:39  18  among such persons, merely being present at a place

15:25:42  19  where a crime takes place or is discussed, or even

15:25:44  20  knowing about criminal conduct does not, of itself, make

15:25:47  21  someone a member of a conspiracy or a conspirator.

15:25:51  22       If the evidence establishes beyond a reasonable

15:25:53  23  doubt that the defendant knowingly and intentionally

15:25:56  24  entered into an agreement, the fact that the other, that

15:26:00  25  any other defendants did not join the agreement at its

15:26:04  1    beginning or did not know all of the details of the

15:26:07  2    agreement, or did not participate in each of the acts of

15:26:10  3    the agreement, or did not play a major role in

15:26:13  4    accomplishing the unlawful goal, is not important to

15:26:15  5    your decision regarding membership in the conspiracy.

15:26:18  6         Once you've decided that the defendant was a member

15:26:21  7    of a conspiracy, that defendant is responsible for what

15:26:24  8    other conspirators said or did to carry out the

15:26:29  9    conspiracy, whether or not that defendant knew what they

15:26:31  10   said or did.

15:26:32  11        The extent of a defendant's respective

15:26:35  12   participation has nothing to do with the issue of guilt.

15:26:38  13   A conspirator's guilt is not measured by the extent he

15:26:41  14   participated or the length of time he took part in the

15:26:44  15   conspiracy.

15:26:44  16        Indeed, each member may perform separate and

15:26:47  17   distinct acts and may do them at different times as the

15:26:51  18   conspiracy is carried out.  An equal role is not what

15:26:54  19   the law requires.

15:26:55  20        In fact, even a single act may be enough to make a

15:26:59  21   defendant a member of a conspiracy.  Thus, it is no

15:27:02  22   defense that a defendant's participation in a conspiracy

15:27:04  23   was a minor one or only for a short period of time.

15:27:09  24        Count 38 charges that Walter Hill possessed with

15:27:12  25   the intent to distribute a controlled substance, which

15:27:16  1   is a violation of federal law.

15:27:17  2        In order to sustain its burden of proof for the

15:27:19  3   crime of possession with intent to distribute, the

15:27:22  4   government must prove the following essential elements

15:27:25  5   beyond a reasonable doubt:

15:27:26  6        First, that the defendant possessed the controlled

15:27:30  7   substance described in the indictment.

15:27:31  8        Second, that the defendant knew that this substance

15:27:33  9   was a controlled substance.

15:27:33  10       And third, that the defendant intended to

15:27:36  11  distribute the controlled substance.

15:27:37  12       If you're convinced that each of the elements for

15:27:40  13  possession with intent to distribute a controlled

15:27:44  14  substance has been proved beyond a reasonable doubt for

15:27:45  15  a particular defendant with respect to this count, then

15:27:48  16  it is your duty to return a verdict of guilty as to that

15:27:51  17  particular defendant on this count.

15:27:55  18       However, if you have a reasonable doubt as to any

15:27:57  19  of these elements with respect to this count, then it is

15:28:03  20  your duty to return a verdict of not guilty as to the

15:28:06  21  defendant on this count.

15:28:07  22       The term "to possess" means to exercise control or

15:28:09  23  authority over something at a given time.  There's

15:28:13  24  several types of possession:  Constructive, sole and

15:28:16  25  joint.

15:28:16  1          The possession is considered to be actual when a

15:28:18  2   person knowingly has direct physical control or

15:28:21  3   authority over something.  Possession is called

15:28:23  4   constructive when a person does not have direct physical

15:28:26  5   control over something, but can knowingly control it and

15:28:29  6   intends to control it, sometimes through another person.

15:28:32  7          Possession may be knowingly exercised by one person

15:28:35  8   exclusively, which is sole possession, or possession may

15:28:39  9   be knowingly exercised jointly when it is shared by two

15:28:43  10  or more persons.

15:28:45  11         The phrase "with intent to distribute" means to

15:28:47  12  have in mind or to plan in some way to deliver or to

15:28:50  13  transfer possession or control over a thing to someone

15:28:54  14  else.

15:28:55  15         In attempting to determine the intent of the

15:28:57  16  defendant, you may take into consideration all the facts

15:29:01  17  and circumstances shown by the evidence received in the

15:29:05  18  case concerning a particular defendant.

15:29:06  19         In determining a person's intent to distribute

15:29:11  20  controlled substances, you may consider among other

15:29:13  21  things the purity of the controlled substance, the

15:29:16  22  quantity of the controlled substance, the presence of

15:29:18  23  equipment used in the processing or sale of controlled

15:29:20  24  substance, and large amounts of cash.

15:29:22  25         The government must prove beyond a reasonable doubt

15:29:24  1    the intent to distribute as alleged in the indictment.

15:29:28  2         The evidence in the case need not prove the actual

15:29:32  3    amount of the controlled substance alleged in the

15:29:34  4    indictment.  The government must prove beyond a

15:29:37  5    reasonable doubt, however, that a measurable amount of

15:29:39  6    the controlled substance alleged in the relevant count

15:29:42  7    of the indictment that you are considering was in fact

15:29:44  8    involved.

15:29:44  9         It is not necessary for the government to prove

15:29:47  10   that the defendant knew the precise nature of the

15:29:49  11   controlled substance that was the object of the

15:29:51  12   conspiracy to possess with intent to distribute.  The

15:29:57  13   government must prove beyond a reasonable doubt,

15:29:59  14   however, that the defendant did know that some type of

15:30:02  15   controlled substance was the object of the conspiracy or

15:30:04  16   was possessed with the intent to distribute.

15:30:09  17        In Count 38, the defendant is charged with aiding

15:30:12  18   and abetting in the commission of the offense charged in

15:30:16  19   that count.  A person may violate the law even though he

15:30:21  20   does not personally do each and every act constituting

15:30:25  21   the offense, if that person aided and abetted the

15:30:30  22   commission of the offense.

15:30:31  23        Before a defendant may be held responsible for

15:30:33  24   aiding and abetting others in the commission of a crime,

15:30:36  25   it is necessary that the government prove beyond a

reasonable doubt that the defendant knowingly and
deliberately associated himself in some way with the
crime charged, and participated in it with the intent to
commit the crime.

In order to be found guilty of aiding and abetting
the commission of the crimes charged in Count 38 of the
indictment, the government must prove beyond a
reasonable doubt:

First, the defendant knew that the crime charged
was to be committed or was being committed.

Second, that the defendant knowingly did some act
for the purpose of furthering the commission of the
crime.

Third, that the defendant acted with the intention
of causing the crime charged to be committed.

And fourth, that someone committed each of the
essential elements of the offense charged.

Merely being present at the scene of the crime or
merely knowing that a crime is being committed or is
about to be committed is not sufficient conduct for you
to find that a defendant aided and abetted the
commission of a crime.

The government must prove that the defendant
knowingly associated himself with the crime in some way
as the participant, not as a mere spectator.

15:31:39  1          Counts 4, 5, 6, 7, 8, 9, 10 and 42 charge that a

15:31:46  2     defendant used a telephone to commit or facilitate the

15:31:49  3     commission of an act or acts constituting a drug

15:31:52  4     trafficking felony, which is a violation of federal law.

15:31:55  5          In order to sustain its burden of proof for the

15:31:57  6     crime of using a communication facility as charged in

15:32:02  7     the indictment, the government must prove the following

15:32:05  8     two essential elements beyond a reasonable doubt:

15:32:06  9          First, that the defendant knowingly used a

15:32:09  10    communication facility.

15:32:11  11         And second, that the defendant used the

15:32:14  12    communication facility with the intent to commit or

15:32:16  13    facilitate the commission of an illegal act involving

15:32:19  14    drugs.

15:32:19  15         If you are convinced that the elements for use of a

15:32:23  16    communication facility to cause or facilitate a drug

15:32:26  17    crime have been proved beyond a reasonable doubt for a

15:32:29  18    particular defendant with respect to a specific count,

15:32:32  19    then it is your duty to return a verdict of guilty as to

15:32:34  20    that defendant on that count.

15:32:36  21         However, if you have a reasonable doubt as to any

15:32:38  22    of these elements with respect to a particular count and

15:32:41  23    a particular defendant, then it is your duty to return a

15:32:45  24    verdict of not guilty as to that defendant on that

15:32:47  25    count.

15:32:47  1        The term "communication facility" as used in these

15:32:58  2    instructions means the telephone, radio, wire or any

15:33:03  3    other public or private means of communication.

15:33:06  4        The term "facilitate in the commission" as used in

15:33:10  5    these instructions means to assist or help someone to do

15:33:12  6    something, or in some way make the task less difficult

15:33:17  7    to accomplish.

15:33:21  8        All right.  We'll now have the closing argument.

15:33:25  9    We will start with the closing argument for the Group A

15:33:30  10   panel.

15:33:30  11       So Group B, you will be returned to the

15:33:34  12   deliberation room, and then we'll have your closing

15:33:36  13   argument after these closing arguments.

15:33:38  14       So Group B, you can proceed to the deliberation

15:33:41  15   room.

15:33:42  16       (Jury B panel not present)

15:34:33  17       THE COURT:  Let me see counsel briefly.

15:34:50  18       (Sidebar discussion held as follows:)

15:34:57  19       THE COURT:  We're going to move these tables

15:34:59  20   out of here.  That's what we're waiting for, because the

15:35:02  21   tables need to go downstairs, because Group A, after

15:35:08  22   this, will be deliberating downstairs.  These are their

15:35:12  23   deliberation tables.  So hopefully someone will come in

15:35:14  24   here, whip them out, and then we'll start.

15:35:18  25       MR. WATLINGTON:  So we'll take a break.

15:35:19  1          THE COURT:  No, not take a break.  It will

15:35:23  2      happen just as we're here.

15:35:23  3          (Pause.)

15:35:47  4          Let me see counsel briefly again.

15:36:00  5          Attorney Mingolla?

15:36:02  6          MR. MINGOLLA:  Sir?  Sorry.

15:36:11  7          THE COURT:  Is the cocaine closed up?

15:36:13  8          MS. LAKE:  I believe so.

15:36:15  9          THE COURT:  I react to it the minute it's

15:36:18 10      opened.  And I know it was supposed to be sealed.  And

15:36:20 11      it affects my throat in the worst way.  So if it's not

15:36:25 12      taped, then wrapped in plastic, it's going to be a

15:36:27 13      constant bother.  It might already be in the air for me.

15:36:35 14          MS. LAKE:  It was inside of plastic bags.

15:36:37 15          THE COURT:  It doesn't matter.  Once they

15:36:40 16      unseal it my throat goes to the toilet.  So...

15:36:46 17          MS. LAKE:  I can check to see if they've taped

15:36:49 18      it up.

15:36:49 19          THE COURT:  Yes.  Why don't we see if someone

15:36:52 20      can tape it up.

15:36:54 21          (End of sidebar, open court as follows:)

15:37:14 22          THE COURT:  All right.  We'll now have the

15:37:15 23      closing argument from the government.

15:37:20 24          Attorney Lake?

15:37:21 25          MS. LAKE:  Yes, Your Honor.  Thank you.

| | | |
|---|---|---|
| 15:37:21 | 1 | CLOSING ARGUMENT BY THE GOVERNMENT (Re Def. Brown) |
| 15:37:28 | 2 | MS. LAKE:  Good afternoon, ladies and |
| 15:37:30 | 3 | gentlemen. |
| 15:37:30 | 4 | As you know, Raymond Brown has been charged with |
| 15:37:34 | 5 | conspiracy to possess with intent to distribute cocaine. |
| 15:37:39 | 6 | He has also been charged with using a telephone to |
| 15:37:42 | 7 | commit those crimes. |
| 15:37:44 | 8 | Now, the judge has instructed you on the law.  And |
| 15:37:48 | 9 | those are the instructions that you will follow in your |
| 15:37:50 | 10 | deliberation. |
| 15:37:51 | 11 | And as the judge instructed you, conspiracy, the |
| 15:37:55 | 12 | crime of conspiracy, the crime is the agreement.  That's |
| 15:38:01 | 13 | all the government must prove, the agreement. |
| 15:38:05 | 14 | So what's the evidence presented before you? |
| 15:38:08 | 15 | You heard from Roberto Tapia, you heard from Angel |
| 15:38:18 | 16 | Negron Beltran, also known as Pee Wee. |
| 15:38:20 | 17 | What is the evidence that you have? |
| 15:38:21 | 18 | You have Roberto Tapia testifying and telling you |
| 15:38:24 | 19 | that he and the Defendant Raymond Brown conspired and |
| 15:38:28 | 20 | agreed to distribute 24 kilograms of cocaine. |
| 15:38:34 | 21 | What else do you have? |
| 15:38:36 | 22 | You have telephone calls explaining the agreement, |
| 15:38:41 | 23 | the conspiracy, the agreement to distribute 24 kilograms |
| 15:38:46 | 24 | of cocaine. |
| 15:38:47 | 25 | What else do we know? |

15:38:50  1          We know that the Defendant Raymond Brown is also

15:38:53  2     known as La Catora.  You heard that from Roberto Tapia.

15:38:59  3     You heard that from Angel Negron.

15:39:03  4          What else do we know?

15:39:04  5          We know, you heard from Angel Negron Beltran.  He

15:39:12  6     testified he knows the Defendant Raymond Brown.  He has

15:39:14  7     met him before.  He knows him as La Catora.

15:39:17  8          You heard from Roberto Tapia, the three of them

15:39:20  9     agreed to distribute two kilograms of cocaine.

15:39:23  10          The Defendant Raymond Brown supplied to Roberto

15:39:28  11     Tapia two kilograms of cocaine, that Roberto Tapia then

15:39:34  12     gave to Pee Wee, Angel Negron.

15:39:40  13          What else do we know?

15:39:42  14          We know that Defendant Raymond Brown and Pee Wee

15:39:45  15     arranged to meet to discuss the price of those

15:39:47  16     two kilograms.

15:39:48  17          How do we know this?

15:39:50  18          You know it from the testimony of the witnesses,

15:39:52  19     and you know it from the phone calls.  You know beyond a

15:39:57  20     reasonable doubt that the defendant is guilty of

15:39:59  21     conspiring to distribute two counts -- two separate drug

15:40:05  22     deals, 24 kilograms of cocaine, 24 kilograms of cocaine,

15:40:11  23     and on a separate incident, 2 kilograms of cocaine.

15:40:14  24          So let's listen to those phone calls.

15:40:16  25          The first one, Government's Exhibit 12.

15:40:41  1        (Exhibit published.)

15:41:06  2        So what else do you know?

15:41:07  3        You know that Roberto Tapia and Raymond Brown were

15:41:10  4  discussing the price of cocaine.  The price in Puerto

15:41:17  5  Rico dropped to 22.  The price dropped down.

15:41:19  6        Raymond Brown, you have to go lower on the price

15:41:22  7  and we're going to get this deal done.  We need to get

15:41:25  8  this 24-kilo deal done.  That's what you know.

15:41:27  9        Let's play Exhibit Number 14.

15:41:54  10        (Exhibit published.)

15:42:09  11        What else do you know?

15:42:10  12        In that phone call alone you know that the

15:42:13  13  Defendant Raymond Brown and Roberto Tapia agree on

15:42:17  14  24 kilos.

15:42:18  15        What else do you know?

15:42:20  16        You know that Roberto Tapia told Raymond Brown:

15:42:24  17  I'm going to get the money tomorrow.

15:42:27  18        That is the agreement.  That is the conspiracy.

15:42:30  19  That is the distribution of 24 kilograms of cocaine.

15:42:36  20  That's what you know.  We know that the Defendant

15:42:39  21  Raymond Brown is a drug dealer.  We know that.

15:42:44  22        And finally, Government's Exhibit 16.

15:42:51  23        (Exhibit published.)

15:43:00  24        In this phone call, what do we know?

15:43:02  25        Roberto Tapia testified.  Raymond Brown called him.

15:43:06  1    They agreed to meet at Cape Air.  And they did meet, and

15:43:09  2    they had a conversation.  And Raymond Brown told him the

15:43:13  3    24 kilos will be in a car at Market Square.

15:43:21  4        What else do we know?

15:43:23  5        Roberto Tapia testified and told you that he went

15:43:26  6    to that car, just like Raymond Brown told him to.

15:43:29  7        And what was in that car?  24 kilograms of cocaine.

15:43:33  8        What else do we know?

15:43:34  9        Roberto Tapia put the money inside, took the

15:43:37  10   24 kilograms of cocaine that Raymond Brown left him, and

15:43:41  11   he finished the deal.

15:43:44  12       So what do we know?

15:43:46  13       We know that Raymond Brown is guilty.  We know that

15:43:49  14   he is a drug dealer and we know that he's guilty of

15:43:52  15   conspiring and agreeing to distribute 24 kilograms of

15:43:55  16   cocaine.

15:43:55  17       We know he used his telephone to commit those

15:43:59  18   crimes.

15:43:59  19       So what else do we know?

15:44:02  20       Aside from the fact that the Defendant Raymond

15:44:05  21   Brown is a drug dealer, what else do we know?

15:44:08  22       We know that he conspired and agreed to distribute

15:44:11  23   two additional kilograms on a separate occasion.

15:44:15  24       Let's play Government's Exhibit 31.

15:45:03  25       (Exhibit published.)

15:45:07  1          So what did Roberto Tapia tell us regarding this

15:45:11  2     phone call?  That he and the Defendant Raymond Brown, La

15:45:16  3     Catora, agreed that the Defendant Raymond Brown would

15:45:19  4     provide two kilograms, and that Raymond called and asked

15:45:22  5     for them back.  "I need those two applications back,"

15:45:27  6     because he had another buyer.

15:45:29  7          And what did Roberto Tapia say?

15:45:32  8          "Okay.  I'll get you those subscriptions back."

15:45:36  9          Applications, subscriptions, it's all drugs.  You

15:45:39  10    heard from Roberto Tapia.  It's two kilograms of

15:45:43  11    cocaine.

15:45:43  12         He gave it to Roberto Tapia, and then he asked for

15:45:46  13    them back.  And then he gave them right back to him.

15:45:49  14    And he provided those two kilograms to Angel

15:45:55  15    Negron-Beltran, that we know is Pee Wee.  That's what we

15:45:57  16    know.  And he is a drug dealer.

15:45:59  17         And finally, Government's Exhibits 53a and b.

15:46:22  18         (Exhibit published)

15:49:02  19         What else do you know?

15:49:05  20         You heard from Robert to Tapia and Angel Negron

15:49:10  21    Beltran, they both testified, La Catora, the Defendant

15:49:14  22    Raymond Brown, supplied, provided those two kilograms of

15:49:17  23    cocaine.  He gave them to Roberto Tapia.

15:49:20  24         Roberto Tapia gave them to Angel Negron-Beltran,

15:49:25  25    and that the defendant would contact him, like you saw

15:49:28  1   on the phone call, like you heard in the testimony, the

15:49:31  2   defendant "will contact you.  You two negotiate the

15:49:34  3   price."

15:49:35  4       What do we know?  We know that the defendant is

15:49:39  5   guilty.  We know that there was an agreement.  We knew

15:49:44  6   that -- we know that he had a unity of purpose.  They

15:49:48  7   understood the objectives and that was to distribute and

15:49:53  8   supply cocaine.

15:49:53  9       We know that the defendant is guilty.  We know that

15:49:56  10  he's a drug dealer because you heard from the people

15:49:59  11  that he deals drugs with.

15:50:01  12      You heard from Roberto Tapia:  Yes, he's a drug

15:50:04  13  dealer.

15:50:05  14      You heard from Angel Negron Beltran:  Yes, he is a

15:50:10  15  drug dealer.

15:50:11  16      Because that's who you deal drugs with, other drug

15:50:14  17  dealers.  That's who you know.  The defendant is a drug

15:50:18  18  dealer.  And we are confident and as you deliberate,

15:50:22  19  listen to the calls, listen, remember the evidence, the

15:50:26  20  defendant is guilty of conspiring to distribute

15:50:31  21  24 kilograms and then 2 kilograms.  The Defendant

15:50:35  22  Raymond Brown used his phone to complete those crimes.

15:50:39  23  The defendant is guilty and the government is confident

15:50:43  24  at the end of your deliberations you will come back with

15:50:45  25  a guilty verdict.

15:50:47   1          Thank you.

15:50:49   2                  THE COURT:   Thank you, Attorney Lake.

15:50:51   3          Attorney Watlington?

15:51:04   4                  MR. WATLINGTON:   Good afternoon, Your Honor.

15:51:06   5                  THE COURT:   Good afternoon.

15:51:08   6              CLOSING ARGUMENT BY DEFENDANT BROWN

15:51:08   7                  MR. WATLINGTON:   Good afternoon, ladies and

15:51:10   8      gentlemen of the jury.

15:51:10   9          Well, first of all, I would like to thank you for

15:51:12   10     being very attentive and sitting through this process

15:51:15   11     for three days.  It's one of the most responsible tasks

15:51:20   12     that citizens have in the United States, judging the

15:51:27   13     guilt or innocence of someone.

15:51:30   14         And that process is the hallmark of our democracy,

15:51:37   15     where people who are considered peers determine facts in

15:51:46   16     terms of what is presented in a forum such as this.  So

15:51:52   17     again I thank you.

15:51:55   18          This case isn't about who can say "guilty" the

15:52:00   19     loudest, and how many times you can say "guilty."

15:52:04   20     Actually, only two people determine guilt to any -- or I

15:52:09   21     should say two entities:  a jury like you, or a judge.

15:52:15   22          If the judge were the trier of the facts, then he

15:52:17   23     would determine guilt or innocence.  However, you are

15:52:21   24     the triers of the facts.  You determine what is

15:52:26   25     truthful, what makes sense and what doesn't make sense.

15:52:31  1    And if you evaluate and review the government's case

15:52:36  2    honestly, fairly and carefully, you have to find that

15:52:44  3    what you heard is a lot of nonsense.

15:52:48  4         Here is what the government presented to you.

15:52:51  5         They presented to you the testimony of two

15:52:54  6    convicted drug dealers, one a local former law

15:53:05  7    enforcement, director of Planning and Natural Resources,

15:53:10  8    who did not admit on the witness stand that he's been

15:53:15  9    involved for decades with not only drug running, but

15:53:21  10   with human trafficking.  He said no, he didn't.

15:53:28  11        Here is a drug dealer, ladies and gentlemen, who

15:53:34  12   wants you to believe that his credibility isn't

15:53:39  13   tarnished, and that what he says you should believe, or

15:53:46  14   you can believe.

15:53:49  15        Here is a now disrespected and dethroned law

15:54:04  16   enforcement officer telling you that he speed read his

15:54:10  17   supplement to his plea agreement.  He speed read it.

15:54:13  18   Even though this is supposed to be the most important

15:54:15  19   document that affects his future.  But he still spent

15:54:25  20   three hours going through transcripts, because he wants

15:54:29  21   to tell the truth.

15:54:34  22        We also have a Puerto Rican drug dealer, another

15:54:41  23   convicted Puerto Rican drug dealer who told you he

15:54:45  24   pleaded guilty because he couldn't win his case.  So the

15:54:47  25   next best thing is to try to help convict anyone else

15:54:52   1   who has been accused in this case.

15:54:55   2        That person was being accused with my client,

15:54:59   3   Raymond Brown.

15:55:03   4        You heard his testimony.  You heard him say that

15:55:06   5   Tapia told him that two kilos that he received from

15:55:13   6   Tapia belonged to my client.

15:55:15   7        You heard AUSA Kelly Lake asked, urged and pushed

15:55:31   8   Mr. Negron-Beltran, trying to get him to say that he and

15:55:39   9   Raymond Brown had some deal.

15:55:42  10        But what did he say?

15:55:44  11        He said they spoke in Puerto Rico.  And you heard

15:55:48  12   the testimony from Ms. Springette that, yes, they went

15:55:53  13   to a party there, and just as they came, they left,

15:56:01  14   empty handed.

15:56:02  15        That he said specifically, there was no agreement,

15:56:07  16   no agreement, nothing was done.

15:56:14  17        So where are the two kilos?  Where is the money for

15:56:18  18   these two kilos?  Where is it?

15:56:32  19        Mr. Tapia said it's in Puerto Rico.  But it got

15:56:39  20   there, and it somehow was never paid for?

15:56:42  21        I mean, where did it go?

15:56:48  22        I ask you to review the same transcript, the same

15:56:53  23   Exhibit 53 that the government is relying on.  Listen

15:57:02  24   carefully, review it carefully.  Because if you read it

15:57:06  25   well, and you reviewed the testimony of

15:57:11  1    Ms. Latoya Springette, she told you Raymond doesn't have

15:57:18  2    two children, two sons.

15:57:21  3        The parrot has two sons, the parrot.  And her two

15:57:26  4    sons are coming down.  Mr. Brown has one daughter, five

15:57:35  5    years old.

15:57:35  6        She told you they went there, her daughter,

15:57:40  7    himself, and she, that they stayed there for a few

15:57:46  8    minutes.  They had, they left with no thousands of

15:57:51  9    dollars nor with no cocaine that supposedly was being

15:57:55  10   returned, according to Mr. Tapia or, if you believe,

15:58:01  11   Mr. Angel Negron-Beltran.

15:58:09  12       Now, when we started this trial my client started

15:58:12  13   with ten counts.  You will note that you're going to

15:58:19  14   deliberate on eight, six having to do with telephone

15:58:27  15   calls.

15:58:27  16       I just listened carefully to Attorney Lake as she

15:58:37  17   recapped what was said.  And what I heard in the first

15:58:42  18   call from my client was:  Yes, okay.

15:58:49  19       Second call:  Yeah, all right.

15:58:54  20       Third call:  I right here by -- some place.

15:58:59  21       Fourth call:  Two applications.  Call me when I

15:59:08  22   done.

15:59:08  23       And the fifth call was a discussion between

15:59:15  24   Negron-Beltran and Tapia, wherein Tapia is telling him

15:59:22  25   this or that, and that the parrot and her two sons are

15:59:26   1    coming down.

15:59:30   2        What's also interesting is Mr. Tapia's testimony

15:59:38   3    about this alleged 24 kilos.

15:59:41   4        Now, you don't hear any conversation about I'm

15:59:47   5    going to drop it by a blue Honda in the Market Square.

15:59:54   6    That's what Tapia wants you to believe.  And that's why

15:59:57   7    the government continues to shout at you and say guilty,

16:00:00   8    guilty, guilty, guilty, about ten times.

16:00:04   9        But remember, only you, ladies and gentlemen of the

16:00:06   10   jury, determine guilt or innocence, not me, not Attorney

16:00:11   11   Lake, not the judge in this case, not Attorney Mingolla

16:00:15   12   and not anyone who is listening.

16:00:20   13       Your verdict comes from what you hear, what you

16:00:23   14   make sense out of.

16:00:26   15       And just let me tell you, this is the first and

16:00:31   16   only time -- last time that I'm going to have this

16:00:35   17   opportunity to recap this information.  The government

16:00:38   18   will have another crack, so they will try to rebut what

16:00:42   19   I'm going to say.

16:00:43   20       However, you are the fact finders.  What I say,

16:00:47   21   what they say, is not evidence.  The evidence is the

16:00:52   22   testimony that you've heard.  And the judge has

16:00:58   23   instructed you about how you're supposed to handle that

16:01:01   24   testimony, who to believe and what to believe.

16:01:08   25       Let's think about Negron's testimony.  How much

16:01:12  1    credit should you give Angel Negron-Beltran's testimony?

16:01:20  2          How much weight must you give it?

16:01:24  3          Seven kilos; 200 grams?  Most of it, none.

16:01:33  4          Now let's look at our infamous director of law

16:01:39  5    enforcement and planning, who said that he's been

16:01:41  6    dealing in drugs for almost two decades.  He's using the

16:01:50  7    same boat to pick up these drugs and move these drugs

16:01:54  8    that he also used to pick up -- our taxpayer's boat,

16:02:01  9    that he also used to transport our government officials.

16:02:05  10         Can you -- or I should say -- you cannot believe

16:02:15  11   and rely on Tapia's testimony, not to convict my client.

16:02:25  12   Not if you use the standard that in fact we are

16:02:27  13   committed to use.

16:02:32  14         He testified that my client told him, pick up

16:02:35  15   24 pounds, 24 kilos.  I think that's a little over, a

16:02:40  16   kilo's supposed to be a little over 2 pounds.  I'm not

16:02:46  17   sure.  But I believe I can tell you if it's 24 kilos,

16:02:49  18   that means it's three times the amount that you see in

16:02:52  19   that box.

16:03:01  20         So that means it had to be someplace.  You didn't

16:03:03  21   hear him say:  I went in the car and I take it out of

16:03:06  22   the front seat -- the back seat, under the seat, or

16:03:10  23   where it was.

16:03:16  24         And if you have three times and a little more than

16:03:21  25   that box, it has to be somewhere.  And assuming the

16:03:25  1    Honda Civic, it would be in the back seat, front seat or

16:03:26  2    in the trunk, open and notorious in Market Square, for

16:03:32  3    those of us or you who know Market Square.

16:03:38  4         So obviously -- I can't tell you.  I'm not going to

16:03:41  5    speculate where it was.  But what you did hear -- or

16:03:51  6    what you didn't hear, you never heard any discussion

16:03:54  7    about a cost, a price or a total for these 24 kilos,

16:04:01  8    other than from who?

16:04:06  9         Mr. Tapia, who got upset when somebody said it

16:04:12  10   seems like you would turn in your mother to save

16:04:15  11   yourself.  As we say, sometimes, the guy who is singing

16:04:20  12   for his supper or is singing for a better deal.

16:04:28  13        He said he put $250,000 in a car, he don't know who

16:04:33  14   it belong to.  Just leave it there.  Now, I don't know

16:04:40  15   how much a kilo is, because I'm -- I don't deal in it,

16:04:44  16   so I can't tell you.  So I know none of you also deal in

16:04:48  17   it, so you wouldn't be experts in it either.

16:04:50  18        But what I heard is that testimony that a kilo is

16:04:57  19   20,000, I think you heard that, I heard a suggestion of

16:05:01  20   18,000.  I heard a suggestion of 15,500.  I heard a

16:05:11  21   suggestion of 14,500.

16:05:15  22        But when I asked Mr. Tapia about the amount of

16:05:21  23   money, he quickly say, oh, that one were 13,500 for

16:05:26  24   24 kilos.  Well, you do the math.  That's a big number

16:05:32  25   that he's throwing out here, to think it could just work

16:05:36   1    in -- work out like that.  You have pen and paper.  You

16:05:39   2    do the math.

16:05:39   3         I did it a little earlier and I think I come up

16:05:42   4    with 13 thousand -5, times 24, is 320,000-plus.  I think

16:05:55   5    if you keep going down the list you will find that for

16:06:00   6    alleged 24 kilos, it would be, if you get to 250, it

16:06:07   7    will be someplace or a little over 10,000.

16:06:11   8         So in this business, I believe it have greedy

16:06:18   9    people, so I don't know where the other $70,000, if it

16:06:21   10   was 13, 5, where the other $70,000 went, come or going.

16:06:31   11        But this is the information the government want you

16:06:35   12   to rely upon to convict somebody, you know.  The

16:06:38   13   information from an admitted drug dealer of over

16:06:45   14   20 years, who betrayed the trust of this government and

16:06:49   15   the people of the Virgin Islands.

16:06:52   16        I don't have to shout about guilty, guilty, guilty,

16:06:55   17   because that doesn't make someone culpable.

16:07:01   18        Where is the possession?

16:07:03   19        Where is the agreement to possess and distribute?

16:07:11   20        Where is it?  Yeah, okay.

16:07:15   21        Where are the pictures of this coke?  Where is the

16:07:19   22   cash?

16:07:20   23        Where is the photographs that you can hold and feel

16:07:25   24   and see?

16:07:30   25        The judge has told you that the standard in

16:07:37   1    American jurisprudence is proof beyond a reasonable

16:07:40   2    doubt.  And in my few years of talking to jurors and

16:07:44   3    trying cases, it's always a challenge to explain.  And

16:07:48   4    as the judge says, it is easy to say "proof beyond a

16:07:52   5    reasonable doubt," but it's kind of a little difficult

16:07:54   6    to define, because you don't just -- you're not supposed

16:07:57   7    to define something by using the same words that you're

16:08:00   8    trying to define.

16:08:01   9      But "reasonable doubt" means using your reason, and

16:08:06   10   the kind of doubt is the kind of restraint or pause that

16:08:13   11   you will have to make when you're confronted with an

16:08:17   12   issue that's important to your life.  It's not all

16:08:27   13   doubt, but it's a reasonable doubt.

16:08:32   14      Given the credibility of these two people, given

16:08:36   15   the instruction that the judge told you, you have to be

16:08:41   16   mindful of those individuals who are testifying with a

16:08:46   17   purpose, and the purpose of the government's evidence in

16:08:52   18   the form of Angel Negron-Beltran and Roberto Tapia is

16:09:05   19   their well-being for the next 20, 30 years of their

16:09:13   20   life.

16:09:14   21      I don't believe you will get an opportunity to see

16:09:17   22   the plea agreement or the supplement.  However, it is

16:09:21   23   clear that in there Mr. Tapia has agreed to testify and

16:09:30   24   say whatever he needs to say to get a huge reduction in

16:09:36   25   his proposed sentence.

16:09:40  1        Not a guarantee, but he has to go through the

16:09:51  2    process of testifying.  And again, you got to do the

16:09:54  3    math.  You got to use your common sense, you know,

16:10:01  4    because proof beyond a reasonable doubt suggests that

16:10:05  5    you use your common sense in determining factors.

16:10:13  6        As I said, the judge has instructed you about the

16:10:18  7    difficulty in determining what reasonable doubt is.  We

16:10:21  8    believe that there's more than a doubt.  My client

16:10:28  9    believe -- me and my client believe that if you view the

16:10:34  10   incredible testimony of the two accusers, you cannot

16:10:41  11   find beyond a reasonable doubt that he committed any of

16:10:45  12   the crimes for which he's accused of.

16:10:50  13       As I said, you can't, you haven't seen any

16:10:52  14   pictures, photographs, drawings, proceeds from 24 kilos.

16:11:02  15   You have not seen or heard any discussion on any tapes

16:11:06  16   of any cash paid to Raymond Brown by Mr. Tapia or by

16:11:14  17   Mr. Negron.  None.

16:11:18  18       You've seen -- you've heard no evidence of him

16:11:21  19   possessing, other than Mr. Tapia's statement.  None of

16:11:33  20   the alleged phone calls that the government relies upon

16:11:48  21   has any other reliable corroborating evidence that you

16:11:54  22   can put your hands on, other than Tapia's explanation as

16:12:00  23   to what he wants you to believe and glean from those

16:12:04  24   telephone calls.

16:12:09  25       In short, the evidence just doesn't fit.  The cash

16:12:16  1    doesn't add up.  The two witnesses are singing, singing

16:12:26  2    for their sentence reduction, and they're giving you an

16:12:37  3    incredible story.

16:12:46  4        We believe if you evaluate all that has been said,

16:12:49  5    all the testimony and all the inferences from the

16:12:53  6    testimony of the two accusers, you cannot find Mr. Brown

16:13:03  7    guilty beyond a reasonable doubt.

16:13:07  8        Furthermore, we believe you have a duty to acquit

16:13:12  9    Mr. Brown in this matter, and we hope and we await and

16:13:20  10   look forward to your vote, your unanimous vote and your

16:13:29  11   favorable verdict that we believe shows that the

16:13:38  12   Government of the United States has not put forth the

16:13:45  13   type of evidence that you can rely upon in making the

16:13:52  14   most serious and important decisions that one will

16:13:58  15   utilize, or the standard that you would use when you are

16:14:03  16   making decisions on your own personal affairs.

16:14:07  17       We ask you to transfer that same standard to your

16:14:12  18   judgment of this case.  And we believe once you do that,

16:14:17  19   you have no other choice and option other than to acquit

16:14:23  20   Raymond Brown of all the charges that he's here before

16:14:28  21   this Court.

16:14:29  22       We would like to thank you for your attention,

16:14:31  23   because we know that you've been attentive.  We

16:14:34  24   apologize for any delays or any problems that we may

16:14:39  25   have caused or distractions that we have caused to you.

16:14:42  1   And we hope that you do come back with a favorable

16:14:46  2   verdict.

16:14:47  3        Thank you.

16:14:49  4            THE COURT:  Thank you, Attorney Watlington.

16:14:50  5        Attorney Lake.

16:14:58  6            MS. LAKE:  Thank you.

16:14:58  7   REBUTTAL ARGUMENT BY THE GOVERNMENT (Re Brown)

16:15:02  8            MS. LAKE:  Ladies and gentlemen of the jury, I

16:15:03  9   will try not to repeat myself.  However, Attorney

16:15:08  10  Watlington had a number of questions that he asked, and

16:15:13  11  then he answered them himself.

16:15:15  12       So first, you are the sole judges of the facts.

16:15:20  13  You determine the credibility of the witnesses.  But

16:15:24  14  keep in mind when you are a drug dealer, when your

16:15:31  15  business is drugs, your colleagues are drug dealers, and

16:15:34  16  your colleagues work in drugs.  So the witnesses before

16:15:40  17  you are drug dealers, because they work with the

16:15:42  18  defendant.  They work with Raymond Brown.  They work in

16:15:47  19  the same business of dealing drugs, because the

16:15:51  20  Defendant Raymond Brown is a drug dealer.

16:15:55  21       And some of the questions and concerns Attorney

16:16:00  22  Watlington had, he suggested there had been no

16:16:04  23  conversation of price.  Well, there was a phone call.

16:16:08  24  It's Government's Exhibit 12, Roberto Tapia speaking to

16:16:19  25  Defendant Raymond Brown.  The price in Puerto Rico is

16:16:23  1    22.  It's going down.

16:16:27  2         He testified he told Raymond Brown:  Your price has

16:16:31  3    to go down.

16:16:32  4         Price is discussed.

16:16:35  5         And what else did you hear?

16:16:37  6         Attorney Watlington answered his own question

16:16:41  7    regarding 200,000 or 300-and-something thousand dollars.

16:16:46  8    He answered his own question about the price.

16:16:50  9         What else did you hear?

16:16:54 10         You know that Roberto Tapia and Raymond Brown had

16:16:57 11    discussed price.  They called on the phone and arranged

16:17:01 12    to meet in person, and Roberto Tapia told you what they

16:17:05 13    discussed.  And that's on the 24 kilograms.

16:17:10 14         On the two kilograms, what do you know?  You know

16:17:14 15    that Raymond Brown and La Catora, La Catora, who is

16:17:21 16    Raymond Brown, spoke to Angel Negron to discuss price.

16:17:27 17    You heard that from Roberto Tapia.  That's what we know.

16:17:30 18         We also know the defendant is guilty, and we also

16:17:33 19    know he's a drug dealer.

16:17:34 20         But what evidence do you have?  You have Roberto

16:17:36 21    Tapia and you have Angel Negron Beltran.

16:17:40 22         And you'll have the calls.  Listen to them.  You

16:17:43 23    are the sole judges of the facts.  You are the sole

16:17:47 24    judges of the credibility.  Listen.  Listen to the

16:17:52 25    calls.  Review your notes.  You are the sole judges.

| | | |
|---|---|---|
| 16:17:56 | 1 | But in the call I played for you, La Catora talks |
| 16:18:01 | 2 | about two Parrots, two birds, two sons, two birds, two |
| 16:18:07 | 3 | pigeons.  It's two kilograms.  It's all about |
| 16:18:11 | 4 | two kilograms. |
| 16:18:13 | 5 | So, ladies and gentlemen, you know what you know |
| 16:18:17 | 6 | based on the facts and the evidence.  You know beyond a |
| 16:18:21 | 7 | reasonable doubt that the defendant is guilty.  The |
| 16:18:24 | 8 | defendant is guilty of a conspiracy to distribute |
| 16:18:29 | 9 | cocaine. |
| 16:18:30 | 10 | And one last thing.  Defense counsel Watlington |
| 16:18:33 | 11 | mentioned all you heard was the Defendant Raymond Brown |
| 16:18:37 | 12 | say:  Yes, uhm-hmm, yes. |
| 16:18:38 | 13 | Well, you just heard an agreement.  That is the |
| 16:18:42 | 14 | crime.  The crime is the conspiracy.  And the crime is |
| 16:18:46 | 15 | the agreement.  And you heard the defendant commit the |
| 16:18:50 | 16 | crime.  You heard the agreement. |
| 16:18:52 | 17 | So ladies and gentlemen, we are confident that at |
| 16:18:55 | 18 | the close of your deliberations, you will find the |
| 16:18:58 | 19 | Defendant Raymond Brown guilty of conspiring to |
| 16:19:01 | 20 | distribute 24 kilograms of cocaine, and on a separate |
| 16:19:05 | 21 | occasion 2 kilograms of cocaine. |
| 16:19:07 | 22 | We are confident you will find him guilty. |
| 16:19:10 | 23 | Thank you. |
| 16:19:11 | 24 | THE COURT:  Okay.  Thank you, Attorney Lake. |
| 16:19:11 | 25 | |

FURTHER JURY INSTRUCTIONS BY THE COURT (Re Brown)

THE COURT:  The indictment charges that the crimes charged occurred on or about certain dates.  The proof need not establish with certainty the exact dates of the alleged offense.  It's sufficient if the evidence in this case establishes beyond a reasonable doubt that the offense was committed on dates reasonably near the date alleged.

During the course of this trial you've seen counsel both for the government and for defense make various objections to questions asked and evidence offered.  It is not only the right, it is the duty of counsel for either the government or for the defendants to make an objection when that counsel believes evidence or testimony being offered is not admissible under the Rules of Evidence.

Then I rule on the objections.

Do not be influenced in any way of my rulings, whether in favor of or against the government or the defendant.

As I already told you, these rulings involve questions of law only and must not be given any consideration in your deliberations.

Performing my constitutional role to preside over this trial, I sometimes found it necessary to ask a

16:20:14  1    question of a witness to clarify testimony I thought was

16:20:17  2    unclear.

16:20:18  3        If I've asked questions to any of the witnesses

16:20:20  4    during the course of this trial, or if I've said or done

16:20:23  5    anything during this trial or in the course or manner

16:20:25  6    that I'm instructing you now, whereby it seems to you

16:20:27  7    that I'm inclined to favor the case of the government or

16:20:30  8    the case of any defendant, you must remove any such

16:20:33  9    impression from your minds, as no such impression was

16:20:37  10   intended.

16:20:37  11       You've seen counsel consult with each other and

16:20:40  12   sometimes amongst each other.  Attorneys have an

16:20:44  13   obligation to consult with each other if such

16:20:45  14   consultation is in the best interest of an attorney's

16:20:49  15   client.

16:20:49  16       Counsel has also a right to request of me to make

16:20:53  17   rulings of law and request hearings outside of the jury.

16:20:56  18   All those questions of law must be decided by me, the

16:20:58  19   Court.

16:20:58  20       You should not show any prejudice against an

16:21:01  21   attorney or an attorney's client because the attorney

16:21:02  22   asked for a conference outside the hearing of a jury or

16:21:05  23   asked the Court for a ruling on the law.

16:21:07  24       All of these conferences deal with legal questions

16:21:09  25   on which I've ruled and do not concern your function as

16:21:12  1    jurors.  Do not speculate on such matters during your

16:21:15  2    deliberations.

16:21:15  3        It is my duty to admonish an attorney who, out of

16:21:21  4    zeal for the attorney's cause, says something which I

16:21:24  5    feel is not keeping with the Rules of Evidence or

16:21:26  6    procedure.  You are to draw absolutely no evidence -- no

16:21:30  7    inference against a side to whom an admonition of the

16:21:33  8    Court may have been addressed during the trial of this

16:21:35  9    case.

16:21:35  10       You've been chosen and sworn as jurors in this case

16:21:38  11   to try the issues of facts presented by the defendant's

16:21:41  12   pleas of not guilty to the charges in the indictment.

16:21:43  13       You are to perform this duty without bias, sympathy

16:21:47  14   or prejudice.  Under no circumstances, then, may your

16:21:49  15   deliberations be affected or diverted by any appeals to

16:21:53  16   bias, passion or prejudice, nor influenced by any pity

16:21:56  17   or sympathy in favor of either side.

16:21:58  18       In every respect your judgment must be considered,

16:22:01  19   deliberate and objective.  It must derive its force and

16:22:04  20   validity from the facts and inferences reasonably and

16:22:07  21   logically supported by the testimony.

16:22:08  22       Both the government and defendant expect that you

16:22:12  23   will carefully and impartially consider all of the

16:22:14  24   evidence, follow the law as stated by the Court and

16:22:16  25   reach a just verdict regardless of the consequences.

16:22:19    1        I need not impress upon you, I know, that it is

16:22:21    2    your duty to give an absolutely fair and impartial

16:22:24    3    verdict.

16:22:25    4        It was said that this is an important case.  That

16:22:27    5    is true.  Every case that comes into this Court is

16:22:30    6    important.

16:22:30    7        This case is of equal importance to the government

16:22:32    8    and to the defendant.  Each is entitled to your fairest

16:22:36    9    consideration, your closest judgment and your impartial

16:22:39   10    decision.

16:22:40   11        Jurors perform a very important function in

16:22:42   12    deciding upon their verdict.  You are an arm of this

16:22:44   13    Court, here to do justice.  That is sacred.  Do your

16:22:48   14    duty conscientiously, according to your oath and

16:22:52   15    according to these instructions and justice will be

16:22:54   16    done.

16:22:54   17        You were accepted as jurors based on your answers

16:22:58   18    when you were initially questioned about your

16:23:00   19    qualifications.

16:23:00   20        The answers you then made to the questions with

16:23:03   21    regard to your competency, qualifications, fairness,

16:23:06   22    lack of bias and freedom from sympathy are as binding

16:23:10   23    upon you now as they were then, and shall remain so

16:23:12   24    until you are finally discharged from further

16:23:15   25    consideration of this case.

16:23:16  1        Remember at all times you are not partisans, you

16:23:19  2    are judges, judges of the facts.  Your sole interest is

16:23:23  3    to search for and to ascertain the truth from the

16:23:27  4    evidence in this case.

16:23:27  5        You'll recall earlier in these instructions I

16:23:30  6    charged that under our system of criminal justice the

16:23:33  7    Court and jury have distinct functions.

16:23:35  8        What sentence or punishment, if any, a defendant

16:23:38  9    will receive if found guilty is entirely beyond the

16:23:42  10   province of the jury.  In plain words, that is the

16:23:44  11   business of this Court.

16:23:45  12       Sentence or punishment should never be considered

16:23:48  13   by a jury in any way in arriving at an impartial

16:23:51  14   verdict.

16:23:52  15       Your sole duty is to determine the guilt or lack of

16:23:54  16   guilt of the defendant presently on trial before you.

16:23:58  17       You're further instructed that if any of you has

16:24:00  18   developed any opinion in this case, predicated in whole

16:24:03  19   or in part on sources seen or heard outside of this

16:24:07  20   Court, you are to put such opinion out of your mind.

16:24:12  21       I want to express in the strongest possible terms

16:24:14  22   that regardless of what counsel has said in recalling

16:24:16  23   the facts of this case, it is your recollection of the

16:24:18  24   facts that should guide you in carrying out your

16:24:20  25   function as judges of the facts.

16:24:23  1          If any of the attorneys stated a version of the

16:24:27  2     facts that does not square with your own recollections,

16:24:29  3     you are to disregard that version in favor of your own

16:24:31  4     recollections.

16:24:32  5          In arriving at your verdict you are to consider all

16:24:35  6     the evidence as you recall it, and you are to give to

16:24:39  7     that evidence the weight that you believe it was

16:24:41  8     entitled to receive.

16:24:44  9          During the course of this trial you have no doubt

16:24:46  10    received certain definite impressions in how you think

16:24:48  11    it should be decided.

16:24:49  12         Do not allow these impressions to become so firmly

16:24:52  13    fixed that they prevent you from fairly and frankly

16:24:54  14    discussing this case with any of your fellow jurors who

16:24:56  15    may have a different point of view.

16:24:58  16         It is your duty as jurors to give careful attention

16:25:01  17    and consideration to the views of your fellow jurors, to

16:25:04  18    consult with one another and to deliberate with a view

16:25:06  19    toward reaching an agreement, if you can do so without

16:25:09  20    doing violence to your individual judgment.

16:25:10  21         Each of you must decide the case for yourselves,

16:25:13  22    but do so only after an impartial consideration of the

16:25:17  23    evidence with your fellow jurors.

16:25:18  24         In the course of your deliberations do not hesitate

16:25:21  25    to take a look at your own views and to change your

16:25:24  1   opinion if you become convinced it is wrong.  But do not

16:25:28  2   give up your honest conviction or belief about the

16:25:31  3   effect of the evidence based solely on the opinion of

16:25:34  4   your fellow jurors or just so you can return a verdict.

16:25:36  5       When you retire to the jury room to deliberate,

16:25:38  6   your first order of business is to elect a foreperson.

16:25:40  7       The foreperson will preside over your deliberations

16:25:43  8   and will speak for you here in court.  That person has

16:25:46  9   no greater weight of opinion than anyone else.

16:25:49  10      If it becomes necessary during your deliberations

16:25:51  11  to communicate with me, you may send a note by the court

16:25:54  12  security officer or a marshal.

16:25:56  13      Never try to communicate with me by any means other

16:26:00  14  than by a signed, sealed writing.  And bear in mind you

16:26:05  15  are not to reveal to the Court, or to any person, how

16:26:09  16  you stand numerically or otherwise until you've reached

16:26:19  17  a unanimous verdict.

16:26:21  18      Now a word about your verdict.

16:26:22  19      Your verdict must represent the considered judgment

16:26:24  20  of each juror, and all jurors must agree on the verdict

16:26:28  21  before you return a verdict.  Your verdict must be

16:26:30  22  unanimous.

16:26:30  23      To aid and assist you in the discharge of your

16:26:33  24  obligation, there has been prepared with the consent of

16:26:37  25  counsel a verdict form, which you are to answer

16:26:39  1    unanimously, thereby facilitating your task and that of

16:26:42  2    the Court in determining the proper verdict to be

16:26:45  3    entered.

16:26:45  4         As I discussed before, you will be making a

16:26:48  5    determination of guilty or not guilty on the crime with

16:26:51  6    which each defendant is charged.

16:26:53  7         As you will see when I give you the verdict form,

16:26:55  8    it has the space listed for the charge.  Within the

16:26:58  9    space you will note that there's a space provided for

16:27:00  10   guilty or not guilty.

16:27:01  11        When you've made a unanimous determination of the

16:27:04  12   guilt or innocence of the defendant with respect to a

16:27:06  13   particular charge, you will make an X mark in the

16:27:10  14   appropriate space, indicating either guilty or not

16:27:12  15   guilty.

16:27:12  16        You will also see that following certain charges

16:27:15  17   the verdict form has an additional condition with a

16:27:18  18   space for yes or no answers.

16:27:19  19        Answer these questions only if you find a defendant

16:27:24  20   guilty for that particular charge.  Follow the

16:27:25  21   directions as appropriate for these yes or no questions.

16:27:30  22        Nothing that has been said in these instructions or

16:27:33  23   in the form of verdict is to suggest or convey in any

16:27:37  24   manner what verdict I think you should find.

16:27:39  25        You'll take this form with you and when you have

16:27:41  1    unanimously made a determination, the foreperson should

16:27:43  2    date it, sign it, and then pass it to each of you to

16:27:46  3    sign.

16:27:46  4         Then it should be sealed.

16:27:48  5         Then you should advise the marshal that you wish to

16:27:50  6    be returned to the courtroom.

16:27:51  7         And upon your return to the courtroom, the

16:27:54  8    foreperson should bring the verdict form.

16:27:56  9         I will then ask if you've reached a verdict and, if

16:27:58  10   so, will ask the foreperson to announce the jury's

16:28:02  11   verdict.  Your foreperson will then respond by using the

16:28:04  12   completed verdict form supplied to you.

16:28:08  13        All right.  It is now time for you to begin your

16:28:10  14   deliberations.

16:28:10  15        You will have with you the evidence admitted in

16:28:13  16   this case with respect to Mr. Raymond Brown.  Those are

16:28:20  17   Exhibits 3 through 53.  And you will be deliberating

16:28:25  18   with respect to Mr. Raymond Brown on Counts 1, 4, 5, 6,

16:28:32  19   7, 8, 9, 10.

16:28:36  20        One final note.  You will be moving to our

16:28:41  21   courtroom on the first floor, the deliberation room

16:28:44  22   there, so you will not be in the room where you are now.

16:28:47  23   And if you need to meet with me or if I need to

16:28:49  24   communicate with you, we will do so in the courtroom

16:28:52  25   downstairs.

16:28:53   1          All right?

16:28:54   2          So with that, let me send you to the deliberation

16:29:01   3   room, after we...

16:29:13   4          THE CLERK:  Marshal?  Please raise your right

16:29:15   5   hand.

16:29:16   6      (CSO Heyliger sworn)

16:29:36   7          THE COURT:  It's now time to begin your

16:29:37   8   deliberations.  All rise.

16:30:17   9      (Panel A excused for deliberation.)

16:30:22   10          THE COURT:  Now we'll bring in Group B.

16:30:24   11          MS. LAKE:  Your Honor, may I just have a minute

16:30:26   12   to use the restroom?

16:30:29   13          THE COURT:  All right.  Just a couple of

16:30:31   14   minutes -- we'll be in recess -- we're lining up the

16:30:34   15   jury right now.

16:30:37   16          MR. WATLINGTON:  Your Honor, you didn't excuse

16:30:40   17   us.  Can we be excused?

16:30:42   18          THE COURT:  Yes.

16:30:43   19          MR. WATLINGTON:  Can we --

16:30:45   20          THE COURT:  I don't want you to leave the

16:30:47   21   courthouse, because there's the seven-minute rule, and

16:30:49   22   we need to have the instruction on that.  We'll do it

16:30:52   23   shortly.  So I don't want you to leave the courthouse.

16:30:57   24          MR. WATLINGTON:  No, we're not leaving the

16:30:59   25   courthouse.

| | | |
|---|---|---|
| 16:30:59 | 1 | THE COURT:  All right.  Very good.  Yes, you're |
| 16:31:00 | 2 | excused. |
| 16:31:01 | 3 | MR. WATLINGTON:  Thank you. |
| 16:31:03 | 4 | MS. LAKE:  Can I have a few moments, Your |
| 16:31:05 | 5 | Honor? |
| 16:31:05 | 6 | THE COURT:  Yes.  Let me make sure the redacted |
| 16:31:12 | 7 | indictment -- let me put this on the Elmo.  Attorney |
| 16:31:17 | 8 | Watlington, I don't want you to leave just yet.  This is |
| 16:31:20 | 9 | the indictment that will be going back to the... |
| 16:32:16 | 10 | MS. LAKE:  I'll just be right back, Your Honor. |
| 16:32:18 | 11 | Is that okay? |
| 16:32:19 | 12 | THE COURT:  The purpose of this is I want you |
| 16:32:21 | 13 | to see the redacted indictment that is going down -- |
| 16:32:24 | 14 | we'll take a break for you if we can just show this -- I |
| 16:32:28 | 15 | think if you unplug the back of it and then plug it back |
| 16:32:33 | 16 | in. |
| 16:33:39 | 17 | All right.  That's page one of the redacted |
| 16:33:41 | 18 | indictment.  Any issues with that from the government? |
| 16:33:43 | 19 | MS. LAKE:  No, Your Honor. |
| 16:33:44 | 20 | THE COURT:  Attorney Watlington? |
| 16:33:46 | 21 | MR. WATLINGTON:  No, Your Honor. |
| 16:33:46 | 22 | THE COURT:  Okay.  Let's go to page 2.  That's |
| 16:33:53 | 23 | just a follow-up substance.  Any problem with that? |
| 16:33:55 | 24 | MS. LAKE:  No, Your Honor. |
| 16:33:57 | 25 | MR. WATLINGTON:  No problem, Your Honor. |

| | | |
|---|---|---|
| 16:33:57 | 1 | THE COURT:  Okay.  Next page.  That's the final |
| 16:34:02 | 2 | page.  Any problem with that? |
| 16:34:04 | 3 | MS. LAKE:  No, Your Honor. |
| 16:34:05 | 4 | MR. WATLINGTON:  No, Your Honor. |
| 16:34:06 | 5 | THE COURT:  All right.  That's the indictment |
| 16:34:07 | 6 | that will go down to them, along with the verdict form |
| 16:34:11 | 7 | and the instructions and, of course, the exhibits. |
| 16:34:15 | 8 | All right.  Attorney Lake, you wanted a minute. |
| 16:34:18 | 9 | MS. LAKE:  Can I have one and a half? |
| 16:34:24 | 10 | THE COURT:  Yes.  Go right ahead. |
| 16:34:25 | 11 | MR. MINGOLLA:  You know, Your Honor, if you |
| 16:34:27 | 12 | don't mind, I'll -- |
| 16:34:28 | 13 | THE COURT:  Just go ahead.  One minute. |
| 16:37:55 | 14 | (Pause.) |
| 16:37:55 | 15 | (Jury Panel B present, 4:37 p.m.) |
| 16:37:58 | 16 | THE COURT:  All right.  Ladies and gentlemen, |
| 16:37:59 | 17 | is it now time for closing argument. |
| 16:38:01 | 18 | We'll first hear from the government. |
| 16:38:02 | 19 | Attorney Lake, ready to proceed? |
| 16:38:04 | 20 | MS. LAKE:  Yes, Your Honor. |
| 16:38:05 | 21 | THE COURT:  Go right ahead. |
| 16:38:12 | 22 | CLOSING ARGUMENT BY THE GOVERNMENT (Re Def't Hill) |
| 16:38:12 | 23 | MS. LAKE:  Good evening, ladies and gentlemen. |
| 16:38:17 | 24 | Now, the Defendant Walter Hill has been charged in |
| 16:38:19 | 25 | three counts:  Conspiracy to possess with intent to |

16:38:24   1    distribute cocaine, possessing -- possession with intent
16:38:28   2    to distribute cocaine, and using a phone to commit that
16:38:30   3    offense.
16:38:31   4         So you heard from the witnesses, you have the
16:38:34   5    testimony, you have the evidence.  You are the sole
16:38:39   6    judges of the facts.  You are the sole judges of
16:38:44   7    credibility.  You decide.  You heard the evidence.
16:38:47   8         You heard in trial from Mr. Roberto Tapia, you
16:38:55   9    heard from Angel Negron Beltran, and you heard from
16:38:59  10    Angelo Hill.
16:39:00  11         Essentially what you heard was that on May 17th,
16:39:02  12    Roberto Tapia picked up a bag of money on the water.
16:39:07  13    After he picked up that bag of money, he contacted
16:39:12  14    Angelo Hill and asked for seven kilograms of cocaine.
16:39:17  15         What happened next?
16:39:19  16         Roberto Tapia traveled to St. John.  He was picked
16:39:23  17    up by Angelo Hill and he met with Walter Hill.  Walter
16:39:28  18    Hill gave him seven kilograms of cocaine, and Roberto
16:39:33  19    Tapia gave him money.
16:39:36  20         And Roberto Tapia came back to St. Thomas and he
16:39:39  21    was arrested.  He was arrested with seven kilograms of
16:39:46  22    cocaine, the same seven kilograms of cocaine that he got
16:39:50  23    from Walter Hill.
16:39:51  24         So what's the evidence?
16:39:52  25         What's the testimony?

16:39:53  1       You have the phone calls.  You heard the phone

16:39:56  2  calls.  You heard the testimony of Roberto Tapia.  He

16:39:59  3  called Angelo:  I need seven of them, and they got to be

16:40:02  4  ready.  I really want the price lowered but I have what

16:40:07  5  the guy wants.

16:40:09  6       I have what Walter Hill wants.  I have the price

16:40:15  7  Walter Hill wants.  You heard the testimony.

16:40:17  8       And finally, you heard from Angelo Hill.  He

16:40:23  9  connected Roberto Tapia with Walter Hill.  He spoke with

16:40:28  10  him after the fact.

16:40:30  11       And you heard from Walter Hill's own mouth what

16:40:34  12  happened.  He was there.  They agreed to meet at the

16:40:38  13  inspection lane.  He was worried about his fingerprints

16:40:42  14  on the kilo, because he handled at least one of them.

16:40:46  15  Listen to the video.  Listen to the tape.  You'll have

16:40:49  16  it.  You will have all the evidence and all the

16:40:52  17  testimony.

16:40:53  18       Because what you know is that the defendant is

16:40:56  19  guilty.  What you heard is that the defendant is a drug

16:41:01  20  dealer.  You heard from Roberto Tapia.  He is also a

16:41:05  21  drug dealer.  You heard from Angel Negron-Beltran.  He

16:41:12  22  is also a drug dealer.  You heard from Angelo Hill.  He

16:41:15  23  is a drug dealer.  When your job and your business are

16:41:20  24  drugs, that is who you work with.  Those are your

16:41:25  25  colleagues.

16:41:25   1          So let's just play, not the whole thing.  You'll

16:41:29   2   have them to play at your leisure, but let's just play

16:41:33   3   the first clip.

16:42:01   4          (Exhibit published.)

16:42:01   5          He just said -- you heard from Walter Hill.  He

16:42:04   6   said:  I'm going to tell you exactly what happened.  You

16:42:08   7   remember the thing we were supposed to be by inspection

16:42:10   8   lane.

16:42:11   9          He just told you about the agreement.  And again,

16:42:14  10   he's charged with a conspiracy to distribute, to possess

16:42:18  11   with intent to distribute.  You heard the instructions

16:42:20  12   given to you by the Court, the crime is the agreement.

16:42:24  13   You just heard the crime.

16:42:29  14          Remember we were supposed to be by inspection lane.

16:42:32  15   I'll tell you exactly what happened.  I'll tell you

16:42:34  16   exactly what happened on May 17th when I supplied

16:42:37  17   Roberto Tapia with seven kilograms of cocaine.

16:42:42  18          Now, let's play the next clip.

16:43:35  19          (Exhibit published.)

16:43:37  20          You just heard from Walter Hill:  I handled one of

16:43:42  21   those things.

16:43:42  22          The same thing Roberto Tapia testified to.  Walter

16:43:46  23   Hill gave him seven kilograms.  He handled one of them.

16:43:50  24   You just heard the crime that Walter Hill admitted to

16:43:54  25   committing, conspiracy to possess with intent to

| | | |
|---|---|---|
| 16:43:59 | 1 | distribute seven kilograms of cocaine; possession with |
| 16:44:03 | 2 | intent to distribute seven kilograms of cocaine. |
| 16:44:08 | 3 | The government is confident at the conclusion of |
| 16:44:12 | 4 | your deliberation, you will find the defendant guilty of |
| 16:44:15 | 5 | possession with intent to distribute seven kilograms of |
| 16:44:19 | 6 | cocaine, that he admitted to conspiracy, an agreement to |
| 16:44:25 | 7 | distribute seven kilograms of cocaine. |
| 16:44:28 | 8 | Listen to the call, listen to the tape.  We are |
| 16:44:31 | 9 | confident you will find the defendant guilty. |
| 16:44:33 | 10 | Thank you. |
| 16:44:35 | 11 | THE COURT:  Thank you, Attorney Lake. |
| 16:44:37 | 12 | Attorney Mingolla. |
| 16:44:40 | 13 | MR. MINGOLLA:  Yes, sir. |
| 16:44:40 | 14 | CLOSING ARGUMENT BY DEFENDANT HILL |
| 16:45:10 | 15 | MR. MINGOLLA:  Ladies and gentlemen of the |
| 16:45:10 | 16 | jury, I wish to thank you for your attentiveness, for |
| 16:45:16 | 17 | your time, and your attention to hearing the testimony |
| 16:45:21 | 18 | in this trial. |
| 16:45:23 | 19 | I know that your duty is not always the most |
| 16:45:26 | 20 | pleasant of tasks, and I've also been noting that, |
| 16:45:34 | 21 | unlike many juries that I've had, that all of you have |
| 16:45:41 | 22 | been paying attention.  Sometimes jurors go to sleep, |
| 16:45:44 | 23 | sometimes other things happen.  But all of you have been |
| 16:45:46 | 24 | paying attention, and I appreciate that very much, and |
| 16:45:49 | 25 | so does my client.  So I want you to know that. |

16:45:56  1        Now, my client is not a law enforcement officer.

16:46:07  2    My client is a civilian.  My client has a family and a

16:46:14  3    child.  My client has a very fine job at Caneel Bay.

16:46:26  4            MS. LAKE:  Objection, Your Honor.

16:46:26  5            THE COURT:  Sustained.  Stick to the evidence.

16:46:35  6            MR. MINGOLLA:  Now, there are a number of

16:46:44  7    different issues that we need to discuss, that the

16:46:48  8    government has raised.  At the beginning of -- in my

16:46:55  9    opening argument I had suggested to you or I had made

16:46:59  10   the statement to you that the government in this, in

16:47:04  11   this case were acting in a, some of the government's

16:47:11  12   agents, I should say, were acting as rogues, that they

16:47:22  13   were acting on their own initiative and that that

16:47:28  14   initiative was somewhat out of bounds.  I will develop

16:47:33  15   that, that theory as I continue.

16:47:39  16       I think that the evidence -- or strike that.

16:47:44  17       I think that the testimony that we have heard

16:47:48  18   indicates quite clearly that some of these agents

16:47:52  19   involved in this case went way over the top in their

16:48:01  20   zeal to try and set up my client, Mr. Walter Hill.

16:48:09  21       Now there is some very interesting, interesting to

16:48:22  22   put it mildly, but there's some very interesting aspects

16:48:32  23   of this case that are rather unusual, again, to put it

16:48:46  24   mildly.

16:48:47  25       You heard testimony from a variety, a phalanx, I

16:48:57  1    wouldn't say phalanx, but a wide variety of government

16:49:02  2    agents, FBI agents, DEA agents, pilots, radar operator

16:49:06  3    and so on and so forth.  But none of those have anything

16:49:10  4    to do with my client.

16:49:20  5        The only agent from HIDTA who -- strike that.

16:49:30  6    Agent Grossman from HIDTA, who is one of the

16:49:35  7    higher-ranking men there, testified, for example, that

16:49:38  8    he placed on, placed on Mr. Angelo Hill's wrist a, what

16:49:47  9    they call an audio-visual device.

16:49:54  10       Again, and I'll discuss this a little more in depth

16:49:59  11   later, but that wasn't true.  He didn't know -- that's

16:50:05  12   no reflection on Attorney -- on Agent Grossman.

16:50:09  13       Grossman didn't realize, because he never been

16:50:11  14   involved, that these rogue agents had decided, oh, well,

16:50:16  15   you know, we're not satisfied with what our boss has

16:50:23  16   decided to do and with what the US Attorney's Office has

16:50:27  17   decided to do.  No, no, no, we're going to do our own

16:50:31  18   little thing.

16:50:32  19       And that's where this business about the cup come

16:50:39  20   into play, where they decided that FBI Agent Fernandez,

16:50:43  21   Agent Querrard and Agent Mark Joseph, the three of them,

16:50:47  22   conspired to place another audio-visual device in a cup,

16:50:54  23   without seeking the permission or sanction of anybody,

16:51:01  24   of their superiors.  They just did it on their own.

16:51:11  25       But I started -- I digress.  I started to say, or I

16:51:17  1   was commencing to discuss the fact that one of the

16:51:21  2   unusual things of this case is that we have basically --

16:51:30  3   not basically -- we have two law enforcement officers, a

16:51:34  4   decade, with decades of experience in law enforcement

16:51:41  5   and in drug trafficking.  By their own admissions

16:51:47  6   they've been drug trafficking for decades.

16:51:51  7        Now, these two gentlemen -- I had used an

16:52:06  8   expression that Mr. Tapia took offense to, but my point

16:52:12  9   was that he and Mr. Angelo Hill would literally

16:52:23 10   implicate anybody in order to lessen their very, very,

16:52:32 11   potentially very, very lengthy jail sentences.

16:52:36 12        Now, I mention that because that goes towards these

16:52:46 13   plea bargains.  It is highly unusual for there to be two

16:52:56 14   plea bargains, two separate plea bargains for each of

16:53:01 15   those men, for Tapia and for Angelo Hill.  To say it's

16:53:12 16   unusual is an understatement.

16:53:15 17        It's my supposition that they were -- they executed

16:53:25 18   their first plea bargains and divulged to the

16:53:34 19   government, pursuant to those plea bargains, certain

16:53:38 20   individuals, but they didn't discuss individuals, other

16:53:48 21   individuals that the government wanted them to discuss.

16:53:55 22   And so basically they were given an ultimatum:  Either

16:54:05 23   you give up some other people or you can forget getting

16:54:09 24   any lenient treatment at sentencing pursuant to the plea

16:54:14 25   agreements.

16:54:15  1     Because these plea agreements, you see, the whole

16:54:19  2  concept of the plea agreements is, as a defendant, I'm

16:54:22  3  going to cooperate to the fullest of my ability, tell

16:54:26  4  you all the truth, tell you every crime I've ever been

16:54:29  5  involved with or involved in, and every person of a

16:54:36  6  criminal nature who I've ever been involved in or with.

16:54:41  7     So it would seem to me that both men -- Mr. Angelo

16:54:51  8  Hill calls them proffers.  That's, what he meant was

16:54:56  9  what he was offering to the government.

16:55:00  10     I maintain that what he was offering to the

16:55:03  11  government was insufficient for what, was insufficient

16:55:11  12  for what they wanted, so they coerced him, in essence,

16:55:18  13  into basically coming up with anybody else in a sense,

16:55:25  14  in order to comply -- strike that -- in order to achieve

16:55:33  15  their goals.

16:55:37  16     And that's why you got two plea bargains, because

16:55:43  17  the second plea bargain reflects the fact that by some

16:55:48  18  means I, I dare not call it coercion, but let's say

16:55:56  19  not-so-friendly persuasion that they should, Tapia and

16:56:01  20  Hill, should give up more people.

16:56:05  21     So in a desperate -- these are desperate, desperate

16:56:10  22  men, desperate because they know the penalties involved

16:56:14  23  with their crimes.

16:56:20  24     So they decide, okay, and they start giving up a

16:56:22  25  litany -- Hill said he had given up somewhere around

16:56:28 1    four or five individuals, just as an example.  There

16:56:50 2    were that day on May 17th, the date of this alleged

16:56:57 3    transaction involving my client, there have been a

16:57:07 4    discussion of fingerprints.

16:57:08 5        My client's fingerprints aren't found on anything.

16:57:12 6    There -- there are no fingerprints.  They have never

16:57:19 7    found any drugs on my client.  They've never found my

16:57:26 8    client with, at least that they've mentioned, with a

16:57:32 9    staggeringly huge bank account.  He lives very modestly,

16:57:39 10   unlike the $2-1/2 million home that Sergeant Hill has

16:57:45 11   constructed in St. John.

16:57:53 12       The only two people -- there were somewhere around

16:58:00 13   eight or nine agents from different agencies -- well,

16:58:06 14   we'll get to that in a second.  That's regarding the

16:58:11 15   tape.  Let's discuss this alleged exchange first.  I'm

16:58:15 16   sorry.  I don't want to confuse you.

16:58:21 17       Angelo Hill says:  I couldn't see anything because

16:58:28 18   it was dark.

16:58:31 19       He saw cars, but he said:  I couldn't see anything

16:58:35 20   or anyone because it was too dark.

16:58:45 21       So how does he know that my client was even in the

16:58:53 22   vicinity?

16:58:53 23       He doesn't.  Because it was too dark, and by his

16:58:57 24   own admission he couldn't see anything.

16:59:05 25       He then leaves the scene of this alleged exchange.

| | | |
|---|---|---|
| 16:59:12 | 1 | So he cannot testify -- he leaves the scene in his car, |
| 16:59:21 | 2 | and he goes driving about somewhere.  So he never saw |
| 16:59:23 | 3 | anything.  He didn't see my client. |
| 16:59:29 | 4 | There's a discrepancy as to whether or not this |
| 16:59:34 | 5 | exchange of money and drugs took place in a Ford |
| 16:59:46 | 6 | Explorer, which if you know cars is a very kind of big |
| 16:59:49 | 7 | SUV, or a Suzuki, which is a very, very small SUV. |
| 16:59:56 | 8 | So he can't, he can't even, there's a discrepancy |
| 17:00:02 | 9 | as to the type of vehicle that was purportedly used. |
| 17:00:45 | 10 | Here's another interesting aspect of this case.  As |
| 17:00:54 | 11 | you know, there were eight or nine other men arrested |
| 17:01:05 | 12 | pursuant to this, to this case that the government |
| 17:01:09 | 13 | brought against Mr., originally against Mr. Tapia. |
| 17:01:17 | 14 | Those men were all arrested within, more or less, a |
| 17:01:23 | 15 | month or so of the May 17th transaction.  The |
| 17:01:31 | 16 | transaction takes place in May.  By June, all those guys |
| 17:01:38 | 17 | had been arrested. |
| 17:01:39 | 18 | My client doesn't get arrested until the end of |
| 17:01:46 | 19 | November, seven months -- yeah, eight -- seven or |
| 17:01:53 | 20 | eight months later. |
| 17:01:56 | 21 | If they had such a strong case against my client |
| 17:02:00 | 22 | that he's the kingpin or the ring leader or so on and so |
| 17:02:05 | 23 | forth, then why is it that it takes them another |
| 17:02:12 | 24 | seven months before they get around to arresting him? |
| 17:02:27 | 25 | If they, if the government had had such a strong |

17:02:31  1    case as they would purport, then why wasn't he arrested

17:02:40  2    sooner, rather than seven months, more or less, later?

17:02:59  3        Mr. Tapia, Sergeant Tapia, former Assistant Police

17:03:09  4    Commissioner Tapia, he says that he, he didn't say

17:03:21  5    anything about my client because he feared for his life.

17:03:31  6        Well, number one, he's not a civilian.  I mean, I'm

17:03:35  7    a civilian, and if I thought somebody was going to try

17:03:40  8    and hurt me or shoot me, I certainly, I would want

17:03:46  9    protective custody.  I would want, you know, some -- I

17:03:52  10   would want to be -- let's put it this way:  I surely

17:03:55  11   would not want to keep a high profile where I could get

17:04:01  12   shot at any given moment.

17:04:05  13       But here we have, here we have Tapia saying that he

17:04:13  14   was free to come and go.  And in point of fact, because

17:04:21  15   he has a family, he needs to make money.  So he takes a

17:04:25  16   job working at his mother's food shop, food -- it's a

17:04:31  17   food bar.  And he did this for months, out in the open,

17:04:40  18   walking the streets in order to make, I think he said

17:04:45  19   something like $200 a week.

17:04:48  20       Now, I don't know about you, but if I feared for my

17:04:54  21   life and I thought that some big drug kingpin was going

17:05:02  22   to have me assassinated or murdered, I surely would not

17:05:07  23   be walking the streets on a daily basis, going to one

17:05:14  24   spot, particularly one spot, this food bar, every day,

17:05:20  25   or I think he said 5 days a week, because how easy would

17:05:24  1    it be to get killed?

17:05:27  2        I mean, the killer would just say, okay, he goes

17:05:29  3    every day, he goes to this particular spot, so he'll be

17:05:34  4    easy for me, too easy for me to wham.  That's my lingo.

17:05:42  5    But he would be easy for me to kill.

17:05:44  6        But instead Mr. Tapia, you know, carries on, he

17:05:50  7    asks the Court if he can go back to work.  They say,

17:05:54  8    sure, go ahead.

17:05:57  9        So his credibility regarding the comment that he

17:06:05  10   feared for his life seems a little bit weak, to put it

17:06:11  11   mildly, because that's not, if your -- if you think

17:06:14  12   about it logically -- and I know you will -- that's not

17:06:17  13   how most people who are in fear of their life are going

17:06:21  14   to behave.

17:06:22  15       I would personally hole up somewhere, or I would

17:06:27  16   ask for protective custody or something to protect

17:06:30  17   myself.  I certainly wouldn't expose myself every day

17:06:34  18   for months on end in a predictable pattern.

17:06:54  19       Mr. Tapia basically, to put it in a colloquial

17:06:57  20   parlance, his credibility is tinged.  He, there are, he

17:07:12  21   admits that he knows my client.  But they're both in

17:07:20  22   essence boat captains, and boat captains have a tendency

17:07:26  23   to know one another.  They interacted all the time,

17:07:30  24   particularly when they're at their age.  I mean, it's

17:07:32  25   not like they're doing boating for few, you know, couple

17:07:38   1    years.

17:07:55   2        He, he says that, you know, we only have his word,

17:08:03   3    which I think we have to view in a jaundiced way, in a

17:08:09   4    cynical way -- let me rephrase that.  We only have his

17:08:15   5    word that there were transactions taking place involving

17:08:21   6    my client hitherto in Puerto Rico.

17:08:29   7        My, my client travels to Puerto Rico to have his

17:08:40   8    boat for Caneel Bay repaired, because the Caterpillar

17:08:52   9    engine --

17:08:52  10            MS. LAKE:  Objection.

17:08:53  11            THE COURT:  Overruled.

17:08:55  12            MR. MINGOLLA:  The Caterpillar company, they're

17:08:59  13    in Puerto Rico and they make the engines for the

17:09:01  14    boats --

17:09:02  15            THE COURT:  Let's move on.

17:09:03  16            MR. MINGOLLA:  -- in Puerto Rico so he has to

17:09:07  17    go to Puerto Rico --

17:09:07  18            THE COURT:  All right.  No, stick to the

17:09:11  19    evidence.  Move on.

17:09:32  20            MR. MINGOLLA:  Now, you saw -- well, let's talk

17:09:37  21    about, talk about Angelo Hill for a moment.

17:09:40  22        Okay.  As I pointed out, Angelo Hill also executes

17:09:45  23    two plea agreements.  He executes those on the same day

17:09:53  24    in December.

17:10:05  25        One must assume that something was missing -- or

17:10:09   1    strike that.  One must assume that he wasn't doing

17:10:18   2    enough, according to, you know, doing enough to merit

17:10:22   3    favorable treatment under the first plea bargain.

17:10:28   4        And when he was -- which he signed and his lawyers

17:10:31   5    signed and the AUSA signed.  But they must have

17:10:46   6    ascertained some way or another that he wasn't giving

17:10:50   7    out enough, that he wasn't giving out enough names.  He

17:10:53   8    had only given out four or five names.

17:10:58   9        So again, bearing in mind the ferociously fierce

17:11:08   10   sentence that he was facing, well, he starts spouting

17:11:14   11   off names like crazy because he's desperate for the

17:11:20   12   government to take that into consideration at sentencing

17:11:27   13   time.

17:11:28   14       Again, I emphasize, Tapia and Angelo Hill, these

17:11:37   15   guys are desperate dudes.  They are desperate and they

17:11:42   16   will say and they will do anything in order to avoid

17:11:52   17   their potential jail sentences.

17:12:05   18       Now, regarding, regarding these phone calls, there

17:12:23   19   seems to be some controversy.  Agent Fernandez said I

17:12:26   20   think there were 17,000.  I thought there were 19.  But

17:12:30   21   I'll give him the benefit of the doubt.  He said there

17:12:32   22   were 17,000 phone taps.  And out of the 17,000 phone

17:12:46   23   taps, my client is only on five of them.

17:12:48   24       Well, let me go back.  Out of the 17,000 phone

17:12:52   25   taps, only about 1,800 are relevant.  And of those 1,800

17:12:57  1    my client is only on five.

17:13:01  2         And what he says as you hear the phone

17:13:06  3    conversations, they're innocuous conversations.  And

17:13:12  4    when I say "innocuous," there's no discussion of drugs,

17:13:18  5    of, you know, money, of anything in those phone

17:13:24  6    conversations, now, either in any kind of code or in the

17:13:36  7    open, if you will, in open language.

17:13:45  8         Now, let's go to this, let's go to this videotape.

17:13:54  9         Agent Querrard instructs, according to Mr. Hill.

17:14:01  10   Agent Querrard instructs him to set up a meeting with my

17:14:05  11   client.  Okay.

17:14:12  12        Mr. Angelo Hill, he agrees with that, and he is so

17:14:23  13   anxious to get this meeting going, he's so anxious to

17:14:34  14   get this meeting going that in the span of the

17:14:38  15   approximately, by his testimony, 18 minutes it took

17:14:43  16   Mr. Hill, Walter Hill to get there to the site, he makes

17:14:50  17   innumerable phone calls.  If you work it out, it comes

17:14:53  18   to like one every four minutes to Mr. Hill, to say,

17:14:56  19   where are you, where are you, you know, when are you

17:14:58  20   going to get here, when are you going to get here.

17:15:01  21        People don't do that, I mean, unless they're under

17:15:05  22   tremendous pressure.  You don't call somebody every

17:15:08  23   four minutes to say, where are you, unless you have

17:15:16  24   Agent Querrard standing over your shoulder saying, call

17:15:21  25   him up again.

17:15:33   1          Angelo Hill admits that he would always go to my

17:15:37   2     clients for loans which didn't get paid back, for

17:15:50   3     advice, at that time he met with him frequently.  And

17:15:52   4     that tape indicates that Angelo Hill was more interested

17:16:05   5     in what Mr. Walter Hill was hearing on the street about

17:16:16   6     the case, than vice versa.

17:16:27   7          He, again, if you listen to that tape carefully,

17:16:31   8     you'll see that Mr., Mr. Angelo Hill kept prompting,

17:16:37   9     because he had been coached, kept prompting my client to

17:16:46   10    try to get him into admitting certain things, certain

17:16:54   11    things, to self-incriminating things, were the certain

17:16:58   12    things.

17:16:59   13         As far as, you've never been shown any evidence of

17:17:08   14    my client with drugs.  You haven't heard of any

17:17:12   15    fingerprints, of his fingerprints on any drug packages.

17:17:17   16    Tapia could have met with anybody that night, either

17:17:20   17    someone in a blue Explorer or a Suzuki SUV.  We don't

17:17:25   18    know what.  He could have met with anyone that night,

17:17:29   19    because no one except Tapia says that it's, it's, it

17:17:35   20    was, it was, you know, that he made an exchange with

17:17:42   21    Mr. Hill.

17:17:50   22         And lastly, I would point out that if the

17:17:55   23    government knew that -- or suspected that police officer

17:18:02   24    Hill was going to go to St. John to make an exchange,

17:18:10   25    why didn't they go and follow and go and arrest Mr. --

17:18:15   1    my client at the same time?

17:18:16   2         You know, why didn't they arrest them both when

17:18:22   3    they were making the exchange?

17:18:24   4         Instead they wait until there, until the, until

17:18:33   5    Tapia gets back over to St. Thomas.  And if you're

17:18:42   6    anything like me, admittedly my hearing isn't the

17:18:46   7    greatest in the world, but you had to have had problems

17:18:52   8    discerning when you're listening to that, to that tape,

17:18:58   9    you had to have problems discerning who is talking.  I

17:19:06   10   did.  You can't --

17:19:07   11        I'm sorry, Judge I shouldn't have said that.

17:19:10   12        But you had to have problems trying to figure out

17:19:13   13   who is saying what about what, because the voices are

17:19:20   14   very similar.  So I would ask you, as far as possession,

17:19:34   15   my client was not found with any drugs.

17:19:40   16        As far as conspirator, the only conspirators,

17:19:45   17   alleged coconspirators, not alleged, the only

17:19:48   18   coconspirators are Tapia and Hill, who would say

17:19:52   19   anything to save their skin.

17:20:04   20        As far as the use of a phone, we've already

17:20:06   21   discussed that.  You know, there's five calls out of

17:20:14   22   18,000.

17:20:19   23        I would ask you, when you go into deliberations, to

17:20:22   24   please use your common sense and say to yourself:  Wait

17:20:28   25   a minute, who is it that's testifying against my client?

17:20:39  1    Crooked cops, and crooked cops that have been crooked
17:20:44  2    cops for decades, by their own admission.
17:20:47  3        You know, who is accusing him?  Just crooked cops,
17:20:51  4    two of them, no one else.  There is not one other person
17:21:00  5    accusing my client of being involved in anything.  No
17:21:03  6    one says they know him.  No one.  The government didn't
17:21:05  7    bring forth any other of their other witnesses to say
17:21:09  8    that they know Mr. Hill, just Tapia and Angelo Hill.
17:21:19  9        So I would hope that you will take these things
17:21:24  10   into consideration in your deliberations.  I don't hope,
17:21:27  11   I know you will, because you're a conscientious group of
17:21:31  12   individuals who have indeed been paying attention to
17:21:34  13   what's going on, and the testimony that you've heard.
17:21:39  14       And the government can, as shrilly as possible,
17:21:47  15   saying, he's guilty, he's guilty, he's guilty.  Just
17:21:52  16   because the government shouts at you that an individual
17:21:55  17   is guilty, doesn't make it so.  I mean, I could shout at
17:22:00  18   you and say he's innocent.
17:22:03  19       But I'm not.  He's innocent and I'm saying it in a
17:22:08  20   normal tone.  And moreover, I believe that you will find
17:22:14  21   that he is, he is innocent beyond any reasonable doubt,
17:22:21  22   and that you will acquit Mr. Walter Hill.
17:22:26  23       Thank you for your time.  I appreciate it very
17:22:28  24   much.
17:22:29  25           THE COURT:  Thank you, Attorney Mingolla.

17:22:31   1    Attorney Lake.

17:22:37   2            MS. LAKE:  Thank you, Your Honor.

17:22:37   3        REBUTTAL ARGUMENT BY THE GOVERNMENT (Re Hill)

17:22:38   4            MS. LAKE:  Ladies and gentlemen, I will try not

17:22:39   5    to repeat anything I've already said, but there are just

17:22:42   6    a few comments I thought were important to make.

17:22:48   7            Attorney Mingolla, attorney for Walter Hill, made a

17:22:52   8    lot of comments, so let's just address those comments he

17:22:56   9    made.

17:22:56  10            He indicated that you only heard from two witnesses

17:23:03  11    regarding Walter Hill's guilt, Roberto Tapia and Angelo

17:23:06  12    Hill.

17:23:06  13            That's not true.  You heard from one other person.

17:23:10  14    You heard from Walter Hill.  He told you that he was

17:23:15  15    guilty.  He told you that he was a drug dealer.

17:23:21  16            And Attorney Mingolla mentioned in his closing

17:23:24  17    arguments that the defendant isn't law enforcement.

17:23:28  18    That is correct.  The defendant is not in law

17:23:31  19    enforcement.  The defendant is a drug dealer.  That's

17:23:34  20    his job.

17:23:34  21            And you heard from his own statements, he supplied

17:23:39  22    seven kilograms of cocaine because he is a drug dealer.

17:23:44  23            Now, you heard a lot of statements.  You heard

17:23:48  24    about runaway elephants and a cup.  But focus on why

17:23:52  25    you're here.  You're here just to determine guilt.

17:23:56  1    That's it.  You are the sole judges of the witnesses,

17:24:00  2    the credibility of the evidence.  You are the judges of

17:24:03  3    the facts.  That's why you're here, not about elephants,

17:24:09  4    just the facts.

17:24:12  5        And the fact is that the defendant is guilty

17:24:14  6    because he's a drug dealer and he's guilty of conspiring

17:24:17  7    to distribute seven kilograms of cocaine, and that he

17:24:20  8    did in fact distribute seven kilograms of cocaine.

17:24:24  9        Attorney Mingolla mentioned the testimony of Agent

17:24:27  10   Grossman.  Agent Grossman testified to the amount of

17:24:33  11   phone calls that were made.  And Agent Grossman

17:24:36  12   testified that on May 17th, Walter Hill and Angelo Hill

17:24:40  13   were in contact 12 times.  It took 12 phone calls to

17:24:49  14   complete a drug deal.  That's what Agent Grossman

17:24:51  15   testified to.

17:24:51  16       What else did you hear?

17:24:54  17       You -- Attorney Mingolla mentioned there are no

17:24:56  18   fingerprints on the drugs.  Well, you already knew that

17:24:59  19   because Walter Hill told you that.  You heard the tape.

17:25:04  20   Listen to the tape recording.  He said it himself:  I

17:25:09  21   handled one of those things, but I feel at ease because

17:25:15  22   my man told me the way the packaging is, there's not

17:25:18  23   going to be any prints on there.  I felt a little ease.

17:25:21  24       You listen to that recording.  Walter Hill told you

17:25:24  25   that there will be none of his fingerprints on there.

17:25:27  1    That's how you know that.

17:25:29  2         What else do we know?

17:25:35  3    We know that Angelo Hill told you he couldn't see

17:25:37  4    anything that night.  But how do you know if he was

17:25:40  5    there?  How do we know that Walter Hill was there?

17:25:42  6         Because Walter told you.  He told you.  We were

17:25:47  7    supposed to be by inspection lane.  Seven of those

17:25:52  8    things.  Seven kilos.  He said seven of three-quarter

17:25:58  9    kilos.  That's how you know that.

17:26:03  10        There is no confusion regarding the car.  It is

17:26:05  11   very clear.  Roberto Tapia told you.  Walter Hill was in

17:26:09  12   a Ford.  Walter Hill told him the car next to this is a

17:26:14  13   Suzuki.  That's where the drugs are.  Get it, come back.

17:26:18  14   I will help you put them in the bag and you give me my

17:26:22  15   money.

17:26:23  16        And what else do we know?

17:26:25  17        After that drug deal, Walter Hill paid Angelo Hill

17:26:32  18   $3,500, because he's a drug dealer.  The witnesses you

17:26:39  19   heard from are drug dealers.  When you're in the crime

17:26:42  20   of drugs, your colleagues are in the crime of drugs.

17:26:46  21   When your job is a drug dealer, you work with drug

17:26:48  22   dealers.

17:26:51  23        And what else did you hear?

17:26:53  24        You heard that the recording is confusing, that the

17:26:56  25   voices are similar.  The voices are not similar.  But

17:27:00  1    there is one dominant voice that you keep hearing over

17:27:03  2    and over again, and you saw his face.  It is

17:27:10  3    Walter Hill.  Walter Hill told you that he is guilty.

17:27:15  4        And we are confident that at the conclusion of your

17:27:19  5    deliberation, we are confident that you will also agree

17:27:22  6    with Walter Hill and find him guilty.  We are confident

17:27:26  7    that you will believe Walter Hill's own statements to

17:27:29  8    you that he is a drug dealer.  He handles seven of

17:27:34  9    those.  He supplies seven kilograms of cocaine to

17:27:39  10   Roberto Tapia.  He paid Angelo Hill $3,500.

17:27:44  11       One last thing.  Attorney Mingolla mentioned Angelo

17:27:50  12   Hill borrowing money and not ever paying Walter Hill

17:27:53  13   back.  That's not true.  You heard from Angelo Hill.

17:28:01  14   Walter told him that, "We're good," because he connected

17:28:03  15   him to Roberto Tapia and he and Roberto Tapia

17:28:06  16   transported drugs on two separate occasions to Puerto

17:28:10  17   Rico, and because of that Angelo didn't owe him any more

17:28:15  18   money.  They were good.

17:28:16  19       So what do you know?

17:28:17  20       You know that the defendant is guilty.  You know

17:28:19  21   that the defendant is a drug dealer.  You know the

17:28:22  22   defendant used a phone to commit those crimes.  You know

17:28:26  23   the defendant is guilty.  And we are confident that at

17:28:30  24   the conclusion of your deliberations, you will come back

17:28:32  25   with a guilty verdict.

17:28:33  1          Thank you very much.

17:28:38  2              THE COURT:  All right.  Thank you, Attorney

17:28:38  3    Lake.

17:28:38  4        FURTHER JURY INSTRUCTIONS BY THE COURT (Re Hill)

17:28:40  5              THE COURT:  The indictment charges that the

17:28:41  6    crimes charged occurred on or about certain dates.

17:28:45  7          The proof need not establish with certainty the

17:28:48  8    exact dates of the alleged offense.  It is sufficient if

17:28:51  9    the evidence in the case establishes beyond a reasonable

17:28:52  10   doubt that the offense was committed on dates reasonably

17:28:56  11   near the date alleged.

17:28:57  12         During the course of this trial you've seen counsel

17:28:59  13   both for the government and for the defense make various

17:29:02  14   objections to questions asked and evidence offered.  It

17:29:05  15   is not only the right, it is the duty of counsel for

17:29:08  16   either the government or for the defendant to object

17:29:10  17   when counsel believes evidence or testimony being

17:29:13  18   offered is not admissible under the Rules of Evidence.

17:29:16  19   Then I rule on the objection.

17:29:17  20         Do not be influenced in any way by my rulings,

17:29:22  21   whether in favor of or against the government or the

17:29:25  22   defendant.

17:29:25  23         As I've already told you, these rulings involve

17:29:28  24   questions of law only and may not be given any

17:29:31  25   considerations by you in your deliberations.

17:29:32   1          In performing my constitutional role to preside

17:29:35   2     over this trial, I sometimes found it necessary to ask

17:29:37   3     questions of witnesses to clarify testimony I thought

17:29:39   4     was unclear.

17:29:40   5          If I've asked any questions to any of the witnesses

17:29:43   6     during the course of this trial, or if I have said or

17:29:45   7     done anything during the trial or in the course and

17:29:48   8     manner of instructing you now, whereby it seems to you

17:29:50   9     that I'm inclined to favor the case of the government or

17:29:53   10    the case of any defendant, you must remove any such

17:29:56   11    impression from your minds and not be influenced by it,

17:29:58   12    as no such impression was intended.

17:30:01   13         You've seen the counsel consult with each other and

17:30:04   14    sometimes among each other.  Attorneys have an

17:30:07   15    obligation to consult with each other if such

17:30:09   16    consultation is in the best interest of the attorney's

17:30:12   17    client.

17:30:12   18         Counsel also has a right and duty to ask me to make

17:30:15   19    rulings of law and to make sidebar -- or to have sidebar

17:30:19   20    discussions out of the hearing of the jury.

17:30:21   21         All those questions of law must be decided by me,

17:30:24   22    the Court.

17:30:25   23         You should not show any prejudice against an

17:30:28   24    attorney or the attorney's client because the attorney

17:30:30   25    asked for a conference out of the hearing of the jury or

17:30:33  1    asked the Court for a ruling on the law.

17:30:34  2         All of these conferences deal with legal questions

17:30:37  3    on which I've ruled, and do not concern your function as

17:30:41  4    jurors.  Do not speculate on such matters during your

17:30:43  5    deliberations.

17:30:43  6         It is my duty to admonish an attorney who, out of

17:30:48  7    zeal for the attorney's cause, does something that I

17:30:50  8    feel is not in keeping with the Rules of Evidence or

17:30:53  9    procedure.

17:30:54  10        You are to draw absolutely no inference against a

17:30:57  11   side to whom an admonition of the Court may have been

17:31:00  12   addressed during the trial of this case.

17:31:02  13        You've been chosen and sworn as jurors in this case

17:31:05  14   to try the issues of fact presented by the defendant's

17:31:07  15   pleas of not guilty to the charges in the indictment.

17:31:09  16   You are to perform this duty without bias, sympathy or

17:31:13  17   prejudice.

17:31:13  18        Under no circumstances then may your deliberations

17:31:15  19   be affected or diverted by any appeals to bias, passion

17:31:19  20   or prejudice, nor influenced by any pity or sympathy in

17:31:22  21   favor of either side.

17:31:23  22        In every respect your judgment must be considered,

17:31:26  23   deliberate and objective.  It must derive its force and

17:31:28  24   validity from the facts and inferences reasonably and

17:31:31  25   logically supported by the testimony.

17:31:33   1        Both the government and the defendant expect that

17:31:35   2   you will carefully and impartially consider all of the

17:31:38   3   evidence, follow the law as stated by the Court and

17:31:41   4   reach a just verdict regardless of the consequence.  I

17:31:44   5   need not impress upon you that it is your duty to give

17:31:46   6   an absolutely fair and impartial verdict.

17:31:48   7        It was said that this is an important case.  That

17:31:51   8   is true.  Every case that comes into this Court is

17:31:54   9   important.

17:31:54   10       This case is of equal importance to the government

17:31:57   11   and to the defendants.  Each is entitled to your fairest

17:32:00   12   consideration, your closest judgment and your impartial

17:32:04   13   decision.

17:32:04   14       Jurors perform a very important function in

17:32:07   15   deciding upon their verdict.  You are an arm of this

17:32:09   16   Court, here to do justice.  That is sacred.  Do your

17:32:13   17   duty conscientiously, according to your oath and

17:32:16   18   according to these instructions, and justice will be

17:32:18   19   done.

17:32:18   20       You were accepted as jurors based on your answers

17:32:22   21   when you were initially questioned about your

17:32:25   22   qualifications.

           23       The answers you then made to the questions with

           24   regard to your competency, qualifications, fairness,

           25   lack of bias and freedom from sympathy are as binding

upon you now as they were then, and shall remain so until you are finally discharged from further consideration of this case.

Remember, at all times you are not partisans, you are judges, judges of the facts. Your sole interest is to search for and ascertain the truth from the evidence in this case.

You'll recall earlier in these instructions I charged that under our system of criminal justice the Court and jury have distinct functions.

What sentence or punishment, if any, a defendant will receive if found guilty is entirely beyond the province of the jury. In plain words, that is the business of the Court.

Sentence or punishment should never be considered by a jury in any way in arriving at an impartial verdict. Your sole duty is to determine the guilt or lack of the guilt of the defendant presently on trial before you.

You're further instructed that if any of you has developed any opinion in this case predicated in whole or in part from sources seen and heard outside of this Court, you are to put such opinion out of your mind.

I want to stress in the strongest possible terms that regardless of what counsel has said in recalling

17:33:35  1    the facts of this case, it is your recollection of the

17:33:37  2    facts that should guide you in carrying out your

17:33:39  3    function as judges of the facts.

17:33:41  4        If any of the attorneys stated a version of the

17:33:44  5    facts that does not square with your own recollections,

17:33:46  6    you are to disregard that version in favor of your own

17:33:49  7    recollection.

17:33:49  8        In arriving at your verdict you are to consider all

17:33:52  9    the evidence as you recall it, and you are to give that

17:33:55  10   evidence the weight that you believe it is entitled to

17:33:57  11   receive.

17:33:57  12       During the course of this trial you have no doubt

17:34:00  13   received certain definite impressions on how much you

17:34:04  14   think it should be decided.

17:34:05  15       Do not allow these impressions become so firmly

17:34:08  16   fixed that they prevent you from fairly and frankly

17:34:10  17   discussing this case with any of your fellow jurors who

17:34:12  18   may have a different point of view.

17:34:14  19       It is your duty as jurors to give careful attention

17:34:16  20   and consideration to the views of your fellow jurors, to

17:34:18  21   consult with one another, and to deliberate with a view

17:34:22  22   toward reaching an agreement, if you can do so without

17:34:24  23   doing violence to your individual judgment.

17:34:27  24       Each of you must decide the case for yourself, but

17:34:29  25   do so only after an impartial consideration of the

17:34:32  1   evidence with your fellow jurors.

17:34:35  2        In the course of your deliberations, do not

17:34:36  3   hesitate to take a look at your own views and to change

17:34:39  4   your opinion, if you become convinced it is wrong.  But

17:34:42  5   do not give up your honest conviction or belief about

17:34:45  6   the weight or effect of the evidence solely because of

17:34:48  7   the opinion of your fellow jurors or just so you can

17:34:50  8   return a verdict.

17:34:51  9        When you retire to the jury room to deliberate,

17:34:53  10  your first order of business is to elect a foreperson.

17:34:56  11  The foreperson will preside over your deliberations here

17:34:59  12  and will speak for you here in court.  That person has

17:35:02  13  no greater weight of opinion than anyone else.

17:35:05  14       If it becomes necessary to communicate with me

17:35:09  15  during your deliberations, you may send a note by the

17:35:13  16  court security officer or marshal.  Never try to

17:35:15  17  communicate with me by any means other than by a signed,

17:35:19  18  sealed writing.

17:35:19  19       And bear in mind you are not to reveal to the Court

17:35:22  20  or to any person how you stand, numerically or

17:35:24  21  otherwise, until you have reached a unanimous verdict.

17:35:27  22       Now a word about your verdict.  Your verdict must

17:35:29  23  represent the considered judgment of each juror, and all

17:35:32  24  jurors must agree on the verdict before you return a

17:35:35  25  verdict.  Your verdict must be unanimous.

17:35:38   1        To aid and assist you in the discharge of your

17:35:41   2   obligation, there's been prepared with the consent of

17:35:43   3   counsel a verdict form, which you are to answer

17:35:45   4   unanimously, thereby facilitating your task and that of

17:35:49   5   the Court in determining the proper verdict to be

17:35:52   6   entered.

17:35:52   7        As I discussed before, you will be making a

17:35:54   8   determination of guilty or not guilty on the crime with

17:35:56   9   which the defendant is charged.  As you'll see when I

17:35:59   10   give you the verdict form, it has a space listed for the

17:36:02   11   charge.  Within this space you will note that there's a

17:36:04   12   space provided for guilty or not guilty.

17:36:06   13        When you've made a unanimous determination of the

17:36:09   14   guilt or innocence of the defendant with respect to a

17:36:11   15   particular charge, you'll make an X mark in the

17:36:14   16   appropriate space, indicating either guilty or not

17:36:16   17   guilty.

17:36:16   18        You'll also see that following certain charges the

17:36:19   19   verdict form has an additional question with a space for

17:36:23   20   yes or no answers.

17:36:24   21        Answer these questions only if you find a defendant

17:36:27   22   guilty for that particular charge.  Follow the

17:36:30   23   directions as appropriate for these yes or no questions.

17:36:33   24        Nothing that has been said in these instructions or

17:36:36   25   in the form of verdict is to suggest or convey in any

17:36:38  1  way or manner what verdict I think you should find.

17:36:41  2  You'll take this form with you, and when you have

17:36:44  3  unanimously made a determination, the foreperson should

17:36:47  4  date it, sign it, and then pass it to each of you to

17:36:50  5  sign.  Then it should be sealed.

17:36:53  6      Then you should advise the marshal you wish to be

17:36:55  7  returned to the courtroom.  And upon your return to the

17:36:58  8  courtroom, the foreperson should bring the verdict form.

17:37:00  9      I'll then ask if you've reached a verdict, and if

17:37:03  10  so, will ask the foreperson to announce the jury's

17:37:06  11  verdict.  Your foreperson will then respond by using the

17:37:10  12  completed verdict form supplied to you.

17:37:11  13      It's now time for you to begin your deliberations.

17:37:15  14      (CSO Graneau sworn.)

17:37:41  15      THE COURT:  All right.  Now, ladies and

17:37:43  16  gentlemen, a final word.  As I indicated, you are the

17:37:48  17  panel that will be addressing the case against Walter

17:37:54  18  Hill.  The counts that you will be focused on will be

17:37:57  19  Counts 37, 38 and 42.  And the exhibits are 55 through

17:38:07  20  75 with respect to the phone calls.

17:38:09  21      And you will have those exhibits with you in the

17:38:13  22  deliberation room on the jury electronic system.  You

17:38:19  23  will also have the jury instructions.  You will have the

17:38:24  24  indictment and the verdict form.  All right?

17:38:27  25      Now, one final note.  In our system of justice,

17:38:31  1   while there are alternates who also take part in the

17:38:36  2   jury panel during the course of the trial, for

17:38:39  3   deliberation purposes only 12 jurors may deliberate.

17:38:42  4   The alternates are not excused, though, in the event

17:38:45  5   there's need for your service.  But we do have to

17:38:48  6   separate the alternates from the 12 initial jurors who

17:38:51  7   were selected.  All right.  So it is time to begin

17:38:55  8   deliberations.

17:38:56  9        (Jury out for deliberation.)

17:39:40  10       MS. LAKE:  Your Honor, if I may, one thing.

17:39:41  11  I'm just confused.  The jurors also have Exhibits 80 and

17:39:45  12  86.

17:39:48  13       THE COURT:  Right, yes.  I just said with

17:39:50  14  respect to the phone calls, 55 through 75.  So -- well,

17:39:54  15  I'll check and see what was admitted.  But I know 80

17:39:57  16  that's the contraband and the photographs, they

17:40:00  17  certainly were admitted.

17:40:02  18       MS. LAKE:  86 is the video.

17:40:05  19       THE COURT:  Yes, yes.  If it's admitted, it's

17:40:07  20  going with them.  I was just clarifying that phone calls

17:40:10  21  they have will be 55 through 75.

17:40:13  22       MS. LAKE:  Very good, Your Honor.

17:40:14  23       THE COURT:  They were here for those other

17:40:16  24  exhibits, so they're aware.

17:40:17  25       All right.  This is the redacted indictment that's

17:40:19  1    going back.  We'll go to the first page of substantive

17:40:24  2    information.  Any issues with that?

17:40:32  3              MS. LAKE:  No, Your Honor.

17:40:32  4              THE COURT:  Attorney Mingolla?

17:40:37  5              MR. MINGOLLA:  Forgive me, Judge.

17:40:39  6              THE COURT:  That's the redacted indictment

17:40:41  7    that's going back to the jury.  Any issues with that

17:40:43  8    page?  That's Count 37.

17:40:45  9              MR. MINGOLLA:  Yes, Judge.

17:40:46  10             THE COURT:  You have an issue?  Or you have no.

17:40:50  11             MR. MINGOLLA:  I'm sorry, I'm sorry.  Forgive

17:40:52  12   me.  I object to it going back to the jury, yes.

17:40:55  13             THE COURT:  Oh, you object to the indictment

17:40:58  14   going back to the jury?

17:40:59  15             MR. MINGOLLA:  Yes.

17:40:59  16             THE COURT:  Some form of the indictment will be

17:41:02  17   going back to the jury.  So that's been redacted.  Do

17:41:05  18   you object to that redaction?

17:41:07  19       I know you object generally to the indictment going

17:41:12  20   back, but your objection is noted.  But the indictment

17:41:15  21   will be going back in a redacted form.  Do you object to

17:41:18  22   this form going back?  This is without prejudice to your

17:41:22  23   objection.

17:41:26  24             MR. MINGOLLA:  And this form is from the

17:41:27  25   indictment?

17:41:28    1              THE COURT:  This is in the indictment.  What's

17:41:29    2    removed are references -- statutory references and names

17:41:32    3    of others who are not being considered by this jury.

17:41:42    4              MR. MINGOLLA:  I still would object, Your

17:41:44    5    Honor.

17:41:44    6              THE COURT:  All right.  Turn to the next page.

17:41:51    7        Any objection from the government?

17:41:52    8              MS. LAKE:  No, Your Honor.

17:41:59    9              THE COURT:  And I know you generally object,

17:42:01   10    Attorney Mingolla.  Any -- any input you wish to offer

17:42:04   11    with respect to the redacted version that's going back?

17:42:10   12              MR. MINGOLLA:  No, no, Your Honor.

17:42:18   13              THE COURT:  And then the final Count 42.

17:42:21   14              MS. LAKE:  No objection, Your Honor.

17:42:23   15              THE COURT:  Attorney Mingolla?

17:42:24   16              MR. MINGOLLA:  I don't believe that that's in

17:42:26   17    evidence, Judge.  We never -- 54, I don't believe, was

17:42:32   18    ever admitted into evidence.

17:42:35   19              THE COURT:  That's the indictment, not an

17:42:37   20    exhibit.  That's Count 42.

17:42:42   21              MR. MINGOLLA:  Strike that.

17:43:12   22        So yes, I will object to that as well, Judge.

17:43:14   23              THE COURT:  All right.  Here is the final page.

17:43:18   24              MS. LAKE:  No objection, Judge.

17:43:25   25              THE COURT:  Attorney Mingolla, any objection?

17:43:28  1    That's the final page.

17:43:30  2         MR. MINGOLLA:  This call, to the best of my

17:43:32  3    knowledge, is not in evidence.

17:43:36  4         THE COURT:  Okay.  All right.  I note your

17:43:41  5    input.  All right.  That's the indictment that will be

17:43:46  6    sent back to the jury when they deliberate.

17:43:49  7       All right.  We have counsel here for Mr. Brown, is

17:43:57  8    that right?  Attorney Watlington, you're here with your

17:43:59  9    client?

17:43:59  10        MR. WATLINGTON:  Yes, sir, Your Honor.

17:44:01  11        THE COURT:  All right.  The jury is

17:44:02  12   deliberating.  They'll be in Courtroom 3.  And the B

17:44:06  13   panel will be in Courtroom B -- or deliberation room for

17:44:11  14   Courtroom B -- no, the B panel will be in Courtroom 1,

17:44:15  15   and deliberation for Courtroom 1, that's this courtroom.

17:44:18  16      The seven-minute rule is in effect.  So make sure

17:44:21  17   Ms. Brann has your contact information.  You need to be

17:44:26  18   in -- be, one, reachable by Ms. Brann at all times, and

17:44:32  19   two, to the extent she reaches you, you need to be in

17:44:34  20   the courtroom within seven minutes of her call.

17:44:40  21      So any questions?  Attorney Lake?

17:44:42  22        MS. LAKE:  No.

17:44:43  23        THE COURT:  Anything we need to cover, Attorney

17:44:46  24   Mingolla?

17:44:46  25        MR. MINGOLLA:  No, Your Honor.

17:44:47  1           THE COURT:  Attorney Watlington?

17:44:49  2           MR. WATLINGTON:  Yes, Your Honor.  Is the gate

17:44:53  3  going to be locked?  That's number one.

17:44:56  4      And number two, how long or how late is the Court

17:45:00  5  anticipating we'll be here tonight, if in fact we don't

17:45:03  6  have a verdict, let's say, within the next two hours?

17:45:05  7           THE COURT:  I don't think we'll be here very

17:45:07  8  late tonight.  We will not be here late tonight.

17:45:11  9  Usually we peg these things with the jury.  If the jury

17:45:15  10  wants to work a little bit longer, then they'll work a

17:45:18  11  little bit longer.  Once they let us know they're ready

17:45:24  12  to go, then we go.

17:45:26  13      So in any event, this will not be a late night.

17:45:30  14  You said two hours; assuredly not that long, not that

17:45:34  15  long.

17:45:34  16      And with access to the courthouse, I'm sure the

17:45:36  17  U.S. marshals will let you know about that.  This

17:45:39  18  happens from time to time.  So I think they will let you

17:45:45  19  know what the normal course is.  But access is never

17:45:49  20  denied.

17:45:50  21           MR. WATLINGTON:  I just ask Ms. Brann if she

17:45:53  22  has my number.

17:45:55  23           THE COURT:  You can deal with that.

17:45:57  24           MR. WATLINGTON:  All right.

17:45:57  25           THE COURT:  All right.  Thank you, counsel.

17:45:59  1          (Court in recess, 5:45 p.m.)

18:10:27  2          (After recess, 6:10 p.m., Jury present.)

18:10:27  3              THE COURT:  All right.  Good evening, ladies

18:10:28  4      and gentlemen.

18:10:28  5          I know you've been working hard, and I know there's

18:10:32  6      been a technical glitch.  I don't know if it has been

18:10:36  7      resolved -- it hasn't been resolved.

18:10:38  8          All right.  We'll make sure it is resolved before

18:10:41  9      you resume tomorrow.  Assuredly it will be resolved.

18:10:47  10         I understand you're also ready to get a little

18:10:53  11     energy and refresh for tomorrow.  So what we'll do is

18:10:56  12     allow you to go home tonight and we will resume tomorrow

18:11:00  13     morning.  You should be here at 8:45 a.m., so you can

18:11:03  14     come down right to this courtroom.  You'll be directed

18:11:05  15     where you need to go to, and then begin your

18:11:08  16     deliberations.  At 8:45 you should all be here so you

18:11:11  17     can put in your lunch order, so you can make sure you're

18:11:14  18     fed for the day.  And everything will be working, I

18:11:19  19     assure you by then.  I apologize for any inconvenience.

18:11:22  20         Let me give some instructions before you leave for

18:11:25  21     the evening.

18:11:25  22         First of all, do not make any investigation, make

18:11:32  23     any sort of inquiries about the matters you heard in

18:11:35  24     this case.  It's important that you not do so especially

18:11:38  25     at this stage.  You have all the evidence.  You have the

| | | |
|---|---|---|
| 18:11:40 | 1 | law.  You're in the stage of deliberation. |
| 18:11:41 | 2 | It is very important that what you do concerning |
| 18:11:44 | 3 | this case occurs in that deliberation room with the |
| 18:11:48 | 4 | evidence and with your knowledge of the law, not what |
| 18:11:50 | 5 | you may hear or discuss outside of this courtroom. |
| 18:11:55 | 6 | There might be invitations to discuss this case, |
| 18:11:59 | 7 | inquiries.  There might be an urge on your part.  You |
| 18:12:05 | 8 | need to resist that urge, that temptation and |
| 18:12:07 | 9 | inclination. |
| 18:12:08 | 10 | Keep an open mind.  Deliberation has not yet |
| 18:12:12 | 11 | concluded, obviously. |
| 18:12:13 | 12 | You need to consider the evidence.  If anyone |
| 18:12:17 | 13 | attempts to discuss this case with you, bring it to the |
| 18:12:20 | 14 | Court's attention very promptly.  We take very seriously |
| 18:12:25 | 15 | here, you're only to discuss the case here in the |
| 18:12:27 | 16 | deliberation room. |
| 18:12:27 | 17 | With that, let me wish you a pleasant evening.  I |
| 18:12:30 | 18 | will see you tomorrow morning.  Actually, you don't need |
| 18:12:33 | 19 | to see me before you start your deliberation.  Just head |
| 18:12:36 | 20 | right to the deliberation room. |
| 18:13:07 | 21 | (Jury not present) |
| 18:13:08 | 22 | THE COURT:  All right.  Counsel.  Let's make |
| 18:13:11 | 23 | sure that you're here at 8:45.  The seven-minute rule |
| 18:13:18 | 24 | will go into effect at 8:45 a.m. tomorrow and we'll let |
| 18:13:23 | 25 | you know when lunch is.  We generally suspend the rule |

18:13:26   1   for lunch for 45 minutes.

18:13:29   2        All right.  Anything we need to cover before we

18:13:31   3   adjourn for the evening?

18:13:33   4        Attorney Lake?

18:13:33   5           MS. LAKE:  No, Your Honor.

18:13:34   6           THE COURT:  Attorney Watlington?

18:13:36   7           MR. WATLINGTON:  Yes, Judge.  You're saying we

18:13:39   8   should report here at 8:45, or you just want to make

18:13:42   9   sure we're seven minutes at 8:45?

18:13:49   10          THE COURT:  The seven-minute rule is in effect

18:13:52   11   at 8:45.  So make sure Mrs. Brann has your information,

18:13:55   12   if she doesn't have it, and you're incommunicado.  But

18:13:58   13   she has to reach you with whatever you provide for her.

18:14:01   14   If she can't reach you, it's not her responsibility.

18:14:04   15   It's your responsibility.  So just make sure you're

18:14:06   16   accessible.  It's the seven-minute rule and that's

18:14:09   17   designed so we don't keep the jury waiting.  By the time

18:14:13   18   we get the note and get you here, they've been waiting a

18:14:16   19   while for an answer.

18:14:17   20        All right.  Anything else, Attorney Watlington?

18:14:21   21          MR. WATLINGTON:  No, Your Honor.

18:14:37   22          THE COURT:  All right.  Very good.  Have a good

18:14:40   23   evening, Counsel.

18:46:29   24        (Court in recess, 6:14 p.m.)

18:46:29   25        (After recess, 6:46 p.m., jury present.)

18:46:29  1            THE COURT:  Good evening, ladies and gentlemen.

18:46:29  2    I know you've been working hard and I know it's time to

18:46:29  3    get some energy and fuel, so I'm going to send you home

18:46:29  4    for the evening, and remind you that we will start

18:46:29  5    tomorrow at 8:45.  So be here at 8:45 so you could put

18:46:29  6    in your lunch order.

18:46:29  7         You don't need to come to Court.  You go straight

18:46:29  8    to the deliberation room.  Put in your lunch order and

18:46:29  9    start deliberating.

18:46:29 10         With that, let me give you some instructions.

18:46:29 11         You have a lot of information now.  You have all

18:46:29 12    the evidence in the case.  You have the arguments.  You

18:46:29 13    have my instructions on the law.

18:46:29 14         Do not discuss the case with anyone.  The time to

18:46:29 15    discuss the case is when you're here in the deliberation

18:46:29 16    room.

18:46:29 17         Do not do any investigation, make any inquiries on

18:46:29 18    your own.  You are not to consider items outside.  Don't

18:46:29 19    Google something.  Don't search for anything.  Don't do

18:46:29 20    any independent investigation.  Consider only what came

18:46:29 21    in through the witness stand and what was admitted into

18:46:29 22    evidence.  Keep an open mind until you get into your

18:46:29 23    deliberations and conclude your deliberations.

18:46:29 24         You needn't fix on one thing, but just keep an open

18:46:29 25    mind.

18:46:29  1            And I think with that I'll wish you a pleasant

18:46:29  2      evening, and I'll see you in the morning.  I don't need

18:46:29  3      to see you, but when we do meet we'll meet in the

18:46:29  4      morning.

18:46:29  5            (Jury out)

18:46:39  6            THE COURT:  All right.  Counsel, the

18:46:42  7      seven-minute rule will go into effect at 8:45 a.m.

18:46:44  8      tomorrow morning.

18:46:45  9            We usually suspend it for lunch for 45 minutes.

18:46:48  10     We'll let you know when that is.  Make sure Mrs. Brann

18:46:52  11     has all your contact information.  If she can't reach

18:46:55  12     you because you're inaccessible, that's on you, not on

18:46:58  13     her.  So make sure you give her contacts that work.  If

18:47:01  14     they don't work, you're not accessible, then you need to

18:47:05  15     be here.  But she'll give you 7 minutes lead time.

18:47:07  16           All right.  Thank you, Counsel.  Have a pleasant

18:47:09  17     evening.

          18           (Court in recess, 6:47 p.m.)

          19                           ---

          20

          21

          22

          23

          24

          25

1

2                          CERTIFICATE

3

4              This document is hereby certified

5              to be a true and accurate transcript

6                 of the foregoing proceedings.

7

8        /s_____        September 10, 2014
                 Chandra Kean, RMR              DATE
9              Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25